CASE NO. 24-2051 (L)

IN THE
# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROCKWELL MINING, LLC and
BLACKHAWK LAND AND RESOURCES, LLC

*Plaintiffs-Appellees*

v.

POCAHONTAS LAND LLC

*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

---

| SUPPLEMENTAL JOINT APPENDIX |
| VOLUME I OF II |
| Pages: 1 - 338 |

---

J. Thomas Lane
J. Mark Adkins
Gabriele Wohl
Zachary J. Rosencrance
**BOWLES RICE LLP**
600 Quarrier Street (25301)
Post Office Box 1386
Charleston, West Virginia 25325-1386
(304) 341-1100
Fax: (303) 347-1746
tlane@bowlesrice.com
madkins@bowlesrice.com
gwohl@bowlesrice.com
zrosencrance@bowlesrice.com

*Counsel for Defendant-Appellant
Pocahontas Land LLC*

Brian A. Glasser
Laura E. Babiak
**BAILEY & GLASSER, LLP**
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555
bglasser@baileyglasser.com
lbabiak@baileyglasser.com

Benjamin A. Schwartzman
**BAILEY & GLASSER, LLP**
950 W. Bannock Street, Suite 940
Boise, Idaho 83702
(208) 342-4411
bschwartzman@baileyglasser.com

*Counsel for Plaintiffs-Appellees
Rockwell Mining, LLC and
Blackhawk Land and Resources, LLC*

## SUPPLEMENTAL JOINT APPENDIX TABLE OF CONTENTS
## VOLUME I OF II

Declaration of Laura Babiak in Support of Plaintiffs' Memorandum in Support of Plaintiffs'

Motion for Summary Judgment…...…………………………….……………SA000001

Exhibit A – 1937 Lease………………………….…….……………….……… SA000006

Exhibit B – 2015 Consent and Amendment Agreement……………...…………..……… SA000027

Exhibit C– Greg Wooten's Deposition Transcript Excerpts…….…………………….. SA000043

Exhibit D – Mark Ferguson's Rebuttal Expert Report………………………………. SA000054

Exhibit E – Dr. John Craynon's Expert Report……………………………..……… SA000069

Exhibit F – Dr. John Craynon's Rebuttal Expert Report………………………………. SA000087

Exhibit G – Seth Shwartz's Deposition Transcript Excerpts…….…………….……..…. SA000089

Exhibit H – Dr. Frank Scott's Deposition Transcript Excerpts………………………… SA000102

Exhibit I – Jesse Parrish's Affidavit…………………….…………………………. SA000113

Exhibit J – Dr. Frank Scott's Rebuttal Expert Report…………………….……………. SA000119

Exhibit K – Seth Schwartz's Rebuttal Expert Report………………………………. SA000122

Exhibit L – Dr. Frank Scott's Expert Report…….…………………..………………. SA000128

Exhibit M – Docket No. 455 Filed in *In re Patriot Coal Corp., et al*., 69

(Bankr. No. 12-51502-E.D. Mo. 2012)……………….……………………. SA000157

Exhibit N – Docket No. 456 Filed in *In re Patriot Coal Corp., et al.*,

No. 12-51502-69 (Bankr. E.D. Mo. 2012)…………………...……..……… SA000161

Exhibit O – Docket No. 5169, the Confirmation Order filed in *In re Patriot Coal Corp., et al.*,

No. 12-51502-69 (Bankr. E.D. Mo. 2012)………………………..……..……… SA000167

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**ROCKWELL MINING, LLC and
BLACKHAWK LAND AND RESOURCES, LLC,**

       **Plaintiffs,**

**v.**                           **CIVIL ACTION NO. 2:20-cv-00487**

**POCAHONTAS LAND LLC,**

       **Defendant.**

**DECLARATION OF LAURA BABIAK IN SUPPORT OF
PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

I, Laura Babiak, depose and state as follows:

1.      I am an attorney licensed to practice in West Virginia. I represent Plaintiffs Rockwell Mining, LLC and Blackhawk Land and Resources, LLC in the above-captioned matter.

2.      Attached as Exhibit A is a true and correct copy of the Lease between Loup Creek Colliery Company and the Koppers Coal Co. dated July 1, 1937 ("1937 Lease").

3.      Attached as Exhibit B is a true and correct copy of the Consent and Amendment Agreement between Pocahontas Land Corporation; Rockwell Mining, LLC; and Blackhawk Land and Resources, LLC dated December 21, 2015.

4.      Attached as Exhibit C is a true and correct copy of excerpts from Greg Wooten's deposition transcript.

5.      Attached as Exhibit D is a true and correct copy of Mark Ferguson's rebuttal expert report.

6.      Attached as Exhibit E is a true and correct copy of Dr. John Craynon's expert report.

7.     Attached as Exhibit F is a true and correct copy of Dr. John Craynon's rebuttal expert report.

8.     Attached as Exhibit G is a true and correct copy of excerpts from Seth Schwartz's deposition transcript.

9.     Attached as Exhibit H is a true and correct copy of excerpts from Dr. Frank Scott's deposition transcript.

10.    Attached as Exhibit I is a true and correct copy of Jesse Parrish's affidavit.

11.    Attached as Exhibit J is a true and correct copy of Dr. Frank Scott's rebuttal expert report.

12.    Attached as Exhibit K is a true and correct copy of Seth Schwartz's rebuttal expert report.

13.    Attached as Exhibit L is a true and correct copy of Dr. Frank Scott's expert report.

14.    Attached as Exhibit M is a true and correct copy of Docket No. 455 filed in *In re Patriot Coal Corp., et al.*, No. 12–51502–659 (Bankr. E.D. Mo. 2012).

15.    Attached as Exhibit N is a true and correct copy of Docket No. 456 filed in *In re Patriot Coal Corp., et al.*, No. 12–51502–659 (Bankr. E.D. Mo. 2012).

16.    Attached as Exhibit O is a true and correct copy of Docket No. 5169, the Confirmation Order filed in *In re Patriot Coal Corp., et al.*, No. 12–51502–659 (Bankr. E.D. Mo. 2013).

17.    Attached as Exhibit P is a true and correct copy of Docket No. 1615, the Confirmation Order filed in *In re Patriot Coal Corp., et al.*, No. 15–32450 (Bankr. E.D. Va. 2015).

18.     Attached as Exhibit Q is a true and correct copy of Docket No. 771 filed in *In re Patriot Coal Corp., et al.*, No. 15–32450 (Bankr. E.D. Va. 2015).

19.     Attached as Exhibit R is a true and correct copy of Docket No. 1476 filed in *In re Patriot Coal Corp., et al.*, No. 15–32450 (Bankr. E.D. Va. 2015).

20.     Attached as Exhibit S is a true and correct copy of the Sub-Sublease between Blackhawk Land and Resources and Coronado Coal II dated December 21, 2015.

21.     Attached as Exhibit T is a true and correct copy of the Acknowledgement of the Sub-Sublease between Blackhawk Land and Resources and Coronado Coal II.

22.     Attached as Exhibit U is a true and correct copy of the Assignment of the 1937 Lease from Eastern Associated Coal, LLC, as a subsidiary of Patriot Coal Corporation at the time of Patriot Coal Corporation's 2015 bankruptcy, to Rockwell Mining, LLC dated October 26, 2015.

23.     Attached as Exhibit V is a true and correct copy of the Assignment of the 1937 Lease from The Koppers Coal Co. to Eastern Gas and Fuel Associated dated December 9, 1941.

24.     Attached as Exhibit W is a true and correct copy of the Assignment of the 1937 Lease from Eastern Gas and Fuel Associates to Eastern Associated Coal Corporation dated January 1, 1966.

25.     Attached as Exhibit X is a true and correct copy of the leasehold credit line deed of trust between Rockwell Mining, LLC and Cantor Fitzgerald Securities dated January 22, 2020, filed in Boone County, West Virginia. The same deed of trust was also filed in Wyoming County, West Virginia.

26.     Attached as Exhibit Y is a true and correct copy of the leasehold credit line deed of trust between Rockwell Mining, LLC and Midcap Funding IV Trust dated January 22, 2020, filed in Boone County, West Virginia. The same deed of trust was also filed in Wyoming County, West Virginia.

27.     Attached as Exhibit Z is a true and correct copy of a summary of Plaintiffs' royalty payments made to Defendant and accepted by Defendant since June 1, 2020.

I declare under the penalties of perjury on this 22nd day of November 2021 that the foregoing is correct and true.

Dated: November 22, 2021                           Respectfully submitted,

_____
Laura E. Babiak (WVSB # 13581)
lbabiak@baileyglasser.com
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**ROCKWELL MINING, LLC and
BLACKHAWK LAND AND RESOURCES, LLC,**

  **Plaintiffs,**

**v.**                                              **CIVIL ACTION NO. 2:20-cv-00487**

**POCAHONTAS LAND LLC,**

  **Defendant.**

**<u>CERTIFICATE OF SERVICE</u>**

I, undersigned counsel, do hereby certify that the foregoing **Declaration of Laura Babiak in Support of Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment** was served upon counsel of record this 22nd day of November 2021, through the CM/ECF System, which will send notification to all counsel registered in the system.

_____
Laura Babiak (WVSB #13581)

# EXHIBIT A

THIS INDENTURE OF LEASE,

Made in duplicate original this 1st day of July, 1937, between the LOUP CREEK COLLIERY COMPANY, a corporation organized and existing under and by virtue of the laws of the State of West Virginia, of the first part, hereinafter called the Lessor, and THE KOPPERS COAL COMPANY, a corporation organized and existing under the laws of the State of Delaware, of the second part, hereinafter called the Lessee.

WITNESSETH:

That pursuant to a certain preliminary letter dated January 27th, 1937, addressed to the Lessor by the Lessee and approved by the Lessor, and for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid by the Lessee to the Lessor, the receipt whereof is hereby acknowledged, and of the terms, conditions and stipulations hereinafter set forth to be performed and observed by the Lessee, the Lessor does hereby let, demise and lease to the Lessee for the purpose of mining coal and making coke for and until such time as all the merchantable coal shall have been mined and removed, but not for any period exceeding twenty (20) years from the date hereof, that certain tract or parcel of land situate, lying and being in the Counties of Wyoming and Boone, in the State of West Virginia, and bounded and described as follows:

Beginning at a stone at United States Coast and Geodetic Survey Triangulation Station No. 328 on top of Ivy Knob of Guyandot Mountain (being Corner No. 5 referred to in deed from Pocahontas Coal and Coke Company to the Loup Creek Colliery Company, dated May 27, 1937, and duly recorded in County Court Clerks Offices of said Counties,) said corner being on the dividing line between Raleigh and Wyoming Counties, West Virginia; thence in a general _____ following the top of said Guyandot Mountain 6427.5 feet to an old ____ at the head of Big Branch of Crane Fork of Clear Fork of Guyandot ____ (being Corner No. 4 referred to in said Pocahontas deed); thence leaving the ____ acquired by the Loup Creek Colliery Company under said Pocahontas ____

BLACKHAWK000001

Doc. Kt 3
(102)

Pardee Land Company to the Loup Creek Colliery Company about 2900 feet
to a point near the junction of Walnut Gap Mountain with Cherry Pond Mountain,
said point being in the boundary line between the lands of the Loup Creek
Colliery Company and the Jacob Pettry "22 acres" Grant known as R-D Tract No.
61; thence with said boundary lines of R-D Tract No. 61 as follows: S 25°
57' W 1000.1 feet to a dead chestnut; S 87° 26' W 264.7 feet to a stone; N
25° 51' W to a stake on top of Walnut Gap Mountain (being Corner No. 30 re-
ferred to in said Pocahontas deed); thence leaving said Walnut Gap Mountain
and with the boundary line of said R-D Tract No. 61, N 8° 34' W 1387.1 feet
to a point on top of Cherry Pond Mountain in the dividing line between Raleigh
and Boone Counties, said point being situate N 51° 45' W 13.0 feet from a dry
spring known as the "Indian Spring"; thence in a general northerly direction
with the top of said Cherry Pond Mountain and along the dividing line between
Raleigh and Boone Counties about 9060.8 feet to a tack in root of large
sugar in the boundary line between the lands of the Loup Creek Colliery Com-
pany and the Jacob Pettry "30 acres" Grant, known as R-D Tract No. 60 (being
Corner No. 31 referred to in said Pocahontas deed); thence leaving the top of
said Cherry Pond Mountain and with the boundary line of said R-D Tract No.
60 N 12° 45' W 2044.2 feet to a stone on top of said Cherry Pond Mountain
(being Corner No. 32 referred to in said Pocahontas deed); thence leaving
said Cherry Pond Mountain and running with the protracted line about S 59°
W 8300 feet more or less to the confluence of Pond Fork and Rich Branch of
same; thence down the center of said Pond Fork in a westerly direction about
11,200 feet to a point where said Pond Fork intersects the boundary line be-
tween the lands of the Wharton Estate and the Loup Creek Colliery Company
(acquired under said Pocahontas Deed), said intersection point being situate
S 8° 01' E about 8080 feet from the remains of two chestnut stumps 14 feet
apart ( or from Corner No. 36 referred to in said Pocahontas deed); thence
S 8° 01' E along said boundary line about 6409.3 feet to a large chestnut
stake in the center of Left Hand Fork of Skin Fork (being Corner No. 37 re-
ferred to in said Pocahontas deed); thence running up said Left Hand Fork

        BLACKHAWK000002

and along said boundary line 1821.5 feet to a stake at the mouth of a
branch flowing in from the left; thence running up said branch and along
said boundary line 1600.8 feet to two hickories marked for corner on top
of the divide between Lacy Fork and  Skin Fork; thence in a southerly di-
rection along said boundary line and with the top of said divide about
5185.5 feet to a sugar on top of Walnut Gap Mountain and in the dividing line
between between Boone and Wyoming Counties (being Corner No. 38 referred to
in said Pocahontas deed); thence in a southerly direction along said boundary
line and leaving said divide and running with the top of said Walnut Gap Moun-
tain in the dividing line between said Counties 2459 feet to a chestnut oak
by a large rock; thence leaving said Walnut Gap Mountain and running with a
protracted line about S 30° W 4700 feet more or less to a point on the head-
waters of Chestnut Branch of Toney Fork of Clear Fork where the Southern out-
crop of the Eagle seam on the lands acquired under said Pocahontas deed passes
under said Chestnut Branch; thence in a general southwesterly direction fol-
lowing the outcrop of said Eagle seam 21,200 feet more or less to a stone in
the boundary line between the lands of the Loup Creek Colliery Company and the
David Cook "71 acres" Grant known as R-D Tract No. 34, said stone being situate
S 24° 17' W 2219.8 feet from a stone at two large beech stumps; thence with
the boundary line of said R-D Tract No. 34 N 24° 17' E 2219.8 feet to a stone
at two large beech stumps (being Corner No. 27 referred to in said Pocahontas
deed); thence in part with the boundary line of said R-D Tract No. 34 S 37°
50' E 1306.4 feet to a point in the boundary line between the lands of the
Loup Creek Colliery Company and the Thomas Cook "75 acres" Grant, known as
R-D Tract No. 36; thence with the boundary line of said R-D Tract No. 36 N
31° 55' E 5731.2 feet to a stone, said stone being situate S 36° 16' W 572.1
feet from a stone (being Corner No. 28 referred to in said Pocahontas deed);
thence S 55° 14' E 370.6 feet to a stake; thence S 31° 46' W 358.1 feet to a
point in the south line of the Beckley Location of the Rutter and Etting Sur-
vey (being Corner No. 17 referred to in said Pocahontas deed); thence leaving

-5-

BLACKHAWK000003

said R-D Tract No. 36 and running with the said south line of the Rutter
and Etting Survey as follows: N 89° 52' E 45.7 feet to a stone (gone); due
East 1245.0 feet to the remains of a large chestnut oak stump on a point
(being the "91/2 Mile Tree" of the Rutter and Etting Survey); thence S 87°
50' E 9701.0 feet to a point in the boundary line of the John Canterbury
"105 acres" Grant, known as R-D Tract No. 41, said point being situate N
32° 45' W 170.6 feet from a stone (said stone being Corner No. 22 referred
to in said Pocahontas deed); thence with said boundary lines of R-D Tract
No. 41 as follows: N 32° 24' W 293.0 feet to a stone; N 74° 20' E 736.8 feet
to a stone; N 5° 04' W 354.5 feet to a stake; N 84° 04' E 604.3 feet to a
hickory; N 26° 25' E 259.6 feet to a white oak in the boundary line of the
W. Brooks "89 acres" Grant known as R-D Tract No. 42; thence with the boundary
lines of said R-D Tract No. 42 as follows: N 76° 56' W 36.8 feet to a stake;
N 17° 17' W 792.6 feet to a stone; N 13° 59' E 1382.6 feet to a stake; N 47°
40' E 400 feet more or less to an intersection with the northern outcrop of
the Eagle Seam; thence along the said northern outcrop of the Eagle Seam
and running in a general northeasterly direction about 21,500 feet to a point
where said outcrop goes under cover on the headwaters of Crane Fork of Clear
Fork of Guyandot River; thence leaving said outcrop and running with a pro-
tracted line about N 60° E 6100 feet more or less to the point of beginning;
said tract or parcel of land containing a net area of Loup Creek Colliery's
property of approximately 10,000 acres and outlined in red on map attached
hereto as a part hereof, entitled:

"Map showing boundary of lands
containing approximately 10,000 acres
Leased from
Loup Creek Colliery Co.
to
The Koppers Coal Co.
in
Wyoming and Boone Counties, W. Va.
Scale: 1"=1000'    June 17, 1937

Revised July 1, 1937."

-4-

The above described area is subject to the following reservations:

1. The surface of that certain parcel of land, not owned by the Loup Creek Colliery Company, situate in Boone County on Pond Fork, containing 8.77 acres, more or less, and being the parcel of land referred to as No. 3-R15 in said Pocahontas deed, and being shown in yellow on said map hereto attached.

2. The 4.70 acre fee tract, not owned by the Loup Creek Colliery Company, situate in Wyoming County on Toney Fork, and being shown in brown on said map.

3. The 9.41 acre fee tract, not owned by the Loup Creek Colliery Company, situate in Wyoming County on Toney Fork, and being shown in brown on said map.

**Surface Rights.**
Also the right and privilege of using so much of the surface of the above described tracts or parcels of land owned by the Lessor and of the stone, sand and water thereon, as may be necessary for operations under this lease, including the erection of buildings, coke ovens, and other improvements, for the purposes of this lease, but for no other purpose.

**Right to use certain timber for mining Operations.**
The Lessee shall have the right and privilege of cutting and using, for mining purposes on the leased premises and during the life of this lease for and in connection with its mining operations thereon, but for no other purposes, any and all timber upon the demised premises, except walnut, poplar and line trees.

**Reservations.**
EXCEPTING AND RESERVING to the Lessor and its assigns the entire ownership and control of the said tract or parcel of land and the coal, timber, oil, gas and other minerals and products therein and thereon for all other purposes; the right to sell, or otherwise dispose of, any of the surface not necessary for the purposes or protection of the Lessee hereunder; provided that, in any such sale the right, if any, of the Lessee to use the timber for the purposes aforesaid shall be protected, according to the right hereinbefore given it;

**Railroad Rights of Way**
also, excepting and reserving to the Lessor and its assigns the right to grant and convey from time to time to any and every railroad company, its successors and assigns, so much of the land herein described as may be required by the

**Right to search for oil, etc.**
said railroad company, its successors and assigns, for right of way and other railroad purposes; the right to search for oil or gas, and to extract the

-5-

BLACKHAWK000005

same when found, the right to sink or bore wells for the purpose of dis-
covering and extracting oil or gas; the right to cut, manufacture, use and
remove the timber upon the demised premises, subject to the Lessee's timber
rights hereunder, and to transport the coal and coke from any other lands

**Lessor's Right to Transport Coal, Etc. From Other Lands Over Leased Lands.**

and the timber, oil, gas or other minerals and products from the leased
premises or any other lands as well as materials and goods of all kinds,
over, across, or through the leased premises hereinabove described; the
right to construct and use or authorize the construction and use of such
railroads, tramways, tubing, pipe lines, electric power lines, telegraph and
telephone lines, wagon roads, or other means of transportation, transmission
or right of way as may seem expedient; the right to construct, lay down, and
use the same over, upon, or beneath the surface, as may be necessary or con-
venient; and the right to select and grant rights of way therefor, and also
the right to erect such buildings, structures, machinery and improvements
as may be necessary or convenient for any of the purposes hereinabove set
forth; and any or all of the said rights may be exercised by the said Lessor
or its assigns, or its or their lessees or other agents or attorneys; Pro-
vided, however, that due regard shall always be had for the requirements,
convenience and safety of the operations under this lease, and that the
Lessee hereunder shall be properly compensated for any actual damage accruing
to it in the exercise of the rights reserved hereby; and, provided, further,
if any dispute arises between the Lessor and the Lessee with reference to the
exercise of the rights hereby reserved by the Lessor, the same shall be
settled by arbitration in the manner provided in Article Twenty hereinafter
set out.

This indenture of lease is subject to the following conditions, which
the Lessee covenants to and with the Lessor  faithfully to perform, viz:

**Railroad Facilities.**

ARTICLE ONE.- The Lessee agrees that the construction by it of any and
all tracks upon the leased premises shall be carried out in such manner as
not to interfere with the proper extension by the Lessor or by The Virginian

-6-

BLACKHAWK000006

Railway Company in the future of other mine or spur tracks that may be
necessary to reach other lands beyond the point of junction with tracks
of the Lessee.

Development.

ARTICLE TWO.- That the Lessee shall and will commence work upon, and
prosecute with reasonable diligence, construction operations within sixty
(60) days after the main track of The Virginian Railway Company is available
at a tipple site promptly to be so selected by Lessee that it can be reached
by main track of such curvatures and grades as are ordinarily used in similar
operations, and shall commence work and energetically mine and ship coal as
soon as practicable thereafter, and shall and will at all times during the
operation of this lease energetically open, develop, and keep up its mining
operations on the leased premises in order that, so long as fair prices are
obtainable, its capacity for shipment shall be sufficient to meet the demands
of the market to the fullest extent therefrom.

Royalties
and
Weights.

ARTICLE THREE.- The Lessee shall pay to the Lessor, its successors or
assigns, for the period between July 1, 1937, and the beginning of the first
yearly period fixed by ARTICLE FOUR hereof as rent, a royalty of ten (10)
cents a ton, based on tons of two thousand (2,000) pounds of coal mined or
shipped during such period; and, thereafter, the Lessee shall pay to the
Lessor, its successors or assigns, during the continuance of this lease, as
rent, the following royalties, based on tons of two thousand (2,000) pounds of
coal mined or shipped during each yearly period as fixed by said ARTICLE FOUR,
as per the following table:

| | |
|---|---|
| 1st 500,000 tons in any year Ten | (10) cents per ton. |
| 2nd 500,000 tons in any year Nine | ( 9) cents per ton. |
| 3rd 500,000 tons in any year Eight | ( 8 ) cents per ton. |
| 4th 500,000 tons in any year Seven | ( 7) cents per ton. |

and all tons mined or shipped in any year in excess of two million (2,000,000)
tons seven (7) cents per ton, except that if coke is manufactured on the
premises from coal mined thereon, for simplicity, the tons of coke shipped
may be multiplied by one and six-tenths (1.6) to determine the number of tons

-7-

BLACKHAWK000007

of coal mined and the whole consolidated with the tons of coal shipped and the royalty worked out in accordance with the above table of rates, and except that for coal used on the said premises by the Lessee in its coal mining operations hereunder, or furnished by the Lessee to its employees for their own use, the Lessee may make a monthly payment equal to One Dollar and twenty five cents ($1.25) for every one thousand (1,000) net tons of coal mined and shipped, or manufactured into coke during the preceding month. The above rents shall be paid and accounted for monthly on the twenty-fifth (25th) day of each calendar month for the calendar month immediately preceding. The Lessee shall furnish to the Lessor, its agents or attorneys, on or before the twentieth (20th) day of each calendar month the certificates of the weighmaster, or the proper officer of the Virginian Railway Company or other railway company, showing the quantity of coal or coke taken or made under this lease and shipped over the said railroad during the preceding calendar month; and if any coal or coke shall be taken away from or used upon the said land and not weighed upon the scales of the said Company, or other railroad company, the quantity or equivalent value as hereinabove provided shall be ascertained and an account shall be rendered of the same. The Lessee shall conform to any and all other reasonable requirements of the Lessor to insure the accurate ascertainment of the weight of all coal and coke taken or shipped from the premises hereby leased.

**When rents to be paid**

**Certificates of weights to be furnished**

ARTICLE FOUR.- The Lessee shall pay to the Lessor as a minimum rental under this Lease, whether the quantity of coal mined and coke manufactured in any month of the respective years shall produce that amount of rental or not, at least the sum of Twenty-five Thousand ($25,000.00) Dollars for the year of this lease, beginning on the first day of the third calendar month after that in which the main track shall have been completed to the tipple site as provided in Article Two at least the sum of Seventy-five Thousand ($75,000.00) Dollars for the next succeeding year of this lease, and at least the sum of

**Minimum Rental.**

-8-

          BLACKHAWK000008

One Hundred Thousand ($100,000.00) Dollars for each subsequent year thereafter of this lease, and at that rate for any portion of a year that may occur at the expiration of this lease. The said minimum rental shall be payable monthly, in equal installments, on the 25th day of each calendar month for the calendar month immediately preceding. Payment of any amount necessary to complete the minimum rental for any month shall be made on or before the twenty-fifth (25th) day of the next month; but in case the Lessee in any month shall fail to mine enough coal to equal at the rate of royalty aforesaid the minimum royalty paid by it for such month, it shall have the privilege during the remainder of the period of this lease and of any renewal thereof of mining free from royalty such an amount of coal as at the rate of royalty specified above will reimburse it for the deficiency without interest in said preceding month; provided, that no payments in excess of the minimum rental of any one month shall be credited against a deficiency in any subsequent month, and that no coal shall be mined free of royalty in any month until a sufficient amount of coal shall have been mined in such month to amount at the rate of royalty aforesaid to the minimum royalty for such month.

**Accounts.**     ARTICLE FIVE.- And it is further agreed that the Lessee shall keep books of account for the mining and shipping of coal and for the making and shipping of coke, and said books shall be open for the inspection of the Lessor, its agents or attorneys, for the purpose of comparing and verifying the accounts rendered; and that the Lessee shall furnish a daily written report of its shipments of coal, and coke, giving the car numbers and their capacities.

**Seams to be mined.**     ARTICLE SIX.- The Lessee shall have the right to mine any merchantable seam of coal and covenants that in mining any such seam it will mine the same in such a manner as to recover the greatest possible amount of coal therefrom and in such manner that the mining thereof shall not injure or destroy any other vein or seam of coal not mined, or prevent the convenient and proper mining thereof.

-9-

          BLACKHAWK000009

**Manner of Working Mines.**

ARTICLE SEVEN.- The Lessee shall work or mine the coal in tracts or parcels of land hereby leased according to a system and method of mining to be shown by a plan to a scale of five hundred (500) feet to an inch and description thereof, which shall be submitted in triplicate within three months from the date hereof for the Lessor's written approval and acceptance, two copies of the plan and description to be retained by the Lessor. Dimensions of gangways, airways, pillars and width of rooms shall be definitely stated therein, and shall be subject only to such changes and modifications as may be approved in writing by the engineer or other proper officer of the Lessor. And in case of failure on the Lessee's part to comply with the terms and provisions of this condition, any coal lost thereby shall be paid for in the same manner as though actually mined and shipped. The Lessee shall commence work under this lease as hereinbefore provided, and shall work and mine the coal in the most effectual workmanlike and proper manner according to the most approved and suitable methods of modern mining, complying in every respect with laws now existing or hereafter passed by the State of West Virginia, or of the United States, regulating the proper working of mines, by driving tunnels, drifts, slopes, shafts, gangways, and other necessary and appropriate openings to and in the aforesaid veins or seams of coal on the said land, with openings for airways or ventilating passages of sufficient size for keeping the mines in good working order, and the said gangways, drifts and tunnels to be made on a suitable grade, without any unnecessary loss of level for the proper drainage of water and for hauling the coal by railroad out of the said mines.

**Gangways and Airways**

ARTICLE EIGHT.- The Lessee further covenants that it will drive the regular size of gangways and airways through such portions of said veins or seams of coal as may prove faulty or may not yield merchantable coal; provided, however, that if any situation arises under which it would be unreasonable in good mining practice to require such gangways and airways to be so driven through such portions of such seams, then the Lessee may, with the approval in writing of the engineer of the Lessor, drive such gangways

-16-

BLACKHAWK000010

and airways around such portions; and, if the said engineer should refuse to give such approval, the Lessee may require a decision as to how it shall be allowed to drive said gangways and airways by arbitration in the manner provided in Article Twenty hereinafter set out.

The Lessee will leave no more available coal in mining operations or working than may be necessary and proper for their full security, but will leave pillars and supports of coal along the sides of gangways and elsewhere as the engineer or other proper officer of the Lessor shall consider necessary for such security.   The Lessee shall not at any time during the continuance of this lease drive any drift, tunnel, slope, shaft, room or entry within sixty (60) feet of any of the boundary lines of any tracts or parcels of land not owned by Lessor, or within sixty (60) feet of any entry or aircourse of any adjoining lease or operation, on the same vein of coal, except with the written consent of the engineer of the Lessor.

**Questions of Available Coal Left**

ARTICLE NINE.- If the Lessee, on abandoning any room, working or other opening, or when all the rooms in a heading have been completed, shall leave any available coal standing which in the  opinion of the engineer or other proper officer of the Lessor, is not necessary to be  left for the proper security of the works, the said officer shall give the Lessee notice thereof, with directions to remove the same; and if the Lessee shall refuse to mine and take away the said coal according to the directions of the said officer, for the space of ten days after such  notice, then the Lessee shall forthwith submit the question whether the coal left is or is not available and necessary, as aforesaid, to arbitration as in Article Twenty hereof provided, and the arbitrators  shall determine and report whether any, and if any, how much, available and merchantable coal has been  left standing which ought to have been mined and taken away, and unless the Lessee shall immediately mine the said coal, it shall pay to the Lessor within two weeks after such award a sum equal to eight and one half (8-1/2) cents for every ton of two thousand (2,000) pounds of the available and merchantable coal left standing, which,

-11-

BLACKHAWK000011

according to the report of the said arbitrators, or a majority of them, ought to have been mined and taken away.

It is further expressly understood and agreed that the Lessee shall be bound to conserve, as fully as may be practicable, the timber upon the demised premises, to the end that, upon the termination of this lease, the demised premises shall be in as good condition as a timber property as may be consistent with the right of the Lessee to use timber from the demised premises for its purposes under and in accordance with the terms of this lease, but the Lessee shall conduct its timbering operations in a proper and workmanlike manner according to the best principles and practice of forestry, and so as to avoid damage by fire, flood or otherwise and to encourage the growth of young timber to replace that which may be cut from time to time.

**Disposition of Waste Material.**    ARTICLE TEN.- The Lessee shall not deposit surface earth, coal, dirt, slate, rock, or wornout timber from the mines, brushwood, tree trunks or stumps, ashes or any other refuse or waste material whatsoever on any part of the surface of the ground, other than that which from time to time shall be designated for that purpose by the Lessor, and no deposit of surface earth, coal, dirt, slate rock, timbers, brushwood, tree trunks, stumps, ashes or any other refuse or waste material shall be made, suffered, or permitted to be made by the Lessee on the railroad right of way or in any stream of water, or so near thereto that such earth, dirt, ashes or other refuse will be liable to fall or be carried thereon or therein by the action of the elements; and all refuse shall be disposed of according to such reasonable rules and regulations as may be prescribed by the Lessor. Should a question arise with regard to the reasonableness of any such rules or regulations, such question shall be submitted to arbitration in the manner provided in Article Twenty.

**Lessor's Right of Inspection.**    ARTICLE ELEVEN.- The Lessee further covenants that the Lessor, its superintendent, engineers, or other persons on its behalf, with their assistants, shall have the right to enter at all reasonable times the said

-12-

    BLACKHAWK000012

mines and all other works, whether below or on the surface of the ground,
in order to inspect, examine, survey, or measure the same or any part
thereof, or for any other lawful purpose, and for these purposes to use
freely the means of access to the said mines and works without hindrance
or molestation.

**Lessee to Employ Mining Engineer and to furnish Lessor Mine Maps.**

ARTICLE TWELVE.- It is further agreed that the Lessee shall at all
times employ a competent mining engineer, whose duty it shall be to keep
up mine surveys and give directions and courses of entries, rooms and air
courses, and plat the same on a scale of one hundred feet to an inch and
send a map to the engineer or superintendent of the Lessor, on or before the
twentieth days of January and July of each year, of all mine work done dur-
ing the six preceding calendar months, and the engineer or superintendent of
the Lessor shall make the necessary copies, and shall at all times have
access to the maps, plans, tracings, etc., of the Lessee, relating to the
leased premises and Lessee's operations thereon, and may take therefrom copies
of such portions as he may desire.

If the Lessee shall fail to furnish the maps herein provided for
thirty (30) days after demand therefor shall have been made by the engineer
or other officer of the Lessor, the Lessor may at its option employ a com-
petent engineer to make a survey of the mine and plat the same as herein
provided, the expense thereof to be paid by the Lessee, and in case of
failure of the Lessee to make such a payment within thirty (30) days after
demand therefor, the Lessor may at its option cancel and annul this lease.

**Lessee May Move Coal Mined from Other Property Over Premises etc.**

ARTICLE THIRTEEN.- The Lessee shall have the right to move coal from
other properties belonging to and/or operated by it or any subsidiary or
affiliated company through the demised premises, paying to the Lessor for
such privilege the sum of Two Cents (2¢) for each gross ton of coal so moved
through said demised premises, as determined by mine car weight, payments
to be made monthly; provided, however, that the right hereby given shall not

-13-

be exercised by the  Lessee so as to interfere with the proper and reasonably expeditious mining of coal from the demised premises; and provided, further, that this right shall continue only so long as this lease shall remain in effect.

Taxes.

ARTICLE FOURTEEN.- The Lessor shall pay all taxes, levies and assessments upon the demised premises for each year of this lease or any renewal thereof, including the current year, but the Lessee shall in each year during the term hereof, promptly on receipt of bill from the Lessor therefor, reimburse the Lessor for all such taxes, levies and assessments upon said demised premises; taxes for the current year shall be prorated as of the date of this lease.

The Lessee shall pay all taxes, levies and assessments upon improvements, personal property and equipment placed by the Lessee on the demised premises; and  shall pay any and all taxes, levies or assessments that may be imposed by any laws of West Virginia or of the United States upon coal mined from or coke made upon the demised premises, during the term of this lease or any renewal thereof, and if any such taxes and assessments are paid by the Lessor the Lessee shall repay to the Lessor the amount thereof on demand; provided, however, that the Lessor, its successors, assigns or other lessees, shall pay any and all taxes chargeable by reason of any improvements placed by it or them upon the demised premises for its or their use and the Lessee shall be under no obligation to make reimbursement thereof; and the Lessee covenants and agrees that it will not permit any property placed by it upon the demised premises to be distrained, levied upon or seized for the collection of any such taxes, levies or assessments; and, provided, however, that the Lessee shall not be responsible for any taxes upon any rights hereafter granted by the Lessor to others (except the Lessee), nor on any improvements hereafter placed upon the demised premises by such others, except the Lessee.

-14-

**Remedies for Collection of Monies**

ARTICLE FIFTEEN.- The rents and royalties and other payments herein mentioned shall be treated and considered as rents reserved for the demised premises, and the Lessor shall have for the collection thereof all the rights and remedies which landlords now have or may hereafter have for the collection of rent reserved upon contract under the laws of the State of West Virginia; and it is hereby expressly understood that the Lessor shall have a lien upon all the improvements and property of the Lessee upon the demised premises and any and all parts thereof, and also upon this lease and the lease-hold estate hereby created, to secure all rents or royalties and other sums or payments accruing hereunder; and when any rent or royalty or other payment or any part thereof shall have been due thirty (30) days or more and remain unpaid, the property of the Lessee upon the demised premises, or so much thereof as is necessary, and this lease and the leasehold estate hereby created, may be distrained and sold to pay such rent or royalty or other payments; or, at its election, the Lessor shall have the right to enforce by suit or action in any court of competent jurisdiction the lien hereby given it.

**Lessee not to Assign or Sub-let without consent of Lessor.**

ARTICLE SIXTEEN.- The Lessee further covenants and agrees that it will not mortgage, nor will it assign, convey, lease, under-let, sublet, or set over any of its estate, interest or term, in whole or in part, in the hereby leased premises or their appurtenances, or any part thereof to any person or persons whatsoever, or corporation whatsoever, without the license or consent of the Lessor, its successors or assigns; in writing under seal for that purpose being first had and obtained; and in case of such assignment or transfer, the transferee shall assume in writing all the obligations of the Lessee hereunder in a form satisfactory to the Lessor. Any transfer by option or process of law shall be deemed an assignment by the Lessee within the meaning of this provision and a violation of this covenant. But this covenant shall not be deemed to apply to or prevent the leasing by the Lessee of any house or building or part thereof to its officers, agents or employees or any affiliated or subsidiary company for purposes connected with its operations under this lease.

-15-

BLACKHAWK000015

ARTICLE SEVENTEEN.- It is further agreed that this lease is subject to certain recorded liens given to secure the payment of negotiable promissory notes amounting in the aggregate to $3,155,562.50, with interest thereon, representing deferred purchase money for certain lands, including the leased premises, acquired by the Lessor from the Pocahontas Coal and Coke Company by deed dated May 27, 1937, and from the Pardee Land Company by deed dated July 9, 1937, respectively, to which deeds, duly recorded in the offices of the Clerks of the County Courts of Wyoming and Boone Counties, West Virginia, reference is hereby made; and the Lessor hereby agrees to indemnify and save harmless the Lessee from loss in the event of foreclosures under said liens.

**At Termination Improvements to be Valued and Lessor to Have Right to Purchase at Valuation.**

ARTICLE EIGHTEEN.- At the termination of this lease by the expiration of said period of twenty (20) years or any renewal period any improvements placed upon the surface of the leased premises by the Lessee shall be valued by two disinterested persons, one to be chosen by each of the parties hereto, and in case of a disagreement, these two to choose a third, and the three thus chosen shall value the said improvements, and the Lessor shall have the privilege of purchasing said improvements at such valuation within thirty (30) days after notice of such valuation. If the Lessor shall not within said thirty (30) days accept said improvements at such valuation, the Lessee shall have the privilege of removing the same from the leased premises within ninety (90) days from the expiration of said thirty (30) days.

**Forfeiture**

ARTICLE NINETEEN.- All of the conditions to be kept and performed by the Lessee, and the covenants of the Lessee to perform the same, shall inure to the benefit of the Lessor, its successors and assigns and the Lessor, its successors or assigns, may by proper action at law or suit in equity, re-entry, distress or other proper proceeding, enforce any and all of said conditions and the covenants of the Lessee to perform the same. In case the Lessee shall fail in the performance or observance of any of the terms, conditions, covenants and agreements herein contained to be performed or observed by it, or shall use the leased premises contrary to the limitations hereof, and any such failure or use shall continue for a period of sixty (60) days after the Lessor shall have given to the Lessee written notice of such default and of Lessor's intention to terminate this lease in the

BLACKHAWK000016

event of such continuance in default, then and in such event, at the election of the Lessor, the term and leasehold interest hereby created and all rights of the Lessee under this indenture shall forthwith cease and determine, and the Lessor shall be entitled, without further notice or demand, to re-enter the leased premises and to exclude the Lessee therefrom and to hold the leased premises as of its former estate, together with any and all improvements thereon, anything herein contained to the contrary notwithstanding; and a waiver by the Lessor of any particular cause of forfeiture shall not prevent the forfeiture and cancellation of this lease for any other cause of forfeiture or for the same cause occurring at any other time. The remedies given in this Article are merely cumulative, and shall not deprive the Lessor of any other of its legal or equitable remedies. After forfeiture of the lease and re-entry of the premises by the Lessor as herein provided, no subsequent payment or tender of payment of rent by the Lessee to the Lessor, or by any other person, shall have the effect of relieving the Lessee against such forfeiture, or of re-instating the Lessee in its possession of the premises.

**Questions Under Certain Articles to be Arbitrated.** ARTICLE TWENTY.- Should any question arise between the parties hereto as to the performance by the Lessee of Articles Six, Seven, Eight, Nine and Ten hereof, or of any of them, or of any covenant contained in said Articles, or any of them, every such question shall be determined by arbitration in the manner provided for in this Article and the Lessee hereby covenants with the Lessor to comply with and carry out promptly the decision or award of any and every board of arbitration appointed under this or any other article of this lease. Questions in dispute to be determined by arbitration hereunder shall be submitted to two disinterested arbitrators, one of whom shall **How Arbitrators Chosen.** be appointed by each of the parties hereto respectively, and in case the two thus chosen cannot agree, they shall appoint a third who shall also be disinterested; and in case either party hereto neglects to nominate an arbitrator for the space of ten days after receiving notice from the other party to nominate any arbitrator then the other party shall nominate two and the two thus appointed shall appoint a third, all of them to be disinterested. The decision and award of such arbitrators, or any two of them, shall be final and conclusive and binding upon the parties hereto, and the said arbitrators

or any two of them may, in their decision or award, as a part thereof, decide by whom, and if by both parties in what proportion, the costs of such arbitration shall be borne and paid, and the amount of such costs.

**Service of Notice on Lessee.**

ARTICLE TWENTY-ONE.- The giving of any notice to or the making of any demand on the Lessee under the provisions hereof shall be sufficient, if in writing mailed postage prepaid, addressed to the Lessee at the Keppers Building, Pittsburgh, Pennsylvania, or at such other address as may hereafter be designated by the Lessee for the purpose by written notice given to the Lessor. Notice so given shall have the same force and effect as if the notice had been served or demand had been made personally on the President or other chief officer of the Lessee, in the manner provided by law for the service of summons in personal actions. Except as otherwise herein expressly provided ten (10) days shall be considered a reasonable time for any notice or demand.

**Warranty.**

ARTICLE TWENTY-TWO.- Nothing herein contained shall be or be deemed to be, on the part of the Lessor, a covenant of title, express or implied, except to this extent only, that the Lessor will warrant specially the property hereby leased for the term hereby created.

**Right of Renewal.**

ARTICLE TWENTY-THREE.- The Lessee, by written notice to the Lessor given at least six months before the expiration of the said twenty-year period may renew this lease for a further period of twenty years, on the same terms and conditions, and likewise thereafter for further such periods until all the merchantable coal in said lands shall have been mined or removed.

IN WITNESS WHEREOF, The Lessor and Lessee have hereunto caused their respective corporate names to be signed and their respective corporate seals to be affixed by their respective Presidents thereunto duly

-18-

authorized, the day and year first above written.

Executed in duplicate.

LOUP CREEK COLLIERY COMPANY.

By _____
President.

ATTEST:

_____
Asst. Secretary.

THE KOPPERS COAL COMPANY,

By _____
President.

ATTEST:

_____
Asst. Secretary.

APPROVED AS
TO LEGAL FORM

-19-

BLACKHAWK000019

STATE OF VIRGINIA )
CITY OF NORFOLK, ) SS:

I, C. F. Fitzsimmons, a Notary Public of the said City of Norfolk, in and for the City and State aforesaid, do certify that O. Bucholtz, who signed the writing hereto annexed for the Loup Creek Colliery Company, one of the corporations described in the writing attached hereto, bearing date the 1st day of July, 1937, has this day, in my said City, before me, acknowledged the said writing to be the act and deed of said corporation.

Given under my hand and official seal this 29th day of July, 1937.

_Fitzsimmons_
Notary Public

My commission expires March 4, 1940.

STATE OF PENNSYLVANIA, )
COUNTY OF ALLEGHANY, ) SS:

I, W V Blackstone, a Notary Public in the City of Pittsburgh, in and for the State and County aforesaid, do certify that J P William who signed the writing hereto annexed for The Koppers Coal Company, one of the corporations described in the writing attached hereto, bearing date the 1st day of July, 1937, has this day, in my said City and County, before me, acknowledged the said writing to be the act and deed of said corporation.

Given under my hand and official seal this 10th day of 1937.

W V Blackstone
Notary Public

W. V. BLACKSTONE, Notary Public
MY COMMISSION EXPIRES
APRIL 1, 1939

My commission expires.

OFFICE OF THE CLERK OF THE COUNTY COURT }
Wyoming County, W. Va. August 20, 1937 } ss.
The foregoing writing, together with the certificates of acknowledgement thereto of there thereto annexed, was this day admitted to record in said office.
Teste: C. W. Shannon, Clerk,

...inia,
k's Office, Sept 22, 1937
ther with the annexed certificate and map,
in my said office. -20-

# EXHIBIT B

## <u>CONSENT AND AMENDMENT AGREEMENT</u>

**THIS CONSENT AND AMENDMENT AGREEMENT** (this "Consent"), made this 21st day of December, 2015, by and among **POCAHONTAS LAND CORPORATION**, a Virginia corporation ("Poca Land") and **ROCKWELL MINING, LLC**, a Delaware limited liability company ("Rockwell"), and **BLACKHAWK LAND AND RESOURCES, LLC**, a Delaware limited liability company ("BLR").

**WHEREAS**, by Indenture of Lease, dated July 1, 1937, Loup Creek Colliery Company leased to The Koppers Coal Company approximately 10,000 acres located in Wyoming and Boone Counties, West Virginia, for coal mining purposes (hereinafter the "1937 Lease"); and

**WHEREAS**, by Supplemental Lease, dated August 21, 1941, Loup Creek Colliery Company amended the 1937 Lease to lease to The Koppers Coal Company two additional tracts of land situate on Toney Fork of Clear Fork of Guyandotte River, in Wyoming County, West Virginia; and

**WHEREAS**, by Deed of Assignment and Consent, dated December 9, 1941, The Koppers Coal Company assigned the 1937 Lease, as supplemented, to Eastern Gas and Fuel Associates, with the consent of Loup Creek Colliery Company; and

**WHEREAS**, by Supplemental Lease, dated November 2, 1943, Loup Creek Colliery Company amended the 1937 Lease to lease to Eastern Gas and Fuel Associates an additional tract of land situate on Toney Fork of Clear Fork of Guyandotte River, in Wyoming County, West Virginia; and

**WHEREAS**, Loup Creek Colliery Company changed its name to Loup Creek Company by charter amendment dated January 10, 1946; and

**WHEREAS**, by Supplemental Lease, dated May 15, 1947, Loup Creek Company amended the 1937 Lease to lease to Eastern Gas and Fuel Associates an additional tract of land situate on the waters of Clear Fork and Toney Fork, in Wyoming County, West Virginia; and

10070033v2

SA000028                                    **BLACKHAWK000056**

WHEREAS, by Supplemental Lease, dated December 1, 1947, Loup Creek Company amended the 1937 Lease to lease to Eastern Gas and Fuel Associates additional tracts of land situate in Logan, Boone and Wyoming Counties, West Virginia, and amended other provisions of the 1937 Lease, including Articles 4 and 13; and

WHEREAS, by Supplemental Lease, dated April 1, 1950, Loup Creek Company amended the 1937 Lease to lease to Eastern Gas and Fuel Associates two additional tracts of land situate in Wyoming and Logan Counties, West Virginia; and

WHEREAS, by Indenture dated April 1, 1950, Loup Creek Company, Eastern Gas and Fuel Associates, Pardee Land Company and Lorado Coal Mining Company, agreed to set up a mining barrier pillar between the dividing line of Pardee Land Company's property (leased by Lorado Coal Mining Company) and Loup Creek Company's property (leased by Eastern Gas and Fuel Associates); and

WHEREAS, by Supplemental Lease, dated January 15, 1953, Loup Creek Company and Eastern Gas and Fuel Associates amended Article 4 of the 1937 Lease and renewed the term of the 1937 Lease for an additional 20 years; and

WHEREAS, by Supplemental Lease, dated September 12, 1956, Loup Creek Company amended the 1937 Lease to lease to Eastern Gas and Fuel Associates additional acreage situate in Wyoming County, West Virginia; and

WHEREAS, by Indenture dated June 9, 1959, Loup Creek Company and eastern Gas and Fuel Associates amended Article 1 of the 1937 Lease; and

WHEREAS, by Indenture and Release, Eastern Gas and Fuel Associates released certain of its rights under Article 1 of the 1937 Lease, being its right to cut and use walnut and poplar trees; and

WHEREAS, Poca Land, Loup Creek Company and The Wandle Company merged on June 16, 1965, leaving Poca Land as the surviving entity; and

2

**WHEREAS**, by Deed of Assignment and Consent, dated January 1, 1966, Eastern Gas and Fuel Associates assigned all of its right in the 1937 Lease, as amended and supplemented, to Eastern Associated Coal Corp. ("Eastern"), with the consent of Poca Land; and

**WHEREAS**, by Agreement dated January 1, 1970, Pocahontas granted Eastern the right to manufacture commercial lumber from sideboards produced in preparing timber for use in mining operations and to sell commercial lumber to others; and

**WHEREAS**, by Release Agreement dated April 15, 1971, Pocahontas released Eastern Gas and Fuel Associates from its responsibility for the performance and observance of Eastern's duties, responsibilities, obligations and liabilities under the 1937 Lease; and

**WHEREAS**, by Notice of Renewal of Term of Lease, dated November 10, 1976, Eastern renewed the term of the 1937 Lease for an additional 20 years; and

**WHEREAS**, by letter agreement, dated July 28, 1977, Poca Land granted Eastern the right to transport coal from lands not owned or operated by Eastern for a fee; and

**WHEREAS**, by letter, dated August 24, 1995, Eastern renewed the term of the 1937 Lease for an additional 20 years until June 30, 2017; and

**WHEREAS**, on August 1, 2005 Eastern filed Articles of Conversion with the Office of the Secretary of State of West Virginia converting from a corporation to a limited liability company and changed its name to Eastern Associated Coal, LLC ("EAC"); and

**WHEREAS**, pursuant to (a) Findings of Fact, Conclusions of Law, and Order (I) Confirming the Debtors' Fourth Amended Joint Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code and (II) Approving the Fourth Amended Disclosure Statement, in the Chapter 11 proceedings styled *In Re: Patriot Coal Company, et al.* (including EAC), such proceedings being jointly administered in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, under Case No. 15-32450, and (b) that certain Asset Purchase Agreement by and among Blackhawk Mining LLC, Patriot Coal Corporation and the Subsidiaries of Patriot listed on Schedule A thereto dated June 22, 2015, as amended by First Amendment to Asset Purchase Agreement, dated August 31, 2015, EAC assigned all of its right,

3

title and interest in and to the 1937 Lease to Rockwell pursuant to the Lease Assignment and Assumption Agreement dated October 26, 2015; and

**WHEREAS**, the 1937 Lease, as previously amended, supplemented, renewed and assigned and further amended herein, applicable to the Subleased Reserves (as herein defined) is referred to herein as the "Pocahontas Land Lease"; and

**WHEREAS**, (i) Rockwell desires to sublease, a portion of the Powellton A seam covered by the Pocahontas Land Lease as shown on the map attached hereto as <u>Exhibit A</u> ("Subleased Reserves"), to its affiliate, BLR (the "Intercompany Sublease"), and (ii) thereupon, BLR desires to further sublease the Subleased Reserves to Coronado Coal II, LLC, or any entity wholly owned, whether directly or indirectly, by Coronado Coal II, LLC (for the purpose of this Consent, Coronado Coal II, LLC and any such wholly owned entity is referred to herein as "Coronado") (the "BLR-Coronado Sub-Sublease"); and

**WHEREAS**, Poca Land is willing to consent to each of the Intercompany Sublease and the BLR-Coronado Sub-Sublease upon the terms and conditions of this Consent.

## AGREEMENTS

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Consent.**

    1.1 **Consent to Subleases.** To the extent required under the Pocahontas Land Lease, Poca Land hereby consents (i) to the sublease of the Subleased Reserves from Rockwell to BLR pursuant to the Intercompany Sublease and (ii) to the further sublease of the Subleased Reserves from BLR to Coronado pursuant to the BLR-Coronado Sub-Sublease. Poca Land hereby represents and warrants to Rockwell that no other party need consent to or approve the Intercompany Sublease or the BLR-Coronado Sub-Sublease in order to satisfy any provision or condition of the Pocahontas Land Lease with respect to the Subleased Premises.

    1.2 **Assumption of Lease Obligations.** The BLR-Coronado Sub-Sublease will contain a provision that Coronado agrees to assume and perform all of the lessee's

4

          BLACKHAWK000059

obligations and duties under the provisions of the Pocahontas Land Lease (except for the payment of any minimum rentals) allocable to the period from and after the date of such BLR-Coronado Sub-Sublease.

**1.3** **Implementation of Consent.** Poca Land agrees to execute such documents of consent, as Rockwell, BLR or Coronado may reasonably request, in order to place of record Poca Land's consent to the Intercompany Sublease or the BLR-Coronado Sub-Sublease as herein provided. Rockwell and BLR shall provide Poca Land with fully executed copies of the Intercompany Sublease and the BLR-Coronado Sub-Sublease within ten (10) days following the execution thereof.

**2.** **Further Consent.** Poca Land's consent hereby given shall neither constitute nor be construed as a waiver or relinquishment of any rights of Poca Land to insist upon consent to any further subleases beyond those agreed to in Section 1.1 hereof nor, except as expressly set forth in Section 1.1 hereof, shall such consent be construed to modify the provisions of Article Sixteen of the Pocahontas Land Lease. Notwithstanding the foregoing, Poca Land does acknowledge and agree that Coronado may assign the BLR-Coronado Sub-Sublease to an affiliated entity owned or controlled by Coronado or under common ownership and control with Coronado without the consent of Poca Land, BLR or Rockwell; provided, however, that Coronado shall remain responsible for the performance of the BLR-Coronado Sub-Sublease by such Coronado affiliated entity.

**3.** **Estoppel.** Poca Land declares that, as of the date hereof, (i) the Pocahontas Land Lease is in full force and effect, (ii) the Pocahontas Land Lease, as defined herein, and as herein amended, represents the entire agreement between Poca Land and Rockwell, and (iii) it does not have any knowledge of any default or breach or a condition which, with the passage of time or the giving of notice or both, will become a default or breach by Rockwell, of any obligations or duties under the Pocahontas Land Lease. For purposes of this Section, knowledge possessed by Poca Land or by the agent or agents of Poca Land shall be deemed to be knowledge possessed by Poca Land; and knowledge possessed by any engineer acting on behalf of Poca Land in connection with operations under the Pocahontas Land Lease shall be deemed to be knowledge possessed by Poca Land.

5

4.    **Poca Land Further Agreement**. In the event that the Pocahontas Land Lease should be terminated either by the mutual consent of Poca Land and Rockwell or due to the breach of the terms thereof by Rockwell, including, without limitation, a breach caused by the action or failure to act by BLR, then the Intercompany Sublease will automatically terminate pursuant to its terms, and Poca Land shall immediately at that time enter into a lease with Coronado containing the same terms, conditions and provisions as set forth in the Pocahontas Land Lease and the BLR-Coronado Sub-Sublease and this Consent, as they are applicable to the Subleased Reserves; provided, however, that the "base royalty" due Poca Land pursuant to such a lease with Coronado shall be three percent (3%) rather than one and one-half percent (1 1/2 %). In the event the Intercompany Sublease should otherwise be terminated either by the mutual consent of Rockwell and BLR or due to the breach of the terms thereof by BLR or Rockwell, then Rockwell shall immediately at that time enter into a sublease with Coronado containing the same terms, conditions and provisions as set forth in the BLR-Coronado Sub-Sublease, as they are applicable to the Subleased Reserves.

For the avoidance of doubt, this provision 4 shall survive the termination or expiration of this Consent, the Intercompany Sublease, the BLR Coronado Sub-Sublease and the Pocahontas Land Lease. The intention of this section is to provide Coronado uninterrupted access to the Subleased Reserves.

5.    **Amendment**.

With respect to only the reserves actually included in the Intercompany Sublease and the BLR-Coronado Sub-Sublease, Poca Land, BLR and Rockwell agree that the first sentence of Article Three of the Pocahontas Land Lease, containing royalty provisions, is hereby deleted in its entirety and replace with the following:

> Lessee shall pay to Lessor, as rent, a royalty of one and one-half percent (1.5%) of the average gross selling price ("Royalty"), as hereinafter defined, for each ton of 2,000 pounds of coal mined and sold from the leased premises, calculated and reported on a monthly basis.
> For the purpose of calculating the Royalty provided for above, the term "average gross selling price" as used herein shall mean the actual gross sales for the month applicable to Lessor's tonnage, less any sales tax imposed thereon, divided by the actual tons sold for the month to a bona fide purchaser, calculated on a mine by mine

6

basis, if practicable. This average gross selling price assumes that the sale occurs f.o.b. the initial outbound loading point after preparation, if any, or, if not first transported to a preparation facility, the actual price paid for the coal, assuming the sale occurs, f.o.b. the outbound loading point on the leasehold, but in any case without deduction for selling commissions, advertising, credit losses, or other expenses, but with deductions for discounts or allowances actually allowed to arms-length wholesalers; provided, however, that if Lessor gives notice to Lessee in writing that, in Lessor's reasonable judgment, a particular purchaser is not a bona fide purchaser, Lessor may elect to substitute for the gross selling price paid by that purchaser the prevailing market price of such coal as reasonably determined by Lessor and based upon recent sales by Lessee and others of coal of comparable quality to bona fide purchasers; provided further, that for any coal consumed on or off the leased premises without sale by Lessee, the gross selling price for the purpose of computing the Royalty shall be the prevailing market price, as determined above, of such coal at the time of shipment from the leased premises or, if used on the leased premises, at the time of use.

The term "bona fide purchaser", as used herein shall mean a purchaser who pays valuable consideration in good faith without intending to take unfair advantage of any third parties, including Lessor, but in no case shall that phrase include persons or parties affiliated with lessee, either directly, indirectly or through any joint ownership.

With respect to Article Sixteen of the Pocahontas Land Lease, Poca Land, BLR and Rockwell agree that the Pocahontas Land Lease is amended hereby to provide that a transfer of control of the lessee therein shall be an event of assignment requiring Poca Land's consent, and shall be deemed to have occurred whenever 50.1% or more of the lessee's capital stock or membership interests shall become subject to the direct or indirect control of persons or entities, some or all of whom are different than those persons or entities which directly or indirectly control that portion of the lessee's capital stock or membership interests as of the effective date of this Consent. Notwithstanding this amendment to the Pocahontas Land Lease, Poca Land hereby acknowledges and agrees that it shall not unreasonably withhold its consent to an assignment of the Pocahontas Land Lease or the BLR-Coronado Sub-Sublease where a transfer of control as set forth above occurs provided the assignee has reasonable coal mining experience and reasonable financial standing.

6.    **Notices, Etc.** All notices and other communications provided for under this Consent shall be in writing and mailed or delivered to:

Poca Land:

Pocahontas Land Corporation
Attention: Vice President
P.O. Box 1517
Bluefield, WV 24701

7

SA000034                                    BLACKHAWK000062

Rockwell:

    Rockwell Mining, LLC
    Attention:  Elizabeth Nicholas, General Counsel
    3228 Summit Square Place, Suite 180
    Lexington, KY  40509

BLR:

    Blackhawk Land and Resources, LLC
    Attention:  Elizabeth Nicholas, General Counsel
    3228 Summit Square Place, Suite 180
    Lexington, KY  40509

or at such other addresses as shall be designated by any party in a written notice to the other party complying as to delivery with the terms of this section. Any notice or other communication which may be required or permitted to be given or served upon Poca Land and/or Rockwell and/or BLR hereunder shall be deemed to have been sufficiently given when delivered to the party to receive notice, or, if and when deposited in the United States registered or certified mail, postage prepaid, and addressed to the address shown above or such different address as Poca Land or Rockwell or BLR shall have designated by written notice received by the other party.

    7.    **Governing Law.**  This Consent shall be governed by and construed in accordance with the laws of the State of West Virginia, without regard to its conflict of laws provisions.

    8.    **Counterparts.**  All parties do hereby agree that this Consent may be and is being executed in counterparts, including by means of facsimile signatures, all of which shall be taken together as one whole document, and that the execution and acknowledgement pages may be collated into one document.

    9.    **Severability; Waiver**.  If any terms, covenants, promises and agreements in this Consent should be held to be unenforceable for any reason, all other terms, covenants, promises and agreements of the parties in this Consent shall remain in full force and effect.  No waiver, at any time, of the terms, provisions or conditions of this Consent shall be construed as a waiver of any of the other terms, provisions or conditions, nor shall a waiver of any such term, provision or condition be construed to confer a right to a subsequent waiver of the same

10070033v2

SA000035          **BLACKHAWK000063**

provision or condition.  Any remedies provided in this Consent are cumulative and not exclusive of any remedies provided by law.

      **10.**    <u>**Entire Agreement; Amendments**</u>.  This Consent and the other documents referred to herein and therein constitute the entire agreement between and among the parties relating to the subject matter hereof, incorporate all prior agreements and understandings between and among the parties hereto relating to the subject matter hereof, and cannot be changed or terminated orally.  No amendment or waiver of any provision of this Consent shall be effective unless the same shall be in writing and signed by the parties hereto, and then such waiver and consent shall be effective only in the specific instance and for the specific purpose for which given.

      **11.**    <u>**Successors and Assigns**</u>.  This Consent shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

      **12.**    <u>**Headings.**</u>  Section headings used herein are for convenience of reference only and shall not affect the meaning or construction of any provision hereof.

*Remainder of Page Intentionally Left Blank; Signature Page Follows*

10070033v2

SA000036

**BLACKHAWK000064**

**IN WITNESS WHEREOF**, the parties have each caused this Consent to be executed by their respective officers thereunder duly authorized as of the day and year first above written.

POCAHONTAS LAND CORPORATION

By: _____
John W. Payne, Vice President

STATE OF WEST VIRGINIA,
COUNTY OF MERCER, to-wit:

I, _Kristin Saltz_____, a Notary Public of said County, do certify that John W. Payne, who is the Vice President of POCAHONTAS LAND CORPORATION, a Virginia corporation, and who signed the writing above dated _December 21st_____, 2015, for POCAHONTAS LAND CORPORATION, has this day in my said county before me, acknowledged the said writing to be the act and deed of said corporation.

Given under my hand and official seal this _21_ day of _December_, 2015.

My commission expires: _April 30, 2019_____.

_____
Notary Public

[S E A L]

KRISTIN DAWN SALTZ
NOTARY PUBLIC
REGISTRATION # 7651353
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
APRIL 30, 2019

10070033v2

SA000037                                           **BLACKHAWK000065**

ROCKWELL MINING, LLC

By: _____

Its: SVP L&D + Acquisitions

STATE OF Kentucky.
COUNTY OF Fayette, to-wit:

I, Laurel J. Unseld, a Notary Public of said County, do certify that Chad Salyer, who is the Sr. VP Land & Acquisitions of ROCKWELL MINING, LLC, a Delaware limited liability company, and who signed the writing above dated 12/21, 2015, for ROCKWELL MINING, LLC has this day in my said county before me, acknowledged the said writing to be the act and deed of said limited liability company.

Given under my hand and official seal this 21st day of December, 2015.

My commission expires: 6/17/19.

_____
Notary Public

[S E A L]

> Laurel J. Unseld
> NOTARY PUBLIC
> Notary ID 535189
> Kentucky, State at Large
> My Comm. Exp. June 17, 2019

16076003v2

BLACKHAWK LAND AND RESOURCES, LLC

By: _____

Its: _President_

STATE OF _Kentucky_,
COUNTY OF _Fayette_, to-wit:

I, _Laurel J. Unseld_, a Notary Public of said County, do certify that _Chad Salyer_, who is the _President_ of BLACKHAWK LAND AND RESOURCES, LLC, a Delaware limited liability company, and who signed the writing above dated _Dec. 21_, 2015. for BLACKHAWK LAND AND RESOURCES has this day in my said county before me, acknowledged the said writing to be the act and deed of said limited liability company.

Given under my hand and official seal this _21_ day of _December_, 2015.

My commission expires: _6/17/19_.

_Laurel J. Unseld_
Notary Public

[S E A L]

> Laurel J. Unseld
> NOTARY PUBLIC
> Notary ID 535189
> Kentucky, State at Large
> My Comm. Exp. June 17, 2019

This instrument prepared by
and upon recording return to:

Brady W. Dunnigan
DINSMORE & SHOHL LLP
250 West Main Street, Suite 1400
Lexington, Kentucky 40507
(859) 425-1063

10070033v2

SA000039                                            **BLACKHAWK000067**

# ACKNOWLEDGEMENT

Coronado hereby acknowledges it has read this Consent and that the terms of the BLR-Coronado Sub-Sublease are subject to the terms of this Consent.

In the event of a default by Rockwell or BLR under the Pocahontas Land Lease, Pocahontas hereby agrees to provide prompt written notice of such default to Coronado. Likewise, in the event of a default under the Intercompany Lease by BLR, Rockwell hereby agrees to provide prompt written notice of such default to Coronado.

Further, Coronado, Rockwell and Poca Land hereby agree and acknowledge that, as between each of them individually and among them collectively, the Consent, including without limitation the provisions of sections 2 and 4 of the Consent, shall survive any Rockwell or BLR default and/or the termination of the Pocahontas Land Lease, the Intercompany Lease, this Consent, and/or the BLR-Coronado Sub-Sublease (a copy of which is attached hereto as Exhibit A).

In the event of any termination of the Pocahontas Land Lease, the Intercompany Lease, the BLR-Coronado Sub-Sublease, or the Consent, either by the mutual consent of Poca Land and Rockwell or BLR, as applicable, or due to the breach of the terms thereof by Rockwell or BLR, then Poca Land and Coronado shall enter into a lease containing the same terms, conditions, and provisions as set forth in the Pocahontas Land Lease, BLR-Coronado Sub-Sublease, and the Consent as applicable to maintain Coronado's rights thereunder, as they are applicable to the Subleased Reserves. In the event of a termination or non-curable default of the Intercompany Lease (but not the Pocahontas Land Lease), then Rockwell and Coronado shall enter into a sublease containing the same terms, conditions and provisions as set forth in the BLR-Coronado Sub-Sublease and the Consent as they are applicable to the Subleased Reserves.

**POCAHONTAS LAND CORPORATION**

By: _____

John W. Payne, Vice President

**ROCKWELL MINING, LLC**

By: _____

Its: _____

10070033v2

SA000040                                    **BLACKHAWK000068**

## ACKNOWLEDGEMENT

Coronado hereby acknowledges it has read this Consent and that the terms of the BLR-Coronado Sub-Sublease are subject to the terms of this Consent.

In the event of a default by Rockwell or BLR under the Pocahontas Land Lease, Pocahontas hereby agrees to provide prompt written notice of such default to Coronado. Likewise, in the event of a default under the Intercompany Lease by BLR, Rockwell hereby agrees to provide prompt written notice of such default to Coronado.

Further, Coronado, Rockwell and Poca Land hereby agree and acknowledge that, as between each of them individually and among them collectively, the Consent, including without limitation the provisions of sections 2 and 4 of the Consent, shall survive any Rockwell or BLR default and/or the termination of the Pocahontas Land Lease, the Intercompany Lease, this Consent, and/or the BLR-Coronado Sub-Sublease (a copy of which is attached hereto as Exhibit A).

In the event of any termination of the Pocahontas Land Lease, the Intercompany Lease, the BLR-Coronado Sub-Sublease, or the Consent, either by the mutual consent of Poca Land and Rockwell or BLR, as applicable, or due to the breach of the terms thereof by Rockwell or BLR, then Poca Land and Coronado shall enter into a lease containing the same terms, conditions, and provisions as set forth in the Pocahontas Land Lease, BLR-Coronado Sub-Sublease, and the Consent as applicable to maintain Coronado's rights thereunder, as they are applicable to the Subleased Reserves. In the event of a termination or non-curable default of the Intercompany Lease (but not the Pocahontas Land Lease), then Rockwell and Coronado shall enter into a sublease containing the same terms, conditions and provisions as set forth in the BLR-Coronado Sub-Sublease and the Consent as they are applicable to the Subleased Reserves.


**POCAHONTAS LAND CORPORATION**


By: _____
       John W. Payne, Vice President


**ROCKWELL MINING, LLC**


By: _____

Its: _SVP Land + Acquisitions_


10070033v2

BLACKHAWK000069

**CORONADO COAL II, LLC**

By: _____

Its: _____

10070033v2

**BLACKHAWK000070**

# EXHIBIT C

ROCKWELL MINING v.                                      GREG WOOTEN
POCAHONTAS LAND LLC                                      10/06/2021

```
 1          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2               CHARLESTON DIVISION

 3

 4    * * * * * * * * * * * * * * * * * * * * * * * *

 5   ROCKWELL MINING, LLC, and
     BLACKHAWK LAND AND RESOURCES, LLC,
 6
         Plaintiffs and Counter-Defendants,
 7
     vs.                    CIVIL ACTION NO. 2:20-cv-
 8   00487

 9   POCAHONTAS LAND  LLC,

10       Defendant and Counter-Claimant.

11    * * * * * * * * * * * * * * * * * * * * * * * *

12

13          Videotaped deposition of GREG WOOTEN taken
     by the Defendant under the Federal Rules of Civil
14   Procedure in the above-entitled action, pursuant to
     notice, before Teresa Reedy, a Registered
15   Professional Reporter, at 1:00 p.m., at the offices
     of Bowles Rice, 600 Quarrier Street, Charleston,
16   West Virginia, on the 6th day of October, 2021.

17

18

19

20          REALTIME REPORTERS, LLC
                 713 Lee Street
21           Charleston, WV  25301
                (304) 344-8463
22           realtimereporters.net

23

24
```

USCA4 Appeal: 24-2051   Doc: 34-1   Filed: 02/10/2025   Pg: 47 of 340

1  the case with many issues, there are legal ways of

2  looking at things and there are practical business

3  ways of looking at things, and I would imagine you

4  probably have an opinion as to the latter, so

5  that's kind of what I'm looking for, if you did.

6  If you didn't have an opinion or don't know, feel

7  free to offer that as your response, but if you do,

8  I would like to know it.  Okay?

9      A.  Okay.

10      Q.  With that series of exchanges and

11  established conditions for the record, I'll just

12  ask this again so we have a nice, clean order of

13  transcript.

14          As you sit here today, do you believe

15  that the 1937 lease continues to be a binding and

16  enforceable contract?

17      A.  I do.

18      Q.  As you sit here today, do you believe that

19  Poca Land has performed all of its obligations as

20  you would define those under the lease?

21      A.  Yes.

22      Q.  As you sit here today, are you aware of any

23  instances on which Poca Land has communicated to

24  either Blackhawk or Rockwell via a position that

USCA4 Appeal: 24-2051   Doc: 34-1   Filed: 02/10/2025   Pg: 48 of 340

1  about the 1937 lease, I just want to make sure we

2  tack down some of these same questions with respect

3  to the 2015 consent and amendment that relate to

4  the 1937 lease.  I'll just use the phrase 2015

5  consent for shorthand.  Is that okay with you?

6      A.  Sure.

7      Q.  Are you familiar with any of the

8  circumstances in which the 2015 consent was

9  negotiated and drafted?

10     A.  I am not.

11     Q.  You had no participation in that?

12     A.  I did not.

13     Q.  So back to the 1937 lease.  As you sit here

14  today, do you personally believe that the terms of

15  the 1937 lease were unconscionable at the time it

16  was drafted?

17         MR. ADKINS:  Object to form.  You may

18  answer if you're able.

19     A.  From a structural standpoint, I don't think

20  that you had unsophisticated parties at the table

21  and they made the deal that they made.  So from

22  that standpoint, it might not have been

23  unconscionable at that time.  What -- from a

24  non-legal perspective, to me what is unconscionable

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 49 of 340

1    Q.  And see if we can get a range that we
2  bookend at both ends and work inward.  I'm not
3  trying to trick you or anything.  I'm just going to
4  say was it in your opinion grossly unfair in 1957?
5    A.  Yes.
6    Q.  Was it grossly unfair in 1967?
7    A.  Yes.
8    Q.  1977?
9    A.  Yes.
10    Q.  Would it be fair to say that at any point
11  after 1977 it would also be grossly unfair?
12    A.  Yes.
13    Q.  So, again, your opinion is that it was
14  grossly unfair before 1957 at some point?  That's a
15  bad question.
16          So you said in 1957 it was grossly
17  unfair; correct?
18    A.  I agreed with you, yes.
19    Q.  Okay.  What about 1947?
20    A.  Possibly.
21    Q.  So using the numbers we've established with
22  a bit more assurance, it would be your opinion that
23  the 1937 lease has been grossly unfair for at least
24  70 years if I did the math right?

SA000047

ROCKWELL MINING v.                                    GREG WOOTEN
POCAHONTAS LAND LLC                                   10/06/2021

```
 1      A.  Yes.
 2      Q.  Do you believe that anybody familiar with
 3  the coal leasing industry -- if industry is the
 4  right word -- would have been able to determine in
 5  1957 that the 1937 lease was unfair?
 6              MR. ADKINS:  Object to the form of the
 7  question.  Calls for speculation.  You may answer.
 8      A.  Based on my experience, it would have been
 9  obvious.
10      Q.  Do you know if Poca Land has ever formally
11  communicated any opinion or position that the 1937
12  lease was grossly unfair prior to the present
13  lawsuit?
14      A.  I have no idea.
15      Q.  Are you familiar with the provisions in the
16  1937 lease that describe the circumstances in which
17  a lessee is required to obtain consent for the
18  lessor for mortgages on the property?
19      A.  I'm aware of that provision.
20      Q.  And property's probably a vague --
21  mortgages on the leasehold.
22      A.  Yes, I am.
23      Q.  Can you tell me your understanding of
24  those?
```

SA000048

```
 1  lease provisions themselves that you're aware of?
 2      A.  Not that I'm aware of.
 3      Q.  And referencing this document we've
 4  denominated the 2015 consent and amendment, are we
 5  on the same page with that?
 6      A.  Yes.
 7      Q.  Same question.  Are you of the
 8  understanding that the 2015 consent and amendment
 9  required Blackhawk to obtain the consent of Poca in
10  order to enter the transaction with Sev.en in May
11  of 2020?
12          MR. ADKINS:  Object to form of the
13  question.  You may answer if you're able.
14      A.  That's my understanding.
15      Q.  And the same attempted precision, would
16  that be based on the language of the 2015 consent?
17      A.  Yes.
18      Q.  Anything else?
19      A.  No.
20      Q.  Do you have any recollection of whether
21  Blackhawk land requested that Poca provide consent
22  to the 2020 transaction with Sev.en Energy?
23      A.  I don't remember.
24      Q.  Perfectly fair.  Let's have you turn to
```

ROCKWELL MINING v.                                              GREG WOOTEN
POCAHONTAS LAND LLC                                              10/06/2021

1   considering consent?

2       A.   Specific to the management?

3       Q.   Specific to what's being expressed here

4   that, yeah, the transaction will have no effect on

5   who is conducting the mining operations.

6       A.   None that I recall.

7       Q.   The next sentence that begins where I left

8   off says, As Poca Land has not previously expressed

9   concern with respect to the mining operations

10  conducted pursuant to either the Hamden or Rockwell

11  lease -- that's a primary clause.  I want to stop

12  there and just investigate that with you.  Do you

13  have any recollection of Poca Land at any time

14  prior to the Sev.en lease expressing concern with

15  respect to the mining operations conducted on the

16  1937 lease leasehold premises?

17            MR. ADKINS:  Object to form.  You may

18  answer.

19      A.   I have no idea.

20      Q.   I'm going to go deeper into that paragraph.

21  It's a sentence that begins with the conjunction

22  and.  It's about halfway through.  It says "and

23  while control."  Do you see where I am?

24      A.   Yes, sir.

SA000050

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 53 of 340

```
 1      Q.   The royalty payments are the same before
 2  and after the transaction.  Am I correct?
 3      A.   Unfortunately you're correct.
 4      Q.   Do you know if subsequent to the receipt of
 5  this June 22, 2020 correspondence by Poca there was
 6  any official notice of termination of the lease
 7  that was ever sent by Poca to Blackhawk?
 8      A.   So we're still on 35?
 9      Q.   We're more less done with it except as a
10  temporal marker.  I'm just wondering subsequent to
11  this correspondence we've now seen in these
12  exhibits which is around June of 2020, do you have
13  any recollection of Pocahontas sending a notice of
14  termination to Blackhawk with respect to the 1937
15  lease?
16      A.   No, my understanding is they are in default
17  and continued to be in default and termination is
18  certainly an option that has not been to my
19  knowledge been exercised yet.
20      Q.   Aside from a notice of termination which we
21  covered, do you recall any other communications
22  from Poca to Blackhawk about the 1937 lease that
23  would have been subsequent to this June
24  correspondence we've seen?
```

USCA4 Appeal: 24-2051     Doc: 34-1          Filed: 02/10/2025     Pg: 54 of 340

ROCKWELL MINING v.                                              GREG WOOTEN
POCAHONTAS LAND LLC                                              10/06/2021

```
 1      Q.  Is that fair?

 2      A.  You're going to -- you said Pocahontas.

 3      Q.  I'm sorry.  All right.  So Pocahontas would

 4  be receiving the same royalties under the 1937

 5  lease if the deed of trust mortgages of January

 6  2020 had never occurred; correct?

 7      A.  If your question is limited only to the

 8  deed of trust and you're eliminating the consent

 9  and everything that is attributed to obtaining a

10  bona fide deed of trust, then your proposition is

11  correct.

12      Q.  And we are going to take them in series.

13  We're going to get to the consents, but, again, for

14  clarity and accuracy, I want to address them one at

15  a time.  Okay?

16      A.  Yeah.

17      Q.  So the financial benefit to Pocahontas was

18  the same under the 1937 lease terms before and

19  after the deeds of trust of 2020; correct?

20      A.  As we sit here today, yes.

21      Q.  You have not seen any evidence to the

22  contrary as you sit here today.  Am I correct?

23      A.  That's correct.

24      Q.  Now we can talk about that first
```

SA000052

USCA4 Appeal: 24-2051    Doc: 34-1      Filed: 02/10/2025    Pg: 55 of 340

1  normal course of granting consents, we would want

2  to have a superior position in the line, so to

3  speak, should this go into bankruptcy or otherwise.

4  And so I suppose within those documents, they've

5  ignored us.

6      Q.  Have you actually had anyone research that

7  document?

8      A.  I have not specifically raised that

9  question.

10     Q.  Do you know if anybody else at Poca has?

11     A.  I don't know.

12     Q.  Subsequent to the notices of default we've

13  reviewed today from Poca, did Poca continue to

14  accept Blackhawk's royalty payments?

15     A.  The answer to that is yes.

16     Q.  Subsequent to each of the notices of

17  default we've reviewed today, did Poca leave

18  Blackhawk and Rockwell in possession of the

19  leasehold premises?

20     A.  Subject to the defaults, they are --

21  currently are the lessee, again, in default.

22     Q.  But Poca has taken no action to terminate

23  their possession of the leasehold; correct?

24     A.  We have not moved to repossessing our

# EXHIBIT D

# FERGUSON LAW OFFICE, PLLC

### Attorneys At Law
### 230 Capitol Street
### Suite 300
### Charleston, West Virginia  25301

Mark A. Ferguson
*mark@fl-wv.com*

Telephone  (304) 342-9100
Facsimile  (304) 342-9119

October 7, 2021

Bailey & Glasser, LLP
Attn: Brian A. Glasser
209 Capitol Street
Charleston, WV 25301

Re:    Rockwell Mining, LLC, Blackhawk Land and Resources, LLC
       Litigation

Dear Mr. Glasser:

You have requested my opinion as to several specific matters related to pending litigation in the Southern District of West Virginia involving Rockwell Mining, LLC ("Rockwell") and Blackhawk Land and Resources, LLC ("Blackhawk Land") (collectively, "Rockwell") vs. Pocahontas Land, LLC ("Poca"), styled Civil Action Number: 2:20-cv-487. The subject of these opinions and the relevant matter in dispute in the litigation relate to the history and status of a coal lease dated July 1, 1937 ("1937 Lease") between Loup Creek Colliery Company ("Loup Creek"), as Lessor, and The Koppers Coal Company ("Koppers Coal"), as Lessee, covering approximately 10,000 acres in Wyoming and Boone Counties, West Virginia.

In preparing my report, I reviewed the Expert Report of Dr. Frank Scott ("Scott Report"), the Rebuttal Report of Dr. Frank Scott, the Expert Report of Seth Schwartz and his Rebuttal Report ("Schwartz"), the Expert Report of John Craynon ("Craynon Report"), the 1937 Lease, various historical and corporate documents with regard to entities involved in the 1937 Lease, and the October 1, 2021 deposition transcript of Dr. Scott ("Scott Transcript").

By way of background, Loup Creek was formed as a West Virginia corporation on November 17, 1902, as a wholly owned subsidiary of the Virginian Railroad ("Virginian"). Koppers Coal was formed as a subsidiary of Eastern Gas and Fuel Associates ("Eastern Gas"), which was a Massachusetts business trust under the control of The Koppers Company ("Koppers").[1]

Loup Creek had, for a number of years, engaged in the business of acquiring real estate in conjunction with rail lines and rights of way of the Virginian. However, it purchased the property in question only shortly before the 1937 Lease. By Deed dated May 27, 1937, a significant

---

[1] Koppers owned more than 42% of the ownership of Eastern and in turn the Mellon family owned 50% of Koppers' stock. Koppers United Co., v. SEC, 158 F.2d 577 (D.C. Cir. 1943).

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 2

portion of the lease property was acquired from Pocahontas Coal & Coke Company, apparently for consideration of approximately $2,992,000.[2] In fact, the owner, Pocahontas Coal & Coke Company,[3] financed the acquisition, receiving a down payment of only $292,000 with the remaining $2.7 million financed over four promissory notes, with terms running through 1941.[4]

Following execution of the 1937 Lease, Koppers Coal began the process of developing coal mines in what became the town of Kopperston, in conjunction with expansion of a railroad access line to connect Virginian's rail line to Norfolk, Virginia.

Koppers Coal was an indirect subsidiary of Koppers (later, Koppers United), which as of 1937, was owned in part by members of the Mellon family and trusts associated with the Mellon family. In 1937, Eastern Gas and others organized a holding company, The Virginian Corporation, which acquired interests in the Virginian from the Henry Rogers Estate ("Rogers Heirs"), consisting of approximately 75% of preferred and common stock, purportedly giving Eastern Gas a 40% ownership interest in the Virginian.[5] Therefore, at the time of the 1937 Lease, the individual Mellons and some Mellon associated trusts indirectly had a level of ownership with regard to Loup Creek, as a subsidiary of Virginian.

However, Virginian also had significant other ownership, and Defendant's expert reports — in particular that authored by Frank Scott — present no basis to assert that the 1937 Lease constituted "an internal transaction between two parts of the Mellon family enterprises."[6] There were, in fact, significant other ownership and economic interests between the various corporate entities involved in the Loup Creek Lease. As Dr. Scott testified he did not put any significance on the legal ownership structure of these entities.[7] Dr. Scott points to no evidence respecting the operations or management of the various entities involved in the lease transaction itself in reaching his sweeping conclusions.

---

[2] *See* Loup Creek Deed, Deed Book 43, at Page 131, Boone County Clerk's Office, West Virginia May 27, 1937.
[3] Pocahontas Coal & Coke Company is a predecessor to Defendant Poca, pursuant to the Assignment of all rights to 400,000 acres of land in West Virginia by Pocahontas Coal & Coke Company to Pocahontas Land Corporation, another predecessor to Poca. This Assignment was recorded with the Secretary of State of West Virginia on September 28, 1939, in conjunction with the withdrawal of Pocahontas Coal & Coke Company as a foreign corporation.
[4] Loup Creek Deed of Trust, Trust Deed Book 19, at Page 456, Boone County Clerk's Office., May 27, 1937.
[5] In re Koppers United Co., 12 S.E.C 184 (1942).
[6] Scott Report, at Page 11.
[7] Scott Transcript, at Page 51.

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 3

Following development of the Kopperston mines, the 1937 Lease continued in operation until the current date, through several changes of entities and ownership. From the Lessor's perspective, Loup Creek remained Lessor until it merged into Pocahontas Land Company effective on June 30, 1965. At that point, the Lease remained under Poca, as successor by merger. Poca thus continues to this date as successor by merger to Loup Creek, the original Lessor.[8]

On the Lessee side of the transaction, Koppers Coal assigned the lease interests to Eastern Gas in 1941, prior to Eastern Gas's required dissociation from Koppers pursuant to the Public Utility Holding Company Act.[9] In the early 1960s, Eastern Gas converted into corporate form and subsequently reorganized, creating various operating subsidiaries. One of these held the rail, mining and related real estate operations under the name Eastern Associated Coal Company ("EACC"), which was formed on March 27, 1963.

EACC was thereafter acquired by Peabody Coal Company in 1987,[10] and continued as a part of the Peabody group, ultimately owned through Peabody's subsidiary Patriot Coal Co. until Patriot's bankruptcy. As a result of Patriot's bankruptcy, certain assets of EACC, including the mine properties operating on the 1937 Lease, were sold to Blackhawk on October 26, 2015. Blackhawk's subsequent 2019 bankruptcy resulted in a sale and transfer of those mines and related assets to a reconstituted Blackhawk and its affiliate Rockwell, which acquired the Lessee interests under the 1937 Lease.

During all of these various transactions, numerous consents to assignment of the 1937 Lease were granted by Poca as an ongoing and customary practice, including those in the Peabody acquisition, the Patriot Chapter 11, and the Blackhawk Chapter 11. Initially, Pocahontas had granted consent to the transfer from Eastern Gas to EEAC by consent dated January 1, 1966.[11]

Following the Patriot Bankruptcy, Rockwell entered into a sublease of a portion of the 1937 Lease property with Blackhawk Land, again with the consent of Poca. Thereafter,

---

[8] Thus, less than twenty years after the original sale of the property to Loup Creek, Poca reacquired ownership of the property and Loup Creek, and through its status as a subsidiary of N&W, regained ownership of both Loup Creek and the property that had been sold for a significant price in 1936, likely more than $50 million in current value.

[9] Koppers Industries – Company Profile.

[10] It appears that Peabody acquired EACC via a stock merger for about 15.5% of Peabody's stock. Eastern Associated subsequently sold the Peabody stock for approximately $150 million in 1990. See, History of Eastern Enterprises.

[11] Defendant's Third Party Complaint, ¶ 14.

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 4


Blackhawk Land in turn entered further subleases for certain seams to Coronado Coal II, LLC, to which Poca again consented.[12]

These consents never raised any issue or objection to the royalty terms under the 1937 Lease. Recently, and more importantly, Blackhawk and Poca entered into an amendment of the 1937 Lease. This was part of the negotiated consent for the 2015 Consent by Poca for the transfer to Rockwell. Again, that amendment, although specifically modifying lease language with respect to the sub-leased premises, did not address any economic issues with regard to the royalty rate. [13]

As of the current date, the 1937 Lease remains in place. The Lessor is the successor by merger to the original Lessor. The Lessee is a third-tier unrelated purchaser for value through various sales.

You have asked my opinions on certain questions.

1. **What is the effect of a corporate merger with regard to the merger parties?**

   Poca is the current Lessor by virtue of being a successor through merger to Loup Creek, following the 1965 merger. Loup Creek was the initial party that executed the 1937 Lease. The merger was consummated on June 30, 1965, whereby both Loup Creek and another entity, The Wandle Company, an Ohio corporation, merged into Pocahontas Land Corporation as the surviving company. Copies of the Articles of Merger reflect the terms contained. [14]

   Such merger would have occurred under the prior version of the West Virginia Business Corporation Act, which provides that the successor corporation continues legally as a continuation of the component entities of the merger. Thus, as a result of this merger Poca *is* Loup Creek, and it continues as the same legal entity with all rights, liabilities, and obligations carried over and merged into the surviving entity. Thus, a merger is legally different than a purchase of assets. In this regard, Dr. Scott's testimony conceded that he did not place any particular significance on the legal

---

[12] Defendant's Third Party Complaint, ¶¶ 17–18.
[13] Plaintiff's Complaint, ¶¶ 14–15; Defendant's Counterclaim, ¶ 26.
[14] *See* Loup Creek Articles of Merger, effective June 30, 1965.

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 5

status of the merger of Loup Creek into Poca, treating it instead as a general "acquisition" for economic purposes. [15] This is not correct as to the legal acts taken

As expressly stated in the West Virginia Business Corporation Act, the effect of a merger is made clear:

> a. Upon the issuance of the certificate of merger or the certificate of consolidation by the secretary of state, the merger or consolidation shall be effected. When such merger or consolidation has been effected:

> (1) the several corporations parties to the plan of merger or consolidation shall be a single corporation, which, in the case of merger, shall be that corporation designated in the plan of merger as the surviving corporation, and, in the case of a consolidation, shall be the new corporation provided for in the plan of consolidation;

> (2) The separate existence of all corporations parties to the plan of merger or consolidation, except the surviving or new corporation, shall cease.

> (3)    Such surviving or new corporation shall have all of the rights, privileges, immunities and powers and shall subject to all of the duties and liabilities of a corporation organized under this article. [16]

The same rule was established by the Supreme Court of Appeals of West Virginia in Davis v. Celotex Corporation, holding: "Finally, such liability will also result where the successor corporation is a mere continuation or *reincarnation* of its predecessor."[17]

---

[15] Scott Transcript, at 21–24.
[16] W.Va. Code § 31-1-37 (following adoption of 1974 Amendments) (prior provisions in W.Va. Code § 31-1-63), (current provisions in W. Va. Code § 31D-11-1107).
[17]   420 S.E. 2d 557 (W. Va. 1992) (citing W.Va. Code § 31-1-37) (emphasis added).
.

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 6

As more expressly stated in the Poca-Loup Creek Articles of Merger:

(2)    Except as herein otherwise specifically set forth, the corporate identity, existence, purposes, powers, franchises, rights, and immunities of Pocahontas shall continue unaffected and unimpaired by the merger, and the corporate identity, existence, purposes, powers, franchises, rights and immunities of Loup Creek and Wandle shall be merged into Pocahontas, and Pocahontas shall be fully vested therewith. The separate corporate existence of Loup Creek and Wandle, except, insofar as the same may be continued by statute, shall cease upon the Merger Date, and thereupon the constituent corporations shall become a single corporation, to wit, Pocahontas, which shall survive such merger, and continue its corporate existence exclusively under, and continue to be governed by, the laws of the Commonwealth of Virginia.

(3)    On the Merger Date, the surviving corporation shall thereupon and thereafter possess all the rights, privileges, immunities, and franchises, as well of a public as of a private nature, of each of the constituent corporations, and all property, real, personal and mixed, and all debts due on whatever amount, and all other choses in action, and all and every other interest of or belonging to or due to each of the constituent corporations, including Loup Creek's license to hold 65,000 acres of land in the State of West Virginia, shall be taken and deemed to be transferred to and vested in the surviving corporation without further act or deed except as may be required by law; and the title to any real estate, or any interest therein, vested in any of the constituent corporations shall not revert or be in any way impaired by reason of such merger; provided, however, that the surviving corporation shall thenceforth be responsible and liable for all the liabilities and obligations of each of the constituent corporations; any claim existing or action or proceeding pending by or against any of the constituent corporations may be prosecuted as if such merger had not taken place; or the surviving corporation may be substituted in

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 7

> its place; and neither the rights of creditors nor any liens upon the property of any of the constituent corporations shall be impaired by such merger. Nothing herein is intended to or shall extend or enlarge the lien of any indenture, agreement or other instrument executed or assumed by Pocahontas, Loup Creek or Wandle.

Therefore, for all purposes of this discussion, including any analysis of equities involving the status and negotiation of the 1937 Lease, Poca, the Defendant in this action, is equally the same entity as Loup Creek, the original Lessor.

2. **What is the status of Rockwell as the successor to the Lessee interest?**

While Poca is a successor by merger, Rockwell acquired the Lessee interest in the 1937 Lease as an ultimate bona fide purchaser following the sale transaction in the Patriot bankruptcy, as well as the subsequent Blackhawk bankruptcy case. Unlike Poca, Blackhawk is a "legal stranger" to and not in any sense a successor of or the same party as Koppers Coal, the original Lessee in 1937.

Instead, Rockwell is a purchaser for value from an unrelated party, in this case, Patriot. In turn, Patriot was a subsidiary of Peabody, the original bona fide purchaser, having acquired the Lessee interests in the 1937 Lease as part of its 1987 acquisition of EACC.

Therefore, unlike Poca — which for all legal purposes is the same entity as Loup Creek — Rockwell has no relation to and is no way a continuation of Koppers Coal, the original Lessee. Rockwell, as a purchaser having acquired assets in an arms length transaction, paid fair value for those assets — which would include all terms of the 1937 Lease — as bargained for elements of that purchase. The same purchase relationship and bargained for terms of the 1937 Lease applied to Peabody's purchase of those assets from EACC in 1987.

West Virginia authorities clearly establish and accept the continuing liability of a successor or reincarnated corporation. Continuation, however, does not exist in the sale of business assets from one corporation to another, in the absence of certain specific factors. As the Supreme Court has stated, "the mere continuation exception to

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 8

the rule of non-liability envisions a common identity of directors and stockholders and the existence of only one corporation at the conclusion of the transfer." [18]

As the Jordan Court noted, some assets were transferred and there was no common identity of directors and stockholders. Unlike Poca as the merger successor — or Loup Creek reincarnated — Rockwell was unrelated to its seller, each of which was in turn unrelated to each prior seller, i.e. EACC to Peabody transaction.

It is also perhaps relevant that this same concept leads to a different conclusion concerning the status of Rockwell and Blackhawk in the Sev.en transaction. In that case, after that shareholder level event, there is only a single corporation with the identity of managers and directors the same. In essence, following that event, the entity continued unaffected in the same operations and management of its business. Thus, the principles of Jordan also support the proportion that this "new" Blackhawk is the same entity as the former Blackhawk.

3.  **Does the Scott Report present any evidence to support the assertion that due to asserted control by the Mellon family, "it did not matter economically what the stipulated royalty rate was"?**

The Scott Report in this discussion, as well as its assertion that the 1937 Lease was not on arms length terms (see discussion below), attempts to treat Loup Creek and Koppers as essentially identical entities with the same ownership. Thus, Dr. Scott asserts it would not matter whether profits were taken by the lessee or the lessor: "The royalty rate fixed at ten cents per ton was simply an internal transfer price between the left hand and the right hand of the same body." [19]

As a legal matter, Dr. Scott's assertion of such "identity" would require that the Mellon family have the legal right to control both "sides of the transaction," i.e.

---

[18]   Jordan v. Ravenswood Aluminum Corp., 455 S.E.2d 561, 564 (W. Va. 1995) (citing 199 Am. Jur. 2d Corporations, § 2711); see also Meadows v. Krayem, No. 2:19–525, 2021 WL 1929353 (S.D. W. Va. May 13, 2021).
[19] Scott Report, at 11.

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 9

Koppers and Loup Creek. In fact, Dr. Scott conceded in his testimony that he did not examine this matter in terms of legal control, but rather, economic concepts.[20]

Further, in both his Report and his testimony, Dr. Scott conceded that the Mellon persons did not have legal control over the Virginian, and that the Rogers Heirs, through directly owned stock and proxies, could exercise voting control. Koppers acquired its interest in the Virginian by forming the Virginian Corporation as an upper-tier entity. That entity issued common preferred stock to Koppers, and notes and cash to the Rogers Heirs. In turn, the Virginian Corporation holds about 40% of voting stock of Virginian Railway.

About 34.5% of Virginian Railway's voting stock was held by Coe, members of his family and their trusts. "Coe expressed the opinion, in his testimony, that if a show-down fight ever arose in Virginian Railway that the Coe interests (though owning less voting stock) could, by command of proxies, out-vote Koppers. Coe admitted, however, that it was to the mutual advantage of both groups to cooperate rather than to fight."[21] Thus, as a legal matter, the necessary predicate for such identical economic interests does not exist. As a result, the conclusions reached by the Scott Report would not be substantiated.

However, Dr. Scott's testimony further elaborated his analysis as one of common economic benefit through the joint ownership of the Virginian, as a matter of economics rather than law. As he stated:

> Q:     Well, to the extent that the two
> 18 partners in this relationship see that they have a
> 19 mutual interest in operating this entity in a
> 20 certain way, then to that extent, they're able to
> 21 control the economic decisions of the entity by
> 22 convincing the other partner in the relationship
> 23 that we're both better off if we behave in this
> 24 way.[22]

---

[20] Scott Transcript, at 51.
[21] In the  Matter of Koppers United Co., 12 S.E.C. 184 (1942) at page 15.
[22] Scott Transcript, at 62: 17–24.

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 10

Thus, he instead sees the economic nature of the Virginian and its long term success, both for itself and its owners, as a matter of shared or reciprocal economic benefit.

The investment by both the Mellon family members and the Rogers Heirs in the Virginian, allowing the Mellon individuals and trusts to share the benefits of its operations and the lease and mining of the Koppers Coal operations, resulted in profit to both sides. Of course, given both the divergent ownership in the Virginian as well as the necessity to maintain that equilibrium to protect such benefits, Koppers would be unlikely to force or coerce unreasonable terms on either the Virginian or Loup Creek. Thus, the Mellon individuals did not have "control" of the combined entity anymore than did the Rogers Heirs. The "transfer price" between the two sides of the transaction thus had both economic and operational impact. Such amounts were not a case of the left hand pocket and the right hand pocket — but two pockets in two different suits.

The Scott Report also talks about the carrot and the stick or "club" held by the Mellons and Koppers over the Rogers Heirs with regard to the choice of other rail carriers, either the C&O or the N&W. To the extent that existed, its use would be of no economic benefit to the Mellons since they would be simply paying the same transportation costs to another carrier.

Similarly, the economic consequences of royalty revenue to either Koppers Coal or Loup Creek would have different impact on the respective owners of those interests. Various members of the Mellon family (who may or may not have acted in concert at any particular time) [23] having partial indirect economic interest through several tiers of corporate entities is not the same as 100% ownership of both companies. In this regard, Dr. Scott also conceded that his economic analysis did not focus on actual legal ownership or flow of funds between the chains of entities which he did not consider "hypercritical."[24]

---

[23] In fact, as noted above, the various members of the Mellon family owned, in aggregate, a 50% economic interest in Koppers, which in turn had a 75% economic interest in Eastern Gas. In other words, the "Mellon family" — which notably was composed of multiple different individuals, trusts, and a charity — accounted for 37.5% of the economic interests in Eastern Gas. Loup Creek, having been acquired as part of the acquisition of control of the Virginian Railroad, was held indirectly through Eastern Gas. Thus, significant economic interest was held by other investors, including the original ownership of the Rogers Heirs — an investor block unaffiliated in any legal or familial sense with the "Mellon family." *See* The Distribution of Ownership of the 200 Largest Non-Financial Corporations, U S Securities and Exchange Commission, October, 1940, at pages 101-04.

[24] Scott Transcript, at 67–68.

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 11

Dr. Scott in his testimony stated that he had not considered the question of legal control of the Virginian by Koppers.

> Q. So let me break this down further. Would
> 15 it be fair that you have not concluded in any way
> 16 that the Koppers Company by itself through the
> 17 exercise of its own power or ownership could
> 18 control the Virginian corporation?
> 19    A. No, I've not concluded that.
> 20    Q. In other words, your conclusion is more
> 21 that based on the records you've seen, the Koppers
> 22 Company had reached an agreement with other owners
> 23 of the Virginian corporation that they would work
> 24 together?
> A. I think that's fair.[25]

And in any event, as noted above, such economic misalignment between the Lessor and Lessee interests would undermine the reciprocal benefit the parties enjoyed in the Virginian.

Per the Scott Report, the assertion is made that there was an "identity of interest" between Loup Creek and Koppers Coal existing in the Mellon family at the time of the 1937 Lease. However, the evidence shows at most that there was some overlapping ownership and control, governed by the economic balancing required for the reciprocal benefits of joint ownership of the Virginian between the Mellons and the Rogers Heirs. This in no sense creates an "identity" of ownership or interest on both sides of the 1937 Lease transaction.

4. **Does the Scott Report present any evidence that the 1937 Lease was not negotiated on arms length terms?**

The mere presence of some overlapping, upper-tier ownership between Koppers Coal and Loup Creek does not mean that the lease terms were not arms length. The Scott

---

[25] Scott Transcript, at 64:20–65:1.

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 12

Report presents no facts to show that either party was disadvantaged under the terms of the Lease. Similarly, there is no information as to the management structure of either entity, either their officers or board of directors, nor whether there was any overlap or identity of those persons.[26]

In fact, it is clear that following the death of Henry Rogers in 1909, the next generation became active in the business and continued thereafter, primarily his son-in-law, William Coe, who apparently was the primary negotiator in Mellons' investment in the Virginian. Coe testified that the "Rogers family and the Koppers company had a cooperative relationship in running the Virginian railway."[27] In fact, the Coes continued long running involvement, management, and investment in the Virginian well after the 1937 Lease. William Coe's son, William Rogers Coe, subsequently served as Vice President and Treasurer of the Virginian as well as a member of the Executive Committee until his death in 1971.[28] Thus, after Henry Rogers' death, both the second and third generation of Rogers family members remained involved with the Virginian in the management and operations for many years.

This is bolstered by the Craynon Report, submitted by Plaintiffs, which indicates that the general economic terms of the 1937 Lease were consistent with other coal leases entered at that time. In the absence of any specific evidence of unfair or disproportionate terms, there should be no assumption that the 1937 Lease was not negotiated on arms length terms.

In fact, Scott's Rebuttal Report further concedes that the "royalty established in the 1937 Lease was fairly representative of coal leases in Southern West Virginia at the time."[29] Similarly, the Schwartz Rebuttal Report, dated August 2021, also concedes that "the royalty rates in the Lease may have been commercially reasonable at the time they were agreed in 1937."[30] Therefore, in the absence of specific facts to

---

[26] In fact, Scott's subsequently generated Rebuttal Report, dated August 2021, in essence wholly speculates that the Lease had been negotiated by non-independent management without competent legal counsel. Again, there is nothing presented in the Rebuttal Report to support this assertion. In fact, the record would indicate that these were well thought out transactions having been conceived as an overall acquisition plan in 1937 to acquire interests in both the Virginian and the leasehold property itself, which was acquired from Pocahontas Coal & Coke Company.

[27] Scott Report, at 7 n. 16.

[28] *William Coe Obituary*, New York Times (June 9, 1971).

[29] Scott Rebuttal Report, at 1.

[30] Schwartz Rebuttal Report, at 2.

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 13

support Scott's assertion of unfair terms, there is no factual basis to assume that the 1937 Lease did not include commercially reasonable terms.

Moreover, the mere presence of some common indirect ownership between Loup Creek and Koppers Coal through individual members of the Mellon family does not indicate a single-minded unity of purpose or action. As noted previously, the "Mellon family" is a broad brush. In fact, the Mellon's 50% ownership of Koppers appeared to involve at least four different individuals in the Mellon family, as well as at least one trust and one charity.[31] It further appears that the Virginian Corporation, which owned interests in the Virginian and Loup Creek, had other outside ownership apart from Koppers, and the Rogers Heirs retained actual legal voting control of the Virginian.

It is also worthwhile noting that Loup Creek acquired the property in question through owner financing from Pocahontas Coal & Coke Company pursuant to the terms of the 1937 deed, having paid only 10% down. Loup Creek needed to repay the remaining $2.7 million within the next four years, according to the terms of the promissory notes.

Thus, it would have been imperative to Loup Creek to ensure that royalty rates were sufficiently high to cover such a significant outstanding debt in order to retain ownership of the property. In fact, it appears that all four notes were paid off early since the deed of trust was released early by Pocahontas Coal & Coke Company in 1939.[32] Thus, there must have been sufficient revenue earned under the terms of that Lease to support meeting these obligations. Dr. Scott does not address this issue in his reports.

In conclusion, contrary to the assertion in the Scott Report — but more consistent with Dr. Scott's testimony regarding joint economic interests and reciprocal benefits shared by the Mellon family and the Rogers Heirs through co-ownership of the

---

[31] The Distribution of Ownership of the 200 Largest Non-Financial Corporations, U S Securities and Exchange Commission, October, 1940, at pages 101-04. Critically, there is no evidence in Scott's report that the four individual Mellons would always act in perfect harmony with one another. There is no evidence in the Scott Report of the percentage interest owned by the charity in each of these enterprises. There is no evidence in the Scott report that the charity was improperly governed. The same holds true for the trust. Scott does not identify the trustee or explain why that person or corporation would always act in perfect harmony with the four individual Mellons' collective wishes. In short, by using the broad statement the "Mellon family," Dr.. Scott avoids any actual analysis of the then current persons who acted in 1937.

[32] Loup Creek Release, Release Book 8, Page 493, Boone County Clerk's Office, March 21, 1939

# FERGUSON LAW OFFICE, PLLC

Bailey & Glasser, LLP
Attn: Brian A. Glasser
Rockwell Mining, LLC, Blackhawk Land and Resources, LLC Litigation
October 7, 2021
Page 14

Virginian — such equilibrium would require a significant level of balanced economic terms between the interests of Koppers and Loup Creek. It thus seems an unfounded conclusion when the Scott Report states:

> As long as the Mellons and the Koppers Company owned and controlled both Loup Creek Colliery and the Koppers Coal Company, it did not matter economically what the stipulated royalty rate was. As a result, the 1937 Lease did not have protections built into it that would normally have been included in a contract between two unrelated parties.[33]

Notwithstanding that the parties to that 1937 Lease may not have been completely unrelated in part, the concepts of shared mutual benefit in the Virginian, together with the absence of true legal control by the Mellons, means the parties would necessarily have had to operate on terms equivalent to arm's length. Thus, the conclusion of Dr. Scott's Report cannot stand. Instead, those reciprocal benefits underlying the shared ownership of the Virginian and its subsidiary Loup Creek, as embodied in the 1937 Lease — and so well identified in Dr. Scott's testimony — would necessarily require that the Lease be structured and operated on the same as "arms length" terms.

Sincerely,

Mark A. Ferguson

---

[33] Scott Report, at Page 12

# EXHIBIT E

**Expert Report of John R. Craynon, Ph.D., P.E.**

1. INTRODUCTION AND QUALIFICATIONS

    1.1  I have been retained by Bailey Glasser to serve as an expert witness on behalf of the Plaintiffs in this case, to provide testimony and opinions on the coal lease in question, with regard to, among other things, the historical context in the mining industry, royalty, minimum royalty, and related financial terms in the lease.

    1.2  I am employed as a Teaching Assistant Professor in the Department of Mining Engineering at West Virginia University in Morgantown, West Virginia, since August 2020. My participation in this case, however, is in my role as sole proprietor of Craynon Consulting LLC, Morgantown, West Virginia.

    1.3  A copy of my Curriculum Vitae is hereto attached as Appendix A. As noted in my Curriculum Vitae, I have Bachelor of Science, Master of Science, and Doctor of Philosophy degrees in Mining and Minerals Engineering from Virginia Tech, Blacksburg, Virginia.

    1.4  I am a licensed Professional Engineer in the Commonwealth of Virginia and a registered Professional Engineer in the State of West Virginia.

    1.5  Beginning in 1983, I worked in the US Department of the Interior in various roles at the US Bureau of Mines, the Bureau of Land Management, the departmental Office of Environmental Policy and Compliance, and the Office of Surface Mining Reclamation and Enforcement.

    1.6  In 2011, I became the Director of Environmental Programs at the Virginia Center for Coal and Energy Research at Virginia Tech. In that position, I authored a number of technical reports and professional papers and served as editor of a book on environmental considerations in energy production. These are delineated in 1.7 below.

    1.7  <u>Publications in the past 10 years</u>

Craynon, J.R., editor, Environmental Considerations in Energy Production 2, Society for Mining, Metallurgy and Exploration, Englewood, Colorado, 2015.

Craynon, J.R., E.A. Sarver, N.S. Ripepi and M.E. Karmis, 2015 "A GIS-based methodology for identifying sustainability conflict areas in mine design – a case study from a surface coal mine in the USA" International Journal of Mining, Reclamation and Environment doi: 10.180/17480930.2015.1035872.

Craynon, J.R., editor, Environmental Considerations in Energy Production Society for Mining, Metallurgy and Exploration, Englewood, Colorado, 2013.

Craynon, J.R., E.A. Sarver and M.E. Karmis, 2013 "Incorporating Sustainable Development Principles into Coal Mine Design" International Journal of Sustainability Policy and Practice 8(3):57-64.

Craynon, J.R., E.A. Sarver and M.E. Karmis, 2013 "The role of science in public ecology and sustainable development in mining" in: 6th International Conference on Sustainable Development in the Minerals Industry, 30 June – 3 July 2013, Milos Island, Greece.

Craynon, J.R., E.A. Sarver and D.P. Robertson, 2012 "Could a Public Ecology Approach Help Resolve the Mountaintop Mining Controversy?" Resources Policy 38:44-49.

Craynon, J.R. and M.E. Karmis, 2011 "Optimizing coal mine design for sustainable development at a large surface coal mining operation in Appalachia" in SDIMI 2011: Aachen International Mining Symposia, Sustainable Development in the Minerals Industry: From Primary Production to Sustainable Supply Chains, Aachen, Germany, pp. 75-82.

1.8   In 2016, I returned to the US government as Senior Mining Engineer at the Export-Import Bank of the United States where I evaluated the technical feasibility and assessing the technical risks of projects in the mining, mineral processing, metals, oil and gas, and heavy construction sectors and conducted project monitoring and field inspections to assess the technical and environmental performance associated with the operations of projects financed by EXIM.  I subsequently retired from government service on December 31, 2018.

1.9   In my thirty-eight-year professional career I have amassed and maintained extensive experience related to coal mining and coal leasing, as well as the general financial issues related to the mining industry.  While working at the Bureau of Land Management, I was a mining engineer directly involved in the Federal Coal Management program, involved in coal leasing and operations on Federal lands and resources.  My experience of fifteen years at the Office of Surface Mining Reclamation and Enforcement involved regulating the US coal industry, and evaluation of all aspects of their business, including financial agreements.  I have also served as a consultant in the international coal, metals, and industrial minerals industries for over fifteen years.  Further, my career has involved six years in an academic environment, conducting research and teaching mining engineering and related courses.

1.10  I am being compensated in this matter at my normal billing rate of $275 per hour. This compensation is not contingent on the nature of my findings or on the outcome of this litigation.  I have worked approximately 60 hours to date, and I anticipate additional work with this litigation as needed.

1.11  In preparation of this report, I have relied on my general knowledge, training, experience, and expertise.  My analysis, factual observations, and conclusions that I make in this report are based on the foregoing and the supporting materials I have had available to me.

1.12  My work in this matter is ongoing, and I may review additional materials or conduct additional analysis.  As such, I reserve the right to amend, update, or revise my conclusions as appropriate.

1.13  I have not served as an expert witness in any other cases in the past 4 years.

## 2.  HISTORICAL CONTEXT OF THE LEASE

2.1  This matter relates to the continuation of a lease originally signed between Loup Creek Colliery Company and The Koppers Coal Company on July 1, 1937.  Plaintiff and Defendant represent the successors of the original parties. Hereafter, I will refer to this as "the lease" or the "Loup Creek lease".

2.2  The lease specifies a royalty rate of 10 cents per ton of 2,000 pounds (short ton), and a minimum royalty/rental of $100,000 per annum.

2.3  The lease has been continued many times in the succeeding years in accordance with the terms.

2.4  The lease was agreed to during the Great Depression and in the midst of great uncertainty in the West Virginia coal industry.  Over the years before and after the signing of the original lease, coal production in the State and in particular in Boone and Wyoming Counties, varied wildly.  Appendix B includes a table of historical coal production in West Virginia, Boone and Wyoming Counties for the period from 1927 through 1937.  West Virginia total production was 117 million tons in 1936 and 118 million tons in 1937 (*Minerals Yearbook, 1939*).

2.5  In April 1937, the Congress passed the Bituminous Coal Act (50 Stat. 72, 1937) which restored regulation of bituminous coal in interstate commerce, established a nineteen and one-half percent tax on all bituminous coal producers, and created the National Bituminous Coal Commission, whose purpose was to supervise the establishment of minimum coal prices.  This Act was a successor to a 1935 Act that had failed judicial challenges.

2.6  Demand for bituminous coal, including metallurgical coal, fluctuated wildly in the decade preceding the establishment of the lease.  In 1932, US demand for

bituminous coal was 360 million short tons, which had increased to 425 million tons by 1937, according to the US Bureau of Mines in the *Minerals Yearbook, 1938*.

2.7 According to the US Bureau of Labor Statistics, 1937 saw a peak number of labor strikes.  In the bituminous coal industry, there were 54 strikes, involving 59,600 workers and a loss of 1,924,951 manhours. Even so, the total employment in the bituminous coal sector increased by 1.8 percent.  According to the US Bureau of Mines, this increase was heavily influenced by the reduction of the work week from 48 hours to 35 and the work year from 308 days to 261 (*Minerals Yearbook, 1938).*

3. OBSERVATIONS, OPINIONS, AND CONCLUSIONS

3.1 Time Value of Money**.** Economically there are standard methods for determining the comparable value of money in different years, based on some chosen "discount rate".  For this report, I have used the Consumer Price Index, available from the Bureau of Labor Statistics website (www.bls.gov).

**3.2**  Royalty Rate.  Royalty rates are set in the terms of a lease or other agreement as a way of compensating the lessor for the use of the land and the production of valuable resources.  In the case of coal, these rates are usually set on the basis of cents per ton of coal mined, shipped, or sold.  In this case, the royalty rate was set, as mentioned in 2.2 above, as 10 cents per ton.

An analysis of a sample of fourteen other coal leases in Boone and Wyoming Counties covering the period of 1927 through 1937, shows 10 cents per ton as the then prevailing rate.  In the cases where the rate was higher, the production was measured in long tons of 2240 pounds.  Using the proportion between 2000 pounds and 2240 pounds, these higher rates per long ton are very comparable to 10 cents per short ton.  Appendix C contains a summary of those leases. Based on my analysis of these comparable leases, the royalty rate contained in the lease not out of the ordinary. .

3.3 Minimum Royalty. Minimum royalty is one of the negotiated terms of a lease or other legal agreement that guarantees the lessor receives at a minimum some stipulated annual payment.  It is devised to put a floor on the lessor's return and guarantees at least that amount each year of the agreement, whether or not mining occurs. This lease term, along with royalty rate, considers the quantity of coal in the reserve, the expected length of the mining operation, other encumbrances that the lessor may have, and other business factors.  If coal production from the lease results in royalties that exceed the minimum, the lessor receives increased revenues.

Some leases do not contain minimum royalty amounts based on production, but substitute minimum rentals based on the surface acreage of the lease. The intent of

these minimum rentals is the same, ensuring a minimum annual return. In the case of this lease, where the minimum royalty is $100,000 at a 10 cent per ton royalty rate, the production required to exceed the minimum is 1,000,000 short tons.

For the analyzed leases in Boone and Wyoming County, there were a number of ways that a minimum income for the lessor was established in the lease provisions. Additionally, the value of the minimum royalty/rental varied wildly from none required to $120,000 annually. The basis for these extreme differences appears to be the acreage included in the lease, the expected term of coal production, and the requirement for diligent production of the coal reserves on the property. The leases with the most in common with the Loup Creek lease are the ones with comparable (though higher) minimum royalties and/or rentals. Based on this analysis, the establishment of a minimum royalty of $100,000 annually is not unreasonable for similar mineral leases at that time.

3.4  <u>Lessee's Business Confidence</u>. The business and financial risks created by capital investment, time, and other factors required to build facilities and start mining on this lease were acceptable to the Lessee in 1937. These risks include the royalty rate and the minimum royalty specified in the lease. Additional factors, such as the national economic situation and the recent creation of a 19.5 percent tax and minimum price standards, added additional business risk.

The capital investment required to construct a rail siding on the property, the construction of an underground mine and the other facilities to produce 1,000,000 tons per year would have been significant, even in 1937 dollars. The lease also contained terms that require the commencement of construction within 60 days and diligent work to produce coal. The Lessee met those requirements and successfully achieved coal production on the site.

Given the historical challenges outlined in Section 2.0 above, the Lessee took on significant risk and demonstrated great confidence in their ability to make this lease valuable investment for the themselves and the Lessor.

3.5  <u>Value of $100,000 from 1937 in 2021 dollars</u>. I was asked to calculate the value of $100,000 in 1937 in 2021 dollars. Using the average Consumer Price Index as the discount factor, the value of a $100,000 payment in 1937 is $1,854,542 in 2021 dollars. Appendix D has the table with the calculations.

3.6  <u>Value of total minimum payments from 1937 through 2021 in 2021 dollars</u>. Additionally, I was asked to calculate the 2021-dollar value of the total payments made during the term of the lease. Assuming that the minimum royalty payments were all that were made in each year that the lease has been in effect, the grand total of payments is $8,400,000. Using the average Consumer Price Index from each

payment year through 2021, the total value of those payments in 2021 dollars is $51,073,413. Appendix D has the table summarizing the calculations

3.7  Invested payments.  While examining the effect that the time value of money has on the value of payments, I was also asked to evaluate the value of the royalty payments had they been reinvested by the Lessor in a commonly available manner. From 1937 until 2021, one of the most widely available investment vehicles, with generally conservative rates-of-return were 10-year term Treasury bills. If the Lessor had invested the minimum royalty payments each year that the lease has been in effect into 10-year Treasury bills and reinvested all the proceeds of those Treasury bills into new 10-year Treasury bills, the total value of the payments and the earnings on this low to no risk investment in Treasury bills would be $162,850,631. Appendix E includes the spreadsheet with the calculations of this number. The interest rate on the Treasury bills in each year was obtained from the Department of Treasury website (www.treasury.gov).

3.8  Conclusion on Lessor's return.  The foregoing analysis likely does not reflect how the Lessor used the proceeds from the lease. Actual payments made by the Lessee through the years may have exceeded the minimum royalty in many of the years of the lease. However, based on the calculations in 3.5 through 3.7 above, it is clear that even the minimum royalty payments made over the 84 years that this lease has been in force have provided a significant value to the Lessor.

3.9  Overall conclusions.  My analysis of the lease in question has been focused on the reasonableness of the royalty rate, the minimum royalty, and other similar terms included in the Loop Creek lease. Additionally, I analyzed what the value of minimum royalty payments made through the years would be in 2021 dollars. Further, I looked at the value that could have been gained if the minimum royalty payments had been invested in no-risk 10-year Treasury bills.

Based on my analyses and my knowledge of the coal mining industry, I believe that this lease was typical and customary for its time period and has provided a reasonable rate of return to the Lessor. Further, I believe that the Lessee demonstrated a commitment to a successful coal mining operation in the light of difficult economic and social contexts and has continued to adhere to those terms of the lease that I have analyzed.

I hold all my opinions to a reasonable degree of certainty.

John R. Craynon, PhD, PE

# APPENDIX A

# Curriculum Vitae

Name:           John R. Craynon, PhD, PE
Institution:    Craynon Consulting LLC.
Contact Info:   jcraynon@gmail.com, 540-505-3362

**Education and Training:**
- Virginia Tech, Mining and Minerals Engineering, BS, 1982
- Virginia Tech, Mining and Minerals Engineering, MS, 1985
- Virginia Tech, Mining and Minerals Engineering, PhD, 2011

**Research and Professional Experience:**

**2020 – Present        Owner, Craynon Consulting LLC**
Technical advice, financial, and management consulting
**2020 – Present        Technical Director, GAS Alternative Systems Inc.**
Technical advice and management of projects at GAS and related companies.
**2020 – Present        Teaching Assistant Professor, West Virginia University**
Teaching position in the Department of Mining Engineering.
**2018 – Present        President, Mining & Development Services LLC**
Financial and management consulting in the minerals and related industries.
**2016 – 2018        Senior Mining Engineer, Export-Import Bank of the United States**
Technical support for the analysis and monitoring of loans in the mining, metals, energy, and related
sectors.
**2011 – 2016        Director, Environmental Projects, Virginia Center for Coal and Energy
                Research, Virginia Tech**
Oversight and direction of a multi-university research program related to environmental, economic, and
public health impacts of coal mining and energy development.
**1996 – 2011        Division Chief, Office of Surface Mining Reclamation and Enforcement,
                United States Department of the Interior**
Management of regulatory and technical staff in the Washington, DC headquarters of a Federal regulatory
agency within the US Department of the Interior.
**1991 – 1996        Physical Scientist, Office of Environmental Policy and Compliance,
                United States Department of the Interior**
Technical expert on mining and mining wastes related to cleanup of waste sites and management of
wastes related to the activities and lands of the US Department of the Interior
**1988 – 1991        Mining Engineer, Bureau of Land Management
                United States Department of the Interior**
Technical expert related to the environmental impacts of coal and non-coal mining involving Federal
lands and resources.
**1985 – 1988        Foreign Minerals Specialist, US Bureau of Mines**
Monitored the production and trade of minerals, metals, and energy in assigned European countries and
produced authoritative reports.
**1983 – 1985        Minerals Engineer, US Bureau of Mines
                United States Department of the Interior**
Conducted electrometallurgical research.

**Publications:**
Craynon, J.R., editor, Environmental Considerations in Energy Production 2 Society for Mining,
        Metallurgy and Exploration, Englewood, Colorado, 2015.

Craynon, J.R., E.A. Sarver, N.S. Ripepi and M.E. Karmis, 2015 "A GIS-based methodology for identifying sustainability conflict areas in mine design – a case study from a surface coal mine in the USA" International Journal of Mining, Reclamation and Environment doi: 10.180/17480930.2015.1035872.

Craynon, J.R., editor, Environmental Considerations in Energy Production Society for Mining, Metallurgy and Exploration, Englewood, Colorado, 2013.

Craynon, J.R., E.A. Sarver and M.E. Karmis, 2013 "Incorporating Sustainable
Development Principles into Coal Mine Design" International Journal of Sustainability Policy and Practice 8(3):57-64.

Craynon, J.R., E.A. Sarver and M.E. Karmis, 2013 "The role of science in public ecology and sustainable development in mining" in: 6th International Conference on Sustainable Development in the Minerals Industry, 30 June – 3 July 2013, Milos Island, Greece.

Craynon, J.R., E.A. Sarver and D.P. Robertson, 2012 "Could a Public Ecology Approach Help Resolve the Mountaintop Mining Controversy?" Resources Policy 38:44-49.

Craynon, J.R. and M.E. Karmis, 2011 "Optimizing coal mine design for sustainable development at a large surface coal mining operation in Appalachia" in SDIMI 2011: Aachen International Mining Symposia, Sustainable Development in the Minerals Industry: From Primary Production to Sustainable Supply Chains, Aachen, Germany, pp. 75-82.

Craynon, J.R. and M.E. Karmis, 2009 "An Approach to Optimising Coal Mine Design for Sustainable Development" in Sustainable Development Indicators in the Minerals Industry Conference: SDIMI 2009, Publication Series – Australasian Institute of Mining and Metallurgy, vol. 6/2009, pp. 109-114.

Craynon, J.R. and M. E. Karmis, 2007 "Integrating sustainability in coal mining operations" in Proceedings 3rd International Conference on Sustainable Development Indicators in the Minerals Industry, Zach Agioutantis, ed., Heliotopos Publications, pp. 73-76.

**Synergistic Activities:**
- Professional Engineer, Commonwealth of Virginia
- Professional Engineer, State of West Virginia
- Member, Committee on Geologic and Geotechnical Engineering, National Research Council, National Academies (2014-15)
- Co-chair, 2017 Engineering Solutions for Sustainability: Materials and Resources 3: Towards a Circular Economy Symposium, Denver, CO, sponsored by the American Institute of Mining, Metallurgical and Petroleum Engineers and other engineering professional societies
- Member, Society of Mining, Metallurgy and Exploration (SME)
  - Member, Structure and Governance Committee (2021-2024)
  - Past Chair, Sustainable Development Committee (2017-18)
  - Chair, Sustainable Development Committee (2016-17)
  - Vice-Chair, Sustainable Development Committee (2015-16)
  - Secretary, Sustainable Development Committee (2014-15)
  - Coal and Energy Division Representative, Sustainable Development Committee
  - (2013-14)
- Program Evaluator, Mining and Minerals Engineering, ABET (2017-Present)
- Member, Society of Mining Professors (2020-Present)
- Member, American Society for Engineering Education (2020-Present)
- Member, International Mine Water Association (1997-Present)
- Member, Association of Engineering and Environmental Geologists (2014-Present)
- Member, American Society for Reclamation Sciences (1996-Present)

# APPENDIX B

Historic Coal Production

Short Tons

| County | 1937 | 1936 | 1935 | 1934 | 1933 | 1932 | 1931 | 1930 | 1929 | 1928 | 1927 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Boone | 3,738,423 | 3,782,313 | 2,958,037 | 2,583,157 | 2,317,064 | 2,200,164 | 2,427,634 | 3,045,056 | 3,507,876 | 3,399,552 | 3,961,534 |
| Wyoming | 2,635,684 | 2,273,477 | 1,852,994 | 1,667,938 | 1,721,003 | 1,460,086 | 1,899,187 | 2,238,864 | 2,342,683 | 1,973,006 | 2,898,648 |
| West Virginia | 118,006,347 | 117,191,206 | 99,140,679 | 96,961,761 | 93,360,362 | 84,974,978 | 101,132,074 | 120,655,065 | 137,825,256 | 131,667,437 | 144,570,261 |

# APPENDIX C

| Lease | County | Date | Royalty Rate (cents/ton) | Minimum Royalty | Notes |
|---|---|---|---|---|---|
| FH Good/Big Eagle | Wyoming | 1927 | 15 | $6,000 | minimum royalty increased from $1,500 to $6,000 over first 5 years of lease. |
| Bedford Corp/Vermillion | Boone | 1927 | 10 RENTAL | | pre-Depression. Rental of $4 per acre in year 1, incremental increase to $7 per acre for year 4 and beyond, to be offset by royalty. |
| Pocahontas/Houston | Wyoming | 1929 | | | Royalty rate escalated by tonnage from 11 cents/ton to 12.73 over 20,000 tons and minimum royalty escalated by year to $112,000 in 1934. Continuation of 1915 lease with |
| Wyoming Land/Erin Smokeless | Wyoming | 1930 | 12.73 | $112,000 | new terms |
| Boone County Coal/Spruce River | Boone | 1931 | 12.5 | $6,650 | long tons (2240 lbs) |
| Bull Creek Coal Land/Henry L. Fisher et. al. | Boone | 1932 | 10 | $5,000 | Bonus royalty of 5 percent if selling price exceeds $1.50 |
| Wharton Coal/Oriole Coal | Boone | 1932 | 10 | $2,000 | 60-day begin work clause. |
| W. M. Ritter Lumber/ Morrison Coal | Wyoming | 1933 | 10 | $25,000 | minimum royalties of $25,000 plus $5 per acre for any exclusive area besides the first. a 15 cents/ton royalty applied to all areas besides the "first exclusive area". Additional |
| Wyoming Land/Black Eagle | Wyoming | 1934 | 12.5 | $2,500 | Minimum royalty effective January 1, 1935. |
| Southern Land/Elkhorn Piney | Boone | 1934 | 10 NONE | $5,000 | 60-day begin work clause. Long tons (2240 lbs) |
| Youghiogheny & Ohio/Red Parrot | Boone | 1935 | 5 | | Henshaw seam |
| Federal Coal/Red Parrot | Boone | 1935 | 2 | $2,000 | Five year mine out specified. |
| Wyoming Pocahontas/Milams Fork | Wyoming | 1936 | 10 | $120,000 | Transport lease. long tons (2240 lbs) $10 per acre minimum rental ($1,200) effective January 1, 1939 |
| Western Pocahontas/Brule Smokeless | Wyoming | 1937 | 15 RENTAL | | Bonus rental of 5 percent of net price (after rail fees) of prices over $2.50 per ton. After mine-out of a 1923 lease, the minimum royalty increased to $240,000. Many other specific terms related to that lease. |

# APPENDIX D

| Year | Payment | Average inflation | Converted amount |
|------|---------|-------------------|------------------|
| 1937 | $ 100,000.00 | 3.54 | $ 1,854,541.67 |
| 1938 | $ 100,000.00 | 3.61 | $ 1,894,000.00 |
| 1939 | $ 100,000.00 | 3.67 | $ 1,921,251.80 |
| 1940 | $ 100,000.00 | 3.71 | $ 1,907,528.57 |
| 1941 | $ 100,000.00 | 3.69 | $ 1,816,693.88 |
| 1942 | $ 100,000.00 | 3.60 | $ 1,638,368.10 |
| 1943 | $ 100,000.00 | 3.57 | $ 1,543,664.74 |
| 1944 | $ 100,000.00 | 3.59 | $ 1,517,352.27 |
| 1945 | $ 100,000.00 | 3.61 | $ 1,483,633.33 |
| 1946 | $ 100,000.00 | 3.55 | $ 1,369,507.69 |
| 1947 | $ 100,000.00 | 3.41 | $ 1,197,551.57 |
| 1948 | $ 100,000.00 | 3.35 | $ 1,108,107.88 |
| 1949 | $ 100,000.00 | 3.42 | $ 1,122,075.63 |
| 1950 | $ 100,000.00 | 3.45 | $ 1,108,107.88 |
| 1951 | $ 100,000.00 | 3.38 | $ 1,027,130.77 |
| 1952 | $ 100,000.00 | 3.40 | $ 1,007,750.94 |
| 1953 | $ 100,000.00 | 3.44 | $ 1,000,202.25 |
| 1954 | $ 100,000.00 | 3.49 | $ 992,765.80 |
| 1955 | $ 100,000.00 | 3.54 | $ 996,470.15 |
| 1956 | $ 100,000.00 | 3.58 | $ 981,816.18 |
| 1957 | $ 100,000.00 | 3.58 | $ 950,370.11 |
| 1958 | $ 100,000.00 | 3.59 | $ 924,062.28 |
| 1959 | $ 100,000.00 | 3.64 | $ 917,711.34 |
| 1960 | $ 100,000.00 | 3.67 | $ 902,209.46 |
| 1961 | $ 100,000.00 | 3.72 | $ 893,157.19 |
| 1962 | $ 100,000.00 | 3.76 | $ 884,284.77 |
| 1963 | $ 100,000.00 | 3.81 | $ 872,725.49 |
| 1964 | $ 100,000.00 | 3.85 | $ 861,464.52 |
| 1965 | $ 100,000.00 | 3.89 | $ 847,790.48 |
| 1966 | $ 100,000.00 | 3.91 | $ 824,240.74 |
| 1967 | $ 100,000.00 | 3.92 | $ 799,562.87 |
| 1968 | $ 100,000.00 | 3.92 | $ 767,396.55 |
| 1969 | $ 100,000.00 | 3.89 | $ 727,667.57 |
| 1970 | $ 100,000.00 | 3.85 | $ 688,283.51 |
| 1971 | $ 100,000.00 | 3.84 | $ 659,392.59 |
| 1972 | $ 100,000.00 | 3.86 | $ 638,885.17 |
| 1973 | $ 100,000.00 | 3.81 | $ 601,472.97 |
| 1974 | $ 100,000.00 | 3.66 | $ 541,691.68 |
| 1975 | $ 100,000.00 | 3.54 | $ 496,382.90 |
| 1976 | $ 100,000.00 | 3.50 | $ 469,339.19 |
| 1977 | $ 100,000.00 | 3.43 | $ 440,683.17 |
| 1978 | $ 100,000.00 | 3.33 | $ 409,592.02 |
| 1979 | $ 100,000.00 | 3.15 | $ 367,842.98 |
| 1980 | $ 100,000.00 | 2.91 | $ 324,094.66 |
| 1981 | $ 100,000.00 | 2.73 | $ 293,788.78 |
| 1982 | $ 100,000.00 | 2.64 | $ 276,739.90 |
| 1983 | $ 100,000.00 | 2.63 | $ 268,126.51 |
| 1984 | $ 100,000.00 | 2.58 | $ 257,029.84 |
| 1985 | $ 100,000.00 | 2.56 | $ 248,191.45 |
| 1986 | $ 100,000.00 | 2.58 | $ 243,662.41 |
| 1987 | $ 100,000.00 | 2.55 | $ 235,082.75 |
| 1988 | $ 100,000.00 | 2.50 | $ 225,743.03 |
| 1989 | $ 100,000.00 | 2.43 | $ 215,366.13 |
| 1990 | $ 100,000.00 | 2.33 | $ 204,325.94 |
| 1991 | $ 100,000.00 | 2.27 | $ 196,074.89 |
| 1992 | $ 100,000.00 | 2.24 | $ 190,344.98 |
| 1993 | $ 100,000.00 | 2.22 | $ 184,812.46 |
| 1994 | $ 100,000.00 | 2.21 | $ 180,198.38 |
| 1995 | $ 100,000.00 | 2.18 | $ 175,232.28 |
| 1996 | $ 100,000.00 | 2.15 | $ 170,206.50 |
| 1997 | $ 100,000.00 | 2.14 | $ 166,388.79 |
| 1998 | $ 100,000.00 | 2.17 | $ 163,836.81 |
| 1999 | $ 100,000.00 | 2.17 | $ 160,296.52 |
| 2000 | $ 100,000.00 | 2.11 | $ 155,083.62 |
| 2001 | $ 100,000.00 | 2.07 | $ 150,792.77 |
| 2002 | $ 100,000.00 | 2.10 | $ 148,445.80 |
| 2003 | $ 100,000.00 | 2.09 | $ 145,138.04 |
| 2004 | $ 100,000.00 | 2.06 | $ 141,373.21 |
| 2005 | $ 100,000.00 | 1.97 | $ 136,740.40 |
| 2006 | $ 100,000.00 | 1.86 | $ 132,467.26 |
| 2007 | $ 100,000.00 | 1.82 | $ 128,798.80 |
| 2008 | $ 100,000.00 | 1.67 | $ 124,036.36 |
| 2009 | $ 100,000.00 | 1.84 | $ 124,479.23 |
| 2010 | $ 100,000.00 | 1.86 | $ 122,470.37 |
| 2011 | $ 100,000.00 | 1.73 | $ 118,722.85 |
| 2012 | $ 100,000.00 | 1.69 | $ 116,315.76 |
| 2013 | $ 100,000.00 | 1.72 | $ 114,636.61 |
| 2014 | $ 100,000.00 | 1.74 | $ 112,806.67 |
| 2015 | $ 100,000.00 | 2.01 | $ 112,672.93 |
| 2016 | $ 100,000.00 | 2.16 | $ 111,269.25 |
| 2017 | $ 100,000.00 | 2.17 | $ 108,948.27 |
| 2018 | $ 100,000.00 | 2.06 | $ 106,298.61 |
| 2019 | $ 100,000.00 | 2.20 | $ 104,457.72 |
| 2020 | $ 100,000.00 | 4.16 | $ 103,184.68 |
| 2021 | $ 100,000.00 | | $ 100,000.00 |
| | | | $ 51,073,412.87 |

SA000084

# APPENDIX E

| Year | Payment | 10 yr Tbill Rate | Maturity Year | Value at maturity | Reinvestment Tbill rate | Reinvestment maturity Year | Reinvestment Value at Maturity | 2nd reinvestment Tbill rate | 2nd reinvestment maturity year | 2nd reinvestment value at maturity | 3rd reinvestment Tbill rate | 3rd reinvestment maturity year | 3rd reinvestment value at maturity | 4th reinvestment Tbill rate | 4th reinvestment maturity year | 4th reinvestment value at maturity | 5th reinvestment Tbill rate | 5th reinvestment maturity year | 5th reinvestment value at maturity | 6th reinvestment Tbill rate | 6th reinvestment maturity year | 6th reinvestment value at maturity | 7th reinvestment Tbill rate | 7th reinvestment maturity year | 7th reinvestment value at maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1937 | $ 100,000.00 | 2.68 | 1947 | $ 130,274.26 | 2.25 | 1957 | $ 162,739.05 | 3.46 | 1967 | $ 228,673.85 | 4.58 | 1977 | $ 357,851.53 | 7.21 | 1987 | $ 717,886.59 | 7.08 | 1997 | $ 1,422,785.62 | 6.58 | 2007 | $ 2,690,894.23 | 4.76 | 2017 | $ 4,284,020.34 |
| 1938 | $ 100,000.00 | 2.56 | 1948 | $ 128,759.75 | 2.44 | 1958 | $ 163,861.08 | 3.09 | 1968 | $ 222,147.39 | 5.53 | 1978 | $ 380,540.25 | 7.96 | 1988 | $ 818,520.11 | 8.67 | 1998 | $ 1,879,862.25 | 5.54 | 2008 | $ 3,223,271.77 | 3.74 | 2018 | $ 4,653,281.88 |
| 1939 | $ 100,000.00 | 2.36 | 1949 | $ 126,270.75 | 2.31 | 1959 | $ 158,665.91 | 4.02 | 1969 | $ 235,316.36 | 6.04 | 1979 | $ 423,008.70 | 9.1 | 1989 | $ 1,010,640.76 | 9.09 | 1999 | $ 2,412,382.82 | 4.72 | 2009 | $ 3,825,978.83 | 2.52 | 2019 | $ 4,907,141.01 |
| 1940 | $ 100,000.00 | 2.21 | 1950 | $ 124,432.52 | 2.32 | 1960 | $ 156,508.96 | 4.72 | 1970 | $ 248,219.29 | 7.79 | 1980 | $ 525,557.52 | 10.8 | 1990 | $ 1,465,608.10 | 8.21 | 2000 | $ 3,226,204.01 | 6.66 | 2010 | $ 6,147,628.57 | 3.73 | 2020 | $ 8,866,483.27 |
| 1941 | $ 100,000.00 | 1.95 | 1951 | $ 121,303.21 | 2.57 | 1961 | $ 156,342.07 | 3.84 | 1971 | $ 227,888.63 | 6.24 | 1981 | $ 417,448.85 | 12.57 | 1991 | $ 1,364,048.88 | 8.09 | 2001 | $ 2,969,512.11 | 5.16 | 2011 | $ 4,911,236.80 | 3.39 | 2021 | $ 6,854,507.06 |
| 1942 | $ 100,000.00 | 2.46 | 1952 | $ 127,509.79 | 2.68 | 1962 | $ 166,112.42 | 4.08 | 1972 | $ 247,784.97 | 5.95 | 1982 | $ 441,656.43 | 14.59 | 1992 | $ 1,724,057.54 | 7.03 | 2002 | $ 3,401,002.96 | 5.04 | 2012 | $ 5,561,015.95 | | | |
| 1943 | $ 100,000.00 | 2.47 | 1953 | $ 127,634.29 | 2.83 | 1963 | $ 168,719.67 | 3.83 | 1973 | $ 245,693.84 | 6.46 | 1983 | $ 459,471.82 | 10.46 | 1993 | $ 1,242,536.82 | 6.6 | 2003 | $ 2,354,405.78 | 4.05 | 2013 | $ 3,501,887.26 | | | $ 29,565,433.56 |
| 1944 | $ 100,000.00 | 2.48 | 1954 | $ 127,758.90 | 2.48 | 1964 | $ 163,223.37 | 4.17 | 1974 | $ 245,589.04 | 6.99 | 1984 | $ 482,659.49 | 11.67 | 1994 | $ 1,455,479.23 | 5.75 | 2004 | $ 2,545,714.95 | 4.15 | 2014 | $ 3,822,984.32 | | | |
| 1945 | $ 100,000.00 | 2.37 | 1955 | $ 126,394.17 | 2.61 | 1965 | $ 163,539.97 | 4.19 | 1975 | $ 246,538.24 | 7.5 | 1985 | $ 508,123.09 | 11.38 | 1995 | $ 1,492,935.58 | 7.78 | 2005 | $ 3,158,078.06 | 4.22 | 2015 | $ 4,774,562.12 | | | |
| 1946 | $ 100,000.00 | 2.19 | 1956 | $ 124,189.25 | 2.9 | 1966 | $ 165,286.64 | 4.61 | 1976 | $ 259,399.87 | 7.74 | 1986 | $ 546,687.91 | 9.19 | 1996 | $ 1,316,946.50 | 5.65 | 2006 | $ 2,281,724.19 | 4.42 | 2016 | $ 3,516,414.28 | | | |
| 1947 | $ 100,000.00 | 2.25 | 1957 | $ 124,920.34 | 3.46 | 1967 | $ 175,532.65 | 4.58 | 1977 | $ 274,690.91 | 7.21 | 1987 | $ 551,057.91 | 7.08 | 1997 | $ 1,092,146.42 | 6.58 | 2007 | $ 2,065,561.01 | 4.76 | 2017 | $ 3,288,462.73 | | | |
| 1948 | $ 100,000.00 | 2.44 | 1958 | $ 127,261.11 | 3.09 | 1968 | $ 172,528.60 | 5.53 | 1978 | $ 295,542.86 | 7.96 | 1988 | $ 635,695.64 | 8.67 | 1998 | $ 1,459,976.63 | 5.54 | 2008 | $ 2,503,322.50 | 3.74 | 2018 | $ 3,613,925.87 | | | |
| 1949 | $ 100,000.00 | 2.31 | 1959 | $ 125,655.31 | 4.02 | 1969 | $ 186,358.56 | 6.04 | 1979 | $ 335,001.33 | 9.1 | 1989 | $ 800,375.96 | 9.09 | 1999 | $ 1,910,484.22 | 4.72 | 2009 | $ 3,029,980.20 | 2.52 | 2019 | $ 3,886,205.53 | | | |
| 1950 | $ 100,000.00 | 2.32 | 1960 | $ 125,778.18 | 4.72 | 1970 | $ 199,481.05 | 7.79 | 1980 | $ 422,363.49 | 10.8 | 1990 | $ 1,177,833.69 | 8.21 | 2000 | $ 2,592,733.89 | 6.66 | 2010 | $ 4,940,532.23 | 3.73 | 2020 | $ 7,125,535.63 | | | |
| 1951 | $ 100,000.00 | 2.57 | 1961 | $ 128,885.35 | 3.84 | 1971 | $ 187,866.93 | 6.24 | 1981 | $ 344,136.68 | 12.57 | 1991 | $ 1,124,495.26 | 8.09 | 2001 | $ 2,448,007.81 | 5.16 | 2011 | $ 4,048,727.74 | 3.39 | 2021 | $ 5,650,721.81 | | | |
| 1952 | $ 100,000.00 | 2.68 | 1962 | $ 130,274.26 | 4.08 | 1972 | $ 194,326.23 | 5.95 | 1982 | $ 346,370.62 | 14.59 | 1992 | $ 1,352,098.22 | 7.03 | 2002 | $ 2,667,248.59 | 5.04 | 2012 | $ 4,361,246.41 | | | | | | |
| 1953 | $ 100,000.00 | 2.83 | 1963 | $ 132,189.93 | 3.83 | 1973 | $ 192,498.30 | 6.46 | 1983 | $ 359,990.89 | 10.46 | 1993 | $ 973,513.34 | 6.6 | 2003 | $ 1,844,649.90 | 4.05 | 2013 | $ 2,743,688.47 | | | $ 44,741,715.49 | | | |
| 1954 | $ 100,000.00 | 2.48 | 1964 | $ 127,758.90 | 4.17 | 1974 | $ 192,228.51 | 6.99 | 1984 | $ 377,789.33 | 11.67 | 1994 | $ 1,139,239.00 | 5.75 | 2004 | $ 1,992,593.03 | 4.15 | 2014 | $ 2,992,342.83 | | | | | | |
| 1955 | $ 100,000.00 | 2.61 | 1965 | $ 129,388.86 | 4.19 | 1975 | $ 195,055.08 | 7.5 | 1985 | $ 402,014.67 | 11.38 | 1995 | $ 1,181,174.42 | 7.78 | 2005 | $ 2,498,594.77 | 4.22 | 2015 | $ 3,777,517.76 | | | | | | |
| 1956 | $ 100,000.00 | 2.9 | 1966 | $ 133,092.55 | 4.61 | 1976 | $ 208,874.67 | 7.74 | 1986 | $ 440,205.52 | 9.19 | 1996 | $ 1,060,435.21 | 5.65 | 2006 | $ 1,837,296.11 | 4.42 | 2016 | $ 2,831,496.59 | | | | | | |
| 1957 | $ 100,000.00 | 3.46 | 1967 | $ 140,515.66 | 4.58 | 1977 | $ 219,892.85 | 7.21 | 1987 | $ 441,127.44 | 7.08 | 1997 | $ 874,274.28 | 6.58 | 2007 | $ 1,653,502.52 | 4.76 | 2017 | $ 2,632,447.74 | | | | | | |
| 1958 | $ 100,000.00 | 3.09 | 1968 | $ 135,570.56 | 5.53 | 1978 | $ 232,233.45 | 7.96 | 1988 | $ 499,520.75 | 8.67 | 1998 | $ 1,147,229.24 | 5.54 | 2008 | $ 1,967,075.85 | 3.74 | 2018 | $ 2,839,772.45 | | | | | | |
| 1959 | $ 100,000.00 | 4.02 | 1969 | $ 148,309.34 | 6.04 | 1979 | $ 266,603.40 | 9.1 | 1989 | $ 636,961.51 | 9.09 | 1999 | $ 1,520,416.62 | 4.72 | 2009 | $ 2,411,342.74 | 2.52 | 2019 | $ 3,092,750.74 | | | | | | |
| 1960 | $ 100,000.00 | 4.72 | 1970 | $ 158,597.50 | 7.79 | 1980 | $ 335,800.28 | 10.8 | 1990 | $ 936,437.20 | 8.21 | 2000 | $ 2,061,354.23 | 6.66 | 2010 | $ 3,927,972.35 | 3.73 | 2020 | $ 5,665,160.28 | | | | | | |
| 1961 | $ 100,000.00 | 3.84 | 1971 | $ 145,762.83 | 6.24 | 1981 | $ 267,009.93 | 12.57 | 1991 | $ 872,477.18 | 8.09 | 2001 | $ 1,899,368.56 | 5.16 | 2011 | $ 3,141,340.54 | 3.39 | 2021 | $ 4,384,301.09 | | | | | | |
| 1962 | $ 100,000.00 | 4.08 | 1972 | $ 149,167.03 | 5.95 | 1982 | $ 265,878.03 | 14.59 | 1992 | $ 1,037,885.97 | 7.03 | 2002 | $ 2,047,410.35 | 5.04 | 2012 | $ 3,347,742.34 | | | | | | | | | |
| 1963 | $ 100,000.00 | 3.83 | 1973 | $ 145,622.52 | 6.46 | 1983 | $ 272,328.54 | 10.46 | 1993 | $ 736,450.48 | 6.6 | 2003 | $ 1,395,454.22 | 4.05 | 2013 | $ 2,075,565.48 | | | $ 35,320,724.36 | | | | | | |
| 1964 | $ 100,000.00 | 4.17 | 1974 | $ 150,461.93 | 6.99 | 1984 | $ 295,704.90 | 11.67 | 1994 | $ 891,710.08 | 5.75 | 2004 | $ 1,559,651.04 | 4.15 | 2014 | $ 2,342,179.53 | | | | | | | | | |
| 1965 | $ 100,000.00 | 4.19 | 1975 | $ 150,751.06 | 7.5 | 1985 | $ 310,702.70 | 11.38 | 1995 | $ 912,887.29 | 7.78 | 2005 | $ 1,931,074.15 | 4.22 | 2015 | $ 2,919,507.80 | | | | | | | | | |
| 1966 | $ 100,000.00 | 4.61 | 1976 | $ 156,939.41 | 7.74 | 1986 | $ 330,751.43 | 9.19 | 1996 | $ 796,765.27 | 5.65 | 2006 | $ 1,380,465.02 | 4.42 | 2016 | $ 2,127,464.37 | | | | | | | | | |
| 1967 | $ 100,000.00 | 4.58 | 1977 | $ 156,489.92 | 7.21 | 1987 | $ 313,934.71 | 7.08 | 1997 | $ 622,189.90 | 6.58 | 2007 | $ 1,176,738.92 | 4.76 | 2017 | $ 1,873,419.42 | | | | | | | | | |
| 1968 | $ 100,000.00 | 5.53 | 1978 | $ 171,300.80 | 7.96 | 1988 | $ 368,458.13 | 8.67 | 1998 | $ 846,222.97 | 5.54 | 2008 | $ 1,450,960.90 | 3.74 | 2018 | $ 2,094,682.22 | | | | | | | | | |
| 1969 | $ 100,000.00 | 6.04 | 1979 | $ 179,761.71 | 9.1 | 1989 | $ 429,481.73 | 9.09 | 1999 | $ 1,025,165.81 | 4.72 | 2009 | $ 1,625,887.34 | 2.52 | 2019 | $ 2,085,337.84 | | | | | | | | | |
| 1970 | $ 100,000.00 | 7.79 | 1980 | $ 211,731.13 | 10.8 | 1990 | $ 590,448.91 | 8.21 | 2000 | $ 1,299,739.43 | 6.66 | 2010 | $ 2,476,692.49 | 3.73 | 2020 | $ 3,572,036.32 | | | | | | | | | |
| 1971 | $ 100,000.00 | 6.24 | 1981 | $ 183,181.08 | 12.57 | 1991 | $ 598,559.44 | 8.09 | 2001 | $ 1,303,054.11 | 5.16 | 2011 | $ 2,155,103.95 | 3.39 | 2021 | $ 3,007,832.01 | | | | | | | | | |
| 1972 | $ 100,000.00 | 5.95 | 1982 | $ 178,241.82 | 14.59 | 1992 | $ 695,787.79 | 7.03 | 2002 | $ 1,372,562.28 | 5.04 | 2012 | $ 2,244,291.11 | | | | | | | | | | | | |
| 1973 | $ 100,000.00 | 6.46 | 1983 | $ 187,009.91 | 10.46 | 1993 | $ 505,725.68 | 6.6 | 2003 | $ 958,268.15 | 4.05 | 2013 | $ 1,425,305.30 | | | $ 25,445,767.33 | | | | | | | | | |
| 1974 | $ 100,000.00 | 6.99 | 1984 | $ 196,531.37 | 11.67 | 1994 | $ 592,648.29 | 5.75 | 2004 | $ 1,036,575.16 | 4.15 | 2014 | $ 1,556,659.19 | | | | | | | | | | | | |
| 1975 | $ 100,000.00 | 7.5 | 1985 | $ 206,103.16 | 11.38 | 1995 | $ 605,559.44 | 7.78 | 2005 | $ 1,280,968.86 | 4.22 | 2015 | $ 1,936,641.61 | | | | | | | | | | | | |
| 1976 | $ 100,000.00 | 7.74 | 1986 | $ 210,751.03 | 9.19 | 1996 | $ 507,689.72 | 5.65 | 2006 | $ 879,616.54 | 4.42 | 2016 | $ 1,355,595.99 | | | | | | | | | | | | |
| 1977 | $ 100,000.00 | 7.21 | 1987 | $ 200,610.18 | 7.08 | 1997 | $ 397,591.04 | 6.58 | 2007 | $ 751,958.28 | 4.76 | 2017 | $ 1,197,150.20 | | | | | | | | | | | | |
| 1978 | $ 100,000.00 | 7.96 | 1988 | $ 215,094.23 | 8.67 | 1998 | $ 493,998.27 | 5.54 | 2008 | $ 847,025.19 | 3.74 | 2018 | $ 1,222,809.39 | | | | | | | | | | | | |
| 1979 | $ 100,000.00 | 9.1 | 1989 | $ 238,917.25 | 9.09 | 1999 | $ 570,291.53 | 4.72 | 2009 | $ 904,468.11 | 2.52 | 2019 | $ 1,160,056.75 | | | | | | | | | | | | |
| 1980 | $ 100,000.00 | 10.8 | 1990 | $ 278,867.31 | 8.21 | 2000 | $ 613,863.17 | 6.66 | 2010 | $ 1,169,734.68 | 3.73 | 2020 | $ 1,687,062.40 | | | | | | | | | | | | |
| 1981 | $ 100,000.00 | 12.57 | 1991 | $ 326,758.32 | 8.09 | 2001 | $ 711,347.53 | 5.16 | 2011 | $ 1,176,488.28 | 3.39 | 2021 | $ 1,641,999.26 | | | | | | | | | | | | |
| 1982 | $ 100,000.00 | 14.59 | 1992 | $ 390,361.69 | 7.03 | 2002 | $ 770,056.25 | 5.04 | 2012 | $ 1,259,127.12 | | | | | | | | | | | | | | | |
| 1983 | $ 100,000.00 | 10.46 | 1993 | $ 270,427.21 | 6.6 | 2003 | $ 512,415.71 | 4.05 | 2013 | $ 762,154.96 | | | $ 15,427,571.19 | | | | | | | | | | | | |
| 1984 | $ 100,000.00 | 11.67 | 1994 | $ 301,554.05 | 5.75 | 2004 | $ 527,434.97 | 4.15 | 2014 | $ 792,066.54 | | | | | | | | | | | | | | | |
| 1985 | $ 100,000.00 | 11.38 | 1995 | $ 293,813.76 | 7.78 | 2005 | $ 621,518.31 | 4.22 | 2015 | $ 939,646.75 | | | | | | | | | | | | | | | |
| 1986 | $ 100,000.00 | 9.19 | 1996 | $ 240,895.48 | 5.65 | 2006 | $ 417,372.35 | 4.42 | 2016 | $ 643,221.51 | | | | | | | | | | | | | | | |
| 1987 | $ 100,000.00 | 7.08 | 1997 | $ 198,190.86 | 6.58 | 2007 | $ 374,835.56 | 4.76 | 2017 | $ 596,754.47 | | | | | | | | | | | | | | | |
| 1988 | $ 100,000.00 | 8.67 | 1998 | $ 229,665.98 | 5.54 | 2008 | $ 393,792.62 | 3.74 | 2018 | $ 568,499.39 | | | | | | | | | | | | | | | |
| 1989 | $ 100,000.00 | 9.09 | 1999 | $ 238,698.35 | 4.72 | 2009 | $ 378,569.61 | 2.52 | 2019 | $ 485,547.51 | | | | | | | | | | | | | | | |
| 1990 | $ 100,000.00 | 8.21 | 2000 | $ 220,127.33 | 6.66 | 2010 | $ 419,459.24 | 3.73 | 2020 | $ 604,969.59 | | | | | | | | | | | | | | | |
| 1991 | $ 100,000.00 | 8.09 | 2001 | $ 217,698.37 | 5.16 | 2011 | $ 360,048.45 | 3.39 | 2021 | $ 502,511.84 | | | | | | | | | | | | | | | |
| 1992 | $ 100,000.00 | 7.03 | 2002 | $ 197,267.37 | 5.04 | 2012 | $ 322,553.97 | | | | | | | | | | | | | | | | | | |
| 1993 | $ 100,000.00 | 6.6 | 2003 | $ 189,483.78 | 4.05 | 2013 | $ 281,833.68 | | | $ 7,154,499.68 | | | | | | | | | | | | | | | |
| 1994 | $ 100,000.00 | 5.75 | 2004 | $ 174,905.62 | 4.15 | 2014 | $ 262,661.55 | | | | | | | | | | | | | | | | | | |
| 1995 | $ 100,000.00 | 7.78 | 2005 | $ 211,534.78 | 4.22 | 2015 | $ 319,810.33 | | | | | | | | | | | | | | | | | | |
| 1996 | $ 100,000.00 | 5.65 | 2006 | $ 173,258.69 | 4.42 | 2016 | $ 267,012.69 | | | | | | | | | | | | | | | | | | |
| 1997 | $ 100,000.00 | 6.58 | 2007 | $ 189,128.58 | 4.76 | 2017 | $ 301,100.90 | | | | | | | | | | | | | | | | | | |
| 1998 | $ 100,000.00 | 5.54 | 2008 | $ 171,463.19 | 3.74 | 2018 | $ 247,533.13 | | | | | | | | | | | | | | | | | | |
| 1999 | $ 100,000.00 | 4.72 | 2009 | $ 158,597.50 | 2.52 | 2019 | $ 203,414.69 | | | | | | | | | | | | | | | | | | |
| 2000 | $ 100,000.00 | 6.66 | 2010 | $ 190,553.00 | 3.73 | 2020 | $ 274,827.11 | | | | | | | | | | | | | | | | | | |
| 2001 | $ 100,000.00 | 5.16 | 2011 | $ 165,388.68 | 3.39 | 2021 | $ 230,829.40 | | | | | | | | | | | | | | | | | | |
| 2002 | $ 100,000.00 | 5.04 | 2012 | $ 163,511.06 | 1.97 | | | | | | | | | | | | | | | | | | | | |
| 2003 | $ 100,000.00 | 4.05 | 2013 | $ 148,737.63 | 1.91 | | $ 2,711,577.45 | | | | | | | | | | | | | | | | | | |
| 2004 | $ 100,000.00 | 4.15 | 2014 | $ 150,173.31 | 2.86 | | | | | | | | | | | | | | | | | | | | |
| 2005 | $ 100,000.00 | 4.22 | 2015 | $ 151,185.69 | 1.88 | | | | | | | | | | | | | | | | | | | | |
| 2006 | $ 100,000.00 | 4.42 | 2016 | $ 154,112.15 | 2.09 | | | | | | | | | | | | | | | | | | | | |
| 2007 | $ 100,000.00 | 4.76 | 2017 | $ 159,204.34 | 2.43 | | | | | | | | | | | | | | | | | | | | |
| 2008 | $ 100,000.00 | 3.74 | 2018 | $ 144,365.17 | 2.58 | | | | | | | | | | | | | | | | | | | | |
| 2009 | $ 100,000.00 | 2.52 | 2019 | $ 128,258.45 | 2.71 | | | | | | | | | | | | | | | | | | | | |
| 2010 | $ 100,000.00 | 3.73 | 2020 | $ 144,226.07 | 1.76 | | | | | | | | | | | | | | | | | | | | |
| 2011 | $ 100,000.00 | 3.39 | 2021 | $ 139,567.84 | 1.08 | | | | | | | | | | | | | | | | | | | | |
| 2012 | $ 100,000.00 | 1.97 | | | | | | | | | | | | | | | | | | | | | | | |
| 2013 | $ 100,000.00 | 1.91 | | $ 1,483,341.70 | | | | | | | | | | | | | | | | | | | | | |
| 2014 | $ 100,000.00 | 2.86 | | | | | | | | | | | | | | | | | | | | | | | |
| 2015 | $ 100,000.00 | 1.88 | | | | | | | | | | | | | | | | | | | | | | | |
| 2016 | $ 100,000.00 | 2.09 | | | | | | | | | | | | | | | | | | | | | | | |
| 2017 | $ 100,000.00 | 2.43 | | | | | | | | | | | | | | | | | | | | | | | |
| 2018 | $ 100,000.00 | 2.58 | | | | | | | | | | | | | | | | | | | | | | | |
| 2019 | $ 100,000.00 | 2.71 | | | | | | | | | | | | | | | | | | | | | | | |
| 2020 | $ 100,000.00 | 1.76 | | | | | | | | | | | | | | | | | | | | | | | |
| 2021 | $ 100,000.00 | 1.08 | | | | | | | | | | | | | | | | | | | | | | | |
| | $ 1,000,000.00 | | | | | | present value | $ 162,850,630.78 | | | | | | | | | | | | | | | | | |

# EXHIBIT F

October 7, 2021

Brian A. Glasser, Esquire
Bailey & Glasser LLP
209 Capitol St.
Charleston, WV 25301

RE:  Rebuttal Opinion to Seth Schwartz

Dear Mr. Glasser:

In Mr. Schwartz's deposition, he opined that the decade prior to the signing of the Loup Creek lease was characterized by both deflation and a reduction in the demand for coal. As this period was during the Great Depression, I concur with those observations.

In my view, this is another reason that the minimum royalty rate of $100,000 per annum in the Loup Creek lease was established. Further erosion of the price of and demand for coal would have left the lease being worth less and less to the Lessor. By setting a minimum royalty of $100,000, the Lessor was guaranteed base income from the lease.

Both parties were aware of the financial situation that the United States and the rest of the world were in at the time of entering the agreement. As I previously stated in my report, the Lessee took on the risks associated with mining a large tract and producing coal at the rate of 1 million tons per year to cover the minimum royalty required by the lease. At the time of the lease, according to the US Bureau of Mines Minerals Yearbook, there were only 62 of 754 coal mines in West Virginia were producing 500,000 or more tons per year. (Table 10, page 784).

Both parties agreed to the minimum royalty required by the lease, which ensured that the Lessor was to be paid a fair return. This business arrangement also provided ample motivation to the Lessee to produce coal in sufficient quantity to make the burden of paying the minimum royalty reasonable. The minimum royalty requirement in the Loup Creek lease was mutually-agreed business decision which occurred at a time where both parties were fully aware of the ongoing deflation and declining demand for coal and not unreasonable for either party.

John R. Craynon, PhD, PE

# EXHIBIT G

ROCKWELL MINING, LLC, et al. v.                                    SETH SCHWARTZ
POCAHONTAS LAND, LLC                                               October 04, 2021

```
 1            IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION

 3   - - - - - - - - - - - - x
     ROCKWELL MINING, LLC and    :
 4   BLACKHAWK LAND AND
     RESOURCES, LLC              :
 5                                    Civil Action No.
          Plaintiffs,           :
 6                                    2:20-cv-00487
        v.                      :
 7
     POCAHONTAS LAND LLC,        :
 8
          Defendants.           :
 9   - - - - - - - - - - - - x

10

11            Deposition of SETH SCHWARTZ

12               Conducted Virtually

13             Monday, October 4, 2021

14                  8:45 a.m. EST

15

16

17

18

19

20

21

22

23   Job No.: 363365

24   Pages: 1 - 64

25   Reported By: Okeemah S. Henderson
```

Realtime Reporters, LLC
schedulerealtime@gmail.com  304-344-8463

SA000090

1  word "low" even though you read it correctly,

2  obviously I typed it incorrectly.

3      Q  I understood what you meant and yes, we're

4  all victim to the bugaboo of typos.  You also

5  state in this section, in the preceding paragraph

6  about halfway through, "demand" and that's for

7  coal; correct?  "Fell across all sectors."  Do you

8  see where I am?

9      A  Yes.

10     Q  Did I essentially capture what that

11  sentence is intended to convey?  The demand for

12  coal at the time of the 1937 lease was generally

13  falling across all sectors of the coal industry?

14     A  I wouldn't say necessarily at the time of

15  the 1937 lease, but however, in the years

16  preceding the 1937 lease.  During the Great

17  Depression from 1929 to the mid-1930s, yes, demand

18  had been falling across all sectors.

19     Q  And you state also in this report that

20  competition from energy sources other than coal

21  was increasing at this time; is that correct?

22     A  That's correct.

23     Q  So, is it fair to say that these were the

24  conditions immediately preceding the creation of

25  the 1937 lease?

1    A  Yes, it is.

2    Q  And I'm just going to borrow a word that

3  you used on page 10, the last sentence, the one

4  that doesn't complete on that page, it says, "A

5  crisis of low prices for coal were such a national

6  concern that Congress took certain action."  Would

7  that be a fair characterization?

8    A  Yes.  At least it was based on my

9  research; it was considered to be a crisis by

10  lawmakers in the United States Government.  Not

11  just across coal but across other industries that

12  prices had been falling.  There was deflation in

13  the economy and certainly for coal in particular

14  that was true.  And coal was a very important part

15  of the economy at the time.

16    Q  Sure.  So with respect to coal and its

17  production and its sale, to summarize, we've got

18  falling prices, and we've got decreasing demand,

19  and we've got increased competition envisioned

20  between coal as a source of energy and other forms

21  of energy; is that fair?

22    A  That's generally fair, yes.

23    Q  Now in these conditions, per your opinion,

24  could a rational coal lessor, in entering a

25  bargain or a contract, have a strong concern to

ROCKWELL MINING, LLC, et al. v.
POCAHONTAS LAND, LLC

SETH SCHWARTZ
October 04, 2021

```
1    protect itself from falling prices?

2        A  Yes.

3        Q  And would it have a rational significant

4    concern to protect itself from falling demand for

5    coal?

6        A  Yes.

7        Q  And under those circumstances, is one

8    reasonable way to incorporate such protections in

9    a contract deal to set a fixed rate tonnage

10   royalty?

11       A  With regards to the former, which regard

12   the prices, yes, setting a minimum royalty as a

13   fixed rate is one way to protect against falling

14   prices.

15       Q  And by fixing a very high minimum royalty

16   per year, would a rational coal lessor be taking

17   reasonable protections to insulate itself from

18   falling demand?

19       A  Generally, yes.

20       Q  Are you aware of what the minimum royalty

21   is, that is fixed by the 1937 lease?

22       A  Yes.

23       Q  Is it $100,000 ultimately after several

24   years of adjustment?  Is that a fair

25   characterization?
```

ROCKWELL MINING, LLC, et al. v.                    SETH SCHWARTZ
POCAHONTAS LAND, LLC                               October 04, 2021

 1   determined the cost, to extract any amount of

 2   coal, at the time the lease was signed?

 3       A   Not at the time.  I am familiar with the

 4   property since my involvement in the coal industry

 5   from the late 1970s, so I have some understanding

 6   of what that property looks like at the present

 7   time with regards to other areas of the coal

 8   fields.  But I don't have the knowledge of what

 9   the conditions were in the 1930s.

10       Q   Let's try to do it in summary fashion.  At

11   what point in time does your familiarity with the

12   production characteristics of that coal field

13   begin?

14       A   Late 1970s, early 1980s.

15       Q   With respect to the fixed tonnage royalty,

16   in the conditions extent at the time the 1937

17   lease was signed, was that royalty a reasonable

18   protection to the lessor against falling prices?

19       MR. ADKINS:  Object to form.  You may

20   answer.

21       THE WITNESS:  It was based upon the leases

22   produced by Mr. Craynon, which I -- which I read

23   and researched is other comparable leases or other

24   leases that he uncovered in that period of time.

25   The dollar amount per ton was comparable to other

USCA4 Appeal: 24-2051   Doc: 34-1      Filed: 02/10/2025   Pg: 97 of 349

1   leases at the time.  Other minimum rates per ton.
2   And based upon my research as to market prices for
3   coal at the time, the relationship of the per-ton
4   royalty rate compared to the per-ton sales price
5   for coal was something that I would consider to be
6   normal, meaning in the 5 to 6 percent range of
7   market prices.
8          So yes, 10 to 7 cents per ton, seemed
9   normal for the market conditions at the time.
10  BY MR. SCHWARTZMAN:
11     Q  And having concluded it is normal for the
12  time and under the circumstances, would you in
13  your expert opinion denominate that as reasonable?
14     A  With regards to a minimum rate per ton,
15  yes.
16     Q  Let's look quickly at a statement on page
17  11 -- just want to tack this down before we circle
18  back to the beginning.  The last -- or sorry, the
19  last paragraph of page 11 starts with the
20  sentence, "The fixed rate in the 1937 lease was
21  not surprisingly low in 1937," and there's a sub
22  clause.
23          With respect to that first clause, do you
24  stand by that?
25     A  Yes.

ROCKWELL MINING, LLC, et al. v.                                    SETH SCHWARTZ
POCAHONTAS LAND, LLC                                               October 04, 2021

1   to the tonnage royalty as opposed to the minimum

2   annual rental, correct?

3       A  That's correct.

4       Q  Is there a temporal component conditioning

5   that statement that you make?

6       A  Yes.

7       Q  Can you explain to me what that is?

8       A  The temporal component would be, in the 40

9   years of my experience in the coal industry, in

10  the central Appalachian coal basin, a 10 cent per

11  ton royalty rate is so unusually low as to be an

12  outlier over the last 40 years.

13      Q  Over the last 40 years is sort of then

14  what I'm going to key on so we're basically

15  talking 1971 forward, roughly?

16      A  Late 1970s forward.

17      Q  Okay.  Sure.  I know you're being

18  reasonably approximate there.  So, even though

19  these may sound repetitive, for the record, I want

20  to ask them.  This statement is not intended to

21  convey the opinion that it was unreasonably low in

22  1937, correct?

23      A  That's correct.

24      Q  Could we say the same about 1947?

25      A  I don't know.  The statement's not

SA000096

USCA4 Appeal: 24-2051     Doc: 34-1     Filed: 02/10/2025     Pg: 99 of 340

1   going to reflect the specifics of the parties'
2   situations and what they're willing to agree to,
3   and so it's certainly possible.  The point of
4   having a percentage royalty rate is that the
5   royalty is related to market prices at the time.
6   The point of having a minimum rate per ton is the
7   lessor's protection against falling market prices.
8        It is true that a lessee may not like that
9   at the time in 1937, but that's standard in the
10  industry in the last 40 years.  Whether it was
11  standard at the time, certainly some of the leases
12  produced by Mr. Craynon, at the time most of them
13  had some type of similar provision as that.  But I
14  can't say as to all leases in the 1930s, whether
15  that was common or not.
16      Q  And that's totally fair.  I'm just saying
17  in this hypothetical based on your experience, you
18  would find it reasonable, would you not, of a
19  lessee protecting its own interests against
20  prevailing market conditions of falling prices, to
21  reject the idea that -- or essentially to fight
22  for the notion that if I'm going to have to pay a
23  very high minimum and a fixed rate, that fixed
24  rate needs to be one that fairly allocates the
25  risk of those conditions between lessor and

SA000097

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 100 of 340

1  lessee?

2     A  No, I don't agree.  First of all, I don't

3  agree that it's a high minimum annual rental;

4  although, you keep wanting to put that in your

5  questions, I'm not agreeing to that.  It is

6  related to the size of the property.  This is a

7  huge property.  I have no reason to believe that

8  this is an unusually high minimum annual rental at

9  all.

10        Secondly, no, with regard to your

11  hypothetical.  If in fact that were the lessee's

12  concern, the lessee would welcome a percentage

13  royalty rate and would fight to reject a fixed

14  rate per ton, because that way the lessee and the

15  lessor would both be sharing in the ups and downs

16  of market prices.  So the fact that the lessee

17  agreed to a fixed rate per ton at least indicates

18  that even if that were the lessee's desire in this

19  negotiation, the lessee failed.

20     Q  So in other words, that's a better

21  protection for the lessor?

22     A  Against a falling market, that's a

23  protection for the lessor, and the lessee

24  obviously agreed to that.  Whether or not that was

25  freely entered into, I have no idea.

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 101 of 340

1      Q   Understood, but under those conditions,

2   would it be fair to say that, that seems like it

3   was a well-negotiated term for the lessor?

4          MR. ADKINS:  Object to the form.

5          THE WITNESS: Not necessarily, no.

6   BY MR. SCHWARTZMAN:

7      Q   With respect to the minimum royalty, did

8   you compare the minimum annual rental in the 1937

9   lease to those that were contained in the other

10   leases identified by Dr. Craynon?

11     A   Yes.

12     Q   And what was your conclusion?

13     A   That relative to the size of the property,

14   this was in the range of what might be considered

15   to be standard compared to the other leases that

16   he researched.

17     Q   Was it more favorable to the lessor than

18   the minimum annual rental terms in those other

19   leases?

20     A   No.

21     Q   You believe it was similar?

22     A   Yes.  Relative to the size of the property

23   and -- and you know -- yes.  And that's the way to

24   think of it.  If it's a dollar amount, it is -- if

25   it's one lease for all of West Virginia, you would

 1   period.  And Mr. Craynon or Dr. Craynon's opinions

 2   were related to the 1937 time period, and what I'm

 3   observing is that he offered no opinion as to

 4   whether those terms would be reasonable today.

 5        Q  And so, in connecting order I guess,

 6   defining the interface of those two statements,

 7   are you attempting to state that Mr. Craynon was

 8   incorrect in any of his opinions about the

 9   reasonableness at the time period the 1937 lease

10   was entered?

11        MR. ADKINS:  Object to the form of the

12   question.  You may answer.

13        A  No.  I was pointing out -- I was not

14   critiquing his opinion about the reasonableness at

15   that time in 1937, but rather pointing out that he

16   was not opining about its reasonableness today.

17   BY MR. SCHWARTZMAN:

18        Q  In the third bullet point, you state that

19   "The value of money in 2021 is a small fraction of

20   its value in 1937 when the lease was signed," did

21   I read that correctly?

22        A  Yes.

23        Q  And I think -- what I'm assuming you mean

24   by money, is a coordinate unit of money such as a

25   dollar, and not money in general?

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 103 of 340
Case 2:20-cv-00487  Document 105-8  Filed 11/22/21  Page 13 of 13 PageID #: 1376

1        Q   Correct.

2        A   But in 1937 dollars, it was only $5,000.

3        Q   But in 1937, the minimum rental was

4    $100,000, correct?

5        A   Yes, it was.

6        Q   So in 1937, the minimum rental did not

7    have a purchasing power of $5,392, did it?

8        A   No, it did not.

9        Q   It had a purchasing power relative to

10   today, of $1,854,000, correct?

11       A   That's correct.  So it was a large amount

12   of money at that time, but it is a trivial amount

13   of money today.  And that is Mr. Craynon's

14   point -- or Mr. Craynon's point was the reverse,

15   was it was a large amount of money then.  And my

16   point is taking the same economic logic.  What

17   looked like a lot of money in 1937 because it has

18   not been adjusted for inflation is now a trivial

19   amount of money.

20       Q   And you may use the word trivial, but the

21   amount of money today represented by that minimum

22   annual royalty is not $5,392, is it?

23       A   That's not the amount today, but it is as

24   I said again, the economic analogy of Mr.

25   Craynon's calculation.  And I think you understand

# EXHIBIT H

ROCKWELL MINING, LLC, et al. v.                                     FRANK SCOTT
POCAHONTAS LAND, LLC                                             October 01, 2021

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                     CHARLESTON DIVISION

 3

 4   * * * * * * * * * * * * * * * * * * * * * * * * *

 5   ROCKWELL MINING, LLC, and
     BLACKHAWK LAND AND RESOURCES, LLC,
 6
          Plaintiffs and Counter-Defendants,
 7
     vs.                        CIVIL ACTION NO.
 8   2:20-cv-00487

 9   POCAHONTAS LAND LLC,

10        Defendant and Counter-Claimant.

11   * * * * * * * * * * * * * * * * * * * * * * * * *

12

13           Videotaped deposition of FRANK SCOTT,
     Ph.D., taken by the Plaintiff under the Federal
14   Rules of Civil Procedure in the above-entitled
     action, pursuant to notice, before Teresa Reedy, a
15   Registered Professional Reporter, at 9:30 a.m., at
     the offices of Bowles Rice, 600 Quarrier Street,
16   Charleston, West Virginia, on the 1st day of
     October, 2021.

17

18

19

20              REALTIME REPORTERS, LLC
                   713 Lee Street
21              Charleston, WV  25301
                   (304) 344-8463
22              realtimereporters.net

23

24
```

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 106 of 340

1    A.  I'm thinking that there is a continuum

2  there of control and cooperation, and in a

3  partnership like this, it's -- you know, does one

4  partner control.  One partner controls to the

5  extent that they can declare a war and the other

6  partner controls to the extent that they can

7  declare war and blow up the relationship.  And

8  usually in a partnership relationship like this,

9  especially in this case, both parties seem to

10  publicly acknowledge that, no, this is a

11  cooperative relationship.  We're going to maximize

12  the joint profits of each of us in operating and

13  making decisions in this way.

14    Q.  So let me break this down further.  Would

15  it be fair that you have not concluded in any way

16  that the Koppers Company by itself through the

17  exercise of its own power or ownership could

18  control the Virginian corporation?

19    A.  No, I've not concluded that.

20    Q.  In other words, your conclusion is more

21  that based on the records you've seen, the Koppers

22  Company had reached an agreement with other owners

23  of the Virginian corporation that they would work

24  together?

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 107 of 340

1  evidence that they were subject to influence and

2  control and threat by their ownership?

3      A.  I don't think I would use the word

4  "threat," but that maybe it's an implied threat out

5  there.  So I think the cooperative behavior that

6  all the parties to this economic transaction

7  engaged in indicates that they saw the commonality

8  of the interest and behaved accordingly.

9      Q.  But you can't rule out other reasons that

10 they might have engaged in the same transaction,

11 can you?

12     A.  Well, I'm open to your suggestion.  If you

13 have other reasons that you have out there that

14 you're thinking of.  What --

15     Q.  Well, I guess answer my question first.

16 You can't rule out other reasons, can you?

17     A.  Well, I want to hear what those others

18 reasons are.  I mean, it's a basic economic

19 transaction.  Both parties benefit from it.

20     Q.  Have you even considered other reasons that

21 they might have had?

22     A.  Well, I guess not because I'm wondering

23 what other --

24     Q.  Sounds --

SA000105

ROCKWELL MINING, LLC, et al. v.                                    FRANK SCOTT
POCAHONTAS LAND, LLC                                           October 01, 2021

 1      A.  -- reasons.

 2      Q.  Okay.  You didn't consider any other

 3  reasons?  And you said in the answer before --

 4              MR. SCHWARTZMAN:  Could you read back

 5  the end of his prior answer about the transaction?

 6              (The requested testimony was read.)

 7      Q.  So is it your opinion as you stated there

 8  that both parties did benefit from this

 9  transaction?

10      A.  Yes.

11      Q.  And, again, I know it seems like I'm being

12  hypertechnical and I apologize, but you don't have

13  any direct evidence of the thought process or the

14  motivations or the understandings of the parties

15  when they entered the 1937 lease?  You're instead

16  judging from their subsequent behavior.  Is that

17  fair?

18              MR. ADKINS:  Object to form.

19      A.  Read the question again.

20      Q.  You can read it.

21      A.  I'm sorry.  I guess I don't get --

22          [CROSSTALK]

23      A.  I could ask you to repeat the question.

24      Q.  That's fair.

ROCKWELL MINING, LLC, et al. v.                           FRANK SCOTT
POCAHONTAS LAND, LLC                                      October 01, 2021

1      A.  Yeah.

2      Q.  You don't have any direct evidence of the

3  motivations, the attitudes, the understandings of

4  the individuals representing each party in the 1937

5  lease at the time they negotiated and executed that

6  transaction?

7            MR. ADKINS:  Object to form.

8      A.  So the individuals -- I don't know anything

9  about who were the individuals involved even, so I

10  have no basis for that.  The motivations of those

11  individuals, I do have some understanding that I

12  think is reasonable to assume, conclude; and that

13  is that while they were working for -- they were

14  representing two economic entities that had a

15  transaction in front of them that would be mutually

16  beneficial and so there were motivations --and

17  maybe this is -- maybe I'm totally off base here in

18  thinking that these economic actors might behave

19  according to the best economic interest.

20            But that's what my training is, and so

21  there's a clear mutual interest in entering into

22  this translation because there are clear benefits

23  to both parties as a result of doing it.  Not to

24  mention that they both work for and the profits get

ROCKWELL MINING, LLC, et al. v.                                    FRANK SCOTT
POCAHONTAS LAND, LLC                                            October 01, 2021

 1   contract like that and one has a resource and one

 2   is wondering about the complexities of tapping that

 3   resource over an extended period of time along with

 4   the vagaries of the market that might occur at any

 5   point in time over the life of that contract.

 6             I could probably have some nontrivial

 7   input into that discussion, but I have not done

 8   that as I sit here.

 9       Q.  Right.  You haven't done that and that's

10   not the basis of any of your opinions?

11       A.  Right.

12       Q.  Correct?

13       A.  Right.

14       Q.  And, for example, you didn't evaluate what

15   the overburden ratio was on any of the properties

16   which were affected by these leases?

17       A.  No.

18       Q.  And, as I read your rebuttal and your --

19   even your primary opinion, you are not opining on

20   whether Doctor Kranen erred in concluding that the

21   1937 lease royalty rate was reasonable for leases

22   at the time; correct?

23       A.  I would go maybe a little bit further.  In

24   looking at different leases in the area and from

SA000108

ROCKWELL MINING, LLC, et al. v.
POCAHONTAS LAND, LLC

FRANK SCOTT
October 01, 2021

1  all the resources, ten cents per ton seemed to be

2  fairly common in southern West Virginia at that

3  point in time.

4      Q.  Going through Doctor Kranen's report again

5  just to see whether you had further commentary on

6  paragraph -- or section 3.3, minimum royalty, were

7  you offering any rebuttal opinions for that?

8      A.  Let me read through that.

9      Q.  Sure.

10     A.  (Reviews document.) I read that and didn't

11  trigger any --

12     Q.  Right.  I'll represent that in your

13  rebuttal report itself I don't believe there's any

14  section devoted to the content of section 3.3 in

15  Doctor Kranen's report.

16     A.  That's correct.

17     Q.  Same question for section 3.4.  I don't see

18  any commentary in your rebuttal report directed to

19  that paragraph, but I want to ask you today, are

20  you offering any opinions or rebuttal about that?

21     A.  No.  Let me quickly look through it.

22  (Reviews document.)  In fact, I would say that his

23  second paragraph in section 3.4 is entirely

24  congruent with some of the factual evidence that I

ROCKWELL MINING, LLC, et al. v.                                    FRANK SCOTT
POCAHONTAS LAND, LLC                                          October 01, 2021

```
 1   life of this lease because the $100,000 will be
 2   adjusted by the Consumer Price Index each year.
 3              And then the -- so you see where I am
 4   going with this.  The way -- the correct way
 5   logically to see what -- at the time the contract
 6   was written, the contract was stated -- it was
 7   written so as to state that that, yeah, by the time
 8   20 -- 80 years later -- 85 years later we're going
 9   to be getting a pittance in 1937 dollars by the
10   time we get to 2021.
11      Q.  Do you think that the analysis you just
12   described is what Doctor Kranen is trying to do in
13   paragraph 3.5?
14      A.  Kind of sounds like it.
15      Q.  Do you think he's simply trying to say the
16   spending power of $100,000 in 1937 is equal to the
17   spending power of $1,854,000 in 2021?
18      A.  Right.  I would agree with that.  The two
19   parties thought $100,000 in 1937 dollars was an
20   agreeable amount for both of them in 1937 when they
21   signed the lease.
22      Q.  He's not saying that in 3.5, is he?
23      A.  That's -- so it seems to me like he's
24   saying then in this if we're trying to figure out
```

ROCKWELL MINING, LLC, et al. v.                                    FRANK SCOTT
POCAHONTAS LAND, LLC                                          October 01, 2021

 1  whether $100,000 in 1937 was a lot of money, the
 2  answer is yeah.  It was 1.8 million in today's
 3  dollars, so it was a lot of money.
 4      Q.  And he gets that correct?
 5      A.  And he gets that correct, but then the
 6  logical extension of this then is do you think then
 7  that these parties had they -- had they had perfect
 8  foresight in this and looked ahead and seen the
 9  country going off the gold standard and inflation
10  becoming an issue in long-term contracts, would
11  they have written that contract without some
12  protection in it if they were unrelated parties.
13          And if you were their attorney advising
14  them, advising the lessor, you probably would have
15  said, well, you know, if this thing's going to be
16  in effect for 80 years, maybe we need to anticipate
17  that maybe inflation will be a problem and include
18  such a protection in that contract.
19      Q.  But Doctor Kranen isn't offering any of
20  those opinions?
21      A.  He's not.  He's not doing that.  That's how
22  I'm looking at this particular paragraph and that's
23  what he triggers in me.
24      Q.  That's what you suddenly start to think of

SA000111

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 114 of 340

ROCKWELL MINING, LLC, et al. v.
POCAHONTAS LAND, LLC

FRANK SCOTT
October 01, 2021

1          MR. ADKINS:  Object to form.  You may

2    answer.

3        A.  So based upon that small sample of

4    comparison and the fact that -- that if we buy the

5    assumption here that you have underlying all of

6    this discussion that these are two unrelated

7    parties, then the fact that both parties agreed to

8    that amount of the minimum royalty was agreeable

9    and a value to both them at the time.  And so we

10   can conclude that given who else might be bidding

11   on that coal property to mine it, that that must

12   have been the best option that Loop Creek had at

13   the.

14          Now, obviously we know that they were

15   not putting that out for bid among independent coal

16   operators, but instead it was a related party, but,

17   you know, even buying that assumption, it had

18   significant value to them at the time.

19       Q.  It did, didn't it?

20       A.  Yeah.

21       Q.  And my question wasn't whether it was the

22   best value they could have gotten.  It was -- did

23   it constitute a significant value?

24       A.  So now we're back to my comparison though.

SA000112

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

ROCKWELL MINING, LLC and
BLACKHAWK LAND AND RESOURCES, LLC,

        Plaintiffs,

v.                                    CIVIL ACTION NO. 2:20-cv-00487

POCAHONTAS LAND LLC,

        Defendant.

## AFFIDAVIT OF JESSE M. PARRISH

STATE OF KENTUCKY

COUNTY OF FAYETTE, TO-WIT

      Before me, the undersigned authority, this day personally appeared **Jesse M. Parrish**, who, by me first duly sworn, on his oath, deposes and says:

      1.     My name is Jesse M. Parrish, and I am the Chief Executive Officer of Blackhawk Mining, LLC, a Delaware limited liability company formed on August 30, 2019, in connection with the Bankruptcy Case (defined below) ("Reorganized Blackhawk"). I have personal knowledge of the matters outlined in this affidavit or have obtained knowledge of these matters through the regular course of business.

      2.     Plaintiff Rockwell Mining, LLC ("Rockwell") is a Delaware limited liability company with its principal place of business located at 250 West Main Street, Suite 2000, Lexington, Kentucky, 40507.

3.      Plaintiff Blackhawk Land and Resources, LLC ("BLR") is a Delaware limited liability company with its principal place of business located at 250 West Main Street, Suite 2000, Lexington, Kentucky, 40507.

4.      On December 21, 2015, Defendant Pocahontas Land Corporation, n/k/a Pocahontas Land LLC ("Poca Land" or "Lessor"), Rockwell and BLR executed a Consent and Amendment Agreement (the "2015 Consent and Amendment Agreement") pertaining to that certain Indenture of Lease, dated July 1, 1937, originally between Loup Creek Colliery Company, as lessor, and The Koppers Coal Company, as lessee (the "1937 Lease").

5.      As of December 21, 2015, Rockwell was, and through this date remains, the lessee under the 1937 Lease.

6.      As of December 21, 2015, Rockwell was a wholly-owned subsidiary of Blackhawk Mining LLC, a Kentucky limited liability company ("Old Blackhawk").

7.      As of December 21, 2015, plurality control of the voting interests in Old Blackhawk was held by entities controlled by John Mitchell Potter.  Specifically, John Mitchel Potter affiliate JMP Blackhawk held 43.35% of the voting interests, John Mitchell Potter affiliate JMP Coal Holdings, LLC held 22.75% of the voting interests, and John Mitchell Potter affiliate JMP Holdings, LLC held 17.26% of the voting interests, for aggregate voting control by John Mitchell Potter of 83.36%.  Two parties unrelated to John Mitchell Potter held the remaining 16.64% if voting control.

8.      On July 19, 2019, Old Blackhawk and affiliated debtors, including Rockwell and BLR, each filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware in the cases: In re:

Blackhawk Mining LLC, *et al.*, Case No. 19-11595 (LSS) (Jointly Administered) (collectively, the "Bankruptcy Case").

9. Pursuant to the Debtors' First Amended Joint Prepackaged Chapter 11 Plan of Reorganization, as supplemented, on October 31, 2019, a series of transactions were consummated pursuant to which, *inter alia*, 100% of the ownership interests in Rockwell and BLR became vested in and owned by Blackhawk Sub, LLC, a Delaware limited liability company wholly-owned by Blackhawk DRE, LLC, a Delaware limited liability company wholly-owned by Reorganized Blackhawk (the "Reorganization").

10. Upon consummation of the Reorganization, 100% of the membership interests in Reorganized Blackhawk were owned by applicable first lien and second lien creditors of Old Blackhawk, none of whom were John Mitchell Potter, any entity controlled by John Mitchell Potter, or any other entity or person that controlled voting interests in Old Blackhawk as of December 21, 2015.

11. On May 24, 2020, Reorganized Blackhawk, Sev.en US Met Coal Inc., a Delaware corporation, and BH Mining Merger Sub LLC, a Delaware limited liability company and wholly owned subsidiary of Sev.en US Met Coal Inc. ("Merger Sub"), executed an Agreement and Plan of Merger (the "Merger Agreement"). Neither Rockwell nor Blackhawk Land were parties to the Merger Agreement.

12. The closing under the Merger Agreement occurred on June 1, 2020.

13. Pursuant to the Merger Agreement, upon the closing Merger Sub merged with and into Reorganized Blackhawk in accordance with the Delaware limited liability company act, the separate existence of Merger Sub ceased, and Reorganized Blackhawk was the surviving company.

4874-4890-8545.v3

At the effective time of the closing and merger the membership interests in Merger Sub were converted into and became 100% of the membership interests in Reorganized Blackhawk, and the pre-merger holders of membership interests in Reorganized Blackhawk received merger consideration in the amount of $0.01 per canceled membership unit. Neither the Merger Agreement nor the consummation of the merger affected the 100% ownership of Rockwell and BLR by Blackhawk Sub, LLC, the 100% ownership of Blackhawk Sub, LLC by Blackhawk DRE, LLC, or the 100% ownership of Blackhawk DRE, LLC by Reorganized Blackhawk.

14.    BLR and Rockwell are and as of the closing under the Merger Agreement were each wholly-owned subsidiaries of Blackhawk Sub, LLC, a Delaware limited liability company. Blackhawk Sub, LLC is and as of the time of the Merger Agreement was a wholly owned subsidiary of Blackhawk DRE, LLC, a Delaware limited liability company. Blackhawk DRE, LLC is and as of the time of the Merger Agreement was a wholly-owned subsidiary of Reorganized Blackhawk.

15.    From June 1, 2020, through the date of this affidavit, Rockwell has paid to Lessor and Lessor has received and accepted from Rockwell monthly royalty payments under the Lease totaling One Hundred Ninety-Seven Thousand Two Hundred Forty-One Dollars and Eighty-Two Cents ($197,241.82).

16.    Rockwell and Blackhawk Land operate six (6) coal mines, one (1) preparation plant, and two (2) loadouts in Boone and Wyoming Counties, West Virginia, which operations employ over 500 individuals, with over 200 of those individuals employed as part of operations directly tied to the 1937 Lease.

17.    Under the terms of the 1937 Lease, Rockwell bears the cost of maintenance and taxes in connection with the leased premises.

Further the Affiant saith not.

IN WITNESS WHEREOF, the undersigned Jesse Parrish has affixed his signature this 21 day of November, 2021.

_____
Jesse M. Parrish

COMMONWEALTH OF KENTUCKY;

COUNTY OF FAYETTE; to-wit:

The foregoing instrument was acknowledged before me this 21st day of November, 2021 by Jesse M. Parrish.

My Commission expires:  Feb. 1, 2023 .

_____
NOTARY PUBLIC

TODD C. MYERS
NOTARY
PUBLIC
ID NO. 616485
MY COMMISSION
EXPIRES
2/1/2023
STATE AT LARGE KY.

4874-4890-8545.v3

SA000118

# EXHIBIT J

EXHIBIT
1

## Rebuttal Report of Frank Scott

The purpose of this report is to respond to the economic logic and analysis contained in the report submitted by Plaintiffs' expert John Craynon. Dr. Craynon confuses two basic concepts related to comparing economic valuations at one point in time to those at another point in time. He then conducts two exercises that have no clear connection to the economic logic necessary to evaluate whether the 1937 Lease had protections built into it that normally would have been included in a contract between two unrelated parties. As such, Dr. Craynon's economic analysis and methodology are flawed. Let me elaborate why.

In paragraph 3.1 of his report, Dr. Craynon confuses two basic economic concepts under the heading of "Time Value of Money". He talks about choosing a "discount rate" for this purpose, and then explains that the discount rate he uses is the Consumer Price Index. In so doing he conflates two economic issues that come into play when comparing economic valuations at one point in time to those at another point in time:

(1) If prices enumerated in dollars are generally rising over time, i.e. inflation, then a dollar today will buy more real goods and services than a dollar will purchase next year. If dollar (or nominal) prices are generally falling, i.e. deflation, then a dollar today will buy fewer goods and services than a dollar will a year from now. To account for and adjust for changes over time in the real purchasing power of a dollar, we use prices indexes like the Consumer Price Index (CPI), the Wholesale Price Index, the Producer Price Index, or the GDP deflator.

(2) Human beings generally have a positive time rate of preference, i.e. they prefer current consumption to future consumption. Having a given bundle of goods and services available to consume today is worth more than the certain prospect of having the same bundle of goods and services to consume a year from now. To induce a person to postpone consumption they must be offered some extra inducement. Through the interactions of borrowers and lenders, a market interest rate is established. Thus if one is willing to give up/postpone consuming a dollar's worth of real goods and services today and lend that dollar to a borrower, one can have (1+r) times a dollar's worth of real goods and services to consume a year from now, where r is the market rate of interest. Alternatively, the certain promise of $1 to be paid a year from now is only worth 1/(1+r) today. When determining the present discounted value of some future value in this manner, r is known as the "discount rate".

Dr. Craynon confuses using a price index to adjust for inflation with discounting future values to determine present value. Or more accurately, he conflates them in Paragraph 3.1 into one confused discussion of the "time value of money".

In paragraph 3.2 Dr. Craynon describes the royalty rate in coal leases using the present tense: "In the case of coal, these rates are usually set on the basis of cents per ton of coal mined, shipped, or sold." While the ten cents per ton royalty established in the 1937 Lease was fairly representative of coal leases in southern West Virginia at the time, Defendants' expert Mr. Seth Schwartz states that in his 40 years' experience in the coal industry, he has never seen any new coal leases without a percentage royalty rate that links the royalty to revenues received by the Lessee. Dr. Craynon analyzes fourteen other coal leases in Boone and Wyoming Counties from 1927 to 1937 in his Appendix C. I would ask, are any of those leases still in effect? And were any of those leases written to lock in the cents per ton rate in perpetuity?

In paragraph 3.5, Dr. Craynon mistakenly describes the CPI as a "discount factor" instead of as a price deflator or price index.

There is no obvious economic point to the exercise that Dr. Craynon goes through in paragraph 3.6, other than to establish that a dollar won't buy what it used to. Using 1982-84 as the base period with a value of 100, the CPI in 1937 was 14.4, while the CPI in 2020 was 258.8 (https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202101.pdf). This means that it took $258.80 in 2020 to buy what $100 would have bought in 1983; and that in 1937 one could buy the same bundle of goods and services for only $14.40. Another way of looking at the effects of inflation over the past 84 years is to express the terms of the 1937 Lease in this way: If in 1937 the parties had perfect foresight in stipulating the royalty, they would have foreseen that the $0.10 per ton royalty that would still be paid in 2020 would only be $0.0056 per ton when expressed in 1937 prices.

In the exercise he goes through in paragraph 3.7, Dr. Craynon explains the power of compound interest. If one had invested a dollar in 1937 and left it alone, letting the interest compound, one would have a lot more than a dollar eighty-four years later. If one had invested another dollar in 1938 and left it alone, letting the interest compound, one would have a lot more than a dollar eighty-three years later, albeit slightly less than the amount accrued by the dollar invested in 1937. There is no economic point relevant to this case that I can see from this exercise.

In paragraph 3.8, Dr. Craynon concludes that "it is clear that even the minimum royalty payments made over the 84 years that this lease has been in force have provided a significant value to the Lessor." He bases this conclusion on the calculations he made in paragraphs 3.5 through 3.7. The exercises that Dr. Craynon goes through in paragraphs 3.5 through 3.7 are useful in illustrating what a powerful tool Excel software is in performing numerical calculations, but really have no relevance to the core economic issue in this case. If the 1937 Lease had been negotiated as an arm's length contract between two independent parties, each represented by competent lawyers, it would have contained provisions to protect both lessor and lessee from nontrivial changes in the market for coal. That could have easily have been accomplished by stipulating a royalty in percentage terms or providing that the dollar rate per ton be adjusted at reasonable intervals. It would not have locked in a royalty in perpetuity that has resulted in the royalty rate declining from 5% to 0.1%. That suggests that the appropriate economic exercise is to compare the actual royalty payments each year from 1937 to 2021 with what they would have been if the lessee paid the lessor the going market royalty rate for the coal mined in each year.

Dr. Craynon concludes in paragraph 3.9 that the 1937 Lease "has provided a reasonable rate of return to the Lessor." "Reasonable" is a subjective term as used by Dr. Craynon. The logic of economics suggests that the standard of comparison should be what a competitive market return would have been over the period of the contract, which is the comparison I suggested in the previous paragraph.

Respectfully Submitted,

*Frank A. Scott, Jr.*

Frank A. Scott, Jr.

# EXHIBIT K

EXHIBIT
2

# Rebuttal Expert Report of Seth Schwartz

### ROCKWELL MINING, LLC
### BLACKHAWK LAND AND RESOURCES, LLC

### v.

### POCAHONTAS LAND LLC

### United States District Court
### of the Southern District of West Virginia
### Civil Action No. 2:20-cv-487

### August 2021

_____
Seth Schwartz

## I.    Summary and Conclusions

I previously submitted an expert report on behalf of Pocahontas Land LLC ("Poca Land") in this dispute.  I have prepared this report in rebuttal to the expert report filed by John R. Craynon on behalf of Rockwell in this case.

I have reached the following opinions:

- Mr. Craynon offered an opinion on the "reasonableness of the royalty rate, the minimum royalty, and other similar terms included in the Loop Creek lease" and concluded that "this lease was typical and customary for its time period".

- Mr. Craynon offered no opinion as to whether the royalty rate in the Loop Creek Lease continues to be reasonable today – 84 years later.

- As Mr. Craynon points out, the value of money in 2021 is a small fraction of its value in 1937 when the Lease was signed.  Using the Consumers Price Index ("CPI") as the measure of inflation, Mr. Craynon concluded that the value of the $100,000 annual minimum rental payment in 1937 would be $1,854,542 in 2021.  But Poca Land is not being paid $1,854,542 in 2021, it is being paid only $100,000.

- Because of the effect of inflation, the value of the royalty rate and the minimum royalty have eroded over time to a point where they have minimal value today.  Using the CPI as the measure of inflation, the value of the production royalty (which is 10 cents per ton on the first 500,000 tons per year but declines with increased production) is only $0.0054 per ton – half a cent per ton – in constant 1937 dollars.  Similarly. The value of the annual minimum rental payment of $100,000 is only $5,392 in 1937 dollars.

- Mr. Craynon also reviewed the royalty rates of 13 other coal production leases entered during the period 1927 - 1937.[1]  He concluded that his analysis "shows 10 cents per ton

---

[1] Mr. Craynon stated that he analyzed fourteen other coal leases in Boone and Wyoming Counties, but one of these leases was a lease for coal transportation (also known as:"wheelage"), not coal production.

as the prevailing rate." However, only one of these 13 other coal leases allowed the Lessee to extend the lease under successive time periods through exhaustion of the coal reserve with the Lessor having no right to adjust the royalty rate to reflect current market conditions.

- The fixed royalty per ton in the 1937 Lease was equivalent to a percentage royalty rate of 5% - 6% based on coal prices prevailing in the market at the time, which were about $1.76 per ton. Two of the thirteen other leases reviewed by Mr. Craynon had percentage royalty rates of 5%, in addition to the fixed rates. Royalty rates of 5% - 6% continue to be similar to royalty rates in Southern West Virginia under new coal leases.

- Of the thirteen coal production leases reviewed by Mr. Craynon, I concluded that:

  o Two leases had percentage royalty rates of 5%, not fixed rates.

  o Five had no provision for renewal and would have expired at the end of their terms of 5 – 40 years.

  o Three leases had a specific provision for renewal that rents and royalties would be reasonable and fair at the time of renewal.

  o One lease provided that rents and royalties were subject to mutual agreement at the time of renewal.

  o One lease provided that renewal was subject to the Lessor's assent.

  o Two leases do not provide for continued renewals.

  o Only one lease provides that the Lessee can continue to renew the term of the lease through exhaustion of the coal with no change in the royalty and rental rates, like the Loop Creek Lease.

- In my opinion, while the royalty rates in the Lease may have been commercially reasonable at the time they were agreed in 1937, they are no longer commercially reasonable today, 84 years later.

SA000125

## Exhibit 1 – Summary of Lease Terms

| Lessee | The Brule Smokeless Coal Company | Morrison Coal Company | The Red Parrot Coal Company | The Spruce River Coal Company | Elkhorn Piney Coal Mining Company | Morrison Coal Company | Elkhorn Piney Coal Company | Fisher, Orland, and Vietre | Houston Collieries Company | Erin Smokeless Coal Company | Big Eagle Pocahontas Land Company | Vermilion Coal Company | Black Eagle Smokeless Coal Company |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lessor | Western Pocahontas Corporation | Ritter Lumber Company | Youghiogheny and Ohio Coal Company | Boone County Coal Company | The Southern Land Company | Pocahontas Coal & Coke Company | Wharton Coal Company | The Bull Creek Coal Land Company | Pocahontas Coal and Coke Company | Wyoming Land Company | F. H. Good | Bedford Corporation | Wyoming Land Company |
| Date | 12/23/1937 | 11/29/1933 | 3/18/1935 | 1/1/1931 | 8/1/1934 | 12/26/1935 | 11/26/1932 | 11/17/1931 | 6/29/1929 | 6/1/1929 | 5/31/1927 | 5/1/1927 | 1/12/1934 |
| County | Wyoming | Wyoming | Boone | Logan and Boone | Boone | Wyoming | Boone | Boone | McDowell and Wyoming | Wyoming | Wyoming | Boone | Wyoming |
| Acres | 120.00 | 253.32 | 114.00 | | 372.20 | 2,180.86 | 6,447.32 | | 15,105.32 | 692.34 | | 468.25 | 857.62 |
| Start | 1/1/1938 | 1/1/1933 | 3/18/1935 | 1/1/1931 | 8/1/1934 | 1/1/1936 | 1/1/1933 | | 7/1/2029 | | 7/1/1929 | | 1/1/1934 |
| Primary term | 20 years | 20 years | 5 years | 2 years | 10 years | 30 years | 15 years | 15 years | 30 years | 25 years | 14 years | 40 years | 30 years |
| Renewal | 20 years | 30 years | none | every 2 years | none | 30 years | none | 10 years | 30 years | 25 years | none | none | 30 years |
| Renewal term | Rents and royalties the same as modern leases in the Winding Gulf District | Rents and royalties for any term of renewal shall be reasonable and fair at the time of renewal | | subject to Lessor's assent | | Rents and royalties for any term of renewal shall be reasonable and fair at the time of renewal | | rent and royalties subject to mutual agreement | | | | | |
| Royalty | 15 cents per ton | 10 cents per ton | 5 cents per ton | 10 cents per ton plus 5% of the selling price over $1.50 per ton | 10 cents per ton | 10 cents per ton plus 5% of the Hampton Roads price less rail freight over $2.50 per ton | 10 cents per ton; then 15 cents per ton | | 11.0 cents first 10,000 tons; 11.5 cents for the next 10,000 tons; 12.73 cents for all coal in excess of 20,000 tons | 12.5 cents per gross ton | 15 cents per ton | 10 cents per ton | 12.5 cents per gross ton |
| Basis | ROM gross ton | net ton railroad weights | net ton railroad weights | net ton railroad weights | net ton | net ton | net ton railroad weights | net ton railroad weights | gross ton railroad weights | gross ton | net ton | net ton railroad weights | gross ton railroad weights |
| Minimum rental | Year 1 - $600; Following - $1,200 | Year 1&2 - none; Following - $2,500 | $2,000 per year | $5,000 per year | | Year 1 - none; Year 2 - 30,000 tons; Year 3 - 60,000 tons; Year 4 - 90,000 tons; Following 120,000 tons | $25,000 per year | Year 1 - $1,000; Year 2 - $1,600; Following - $2,000 | 1929 - $45,000; 1930 - 1934 - $90,000 per year; after 1934 - $112,000 per year | $6,650 per year | 1929 - $1,000; 1930 - $1,500; 1931 - $2,000; 1932 - $3,000; 1933 - $4,000; 1934 - $5,000; 1935+ - $6,000 | Year 1 - $4/acre; Year 2 - $5/acre; Year 3 - $6/acre; $7/acre | $5,000 per year |
| Recoupment | current year only | following year only | following year | following year | unlimited | unlimited | unlimited | following year | unlimited | following year only | following month only | following month only | 2 years |
| Bates start | 006027 | 006013 | 006006 | 005989 | 005984 | 005968 | 005947 | 005938 | 005909 | 005896 | 005881 | 005874 | 005857 |
| Bates end | 006038 | 006027 | 006009 | 006006 | 005989 | 005983 | 005967 | 005946 | 005937 | 005909 | 005895 | 005880 | 005873 |

## Documents Reviewed and Relied Upon

Mr. Schwartz reviewed and relied upon the following documents in preparing his opinion in this case:

- Coal lease between Wyoming Land Company (Lessor) and Black Eagle Smokeless Coal Company (Lessee) dated January 12, 1934
- Coal lease between Bedford Corporation (Lessor) and Vermillion Coal Company (Lessee) dated May 1, 1927
- Coal lease between F. H. Good (Lessor) and Big Eagle Pocahontas Land Company (Lessee) dated May 31, 1927
- Coal lease between Wyoming Land Company (Lessor) and Erin Smokeless Coal Company (Lessee) dated June 1, 1929
- Coal lease between Pocahontas Coal and Coke Company (Lessor) and Houston Collieries Company (Lessee) dated June 29, 1929
- Coal lease between The Bull Creek Coal Land Company (Lessor) and Fisher, Orlandi, and Veltre (Lessee) dated November 17, 1931
- Coal lease between Wharton Coal Company (Lessor) and Elkhorn Piney Coal Mining Company (Lessee) dated November 26, 1932
- Coal lease between Wyoming Pocahontas Coal and Coke Company (Lessor) and Morrison Coal Company (Lessee) dated December 16, 1935
- Coal lease between The Southern Land Company (Lessor) and Elkhorn Piney Coal Mining Company (Lessee) dated August 1, 1934
- Coal lease between Boone County Coal Company (Lessor) and The Spruce River Coal Company (Lessee) dated January 1, 1931
- Coal lease between Youghiogheny and Ohio Coal Company (Lessor) and The Red Parrot Coal Company (Lessee) dated March 18, 1935
- Coal lease between Ritter Lumber Company (Lessor) and Morrison Coal Company (Lessee) dated November 29, 1933
- Coal lease between Western Pocahontas Corporation (Lessor) and The Brule Smokeless Coal Company (Lessee) dated December 23, 1937

# EXHIBIT L

# Exhibit 1

**Expert Report of Frank Scott**

## I.    Background and Qualifications

I am Professor of Economics in the Gatton College of Business and Economics at the University of Kentucky. I received a B.A. in economics from the College of William & Mary in 1973, and a Ph.D. in economics from the University of Virginia in 1979. My graduate fields of concentration were industrial organization and quantitative methods. I served as instructor and assistant professor at Auburn University in Alabama from 1978 until 1982. Since 1982, I have been employed as assistant professor, associate professor, and professor of economics at the University of Kentucky. A copy of my curriculum vitae is attached as Exhibit 1.

In my position as professor of economics, I teach courses at the undergraduate and graduate level in microeconomic theory, managerial economics, and industrial organization. I have previously taught courses in statistics and econometrics. I supervise graduate students and conduct research in the general areas of applied microeconomics and industrial organization. I have authored numerous papers in peer-reviewed economics journals, and have served as a reviewer for academic journals on a regular basis. I consult and provide expert testimony in the areas of industrial organization and antitrust. A copy of my curriculum vitae is attached as Exhibit 1.

## II.    Introduction

I have been asked by defendants to consult and provide expert testimony in the matter of Rockwell Mining, LLC and Blackhawk Land and Resources, LLC, Plaintiffs v. Pocahontas Land LLC, Defendant (U.S. District Court of the Southern District of West Virginia, Civil Action No.: 2:20-487). At the heart of this dispute is a 1937 lease between Loup Creek Colliery Company (lessor) and The Koppers Coal Company (lessee) to mine coal in northwestern Wyoming County and southeastern Boone County, West Virginia. Poca Land is the successor lessor by merger with Loup Creek and Rockwell and Blackhawk Land are the successor lessees under the 1937 Lease. The purpose of this report is to analyze the market for coal in southern West Virginia prior to and at the time of the signing of the 1937 Lease, and to explore and explain the economic relationship between the parties when they entered into the Lease. As such my report should inform an analysis of whether the 1937 Lease should be viewed as an arms-length

1

agreement between two unrelated parties, each carefully looking out for their own short-run and long-run economic interests, or as merely an internal transaction between two related parties, each serving the greater economic interests of their controlling parent entity.

**III.    Economic Fundamentals**

   *A.   National market for coal*

For over a century, from the mid-1800's to the mid-1900's, coal was the primary energy source driving the industrial revolution in Europe and America.[1]  The simultaneous development of steam engines, railroads, and coal mining fundamentally transformed societies from rural agrarian to urban industrial.  Living standards of average citizens rose accordingly.  In the post-Civil War period, the development of water and rail transportation networks in the eastern half of the United States enabled the economic shipment of coal over long distances.  Producers throughout the Appalachian coal fields competed to sell their coal to buyers who were geographically dispersed along the Atlantic seaboard and throughout the South and Midwest.[2]

Coal is an economic commodity that is bought and sold in national and international markets.  This means that buyers of coal of a given type and grade do not differentiate between the products offered by different sellers—they make their purchase decision based on who has the lowest price.  Since there were many buyers and many sellers competing in this broad geographic commodity market, no single buyer or seller had the ability or market power to influence market price.[3]  Instead, the price of coal was (and is) determined by

---

[1] In 1899 coal provided  90 percent of the total Btu supplied  in the U.S. by mineral fuels and water power, with the remainder supplied by water, natural gas, and petroleum.  See Chart 2, p. 10 in Waldo E. Fisher and Charles M. James, *Minimum Price Fixing in the Bituminous Coal Industry*, Princeton: Princeton University Press and National Bureau of Economic Research, 1955.

[2] C. L. Christenson, *Economic Redevelopment in Bituminous Coal*, Cambridge: Harvard University Press, 1962, provides an excellent historical analysis of the role that coal has played in world economic development.  See Chapter 1: "Coal and World Economic Development."  He also discusses the evolution of the market structure of the coal industry in the U.S. in Chapter 2: "Structure of the Industry."  Glen L. Parker, *The Coal Industry: A Study in Social Control*, Washington, D.C.: American Council on Public Affairs, 1940, also contains an enlightening historical discussion of the evolution of the bituminous coal industry in the U.S.  Parker's outlook, written two decades before Christenson's, provides an interesting contrast in perspective.  See especially his Chapter 1: "Economic Characteristics of the Bituminous Coal Industry."

[3] See the discussion of the "real boundaries of coal markets" in Christenson, *Economic Redevelopment in Bituminous Coal*, 1962, pp. 85-96.

2

market forces, and hence was exogenous to any individual coal producer.[4]  "Coals of approximately the same quality and of identical size, for the same use, of necessity have to sell at the same price at a given destination in an unregulated market."[5]

B.  *Economic viability of mining coal from a specific coal deposit*

Since the selling price of a ton of coal is determined by market forces beyond the control of individual coal producers, the economic viability of mining from a specific coal deposit depends on costs.  Coal is costly to extract from the ground and costly to transport to the customer's location.  The cost of extraction depends on factors such as the depth and thickness of the coal seam, the remoteness of the site, the technology available for mining the coal,[6] and the availability of labor.[7]  Since coal is heavy and bulky, rail and barge access to the mine location are critical.  If the costs of extracting the coal at a specific site and transporting it to the buyer's location are less than the prevailing market price at that location, then that particular mining operation is economically viable.  Indeed, the economic

---

[4] That is not to say that the U.S. Government did not actively intervene in the functioning of coal markets throughout the late nineteenth century through much of the twentieth century.  Created in 1887, the Interstate Commerce Commission continually balanced the interests of northern railroads and coal producers against those of southern and midwestern railroads and coal producers.  Congress created the U.S. Bituminous Coal Commission in 1919.  The U.S. Coal Commission was created in 1922.  The National Industrial Recovery Act of 1933 led to the establishment of the National Bituminous Coal Industrial Board, which attempted to set coal prices in different producing regions.  When the U.S. Supreme Court invalidated the National Recovery Administration in 1935, Congress passed the Coal Conservation Act of 1935, which again attempted to set coal prices through the creation of the National Bituminous Coal Commission.  This Act was also declared unconstitutional, and so Congress followed with the Coal Conservation Act of 1937.  Parker (*The Coal Industry: A Study in Social Control*, 1940, especially pp. 44, 88, 91, 107, 110-112, 119, 123, and 137-145) provides an exhaustive history of these events.
[5] Fisher and James, *Minimum Price Fixing in the Bituminous Coal Industry*, 1955, p. 71, describe and evaluate the national experiment in price fixing in the bituminous coal industry established by the Coal Conservation Act of 1937.
[6] See the discussion of "new mining practices" in Joseph T. Lambie, *From Mine to Market: The History of Coal Transportation on the Norfolk and Western Railway*, New York: New York University Press, 1954, pp. 261-262.  The specific techniques used at the Loup Creek Colliery mining operations at Page WV in 1905 are described in detail in an article by G. W. Harris on "The Loup Creek Colliery Company" in *The Engineering and Mining Journal*, December 9, 1905, pp. 1058-1061.  An excellent survey and history of mining technology and the associated productivity of miners is contained in U.S. Department of Labor Bureau of Labor Statistics, *Technological Change and Productivity in the Bituminous Coal Industry, 1920-60*, Washington, D.C., November 1961.
[7] Price V. Fishback, *Soft Coal, Hard Choices: The Economic Welfare of Bituminous Coal Miners, 1890-1930*, New York: Oxford University Press, 1992, describes the competition among mine owners to hire workers (pp. 25-26): "The labor force was relatively mobile, and during booms competition for labor was fierce.  The number of firms in southern West Virginia alone was large and they were spread among several associations.  In 1913 thirty firms employed over 300 workers in the seven major coal counties in southern West Virginia, and additional one hundred employed over a hundred workers, and at least eighty more employed more than fifty workers.  . . . Miners in southern West Virginia easily crossed state borders into eastern Kentucky where there were at least another 150 companies hiring more than ten workers per year and into Virginia where there were another twenty to forty companies."

3

development of much of the state of West Virginia can best be understood by tracing the evolution of mining techniques and expansion of rail and barge networks over time throughout the state.[8]

C. *The Kopperston mine location*

The 1937 Lease agreement concerned a large untapped coal deposit in northwestern Wyoming County along the Toney and Crane Forks of the Clear Fork of the Guyandotte River and in southeastern Boone County along the Pond Fork of the Little Coal River, henceforth referred to as the Kopperston mine. Although the existence of this coal deposit was known, prior to 1928 it was far removed from any transportation network.[9] Hence, it was not economically viable to mine coal from the Kopperston location. In 1926 the Virginian Railroad started construction of an extension of their line along the Guyandotte River from Mullins, WV to Gilbert, WV.[10] When the extension was finished in 1928, the Kopperston coal was only 19 miles from a rail line.[11]

IV. **Business Transactions Involving Sunk Costs**

A. *Three parties to a successful mining venture*

There are three primary parties to a mining venture like that at Kopperston—the owner of the land and coal underneath, the mining company empowered to extract the coal, and the railroad that is positioned to haul the coal to customers in the downstream market. For the venture to be viable, i.e. economically profitable, the costs incurred by all three parties in mining the coal and transporting it to market must be less than or equal to the price such coal can command in the market.

B. *Up-front irreversible transaction-specific investments*

---

[8] An excellent historical summary of people, places, and events is contained in *Exploring the West Virginia Coalfields* published by the National Coal Heritage Area Authority, Oak Hill, WV. A much more extensive and detailed study is Phil Conley's *History of the West Virginia Coal Industry*, Charleston, WV: Education Foundation, 1960. Conley recounts the history and development of the state as a whole, and then studies each individual coal field. Chapters 9-12 cover the New River, Flat Top-Pocahontas, Winding Gulf, and Logan Fields.

[9] The earliest written records concerning coal mining around Oceana appeared to be written in 1889 by the editor of *The Wyoming News*—see Paul R. Blankenship, *From Cabins to Coal Mines 1799-1999: A Bicentennial History of Oceana, West Virginia*, Chapter 38, pp. 250-254. Christenson (*Economic Redevelopment in Bituminous Coal*, 1962, p. 22) describes the general awareness by outside financial interests of the Pocahontas field in the 1870's.

[10] H. Reid, *The Virginian Railway*, Milwaukee, WI: Kalmbach Publishing Co., 1961, p. 82.

[11] A map of the mine location relative to the Virginian Railroad main line along the Guyandotte River is contained in "Koppers to Open New Mine," *The Charleston Daily Mail*, July 8, 1937, p. 8, and is attached as Exhibit 2.

4

Prior to the 1937 Lease, the Kopperston mine location was just undeveloped mountainous land 19 miles from the nearest railroad tracks.  Before the first ton of coal could be extracted and shipped to market, both the mining company and the railroad had to make sizable up-front investments that were both specific to this particular transaction and irreversible.  In other words, both had to incur large sunk costs that could not be recovered if for some reason the transaction went sour.

Koppers Coal Company had to prepare the site and dig shafts to gain access to the underground coal, costs that were sunk and irrecoverable if the mine were to be closed.[12]  It also built a tipple on the site, the first that it completely designed, constructed, and equipped itself.  And because of the remoteness and scale of the mine operations, Koppers Coal built an entire community, Kopperston, with 355 new houses, a company store, miners boarding house, company offices, miners bathhouse, a post office, doctor's office, school, playgrounds, and church.[13]

The Virginian Railroad had to build a spur line up Clear Creek and Toney Fork to the Kopperston mine site, railroad tracks that had no other function than to haul coal from the mine to the existing Virginian main line along the Guyandotte River.  The 20-mile Mori Branch went from Simon through Oceana and Toney Fork.  A crew of 80 skilled steel layers came from Virginia to build the line, which also required the construction of eight bridges.[14]

Such situations create a special problem for the economics of organization.  Parties to such a transaction expose themselves to what is called *ex post hold-up*.  Once the mining company makes the investment in preparing the land and getting the mine operational, its ongoing costs will be the labor, equipment, and other costs associated with mining coal in an existing mine.  Ex ante, it would only enter into such a venture if it expected the railroad to charge a transportation fee that would enable the mining company to cover its ongoing

---

[12] From Mary Keller Bowman's *Reference Book of Wyoming County History*, Parsons, WV: McClain Printing Company, 1965, p. 261:
"The site selected for camp of the Koppers Coal Co. operation in Wyoming County was a narrow valley with a small stream meandering through it.  To an eye untrained in engineering, it looked most unpromising.  Much planning, engineering, time, and earth moving to an incredible extent, were required to prepare the site for installation of the plant and its equipment and for the camp itself.  First, the bed of the stream was channeled to flow at the foot of the hill leaving the valley for other purposes.  Then the land was bulldozed level, the camp laid out, and construction commenced."
[13] "Kopperston Constructed Nearly 80 Years Ago," by Mary Catherine Brooks, Wyoming County Bureau Chief, December 21, 2015.  Her original source was a 1937 story in the *Raleigh-Register*.
[14] Brooks, 2015, originally reported in 1937 by the *Raleigh-Register*.

mining costs as well as earn at least a competitive return on its up-front investment.  After both parties make their sunk investments and the mine becomes operational, suppose the railroad approaches the mining company and refuses to haul the coal for the price initially anticipated by the mining company.  Instead, suppose that the railroad will only transport the coal down the mountain to market at a higher rate per ton that only leaves enough revenue after the coal is sold for the mining company to just cover its ongoing economic costs of mining the coal, but does not allow it to recoup its initial and now sunk investment to open the mine.

The mining company faces a hard choice—either refuse to pay the higher shipping rate and close the mine, earning zero return on the initial investment, or swallow hard and pay the higher shipping rate, covering all current economic costs of mining the coal but ultimately earning a less-than-competitive return on its initial investment.  This is the potential hold-up problem created when an economic transaction requires one or both parties to make up-front irreversible investments that are specific to this transaction.  If it had anticipated being held up ex post in this way, the mining company would not have entered into the transaction in the first place, because it would not invest in this project when it could earn a higher competitive market return in other ventures.  In the Kopperston project the Virginian Railroad was also exposed to potential ex post hold-up because of the specificity of its spur line asset up to Kopperston.

This issue arises frequently in business transactions.  Understanding the problem, sophisticated economic agents will not expose themselves to such potential ex post hold-up, but instead will craft solutions that protect their interests.  One approach is for the parties to sign a long-term contract wherein each commits to abide by the terms of the agreement for a period long enough for each to recoup its initial investment.  Since it is often impossible for the parties to anticipate all contingencies, instead of a long-term contract the preferred solution may be for one party to acquire the other party, i.e. vertical integration.  If both mining company and railroad are controlled by the same parent organization, there is no incentive for either to hold up the other, since the profits from the entire venture all accrue to the same parent entity.

*C.   How did the parties in this case handle this fundamental economic problem?*

In the economic relationship at the heart of this case, the parties chose vertical integration or common ownership.  Loup Creek Colliery owned the land and coal

underneath it.  It in turn was a wholly owned subsidiary of the Virginian Railroad.  The Koppers Company, through its subsidiary Eastern Gas and Fuel Associates, owned the Koppers Coal Company.[15]  The Koppers Company also owned a large part of the Virginian Railroad, and with the other owners it was assured that the Virginian would be operated in the best interests of Koppers.[16]  The Mellon family controlled the Koppers Company, and so one common entity controlled all the economic parties involved in the 1937 Lease.[17]

## V.    How the Mellon Family Acquired Control of Each of the Economic Entities

### A.    *Loup Creek Colliery*

Loup Creek Colliery, the Lessee, was formed out of the Loup Creek Estate sometime before 1902.  The Loup Creek Estate owned 25,000 acres of coal land in western Fayette County, WV.  It was partially owned by eastern financier Henry H. Rogers.  Rogers partnered with William N. Page, a civil engineer from Ansted who had considerable experience in the

---

[15] See the chart outlining the corporate structure of the Koppers United Company and its Subsidiaries, Exhibit No. 1283, attached to *Investigation of Railroads, Holding Companies, and Affiliated Companies,* U.S. Senate Subcommittee of the Committee on Interstate Commerce Hearings, August 9, 1937.  Exhibit 1307, p. 4552, of that report states that Koppers United Company owned 75 percent of the stock of Eastern Gas and Fuel Associates, which in turn owned all of the stock of the Koppers Coal Company.

[16] In 1933 almost complete ownership of the Virginian Railroad resided in the family of H. H. Rogers.  William Coe, Rogers' son-in-law, negotiated on behalf of the family a transaction that gave the Koppers Company common and preferred stock in the Virginian Corporation in return for cash and collateral notes of the Virginian Corporation.  The Virginian Corporation held about 40 percent of the voting stock of the Virginian Railway.  Coe testified that the Rogers family and the Koppers Company had a cooperative relationship in running the Virginian Railway.  A precise description of the transaction is contained in U.S. Securities and Exchange Commission, "In the Matter of Koppers United Company, the Brooklyn Union Gas Company, Eastern Gas and Fuel Associates, Fuel Investment Associates, and Brockton Gas Light Company," September 28, 1942, p. 15.  The report concludes "The Koppers interests and the Coe interests in Virginian Railway have been cooperative and friendly.  . . .  it appears quite clear that Koppers, at least, regarded Coe's statement that he would cooperate with Koppers as binding and effective."

[17] A description of the Mellon "Sphere of Influence" is contained in a report prepared by the U.S. Securities and Exchange Commission for the Temporary National Economic Committee of the U.S. Senate: "The Distribution of Ownership of the 200 Largest Non-Financial Corporations," September 24, 1940, especially pp. 101-103, which discusses their ownership of Koppers United Company.  How the Mellons acquired control of the Koppers Company is an interesting story in itself, and is recounted in Burton Hersh, *The Mellon Family: A Fortune in History*, New York: William Morrow & Co., 1978, pp. 154-159.  Heinrich Koppers was a German inventor who developed a new technique for coking coal that captured many of the byproducts that previously had been wasted.  He needed financial backing to launch his company in the U.S., and through a chain of events culminating in 1915, Andrew and Richard Mellon became primary shareholders in the new company.  World War I led to rapid growth in Koppers primary business, coke, and even more rapid growth for byproducts of the new coking process.  The Mellons were able to acquire Heinrich Koppers' shares of the company in 1917 after the U.S. entered the war, and by 1921 they owned 55 percent of the stock.  See also David Cannadine, *Mellon: An American Life*, New York: Vintage, 2008, pp. 252-254.

mining and railroad industries. Page, who became director of the Loup Creek Colliery, was aware of untapped coal fields that lay between the territory served by the C&O Railroad and that served by the N&W Railroad.[18] Loup Creek Colliery acquired large swaths of coal-bearing land during the early 1900's. These acquisitions were one part of a larger plan that Page and Rogers had for developing these southern West Virginia coal assets.[19] As of 1920 the Virginian Railway owned all of the capital stock of the Loup Creek Colliery Company.[20]

B. *Virginian Railroad*

Page and Rogers built a new railroad, the Virginian Railroad right under the noses of the N&W and the C&O. Its primary purpose was to haul southern West Virginia coal to Norfolk, VA, where it could be loaded onto steamships and transported to customers along the Atlantic coast, primarily in the northeast. This railroad was positioned geographically to make it economically viable to develop many of the coal deposits earlier acquired by Loup Creek Colliery.

Page and Rogers kept their project secret from the C&O and N&W by initially chartering the West Virginia portion as the Deepwater Railway and the Virginia portion as the Tidewater Railway. Only after the project was too far along to stop did it become clear that these two rail lines would meet at the Virginia-West Virginia state line at Glen Lyn. In early 1907 the Tidewater Railway changed its name to The Virginian Railway Company. A month

---

[18] Christenson (*Economic Redevelopment in Bituminous Coal*, 1962, p. 113) succinctly describes the informational disadvantage many original landowners faced when more knowledgeable outsiders made offers to buy their properties:
"In some cases the acquisition of the best-quality coal lands took place in advance of the building of rail facilities. This was in part true of some of the integrated mines in West Virginia, but it was more strikingly so in eastern Kentucky. In these circumstances land purchases are likely to be made at prices considerably lower than will prevail after the rail networks have been developed. The amount of the unearned increment, of course, depends upon how long such mining properties have to lie dormant before transportation facilities become available. In any case, such advance purchases may add to the other advantages growing out of discriminating selection which accrue simply because of the better seams. Getting the best is good; but getting it before others have helped to establish high market values is still better."

[19] See "Mercer Memories…A Look at the Deep Water Railway Company" by Jeff Harvey, June 8, 2015. Page and Rogers' business model was very similar to that of the N&W Railway and its affiliate, Pocahontas Coal and Coke Company, later to become the Pocahontas Land Company in 1939. Pocahontas owned or controlled hundreds of thousands of acres of coal property in southern West Virginia in the early 1900's. Its customary royalty rate was ten cents per ton, but it also required any coal mined on its leased property to be hauled by the N&W, which was very profitable for the overall enterprise given the rates set by the ICC for hauling coal (Lambie, 1954, Chapter 21, pp. 237-263, "The Pocahontas Coal and Coke Company."

[20] *Eleventh Annual Report of the Virginian Railway Company*, for the year ended December 31, 1920, p. 4.

later, the Deepwater Railway was acquired by the Virginian, and William N. Page was chosen to be president of the Virginian Railway.[21]

C.  *Koppers Coal Company*

Koppers Coal Company was one link in the vertical chain of production of the Koppers Company.  Koppers' initial and primary business was operating coke ovens and transforming coal into coke and a host of other products.[22]  To supply its coke ovens it needed coal, and southern West Virginia had the best coal available for making coke.  While the Koppers Coal Company sold coal to other customers, much of its coal went to Koppers coke plants.  It had extensive coal mines in West Virginia and shipped much of it on the C&O.[23]  It also shipped some of its coal on the Virginian Railroad.

The rates set by the U.S. Interstate Commerce Commission at the time made it very profitable for railroads like the C&O, the N&W, and the Virginian to haul coal from southern West Virginia to the Norfolk-Hampton Roads port area.[24]  The Mellons, through their control of the Koppers Company and Koppers Coal Company, saw an opportunity to capture a sizable portion of the economic profits that were being earned by the railroads who were shipping their southern West Virginia coal to market.

Koppers coal mines accounted for over 38 percent of the revenues of the Virginian Railroad.  The Mellons threatened to shift even more of Koppers coal to the C&O if Henry H. Rogers' heirs did not sell a large portion of the Virginian Railroad to them, a potentially devastating blow to the Virginian.  The carrot they offered was that Koppers would shift

---

[21] References used as background for this section include H. Reid's *The Virginian Railway*, Mary Keller Bowman's *Reference Book of Wyoming County History*, Joseph T. Lambie's *From Mine to Market*, *Wikipedia* entries for William N. Page, Henry H. Rogers, and the Virginian Railway, and various federal government documents.

[22] In an advertisement in the September 26, 1936 *Pittsburgh Post-Gazette*, Koppers explained its corporate strategy of vertical integration upstream into coal mining.  It then described in some detail all the useful byproducts of its coke ovens, including coal tar, chemical ingredients for medicines, benzol, naphthalene, and creosote.

[23] From *Investigation of Railroads, Holding Companies, and Affiliated Companies,* U.S. Senate Subcommittee of the Committee on Interstate Commerce Hearings, August 9, 1937: "During 1936, the Koppers Coal Co. mined approximately 13 million tons of coal, being second in production only to United States Steel Corporation (p. 4182)."  About 90 percent of the total coal used is shipped eastward from the West Virginia fields to tidewater, at Norfolk, and Hampton Roads, over the Norfolk & Western, the Chesapeake & Ohio, and the Virginian (p. 4182.)  "In the years 1932 through 1936, Koppers' tidewater traffic has moved, roughly, one-half over the Chesapeake & Ohio, one-third over the Virginian, and one-sixth over the Norfolk & Western (p. 4183)."

[24] In the same 8/9/1937 Hearings: "Q: The three railroads serving the West Virginia coal fields are, perhaps, the most prosperous in the country, having operating ratios of about 50 percent? A: That is correct according to my general knowledge of the situation. . . . This means that out of every dollar paid by Koppers for freight, 50 cents constitutes operating income to these railroads. (p. 4184)"

9

much of its coal from the C&O to the Virginian if they obtained such ownership of the Virginian and could hence share the profits from shipping their coal.[25]

The transaction between Koppers/Mellons and the Virginian Railroad was finalized in January 1937.[26]  Since the Virginian Railroad owned the Loup Creek Colliery, this acquisition gave the Mellons control of all three significant economic parts of the Kopperston coal mining venture.  The 1937 Lease was signed six months later.  Concurrently, the Koppers Coal Company was shifting millions of tons of coal from the C&O to the Virginian Railroad.


**VI.    Economic Relationships Underlying the 1937 Lease**

In early 1937 the Mellon family had a controlling interest in the Koppers Company.  The Koppers Company owned the Koppers Coal Company.  The Koppers Company had a controlling interest in the Virginian Railroad.  The Virginian Railroad owned the Loup Creek Colliery.  So all the critical parts of the Kopperston mining venture were in place.[27]  As the vice president of Koppers United Co. explained to a U.S. Senate Subcommittee in 1937, "I should say that the acquisition of the Virginian was the logical completion of the Koppers' whole picture.  We mine the coal in West Virginia.  We ship it by our own steamers up the coast to our own coke plants, and a glance at the map will show the desirability of a complete integration by the acquisition of the Virginian."[28]

---

[25] Later in the same 8/9/1937 Hearings (p. 4192): "Q: As a matter of fact, the Koppers Co. had pretty much of a club over the stockholders, because they could take their traffic away at any time they wanted to take it away from them, and make the value of the stock pretty near worthless, could they not?  A: I think that is a correct statement.  Q: They could have transferred it over to the Chesapeake & Ohio?  A: Yes."  Reid, *The Virginian Railroad*, pp. 90-91 provides a colorful description of the economic underpinnings of this transaction.

[26] A precise description of the transaction is contained in Koppers Company *Annual Report: Year Ended December 31, 1937*.  The economic significance of the Virginian piece of the puzzle is contained in the September 28, 1942 Securities and Exchange Commission Hearings (p. 15):  "Coe expressed the opinion in his testimony, that if a show-down fight ever arose in Virginian Railway, the Coe interests (though owning less voting stock) could, by the command of proxies, out-vote Koppers.  Coe admitted, however, that it was to the mutual advantage of both groups to cooperate rather than to fight, and under the circumstances we do not question this statement.  The Virginian Railway is one of the links in the Koppers chain of vertical operations.  As we have noted, coal is brought to Brooklyn Union via Koppers-owned ships.  Coal loaded on these ships is hauled by Virginian Railway.  In 1932, prior to the affiliation of Koppers and Virginian Railway, the road hauled 32 percent of Koppers' coal shipments to the Tidewater base.  In 1938 it hauled over 61 percent."

[27] See U.S. Securities and Exchange Commission, "In the Matter of Koppers Company, Inc. Respondent," May 16, 1945, pp. 1-6, for a summary of the Koppers Company ownership interests in each entity.

[28] *Investigation of Railroads, Holding Companies, and Affiliated Companies,* U.S. Senate Subcommittee of the Committee on Interstate Commerce Hearings, August 9, 1937, p. 4211.

Common ownership meant that Koppers Coal Company and the Virginian Railroad could make the necessary up-front irreversible investments necessary to begin extracting and hauling coal without fear of ex post hold-up. The economic profits available to be earned from the venture were the difference between the exogenously determined price of coal set by the downstream national market and the economic costs of mining coal at Kopperston and transporting it to market. What one Mellon entity charged another Mellon entity in this vertical chain of production was of no real economic consequence to the overall profitability of the entire exercise. Profits could be taken upstream by the Loup Creek Colliery by setting a higher royalty rate on the extracted coal, or profits could be captured downstream by the Koppers Coal Company by setting a lower royalty rate. The profits captured by the Virginian Railroad were determined by the rates for hauling coal set by the Interstate Commerce Commission.

The upshot is that the 1937 Lease signed between Loup Creek Colliery and Koppers Coal Company was hardly an arms-length contract between two unrelated parties, wherein each party made sure that the terms of the contract protected its own short-run and long-run economic interests. Instead, it was an internal transaction between two parts of the Mellon family enterprise. The royalty rate fixed at ten cents per ton was simply an internal transfer price between the left hand and the right hand of the same body. The result is that 84 years later the royalty rate on Kopperston coal has dropped from approximately five percent ($0.10/ton when the F.O.B. price of coal was around $2.00/ton) to less than one-tenth of one percent ($0.10/ton when the price of coal is around $108.81/ton).[29]

## VII.    Conclusions

If the parties to the 1937 Lease had been unrelated, they would have crafted a contract that protected each of their economic interests at the time of the signing and going forward. Over the two decades prior to 1937 the market for coal had hardly been stable. Prices per ton skyrocketed from $1.13 in 1915 to $3.75 in 1920, fell from $2.68 in 1923 to $1.31 in 1932, and then hovered around $2.00 in 1937 when the Lease was signed.[30] Both lessor and lessee could

---

[29] Coal prices around the signing of the 1937 Lease are taken from U.S. Securities and Exchange Commission, "In the Matter of Eastern Gas and Fuel Associates," February 3, 1950, pp. 17-18. Current coal prices are taken from the U.S. Energy Information Administration web page on coal prices: Table 30, Average Sales Price of Coal by State, County, and Number of Mines, 2019 for Wyoming County, West Virginia.

[30] Fisher and James, *Minimum Price Fixing in the Bituminous Coal Industry*, pp. 7-15 and Chart 1.

easily have protected themselves against unanticipated price swings by stipulating a royalty in percentage terms, e.g. five percent of the F.O.B. mine-mouth price per ton of coal. Alternatively, they could have stipulated that the monetary royalty per ton be adjusted at regular intervals according to some agreed-upon market index that reflected changing market conditions, or they could have limited the term of the lease so that, as has occurred, the lease could not be unilaterally renewed potentially in perpetuity with no option to keep terms updated.

Loup Creek Colliery and Koppers Coal Company, however, were not unrelated parties and the lease that they signed was not arms-length. Hence they did not need to worry about building in such protections. Both were owned/controlled by the same parent company, The Koppers Company, and the same family enterprise, the Mellon family. As such, the royalty rate stipulated in the lease agreement was an internal transaction that only affected how much of the total profits were collected by the upstream land holding company and how much were collected by the downstream mining operation. As long as the Mellons and The Koppers Company owned and controlled both Loup Creek Colliery and The Koppers Coal Company, it did not matter economically what the stipulated royalty rate was. As a result, the 1937 Lease did not have protections built into it that would normally have been included in a contract between two unrelated parties.

Respectfully Submitted,

*Frank A. Scott, Jr.*

Frank A. Scott, Jr.

SA000140

July 2021

*CURRICULUM VITAE*

## PERSONAL

| | |
|---|---|
| Name: | **Frank A. Scott, Jr.** |
| Telephone: | (859) 257-7643 -office |
| | (859) 312-0377 -mobile |
| Business Address: | Department of Economics |
| | College of Business and Economics |
| | University of Kentucky |
| | Lexington, Kentucky  40506-0034 |
| | e-mail:  fscott@uky.edu |
| Home Address: | 3505 Castlegate Court |
| | Lexington, KY 40502 |
| Date of Birth: | March 26, 195l |
| Marital Status: | Married; two grown children, five grandchildren |

## EXPERIENCE

Professor of Economics, University of Kentucky, 1995-
       Gatton Endowed Professor, 1999-2021
       Research Professorship, 1998-1999
       Acting Chair, 2001-2002
       Director of Graduate Studies, 1990-91, 1999-2001, 2002-2005
Visiting Senior Research Scholar, Lancaster University, UK, 1999
Associate Professor of Economics, University of Kentucky, 1985-95
Assistant Professor of Economics, University of Kentucky, 1982-1985
Assistant Professor of Economics, Auburn University, 1979-1982
Instructor of Economics, Auburn University, 1978-79
Instructor of Economics, University of Virginia, 1977-78
Research Assistant (Summer Intern), Board of Governors of the Federal
       Reserve System, Washington, D.C., 1976

## ACADEMIC RESEARCH INTERESTS

Applied Microeconomic Theory, Industrial Organization, Antitrust, Public Economics, Public Policy

## EDUCATIONAL BACKGROUND

Graduate:  Ph.D. Economics, University of Virginia, 1979
Fields of Ph.D. Concentration:  Industrial Organization, Quantitative Methods
Doctoral Dissertation:  An Economic Analysis of Fuel Adjustment Clauses (Roger Sherman, Chairman)
Undergraduate:  B.A. Economics, College of William and Mary, 1973

SA000141

**PUBLICATIONS**

**Refereed Journals**

David Barrus and Frank Scott, "Single Bidders and Tacit Collusion in Highway Procurement Auctions," <u>The Journal of Industrial Economics</u> 68:3, September 2020, 483-522.

Luis Gonzalez, Marco Castaneda, and Frank Scott, "Solving the Simultaneous Truel in The Weakest Link: Nash or Revenge?" <u>Journal of Behavioral and Experimental Economics</u> 81, August 2019, 56-72.

Ken Sanford and Frank Scott, "Assessing the Intensity of Sports Rivalries Using Data from Secondary Market Transactions," <u>Journal of Sports Economics</u> 17, February 2016, 159-174.

Ken Sanford and Frank Scott, "What Are SEC Football Tickets Worth? Evidence from Secondary Market Transactions," <u>Southern Economic Journal</u>, 81, July 2014, 23-55.

Aaron Yelowitz, Frank Scott, and Jason Beck, "The Market for Real Estate Brokerage Services in Low- and High-Income Neighborhoods: A 6 City Study," <u>Cityscape: A Journal of Policy Development and Research</u> 15: 1, March 2013, 261-291.

Jason Beck, Frank Scott, and Aaron Yelowitz, "Concentration and Market Structure in Local Real Estate Markets," <u>Real Estate Economics</u>, Fall 2012, 422-460.

Frank Scott and Aaron Yelowitz, "Pricing Anomalies in the Market for Diamonds: Evidence of Conformist Behavior," <u>Economic Inquiry</u> 48, April 2010, 353-368.

Mark Berger, Dan Black, and Frank Scott, "Is There Job Lock?" <u>Southern Economic Journal</u> 70, April 2004, 953-976.

Eric Thompson, Frank Scott, and Mark Berger, "Deregulation in the Electric Utility Industry: Excess Capacity and the Transition to a Long Run Competitive Market," <u>Growth and Change</u> 35, Winter 2004, 1-21.

Mark Berger, Dan Black, Amitabh Chandra, and Frank Scott, "Children, Nondiscriminatory Provision of Fringe Benefits, and Household Labor Market Decisions," <u>Research in Labor Economics</u> vol. 22 (*Worker Well-being and Public Policy*, S. W. Polachek, ed.) 2003, 309-349.

Mark Berger, Dan Black, Jodi Messer, and Frank Scott, "COBRA, Spouse Coverage, and Health Insurance Decisions of Older Households," <u>Journal of Forensic Economics</u> 15, Spring/Summer 2002, 147-164.

Frank Scott and Jeff Anstine, "Critical Mass in the Production of Ph.D.'s: A Multi-Disciplinary Study," <u>Economics of Education Review</u> 21 (2), 2002, 29-42.

Dan Black, Mark Berger, and Frank Scott, "Bounding Parameter Estimates with Non-Classical Measurement Error," <u>Journal of the American Statistical Association</u> 95, September 2000, 739-748.

Frank A. Scott, Jr., "Great School Milk Conspiracies Revisited," <u>Review of Industrial Organization</u> 17, November 2000, 325-341.

Mark C. Berger, Dan A. Black, Frank A. Scott, and Amitabh Chandra, "Health Insurance Coverage of the Unemployed: COBRA and the Potential Effects of Kassebaum-Kennedy," <u>Journal of Policy Analysis and Management</u> 18, Summer 1999, 430-448.

Mark C. Berger, Dan A. Black, and Frank A. Scott, "How Well Do We Measure Employer-Provided Health Insurance?" <u>Contemporary Economic Policy</u> 16, July 1998, 356-367.

Frank Scott and Jeff Anstine, "Market Structure in the Production of Economics Ph.D.'s," Southern Economic Journal 64, July 1997, 307-320.

John Garen, Mark Berger, and Frank Scott, "Pensions, Non-Discrimination Policies, and the Employment of Older Workers," The Quarterly Review of Economics and Finance 36, Winter 1996, 417-429.

Frank A. Scott, Mark C. Berger, and John E. Garen, "Do Health Insurance Costs and Non-Discrimination Policies Reduce the Job Opportunities of Older Workers?" Industrial and Labor Relations Review 48, July 1995, 775-791.

Frank A. Scott, Jr. and O. David Gulley, "Testing for Efficiency in Lotto Markets," Economic Inquiry 33, April 1995, 175-188.

Frank A. Scott, Jr., "Franchising vs. Company Ownership as a Decision Variable of the Firm," Review of Industrial Organization 10, February 1995, 69-81.

Frank Scott and John Garen, "Probability of Purchase, Amount of Purchase, and the Demographic Incidence of the Lottery Tax," Journal of Public Economics 54, June 1994, 121-143.

O. David Gulley and Frank A. Scott, Jr., "The Demand for Wagering on State-Operated Lotto Games," National Tax Journal 46, March 1993, 13-22.

Mark C. Berger and Frank A. Scott, "Changes in U.S. and Southern Economics Departments over Time." Growth and Change 21, Summer 1990, 21-31.

O. David Gulley and Frank A. Scott, Jr., "Lottery Effects on Pari-Mutuel Tax Revenues." National Tax Journal 42, March 1989, 89-94.

Frank A. Scott, Mark C. Berger, and Dan A. Black, "Effects of the Tax Treatment of Fringe Benefits on Labor Market Segmentation," Industrial and Labor Relations Review 42, January, 1989, 216-229.

Frank A. Scott, Jr., Mark C. Berger, and Glenn C. Blomquist, "Impacts of Air Pollution Control Strategies in Kentucky," Growth and Change 19, Spring 1988, 40-55.

Frank A. Scott, Jr., "Assessing U.S. Postal Ratemaking:  An Application of Ramsey Prices," Journal of Industrial Economics 34, March 1986, 279-290.

Frank A. Scott, Jr., James E. Long, and Ken Somppi, "Salary vs. Marginal Revenue Product under Monopsony and Competition - The Case of Professional Basketball," Atlantic Economic Journal 13, September 1985, 50-59, reprinted in The Economics of Sport, Andrew Zimbalist (ed.), Cheltenham, UK: Edward Elgar Publishing, 2001.

Frank A. Scott, Jr. and Stephen O. Morrell, "Two-Part Pricing for a Multi-Product Monopolist," Economic Inquiry 24, April 1985, 295-307.

Frank A. Scott, Jr., "The Effect of a Fuel Adjustment Clause on a Regulated Firm's Selection of Inputs," The Energy Journal 6, April 1985, 117-126.

Frank A. Scott, Jr., "Uncertain Input Prices, Profit Risk, and the Rate-of-Return Regulated Firm: Reply," Land Economics 60, November 1984, 411-413.

Frank A. Scott, Jr., "The Pricing Policy of the Postal Service:  Economics Misapplied," Journal of Policy Analysis and Management 4, Winter 1985, 251-256.

James E. Long and Frank A. Scott, Jr., "The Impact of the 1981 Tax Act on Fringe Benefits and Federal Tax Revenues," National Tax Journal 37, June 1984, 185-194.

3

Frank A. Scott, "A Note on Uncertain Input Prices, Profit Risk, and the Rate-of-Return Regulated Firm," Land Economics 59, August 1983, 337-341.

Frank A. Scott, Jr., James E. Long, and Ken Somppi, "Free Agency, Owner Incentives, and the National Football League Players Association," Journal of Labor Research 4, Summer 1983, 257-264.

James E. Long and Frank A. Scott, "The Income Tax and Nonwage Compensation," The Review of Economics and Statistics 64, May 1982, 211-219.

Frank A. Scott, Jr., "Estimating Recipient Benefits and Waste from Lifeline Electricity Rates," Land Economics 57, November 198l, 536-543.

Albert N. Link and Frank A. Scott, "Effluent Fees, An Alternative System for Achieving Water Quality:  A Case Study," Water Resources Bulletin 17, June 198l, 498-500.

**Chapters in Books and Other Publications**

William H. Hoyt, Frank A. Scott, Jr., and W. Hayden Brown, "Participation Patterns for AFDC and SSI: An Examination of Differences among Kentucky Counties," The Kentucky Journal of Economics and Business 19, 2000, 49-67.

Frank A. Scott, Jr., "Postal Delivery of Newspapers and Periodicals:  A Comment," in M. A. Crew and Paul Kleindorfer (eds.), Competition and Innovation in Postal Services, Boston:  Kluwer Academic Publishers, 1991.

Frank A. Scott, Jr., "Fuel Adjustment Clauses and Profit Risk," in M. A. Crew (ed.), Issues in Public Utility Pricing and Regulation, Lexington, Mass.: Lexington Books, 1980.

Christopher Jepsen, Frank Scott, and Jesse Zenthoefer, "Economic Inefficiencies in Access Rates: Kentucky's Intrastate Switched Telephone Access Charges," Kentucky Annual Economic Report 2012, Center for Business and Economic Research, University of Kentucky, 2012.

John Garen, Christopher Jepsen, and Frank Scott, "The Aluminum Industry in Kentucky," Kentucky Annual Economic Report, 2009, Center for Business and Economic Research, University of Kentucky, 2009.

Frank A. Scott and Mark C. Berger, "Electricity Deregulation Will Benefit Urban and Rural Kentuckians," Foresight, vol. 5, no. 2, 1998.

Frank A. Scott, Jr., "The Changing Market for Electricity in Kentucky," Kentucky Annual Economic Report 1998, Center for Business and Economic Research, University of Kentucky, 1997.

William H. Hoyt and Frank A. Scott, Jr., "County-Level Differences in Per Capita Transfer Income," Kentucky Annual Economic Report 1996, Center for Business and Economic Research, University of Kentucky, 1996.

Frank A. Scott, Jr., "Health Care Reform in Kentucky," Kentucky Annual Economic Report 1995, Center for Business and Economic Research, University of Kentucky, 1995.

O. David Gulley and Frank A. Scott, Jr., "The Effects of State Lotteries on Pari-Mutuel Tax Revenues," Review and Perspective 13, Fall 1989, Center for Business and Economic Research, University of Kentucky.

Frank A. Scott, Jr., Mark C. Berger, and Glenn C. Blomquist, "Estimated Economic Impacts of Acid Rain Controls in Kentucky," Review and Perspective 11, Fall 1987, Center for Business and Economic Research, University of Kentucky.

## WORKING PAPERS

"Competitive Markets and Discrimination: How Online Markets Increase Access and Reduce Prices for Minorities," with Abdullah Al-Bahrani and Aaron Yelowitz.

"The Impact of Real Estate Agent Specialization and Activity Level on Market Outcomes?" with Jason Beck and Aaron Yelowitz.

"Walmart's Entry into Local Grocery Markets: Measuring the Impact through Competitors' Responses," with Jeff Hoffman and Chris Bollinger.

## PROFESSIONAL ACTIVITIES

"Do More-Active Agents Affect Real Estate Market Outcomes?" presented at Southern Economics Association meetings in Washington, D.C., November 2018.

"Single Bidders and Tacit Collusion in Highway Procurement Auctions," presented at Southern Economics Association meetings in Washington, D.C., November 2016.

"Online and In-person Differences in Mortgage Loan Prices and Rejection for Minority and Majority Borrowers," presented at Southern Economics Association meetings, New Orleans, LA, November, 2015.

"Have Wal-Mart Supercenters Slowed the Rate of 'Inflation'?  The Effect of Wal-Mart Entry into Local Grocery Markets on the Consumer Price Index," presented at Southern Economics Association meetings, Atlanta, GA, November 2014.

"Do Price Gimmicks Work in Real Estate?" presented at Southern Economics Association meetings, Tampa, FL, November 2013.

"Assessing the Intensity of Sports Rivalries Using Data from Secondary Market Transactions," presented at Southern Economics Association meetings, New Orleans, LA, November 2012.

"Tacit Collusion in Highway Procurement Auctions," presented at Southern Economics Association meetings, New Orleans, LA, November 2012 and at International Industrial Organization Society meetings, Boston, MA, May 2013.

"Surplus Extraction by Primary Market Monopolists: Evidence from Secondary Market Transactions for SEC Football Tickets," presented at Southern Economic Association meetings, Atlanta, GA, November 2010.

"Repeated Interaction in Private-Value Auctions: The Effect on Price of a Change in the Number of Bidders," presented at Southern Economic Association meetings, Washington, DC, November 2008.

"Economic Forces Shaping the Vertical Chain of Production in the Aluminum Industry," presented at the INFORMS meetings in Washington, D.C., October 2008.

"Testing for Nash Equilibrium in Three-Way Duels," presented at Southern Economic Association meetings, Charleston, SC, November 2006, and at International Industrial Organization Conference, Savannah, GA, April 2007.

"With Snob Goods is it Size itself, or others' Perception of Size, that Matters?: The Case of Diamonds," presented at Southern Economic Association meetings, New Orleans, LA, November 2004, and at Tulane University, March 2008.

"Search Costs, the Internet, and the Pricing of Prescription Drugs," presented at Southern Economic Association meetings, New Orleans, LA, November 2002.

"Geographic Variation in Welfare Participation Rates: Identifying Poverty Pockets," presented at Southern Economic Association meetings, Tampa, FL, November 2001.

"Estimating Dynamic Responses for Duopolists in Repeated Sealed Bid Auctions," presented at Southern Economic Association meetings, Washington, D.C., November 2000, and at Western Economic Association meetings, San Francisco, CA, July 2001.

"Geographic Variation in SSI and AFDC Recipiency:  What is the Role of Non-Program Factors?" presented at Lancaster University, Lancaster, England, May 1999, at Southern Economic Association meetings, New Orleans, LA, November 1999, and at Allied Social Sciences Association meetings, Boston, MA, January 2000.

"Empirical Tests of Tacit vs. Overt Collusion," presented at Western Economic Association meetings, Lake Tahoe, NV, July 1998, at Kentucky Economic Association meetings, Lexington, KY, October 1998, and at Southern Economic Association meetings, Baltimore, MD, November 1998.

"The Dynamics of Family Retirement Decisions," presented at Allied Social Science Associations meetings, Chicago, IL, January 1998.

"Labor Market Responses to Spouse Health Insurance Coverage," presented at Kentucky Economic Association meetings, Lexington, Kentucky, October 1996, at Southern Economic Association meetings, Washington, D.C., November 1996, and at the Allied Social Science Association meetings, New Orleans, Louisiana, January 1997.

"Labor Market Mobility and Job Lock," presented at the Southern Economic Association meetings, New Orleans, Louisiana, November 1995 and at the Allied Social Science Association meetings, San Francisco, California, January 1996.

"Optimum Firm Size in the Production of Economics Ph.D.'s," presented at the Southern Economic Association meetings, New Orleans, Louisiana, November 1995, and at Lancaster University, Lancaster, England, May 1996.

"Measuring the Medically Uninsured by Employment Status" presented at the Kentucky Economic Association meetings, Lexington, Kentucky, October 1993 and at the Southern Economic Association meetings, New Orleans, Louisiana, November 1993.

"Do Health Insurance Costs and Non-Discrimination Policies Reduce the Job Opportunities of Older Workers?" presented at the Kentucky Economic Association meetings, Lexington, Kentucky, October 1992 (won award for the outstanding paper at the 1992 annual meetings), at the Southern Economic Association meetings, Washington, D.C., November 1992, and at the Population Association of America meetings, Cincinnati, Ohio, April 1993.

"Probability of Purchase, Amount of Purchase, and the Demographic Incidence of the Lottery Tax," presented at the Workshop in Economics and Policy, University of Chicago, February 1992.

"Rationality and Efficiency in Lotto Markets" presented at the Southern Economic Association meetings, Nashville, Tennessee, November 1991.

"Postal Delivery of Newspapers and Periodicals: A Comment" presented at a conference on Competition and Innovation in Postal Services, sponsored by the British Post Office, Rugby, England, July 1990.

"Fringe Benefits and the Mobility of Older Workers" presented at the Southern Economic Association meetings, Orlando, Florida, November 1989, and at the Allied Social Science Association meetings, Atlanta, Georgia, December 1989.

"Inter-Industry Differences in Firm Location Decisions" presented at the Southern Economic Association meetings, Orlando, Florida, November 1989.

"Nondiscriminatory Fringe Benefits and Labor Market Segmentation" presented at Miami University (Ohio) and at the Southern Economic Association meetings, Washington, DC, November 1987.

"Vertical Control Via Franchising" presented at the Southern Economic Association meetings, Dallas, Texas, November 1985.

"An Assessment of Postal Ratemaking" presented at the Southern Economic Association meetings, Atlanta, Georgia, November 1984.

"Salary vs. Marginal Revenue Product under Monopsony and Competition--The Case of Professional Basketball," presented at the Southern Economic Association meetings, Washington, DC, November 1983.

"Multi-Part Prices for a Multi-Product Monopolist," presented at the Southern Economic Association meetings, New Orleans, Louisiana, November 198l.

"Effluent Fees: A Case Study," presented at the American Water Resources Association Conference, Minneapolis, Minnesota, October 1980.

"Fuel Adjustments and Company Earnings," presented at the Conference on Current Issues and Problems in Public Utility Regulation, Rutgers University, March 1980.

Managing Advisory Board, Growth and Change, 1988-91.

Referee, at various times for the following journals:
The American Economic Review, The Review of Economics and Statistics, Journal of Industrial Economics, Economic Journal, National Tax Journal, Journal of Public Economics, The Review of Industrial Organization, Economic Inquiry, Industrial and Labor Relations Review, Journal of Labor Economics, Journal of Labor Research, Southern Economic Journal, Canadian Journal of Economics, European Economic Review, Quarterly Journal of Economics and Business, Managerial and Decision Economics, European Journal of Political Economy, Real Estate Economics, Public Finance Quarterly, Risk Analysis, Journal of Economics and Business, Land Economics, Social Science Quarterly, Public Finance Review, Eastern Economic Journal, Journal of Population Economics, International Review of Economics and Finance, Policy Studies Journal, Contemporary Economic Policy, Small Business Economics, Review of Economics of the Household, The Journal of Benefit-Cost Analysis, and Growth and Change, and reviewer for the National Science Foundation and the Social Sciences and Humanities Research Council of Canada.

**FUNDED RESEARCH**

**Externally Funded**

"Kentucky Telephone Access Charges," funded by the Technology and Economic Development Group, Co-Principal Investigator, November 2010-October 2011, $40,366.

"Forces Shaping the Aluminum Industry," funded by the Sloan Center for a Sustainable Aluminum Industry, University of Kentucky. Co-Principal Investigator. January 2008-December 2008, $75,097.

"Geographic Variation in Food Stamp and Other Assistance Program Participation Rates: Identifying Poverty Pockets in the South," funded by the Southern Rural Development Center, Mississippi State University/Economic Research Service. Co-Principal Investigator. October 2003-September 2004, $29,977.

"Spouse Health Insurance and the Retirement Decision," funded by the National Institute on Aging, U.S. National Institute of Health. Co-Principal Investigator. March 1998-February 2000, $73,327.

"Firm Size and Wage Structure: Small Businesses and the Employment of Low-Wage Workers," funded by the U.S. Small Business Administration. Co-Principal Investigator. July 1998-December 1998, $28,900, Contract No. SBAHQ-98-M-0695.

"Competition and Customer Choice in Electric Power: An Analysis of Regulatory Reform in the Kentucky Electric Utility Industry," funded by American Electric Power, Cinergy, Louisville Gas and Electric Company, and Kentucky Utilities. Principal Investigator. March 1997-March 1998, $105,521.

"Employer-Provided Health Insurance and Household Coverage," funded by the U.S. Department of Labor, Pension and Welfare Benefits Administration. Co-Principal Investigator. October 1997-April 1998, $21,525.

"Long-Term Assessment of the Kentucky Economy," funded by the Kentucky Department of Finance and Administration. Consultant. October 1997-June 1998, $43,845.

"Economic Impact Assessment of a Southern Kentucky Corridor (I-66)," funded by the Kentucky Transportation Cabinet. Consultant. January 1996-May 1997, $174,905.

"Health Insurance Coverage During Labor Force Transitions," funded by the Pension and Welfare Benefits Administration of the U.S. Department of Labor. Co-Principal Investigator. June 1995-January 1996, $19,875, Contract No. 41USC252C3.

"Changing Characteristics of the Self-Employed," funded by the U.S. Small Business Administration. Principal Investigator. October 1994-June 1996, $66,934, SBA-8142-OA-94.

"Employer-Provided Health Insurance and Job Lock," funded by the Agency for Health Care Policy and Research, National Institute of Health. Co-Principal Investigator. July 1994-June 1996, $106,626. Grant No. 1-R01-HS08188-01.

"An Analysis of the Effects of Rate Setting and Price Controls on the Delivery of Health Care Services in Kentucky," funded by the AETNA Corporation. Co-Principal Investigator. January 1994-June 1994. $32,057.

"Measuring the Uninsured by Firm Size and Employment Status," funded by the U.S. Small Business Administration. Co-Principal Investigator. November 1992-October 1994, $71,683, SBA-7642-OA-92.

"An Analysis of Health Care in Kentucky," funded by the Kentucky Cabinet for Human Resources. Co-Principal Investigator. June 1992-June 1993, $148,099.

"Applied Microeconomics Research Program," funded by the National Science Foundation. Co-Principal Investigator and Project Co-Director. October 1986-October 1992, $325,612. This was a Component Project of the National Science Foundation Grant (RII-8610671) entitled "Kentucky EPSCoR: A Program to Build Basic Science and Engineering Research in Kentucky."

"Older Workers in the Labor Market," funded by the U.S. Small Business Administration. Co-Principal Investigator. November 1989-October 1991, $57,832. Grant No. SBA-4113-OA-89.

"An Economic and Demographic Profile of Lottery Players," funded by the Center for Business and Economic Research, College of Business and Economics, University of Kentucky, and the Department of Revenue Forecasting, State of Kentucky.  Principal Investigator.  October 1989, $1,200.

"The Impact of a State Plan to Reduce Sulfur Dioxide and Oxides of Nitrogen Emissions on the Kentucky Economy," funded by the Kentucky Division of Air Pollution Control.  Principal Investigator.  August 1986-April 1987, $13,130.  Memorandum of Agreement M/A 6956.

"Vertical Integration, Tying, and Two-Part Tariffs:  An Analysis of Economic Symmetry and Legal Asymmetry," funded by the Bureau of Economics of the Federal Trade Commission, Summer 1984.

"An Assessment of Postal Service Ratemaking," funded by the Bureau of Consumer Protection's Division of Policy and Evaluation of the Federal Trade Commission, Summer 1983.

"Effluent Charge:  An Alternative System for Achieving Water Quality Standards in Alabama:  Pilot Study," funded by the Water Resources Research Institute, Auburn, Alabama (with A. N. Link), 1980.

**Internally Funded**

"Developing a New Ph.D. Sequence in Business Economics," funded by the Humana Instructional Grant Program, College of Business and Economics, University of Kentucky, Summer 1996.

"Employee Benefits and the Labor Market Opportunities of Older Americans," sponsored by the Ashland Oil Summer Research Grant Program, College of Business and Economics, University of Kentucky, Summer 1989.

"Taxation and the Demand for Employer-Provided Health and Life Insurance," sponsored by the Ashland Oil Summer Research Grant Program, College of Business and Economics, University of Kentucky, Summer 1986.

"The Preferential Tax Treatment of Fringe Benefits:  Effects on Employee and Employer Choices," sponsored by the Ashland Oil Summer Research Grant Program, College of Business and Economics, University of Kentucky, Summer 1985.


**CONSULTING AND EXPERT TESTIMONY**

Consultant and Expert Witness for the Attorney General of West Virginia in a civil lawsuit involving monopolization and market allocation, State of West Virginia, ex rel. Patrick Morrisey, Attorney General, et al. v. CRH, plc, et al., CA No. 17-C-41 (Cir. Ct. Kanawha Cnty. -- Business Court), May 2015—September 2020, deposed 11/22/19, 12/16/19, 1/9/20.

Consultant and Expert Witness for Frost Brown Todd LLC and Jones Day in a civil lawsuit brought by the Attorney General of Kentucky involving possible price gouging by a major vertically integrated petroleum company, Commonwealth of Kentucky v. Marathon Petroleum (Commonwealth of Kentucky-Franklin Circuit Court: Civil Action No. 07 CI 00751), July 2007—August 2019, deposed 1/24/19.

Consultant and Expert Witness for Alston & Bird LLP in a civil lawsuit involving alleged anticompetitive behavior by a multiple listing service, Bolinger et al. v. First Multiple Listing Service, et al., (Case no. 2:10-cv-211-RWS, U. S. District Court Northern District of Georgie, Gainesville Division), July 2013—October 2013.

Consultant and Expert Witness for Barnes & Thornburg, LLP in a civil lawsuit involving alleged price fixing in real estate transactions,  Casey William Hyland, et al. v. Home Services of America, Inc., et al.,

(Case no. 3:05-CV-612-R, U.S. District Court Western District of Kentucky, Louisville Division), March 2011—July 2012, deposed 3/30/12, 3/31/12.

Consulting expert for Duane Morris LLP in a bankruptcy lawsuit involving co-branding in a franchisor-franchisee relationship:  Treasure Isles, Inc. v. A&W Restaurants, Inc., Long John Silver's, Inc., and Yum! Brands, Inc., (Case No. 10-50304, U.S. Bankruptcy Court Eastern District of Kentucky, Lexington Division), October 2010—February 2011.

Consultant and Expert Witness for Barnes & Thornburg, LLP in a criminal lawsuit brought by a state attorney general involving possible bidding irregularities in highway resurfacing contracts:  United States v. Leonard Lawson, et al., (Case no. 08-21-DCR, U.S. District Court Eastern District of Kentucky, Frankfort Division), September 2008—January 2010, testified at trial 1/26/10-1/27/10.

Consultant and Expert Witness for  Howry LLP/Baker & Hostetler LLP in a civil lawsuit involving vertical and horizontal aspects of southeastern dairy markets:  Sweetwater Valley Farm, Inc. et al. v. Dean Foods Co., Inc. et al., (Case no. 2:07-cv-208, U.S. District Court Eastern District of Tennessee, Greeneville Division), September 2007—January 2013, deposed 4/12/10.

Consultant and Expert Witness for Antitrust Division of U.S. Department of Justice in Civil Inquiry into acquisition of Turner Dairies by Prairie Farms, Inc., August 2005—February 2006.

Consultant and Expert Witness for National Association of Realtors/Realtor Association of South Central Wisconsin in a tying lawsuit: Jay Reifert v. South Central Wisconsin MLS Corp., et al. (Case no. 04-C-0969-S, U.S. District Court Western District of Wisconsin), May 2005—August 2005, deposed 6/14/05.

Consultant and Expert Witness for National Association of Realtors/Northern Kentucky Board of Realtors in a tying lawsuit: Buyer's Corner Realty, Inc., Sherry Edwards v. Northern Kentucky Board of Realtors, Inc., Northern Kentucky Multiple Listing Service, Inc. (Case No. 04-37-WOB, U.S. District Court Eastern District of Kentucky, Covington Division), December 2004—October 2005, deposed 1/18/05.

Consultant to Blackburn, Hundley & Domene, PLLC in a breach of contract and antitrust case: John W. Wasson v. Peabody Coal Company and Indianapolis Power & Light (Case No. 02-90-C, U.S. District Court, Southern District of Indiana, New Albany Division), June 2003—February 2004.

Consultant and Expert Witness for Antitrust Division of U.S. Department of Justice in United States of America and Commonwealth of Kentucky v. Dairy Farmers of America, Inc. and Southern Belle Dairy Co. LLC (Civil Action No. 03-206-KSF, U.S. District Court Eastern District of Kentucky, London Division), August 2002—October 2006, deposed 4/26/04, 7/13/04.

Consultant and Expert Witness for EMI Network, Inc. in a breach of contract lawsuit: EMI Network, Inc. v. Media Networks, Inc. (Case No. C-1-02-172, U.S. District Court, Southern District of Ohio, Western Division), July 2002—July 2003, deposed 6/24/03.

Consultant to Reed Weitkamp Schell & Vice PLLC in a Section 1 Sherman Act investigation involving bidding for road resurfacing contracts, January 2001—March 2002.

Consultant and Expert Witness for Central Investment Company in a franchising lawsuit:  Pepsico, Inc. v. Central Investment Corporation (Case No. C-1-98-389, U.S. District Court, Southern District of Ohio, Western Division), April 2000—December 2004, deposed 8/9/00, 11/9/00, 11/16/00.

Consultant and Expert Witness for The Goodyear Tire and Rubber Company in a franchising and antitrust lawsuit, Dallas, Texas, 1997-98.

Consultant and Expert Witness for Servpro Industries, Inc. in a franchising lawsuit:  Servpro of North Florida, Inc. et al. v. Servpro Industries, Inc. et al., December 1997—May 1998, deposed 3/13/98.

Consultant to consortium of public and private electric utilities in Kentucky for the purpose of estimating costs and analyzing economic effects of complying with proposed nitrogen oxide emission standards, March—April 1998.

Consultant and Expert Witness for Servpro Industries, Inc. in a franchising lawsuit: Moss, et al. v. Servpro Industries, Inc., et al., November 1997—December 1997, February 2000—May 2000.

Consultant to Borden, Inc. in a Section 1 Sherman Act antitrust case involving the dairy industry: Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., et al., February 1997—June 1997.

Expert Witness for Borg-Warner Protective Services Corporation on anticompetitive effects of restrictive covenants: Borg-Warner Protective Services, Corp. v. Guardsmark, Inc. (Civil Action No. 94-169 in the U.S. District Court, Eastern District of Kentucky, Covington Division), December 1995—August 1996.

Consultant to Warehouse Beer Franchise, Inc. on principal-agent relationships and franchise termination clauses: SLS Enterprise, Inc. v. Warehouse Beer Franchise, Inc., Common Pleas Court of Montgomery Co., Ohio.  February—April 1995.

Consultant to Flav-O-Rich, Inc. on econometric estimation of damages in a Section 1 Sherman Act antitrust case in the dairy industry: Commonwealth of Kentucky v. Flav-O-Rich, Inc., et al.  June 1994—January 1995.

Consultant to Ingersoll-Rand Co. on market definition and monopoly in a Section 2 Sherman Act antitrust case in the industrial air compressor industry: Air Relief, Inc. v. Ingersoll-Rand Company.  March 1994—July 1994.

Expert Witness for Trauth Dairy, Newport, KY in the matter of Commonwealth of Kentucky v. Louis Trauth Dairy, Inc. (Civil Action File No. 92-50 in the U.S. District Court, Eastern District of Kentucky, Covington Division), October 1991—November 1996, deposed 7/29/93, testified at trial 10/31/96-11/1/96; and in the matter of State of Ohio v. Louis Trauth Dairy, Inc., et al. (Case No. Ci-93-553 in the U.S. District Court, Southern District of Ohio, Western Division), August 1993—July 1996, deposed 12/19/95-12/21/95.

Consultant to Yeary, Tate, Lowe & Rowlett in connection with Millers Cove Energy Co. et al. v. Ronald L. Moore, et al. in the U.S. Bankruptcy Court for the Eastern District of Tennessee, March 1993.

Consultant to McCoy & McCoy Environmental Consultants, Lexington, KY, on the economic impact of a proposed landfill in eastern Kentucky, Winter 1991.

Consultant to Kincaid, Shaeffer, Hembree, Van Inwegen & Kinser, Lexington, KY, on fixed costs vs. variable costs and on opportunity cost of idle capacity in manufacturing facilities: Lanson Industries v. Foam Design, Inc.  Summer 1990.

Consultant to Third Class Mail Association on economies of scale and scope in the U.S. postal system, January 1989.

"Concerning Ramsey Pricing," Direct Testimony before the Postal Rate Commission, Docket Number R87-1, October 27, 1987.

"Applying Ramsey Prices to the R84-1 Rate Case," prepared for the Third Class Mail Association (represented by Cohn and Marks, Washington, DC), April 1987, for use in R87-1 Hearings before the Postal Rate Commission.

Consultant to Thalheimer Research Associates, Lexington, KY, and Churchill Downs, Keeneland, Latonia, and Ellis Park race tracks on the economic impact of Kentucky's thoroughbred racing industry, January 1986.

Consultant to Thalheimer Research Associates, Lexington, KY, and the Army Corps of Engineers to design a monitoring program for the Tug Fork Valley flood control program, Winter 1985.

Consultant to Federal Trade Commission on cogeneration and electricity pricing, May 1985.

Senior Economic Consultant for Auburn Technical Assistance Center on Project to Computerize Selected Regulatory Activities of the Alabama Public Service Commission, January—September, 1982.

"An Economic Analysis of Lifeline Rates," prepared for Alabama Power Company, Birmingham, Alabama, 1980 (with A. N. Link), for use in P.U.R.P.A. hearings before the Alabama Public Service Commission.


**FELLOWSHIPS AND AWARDS**

Gatton College of B&E Teaching Excellence Award, 2018.
Gatton MBA Favorite Teacher Award, 2011-12, 2012-13
Department of Economics Outstanding Teacher Award, 2000-01, 2012-13
Outstanding Paper, Kentucky Economic Association Meetings, October 1992, October 1999
Michigan State University Institute of Public Utilities Doctoral Fellowship, 1978
Governor's Fellowship, University of Virginia, 1974-1977
Omicron Delta Kappa, 1973


**PROFESSIONAL MEMBERSHIPS**

American Economic Association
Southern Economic Association
Western Economic Association
Industrial Organization Society
Kentucky Economic Association


**COMMITTEES**

Department
      Master's Exam Committee, Spring 1985, Summer 1986, Summer 1988 (Chair), Summer
          1990, 1991.
      Ph.D. Microeconomic Theory Exam Committee, 1986-91,1994-2005, (Chair in various years).
      Ph.D. Industrial Organization Field Exam Committee, 1990, 1992 (Chair), 1994 (Chair), 1996
          (Chair), 1998 (Chair), 2000 (Chair), 2002 (Chair), 2004 (Chair). 2006 (Chair), 2008
          (Chair), 2012 (Chair), 2015 (Chair), 2016 (Chair), 2017 (Chair), 2020 (Co-chair).
      Ph.D. Public Economics Field Exam Committee, 1995, 1999.
      Ph.D. Health Economics Field Exam Committee, 1995.
      M.B.A. Examining Committee, 1994, 1995.
      Graduate Studies Committee, 1990-91 (Chair), 1997-03, 00-05 (Chair), 05-08, 09-13, 16-19.
      Director of Placement, 1998-99.
      Undergraduate Studies Committee, 1984-85, 85-86, 86-87, 87-88, 93-94, 94-95.
      Recruiting Committee, 1982-83, 85-88, 89-90, 96-97 (Chair), 97-98 (Chair), 98-00, 03-04 (Chair),
          06-07, 07-08 (Chair). 11-12, various ongoing assignments . . .
      Teaching Evaluation Advisory Committee, Fall 1986.
      Coordinator of Principles, 1985-86, 86-87, 87-88, 89-90.
      Coordinator of Personal Computing, 1986-87.
      Ad Hoc Self-Study Committee for Department of Economics (Chair), 1988-89.
      Economics Awards Committee, 1995-96.

Graduate Innovation Committee, 1995-96.
Gatton Endowed Chair Search Committee, 2004, 08.
ECO 401 Review Committee (chair), 2012-13.

College
Ad Hoc Undergraduate Review Committee, 1983.
Search Committee for Department Chair, Economics Department, 1989-90.
Dean's Advisory Committee, 1989-90.
School of Accountancy Review and Evaluation Committee (Chair), 1990-91.
Graduate Studies Committee 1990-91, 99-00.
DBA/PhD Policy Committee 1990-91, 2001-04.
Humana Visiting Scholar Committee 1991.
MBA Policy Committee 1994-95, 96-98, 2005-20, (Chair, Executive Committee 2015-16).
UK-UL Executive MBA Policy Committee, 2014-2020.
MBA Curriculum Review Committee, 2003.
CBER Advisory Committee, 1995-10.
Center for Entrepreneurship Board of Advisors, 1996-98.
School of Management Gatton Chair Search Committee, 1998.
Operating Committee, 2001-02.
Strategic Planning Committee, 2006-07, 07-11.
Promotion and Tenure Committee, 2008-09, 10-11, 11-12, 12-13.
MBA Program Director Search Committee (Chair), 2010-2011.
Ad Hoc Committee to Study Business Analytics Major (Chair), 2012.

University
University Senate, 1989-1992.
Academic Planning and Priorities Committee, 1989-92 (Chair 1991-92).
University Self-Study:  Academic Support Committee, University Staff Subcommittee, 1990.
Focus Group for the Review of the Research and Graduate Studies Strategic Plan, 1992.
Graduate Council Committee on Fellowships and Traineeships, Social Sciences Panel, 1995-97.
Sturgill Award Committee, 1996.
Academic Area Advisory Committee for the Social Sciences, 1996-98.
Academic Excellence Scholarship Award Committee, 1997.
Senate Advisory Faculty Code Committee, 2001-2.
Graduate Council 2006-09.
Presidential Fellowship Award Committee, 2009.
Oswald Research and Creativity Program, Social Sciences Judge, 2012.
Graduate School Promotion and Tenure Committee, 2019.
Patterson School Director Search Committee, chair, 2019-20.


**COURSES TAUGHT**

Undergraduate:
Contemporary Economic Issues
Principles of Microeconomics
Principles of Macroeconomics
Intermediate Microeconomics
Market Structure and Antitrust
Business Economics
Business and Economics Statistics
Seminar in Applications of Microeconomics
Seminar in Law and Economics

Graduate:
Microeconomic Theory

Industrial Organization
Economics of Strategy
Statistics
Econometrics
Managerial Economics (MBA, EMBA)
Social and Legal Environment of Business (MBA)
Public Policy:  Economic Analysis (MPA)

## DISSERTATION AND THESIS COMMITTEES

### 2020
Alexander McGlothlin, Ph.D. in Economics, committee chair, "Antitrust Implications for Mergers Involving Maverick Firms."
Sam Ingram, Ph.D. in Economics, committee member.
### 2019
Zheng Wang, Ph.D. in Economics, committee chair, "Price Discrimination on Complementary Goods: Evidence from the Men's Shaving Razor Market."
Ben Wallace, Ph.D. in Economics, committee member.
Georgette Owusu-Amankwah, Ph.D. in Agricultural Economics, committee member.
Tyson van Alfren, Ph.D. in Business Administration (finance), committee member.
Michael Farrell, Ph.D. in Business Administration (finance), committee member.
### 2018
Gray Forlines, Ph.D. in Economics, committee chair, "Essays on the Role of Government Regulation and Policy in Health Care Markets."
David Moore, Ph.D. in Business Administration (Finance), committee member.
Kevin Chase, Ph.D. in Business Administration (Marketing), Graduate School outside member.
### 2016
Xile (Sheila) Li, Ph.D. in Agricultural Economics, committee member.
### 2015
Sarah Magnotta, Ph.D. in Business Administration (Marketing), Graduate School outside member.
### 2014
Derrick Jenniges, Ph.D. in Economics, committee member.
Tim Riley, Ph.D. in Business Administration (Finance), committee member.
Robert Farmer, Ph.D. in Business Administration (Marketing), Graduate School outside member.
### 2013
Stephen Locke, Ph.D. in Economics, committee member.
Bruno Arthur, Ph.D. in Agricultural Economics, committee member.
### 2012
Dave Yaskewich, Ph.D. in Economics, committee member.
Scott Soltis, Ph.D. in Business Administration (Management), Graduate School outside member.
Monika Rabarison, Ph.D. in Business Administration (Finance), committee member.
### 2011
Tanmoy Bhattacharya, Ph.D. in Economics, committee chair, "Price Levels and Dispersion with Asymmetric Information."
Xiaofei Wang, Ph.D. in Economics, committee chair, "Anticompetitive Effects of Horizontal Mergers in China."
David Barrus, Ph.D. in Economics, chair, "Firm Bidding Behavior in Highway Procurement Auctions:  An Analysis of Single-Bid Contracts, Tacit Collusion, and the Financial Impacts on Kentucky."
Johnny Ducking, Ph.D. in Economics, committee member.
### 2010
Abdullah Al-Bahrani, Ph.D. in Economics, committee chair, "Market Structure and Mortgage Pricing: The Role of Information on Firm and Consumer Behavior."
Jill Kirby, Ph.D. in Business Administration (Finance), committee member.
Mary Beth Holbrook, Ph.D. in Business Administration (Accounting), Graduate School outside examiner.
### 2009

14

Ken Sanford, Ph.D. in Economics, committee co-chair, "Two Empirical Essays in Discrete Choice: Ticket Pricing Decisions by Price Discriminating Monopolists; State Income Taxes and Residential Location Choice."

Jason Beck, Ph.D. in Economics, committee co-chair, "Three Essays on Residential Real Estate Brokerage."

Goce Andrevski, Ph.D. in Business Administration (Management), committee member.

Carla Childers, Ph.D. in Business Administration (Marketing), committee member.

**2008**

Emma Bojinova, Ph.D. in Economics, committee member.

Brandon Koford, Ph.D. in Economics, committee member.

Qun Wu, Ph.D. in Business Administration (Finance), committee member.

**2007**

Wenbin Zang, Ph.D. in Economics, chair, "Entry and Competition of Special Services in Local Hospital Markets."

Rutherford Johnson, Ph.D. in Agricultural Economics, committee member.

Lucia Ona, Ph.D. in Agricultural Economics, Graduate School outside examiner.

Rachel Lange, Ph.D. in Economics, committee member.

**2005**

Nantavut Phipatserathim, Ph.D. in Economics, co-chair, "The Effects of Declining Demand and Asset Specificity on Mergers."

Mary Phillips, Ph.D. in Business Administration (Accountancy), Graduate School outside examiner.

**2004**

Jeremy Thornton, Ph.D. in Economics, committee member.

**2003**

Arun Srinivasan, PhD in Economics, committee member

**2002**

Roxana Toma, Ph.D. in Economics, co-chair, "The Corporate Merger Phenomenon: Determinants and Changes in Merger Policies, Evidence for Acquiring Firms 1986-1998."

Hayden Brown, Ph.D. in Economics, co-chair, "Geographic and Group Variation in Supplemental Security Income."

Dong Kwan Kang, Ph.D. in Economics, co-chair, "Ownership Concentration, Vertical Integration, and their Determinants in Korean Corporations:  How Do Chaebols' Organization Affect Ownership Concentration and Vertical Integration?"

Agus Harjoto, Ph.D. in Economics, committee member.

Michael Highfield, Ph.D. in Business Administration (Finance), committee member.

Barbara Vick, Ed.D. in Instruction and Administration, Graduate School outside examiner.

**2001**

Ivan Roten, Ph.D. in Business Administration (Finance), committee member.

Mike Bewley, Ph.D. in Economics, committee member.

Catherine McCabe, Ph.D. in Business Administration (Marketing), committee member.

**2000**

Amitabh Chandra, Ph.D. in Economics, committee member.

Sang Lee, Ph.D. in Business Administration (Finance), committee member.

Klara Sabirianova, Ph.D. in Economics, committee member.

**1999**

Monica Greer, Ph.D. in Economics, committee member.

Angela Ritzert, Ph.D. in Economics, committee member.

Matt Udie, Ph.D. in Public Administration, Graduate School outside examiner.

**1998**

Dennis Wilson, Ph.D. in Economics, chair, "The Economic Structure of Professional Team Sports Leagues."

Kay Chang, Ph.D. in Economics, committee member.

Brett Noel, Ph.D. in Economics, committee member.

Austin Reitenga, Ph.D. in Business Administration (Accountancy), committee member.

Chuleeporn Changchit, Ph.D. in Business Administration (Decision Sciences), Graduate School outside examiner.

**1997**

Diane Bruce, Ph.D. in Economics, chair, "A Hedonic Analysis of the Cable Television Industry and the Impact of Regulation."

Michael Gumpper, Ph.D. in Economics, 1997, committee member.

Mike Shelton, Ph.D. in Communication, 1997, Graduate School outside examiner.

**1996**

John Jones, Ph.D. in Economics, chair, "Transborder Transportation Regulations and Trade."

Scott Bellamy, Ph.D. in Economics, 1996, committee member.

Jeff Anstine, Ph.D. in Economics, 1996, committee member.

Prais Widjojo, Ph.D. in Economics, 1996, committee member.

Mike Clark, Ph.D. in Economics, 1996, committee member.

Doug Bice, Ph.D. in Economics, 1996, committee member.

**1995**

Juett Cooper, Ph.D. in Business Administration (Management), 1995, committee member.

Shyam Nath, Ph.D. in Business Administration (Management), 1995, committee member.

**1994**

Sandra Rivera, Ph.D. in Economics, 1994, committee member.

**1993**

Ed Hufft, Ph.D. in Business Administration (Management), 1993, committee member.

Gary Keener, Ph.D. in Economics, 1993, committee member.

Shelley Webb, Ph.D. in Business Administration (Finance), 1993, committee member.

Adi Bambang Winarso, Ph.D. in Economics, 1993, committee member.

**1992**

Alina Zapalska, Ph.D. in Economics, 1992, committee member.

Brad Wimmer, Ph.D. in Economics, 1992, committee member.

Gail Mitchell-Hoyt, Ph.D. in Economics, 1992, committee member.

Cathy Carey, Ph.D. in Economics, 1992, committee member.

**1990**

Greg Filbeck, D.B.A. in Finance, 1990, Graduate School outside examiner.

Booil Jeon, Ph.D. in Economics, 1990, committee member.

**1989**

Peter Groothuis, Ph.D. in Economics, 1989, committee member.

Suzanne Schmitz, Ph.D. in Economics, 1989, committee member.

Duha Chowdhury, D.B.A. in Management, 1989, committee member.

John Whitehead, Ph.D. in Economics, 1989, committee member.

**1988**

Sharon Lee, D.B.A. in Finance, 1988, committee member.

Tim Stanton, Ph.D. in Economics, 1988, committee member.

**1987**

Robert Bradley, Ph.D. in Political Science, 1987, Graduate School outside examiner.

Darrell Glenn, Ph.D. in Economics, 1987, committee member.

**1986**

Ed Gillenwater, D.B.A. in Management, 1986, committee member.

Assim Ghosh, D.B.A. in Finance, 1986, committee member.

Bedingar Toubamatingar, Ph.D. in Agricultural Economics, 1986, Graduate School outside examiner.

**1985**

Werner Waldner, Ph.D. in Economics, 1985, committee member.

**1981**

Ken Somppi, M.S. in Economics, Auburn University, 1981, thesis director.

Karen Smith, M.S. in Economics, Auburn University, 1981, thesis director.

**1980**

Ellen Galvin, M.S. in Economics, Auburn University, 1980, committee member.

# EXHIBIT M

David J. Baldwin
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

*Attorney for Pocahontas Land Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **PATRIOT COAL CORPORATION,** *et al.,* | **Case No. 12-12900 (SCC)** |
|  | **(Jointly Administered)** |
| **Debtors.** |  |

## MOTION FOR ADMISSION OF DAVID J. BALDWIN, *PRO HAC VICE*

I, David J. Baldwin, a member in good standing of the bar in the State of Delaware, request admission, ***pro hac vice***, before Honorable Shelley C. Chapman, to represent Pocahontas Land Corporation in the above–captioned case.

My address, telephone number, facsimile number and e-mail address are as follows:

David J. Baldwin (DE No. 1010)
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Floor
Wilmington, DE 19801
(302) 984-6017
(302) 658-1192 (fax)
E-mail: dbaldwin@potteranderson.com

The filing fee of $200.00 has been submitted with this motion for *pro hac vice* admission.

Dated:   August 29, 2012
       New York, New York

David J. Baldwin

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

**PATRIOT COAL CORPORATION**, *et al.*,

Debtors.

Chapter 11

Case No. 12-12900 (SCC)

(Jointly Administered)

<u>**ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE***</u>

    **IT IS ORDERED,** that David J. Baldwin is admitted to practice, *pro hac vice*, in the

above referenced case, in the United States Bankruptcy Court for the Southern District of New

York, subject to payment of the filing fee.

Dated: _____
      New York, New York

              /s/_____
                 UNITED STATES BANKRUPTCY JUDGE

1072787

# EXHIBIT N

Hearing Date and Time: September 11, 2012 at 1:30 p.m. (Prevailing Eastern Time)
Objection Deadline: August 24, 2012 at 4:00 p.m. (Prevailing Eastern Time)
Reply and Objection Joinder Deadline: August 29, 2012 at 4:00 p.m. (Prevailing Eastern Time)

POTTER ANDERSON & CORROON LLP
David J. Baldwin
Theresa V. Brown-Edwards
R. Stephen McNeill
1313 N. Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

*Attorneys for Pocahontas Land Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PATRIOT COAL CORPORATION**, *et al.*, | Case No. 12-12900 (SCC) |
| | **(Jointly Administered)** |
| **Debtors.** | Re: Dkt No. 425 |

**JOINDER OF POCAHONTAS LAND CORPORATON TO THE DEBTORS'
OBJECTION TO (i) MOTION OF THE UNITED MINE WORKERS OF
AMERICA TO TRANSFER THE CASE TO THE SOUTHERN DISTRICT OF
WEST VIRGINIA, (ii) SURETIES' MOTION TO TRANSFER JOINTLY
ADMINISTERED CASES TO SOUTHERN DISTRICT OF WEST VIRGINIA,
AND (iii) MOTION OF THE UNITED STATES TRUSTEE TO TRANSFER IN
THE INTEREST OF JUSTICE**

Pocahontas Land Corporation ("**Pocahontas**") through its undersigned counsel

hereby submits this joinder (the "**Joinder**") to the Debtors' Objection (the "**Objection**")

to: (i) the Motion of the United Mine Workers of America Pursuant to 28 U.S.C. § 1412

and Rule 1014 to Transfer the Case to the Southern District of West Virginia [Dkt. Nos.

116, 127], (ii) the Sureties' Motion to Transfer Jointly Administered Cases to Southern

District of West Virginia [Dkt. No. 287], and (iii) Motion of the United States Trustee to Transfer in the Interest of Justice [Dkt Nos. 406, 407] (collectively, the "**Motions**"). In support of the Joinder, Pocahontas respectfully submit as follows:

1.    Pocahontas Land Corporation is a party in interest in the above-captioned cases pursuant to its status as a creditor of the Debtors. Pocahontas Land Corporation, as it's self or as agent for Southern Region Industrial Realty, Inc., leases property to Patriot Coal Corporation for the purpose of mining and removal of coal.

2.    As set forth in detail in the Objection, the United Mine Workers of America (the "**Union**"), and Argonaut Insurance Company, Indemnity National Insurance Company, US Specialty Insurance, and Westchester Fire Insurance Company (together, the "**Sureties**") have filed the Motions seeking to transfer venue of these cases from the Southern District of New York to the Southern District of West Virginia. The United States Trustee (the "**Trustee**") does not seek to transfer venue to a specific court; instead, the Trustee seek to transfer venue from the Southern District of New York "in the interest of justice." Pocahontas hereby objects to the Motions on the grounds raised and asserted in the Objection, and supports venue of these cases in the Southern District of New York.

SA000163

WHEREFORE, Pocahontas respectfully requests that the Court enter an order (i)

denying the Motions and (ii) granting such other and further relief as this Court deems

just and proper.

Dated: August 29, 2012                          POTTER ANDERSON & CORROON LLP

                                                By: _David J. Baldwin_

                                                David J. Baldwin
                                                Theresa V. Brown-Edwards
                                                R. Stephen McNeill
                                                1313 North Market Street, 7th Floor
                                                Wilmington, DE 19801
                                                Tel: (302) 984-6142
                                                Fax: (302) 658-1192

                                                *Attorneys for Pocahontas Land Corporation*

3

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

In re:

PATRIOT COAL CORPORATION, *et al.*,

Debtors.

Chapter 11

Case No. 12-12900 (SCC)

(Jointly Administered)

## CERTIFICATE OF SERVICE

I, David J. Baldwin, hereby certify that I am not less than 18 years of age and on this 29th day of August, 2012, I caused a true and correct copy of the **Joinder of Pocahontas Land Corporation to the Debtors' Objection to (i) Motion of the United Mine Workers of America to Transfer the Case to the Southern District of West Virginia and (ii) Sureties' Motion to Transfer Jointly Administered Cases to Southern District of West Virginia, and (iii) Motion of the United States Trustee to Transfer in the Interest of Justice** to be served upon the following parties, as indicated:

### VIA FIRST-CLASS MAIL

William T. Gorton III, Esq.
W. Blaine Early, III, Esq.
Elizabeth Lee Thompson, Esq.
Chrisandrea L. Turner, Esq.
STITES & HARBISON, PLLC
250 West Main Street
Suite 2300
Lexington, KY 40507
(*Counsel to Argonaut Insurance Company,*
*Indemnity National Insurance Company,*
*US Specialty Insurance, and*
*Westchester Fire Insurance Company*)

### VIA FIRST-CLASS MAIL

Susan M. Jennik, Esq.
Serge Ambroise, Esq.
Kennedy, Jennik, & Murray, P.C.
113 University Place, 7th Floor
New York, NY 10003
(*Counsel for the United*
*Mine Workers of America*)

### VIA FEDEX

The Honorable Shelley C. Chapman
United States Bankruptcy Judge
c/o Clerk's Office
United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, NY 10004-1408

### VIA FIRST-CLASS MAIL

Marshall S. Huebner, Esq.
Brian M. Resnick, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(*Counsel to the Debtors*)

**VIA FIRST-CLASS MAIL**
Steven J. Reisman, Esq.
Michael A. Cohen, Esq.
Curtis, Mallet-Prevost, Colt
& Mosle LLP
101 Park Avenue
New York, NY 10178
(*Conflicts Counsel to the Debtors*)

**VIA FIRST-CLASS MAIL**
Office of the United States Trustee
for the Southern District of New York
33 Whitehall Street
Suite 2100
New York, New York 10004
Attn: Elisabetta G. Gasparini, Esq.
       Paul K. Schwartzberg, Esq.

**VIA FIRST-CLASS MAIL**
Patriot Coal Corporation
c/o GCG, Inc.
P.O. Box 9898
Dublin, OH 43017-5798
(*Authorized Claims and
Noticing Agent*)

**VIA FIRST-CLASS MAIL**
Marcia Goldstein, Esq.
Joseph Smolinsky, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(*Counsel for the Administrative
Agents for the Debtors Postpetition Lenders*)

**VIA FIRST-CLASS MAIL**
Margot B. Schonholtz, Esq.
Ana Alfonso, Esq.
Willkie Farr & Gallager LLP
787 Seventh Avenue
New York, NY 10019
(*Counsel for the Administrative
Agents for the Debtors Postpetition Lenders*)

**VIA FIRST-CLASS MAIL**
Thomas Moer Mayer, Esq.
Adam C. Rogoff, Esq.
Gregory G. Plotko
Kramer Levin Naftalis
& Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
(*Counsel for the Official Committee
Of Unsecured Creditors of Patriot
Coal Corporation, et al.*)

**VIA FIRST-CLASS MAIL**
Micharl D. Warner, Esq.
Michael D. Sirota, Esq.
Cole, Scholtz, Meisel, Forman
& Leonard, P.A.
900 Third Avenue, 16th Floor
New York, NY 10022-4728
(*Conflict Counsel to the Official Committee
Of Unsecured Creditors of Patriot
Coal Corporation, et al.*)

I declare under penalty of perjury the foregoing is true and correct.

David J. Baldwin

1072763

SA000166

# EXHIBIT O

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

In re:

**PATRIOT COAL CORPORATION,** *et al.*,

Debtors.[1]

**Chapter 11**
**Case No. 12-51502-659**
**(Jointly Administered)**

## AMENDED ORDER CONFIRMING DEBTORS' JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

The Debtors' Fourth Amended Joint Plan of Reorganization under Chapter 11 of the

Bankruptcy Code, dated December 15, 2013 (attached hereto as Appendix A, the "**Plan**"),[2]

having been filed with this Court (the "**Court**") by Patriot Coal Corporation ("**Patriot Coal**")

and its subsidiaries that are Debtors and Debtors In Possession in these cases (collectively, the

"**Debtors**"); and the Court having entered, after due notice and a hearing, pursuant to Sections

1125 and 1126 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002 and

3017 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule

3017(D) of the Local Rules of the Bankruptcy Court for the Eastern District of Missouri, an

order dated November 7, 2013 (the "**Approval Order**") (i) approving the Debtors' Disclosure

Statement, including all Appendices attached thereto (as amended, the "**Disclosure Statement**"),

(ii) approving solicitation and notice materials, (iii) approving forms of ballots, (iv) establishing

---

[1] The Debtors are the entities listed on Schedule 1 attached to the Confirmation Brief. The employer tax identification numbers and addresses for each of the Debtors are set forth in the Debtors' Chapter 11 Petitions.

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan.

solicitation and voting procedures, (v) establishing procedures for allowing and estimating

certain claims for voting purposes, (vi) scheduling a confirmation hearing (the "**Confirmation**

**Hearing**") and (vii) establishing notice and objection procedures; and the Debtors having

provided a copy of the Disclosure Statement to all holders of Claims in Class 1C (Senior Notes

Parent Claims), Classes 2C-100C (Senior Notes Guarantee Claims), Class 1D (Convertible Notes

Claims), Classes 1E and 2D-101D (General Unsecured Claims) and Classes 1F and 2E-101E

(Convenience Class Claims) (collectively, the "**Voting Classes**") as provided for by the

Approval Order; and the various schedules to the Plan and Plan Supplements having been filed

and served as required by the Plan; and the Confirmation Hearing having been held before the

Court on December 17, 2013 after due notice to holders of Claims and Interests and other parties

in interest in accordance with the Approval Order, the Bankruptcy Code and the Bankruptcy

Rules; and upon all of the proceedings had before the Court and after full consideration of:

(i) each of the objections to confirmation of the Plan (the "**Objections**"); (ii) the Memorandum

of Law in Support of Confirmation of the Plan filed by the Debtors, dated December 15, 2013

(the "**Confirmation Brief**"); (iii) the declarations filed in connection with confirmation of the

Plan, including (a) the *Declaration of John E. Lushefski in Support of Confirmation of the*

*Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (the

"**Lushefski Declaration**"), (b) the *Declaration of Paul P. Huffard in Support of Confirmation of*

*the Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (the

"**Huffard Declaration**") and (c) the *Declaration of Craig E. Johnson of GCG, Inc. Certifying*

*the Methodology for the Tabulation of Votes on and Results of Voting with Respect to the*

*Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy*

*Code* [ECF No. 5136] (the "**Vote Certification**" and, collectively with the Lushefski Declaration

and the Huffard Declaration, the "**Declarations**") and the testimony contained therein and (iv) all other evidence proffered or adduced during, memoranda and objections filed in connection with and arguments of counsel made at the Confirmation Hearing; and after due deliberation and sufficient cause appearing therefor,

IT HEREBY IS DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a)).  The Court has jurisdiction over the Chapter 11 Cases pursuant to Sections 157 and 1334 of Title 28 of the United States Code.  Venue is proper pursuant to Sections 1408 and 1409 of Title 28 of the United States Code.  Confirmation of the Plan is a core proceeding pursuant to Section 157(b)(2)(L) of Title 28 of the United States Code, and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

2.      Commencement and Joint Administration of the Chapter 11 Cases.  On the Petition Date, each Debtor (other than Brody Mining, LLC and Patriot Ventures LLC) (collectively, the "**Initial Debtors**") commenced with the United States Bankruptcy Court for the Southern District of New York a case under Chapter 11 of the Bankruptcy Code.  On December 19, 2012, the Southern District of New York Bankruptcy Court entered an order transferring the Initial Debtors' Chapter 11 Cases to this Court [ECF No. 1789]. Subsequently, Brody Mining, LLC and Patriot Ventures LLC (together, the "**New Debtors**") each commenced its Chapter 11 Case by filing a petition for voluntary relief with this Court on September 23, 2013.  The Initial Debtors' Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the Joint

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 173 of 340

Case 2:20-cv-00487    Document 105-18    Filed 01/22/21    Page 5 of 172    PageID #: 1446
Case 12-51502    Doc 5169    Filed 12/18/13    Entered 12/18/13 15:01:51    Main Document
Pg 4 of 64

Administration Order entered on July 10, 2012 [ECF No. 30], and the New Debtors' Cases are being jointly administered with the Initial Debtors' cases pursuant to Bankruptcy Rule 1015(b) and the Order Directing Joint Administration of Chapter 11 Cases entered by this Court on September 27, 2013 in each of the New Debtors' Chapter 11 Cases. The Debtors have operated their businesses and managed their properties as Debtors In Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

3.      <u>Judicial Notice</u>.  The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court and/or its duly appointed agent, including, without limitation, all pleadings and other documents filed and orders entered thereon. The Court also takes judicial notice of all evidence proffered or adduced and all arguments made at the hearings held before the Court during the pendency of these Chapter 11 Cases.

4.      <u>Burden of Proof</u>.  The Debtors, as the Plan proponents, have the burden of proving the elements of Section 1129 of the Bankruptcy Code by a preponderance of the evidence, and they have met that burden as further found and determined herein.

5.      <u>Notice; Transmittal and Mailing of Materials</u>.

(a)      Due, adequate and sufficient notice of the Disclosure Statement, the Plan and the Confirmation Hearing, along with adequate notice of the respective deadlines for voting on and filing objections to the Plan, has been given to all known holders of Claims and Interests substantially in accordance with the procedures set forth in the Approval Order, and no other or further notice is or shall be required;

(b)     The Debtors have transmitted to members of the Voting Classes solicitation packages (the "**Solicitation Packages**"), each containing (i) a cover letter describing the contents of the Solicitation Package and the contents of the enclosed CD-ROM, (ii) a CD-ROM containing (x) the Disclosure Statement (with the Plan annexed thereto and other exhibits) and (y) the Approval Order (without exhibits), (iii) the Confirmation Hearing Notice, (iv) a Ballot or Beneficial Ballot, as appropriate, together with a pre-addressed postage paid envelope and (v) a letter from the Creditors' Committee regarding acceptance of the Plan substantially in accordance with the procedures set forth in the Approval Order.  All procedures used to distribute the Solicitation Packages to the Voting Classes were fair and were conducted in accordance with the Bankruptcy Code and the Bankruptcy Rules and all other applicable rules, laws and regulations;

(c)     The Debtors have transmitted to members of the (i) non-voting unimpaired classes — Claims in Classes 1A-101A (Other Priority Claims) and Classes 1B-101B (Other Secured Claims) — and (ii) the non-voting impaired classes — Claims in Classes 1G and 2F-101F (Section 510(b) Claims) and Class 1H (Interests in Patriot Coal) — to the extent knowable, a notice describing such recipient's non-voting status and the deadline for filing objections to the Plan (the "**Non-Voting Notices**") substantially in accordance with the procedures set forth in the Approval Order;

(d)     The Debtors have served all parties in interest with, at a minimum, the Confirmation Hearing Notice;

(e)     Adequate and sufficient notice of the Confirmation Hearing and all other bar dates described in the Approval Order and the Plan has been given in accordance with

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 175 of 340

Case 2-20-cv-00487 Document 105-19 Filed 12/17/21 Page 7 of 172 PageID #: 1448
Case 12-51502   Doc 5169   Filed 12/18/13   Entered 12/18/13 15:01:51   Main Document
Pg 6 of 64

the Bankruptcy Rules and the Approval Order, and no other or further notice is or shall be required; and

(f)      The filing with the Court and service of the version of the Plan attached as Appendix A to the Disclosure Statement, the filing of the Plan on December 15, 2013 and the disclosure of any further modifications to the Plan on the record at the Confirmation Hearing constitute due and sufficient notice of the Plan and all modifications thereto.

6.      <u>Voting</u>.  Votes on the Plan were solicited after disclosure of "adequate information" as defined in Section 1125 of the Bankruptcy Code.  As evidenced by the Vote Certification, votes to accept the Plan have been solicited and tabulated fairly, in good faith and in a manner consistent with the Approval Order, the Bankruptcy Code and the Bankruptcy Rules.

7.      <u>Plan Supplements and Schedules</u>.  On December 5, 2013, the Debtors filed a Plan Supplement, as described in Section 15.6 of the Plan.  In addition, the Debtors filed Schedules 9.2(a) and 9.2(b) on November 27, 2013 and revised Schedules 9.2(a) and 9.2(b) on December 13, 2013.  All such Plan Supplements and schedules to the Plan comply with the terms of the Plan, and the filing and notice of such documents was good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Approval Order, and no other or further notice is or shall be required.

8.      <u>Plan Modifications (11 U.S.C. § 1127)</u>.  Subsequent to solicitation, the Debtors made certain non-material modifications to the Plan (the "**Plan Modifications**").  Prior notice regarding the substance of the Plan Modifications, coupled with the filing with the Court of the Plan as modified by the Plan Modifications and, the disclosure of the Plan Modifications on the record at the Confirmation Hearing, constitute due and sufficient notice thereof.

SA000173

9.     <u>Deemed Acceptance of Plan as Modified</u>.  All Plan Modifications are consistent with all of the provisions of the Bankruptcy Code, including, without limitation, Sections 1122, 1123, 1125 and 1127 and Bankruptcy Rule 3019, and all holders of Claims who voted to accept the Plan and who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified by the Plan Modifications.  No holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Plan Modifications.

10.     <u>Bankruptcy Rule 3016(a)</u>.  The Plan reflects the date it was filed with the Court and identifies the entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).

11.     <u>Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(1) of the Bankruptcy Code.

(a)     <u>Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1))</u>.  In addition to DIP Facility Claims, Administrative Claims and Priority Tax Claims that need not be classified, the Plan classifies 707 Classes of Claims and Interests.  The Claims and Interests placed in each Class are substantially similar to other Claims or Interests, as the case may be, in each such Class.  Valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, the classifications were not done for any improper purpose and such Classes do not unfairly discriminate between or among holders of Claims or Interests.  The Plan satisfies Sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(b)     <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.  Section 3.1 of the Plan specifies that Classes 1A-101A (Other Priority Claims) and Classes 1B-101B (Other

Secured Claims) are Unimpaired by the Plan, thereby satisfying Section 1123(a)(2) of the Bankruptcy Code.

(c)    <u>Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>. Section 3.1 of the Plan designates Class 1C (Senior Notes Parent Claims), Classes 2C-100C (Senior Notes Guarantee Claims), Class 1D (Convertible Notes Claims), Classes 1E and 2D-101D (General Unsecured Claims), Classes 1F and 2E-101E (Convenience Class Claims), Classes 1G and 2F-101F (Section 510(b) Claims) and Class 1H (Interests in Patriot Coal) as Impaired, and Article 3 of the Plan specifies the treatment of each of these Classes of Claims and Interests under the Plan, thereby satisfying Section 1123(a)(3) of the Bankruptcy Code.

(d)    <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.  The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class, unless the holder of a Claim or Interest has agreed to a less favorable treatment, thereby satisfying Section 1123(a)(4) of the Bankruptcy Code.

(e)    <u>Implementation of Plan (11 U.S.C. § 1123(a)(5))</u>.  The Plan and the various documents and agreements set forth in the Plan Supplements and schedules and described in the Plan provide adequate and proper means for the Plan's implementation, thereby satisfying Section 1123(a)(5) of the Bankruptcy Code.

(f)    <u>Nonvoting Equity Securities (11 U.S.C. § 1123(a)(6))</u>.  The certificate of incorporation of Reorganized Patriot Coal, the form of which was filed as a Plan Supplement on December 5, 2013 (the "**New Certificate of Incorporation**"), prohibits the issuance of non-voting equity securities to the extent required by the Bankruptcy

Code.  Thus, the requirements of Section 1123(a)(6) of the Bankruptcy Code are satisfied.

(g)  <u>Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))</u>.  Section 10.3 of the Plan contains provisions on the manner of appointment of the directors and officers of the Reorganized Debtors that are consistent with the interests of creditors, equity security holders and public policy in accordance with Section 1123(a)(7) of the Bankruptcy Code.

(h)  <u>Additional Plan Provisions (11 U.S.C. § 1123(b)(6))</u>.  The Plan's provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code.

12.  <u>Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>.  The Debtors, as the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Section 1129(a)(2) of the Bankruptcy Code.  Specifically, *inter alia*:

(a)  The Debtors are proper debtors under Section 109(d) of the Bankruptcy Code;

(b)  The Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by order of the Court; and

(c)  The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Approval Order in transmitting the Disclosure Statement, the Plan and related documents and notices in soliciting and tabulating votes on the Plan.

(d)  <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>.  Based on the record before this Court in these Chapter 11 Cases, the Debtors, the DIP Agents, the DIP Lenders, the

L/C Issuers, the arrangers, bookrunners and any syndication agent under the DIP

Facilities, the Prepetition Credit Agreement Agent, the Prepetition Credit Agreement

Lenders, the arrangers under the Prepetition Credit Agreement, the Creditors' Committee

and its current and former members, the Exit Credit Facilities Parties, the Backstop

Parties, the Senior Notes Trustee, the Convertible Notes Trustee, Arch, Peabody, the

UMWA and the other Exculpated Parties referred to in Section 11.6 of the Plan have

acted in "good faith" within the meaning of Section 1125(e) of the Bankruptcy Code and

in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy

Rules in connection with all of their respective activities relating to the solicitation of

acceptances to the Plan and their participation in the activities described in Section 1125

of the Bankruptcy Code and the Exculpated Parties referred to in Section 11.6 of the Plan

are entitled to the protections afforded by Section 1125(e) of the Bankruptcy Code and

the exculpation provisions set forth in Section 11.6 of the Plan.

13.    <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Debtors have

proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying

Section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the facts

and records of these Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the

record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases.  The

Plan was proposed with the legitimate and honest purpose of maximizing the value of the

Debtors' Estates and effectuating a successful reorganization of the Debtors.

14.    <u>Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>.  Subject to

the provisions of Section 7.1(a) of the Plan, any payment made or to be made by any of the

Debtors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or

in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying Section 1129(a)(4) of the Bankruptcy Code.

15.    <u>Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5))</u>.  The Debtors have complied with Section 1129(a)(5) of the Bankruptcy Code.  The identity and affiliations of the persons proposed to serve as members of the New Board were disclosed in a Plan Supplement filed on December 5, 2013, and the appointment to, or continuance in, such positions of such persons is consistent with the interests of holders of Claims against, and Interests in, the Debtors and with public policy.

16.    <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>.  The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and does not require approval by any governmental regulator.  Therefore, the Plan satisfies Section 1129(a)(6) of the Bankruptcy Code.

17.    <u>Best Interests of Creditors (11 U.S.C. § 1129(a)(7))</u>.  The Plan satisfies Section 1129(a)(7) of the Bankruptcy Code.  The Liquidation Analysis set forth in Appendix B to the Disclosure Statement and supported in the Lushefski Declaration and the Huffard Declaration (a) is persuasive and credible, (b) has not been controverted by other evidence, (c) is based on sound methodology and (d) establishes that each holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.

18.    <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>.  Classes 1A-101A

(Other Priority Claims) and Classes 1B-101B (Other Secured Claims) are all Classes of

Unimpaired Claims or Interests that are conclusively presumed to have accepted the Plan under

Section 1126(f) of the Bankruptcy Code.  The Voting to Accept Classes (as defined in the

Confirmation Brief) have voted to accept the Plan in accordance with Section 1126(c) of the

Bankruptcy Code.

19.    <u>Treatment of DIP Facility, Administrative, Priority Tax and Priority Non-Tax</u>

<u>Claims (11 U.S.C. § 1129(a)(9))</u>.  The treatment of DIP Facility Claims, Administrative Claims

and Other Priority Claims pursuant to Section 2.1, Section 2.2 and Section 3.2 of the Plan,

respectively, satisfies the requirements of Sections 1129(a)(9)(A) and (B) of the Bankruptcy

Code, and the treatment of Priority Tax Claims pursuant to Section 2.3 of the Plan satisfies the

requirements of Section 1129(a)(9)(C) of the Bankruptcy Code.

20.    <u>Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10))</u>.  The Voting to Reject

Classes (as defined in the Confirmation Brief) have voted against the Plan; and the Deemed to

Reject Classes (as defined in the Confirmation Brief) are not entitled to receive or retain any

property under the Plan and, therefore, are deemed to have rejected the Plan pursuant to Section

1126(g) of the Bankruptcy Code.  Although Section 1129(a)(8) of the Bankruptcy Code has not

been satisfied with respect to the Rejecting Classes (as defined in the Confirmation Brief), the

Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with

respect to the Rejecting Classes and thus satisfies Section 1129(b) of the Bankruptcy Code with

respect to such Classes.  With respect to each Debtor, without including any acceptance of the

Plan by any insider, there is at least one Class of Claims against the Debtors that is Impaired

under the Plan and has accepted the Plan.  Thus, the Plan satisfies the requirements of Section

1129(a)(10) of the Bankruptcy Code.

21.    <u>Feasibility (11 U.S.C. § 1129(a)(11))</u>.  The evidence submitted regarding

feasibility through the Declarations together with all evidence proffered or advanced at or prior

to the Confirmation Hearing (a) is persuasive and credible, (b) has not been controverted by

other evidence and (c) establishes that confirmation of the Plan is not likely to be followed by the

liquidation or the need for further financial reorganization of the Reorganized Debtors, thus

satisfying the requirements of Section 1129(a)(11) of the Bankruptcy Code.

22.    <u>Payment of Fees (11 U.S.C. § 1129(a)(12))</u>.  As provided in Section 15.4 of the

Plan, all fees payable pursuant to Section 1930(a) of Title 28 of the United States Code, as

determined by the Court, have been paid or shall be paid for each quarter (including any fraction

thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first,

thus satisfying the requirements of Section 1129(a)(12) of the Bankruptcy Code.

23.    <u>Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13))</u>.  As required by

Section 1129(a)(13) of the Bankruptcy Code, following the Effective Date of the Plan, as set

forth in Section 9.4 of the Plan, the payment of all retiree benefits (as defined in Section 1114 of

the Bankruptcy Code) will continue at the levels established pursuant to subsections (e)(1)(B) of

Section 1114 of the Bankruptcy Code or as otherwise addressed by orders of the Bankruptcy

Court, at any time prior to the entry of this Confirmation Order, for the duration of the periods

the Debtors have obligated themselves to provide such benefits, thereby satisfying Section

1129(a)(13) of the Bankruptcy Code; *provided, however*, that nothing in this Confirmation Order

will be construed to restrict or enlarge the Reorganized Debtors' rights to modify any such

retiree benefits (including health and welfare benefits) under applicable non-bankruptcy law.

24.    <u>No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b))</u>.  Based upon

the Declarations and all other evidence before the Court, the Plan does not discriminate unfairly

and is fair and equitable with respect to all of the Rejecting Classes, as required by Sections

1129(b)(1) and (2) of the Bankruptcy Code.  Thus, the Plan may be confirmed notwithstanding

certain of the Debtors' failure to satisfy Section 1129(a)(8) of the Bankruptcy Code.  Upon

confirmation and the occurrence of the Effective Date, the Plan shall be binding upon the

members of the Rejecting Classes.

(a)    <u>The Plan Does Not Unfairly Discriminate Against the Rejecting Classes</u>.

The Plan does not unfairly discriminate against the Rejecting Classes.  With respect to

the difference in treatment under the Plan between the Rejecting Classes and the

Accepting Classes, (a) a reasonable basis exists for any discrimination; (b) the Plan

cannot be consummated without the discrimination; (c) the discrimination was proposed

in good faith; and (d) the degree of discrimination is in proportion to its rationale.  As a

result, there is a reasonable basis for any disparate treatment between and among Classes.

Therefore, the Plan satisfies Section 1129(b)(1) of the Bankruptcy Code.

(b)    <u>The Plan is Fair and Equitable</u>.  The Plan is fair and equitable, in that,

other than as provided with respect to Classes 2G-101G (Interests in Subsidiary Debtors),

which serves to preserve the corporate structure for the benefit of all creditors, no holder

that is junior to the Claims and Interests classified in the Rejecting Classes will receive or

retain under the Plan any property on account of such junior interest.  Therefore, the Plan

satisfies Section 1129(b)(2)(C)(ii) of the Bankruptcy Code.

25.     <u>Only One Plan (11 U.S.C. § 1129(c))</u>.  The Plan is the only plan of reorganization filed in these Chapter 11 Cases.  Accordingly, Section 1129(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

26.     <u>Principal Purpose of the Plan (11 U.S.C. § 1129(d))</u>.  The principal purpose of the Plan, as evidenced by its terms, is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act.

27.     <u>Satisfaction of Confirmation Requirements</u>.  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in Section 1129 of the Bankruptcy Code.

28.     <u>Implementation</u>.  All documents and agreements necessary to implement the Plan, including, without limitation, those contained in the Plan Supplements and schedules to the Plan, and all other relevant and necessary documents have been negotiated in good faith at arm's-length and are in the best interests of the Debtors and the Reorganized Debtors and shall, upon completion of such documentation and execution, be valid, binding and enforceable documents and agreements not in conflict with any federal or state law.

29.     <u>Good Faith</u>.  The Debtors, the DIP Agents, the DIP Lenders, the L/C Issuers, the arrangers, bookrunners and any syndication agent under the DIP Facilities, the Prepetition Credit Agreement Agent, the Prepetition Credit Agreement Lenders, the arrangers under the Prepetition Credit Agreement, the Creditors' Committee and its current and former members, the Exit Credit Facilities Parties, the Backstop Parties, the Senior Notes Trustee, the Convertible Notes Trustee, Arch, Peabody, the UMWA and the other Released Parties will be acting in good faith if they proceed to (i) consummate the Plan and the agreements, settlements, transactions and transfers contemplated thereby in accordance with the Plan and this Confirmation Order (including,

without limitation, the Restructuring Transactions set forth in Section 5.6 of the Plan and the

Plan Supplements) and (ii) take the actions authorized and directed by this Confirmation Order.

30.     <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>.  The

Debtors have exercised their reasonable business judgment prior to the Confirmation Hearing in

determining whether to assume or reject each of their executory contracts and unexpired leases

as set forth in Article 9 of the Plan, the schedules to the Plan, the Plan Supplements, this

Confirmation Order or otherwise.  Each assumption or rejection of an executory contract or

unexpired lease pursuant to this Confirmation Order and in accordance with Article 9 of the Plan,

or otherwise by prior order of this Court, shall be legal, valid and binding upon the applicable

Reorganized Debtor and all non-Debtor entities party to such executory contract or unexpired

lease (subject to the rights of the non-debtor entities party to such agreements to object to such

assumption or rejection and the rights of the applicable Reorganized Debtor in response to any

such objection); *provided, however,* that nothing in this Confirmation Order shall be construed as

an Order of this Court compelling performance under any assumed contract or lease; *provided*,

*further*, that no unexpired lease listed on Schedule 9.2(a) shall include or be deemed to include

any (i) payment agreements; (ii) royalty agreements, including overriding royalty agreements;

(iii) assignment and assumption agreements; (iv) purchase and other acquisition agreements; (v)

sale agreements; or (vi) purchase option agreements.

31.     <u>Adequate Assurance</u>.  The Debtors have provided adequate assurance of future

performance for each of the executory contracts and unexpired leases that are being assumed by

the Debtors pursuant to the Plan.  The Debtors have cured or provided adequate assurance that

the Reorganized Debtors will cure defaults (if any) under or relating to each of the executory

contracts and unexpired leases that are being assumed by the Debtors pursuant to the Plan.  The

Plan and such assumptions, therefore, satisfy the requirements of Section 365 of the Bankruptcy Code.

32.     <u>Valuation</u>.  In accordance with the estimated recoveries set forth in the Disclosure Statement, the enterprise value of the Debtors is insufficient to support a distribution to holders of Interests in Patriot Coal (Class 1H) or Section 510(b) Claims (Classes 1G, 2F-101F).

33.     <u>Transfers by Debtors; Vesting of Assets</u>.  All transfers of property of the Debtors' Estates, including, without limitation, the transfer of the New Common Stock, the Rights Offering Notes and the Rights Offering Warrants, shall be free and clear of all mortgages, deeds of trust, Liens, charges, Claims, encumbrances, pledges and other interests, except as expressly provided in the Plan, this Confirmation Order or the Exit Credit Facilities Documents.  Pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, all property of each of the Debtors (excluding property that has been abandoned pursuant to the Plan or an order of the Bankruptcy Court) shall vest in each of the respective Reorganized Debtors or their successors or assigns, as the case may be, free and clear of all mortgages, deeds of trust, Liens, pledges, charges, Claims, encumbrances and other interests, except as expressly provided in the Plan, this Confirmation Order or the Exit Credit Facilities Documents.  Such vesting does not constitute a voidable transfer under the Bankruptcy Code or applicable nonbankruptcy law.

34.     <u>Releases and Discharges</u>.  The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by holders of Claims, constitute good faith compromises and settlements of the matters covered thereby and are consensual.  Such compromises and settlements are made in exchange for consideration and are in the best interest of holders of Claims, are fair, equitable, reasonable and are integral elements

SA000184

of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of the discharge, release, indemnification and exculpation provisions set forth in the Plan, including, without limitation, those set forth in the UMWA Settlement, the UMWA Settlement Order, the Non-Union Retiree Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement and the Peabody Settlement Order, each of which are incorporated herein by reference, (a) is within the jurisdiction of the Bankruptcy Court under Sections 1334(a), 1334(b) and 1334(e) of Title 28 of the United States Code, (b) is an essential means of implementing the Plan, (c) is an integral and non-severable element of the Plan and the transactions incorporated therein, (d) confers a material benefit on, and is in the best interests of, the Debtors, their Estates and their Creditors, (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors, (f) is fair, equitable and reasonable and in exchange for good and valuable consideration and (g) is consistent with Sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

35.    <u>Exit Credit Facilities</u>.  The incurrence of indebtedness, provision of guarantees and granting of collateral under the Exit Credit Facilities and the Exit Credit Facilities Documents are in the best interests of the Reorganized Debtors, and are necessary and appropriate for the consummation of the Plan and the operations of the Reorganized Debtors. The Exit Credit Facilities Documents were negotiated at arm's length, and in good faith, without the intent to hinder, delay or defraud any creditor of the Debtors.  The Exit L/C Credit Agreement has been approved by the requisite Second Out DIP Lenders pursuant to paragraph 23 of the DIP Order.  The Debtors have provided sufficient and adequate notice of the Exit Credit Facilities and the Exit Credit Facilities Documents to all parties in interest in these

Chapter 11 Cases.  The terms and conditions of the Exit Credit Facilities, as set forth in the Exit Credit Facilities Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are approved.

36.    <u>Rights Offerings</u>.  The incurrence of indebtedness, provision of guarantees and granting of collateral under the Rights Offering Notes, the Rights Offering Notes Indenture and the Collateral Documents (as defined in the Rights Offering Notes Indenture) (the "**Rights Offering Notes Collateral Documents**," and together with the Rights Offering Notes Indenture, the "**Rights Offering Notes Documents**"), are, in each case, in the best interests of the Reorganized Debtors, and are necessary and appropriate for the consummation of the Plan and the operations of the Reorganized Debtors.  The Debtors have provided sufficient and adequate notice of the Rights Offering Notes and the Rights Offering Notes Documents to all parties in interest in these Chapter 11 Cases.  The terms and conditions of the Rights Offering Notes, as set forth in the Rights Offering Notes Documents are, in each case, fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are approved.

37.    <u>Backstop Parties</u>.  Pursuant to, *inter alia*, the Plan, the Backstop Rights Purchase Agreement, and the Rights Offerings Procedures, upon the Effective Date, as a result of the transactions effectuated by the Plan, the Rights Offerings, and the Backstop Rights Purchase Agreement, the Backstop Parties will not own, directly or indirectly, any of the New Common Stock, by vote or value of such New Common Stock, and the Backstop Parties shall only be passive investors in the Reorganized Debtors with respect to and by virtue of their receipt and holding of the Rights Offering Warrants and the Rights Offering Notes obtained in connection with the Rights Offerings.  Pursuant to, *inter alia*, the Plan, the Backstop Rights Purchase

Agreement, and the Rights Offerings Procedures, the Backstop Parties have acted individually in making their respective passive investments in the Reorganized Debtors, and, upon the Effective Date, the Backstop Parties' investment interests in the Reorganized Debtors shall not provide for any right or ability (and the Backstop Parties and their respective affiliates expressly disclaim any intention) to participate in or control the management, business, or operations of the Reorganized Debtors.

38.    The Debtors have made an overwhelming and uncontroverted showing of the very substantial cost, harm, risk and prejudice to these Estates and their Creditors that would result if the Plan is not consummated.

## DECREES

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

39.    <u>Confirmation</u>.  The Plan is approved and confirmed under Section 1129 of the Bankruptcy Code.  The schedules to the Plan and the terms of the Plan Supplements are incorporated by reference into and are an integral part of the Plan.

40.    <u>Objections</u>.  All objections that have not been withdrawn, waived or settled, and all reservations of rights pertaining to Confirmation of the Plan, are overruled on the merits.

41.    <u>Plan Supplements</u>.  The documents contained or referred to in the Plan or the Plan Supplements, including, *inter alia*, the Voting Trust Agreement, the Rights Offering Notes Indenture, the New Stockholders' Agreement, the Rights Offering Warrant Agreement, the Exit Credit Facilities Documents, the Registration Rights Agreement, the documents underlying the Restructuring Transactions, and any amendments, modifications, and supplements thereto, and

all documents and agreements related thereto (including all exhibits and attachments thereto and documents referred to therein), and the execution, delivery and performance thereof by the Reorganized Debtors, are authorized and approved.  Unless the provisions of the documents contained or referred to in the Plan or the Plan Supplements provide otherwise, until such documents are finalized and executed, without further order or authorization of this Court, the Debtors, the Reorganized Debtors and their successors are authorized and empowered to make any and all modifications to all documents included as part of the Plan Supplements or otherwise contemplated by the Plan in accordance with Article 13 of the Plan.  Once finalized and executed, and upon the Effective Date, the documents comprising the Plan Supplements and all other documents contemplated by the Plan shall constitute legal, valid, binding and authorized obligations of the respective parties thereto, enforceable in accordance with their terms subject to any amendments, modifications and supplements thereto without approval of this Court and, to the extent applicable, shall create, as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests purported to be created thereby.

42.     <u>Provisions of Plan and Confirmation Order Non-Severable and Mutually Dependent</u>.  The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are each non-severable and mutually dependent.

43.     <u>Preparation, Delivery and Execution of Additional Documents by Third Parties</u>. Each holder of a Claim receiving a distribution pursuant to the Plan and all other parties in interest shall, from time to time, take any reasonable actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

SA000188

44.      <u>Solicitation and Notice</u>.  Notice of the Confirmation Hearing complied with the terms of the Approval Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.  The solicitation of votes on the Plan complied with the solicitation procedures in the Approval Order, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.  Notice of the Plan Supplements and all related documents was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Plan, the Bankruptcy Code and the Bankruptcy Rules.

45.      <u>Plan Classifications Controlling</u>.  The classification of Claims and Interests for purposes of distributions made under the Plan shall be governed solely by the terms of the Plan. The classifications set forth on the Ballots tendered to or returned by the Creditors in connection with voting on the Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims under the Plan for distribution purposes and (c) shall not be binding on the Debtors or Reorganized Debtors.

46.      <u>Treatment in Full Satisfaction</u>.  The treatment of Claims and Interests set forth in the Plan is in full and complete satisfaction of the legal, contractual and equitable rights that each holder of a Claim or Interest may have against the Debtors, the Debtors' Estates or their respective property, on account of such Claim or Interest.

47.    <u>Releases of Liens</u>.  Except as otherwise provided in the Plan or in any contract,
instrument, release, or other agreement or document created pursuant to the Plan (including, but
not limited to, the Exit Credit Facilities Documents and the Rights Offering Notes Documents)
on the Effective Date and concurrently with the applicable distributions made pursuant to the
Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim
that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other
security interests against any property of the Estates shall be fully released, settled, discharged
and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of
trust, Liens, pledges or other security interests against any property of the Estates shall revert to
the Reorganized Debtors and their successors and assigns.  Each DIP Agent, DIP Lender and
holder of a Secured Claim shall take all actions to effectuate and confirm such termination,
release and discharge as reasonably requested by the Debtors or the Reorganized Debtors;
*provided*, *however*, that with respect to the First Out DIP Facility, the foregoing shall be
conditioned upon satisfaction of, and consistent with, the terms and provisions of that certain
payoff letter, dated prior to or as of the Effective Date, by and between the First Out DIP Agent
and the Debtors.  The Reorganized Debtors are authorized to file any necessary or desirable
documents to evidence such release in the name of the party secured by such pre-Effective Date
mortgages, deeds of trust, Liens, pledges or other security interests.

48.    <u>Continued Organizational Existence</u>.  Except as otherwise provided in the Plan
and subject to any Restructuring Transactions consummated as permitted by Section 5.6 of the
Plan or described in the Plan Supplements, each Debtor shall, as a Reorganized Debtor, continue
to exist after the Effective Date as a separate legal entity, each with all of the powers of a
corporation, limited liability company, partnership, or other applicable legal entity form, under

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 193 of 340

Case 2:20-cv-00487    Document 105    Filed 01/13/21    Page 25 of 172    PageID #: 1466
Case 12-51502    Doc 5169    Filed 12/18/13    Entered 12/18/13 15:01:51    Main Document
Pg 24 of 64

the laws of its jurisdiction of organization and without prejudice to any right to alter or terminate

such existence (whether by merger or otherwise) under applicable state law.

49.     <u>Cancellation of Old Stock and Debtors' Obligations under Indenture Documents</u>.

On the Effective Date, all rights of any holder of Claims against, or Interest in, the Debtors,

including options or warrants to purchase Interests, obligating the Debtors to issue, transfer or

sell Interests or any other capital stock of the Debtors, shall be cancelled; *provided*, *however*, that

Interests in Subsidiary Debtors shall be Reinstated.  Regarding the Convertible Notes Indenture

and the Senior Notes Indenture, and any related note, guaranty, bond, certificate or similar

instrument (other than, for the avoidance of doubt, the Rights Offering Notes Indenture)

(together the "**Indenture Documents**"), the obligations of the Debtors thereunder and in any

way related thereto shall be fully satisfied, released and discharged in exchange for the treatment

provided under the Plan for Allowed Senior Notes Claims and Allowed Convertible Notes

Claims, as applicable; *provided* that the satisfaction, release and discharge of the Debtors'

obligations with respect to the Indenture Documents shall not alter the obligations or rights of

any non-Debtor third parties vis-à-vis one another with respect to such Indenture Documents.

50.     <u>Authorization of New Common Stock; Rights Offering Warrants; Rights Offering</u>
<u>Notes</u>.  Without further act or action under applicable law, regulation, order or rule, Reorganized

Patriot Coal is authorized to issue the New Common Stock, Rights Offering Notes and Rights

Offering Warrants on the Effective Date pursuant to the terms of the Plan, free and clear of all

Liens, Claims and other Interests.  Each share of the New Common Stock, Rights Offering Note

and Rights Offering Warrant issued and distributed pursuant to the Plan shall be duly authorized,

validly issued, and fully paid and non-assessable.  The Debtors or the Reorganized Debtors, as

the case may be, are authorized to execute and deliver all documentation relating to the issuance

USCA4 Appeal: 24-2051    Doc: 34-1       Filed: 02/10/2025    Pg: 194 of 340

Case 2:20-cv-00487-JPS    Document 105-18    Filed 11/22/21    Page 25 of 172    PageID #: 1467
Case 12-51502    Doc 5169    Filed 12/18/13    Entered 12/18/13 15:01:51    Main Document
Pg 25 of 64

of the aforementioned New Securities and the Restructuring Transactions, and are authorized to engage in such further transactions as are determined by the Debtors (or the Reorganized Debtors) to be necessary in the furtherance of the Plan or the Rights Offerings.

51.    <u>Exit Credit Facilities; Rights Offering Notes; Incurrence of New Indebtedness</u>.

(a)    The Reorganized Debtors' entry on the Effective Date into (i) the Exit Credit Facilities and the Exit Credit Facilities Documents and (ii) the Rights Offering Notes Documents in connection with the issuance of the Rights Offering Notes, and, in each case of (i) and (ii), the incurrence of the indebtedness thereunder, the provision of guarantees, the granting of collateral and other security interests in accordance therewith, and all other actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors (including, without limitation, the payment of all fees, expenses, losses, damages, indemnities and other amounts provided for in the Exit Credit Facilities Documents and the Rights Offering Notes Documents) shall be authorized and approved in all respects by virtue of entry of this Confirmation Order, in accordance with the Bankruptcy Code and applicable state law (including, but not limited to, Section 303 of the Delaware General Corporations Law, to the extent applicable, and any analogous provision of the applicable business organizations law or code of each other state in which the Reorganized Debtors are incorporated or organized) and without the need for any further corporate action or any further action by holders of Claims or Interests in the Debtors or the Reorganized Debtors or stockholders, directors, members or partners of the Debtors or the Reorganized Debtors, and with like effect as if such actions had been taken by unanimous actions thereof.

(b)      Each of the Reorganized Debtors, without any further action by the Court or each respective Reorganized Debtors' officers, directors or stockholders, is hereby authorized and directed to enter into, and take such actions as necessary to perform under, or otherwise effectuate, the Exit Credit Facilities, the Exit Credit Facilities Documents, the Notes Rights Offering and the Rights Offering Notes Documents, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of Liens or other security interests in connection therewith.

(c)      Upon consummation of the Exit Credit Facilities and the Notes Rights Offering, the lenders or trustees thereunder, as applicable, shall have legal, valid, binding and enforceable Liens and other security interests on the collateral specified in the Exit Credit Facilities Documents and the Rights Offering Notes Documents.  The guarantees, mortgages, deeds of trust, pledges, Liens and other security interests granted pursuant to or in connection with the Exit Credit Facilities and Rights Offering Notes Documents are granted in good faith, for good and valuable consideration and for legitimate business purposes as an inducement to lenders to extend credit thereunder and are reasonable and shall be, and hereby are, deemed not to constitute a preferential transfer, fraudulent conveyance, fraudulent transfer or other voidable transfer and shall not otherwise be subject to avoidance, recharacterization or subordination.  The priorities of such Liens and other security interests shall be as set forth in and subject to the Intercreditor Agreements (as defined in the Exit Credit Facility Documents), the other Exit Credit Facility Documents or Rights Offering Notes Documents and applicable law.

SA000193

(d)     The Reorganized Debtors and the secured parties (and their designees and agents) under the Exit Credit Facilities Documents are hereby authorized to make all filings and recordings, and to obtain all governmental approvals and consents to evidence, establish and perfect such Liens and other security interests under the provisions of the applicable state, provincial, federal or other law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection of the Liens and other security interests granted under the Exit Credit Facilities Documents shall occur automatically by virtue of the entry of this Confirmation Order and consummation of the Exit Credit Facilities, and any such filings, recordings, approvals and consents shall not be necessary or required as a matter of law to perfect such Liens and other security interests), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and other security interests to third parties.

(e)     The Exit L/C Credit Agreement, having been approved by the affirmative vote of the requisite holders of Second Out DIP Facility Claims pursuant to paragraph 23 of the DIP Order, is an Approved Second Out DIP L/C Arrangement, and, upon consummation of the Exit L/C Credit Agreement, each Outstanding L/C under the Second Out DIP Facility shall be deemed to be Paid in Full.  From and after the Effective Date, the Second Out DIP Agent and each lender and L/C Issuer under the Second Out DIP Facility shall be deemed to be bound by the Exit L/C Credit Agreement.  Without limiting the foregoing, upon the consummation date of the Exit L/C Credit Agreement, the Debtors are authorized to and shall pay the consent fee payable under that certain Agreement, dated as of November 5, 2013, to the Second Out DIP Facility Lenders

entitled thereto.  Neither Barclays Bank PLC nor Deutsche Bank Securities Inc. shall

have any obligations or liability to the Second Out DIP Agent or any lender or any L/C

Issuer under the Second Out DIP Facility in connection with or related to the Exit L/C

Credit Agreement, except to the extent of the obligations expressly provided for in the

Exit L/C Credit Agreement.

(f)    Notwithstanding anything to the contrary in this Confirmation Order or the

Plan, the Court's retention of jurisdiction shall not govern any disputes arising or asserted

under, or any enforcement action or rights or remedies taken or exercised in connection

with any documentation executed in connection with the Exit Credit Facilities, the Rights

Offering Notes or any Liens or other security interests related thereto.

52.    <u>Restructuring Transactions</u>.

(a)    On or after the Effective Date, including after the cancellation and

discharge of all Claims pursuant to the Plan and before the issuance of the New Common

Stock, the Reorganized Debtors may engage in or take such actions as may be necessary

or appropriate to effect the Restructuring Transactions.  The actions to effect the

Restructuring Transactions may include (a) dissolving companies or creating new

companies (including limited liability companies), (b) merging, dissolving, transferring

assets or otherwise consolidating any of the Debtors in furtherance of the Plan, or

engaging in any other transaction in furtherance of the Plan, (c) executing and delivering

appropriate agreements or other documents of merger, consolidation, restructuring,

conversion, disposition, transfer, dissolution, liquidation, domestication, continuation or

reorganization containing terms that are consistent with the terms of the Plan and that

satisfy the requirements of applicable law; (d) executing and delivering appropriate

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 198 of 340

Case 2:20-cv-00487    Document 105-18    Filed 11/23/21    Page 30 of 172    PageID #: 1471
Case 12-51502    Doc 5169    Filed 12/18/13    Entered 12/18/13 15:01:51    Main Document
Pg 29 of 64

instruments of transfer, assignment, assumption or delegation of any property, right, liability, debt or obligation on terms consistent with the terms of the Plan; (e) filing appropriate certificates or articles of merger, consolidation or dissolution or other filings or recordings pursuant to applicable state law; and (f) taking any other action reasonably necessary or appropriate in connection with the Restructuring Transactions.  In each case in which the surviving, resulting or acquiring Entity in any of these transactions is a successor to a Reorganized Debtor, such surviving, resulting or acquiring Entity will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan, including with respect to the DIP Agents and the DIP Lenders and including paying or otherwise satisfying the Allowed Claims to be paid by such Reorganized Debtor. Implementation of any Restructuring Transaction shall not affect any performance obligations, distributions, discharges, exculpations, releases or injunctions set forth in the Plan.  Nothing in the Plan or this Confirmation Order authorizes the transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval without compliance with all applicable legal requirements under non-bankruptcy laws and regulations governing such transfers or assignments.

(b)      The Debtors or the Reorganized Debtors, as the case may be, are hereby authorized to execute and deliver such contracts, instruments, certificates, agreements and documents (collectively, the "**Restructuring Documents**") to make such filings under state law or applicable law and to take such other actions as any appropriate officer may determine to be necessary, appropriate or desirable to effect the transactions contemplated by Section 5.6(c) of the Plan.  Each appropriate officer of each Debtor or Reorganized Debtor is authorized to execute, deliver, file and have recorded any of the

Restructuring Documents and to take such other actions on behalf of such Debtor or
Reorganized Debtor as such person may determine to be required, appropriate or
desirable under state law or any other applicable law in connection with the Restructuring
Transactions, and the appropriate officers of each Debtor or Reorganized Debtor are
authorized to certify or attest to any of the foregoing actions.  The execution and delivery
or filing of any such Restructuring Document or the taking of any such action shall be
deemed conclusive evidence of the authority of such person so to act.  Each federal, state
and local governmental agency or department is authorized and directed to accept the
filing of any Restructuring Document.  This Confirmation Order is declared to be in
recordable form and shall be accepted by any filing or recording officer or authority of
any applicable governmental authority or department without any further orders,
certificates or other supporting documents.

53.    Voting Trust.

(a)    Entry into the Voting Trust Agreement, the establishment of the Voting
Trust, the selection of the Voting Trustee and the form of the proposed Voting Trust
Agreement is appropriate and in the best interests of the Debtors.

(b)    On or before the Effective Date, the parties to the Voting Trust Agreement
are authorized to enter into and perform under the Voting Trust Agreement. The Voting
Trust Agreement shall, upon execution, be valid, binding and enforceable in accordance
with its terms.

(c)    On the Effective Date, the shares of New Class B Common Stock
designated to be transferred to a Voting Trust(s) shall be issued and transferred by the
Debtors directly to the Voting Trust(s) without the need for any person or Entity to take

any further action or obtain any approval.  Such transfers shall be exempt from any

stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  Upon the

foregoing transfers to the Voting Trust, except as specifically set forth in the Voting Trust

Agreement, the Debtors and the Reorganized Debtors shall have no further liability or

obligation relating to the Voting Trust.  Except as specifically set forth in the Voting

Trust Agreement, in no event shall the Debtors or the Reorganized Debtors have or be

deemed to have any fiduciary or other duty to the Voting Trust, nor any responsibilities

for administering the Voting Trust.

(d)    The appointment of the Voting Trustee(s) in accordance with the terms of

the Plan and the Voting Trust Agreement is hereby approved.  The duty of the Voting

Trustee(s) shall be to vote the shares of the New Class B Common Stock held in trust so

as to maximize the enterprise value of Reorganized Patriot Coal that accretes to the

holders of the debt and equity of Reorganized Patriot Coal.  The Voting Trustee(s) shall

govern the Voting Trust(s) in accordance with the Voting Trust Agreement(s).  The

Backstop Parties shall have no interest in the Voting Trust or the shares subject thereto,

and shall have no right to designate, direct, remove or reappoint any Voting Trustee(s).

(e)    From and after the date of the Effective Date, the Voting Trustee, the

Voting Trust, and each of their respective members, attorneys, advisors or agents, shall

(a) not have or incur any liability to any Person (including the Patriot Retirees VEBA and

any holder of the Reorganized Debtors' loans or securities) for any act or omission in

connection with, or arising out of, the administration of the Voting Trust or any other

actions taken or not taken in connection with the Voting Trust Agreement, including with

respect to any votes cast or not cast, and any transfer of New Common Stock pursuant to

Section 2.2 of the Voting Trust Agreement (including, without limitation, with respect to the timing thereof, the amount of consideration received therefore and the process pursuant to which the Voting Trustee determined the fair market value of such New Common Stock), unless such act or omission constitutes fraud, gross negligence or willful misconduct on its part as determined by a final, non-appealable order of a court of competent jurisdiction, (b) be entitled to rely in good faith upon the advice of counsel with respect to their duties and responsibilities under the Voting Trust and the Voting Trust Agreement, and (c) be fully protected in, and shall not have or incur any liability to any Person (including the Patriot Retirees VEBA and any holder of the Reorganized Debtors' loans or securities) for, acting or in refraining from acting, in accordance with such advice.

54. <u>Corporate Action</u>.

(a)    On and after the Effective Date, the adoption, filing, approval and ratification, as necessary, of all corporate or related actions contemplated hereby with respect to each of the Reorganized Debtors shall be deemed authorized and approved in all respects. Without limiting the foregoing, such actions may include: (i) the adoption and filing of the New Certificate of Incorporation, (ii) the adoption and filing of certificates of incorporation and other organizational documents of the Reorganized Debtors and (iii) the Restructuring Transactions authorized by Section 5.6 of the Plan, including those described in the Plan Supplements.

(b)    All matters provided for in the Plan involving the corporate structure of any Debtor or any Reorganized Debtor, or any corporate action required by any Debtor or any Reorganized Debtor in connection with the Plan, shall be deemed to have occurred

and shall be in effect, without any requirement of further action by the security holders or directors of such Debtor or Reorganized Debtor or by any other stakeholder.

(c)    On or after the Effective Date, the appropriate officers of each Reorganized Debtor and members of the board of directors, board of managers or equivalent body of each Reorganized Debtor are authorized and directed to issue, execute, deliver, file and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases and instruments contemplated by the Plan or the transactions contemplated thereby in the name of and on behalf of such Reorganized Debtor and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the transactions contemplated thereby.

55.    New Board.  Upon the occurrence of the Effective Date, the Persons proposed to serve as members of the New Board, as identified in the Plan Supplement filed on December 5, 2013, shall be the members of the New Board.

56.    Securities Laws Exemption.  To the maximum extent provided by Section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the offering, issuance and distribution of the New Common Stock shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities, subject to the provisions of Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act.  The offering, issuance and distribution of the Rights Offering Notes and the Rights Offering Warrants will be made pursuant to the exemption set forth in Section 4(2) of the Securities Act or another exemption thereunder.  In addition, any securities contemplated by the

SA000200

Plan and any and all agreements incorporated therein, including the New Securities, shall be subject to (i) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (ii) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the New Certificate of Incorporation, the New Stockholders' Agreement, the Rights Offering Warrant Agreement and the Rights Offering Notes Indenture; and (iii) applicable regulatory approval, if any.

57.    <u>Distributions Under the Plan</u>.  All distributions under the Plan shall be made in accordance with Article 6 of the Plan.

58.    <u>Unclaimed Distributions</u>.  All distributions under the Plan that remain unclaimed for one year after distribution shall indefeasibly revert to Reorganized Patriot Coal.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

59.    <u>Disputed Claims</u>.  On and after the Effective Date, the Reorganized Debtors shall have the sole authority to litigate, compromise, settle, otherwise resolve or withdraw any objections to all Claims and to compromise and settle any Claims without notice to or approval by the Bankruptcy Court or any other party.  Notwithstanding any other provision in the Plan, no payments or distributions shall be made with respect to a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

USCA4 Appeal: 24-2051    Doc: 34-1       Filed: 02/10/2025    Pg: 204 of 340

Case: 2:20-cv-00487    Document 105-18    Filed 11/22/21    Page 36 of 172    PageID #: 1477
Case 12-51502    Doc 5169    Filed 12/18/13    Entered 12/18/13 15:01:51    Main Document
Pg 35 of 64

60.    <u>Other Administrative Claim Bar Date</u>.  All requests for payment of Other Administrative Claims that accrued on or before the Effective Date (other than Professional Fee Claims, which are subject to the provisions of Section 7.1 of the Plan) must be filed with the Claims Agent and served on counsel for the Debtors and Reorganized Debtors by the Other Administrative Claim Bar Date.  Any requests for payment of Other Administrative Claims pursuant to Section 7.2 of the Plan that are not properly filed and served by the Other Administrative Claim Bar Date shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court. Notwithstanding the foregoing, requests for payment of Other Administrative Claims need not be filed with respect to Other Administrative Claims that (i) are for goods or services provided to the Debtors in the ordinary course of business, (ii) previously have been Allowed by Final Order of the Bankruptcy Court, including the DIP Orders, (iii) are for Cure amounts, (iv) are on account of post-petition taxes (including any related penalties or interest) owed by the Debtors or the Reorganized Debtors to any governmental unit (as defined in Section 101(27) of the Bankruptcy Code), (v) are held by Peabody and preserved under the terms of the Peabody Settlement, or (vi) the Debtors or the Reorganized Debtors have otherwise agreed in writing do not require such a filing.

61.    <u>Approval of Assumption or Rejection of Executory Contracts</u>.  Entry of this Confirmation Order shall, subject to the occurrence of the Effective Date, constitute approval, to the extent applicable, (a) pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 9 of the Plan, (b) pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption and assignment of the executory contracts and unexpired leases assumed and

assigned pursuant to Article 9 of the Plan, and (c) pursuant to Sections 365(a) and 1123(b)(2) of

the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected

pursuant to Article 9 of the Plan; *provided, however,* that nothing in this Confirmation Order

shall be construed as an Order of this Court compelling performance under any assumed contract

or lease.  In the event that the mergers of some or all of the Debtors—as contemplated in Section

5.6 of the Plan, including as described in the Plan Supplements—are consummated, any

executory contracts or unexpired leases assumed by the Debtors hereunder, under the Plan or by

prior order of the Court, shall be assumed and assigned (and be deemed to be assumed and

assigned) to the surviving entity of the applicable merger, and, to the extent applicable, any

provision in any executory contract or unexpired lease so assumed and assigned that purports to

declare a breach or default as a result of a change of control, an assignment of such contract, the

Debtors' or the Reorganized Debtors' financial condition, bankruptcy, or failure to perform any

of its obligations under such contract is unenforceable, and no counterparty to any such

executory contract or unexpired lease so assumed and assigned shall be permitted to declare a

default by or against the Debtors or the Reorganized Debtors under such contract or otherwise

take any action against the Debtors or the Reorganized Debtors in connection with any of the

foregoing.

62.    <u>Inclusiveness</u>.  Unless otherwise specified on a schedule to the Plan or a notice

sent to a given party, each executory contract and unexpired lease listed or to be listed thereon

shall include any and all modifications, amendments, supplements and restatements of such

executory contract or unexpired lease; *provided*, *however*, that no unexpired lease listed on

Schedule 9.2(a) shall include or be deemed to include any (i) payment agreements; (ii) royalty

agreements, including overriding royalty agreements; (iii) assignment and assumption

agreements; (iv) purchase and other acquisition agreements; (v) sale agreements; or (vi) purchase option agreements.

63.    <u>Notice of Assumption and Rejection of Executory Contracts and Unexpired Leases Assumed Under the Plan</u>.  The filing of the Plan and the schedules thereto and the publication of notice of the entry of this Confirmation Order provide adequate notice of the assumption, assumption and assignment and rejection of executory contracts and unexpired leases pursuant to Article 9 of the Plan (both for contracts and leases that appear on any of those schedules and for contracts and leases assumed or rejected by category or default).

64.    <u>Cure of Defaults</u>.  The parties to each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to the Plan were afforded good and sufficient notice of such assumption or assumption and assignment and an opportunity to object and be heard.  Treatment Objections shall be resolved in accordance with Section 9.5(c) of the Plan.  In accordance with Section 9.5(d) of the Plan, if a Treatment Objection is filed with respect to any executory contract or unexpired lease sought to be assumed or rejected by any of the Debtors or Reorganized Debtors, the Reorganized Debtors reserve the right (a) to seek to assume or reject such agreement at any time before the assumption, rejection, assignment or Cure with respect to such agreement is determined by Final Order and (b) to the extent a Final Order is entered resolving a dispute as to Cure or the permissibility of assignment (but not approving the assumption of the executory contract or unexpired lease sought to be assumed), to seek to reject such agreement within 14 calendar days after the date of such Final Order, in each case by filing with the Bankruptcy Court and serving upon the applicable Assumption Party or Rejection Party, as the case may be, a Notice of Intent to Assume or Reject.

65.    <u>Treatment Objection Deadline</u>.  With respect to an executory contract or unexpired lease sought to be assumed, rejected or deferred pursuant to the Plan, the Treatment Objection Deadline shall be the deadline for filing and serving a Treatment Objection, which deadline shall be 4:00 p.m. (prevailing Central Time) on, (a) with respect to an executory contract or unexpired lease listed on Schedule 9.2(a) or 9.2(b), the 15th calendar day after the relevant schedule is filed and notice thereof is mailed, (b) with respect to an executory contract or unexpired lease the proposed treatment of which has been altered by an amended or supplemental Schedule 9.2(a) or 9.2(b), the 15th calendar day after such amended or supplemental schedule is filed and notice thereof is mailed, (c) with respect to an executory contract or unexpired lease for which a Notice of Intent to Assume or Reject is filed, the 15th calendar day after such notice is filed and notice thereof is mailed and (d) with respect to any other executory contract or unexpired lease, including any to be assumed or rejected by category pursuant to Sections 9.1, 9.3 or 9.4 of the Plan (without being listed on Schedule 9.2(a) or 9.2(b)), the deadline for objections to Confirmation of the Plan established pursuant to the Approval Order or other order of the Bankruptcy Court.

66.    <u>Rejection Claims and Rejection Bar Date</u>.  Any Rejection Claim must be filed with the Claims Agent by the earlier of the Rejection Bar Date and 30 days after the entry of this Confirmation Order (the "**Confirmation Bar Date**").  Any Rejection Claim for which a Proof of Claim is not properly filed and served by the Confirmation Bar Date shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors or their respective Estates or properties.  The Debtors or the Reorganized Debtors, as applicable, may contest any Rejection Claim in accordance with, and to the extent provided by, Section 8.1 of the Plan.

67.    <u>Adequate Assurance for Counterparties to Executory Contracts Assumed Under the Plan</u>.  Subject only to the occurrence of the Effective Date, to the extent applicable, all counterparties to all executory contracts and unexpired leases of the Debtors assumed and assigned in accordance with Article 9 of the Plan are deemed to have been provided with adequate assurance of future performance pursuant to Section 365(f) of the Bankruptcy Code.

68.    <u>Operation as of the Effective Date</u>.  As of the Effective Date, unless otherwise provided in the Plan or this Confirmation Order, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and settle and compromise Claims and Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code.

69.    <u>Discharge of Claims and Termination of Interests</u>.  Except as otherwise specifically provided in the Plan, this Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, the rights afforded in the Plan and the payments and distributions to be made thereunder shall discharge all existing debts and Claims, and shall terminate all Interests of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by Section 1141 of the Bankruptcy Code.  Except as otherwise specifically provided in the Plan, this Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, upon the Effective Date, all existing Claims against the Debtors and Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Interests (and all representatives, trustees or agents on

behalf of each holder) shall be precluded and enjoined from asserting against the Reorganized

Debtors, their successors or assignees, or any of their assets or properties, any other or further

Claim or Interest based upon any act or omission, transaction or other activity of any kind or

nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of

Claim and whether or not the facts or legal bases therefore were known or existed prior to the

Effective Date.  Except as otherwise specifically provided in the Plan, this Confirmation Order,

the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement

Order, the Peabody Settlement or the Peabody Settlement Order, this Confirmation Order shall

be a judicial determination of the discharge of all Claims against, liabilities of and Interests in the

Debtors, subject to the occurrence of the Effective Date.

70.    <u>Discharge of Debtors</u>.  Upon the Effective Date and in consideration of the

distributions to be made under the Plan, except as otherwise specifically provided in the Plan,

this Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch

Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order,

each holder (as well as any representatives, trustees or agents on behalf of each holder) of a

Claim or Interest and any Affiliate of such holder shall be deemed to have forever waived,

released and discharged the Debtors, to the fullest extent permitted by Section 1141 of the

Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior

to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and

enjoined, pursuant to Section 524 of the Bankruptcy Code, from prosecuting or asserting any

such discharged Claim against, or terminated Interest in, the Debtors.

71.    <u>Governmental Units</u>.  Nothing in the Plan or this Confirmation Order releases,

discharges, precludes, exculpates, or enjoins the enforcement of: (i) any liability or obligation to,

or any Claim or cause of action by, a Governmental Unit under any applicable Environmental Law to which any Entity is subject as and to the extent that they are the owner, lessee, controller, or operator of real property or a mining operation after the Effective Date (whether or not such liability, obligation, Claim or cause of action is based in whole or part on acts or omission prior to the Confirmation Date); (ii) any liability to a Governmental Unit under any applicable Police or Regulatory Law that is not a Claim; (iii) the Debtors' and Reorganized Debtors' obligations under (1) the Consent Decree in *United States v. Patriot Coal et al.,* 2:09cv0099 (S.D. W.Va.), (2) the settlement and consent order (including subsequent modifications) entered in *Mandirola v. Hobet Mining, LLC and Catenary Coal Co., LLC*, Case Nos. 07-C-03 & 10-C-96 (W. Va. Cir. Ct. Boone County), (3) the settlement and consent order (including subsequent modifications) entered in *Mandirola v. Apogee Coal Co., LLC*, Case No. 10-C-144 (W. Va. Cir. Ct. Logan County), (4) the consent decree and court orders in *Ohio Valley Environmental Coalition, Inc. v. Hobet Mining, LLC, et al.*, Case Nos. 3:07-cv-00413, 3:08-cv-00088, and 3:09-cv-01167 (S.D. W.Va.), and (5) the consent decree in *Ohio Valley Environmental Coalition, Inc. v. Patriot Coal Corp., et al.*, Case No. 3:11-cv-00115 (S.D. W. Va.); (iv) any Claim of a Governmental Unit under any applicable Police or Regulatory Law arising on or after the Confirmation Date; (v) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors; (vi) any liability to a Governmental Unit under the Mine Act, any state mine safety law or the Federal Black Lung Benefit Act (the **"BLBA"**); or (vii) any valid right of setoff or recoupment by any Governmental Unit.  Nothing in the Plan or this Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

72.      Nothing in the Plan or this Confirmation Order, or any documents incorporated by reference herein, including, without limitation, the Peabody Settlement and the Peabody Settlement Order, limits or in any way affects (i) the liability of the Debtors, the Reorganized Debtors, or any third party to successful claimants or the Department of Labor (the **"DOL"**) under the BLBA, (ii) the DOL's power to administer the Mine Act or the BLBA, including, without limitation, the authority to determine whether and under what conditions the Debtors, the Reorganized Debtors, or any third party shall be authorized to self-insure their BLBA liabilities and the form and amount of security necessary to secure those liabilities, or (iii) the liability of, or right of action against, any non-Debtor for any Claim under ERISA by a Governmental Unit.

73.      <u>UMWA Plans, Other UMWA Plans</u>.  For the avoidance of doubt, nothing in the Plan or this Confirmation Order, or any documents incorporated by reference herein, including, without limitation, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, is to be construed as (i) (a) releasing, discharging, precluding, waiving or enjoining the liability of the Reorganized Debtors or any third party to the UMWA 1974 Pension Plan, the UMWA 1992 Benefit Plan or the UMWA Combined Benefit Fund (collectively, the "**UMWA Plans**"), if any, on account of any claim by or on behalf of the UMWA Plans, if any, (b) releasing, discharging, precluding, waiving or enjoining the liability of any third party to the UMWA 2012 Retiree Bonus Account Trust or the UMWA 1993 Benefit Plan (collectively, the "**Other UMWA Plans**"), if any, on account of any claim by or on behalf of the Other UMWA Plans, or (c) releasing, discharging, precluding, waiving or enjoining the liability of the Reorganized Debtors to the Other UMWA Plans, if any, on account of any claim by or on behalf of the Other UMWA Plans, solely, in the case of this subclause (c), to the extent arising on or after the Effective Date;

SA000209

or (ii) affecting the rights and defenses of any party with respect to any such Claim. This provision shall not apply with respect to any Causes of Action of the Debtors or the Reorganized Debtors against Arch or Peabody that are released under the Arch Settlement Order or the Peabody Settlement Order, as applicable, or the Arch Settlement or the Peabody Settlement, as applicable.

74.    <u>Potential LRPB Claims</u>. Nothing in the Plan (including, without limitation, Section 11.4 thereof) or this Confirmation Order, shall (i) release, waive, or discharge the Potential LRPB Claims or (ii) preclude the LRPB Lessors from prosecuting the Potential LRPB Claims against the Reorganized Debtors and/or any other person or entity to the fullest extent permitted by applicable law from and after the Effective Date. Nothing in the Plan or this Confirmation Order or any other order or decree entered into after November 1, 2013 shall be deemed to impair, bar or estop the LRPB Lessors from exercising their rights (i) available pursuant to applicable law or (ii) set forth in the LRPB Lease, in each case from and after the Effective Date.

75.    <u>Term of Injunction or Stay</u>. Unless otherwise provided in the Plan or this Confirmation Order, any injunction or stay arising under or entered during the Chapter 11 Cases under Section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

76.    <u>Exculpation</u>. As provided for in Section 11.6 of the Plan, and except as otherwise specifically provided in the Plan, this Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the

Peabody Settlement Order, to the maximum extent permitted by applicable law, none of the
Exculpated Parties shall have or incur any liability to any holder of a Claim, Cause of Action or
Interest for any act or omission in connection with, related to or arising out of, the Chapter 11
Cases, the negotiation of any settlement or, agreement, contract, instrument, release or document
created or entered into in connection with the Plan or in the Chapter 11 Cases (including the Plan
Supplements, the Rights Offerings, the Backstop Rights Purchase Agreement, the Rights
Offerings Procedures, the DIP Facilities, the UMWA Settlement, the Non-Union Retiree
Settlement Order (including the termination of life insurance benefits in accordance with
paragraph 10 thereof), the Arch Settlement, the Peabody Settlement and, in each case, any
documents related thereto), the Exit Credit Facilities (and, in each case, any documents related
thereto), the pursuit of confirmation of the Plan, the consummation of the Plan, the preparation
and distribution of the Disclosure Statement, the offer, issuance and distribution of any securities
issued or to be issued under or in connection with the Plan, including pursuant to the Rights
Offerings and the Backstop Rights Purchase Agreement, the Backstop Fees, the Backstop
Expense Reimbursement, any other prepetition or postpetition act taken or omitted to be taken in
connection with or in contemplation of the restructuring of the Debtors or the administration of
the Plan or the property to be distributed under the Plan, except for any act or omission that is
determined in a Final Order to have constituted willful misconduct (including, without limitation,
actual fraud) or gross negligence.  Each Exculpated Party shall be entitled to rely upon the advice
of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.

77.    <u>Release by the Debtors</u>.  As provided for in Section 11.7 of the Plan, pursuant to
Section 1123(b) of the Bankruptcy Code, to the maximum extent permitted by applicable law,
and except as otherwise specifically provided in the Plan (including Section 11.12 of the Plan),

this Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch

Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order,

on and after the Effective Date, in exchange for good and valuable consideration, including their

cooperation and contributions to these Chapter 11 Cases, the Released Parties shall be deemed

released and discharged by the Debtors, the Reorganized Debtors and their Estates from any and

all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities

whatsoever, including any derivative claims asserted on behalf of the Debtors, their Estates

and/or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, asserted or

unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud,

contract, violations of federal or state laws, or otherwise, including those Causes of Action based

on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability,

contribution, indemnification, joint liability or otherwise that the Debtors, the Reorganized

Debtors, their estates or their affiliates would have been legally entitled to assert in their own

right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or

other entity or that any holder of a Claim or Interest or other entity would have been legally

entitled to assert for or on behalf of the Debtors, their estates or the Reorganized Debtors, based

on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized

Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any

security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or

events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual

arrangements between any Debtor and any Released Party (excluding any assumed executory

contract or lease), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases,

the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 215 of 340

Case: 2:20-cv-00487    Document 105-18    Filed: 11/22/21    Page 47 of 172    PageID #: 1488
Case 12-51502    Doc 5169    Filed 12/18/13    Entered 12/18/13 15:01:51    Main Document
Pg 46 of 64

Supplements, the DIP Facilities, the Loan Documents (as defined in the Prepetition Credit

Agreement), the Exit Credit Facilities (and, in each case, any documents related thereto), the

Rights Offerings, the Backstop Rights Purchase Agreement, the Rights Offerings Procedures, the

UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement

Order, the Peabody Settlement, the Peabody Settlement Order or, in each case, related

agreements, instruments or other documents, or upon any other act or omission, transaction,

agreement, event or other occurrence taking place on or before the Effective Date, other than

claims or liabilities arising out of or relating to any act or omission of a Released Party that is

determined in a Final Order to have constituted willful misconduct (including, without limitation,

actual fraud) or gross negligence; *provided, however*, that if any Released Party directly or

indirectly brings or asserts any Claim or Cause of Action that has been released or is

contemplated to be released pursuant to the Plan in any way arising out of or related to any

document or transaction that was in existence prior to the Effective Date against the Debtors or

the Reorganized Debtors, or any of their respective Affiliates, officers, directors, members,

employees, advisors, actuaries, attorneys, financial advisors, investment bankers, professionals

or agents, in each case, solely in their capacity as such, then the release set forth in Section 11.7

of the Plan shall automatically and retroactively be null and void *ab initio* with respect to such

Released Party bringing or asserting such Claim or Cause of Action**;** *provided further* that the

immediately preceding proviso shall not apply to (i) any action by a Released Party in the

Bankruptcy Court (or any other court determined to have competent jurisdiction), including any

appeal therefrom, to prosecute the amount, priority or secured status of any prepetition or

ordinary course administrative Claim against the Debtors, (ii) any release or indemnification

provided for in any settlement or granted under any other court order, including, without

limitation, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch

Settlement Order, the Peabody Settlement or the Peabody Settlement Order, (iii) any action by a

Released Party to enforce such Released Party's rights against the Debtors and/or the

Reorganized Debtors under the UMWA Settlement, the UMWA Settlement Order, the Arch

Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order,

or (iv) any action by the DIP Agents or DIP Lenders to enforce their rights under the DIP

Facilities relating to Contingent DIP Obligations or any Approved Second Out DIP L/C

Arrangement, in which case of (i) through (iv), however, the Debtors shall retain all defenses

related to any such action.

78.    <u>Voluntary Releases by the Holders of Claims and Interests</u>.  As provided for in

Section 11.8 of the Plan, except as otherwise specifically provided in this Confirmation Order or

in the Plan (including Section 11.12(c) thereof), for good and valuable consideration, on and

after the Effective Date, to the maximum extent permitted by applicable law, holders of Claims

that (i) are deemed to have accepted the Plan or (ii) (a) voted to accept or reject the Plan and (b)

did not elect (as permitted on the Ballots) to opt out of the releases contained in Section 11.8 of

the Plan shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and

forever, released and discharged the Released Parties from any and all claims, equity interests,

obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever,

including any derivative claims asserted on behalf of the Debtors, the Debtors' Estates and/or the

Reorganized Debtors, whether known or unknown, foreseen or unforeseen, asserted or

unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud,

contract, violations of federal or state laws, or otherwise, including those Causes of Action based

on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability,

contribution, indemnification, joint liability or otherwise that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the restructuring, the Chapter 11 Cases, the DIP Facilities, the Loan Documents (as defined in the Prepetition Credit Agreement), the UMWA Settlement, the UMWA Settlement Order, the Non-Union Retiree Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement, the Peabody Settlement Order, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (excluding any assumed executory contract or lease), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplements, the Rights Offerings, the Exit Credit Facilities Documents, the Backstop Rights Purchase Agreement, the Rights Offerings Procedures, or, in each case, related agreements, instruments or other documents, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; provided that any holder of a Claim that elects to opt out of the releases contained in Section 11.8 of the Plan shall not receive the benefit of the releases set forth in Section 11.8 of the Plan (even if for any reason otherwise entitled); *provided, further,* that no Governmental Unit shall be deemed to have given the foregoing release.

79.    <u>Injunction</u>.  Except as otherwise specifically provided in the Plan, this

Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement,

the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, all Entities

who have held, hold or may hold claims, interests, Causes of Action or liabilities that: (1) are

subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released

pursuant to Section 11.7 of the Plan; (3) have been released pursuant to Section 11.8 of the Plan;

(4) have been released or are contemplated to be released pursuant to the UMWA Settlement, the

UMWA Settlement Order, the Non-Union Retiree Settlement Order, the Arch Settlement, the

Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, (5) are subject

to exculpation pursuant to Section 11.6 of the Plan, including exculpated claims (but only to the

extent of the exculpation provided in Section 11.6 of the Plan); or (6) are otherwise stayed or

terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and

after the Effective Date, from: (a) commencing or continuing in any manner any action or other

proceeding of any kind, whether directly, derivatively or otherwise, including on account of any

claims, interests, Causes of Action or liabilities that have been compromised or settled against

the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property or

estate of any Entity, directly or indirectly, so released or exculpated) on account of or in

connection with or with respect to any released, settled, compromised, or exculpated claims,

interests, Causes of Action or liabilities; (b) enforcing, attaching, collecting, or recovering by any

manner or means any judgment, award, decree, or order against the Debtors, the Reorganized

Debtors, or any Entity so released or exculpated (or the property of the Debtors or the Estates,

the Reorganized Debtors, or any Entity so released or exculpated) on account of or in connection

with or with respect to any such released, settled, compromised, or exculpated claims, interests,

Causes of Action, or liabilities; (c) creating, perfecting or enforcing any lien, claim, or

encumbrance of any kind against the Debtors, the Reorganized Debtors, or any Entity so released

or exculpated (or the property of the Debtors or the Estates, the Reorganized Debtors, or any

Entity so released or exculpated) on account of or in connection with or with respect to any such

released, settled, compromised, or exculpated claims, interests, Causes of Action, or liabilities;

(d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation

due from the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the

property of the Debtors or the Estates, the Reorganized Debtors, or any Entity so released or

exculpated) on account of or in connection with or with respect to any such released, settled,

compromised, or exculpated claims, interests, Causes of Action or liabilities unless such holder

has filed a timely proof of claim with the Bankruptcy Court preserving such right of setoff

pursuant to Section 553 of the Bankruptcy Code or otherwise; and (e) commencing or continuing

in any manner any action or other proceeding of any kind against the Debtors, the Reorganized

Debtors, or any Entity so released or exculpated (or the property of the Debtors or the Estates,

the Reorganized Debtors, or any Entity so released or exculpated) on account of or in connection

with or with respect to any such released, settled, compromised, or exculpated claims, interests,

Causes of Action, or liabilities released, settled or compromised pursuant to the Plan; provided

that nothing contained herein shall preclude an Entity from obtaining benefits directly and

expressly provided to such Entity pursuant to the terms of the Plan; provided, further, that

nothing contained herein shall be construed to prevent any Entity from defending against claims

objections or collection actions whether by asserting a right of setoff or otherwise to the extent

permitted by law.

80.     For the avoidance of doubt, Barclays Bank PLC, Deutsche Bank Securities Inc.,
and issuers of letters of credit under the Exit L/C Credit Agreement are "Exit Credit Facilities
Parties," "Exculpated Parties" and "Released Parties," as used in this Confirmation Order and in
the Plan.

81.     <u>Bankruptcy Court Jurisdiction to Evaluate Scope of Release and Exculpation and
Related Injunction</u>.  Following entry of this Confirmation Order, this Court shall retain exclusive
jurisdiction to consider any and all Claims or Causes of Action subject to the exculpations and
releases in Article 11 of the Plan for the purpose of determining whether such claims belong to
the Debtors' Estates or third parties and all parties shall be enjoined from pursuing any such
Claims or Causes of Action prior to this Court making such determination.  In the event it is
determined that any such Claims or Causes of Action belong to third parties, then, subject to any
applicable subject matter jurisdiction or other statutory limitations, this Court shall have
exclusive jurisdiction with respect to any such litigation, subject to any determination by this
Court to abstain and consider whether such litigation should more appropriately proceed in
another forum.

82.     Except as otherwise provided in this Confirmation Order or in the Plan, and to the
maximum extent permitted by law, all entities who have held, hold or may hold Claims,
Interests, Causes of Action or liabilities that (1) have been released pursuant to Article 11 of the
Plan or (2) are subject to exculpation pursuant to Article 11 of the Plan (such Claims, Interests,
Causes of Action or liabilities, the "**Enjoined Causes of Action**") are permanently enjoined and
precluded, from and after the Effective Date, from commencing or continuing in any manner any
such Enjoined Causes of Action against, as applicable, any Released Party or Exculpated Party,
including, with respect thereto, (i) the enforcement, attachment, collection or recovery by any

manner or means of any judgment, award, decree or order against the Exculpated Parties or the Released Parties (or property of any Exculpated Party or Released Party), (ii) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Exculpated Parties or the Released Parties or against the property or interests in property of the Exculpated Parties or the Released Parties, or (iii) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Exculpated Parties or the Released Parties or against the property or interests in property of the Exculpated Parties or the Released Parties, with respect to any such Claim, Cause of Action or Interest.  Such injunction of the Enjoined Causes of Action shall, to the maximum extent permitted by law, extend to any successors or assignees of the Exculpated Parties or the Released Parties and their respective properties and interest in properties.

83.    <u>Preservations of Causes of Action</u>.

(a)    Except as expressly provided in Article 11 of the Plan, nothing contained in the Plan or this Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or that the Reorganized Debtors may choose to assert on behalf of their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors or representatives or (ii) the turnover of any property of the Debtors' Estates.

(b)    Except as set forth in Article 11 of the Plan, nothing contained in the Plan or this Confirmation Order shall be deemed to be a waiver or relinquishment of any rights

or Causes of Action that the Debtors had immediately prior to the Petition Date or the Effective Date against or with respect to any Claim left Unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such rights and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

(c)     Except as set forth in Article 11 of the Plan, nothing contained in the Plan or this Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in a Plan Supplement) executed in connection with implementation of the Plan.

84.     <u>Retention of Jurisdiction</u>.  In accordance with (and as limited by) Article 14 of the Plan and Section 1142 of the Bankruptcy Code, and except as provided in the Plan and this Confirmation Order, this Court shall have exclusive jurisdiction of all matters arising out of and related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)     To hear and determine all matters relating to the assumption or rejection of executory contracts or unexpired leases and the allowance of Cure amounts and Claims resulting therefrom;

(b)     To hear and determine any motion, adversary proceeding, application, contested matter or other litigated matter pending on or commenced after the Confirmation Date;

SA000220

(c)      To hear and determine all matters relating to the allowance, disallowance, liquidation, classification, priority or estimation of any Claim;

(d)      To hear and determine matters relating to the DIP Facilities and the DIP Order;

(e)      To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(f)      To hear and determine all applications for compensation and reimbursement of Professional Fee Claims;

(g)      To hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement or any order of the Bankruptcy Court, including this Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, this Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing;

(i)      To issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, this Confirmation Order or any other order of this Court;

(j)      To issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan;

(k)     To enter, implement or enforce such orders as may be appropriate in the event this Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(l)     To hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under Section 505(b) of the Bankruptcy Code);

(m)     To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code;

(n)     To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Approval Order, this Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to the Plan, the Disclosure Statement or the Plan Supplements;

(o)     To recover all assets of the Debtors and property of the Debtors' Estates, which shall be for the benefit of the Reorganized Debtors, wherever located;

(p)     To hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(q)     To hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(r)     To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases with respect to any Person;

(s)    To hear and resolve any disputes relating to the Rights Offerings (and the conduct thereof) and the issuances of Rights;

(t)    To hear and resolve any disputes relating to the Backstop Rights Purchase Agreement;

(u)    To hear and resolve any disputes relating to the UMWA Settlement, the UMWA Settlement Order, the Non-Union Retiree Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order; *provided*, *however*, that nothing in the Plan or this Confirmation Order shall alter the alternative dispute resolution provisions of the New CBAs or the MOU;

(v)    To hear any other matter not inconsistent with the Bankruptcy Code; and

(w)    To enter a final decree closing the Chapter 11 Cases.

Notwithstanding the foregoing, nothing in the Plan or this Confirmation Order divests any tribunal of any jurisdiction it may have under applicable Environmental Law to adjudicate any defense asserted under the Plan or this Confirmation Order or grants the Bankruptcy Court any jurisdiction over the Non-Union Retiree VEBA or the Patriot Retirees VEBA.

85.    Enforceability of Plan Documents.  Pursuant to Sections 1123(a) and 1142(a) of the Bankruptcy Code and the provisions of this Confirmation Order, the Plan and all Plan-related documents shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

86.    Ownership and Control. The consummation of the Plan shall not, unless the Debtors expressly agree in writing, constitute a change of ownership or change in control, as such terms are used in any statute, regulation, contract or agreement (including, but not limited to, any agreements assumed by the Debtors pursuant to the Plan or otherwise and any agreements

related to employment, severance or termination agreements or insurance agreements) in effect

on the Effective Date and to which any of the Debtors is a party.

87.    <u>Exemption from Transfer Taxes and Recording Fees</u>.  Pursuant to Section 1146(a)

of the Bankruptcy Code, none of the issuance, Transfer or exchange of notes or equity securities

under the Plan, the creation, the granting, the filing or recording of any mortgage, deed of trust or

other security interest, the making, assignment, filing or recording of any lease or sublease, the

transfer of title to or ownership of any of the Debtors' interests in any property or the making or

delivery of any deed, bill of sale or other instrument of transfer under, in furtherance of, or in

connection with the Plan, including, without limitation, the Exit Credit Facilities, the New

Common Stock, Rights Offering Notes, Rights Offering Warrants or agreements of

consolidation, deeds, bills of sale or assignments executed in connection with any of the

transactions contemplated under the Plan, shall be subject to any document recording tax, stamp

tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax,

mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax

or governmental assessment in the United States.  All sale transactions consummated by the

Debtors and approved by the Court including, without limitation, the transfers effectuated under

the Plan, the sale by the Debtors of owned property or assets pursuant to Section 363(b) of the

Bankruptcy Code, and the assumption, assignment and sale by the Debtors of unexpired leases of

non-residential real property pursuant to Section 365(a) of the Bankruptcy Code, are deemed to

have been made under, in furtherance of, or in connection with the Plan and, therefore, shall not

be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax,

mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial

Code filing or recording fee or other similar tax or governmental assessment in the United States.

The appropriate federal, state and/or local governmental officials or agents are hereby directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

88.    <u>Effectiveness of All Actions</u>.  All actions authorized to be taken pursuant to the Plan shall be effective on, prior to or after the Effective Date pursuant to this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, members or stockholders of Reorganized Patriot Coal or the other Reorganized Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, members or stockholders.

89.    <u>Approval of Consents</u>.  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the schedules to the Plan, the Plan Supplements and the Disclosure Statement and any documents, instruments or agreements, and any amendments or modifications thereto.

90.    <u>Payment of Professionals</u>.  As of January 1, 2014, any requirement that Professionals comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Reorganized Debtors may employ and pay all Professionals and may pay the reasonable and documented fees and expenses of each of the DIP Agents' professionals in accordance with the

DIP Documents and the DIP Order in the ordinary course of business without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

91.    <u>Dissolution of Creditors' Committee</u>.  Upon the Effective Date, the Creditors' Committee shall dissolve automatically, except as provided for in the Plan, and their members shall be released and discharged from all rights, duties, responsibilities and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code.

92.    <u>Disclosure: Agreements and Other Documents</u>.  The Debtors have disclosed all material facts regarding, to the extent applicable, (a) the New Certificate of Incorporation and similar constituent documents, (b) the selection of directors and officers for the Reorganized Debtors, (c) the Restructuring Transactions described in Section 5.6 of the Plan and the Plan Supplements, (d) the distribution of Cash, (e) the New Common Stock, (f) the Rights Offering Notes, (g) the Rights Offering Warrants, (h) the Exit Credit Facilities, (i) the other matters provided for under the Plan involving corporate action to be taken by or required of the Reorganized Debtors, and (j) all contracts, leases, instruments, releases, indentures and other agreements related to any of the foregoing.

93.    <u>AIG</u>.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Debtors' assumption of any Insurance Plans pursuant to the *Stipulation and Order Pursuant to Sections 105(a), 363(b) and 365(a) of the Bankruptcy Code Authorizing and Approving (i) the Debtors' Assumption of Certain Insurance Programs, and (ii) the Debtors' Entry into Insurance Programs* entered on December 10, 2012 [ECF No. 1694] (the "**AIG Assumption Order**") shall be governed by the AIG Assumption Order.

94.     <u>Peabody Settlement</u>.  Nothing herein shall or shall be deemed to limit or impair any relief granted to, or rights of, Peabody pursuant to the Peabody Settlement or the Peabody Settlement Order.

95.     <u>Big Rivers</u>.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the assumption of contract CSA 053 between Patriot Coal Sales LLC and Big Rivers Electric Corporation and its related guaranty GUAR 001, each set forth on Schedule 9.2(a) to the Plan (together, the "**Big Rivers Contract**"), will have no effect upon the ability of any party to the Big Rivers Contract to declare a default under the Big Rivers Contract based upon a failure to perform under the Big Rivers Contract that (i) occurs prior to the Effective Date, (ii) continues to occur after the Effective Date and (iii) results in the occurrence of an event of default under the terms of the Big Rivers Contract after the Effective Date.  Any time periods for performance under the Big Rivers Contract shall not be affected by the Plan or this Confirmation Order.

96.     <u>KU</u>.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, any contracts, instruments, releases or documents entered into by (i) the Debtors and (ii) Kentucky Utilities Company ("**KU**") or Louisville Gas & Electric Company after the Petition Date in the ordinary course of the Debtors' businesses, including, but not limited to, those certain coal supply agreements and corresponding guarantees and the Settlement and Release Agreement to which certain of the Debtors and KU are parties, shall remain in full force and effect and the parties thereto shall remain obligated to perform thereunder to the extent required therein, in each case after the occurrence of the Effective Date.

97.    <u>Alderson Group</u>.  Nothing in the Plan or this Confirmation Order shall preclude any lessor under any of the Debtors' real property leases with Alderson Heirs, LLC, Horse Creek Land and Mining, Lawson Heirs, LLC, Little Coal Land Company, Payne-Gallatin Company, Pocatanico Hills, and Southern Land Company L.P. that were assumed pursuant to an order entered during the Chapter 11 Cases or pursuant to the Plan (collectively, the "**Alderson Group Leases**") from asserting that nothing in the Plan or Confirmation Order releases, discharges, precludes, exculpates, or enjoins the enforcement of (a) any default under the applicable Alderson Group Lease that is not in existence as of the Effective Date or (b) any amount or obligation on account of any claim arising from or relating to any environmental condition, claim, or obligation (if any), in each case to the extent provided for under the applicable Alderson Group Lease, and which, as of the Effective Date is contingent or unliquidated, and, in each case of (i) and (ii), the Debtors shall retain all rights and defenses with respect to any such assertions.

98.    <u>Old Republic</u>.  Notwithstanding anything in the Plan or this Confirmation Order, the Cure in respect of the Claims Service Agreement between Patriot Coal and Old Republic Insurance Company ("**Old Republic**") dated as of February 9, 1988, Contract ID LIT003, as set forth on Schedule 9.2(a) of the Plan, shall not include any amounts asserted by Old Republic in the Patriot PA Litigation (as defined in the Objection of Old Republic Insurance Company to Proposed Cure Amount dated December 9, 2013 [ECF No. 5106]) that result in a default under the CSA (as defined in the Objection of Old Republic Insurance Company to Proposed Cure Amount dated December 9, 2013 [ECF No. 5106]), which amounts, if any, shall be paid by the Debtors upon either an agreement between the Debtors and Old Republic as to any amounts owed to Old Republic, or the entry of a final order in the PA Litigation determining any amounts

owed to Old Republic; *provided*, that such amounts, if any, shall be subject to any offsets agreed between the Debtors and Old Republic or determined pursuant to a final order in the PA Litigation.

99.    <u>Binding Effect</u>.  The Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former holders of Claims or Interests and their respective heirs, executors, administrators, successors and assigns.

100.    <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to the Plan or a schedule or Plan Document provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Missouri, without giving effect to the principles of conflict of laws thereof.

101.    <u>Notice of Entry of Confirmation Order and Effective Date</u>.  Pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c), the Reorganized Debtors shall file and serve notice of entry of this Confirmation Order and Effective Date in substantially the form annexed hereto as Appendix B (the "**Notice of Confirmation**") on all holders of Claims and Interests, the United States Trustee for the Eastern District of Missouri, the attorneys for the Creditors' Committee and other parties in interest by causing the Notice of Confirmation to be delivered to such parties by first-class mail, postage prepaid, within 10 Business Days after the Effective Date.  The Notice of Confirmation shall also be published in *The Wall Street Journal*, *National Edition*, and posted on the Debtors' case information website (located at http://www.patriotcaseinfo.com).  Such notice is adequate under the particular circumstances and is approved and no other or further notice is necessary.  Such Notice of Confirmation shall also

serve as the notice setting forth the Other Administrative Claim Bar Date required by Section 7.2 of the Plan and as the notice of the Effective Date.

102.    <u>Substantial Consummation</u>.  On the Effective Date, the Plan shall be deemed to be substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code.

103.    <u>References to Plan Provisions</u>.  The failure to include or specifically describe or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be approved and confirmed in its entirety.

104.    <u>Findings of Fact</u>.  The determinations, findings, judgments, decrees and orders set forth and incorporated herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law.  Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

105.    <u>Conflicts Between Confirmation Order and Plan</u>.  The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided*, *however*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern over the provisions of the Plan and any such provision of

SA000230

this Confirmation Order shall be deemed a modification of the Plan and shall control and take

precedence.

106. <u>Final Order</u>.  This Confirmation Order is a final order and the period in which an

appeal must be filed shall commence upon the entry hereof.  Notwithstanding Bankruptcy Rule

3020(e) or any other Bankruptcy Rule, this Order shall be immediately effective and enforceable

upon its entry.

<div style="text-align:right;">

*Kathy A. Surratt – States*

KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

</div>

DATED:  December 18, 2013
St. Louis, Missouri
jjh

**Order prepared by**:
Marshall S. Huebner
Brian M. Resnick
Michelle M. McGreal
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017

# APPENDIX A

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

In re:

**PATRIOT COAL CORPORATION,** *et al.*,

**Debtors.**[1]

Chapter 11
Case No. 12-51502-659
(Jointly Administered)

### DEBTORS' FOURTH AMENDED JOINT PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:    (212) 450-4000
Facsimile:    (212) 607-7983
Marshall S. Huebner
Elliot Moskowitz
Brian M. Resnick
Michelle M. McGreal

*Counsel to the Debtors*
*and Debtors in Possession*

Dated:  December 15, 2013

---

[1] The Debtors and their respective employer tax identification numbers are listed in Schedule A hereto.

## TABLE OF CONTENTS

PAGE

ARTICLE 1
DEFINITIONS AND RULES OF INTERPRETATION

| | | |
|---|---|---|
| Section 1.1 | Definitions | 1 |
| Section 1.2 | Rules of Interpretation | 28 |
| Section 1.3 | Computation of Time | 28 |
| Section 1.4 | References to Monetary Figures | 28 |
| Section 1.5 | Exhibits; Schedules; Plan Supplement | 29 |

ARTICLE 2
TREATMENT OF DIP FACILITY CLAIMS, ADMINISTRATIVE CLAIMS AND

PRIORITY TAX CLAIMS

| | | |
|---|---|---|
| Section 2.1 | Treatment of DIP Facility Claims | 29 |
| Section 2.2 | Treatment of Administrative Claims | 30 |
| Section 2.3 | Treatment of Priority Tax Claims | 30 |
| Section 2.4 | Backstop Fees; Breakup Fee; Backstop Expense Reimbursement | 31 |

ARTICLE 3
CLASSIFICATION AND TREATMENT OF OTHER CLAIMS AND INTERESTS

| | | |
|---|---|---|
| Section 3.1 | Classes and Treatment of Claims Against and Interests in the Debtors (Debtors 1-101) | 32 |
| Section 3.2 | Treatment of Claims Against and Interests in the Debtors | 34 |
| Section 3.3 | Treatment of Intercompany Claims | 38 |

ARTICLE 4
ACCEPTANCE OR REJECTION OF THE PLAN

| | | |
|---|---|---|
| Section 4.1 | Voting of Claims | 39 |
| Section 4.2 | Presumed Acceptance of Plan | 39 |
| Section 4.3 | Presumed Rejection of Plan | 39 |
| Section 4.4 | Acceptance by Impaired Classes | 39 |
| Section 4.5 | Elimination of Vacant Classes | 39 |
| Section 4.6 | Consensual Confirmation | 40 |
| Section 4.7 | Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code | 40 |

Section 4.8        Severability; Reservation of Rights ...................................................40

## ARTICLE 5
### IMPLEMENTATION OF THE PLAN

Section 5.1        Continued Corporate Existence ...............................................40
Section 5.2        Section 1145 Exemption ........................................................41
Section 5.3        Authorization of New Common Stock .....................................41
Section 5.4        Cancellation of Existing Securities and Related Agreements and the
                   Indentures........................................................................42
Section 5.5        Settlements............................................................................42
Section 5.6        Financing and Restructuring Transactions...........................43
Section 5.7        Voting Trust(s) ......................................................................45

## ARTICLE 6
### PROVISIONS GOVERNING DISTRIBUTIONS

Section 6.1        Disbursing Agent ...................................................................46
Section 6.2        Timing and Delivery of Distributions....................................47
Section 6.3        Manner of Payment under Plan.............................................49
Section 6.4        Undeliverable or Non-Negotiated Distributions ..................50
Section 6.5        Claims Paid or Payable by Third Parties ...............................51

## ARTICLE 7
### FILING OF ADMINISTRATIVE CLAIMS

Section 7.1        Professional Fee Claims.........................................................51
Section 7.2        Other Administrative Claims .................................................52

## ARTICLE 8
### DISPUTED CLAIMS

Section 8.1        Objections to Claims..............................................................53
Section 8.2        Resolution of Disputed Claims ..............................................53
Section 8.3        Estimation of Claims and Interests .......................................53
Section 8.4        Payments and Distributions for Disputed Claims.................54
Section 8.5        No Amendments to Claims.....................................................56
Section 8.6        No Interest.............................................................................56

## ARTICLE 9
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 9.1        Rejection of Executory Contracts and Unexpired Leases....................57

ii

SA000235

Section 9.2      Schedules of Executory Contracts and Unexpired Leases ....................57
Section 9.3      Categories of Executory Contracts and Unexpired Leases to Be
                 Assumed ..............................................................................................58
Section 9.4      Other Categories of Agreements and Policies ......................................61
Section 9.5      Assumption and Rejection Procedures and Resolution of Treatment
                 Objections ...........................................................................................62
Section 9.6      Rejection Claims ...................................................................................63
Section 9.7      Assignment ...........................................................................................64
Section 9.8      Approval of Assumption, Rejection, Retention or Assignment of
                 Executory Contracts and Unexpired Leases .........................................64
Section 9.9      Modifications, Amendments, Supplements, Restatements or Other
                 Agreements ...........................................................................................65

## ARTICLE 10
PROVISIONS REGARDING CORPORATE GOVERNANCE OF THE REORGANIZED DEBTORS

Section 10.1     Corporate Action ...................................................................................65
Section 10.2     Certificates of Incorporation and Bylaws ............................................66
Section 10.3     Directors and Officers of the Reorganized Debtors ..............................66

## ARTICLE 11
EFFECT OF CONFIRMATION

Section 11.1     Vesting of Assets ..................................................................................67
Section 11.2     Release of Liens ....................................................................................68
Section 11.3     Releases and Discharges .......................................................................68
Section 11.4     Discharge and Injunction ......................................................................68
Section 11.5     Term of Injunction or Stays ..................................................................71
Section 11.6     Exculpation ...........................................................................................71
Section 11.7     Release by the Debtors ..........................................................................72
Section 11.8     Voluntary Releases by the Holders of Claims and Interests .................73
Section 11.9     Injunction .............................................................................................74
Section 11.10    Set-off and Recoupment .......................................................................75
Section 11.11    Avoidance Actions ................................................................................76
Section 11.12    Preservation of Causes of Action ..........................................................76
Section 11.13    Compromise and Settlement of Claims and Controversies ...................77

## ARTICLE 12
CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

Section 12.1     Conditions to Confirmation ..................................................................77
Section 12.2     Conditions to Effectiveness ..................................................................77
Section 12.3     Satisfaction and Waiver of Conditions to Effectiveness .......................78

iii

## ARTICLE 13
### MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

Section 13.1     Plan Modifications ................................................................79
Section 13.2     Revocation or Withdrawal of the Plan and Effects of Non-
               Occurrence of Confirmation or Effective Date .....................79

## ARTICLE 14
### RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

## ARTICLE 15
### MISCELLANEOUS

Section 15.1     Exemption from Transfer Taxes and Recording Fees ...........82
Section 15.2     Expedited Tax Determination ...............................................83
Section 15.3     Payment of Fees and Expenses of the Indenture Trustees....83
Section 15.4     Payment of Statutory Fees ....................................................83
Section 15.5     Dissolution of the Creditors' Committee and the Non-Union Retiree
               Committee .............................................................................83
Section 15.6     Plan Supplement ...................................................................84
Section 15.7     Claims Against Other Debtors ..............................................84
Section 15.8     Substantial Consummation ...................................................84
Section 15.9     Section 1125 of the Bankruptcy Code ..................................84
Section 15.10    Severability ...........................................................................84
Section 15.11    Governing Law ......................................................................85
Section 15.12    Binding Effect .......................................................................85
Section 15.13    Notices ..................................................................................85
Section 15.14    Reservation of Rights ...........................................................87
Section 15.15    Further Assurances ...............................................................87
Section 15.16    Case Management Order .......................................................87

iv

## Schedules

Schedule A:                    Debtor Entities
Schedule B:                    Debtor Groups

Schedule 9.2(a):               Executory Contracts and Unexpired Leases to Be Assumed
Schedule 9.2(b):               Executory Contracts and Unexpired Leases to Be Rejected

v

# INTRODUCTION

Pursuant to section 1121(a) of the Bankruptcy Code,[2] the Debtors in the above-captioned jointly administered Chapter 11 Cases respectfully propose the Plan. The Debtors are the proponents of the Plan under section 1129 of the Bankruptcy Code.

A complete list of the Debtors is set forth in Schedule A to the Plan. The list identifies each Debtor by its case number in these Chapter 11 Cases and by its Employer Identification Number, and assigns a number and three-letter identifier to each Debtor for classification purposes.

The Plan contemplates the reorganization of the Debtors and the resolution of all outstanding Claims against, and Interests in, the Debtors.

Pursuant to section 1125(b) of the Bankruptcy Code, votes to accept or reject a plan of reorganization cannot be solicited from holders of Claims or Interests entitled to vote on a plan until a disclosure statement has been approved by a bankruptcy court and distributed to such holders. On November 7, 2013, the Bankruptcy Court entered the Approval Order that, among other things, approved the Disclosure Statement, set voting procedures and scheduled the Confirmation Hearing. The Disclosure Statement that accompanies the Plan contains, among other things, a discussion of the Debtors' history, businesses, properties and operations, projections for those operations, risk factors associated with the Debtors' businesses and the Plan, and a summary and analysis of the Plan and certain related matters.

## ARTICLE 1
### DEFINITIONS AND RULES OF INTERPRETATION

### Section 1.1    Definitions

Unless the context requires otherwise, the following terms used in the Plan shall have the following meanings:

1.  "**Additional Debtors**" means Brody Mining, LLC and Patriot Ventures LLC.

2.  "**Adjustment Distribution**" has the meaning set forth in Section 8.4(b)(iii) of the Plan.

3.  "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the Backstop Fees, the Breakup Fee (if any), the Backstop Expense Reimbursement, Other Administrative Claims and Professional Fee Claims (excluding, for the avoidance of doubt, DIP Facility Claims).

---

[2] Capitalized terms shall have the meanings ascribed to them in Section 1.1 of the Plan.

4.    "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.    "**Allowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim against any Debtor (i) that has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time, as liquidated in amount and not disputed or contingent, and for which no contrary or superseding Proof of Claim has been filed, (ii) that has been expressly allowed by Final Order or under the Plan, (iii) that has been compromised, settled or otherwise resolved pursuant to the Claims Settlement Procedures Order, another Final Order of the Bankruptcy Court or Section 8.2 of the Plan or (iv) that the Debtors do not timely object to in accordance with Section 8.1 of the Plan; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan shall not be considered "Allowed" for any other purpose under the Plan or otherwise, except if and to the extent otherwise determined to be Allowed as provided herein.  Unless otherwise specified under the Plan, under the Bankruptcy Code, by order of the Bankruptcy Court or as otherwise agreed by the Debtors, Allowed Claims shall not, for any purpose under the Plan, include any interest, costs, fees or charges on such Claims from and after the Petition Date.

6.    "**Approval Order**" means the Order (i) Approving Disclosure Statement; (ii) Approving Solicitation and Notice Materials; (iii) Approving Forms of Ballots; (iv) Establishing Solicitation and Voting Procedures; (v) Establishing Procedures for Allowing and Estimating Certain Claims for Voting Purposes; (vi) Scheduling a Confirmation Hearing and (vii) Establishing Notice and Objection Procedures, entered by the Bankruptcy Court on November 7, 2013, together with any supplemental order(s) that may be entered by the Bankruptcy Court in connection therewith.

7.    "**Approved Second Out DIP L/C Arrangement**" means the treatment of any Second Out DIP L/C consented to by the Second Out DIP Lenders as provided for in paragraph 23 of the DIP Order.

8.    "**Arch**" means Arch Coal, Inc. and its subsidiaries and affiliates.

9.    "**Arch Settlement**" means the settlement between the Debtors and Arch approved by the Bankruptcy Court on November 7, 2013, the terms of which are incorporated herein by reference.

10.    "**Arch Settlement Order**" means the order of the Bankruptcy Court approving the Arch Settlement.

11.    "**Assumption Effective Date**" means the date upon which the assumption of an executory contract or unexpired lease under the Plan is deemed effective, which in no case shall be later than the Effective Date unless otherwise agreed by the relevant Assumption Party.

12.   "**Assumption Party**" means a counterparty to an executory contract or unexpired lease to be assumed and/or assigned by the Debtors under the Plan.

13.   "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

14.   "**Backstop Approval Order**" means the Order Pursuant to 11 U.S.C. §§ 363(b)(1) and 105(a) (i) Authorizing Entry into a Backstop Purchase Agreement, (ii) Authorizing the Debtors to Conduct the Rights Offerings in Connection with the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and (iii) Approving Rights Offerings Procedures, entered by the Bankruptcy Court on November 7, 2013.

15.   "**Backstop Commitment Percentage**" has the meaning set forth in the Backstop Rights Purchase Agreement.

16.   "**Backstop Expense Reimbursement**" means the Debtors' obligations (approved by the Bankruptcy Court under the Backstop Approval Order) to reimburse the Backstop Parties' third-party fees and expenses in accordance with the terms of the Backstop Rights Purchase Agreement.

17.   "**Backstop Fee**" means the backstop fee approved by the Bankruptcy Court under the Backstop Approval Order and required to be paid to the Backstop Parties in a form in accordance with the Backstop Rights Purchase Agreement.

18.   "**Backstop Parties**" has the meaning set forth in the Backstop Rights Purchase Agreement.

19.   "**Backstop Rights Purchase Agreement**" means the Backstop Rights Purchase Agreement by and among the Debtors and the Backstop Parties party thereto, and consented to by the Creditors' Committee and the UMWA, dated as of November 4, 2013.

20.   "**Ballot**" means the voting form distributed to each holder of an Impaired Claim entitled to vote, on which the holder is to indicate acceptance or rejection of the Plan in accordance with the Voting Instructions and make any other elections or representations required pursuant to the Plan or the Approval Order.

21.   "**Bankruptcy Code**" means title 11 of the United States Code, as now in effect or hereafter amended, to the extent applicable to the Chapter 11 Cases.

22.   "**Bankruptcy Court**" means the United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases, and, with respect to withdrawal of any reference under section 157 of title 28 of the United States Code and/or order of a district court pursuant to section 157(a) of title 28 of the United States Code, the United States District Court for the

3

Eastern District of Missouri. The term "Bankruptcy Court" shall also refer to the Bankruptcy Court for the Southern District of New York, where applicable.

23. "**Bankruptcy Court's Website**" means *www.moeb.uscourts.gov*.

24. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, each as now in effect or as hereafter amended, to the extent applicable to the Chapter 11 Cases.

25. "**Bar Date Order**" means (a) with respect to the Initial Debtors, the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, entered by the Bankruptcy Court on October 18, 2012 [ECF No. 1388]; (b) with respect to Brody Mining, LLC, the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, entered by the Bankruptcy Court on September 27, 2013 [Case No. 13-48727, ECF No. 14]; and (c) with respect to Patriot Ventures LLC, the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, entered by the Bankruptcy Court on September 27, 2013 [Case No. 13-48728, ECF No. 14].

26. "**Beneficial Ballots**" means the ballots upon which Beneficial Holders shall indicate to Nominees their acceptance or rejection of the Plan in accordance with the Voting Instructions.

27. "**Beneficial Holder**" or "**Beneficial Ownership**" means, with respect to any security, having "beneficial ownership" of such security (as determined pursuant to Rule 13d-3 of the Exchange Act).

28. "**BLBA**" means the Federal Black Lung Benefit Act, 30 U.S.C. §§ 901-944.

29. "**Board**" means, as of any date prior to the Effective Date, Patriot Coal's then-existing board of directors, including any duly formed committee thereof.

30. "**Breakup Fee**" has the meaning set forth in the Backstop Rights Purchase Agreement.

31. "**Business Day**" means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or any other day on which banking institutions in either New York, New York or St. Louis, Missouri are required or authorized to close by law or executive order.

32. "**Case Management Order**" means, before the Effective Date, the *Order Establishing Notice, Case Management and Administrative Procedures*, entered by the Bankruptcy Court on March 22, 2013 [ECF No. 3361], and, on and after the Effective Date, such order as modified by Section 15.16 hereof.

33.     "**Cash**" means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

34.     "**Cause of Action**" means, without limitation, any and all actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of set-off, recoupment rights, suits, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, franchises, Claims, and including alter-ego claims and claims under chapter 5 of the Bankruptcy Code as well as any claims or rights created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Petition Date, counterclaims, cross-claims, affirmative defenses and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law, in equity or otherwise in any court, tribunal, forum or proceeding, under any local, state, federal, foreign, statutory, regulatory or other law or rule, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

35.     "**Certified Eligible Holder**" has the meaning set forth in the Rights Offerings Procedures.

36.     "**Chapter 11 Cases**" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the applicable Petition Date, pending in the Bankruptcy Court with the case numbers as set forth in Schedule A to the Plan, that are jointly administered in the case styled *In re: Patriot Coal Corporation*, Case No. 12-51502-659.

37.     "**Charging Lien**" means, collectively, the Convertible Notes Charging Lien and the Senior Notes Charging Lien.

38.     "**Claim**" means a "claim," as defined in section 101(5) of the Bankruptcy Code.

39.     "**Claims Agent**" means GCG, Inc., which is located at 1985 Marcus Ave., Suite 200, Lake Success, New York 11042.

40.     "**Claims Objection Deadline**" means 11:59 p.m. (prevailing Central Time) on the 365th calendar day after the Effective Date, subject to further extensions and/or exceptions as may be ordered by the Bankruptcy Court.

41.     "**Claims Objection Procedures Order**" means the *Order Establishing Procedures for Claims Objections*, entered by the Bankruptcy Court on March 1, 2013 [ECF No. 3021].

42.     "**Claims Settlement Procedures Order**" means the *Order Authorizing and Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action*, entered by the Bankruptcy Court on February 13, 2013 [ECF No. 2821].

43.    "**Class**" means any group of Claims or Interests classified by the Plan pursuant to section 1122(a) of the Bankruptcy Code.

44.    "**Collateral**" means any property or interest in property of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance and is not otherwise invalid under the Bankruptcy Code or other applicable law.

45.    "**Confirmation**" means confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

46.    "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court on its docket.

47.    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

48.    "**Confirmation Order**" means the order of the Bankruptcy Court entered pursuant to section 1129 of the Bankruptcy Code confirming the Plan.

49.    "**Contingent**" means, when used in reference to a Claim, any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event that has not yet occurred as of the date on which such Claim is sought to be estimated or on which an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

50.    "**Contingent DIP Obligations**" means all of the Debtors' obligations under the DIP Documents and the DIP Order that are contingent and/or unliquidated (including, without limitation, those set forth in Section 12.04 of the First Out DIP Facility and Section 10.04 of the Second Out DIP Facility), other than DIP Obligations that are paid in full in Cash (or, in the case of any Outstanding L/C, Paid in Full) on or prior to the Effective Date.

51.    "**Convenience Class Claim**" means (i) a Claim against any of the Debtors that would otherwise be a General Unsecured Claim and that is greater than $0 and less than or equal to $500,000 in Allowed amount or (ii) a Claim against any of the Debtors that would otherwise be a General Unsecured Claim in an amount greater than $500,000 but which is reduced to $500,000 by an irrevocable written election of the Holder of such Claim made on a properly executed and delivered Ballot; *provided*, *however*, that a General Unsecured Claim originally Allowed in an amount in excess of $500,000 may not be sub-divided into multiple Claims of $500,000 or less for purposes of receiving treatment as a Convenience Class Claim.

52.    "**Convenience Class Consideration**" means Cash in the amount of $3 million.

6

53.     "**Convertible Notes**" means those certain 3.25% Convertible Senior Notes due 2013 in the aggregate principal amount of $200,000,000 issued pursuant to the Convertible Notes Indenture.

54.     "**Convertible Notes Charging Lien**" means the lien of the Convertible Notes Trustee, arising under the Convertible Notes Indenture, upon any distributions relating to or on account of Convertible Notes, securing the payment of, including without limitation, the fees and expenses of the Convertible Notes Trustee, including fees and expenses of counsel and other professionals engaged by, on behalf of or for the benefit of the Convertible Notes Trustee, whether incurred prepetition, postpetition or before or after the Effective Date, in each case, solely as provided for in the Convertible Notes Indenture.

55.     "**Convertible Notes Indenture**" means that certain Indenture, dated as of May 28, 2008, between Patriot Coal and the Convertible Notes Trustee.

56.     "**Convertible Notes Trustee**" means U.S. Bank National Association, in its capacity as indenture trustee under the Convertible Notes Indenture.

57.     "**Creditor**" means any holder of a Claim.

58.     "**Creditors' Committee**" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as constituted from time to time.

59.     "**Cure**" means a distribution made in the ordinary course of business following the Effective Date pursuant to an executory contract or unexpired lease assumed under section 365 or 1123 of the Bankruptcy Code (i) in an amount equal to the Proposed Cure (including if such Proposed Cure is zero dollars) or (ii) if a Treatment Objection is filed with respect to the applicable Proposed Cure, then in an amount equal to the unpaid monetary obligations owing by the Debtors and required to be paid pursuant to section 365(b) of the Bankruptcy Code, as may be (x) determined by Final Order or (y) otherwise agreed upon by the parties, in consultation with the Creditors' Committee (if prior to the Effective Date).

60.     "**Customer Programs**" means the Debtors' customer programs and practices, including, without limitation, prepayment, true-up, and invoice correction programs, as to which the Debtors were authorized to honor prepetition obligations and to otherwise continue in the ordinary course of business by the *Final Order Authorizing (i) Debtors to Honor Prepetition Obligations to Customers in the Ordinary Course of Business and (ii) Financial Institutions to Honor and Process Related Checks and Transfers*, entered by the Bankruptcy Court on August 2, 2012 [ECF No. 254].

61.     "**D&O Liability Insurance Policies**" means all insurance policies for directors', managers' and officers' liability (including employment practices liability and fiduciary

liability) maintained by the Debtors issued prior to the Effective Date, including as such policies may extend to employees, and any such "tail" policies.

62.    "**Debtor-Weighted**" means (i) with respect to a Convertible Notes Claim or a General Unsecured Claim or Convenience Class Claim against a Group 1 Debtor, the amount of such Claim, (ii) with respect to a General Unsecured Claim or Convenience Class Claim against a Group 2 Debtor, the amount of such Claim multiplied by two (2) and (iii) with respect to a General Unsecured Claim or Convenience Class Claim against a Group 3 Debtor, the amount of such Claim multiplied by three (3).

63.    "**Debtors**" means each of the entities listed in Schedule A of the Plan. To the extent that the context requires any reference to the Debtors after the Effective Date, Debtors shall mean the Reorganized Debtors.

64.    "**Debtors' Case Information Website**" means *www.patriotcaseinfo.com*.

65.    "**DIP Agents**" means, collectively, the First Out DIP Agent and the Second Out DIP Agent.

66.    "**DIP Documents**" has the meaning set forth in the DIP Order.

67.    "**DIP Facilities**" means, collectively, the First Out DIP Facility and the Second Out DIP Facility.

68.    "**DIP Facility Claim**" means any Claim of any DIP Agent, DIP Lender or L/C Issuer against a Debtor arising out of or related to the DIP Facilities, including, without limitation, the Superpriority Claims and DIP Liens granted pursuant to, and each as defined in, the DIP Order.

69.    "**DIP Lender**" means any lender under either of the DIP Facilities as of the Effective Date.

70.    "**DIP Order**" means the *Final Order (i) Authorizing Debtors (a) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (b) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (ii) Granting Adequate Protection to Pre-Petition Secured Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 And 364*, entered by the Bankruptcy Court on August 3, 2012 [ECF No. 275], as amended pursuant to the *Supplemental DIP Financing Order Authorizing, Pursuant to 11 U.S.C. §§ 363 and 364, (i) Amendment to the DIP Financing, (ii) Engagement of the First Out DIP Agent in Connection Therewith, (iii) Payment of Fees Related Thereto, and (iv) Waiver of Bankruptcy Rule 6004(h) Stay*, entered by the Bankruptcy Court on August 21, 2013 [ECF No. 4498], and as each of the foregoing has been or is hereafter modified, amended, supplemented or extended from time to time during the Chapter 11 Cases.

71. "**Disallowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim against any Debtor that (i) has been disallowed by a Final Order of the Bankruptcy Court, (ii) is listed in the Schedules as "$0," contingent, disputed or unliquidated and as to which a proof of claim bar date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, (iii) has been agreed to be equal to "$0" or to be expunged pursuant to the Claims Settlement Procedures Order or otherwise or (iv) is not listed on the Schedules and as to which a proof of claim bar date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

72. "**Disbursing Agent**" means Reorganized Patriot Coal or any Person or Entity designated or retained by the Reorganized Debtors, in their sole discretion and without the need for any further order of the Bankruptcy Court, to serve as disbursing agent for Claims.

73. "**Disclosure Statement**" means the disclosure statement relating to the Plan, including all exhibits, appendices and schedules thereto, as amended, supplemented or modified from time to time, in each case, as approved pursuant to section 1125 of the Bankruptcy Code by the Bankruptcy Court in the Approval Order.

74. "**Disputed**" means, when used in reference to a Claim, any Claim or any portion thereof that is neither an Allowed Claim nor a Disallowed Claim.

75. "**Disputed Claims Reserve**" has the meaning set forth in Section 8.4(b)(i) of the Plan.

76. "**Distribution Date**" means any of (i) the Initial Distribution Date, (ii) each Interim Distribution Date and (iii) the Final Distribution Date.

77. "**Distribution Record Date**" means the Confirmation Date.

78. "**DOL**" means the United States Department of Labor.

79. "**DTC**" means the Depository Trust Company.

80. "**Effective Date**" means the Business Day selected by the Debtors that is (i) on or after the Confirmation Date and on which date no stay of the Confirmation Order is in effect and (ii) on or after the date on which the conditions to effectiveness of the Plan specified in Section 12.1 of the Plan have been either satisfied or waived as set forth herein.

81. "**Eligibility Certificate Deadline**" means November 27, 2013 at 5:00 p.m. (prevailing Central Time) or such later time as determined by the Debtors in their sole discretion.

82. "**Eligible Affiliate**" means an affiliate of an Eligible Holder or Backstop Party that is also an Eligible Holder (or would be an Eligible Holder if such affiliate were a holder of an

9

Allowed Senior Notes Claim, Allowed Convertible Notes Claim or Allowed General Unsecured Claim).

83.    "**Eligible Holder**" means a holder of an Allowed Senior Notes Claim, Allowed Convertible Notes Claim and/or Allowed General Unsecured Claim that is (i) a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act or an entity in which all of the equity owners are such "qualified institutional buyers," or (ii) an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), (5), (6) or (7) of the Securities Act, or an entity in which all of the equity owners are such "accredited investors."

84.    "**Employee Agreement**" means any agreement (other than a standard form acknowledgement or undertaking by newly-hired employees for the benefit of any of the Debtors) between, or any offer letter issued by, any of the Debtors and/to any current or former directors, officers or employees of any of the Debtors.

85.    "**Entity**" or "**entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

86.    "**Environmental Law**" means all federal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law, all judicial and administrative orders, agreements and determinations and all common law concerning pollution or protection of the environment, or environmental impacts on human health and safety, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act; the Clean Water Act; the Clean Air Act; the Emergency Planning and Community Right-to-Know Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the Resource Conservation and Recovery Act; the Safe Drinking Water Act; the Surface Mining Control and Reclamation Act; the Toxic Substances Control Act; and any state or local equivalents.

87.    "**ERISA**" means the Employee Retirement Income Security Act of 1974, 29, U.S.C. § 1001, et seq.

88.    "**Estate**" means, individually, the estate of each of the Debtors and collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code. These Estates were jointly administered for procedural purposes only pursuant to the *Order Directing Joint Administration of Chapter 11 Cases* [ECF No. 30], the *Order Directing Joint Administration of Chapter 11 Cases* [Case No. 13-48727, ECF No. 16], and the *Order Directing Joint Administration of Chapter 11 Cases* [Case No. 13-48728, ECF No. 16].

89.    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

90.    "**Exculpated Parties**" means the Released Parties.

10

91.    "**Existing Note**s" means, collectively, the Senior Notes and the Convertible Notes.

92.    "**Exit ABL Credit Agreement**" means a revolving facility to be entered into by the Reorganized Debtors, the material terms of which are set forth in the Plan Supplement.

93.    "**Exit Credit Facilities**" means, collectively, the Exit ABL Credit Agreement, the Exit Term Loan Credit Agreement, the Exit L/C Credit Agreement and/or any additional or alternative sources of exit financing, which shall provide for sufficient financing to repay the DIP Facility Claims in Cash in full (or, in the case of any Outstanding L/C, Paid in Full) prior to or as of the Effective Date.

94.    "**Exit Credit Facilities Documents**" means all loan and security documents, intercreditor agreements and other documents and filings, in each case related to the Exit Credit Facilities and as the same may be amended, restated, supplemented or otherwise modified from time to time.

95.    "**Exit Credit Facilities Parties**" means the banks, financial institutions and other lenders party to the Exit Credit Facilities from time to time, each in their capacity as such.

96.    "**Exit L/C Credit Agreement**" means a letter of credit facility to be entered into by the Reorganized Debtors, the material terms of which are set forth in the Plan Supplement.

97.    "**Exit Term Loan Credit Agreement**" means a term loan credit facility to be entered into by the Reorganized Debtors, the material terms of which are set forth in the Plan Supplement.

98.    "**Final Distribution Date**" means a date selected by the Reorganized Debtors in their sole discretion that is after the Initial Distribution Date and is no earlier than 20 calendar days after the date on which all Disputed General Unsecured Claims and Disputed Convenience Class Claims have become either Allowed Claims or Disallowed Claims.

99.    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired and no appeal, petition for certiorari or motion for a new trial, re-argument or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial, review, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, as made applicable by Rule 9024 of the Federal Rules of Bankruptcy Procedure, may be filed relating to such order shall not cause such order to not be a Final Order.

100.  "**First Out DIP Agent**" means Citibank, N.A. in its capacity as administrative agent under the First Out DIP Facility.

101.  "**First Out DIP Facility**" means that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of July 9, 2012, among, *inter alios*, Patriot Coal as Borrower, the lenders party thereto from time to time and the First Out DIP Agent, as approved by the Bankruptcy Court pursuant to the DIP Order, including any amendments, restatements, modifications or extensions thereof.

102.  "**Foreign Agreements**" means all executory contracts or unexpired leases as to which the Debtors were authorized to pay their prepetition debts in the ordinary course of business pursuant to the *Final Order Authorizing (i) Debtors to Pay Prepetition Obligations Owed to Foreign Creditors and (ii) Financial Institutions to Honor and Process Related Checks and Transfers*, entered by the Bankruptcy Court on August 2, 2012 [ECF No. 256].

103.  "**General Unsecured Claim**" means any prepetition Claim against any of the Debtors that is not a DIP Facility Claim, Other Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Senior Notes Claim, Convertible Notes Claim, Convenience Class Claim, Section 510(b) Claim or Intercompany Claim, including any unsecured claims under section 506(a)(1) of the Bankruptcy Code.

104.  "**Governmental Unit**" means a "governmental unit," as defined in section 101(27) of the Bankruptcy Code.

105.  "**Group 1 Debtors**" means each of the entities listed as a Group 1 Debtor in Schedule B of the Plan.

106.  "**Group 2 Debtors**" means each of the entities listed as a Group 2 Debtor in Schedule B of the Plan.

107.  "**Group 3 Debtors**" means each of the entities listed as a Group 3 Debtor in Schedule B of the Plan.

108.  "**GUC Rights**" means Rights to purchase up to 4.62% of the Rights Offering Notes and up to 4.62% of the Rights Offering Warrants.  The aggregate combined Subscription Purchase Price of the GUC Rights shall be $11,551,155.

109.  "**GUC Stock Allocation**" means New Class A Stock representing 5% of the New Common Stock, subject to any future dilution by shares of New Class A Common Stock issued in respect of the Rights Offering Warrants and management incentive packages.

110.  "**Impaired**" means, when used in reference to a Claim, any Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code.

111. "**Indemnification Obligation**" means any obligation of any Debtor to indemnify directors, officers or employees of any of the Debtors who served in such capacity, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective articles or certificates of incorporation, corporate charters, bylaws, operating agreements or similar corporate documents or other applicable contract or law in effect as of the Effective Date.

112. "**Indemnity Agreements**" has the meaning set forth in Section 9.3(b) of the Plan.

113. "**Indentures**" means, collectively, the Convertible Notes Indenture and the Senior Notes Indenture.

114. "**Indenture Trustees**" means, collectively, the Convertible Notes Trustees and the Senior Notes Trustee.

115. "**Initial Debtors**" means Patriot Coal and the Subsidiary Debtors that filed chapter 11 petitions on July 9, 2012.

116. "**Initial Distribution Date**" means a day selected by the Reorganized Debtors in their sole discretion that is as soon as reasonably practicable after the Effective Date.

117. "**Insurance Plans**" means the Debtors' insurance policies and any agreements, documents or instruments relating thereto entered into before the Petition Date; *provided*, *however*, that the Insurance Plans shall not include the D&O Liability Insurance Policies.

118. "**Intercompany Claim**" means any Claim by a Debtor against another Debtor.

119. "**Intercompany Contract**" means a contract solely between two or more Debtors entered into before the Petition Date.

120. "**Interest**" means any equity security within the meaning of section 101(16) of the Bankruptcy Code including, without limitation, all issued, unissued, authorized or outstanding shares of stock or other equity interests (including common and preferred), together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

121. "**Interim Compensation Order**" means the *Order to Establish Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals*, entered by the Bankruptcy Court on August 2, 2012 [ECF No. 262].

122. "**Interim Distribution Date**" means the date that is no later than 180 calendar days after the Initial Distribution Date or the most recent Interim Distribution Date thereafter, with such periodic Interim Distribution Dates occurring until the Final Distribution Date has

occurred, it being understood that the Reorganized Debtors may increase the frequency of Interim Distribution Dates in their sole discretion as circumstances warrant.

123. "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

124. "**IRS**" means the Internal Revenue Service of the United States of America.

125. "**Knighthead**" means Knighthead Capital Management, LLC, solely on behalf of certain funds and accounts it manages and/or advises.

126. "**L/C**" means any letter of credit issued under either the First Out DIP Facility or the Second Out DIP Facility.

127. "**L/C Issuer**" means the issuer of an L/C under the First Out DIP Facility or the Second Out DIP Facility, as applicable.

128. "**Lien**" means a "lien," as defined in section 101(37) of the Bankruptcy Code.

129. "**LRPB Lease**" means that certain lease dated September 28, 1984 among LaFollette, Robson, Prichard & Broun, et al., Cedar Coal Co. and The Charleston Bank, N.A., as Trustee (as amended, assigned (in part or in whole), transferred, extended, subleased or as the rights derived from that certain lease were conveyed or assumed by the Debtors from time to time).

130. "**LRPB Lessors**" means LML Properties, LLC; PRC Holdings, LLC; Wright Holdings, LLC; AAW Holdings, LLC; Kanawha Boone Holdings, LLC; Prichard School, LLC; The Board of Trustees of Prichard School; LML-AAW Holdings LLC; RBL-AAW Holdings LLC; LaFollette Holdings, LTD; Robert B. LaFollette Holdings, LLC; Broun Properties, LLC; City National Bank of West Virginia, as successor Trustee under a trust agreement dated December 30, 1983 with A.M. Prichard, Lewis Prichard III, and Sarah Ann Prichard and their respective spouses; Riverside Park, Inc.; H.A. Robson Trust; Riverside Park, Inc.; James A. LaFollette Holdings, LLC; Latelle M. LaFollette Trust for Alice A. Wright; Latelle M. LaFollette Trust for Marjorie J. Wright; Robert B. LaFollette Trust for Alice A. Wright; Robert B. LaFollette Trust for Marjorie J. Wright; and Alice Ann Wright.

131. "**LRPB Proofs of Claim**" means, collectively, in each case (i) with reference to the proof of claim number assigned by the Debtors' claims and noticing agent and (ii) as filed on or prior to the date hereof, proof of claim numbers 2701, 2702, 2703, 2704, 2705, 2706, 2716, 2717, 2718, 2719, 2720, 2721, 2722, 2723, 2724, 2725, 2726, 2727, 2728, 2729, 2730, 2731, 2732, 2733, 2734, 2735, 2736, 2737, 2738, 2739, 2740, 2741, 2742, 2743, 2744, 2745, 2746, 2919, 2920, 2921, 2934, 2935, 2936, 2969, 2970, 2971, 2972, 2973, 2974, 2975, 2976, 2977, 2978, 2979, 2980, 2981, 2982, 2983, 2984, 2985, 2986, 2987, 2988, 2989, 2990, 2991, 2992, 2993, 2994, 2995, 2996, 2997, 2998, 2999, 3000, 3001, 3002, 3003, 3004, 3005, 3006, 3317, 3318 and 3319.

14

132.  "**Master Ballots**" means the master ballots upon which the Nominees of Beneficial Holders shall indicate acceptances and rejections of the Plan in accordance with the Voting Instructions.

133.  "**Mine Act**" means the Federal Mine Safety and Health Act of 1977, as amended by the Miner Act of 2006.

134.  "**MOU**" means that Memorandum of Understanding between the UMWA and Patriot Coal, dated August 26, 2013, in the form approved by the UMWA Settlement Order, as has been or is hereafter modified, amended or supplemented.

135.  "**New Board**" means the board of directors of Reorganized Patriot Coal on the Effective Date.

136.  "**New Bylaws**" means the bylaws of Reorganized Patriot Coal, which shall be substantially in the form set forth in the Plan Supplement and in form and substance reasonably acceptable to the Backstop Parties.

137.  "**New CBAs**" has the meaning set forth in the UMWA Settlement Order.

138.  "**New Certificate of Incorporation**" means the certificate of incorporation of Reorganized Patriot Coal, which shall be substantially in the form set forth in the Plan Supplement and in form and substance reasonably acceptable to the Backstop Parties.

139.  "**New Common Stock**" means, collectively, New Class A Common Stock and New Class B Common Stock.

140.  "**New Class A Common Stock**" means the shares of common stock, par value $.01 per share, of Reorganized Patriot Coal to be authorized and issued hereunder or for purposes specified herein, which shall be entitled to a single vote per share on all matters on which the New Common Stock is entitled to vote.

141.  "**New Class B Common Stock**" means the shares of common stock, par value $.01 per share, of Reorganized Patriot Coal to be authorized and issued hereunder or for purposes specified herein, which shall be entitled to 100 votes per share on all matters on which the New Common Stock is entitled to vote.

142.  "**New Securities**" has the meaning set forth in Section 5.2 of the Plan.

143.  "**New Stockholders' Agreement**" means the stockholders' agreement substantially in the form included in the Plan Supplement to be entered into by and among Reorganized Patriot Coal, the Backstop Parties and certain other holders of New Class A Common Stock or Rights Offering Warrants whose number of shares of New Class A Common Stock plus the number of shares of New Class A Common Stock into which their Rights Offering Warrants could be exercised for would, in the aggregate, be equal to or greater

SA000253

than five percent of the total number of outstanding shares of New Class A Common Stock (calculated on a fully diluted basis).

144.    "**Nominee**" means any broker, dealer, commercial loans institution, financial institution or other nominee (or its mailing agent) in whose name securities are registered or held of record on behalf of a Beneficial Holder.

145.    "**Non-Union Retiree Committee**" means the Official Committee of Non-Represented Retirees appointed by the United States Trustee on March 7, 2013 pursuant to section 1114 of the Bankruptcy Code.

146.    "**Non-Union Retiree Settlement Order**" means the *Order Authorizing the Modification and Termination of Certain Non-Vested Benefits for Non-Union Retiree Benefit Participants Pursuant to 11 U.S.C. §§ 105(a) and 363(b)*, entered by the Bankruptcy Court on April 26, 2013 [ECF No. 3849], the terms of which are incorporated herein by reference.

147.    "**Non-Union Retiree VEBA**" means the voluntary employees' beneficiary association within the meaning of section 501(c)(9) of the Internal Revenue Code, authorized by the Bankruptcy Court to be established by the Non-Union Retiree Committee.

148.    "**Notes Rights**" means the subscription rights to purchase the Rights Offering Notes.

149.    "**Notes Rights Offering**" means the rights offering for the Rights Offering Notes as described in Section 5.6 of the Plan.

150.    "**Notice of Intent to Assume or Reject**" means a notice delivered by the Debtors or by the Reorganized Debtors pursuant to Article 9 of the Plan stating an intent to assume or reject an executory contract or unexpired lease and including a proposed Assumption Effective Date or Rejection Effective Date, as applicable, and, if applicable, a Proposed Cure and/or a proposed assignment.

151.    "**Ordinary Course Professionals Order**" means the *Order Authorizing the Debtors to Employ Ordinary Course Professionals Nunc Pro Tunc to the Petition Date*, entered by the Bankruptcy Court on August 2, 2012 [ECF No. 263].

152.    "**Other Administrative Claim**" means an Administrative Claim, other than Professional Fee Claims, the Backstop Fees, the Breakup Fee (if any), the Backstop Expense Reimbursement or fees and charges assessed against the Estates pursuant to section 1930 of title 28 of the United States Code and/or section 3717 of title 31 of the United States Code (which shall be paid pursuant to Section 15.4 of the Plan).

153.    "**Other Administrative Claim Bar Date**" means the date that is 30 calendar days after the Effective Date.

154. "**Other Priority Claim**" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment pursuant to section 507(a) of the Bankruptcy Code.

155. "**Other Secured Claim**" means any Secured Claim, and for the avoidance of doubt, excludes DIP Facility Claims.

156. "**Outstanding L/C**" means any L/C that is outstanding on the Effective Date.

157. "**Paid in Full**" means (a) in respect of any Outstanding L/C under the First Out DIP Facility, any of the following:  (i) such L/C shall have been canceled (as evidenced by return of the original L/C to the applicable L/C Issuer for cancelation or, if no original was issued, written confirmation from the beneficiary of the L/C to the L/C Issuer, via swift or in the form of a release letter, that such Outstanding L/C is no longer in effect) or replaced with a letter of credit issued under the Exit Credit Facilities, (ii) such L/C shall have been collateralized in Cash in an amount equal to 103% of all L/C Obligations (as defined in the First Out DIP Facility) in respect of such L/C, pursuant to documentation in form and substance reasonably satisfactory to the First Out DIP Agent and the applicable L/C Issuer, (iii) a back-to-back letter of credit in an amount equal to 103% of all L/C Obligations (as defined in the First Out DIP Facility) in respect of such L/C shall have been provided to the applicable L/C Issuer on terms and from a financial institution acceptable to such L/C Issuer or (iv) such other treatment shall have been provided with respect to such L/C as the Debtors, the First Out DIP Agent, the Required Revolving Lenders (as defined in the First Out DIP Facility) and the applicable L/C Issuer shall agree; and (b) in respect of each Outstanding L/C under the Second Out DIP Facility, any of the following:  (i) such L/C shall have been canceled (as evidenced by return of the original L/C to the applicable L/C Issuer for cancelation or, if no original was issued, written confirmation from the beneficiary of the L/C to the L/C Issuer, via swift or in the form of a release letter, that such Outstanding L/C is no longer in effect) or replaced with a letter of credit issued under the Exit Credit Facilities, (ii) such L/C shall have been collateralized in Cash in an amount equal to 103% of all L/C Obligations (as defined in the Second Out DIP Facility) in respect of such L/C, pursuant to documentation in form and substance reasonably satisfactory to the Second Out DIP Agent and the applicable L/C Issuer or (iii) any Approved Second Out DIP L/C Arrangement.

158. "**Patriot Coal**" means Patriot Coal Corporation, a Delaware corporation.

159. "**Patriot Retirees VEBA**" means the Patriot Retirees Voluntary Employee Benefit Association.

160. "**Peabody**" means Peabody Energy Corporation and its subsidiaries and affiliates.

161. "**Peabody Settlement**" means the settlement among the Debtors and Patriot Coal's wholly-owned non-debtor subsidiaries and affiliates, the UMWA, on behalf of itself, and as the authorized representative of the UMWA Employees (as defined in the Peabody

17

SA000255

Settlement) and the UMWA Retirees (as defined in the Peabody Settlement), and Peabody, approved by the Bankruptcy Court on November 7, 2013, the terms of which are incorporated herein by reference.

162. "**Peabody Settlement Order**" means the order of the Bankruptcy Court approving the Peabody Settlement.

163. "**Person**" or "**person**" means a person as defined in section 101(41) of the Bankruptcy Code.

164. "**Petition Date**" means, with respect to the Initial Debtors, July 9, 2012, the date on which the Initial Debtors commenced the Chapter 11 Cases, and, where relevant, the time of the filing of the Initial Debtors' chapter 11 petitions on such date, and, with respect to the Additional Debtors, September 23, 2013, the date on which the Additional Debtors commenced the Chapter 11 Cases, and, where relevant, the time of the filing of the Additional Debtors' chapter 11 petitions on such date.

165. "**Plan**" means this Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, including the Plan Supplement and all exhibits, supplements, appendices and schedules to any of the foregoing, as any of them may be amended or modified from time to time hereunder or in accordance with applicable law.

166. "**Plan Documents**" means the agreements, instruments and documents to be executed, delivered, assumed and/or performed in conjunction with the consummation of the Plan on and after the Effective Date, including, without limitation, (i) the New Bylaws, (ii) the New Certificate of Incorporation, (iii) the Reorganized Subsidiary Debtors' Certificates of Incorporation, (iv) the Reorganized Subsidiary Debtors' Bylaws and (v) any other documents listed in the Plan Supplement.

167. "**Plan Supplement**" means, collectively, the documents, agreements, instruments, schedules and exhibits and forms thereof to be filed as specified in Section 15.6 of the Plan as the Plan Supplement, as each such document, agreement, instrument, schedule and exhibit and form thereof may be altered, restated, modified or replaced from time to time, including subsequent to the filing of any such documents, in each case, in form and substance reasonably acceptable to the Backstop Parties. Each such document, agreement, instrument, schedule or exhibit or form thereof is referred to herein as a "Plan Supplement." For the avoidance of doubt, Schedules 9.2(a) and 9.2(b) hereto shall not be deemed to be included in the "Plan Supplement."[3]

---

[3] The Plan Supplement may include, among other documents, the following: (a) the form of the New Certificate of Incorporation and other organizational documents of the Debtors; (b) the form or material terms of the Exit Credit Facilities Documents; (c) the identity and affiliations of each director and officer of the Reorganized Debtors; (d) a list of certain contractual indemnification obligations assumed by the Debtors pursuant to Section 9.3(d) of the Plan; (e) the form of Rights Offering Notes and related Rights Offering Notes Indenture; (f) the form of (…continued)

168. "**Police or Regulatory Law**" means any police or regulatory statute or regulation including, but not limited to, Environmental Law, the Mine Act, the BLBA, and ERISA.

169. "**Potential LRPB Claims**" means, collectively, (i) the claims set forth in the LRPB Proofs of Claim; (ii) any claims arising from the Global Settlement Agreement dated November 15, 2012 between Patriot Coal, the Ohio Valley Environmental Coalition, Inc., the Sierra Club, and the West Virginia Highlands Conservancy (the "**GSA**") and/or the Order approving the GSA, and (iii) any and all claims arising from or related to the LRPB Lease.

170. "**Prepetition Credit Agreement**" means that certain Amended and Restated Credit Agreement, dated as of May 5, 2010 among Patriot Coal as Borrower, the Prepetition Credit Agreement Lenders and the Prepetition Credit Agreement Agent, as the same may have been amended, restated, supplemented or otherwise modified from time to time.

171. "**Prepetition Credit Agreement Agent**" means Bank of America, N.A., in its capacity as administrative agent under the Prepetition Credit Agreement.

172. "**Prepetition Credit Agreement Lenders**" means the lenders and issuers of letters of credit under the Prepetition Credit Agreement.

173. "**Priority Claims**" means, collectively, Priority Tax Claims and Other Priority Claims.

174. "**Priority Tax Claim**" means a Claim (whether secured or unsecured) of a Governmental Unit entitled to priority pursuant to section 507(a)(8) or specified under section 502(i) of the Bankruptcy Code.

175. "**Pro Rata Share**" has the meaning set forth in the Rights Offerings Procedures.

176. "**Professional**" means a person retained in the Chapter 11 Cases by separate Bankruptcy Court order pursuant to sections 327 and 1103 of the Bankruptcy Code or otherwise, but not including any person retained pursuant to the Ordinary Course Professionals Order.

177. "**Professional Fee Claims**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses or other charges and disbursements incurred during the period from the Petition Date through and including the Confirmation Date.

178. "**Proof of Claim**" means a proof of claim filed by a holder of a Claim in accordance with the Bar Date Order.

(continued…)

Rights Offering Warrants and related Rights Offering Warrant Agreement and (g) the form of Registration Rights Agreement.

179. "**Proposed Cure**" means, for a particular executory contract or unexpired lease, the consideration that the Debtors propose (which may be zero or some amount greater than zero) on a Notice of Intent to Assume or Reject as full satisfaction of the Debtors' obligations with respect to such executory contract or unexpired lease pursuant to section 365(b) of the Bankruptcy Code.

180. "**Ratable Share**" means, as of a date certain:

(i)   For an Allowed Senior Notes Parent Claim (other than an Allowed Senior Notes Parent Claim that has received or will receive Senior Notes Class Cash Consideration), the ratio of the Allowed Senior Notes Parent Claim to the aggregate amount of all Allowed Senior Notes Parent Claims as of such date.

(ii)   For an Allowed Senior Notes Parent Claim that has received or will receive Senior Notes Class Cash Consideration, the ratio of the Allowed Senior Notes Parent Claim to the aggregate amount of all Allowed Senior Notes Parent Claims that have received or will receive Senior Notes Class Cash Consideration as of such date.

(iii)   For an Allowed Convertible Notes Claim (other than an Allowed Convertible Notes Claim that has received or will receive Convenience Class Consideration in accordance with Article 3 of the Plan, if any), the ratio of the Debtor-Weighted Allowed Convertible Notes Claim to the Debtor-Weighted (a) aggregate amount of all Allowed Convertible Notes Claims and Allowed General Unsecured Claims as of such date plus (b) the estimated aggregate value of all Disputed General Unsecured Claims as of such date as reasonably determined by the Disbursing Agent (excluding in each of case (a) and (b) the aggregate amount of all Allowed Convertible Notes Claims and Allowed or Disputed General Unsecured Claims that have received or will or are expected to receive (as reasonably determined by the Disbursing Agent) Convenience Class Consideration in accordance with Article 3 of the Plan, if any), as such denominator may be adjusted in accordance with Article 3 of the Plan.

(iv)   For an Allowed General Unsecured Claim (other than an Allowed General Unsecured Claim that has received or will receive Convenience Class Consideration in accordance with Article III of the Plan, if any), the ratio of the Debtor-Weighted Allowed General Unsecured Claim to the Debtor-Weighted (a) aggregate amount of all Allowed Convertible Notes Claims and Allowed General Unsecured Claims as of such date plus (b) the estimated aggregate value of all Disputed General Unsecured Claims as of such date, as reasonably determined by the Disbursing Agent (in each of case (a) and (b) excluding the aggregate amount of all Allowed Convertible Notes Claims and Allowed or Disputed General Unsecured Claims that have received or will or are estimated to receive (as reasonably determined by the Disbursing Agent) Convenience Class Consideration in accordance with Article III of the Plan, if any), as such denominator may be adjusted in accordance with Article III of the Plan.

20

(v)     For an Allowed Convenience Class Claim (or an Allowed Convertible Notes Claim or Allowed General Unsecured Claim that has received or will receive Convenience Class Consideration in accordance with Article III of the Plan, if any), the ratio of the Debtor-Weighted Allowed Convenience Class Claim (or, in the case of a Convertible Notes Claim or a General Unsecured Claim that will receive Convenience Class Consideration in accordance with Article III of the Plan, if any, such Debtor-Weighted Convertible Notes Claim or Debtor-Weighted General Unsecured Claim, as applicable) to the Debtor-Weighted aggregate amount of (a) all Allowed Convenience Class Claims as of such date plus (b) the estimated aggregate value of all Disputed Convenience Class Claims as of such date, as reasonably determined by the Disbursing Agent plus (c) the estimated aggregate amount of all Convertible Notes Claims and Allowed or Disputed General Unsecured Claims as of such date, as reasonably determined by the Disbursing Agent, that will receive Convenience Class Consideration in accordance with Article III of the Plan.

181.    "**Registration Rights Agreement**" means the registration rights agreement for Reorganized Patriot Coal, substantially in the form set forth in the Plan Supplement

182.    "**Reinstated**" or "**Reinstatement**" means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the holder thereof so as to leave such Claim or Interest Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding and without giving effect to any contractual provision or applicable law that entitles a Creditor to demand or receive accelerated payment of a Claim after the occurrence of a default, (A) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (B) reinstating the maturity of such Claim as such maturity existed before such default, (C) compensating the Creditor for any damages incurred as a result of any reasonable reliance by such Creditor on such contractual provision or such applicable law and (D) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Creditor; *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, without limitation, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated to accomplish Reinstatement.

183.    "**Rejection Bar Date**" means the deadline for filing Proofs of Claim arising from the rejection of an executory contract or unexpired lease, which deadline shall be 30 calendar days after the Debtors serve notice of the entry of an order (including, without limitation, the Confirmation Order) approving the rejection of such executory contract or unexpired lease.

184.    "**Rejection Claim**" means a Claim under section 502(g) of the Bankruptcy Code.

21

SA000259

185. "**Rejection Effective Date**" means the date upon which the rejection of an executory contract or unexpired lease under the Plan is deemed effective.

186. "**Rejection Party**" means a counterparty to an executory contract or unexpired lease to be rejected by the Debtors under the Plan.

187. "**Released Parties**" means (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Agents; (d) the DIP Lenders; (e) the L/C Issuers; (f) the arrangers, bookrunners and any syndication agent under the DIP Facilities; (g) the Prepetition Credit Agreement Agent; (h) the Prepetition Credit Agreement Lenders; (i) the arrangers under the Prepetition Credit Agreement; (j) the Creditors' Committee and its current and former members; (k) the Exit Credit Facilities Parties; (l) the Backstop Parties; (m) the Senior Notes Trustee; (n) the Convertible Notes Trustee; (o) Arch; (p) Peabody; (q) the UMWA; and (r) as to each of the foregoing entities in clauses (a) through (q), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and their current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other Professionals (in each case, solely in their capacity as such); *provided* that "Released Parties" shall not include ArcLight Capital Partners, LLC, or any of its current or former owners, shareholders, directors, officers, managers, employees or advisors (in each case, solely in its capacity as such).

188. "**Reorganized Debtors**" means, collectively, each of the Debtors, and any successor thereto, whether by merger, consolidation or otherwise, on and after the Effective Date.

189. "**Reorganized Patriot Coal**" means Patriot Coal, and any successor thereto, whether by merger, consolidation or otherwise, on and after the Effective Date.

190. "**Reorganized Subsidiary Debtors**" means, collectively, each of the Reorganized Debtors other than Reorganized Patriot Coal.

191. "**Reorganized Subsidiary Debtors' Bylaws**" means the bylaws of the Reorganized Subsidiary Debtors.

192. "**Reorganized Subsidiary Debtors' Certificates of Incorporation**" means, collectively, the certificates of incorporation of each of the Reorganized Subsidiary Debtors or, if any Reorganized Subsidiary Debtor is merged into another entity pursuant to the Restructuring Transactions, then the surviving entity of such merger.

193. "**Restructuring Transactions**" means those transactions described in Section 5.6 of the Plan.

194. "**Rights**" means, collectively, the Notes Rights and the Warrants Rights.

SA000260

195. "**Rights Offering Notes**" means the 15% senior secured second lien notes issued by the Reorganized Debtors in the aggregate principal amount of $250 million.

196. "**Rights Offering Notes Indenture**" means the indenture governing the Rights Offering Notes, which indenture shall be in form and substance reasonably satisfactory to the Backstop Parties and otherwise in form and substance substantially similar to the form included in the Plan Supplement.

197. "**Rights Offering Warrant Agreement**" means the warrant agreement governing the Rights Offering Warrants, which agreement shall be in form and substance reasonably satisfactory to the Backstop Parties and otherwise in form and substance substantially similar to the form included in the Plan Supplement.

198. "**Rights Offering Warrants**" means the warrants to acquire New Class A Common Stock.

199. "**Rights Offerings**" means, collectively, the Notes Rights Offering and the Warrants Rights Offering described in Section 5.6(a) of the Plan.

200. "**Rights Offerings Procedures**" means the procedures with respect to the Rights Offerings authorized pursuant to the Backstop Approval Order.

201. "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements have been or may be supplemented, modified or amended from time to time.

202. "**Second Out DIP Agent**" means Bank of America, N.A. in its capacity as administrative agent under the Second Out DIP Facility.

203. "**Second Out DIP Facility**" means that certain Amended and Restated Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of July 11, 2012, among, *inter alios*, Patriot Coal as Borrower, the lenders party thereto from time to time and the Second Out DIP Agent, as approved by the Bankruptcy Court pursuant to the DIP Order, including any amendments, restatements, modifications and extensions thereof.

204. "**Second Out DIP Facility Claims**" means DIP Facility Claims arising under the Second Out DIP Facility.

205. "**Section 510(b) Claims**" means any Claim or Cause of Action against any of the Debtors (i) arising from rescission of a purchase or sale of shares, notes or any other securities of any of the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws, misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (iv) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on

23

account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of securities or (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims or Causes of Action.

206. "**Secured Claim**" means any Claim or portion thereof other than a DIP Facility Claim or a Priority Tax Claim (i) that is reflected in the Schedules or a Proof of Claim as a secured claim and is secured by a Lien on Collateral, to the extent of the value of such Collateral, as determined in accordance with section 506(a) and, if applicable, section 1129(b) of the Bankruptcy Code or (ii) to the extent that the holder thereof has a valid right of set-off pursuant to section 553 of the Bankruptcy Code.

207. "**Securities Act**" means the Securities Act of 1933, as amended.

208. "**Senior Notes**" means those certain 8.25% Senior Notes due 2018 issued in the aggregate principal amount of $250,000,000 pursuant to the Senior Notes Indenture.

209. "**Senior Notes Charging Lien**" means the lien of the Senior Notes Trustee, arising under the Senior Notes Indenture, upon any distributions relating to or on account of Senior Notes, securing the payment of, including, without limitation, the fees and expenses of the Senior Notes Trustee, including fees and expenses of counsel and other professionals engaged by, on behalf of or for the benefit of the Senior Notes Trustee, whether incurred prepetition, postpetition or before or after the Effective Date, in each case, solely as provided for in the Senior Notes Indenture.

210. "**Senior Notes Claims**" means, collectively, the Senior Notes Parent Claims and the Senior Notes Guarantee Claims.

211. "**Senior Notes Class Cash Consideration**" means Cash in the amount equal to the lesser of (i) ten percent (10%) of the principal amount of the Senior Notes underlying the Allowed Senior Notes Claims held by holders that are entitled to receive Senior Notes Class Cash Consideration pursuant to section 3.2(c) of the Plan and (ii) $5 million.

212. "**Senior Notes Guarantee Claim**" means a Claim asserted against a Subsidiary Debtor by a holder of, and on account of, a Senior Note.

213. "**Senior Notes Indenture**" means that certain Indenture dated as of May 5, 2010 by and among Patriot Coal and the Senior Notes Trustee, and substantially all of the Subsidiary Debtors as guarantors (as amended and/or supplemented from time to time, including, without limitation, by that certain First Supplemental Indenture dated as of May 5, 2010 and that certain Second Supplemental Indenture dated as of May 5, 2010).

214. "**Senior Notes Parent Claim**" means a Claim asserted against Patriot Coal by a holder of, and on account of, a Senior Note.

24

215.    "**Senior Notes Rights**" means Rights to purchase up to 55.38% of the Rights Offering Notes and up to 55.38% of the Rights Offering Warrants for an aggregate combined Subscription Purchase Price of $138,463,845.

216.    "**Senior Notes Stock Allocation**" means New Class A Common Stock that represents 60% of the New Common Stock, subject to any future dilution by shares of New Class A Common Stock issued in respect of the Rights Offering Warrants and management incentive packages.

217.    "**Senior Notes Trustee**" means Wilmington Trust Company, in its capacity as indenture trustee under the Senior Notes Indenture.

218.    "**Servicer**" means an indenture trustee, owner trustee, pass-through trustee, subordination agent, agent, servicer or any other authorized representative of Creditors recognized by the Debtors or the Reorganized Debtors.

219.    "**Solicitation Agent**" means GCG, Inc., the Debtors' solicitation agent.

220.    "**Subscription Form**" means the form sent to each Certified Eligible Holder, in substantially the form attached as Annex B to the Rights Offerings Procedures.

221.    "**Subscription Purchase Price**" has the meaning set forth in the Rights Offerings Procedures.

222.    "**Subsidiary Debtors**" means, collectively, each of the Debtors except Patriot Coal.

223.    "**Sureties**" means all sureties that have issued one or more of the Surety Bonds.

224.    "**Surety Bonds**" means each of the surety bonds listed in Exhibit B to the *Debtors' Motion for an Order Authorizing the Debtors to Continue and Renew Surety Bond Program* [ECF No. 18].

225.    "**Transfer**" and words of like import mean, as to any security or the right to receive a security or to participate in any offering of any security (each, a "**security**" for purposes of this definition), the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in or other disposition of such security or the Beneficial Ownership thereof, the offer to make such a sale, transfer, constructive sale or other disposition, and each option, agreement, arrangement or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing. The term "**constructive sale**" for purposes of this definition means a short sale with respect to such security, entering into or acquiring an offsetting derivative contract with respect to such security, entering into or acquiring a futures or forward contract to deliver such security, or entering into any transaction that has substantially the same effect as any of the foregoing.

25

226. "**Treatment Objection**" means an objection to the Debtors' proposed assumption or rejection of an executory contract or unexpired lease pursuant to the provisions of the Plan (including an objection to the proposed Assumption Effective Date or Rejection Effective Date, the Proposed Cure and/or any proposed assignment, but not including an objection to any Rejection Claim) that is properly filed with the Bankruptcy Court and served in accordance with the Case Management Order by the applicable Treatment Objection Deadline.

227. "**Treatment Objection Deadline**" means the deadline for filing and serving a Treatment Objection, which deadline shall be 4:00 p.m. (prevailing Central Time) on, (i) for an executory contract or unexpired lease listed on Schedule 9.2(a) or 9.2(b), the 15th calendar day after the relevant schedule is filed and notice thereof is mailed, (ii) for an executory contract or unexpired lease the proposed treatment of which has been altered by an amended or supplemental Schedule 9.2(a) or 9.2(b), the 15th calendar day after such amended or supplemental schedule is filed and notice thereof is mailed, (iii) for an executory contract or unexpired lease for which a Notice of Intent to Assume or Reject is filed, the 15th calendar day after such notice is filed and notice thereof is mailed and (iv) for any other executory contract or unexpired lease, including any to be assumed or rejected by category pursuant to Sections 9.1, 9.3 or 9.4 of the Plan (without being listed on Schedule 9.2(a) or 9.2(b)), the deadline for objections to Confirmation of the Plan established pursuant to the Approval Order or other applicable order of the Bankruptcy Court.

228. "**UMWA**" means the United Mine Workers of America.

229. "**UMWA Settlement**" means the "Settlements" as defined in and approved by the UMWA Settlement Order, including the New CBAs, the MOU and the VFA, the terms of each of which are incorporated herein by reference, as it may be supplemented or modified.

230. "**UMWA Settlement Order**" means the *Order Pursuant to 11 U.S.C. §§ 363(b), 1113, 1114(e) and 105(a) and Fed. R. Bankr. P. 9019(a) Authorizing Entry Into Collective Bargaining Agreements and Memorandum of Understanding with the United Mine Workers of America*, entered by the Bankruptcy Court on August 22, 2013 [ECF No. 4511], as it may be supplemented or modified.

231. "**UMWA Stock Allocation**" means New Class A Common Stock that represents 35% of the New Common Stock, subject to dilution by shares of New Class A Common Stock issued in respect of the Rights Offering Warrants.

232. "**Unimpaired**" means any Claim or Interest that is not Impaired.

233. "**United States of America**" or "**United States**" means the United States of America and its federal agencies.

SA000264

234.  "**United States Trustee**" means the United States Trustee for Region 13.

235.  "**Unliquidated**" means, when used in reference to a Claim, any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is sought to be estimated.

236.  "**Unsubscribed Rights**" means any Rights that have not been duly subscribed for and fully paid in accordance with the Rights Offerings Procedures.

237.  "**VFA**" means that Agreement to Fund the VEBA between Patriot Coal and the UMWA, dated as of August 26, 2013, in the form approved by the UMWA Settlement Order, as has been or is hereafter modified, amended or supplemented.

238.  "**Voting Deadline**" means the date established by the Approval Order by which the Solicitation Agent must actually receive a valid Ballot properly voting on the Plan in order for such vote to count as a vote to accept or reject the Plan.  Such deadline is 4:00 p.m. (prevailing Central Time) on December 10, 2013.

239.  "**Voting Instructions**" means the instructions for voting on the Plan contained in the Approval Order, Article 7 of the Disclosure Statement and the Ballots, the Master Ballots and the Beneficial Ballots.

240.  "**Voting Record Date**" means the record date for voting on the Plan, which shall be October 30, 2013.

241.  "**Voting Trust**" means a trust established under Section 5.7 hereof to hold in trust certain shares of the New Class B Common Stock.

242.  "**Voting Trust Agreement**" means the agreement governing one or more Voting Trusts substantially in the form included in the Plan Supplement.

243.  "**Voting Trust Beneficiaries**" means the beneficiaries of a Voting Trust.

244.  "**Voting Trustee**" means a trustee of a Voting Trust.

245.  "**Warrants Rights**" means the subscription rights to purchase the Rights Offering Warrants.

246.  "**Warrants Rights Offering**" means the rights offering for the Rights Offering Warrants as described in Section 5.6 of the Plan.

247.  "**Workers' Compensation Plan**" means each of the Debtors' written contracts, agreements, agreements of indemnity and qualified self-insurance for workers' compensation and/or black lung bonds, policies, programs and plans for workers' compensation and/or black lung insurance entered into prior to the Petition Date.

SA000265

### Section 1.2        Rules of Interpretation

Unless otherwise specified, all article, section, exhibit, schedule or Plan Supplement references in the Plan are to the respective article in, section in, exhibit to, schedule to or Plan Supplement to the Plan, as the same may be amended, waived or modified from time to time in accordance with the terms hereof or thereof.    The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular article, section, subsection or clause contained herein.    Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and any pronoun stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender.    Captions and headings in the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof.    Whenever the words "include," "includes" or "including" are used in the Plan, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.    References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.    Any references herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions.    If a particular term of the Plan (including any exhibits, schedules or Plan Supplement hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan or any settlement or other agreement contemplated hereunder, the definitive documentation, settlement or other agreement shall control and shall be binding on the parties thereto.

As to any reference in the Plan to a consent, approval or acceptance by any party, or to an issue, agreement, order or other document (or the terms thereof) that shall be reasonably acceptable to any such party, such consent, approval or acceptance shall not be unreasonably conditioned, delayed or withheld.

### Section 1.3        Computation of Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.    If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

### Section 1.4        References to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### Section 1.5        Exhibits; Schedules; Plan Supplement

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.  Copies of such exhibits, schedules and Plan Supplement can be obtained by downloading such documents from the Debtors' Case Information Website or the Bankruptcy Court's Website.

# ARTICLE 2
## TREATMENT OF DIP FACILITY CLAIMS, ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

### Section 2.1        Treatment of DIP Facility Claims

Pursuant to the DIP Order, all DIP Facility Claims constitute Allowed Claims.  Except to the extent that a holder of a DIP Facility Claim agrees in its sole discretion to less favorable treatment, on or before the Effective Date, each DIP Agent, for the benefit of the applicable DIP Lenders, L/C Issuers and itself, shall be paid in Cash 100% of the then-outstanding amount, if any, of the DIP Facility Claims relating to the applicable DIP Facility (or, in the case of any Outstanding L/C, Paid in Full), other than Contingent DIP Obligations.  Contemporaneously with all amounts owing in respect of principal included in the DIP Facility Claims (other than Contingent DIP Obligations), interest accrued thereon to the date of payment and fees, expenses and non-contingent indemnification obligations as required by the DIP Facilities and arising prior to the Effective Date being paid in full in Cash (or, in the case of any Outstanding L/C, Paid in Full), (i) the commitments under the DIP Facilities shall automatically terminate, (ii) except with respect to Contingent DIP Obligations (which shall survive the Effective Date and shall continue to be governed by the DIP Facilities as provided below), the DIP Facilities and the "Loan Documents" referred to therein shall be deemed canceled, (iii) all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facilities shall automatically terminate, and all Collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agents or DIP Lenders and (iv) all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Facility Claims shall be automatically discharged and released, in each case without further action by the DIP Agents or DIP Lenders.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (a) the Contingent DIP Obligations shall survive the Effective Date on an unsecured basis and shall not be discharged or released pursuant to the Plan or the Confirmation Order and (b) the DIP Facilities and the Loan Documents referred to therein shall continue in full force and effect with respect to any obligations thereunder governing (i) the Contingent DIP Obligations and (ii) the relationships among the DIP Agents, the L/C Issuers and the DIP Lenders, as applicable, including but not limited to those provisions relating to the rights of the DIP Agents and the L/C Issuers to expense reimbursement, indemnification and other similar amounts (either from the Debtors or the DIP Lenders) and any provisions that may survive termination or maturity of the DIP Facilities in accordance with the terms thereof.

29

After the Effective Date, the Reorganized Debtors shall continue to reimburse the DIP Agents for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agents in accordance with the DIP Documents and the DIP Order.

The DIP Agents and the DIP Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors.

### Section 2.2    Treatment of Administrative Claims

**(a)    Other Administrative Claims**

Except to the extent that the applicable Creditor agrees to less favorable treatment with the Reorganized Debtors, each holder of an Allowed Other Administrative Claim against any of the Debtors shall be paid the full unpaid amount of such Allowed Other Administrative Claim in Cash (i) on or as soon as reasonably practicable after the Effective Date (for Claims Allowed as of the Effective Date), (ii) on or as soon as practicable after the date such Claims are Allowed (or upon such other terms as may be agreed upon by such holder and the applicable Reorganized Debtor) or (iii) as otherwise ordered by the Bankruptcy Court.

Allowed Other Administrative Claims regarding assumed agreements, liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and non-ordinary course liabilities approved by the Bankruptcy Court shall be paid in full and performed by the Reorganized Debtors in the ordinary course of business (or as otherwise approved by the Bankruptcy Court) in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

**(b)    Professional Fee Claims**

Each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to Section 7.1 hereof.

### Section 2.3    Treatment of Priority Tax Claims

Except to the extent that the applicable Creditor has been paid by the Debtors before the Effective Date, or the applicable Reorganized Debtor and such Creditor agree to less favorable treatment, each holder of an Allowed Priority Tax Claim against any of the Debtors shall receive, at the sole option of the Reorganized Debtors, (a) payment in full in Cash made on or as soon as reasonably practicable after the later of the Effective Date and the first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (b) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the

30

holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Reorganized Debtors shall have the right, in their sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

Notwithstanding anything to the contrary herein, if the Reorganized Debtors fail to make a regular installment payment when due to a holder of a Priority Tax Claim pursuant to this Section 2.3, if applicable, and if the failure to make such payment is not cured within 35 days from the date a holder of a Priority Tax Claim sends notice of the default to the Reorganized Debtors, such holder may exercise all rights and remedies available under nonbankruptcy law to collect such payment without further notice to or action by the Bankruptcy Court.

### Section 2.4       Backstop Fees; Breakup Fee; Backstop Expense Reimbursement

The Backstop Fees, the Breakup Fee, if any, and the Backstop Expense Reimbursement shall be Allowed Administrative Claims, without reduction or offset, in the full amount due and owing under the Backstop Rights Purchase Agreement.  On the Effective Date, if not previously satisfied in full in accordance with the terms of the Backstop Rights Purchase Agreement, any outstanding Backstop Expense Reimbursement shall be paid in Cash and any outstanding Backstop Fee shall be paid in the form of additional Rights Offering Notes and additional Rights Offering Warrants in accordance with the Backstop Rights Purchase Agreement.

## ARTICLE 3
### CLASSIFICATION AND TREATMENT OF OTHER CLAIMS AND INTERESTS

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to the Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.  Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.  Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the DIP Order), or required by applicable non-bankruptcy law, in no event shall (i) any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such holder's Claim or (ii) any holder of an Allowed Senior Notes Parent Claim and any Allowed Senior Notes

31

Guarantee Claim be entitled to receive distributions that, in the aggregate, exceed the Allowed amount of such holder's Allowed Senior Notes Parent Claim.

**Section 3.1      Classes and Treatment of Claims Against and Interests in the Debtors (Debtors 1-101)**

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  For brevity and convenience, the classification and treatment of Claims and Interests has been arranged into one chart.

The following table designates the classes of Claims against and Interests in the Debtors and specifies which of those classes are (i) impaired or unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to accept or reject the Plan.

| Class | Designation | Plan Treatment of Allowed Claims | Status | Voting Rights |
|---|---|---|---|---|
| 1A-101A | Other Priority Claims | Payment in full in Cash; or other treatment that will render the Claim Unimpaired. | Unimpaired | Deemed to Accept |
| 1B-101B | Other Secured Claims | Payment in full in Cash; Reinstatement of the legal, equitable and contractual rights of the holder of such Claim; payment of the proceeds of the sale or disposition of the Collateral securing such Claim, in each case, to the extent of the value of the holder's secured interest in such Collateral; return of Collateral securing such Claim; or other treatment that will render the Claim Unimpaired. | Unimpaired | Deemed to Accept |

32

| Class | Designation | Plan Treatment of Allowed Claims | Status | Voting Rights |
|---|---|---|---|---|
| 1C; 2C-100C | Senior Notes Parent Claims; Senior Notes Guarantee Claims | Subject to Section 3.2(c) hereof, each holder of an Allowed Senior Notes Parent Claim [4] shall be entitled to (i) if such holder is a Certified Eligible Holder, (1) its Pro Rata Share of the Senior Notes Rights as determined pursuant to the Rights Offerings Procedures and (2) its Ratable Share of the Senior Notes Stock Allocation or (ii) if such holder is not a Certified Eligible Holder, its Ratable Share of the Senior Notes Class Cash Consideration. | Impaired | Entitled to Vote |
| 1D | Convertible Notes Claims | Subject to Section 3.2(d) hereof, each holder of an Allowed Convertible Notes Claim shall be entitled to (i) if such holder is a Certified Eligible Holder, (1) its Pro Rata Share of the GUC Rights as determined pursuant to the Rights Offerings Procedures and (2) its Ratable Share of the GUC Stock Allocation or (ii) if such holder is a not a Certified Eligible Holder, its Ratable Share of the Convenience Class Consideration. | Impaired | Entitled to Vote |

---

[4] The amount of the distribution on account of Senior Notes Parent Claims has been determined by giving effect to the guarantees by the Subsidiary Debtors of the Senior Notes.

SA000271

| Class | Designation | Plan Treatment of Allowed Claims | Status | Voting Rights |
|---|---|---|---|---|
| 1E; 2D-101D | General Unsecured Claims | Subject to Section 3.2(e) hereof, each holder of an Allowed General Unsecured Claim shall be entitled to (i) if such holder is a Certified Eligible Holder, (1) its Pro Rata Share of the GUC Rights as determined pursuant to the Rights Offerings Procedures and (2) its Ratable Share of the GUC Stock Allocation or (ii) if such holder is not a Certified Eligible Holder, its Ratable Share of the Convenience Class Consideration. | Impaired | Entitled to Vote |
| 1F; 2E-101E | Convenience Class Claims | Subject to Section 3.2(f) hereof, each holder of a Convenience Class Claim shall be entitled to its Ratable Share of the Convenience Class Consideration. | Impaired | Entitled to Vote |
| 1G; 2F-101F | Section 510(b) Claims | No distribution. | Impaired | Deemed to Reject |
| 1H | Interests in Patriot Coal | No distribution. | Impaired | Deemed to Reject |
| 2G-101G | Interests in Subsidiary Debtors | Reinstatement of Interests | Unimpaired | Deemed to Accept |

**Section 3.2      Treatment of Claims Against and Interests in the Debtors**

**(a)      Other Priority Claims (Class 1-101A)**

Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 hereof) with the applicable Reorganized Debtor, each holder of an Allowed Other Priority Claim against any of the Debtors shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Claim, Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim shall otherwise be rendered Unimpaired, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) 20 calendar days after the date such Claim becomes Allowed and (iii) the date for payment provided by any applicable agreement between the Reorganized Debtors and the holder of such Claim.

34

(b)    **Other Secured Claims (Class 1-101B)**

Each holder of an Allowed Other Secured Claim against any of the Debtors shall receive, at the sole option of the applicable Reorganized Debtor, and in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, one of the following treatments:  (i) payment in Cash in the amount of such Allowed Other Secured Claim, (ii) Reinstatement of the legal, equitable and contractual rights of the holder relating to such Allowed Other Secured Claim, (iii) a distribution of the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such Collateral, (iv) a distribution of the Collateral securing such Allowed Other Secured Claim without representation or warranty by or recourse against the Debtors or Reorganized Debtors or (v) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  If an Other Secured Claim is satisfied under clause (i), (iii), (iv) or (v), the Liens securing such Other Secured Claim shall be deemed released without further action by any party.  Each holder of an Allowed Other Secured Claim shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors.

Any distributions made pursuant to this Section 3.2 shall be made on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) 20 calendar days after the date such Claim becomes Allowed and (iii) the date for payment provided by any agreement between the applicable Debtor and the holder of such Claim.

For convenience of identification, the Plan classifies the Allowed Claims in Classes 1B through 101B (Other Secured Claims) as a single Class as to each Debtor.  However, these Classes are actually a group of subclasses, depending on the Collateral securing each such Allowed Claim.

(c)    **Senior Notes Parent Claims and Senior Notes Guarantee Claims (Class 1C; 2-100C)**

Each holder of an Allowed Senior Notes Parent Claim[5] shall be entitled to (i) if such holder is a Certified Eligible Holder, (1) its Pro Rata Share of the Senior Notes Rights as determined pursuant to the Rights Offerings Procedures and (2) its Ratable Share of the Senior Notes Stock Allocation; *provided* that a holder may elect to cause its Ratable Share of the Senior Notes Stock Allocation to be issued directly to a Voting Trust in the form of New Class B Common Stock, or (ii) if such holder is not a Certified Eligible Holder, its Ratable Share of the Senior Notes Class Cash Consideration.  Notwithstanding the foregoing, if the Debtors determine in their sole discretion that if New Common Stock were distributed to all of the holders of Claims as contemplated by the Plan, Reorganized Patriot Coal would potentially be required to be a reporting company under the Exchange Act or would potentially be required to be registered

---

[5] The amount of the distribution on account of Senior Notes Parent Claims has been determined by giving effect to the guarantees by the Subsidiary Debtors of the Senior Notes.

35

on any public exchange (assuming, for these purposes, that all of the Rights Offering Warrants were exercised, and including the Debtors' estimate of shares of New Common Stock to be issued in respect of management incentive packages and other issuances), then, with respect to any holder that would otherwise have received less than a threshold number of shares of New Common Stock on account of its claim and in respect of its Rights, as determined by the Debtors in consultation with the Creditors' Committee, such holder(s) shall instead receive its Ratable Share of the Senior Notes Class Cash Consideration, and the Debtors shall decline to permit the subscription for Rights by such holder.

      **(d)**      **Convertible Notes Claims (Class 1D)**

      Each holder of an Allowed Convertible Notes Claim shall be entitled to (i) if such holder is a Certified Eligible Holder, (1) its Pro Rata Share of the GUC Rights as determined pursuant to the Rights Offerings Procedures and (2) its Ratable Share of the GUC Stock Allocation or (ii) if such holder is not a Certified Eligible Holder, its Ratable Share of the Convenience Class Consideration. Notwithstanding the foregoing, if the Debtors determine in their sole discretion that if New Common Stock were distributed to all of the holders of Claims as contemplated by the Plan, Reorganized Patriot Coal would potentially be required to be a reporting company under the Exchange Act or would potentially be required to be registered on any public exchange (assuming, for these purposes, that all of the Rights Offering Warrants were exercised, and including the Debtors' estimate of shares of New Common Stock to be issued in respect of management incentive packages and other issuances), then, with respect to any holder that would otherwise have received less than a threshold number of shares of New Common Stock on account of its claim and in respect of its Rights, as determined by the Debtors in consultation with the Creditors' Committee, such holder(s) shall instead receive its Ratable Share of the Convenience Class Consideration, and the Debtors shall decline to permit the subscription for Rights by such holder.

      **(e)**      **General Unsecured Claims (Class 1E; 2D-101D)**

      (i)      Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 hereof), in full satisfaction, release and discharge of and in exchange for each Allowed General Unsecured Claim, each holder of a General Unsecured Claim that is Allowed as of the Effective Date shall receive, on or as soon as reasonably practicable after the Effective Date, (i) if such holder is a Certified Eligible Holder, (1) its Pro Rata Share of the GUC Rights as determined pursuant to the Rights Offerings Procedures and (2) its Ratable Share of the GUC Stock Allocation or (ii) if such holder is not a Certified Eligible Holder, its Ratable Share of the Convenience Class Consideration. Notwithstanding the foregoing, if the Debtors determine in their sole discretion that if New Common Stock were distributed to all of the holders of Claims as contemplated by the Plan, Reorganized Patriot Coal would potentially be required to be a reporting company under the Exchange Act or would potentially be required to be registered on any public exchange (assuming, for these purposes, that all of the Rights Offering Warrants were exercised, and including the Debtors' estimate of shares of New Common Stock to be issued in respect of management incentive packages and other issuances), then, with respect to any holder that would otherwise have received less than a

threshold number of shares of New Common Stock on account of its claim and in respect of its Rights, as determined by the Debtors in consultation with the Creditors' Committee, such holder(s) shall instead receive its Ratable Share of the Convenience Class Consideration, and the Debtors shall decline to permit the subscription for Rights by such holder.

(ii)     Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 hereof), each holder of a General Unsecured Claim that is Disputed as of the Effective Date and becomes an Allowed General Unsecured Claim after the Effective Date, shall receive, on or as soon as reasonably practicable after the Distribution Date that is at least 20 calendar days after such General Unsecured Claim becomes an Allowed General Unsecured Claim, its Ratable Share of the Convenience Class Consideration.

(iii)     Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 hereof), on any Interim Distribution Date upon which an Adjustment Distribution of Cash is to be distributed, the Disbursing Agent shall effect a distribution, so that each holder of an Allowed Claim that has received Convenience Class Consideration under the Plan shall have received, after giving effect to all prior distributions made to such Allowed Claim under the Plan, its Ratable Share of the Convenience Class Consideration allocable to such Claim on or as soon as reasonably practicable after the Interim Distribution Date.

(iv)     If any Cash remains in the Disputed Claims Reserve after all Disputed General Unsecured Claims have become either Allowed Claims or Disallowed Claims, and all distributions to holders of General Unsecured Claims required pursuant to Section 8.4(c) of the Plan have been made, the Disbursing Agent shall effect a final distribution, so that each Holder of an Allowed Claim that has received Convenience Class Consideration under the Plan shall have received, after giving effect to all prior distributions made to such Allowed Claim under the Plan, its Ratable Share of the Convenience Class Consideration allocable to such Claim on or as soon as reasonably practicable after the Final Distribution Date.

**(f)     Convenience Class Claims (Class 1F; 2E-101E)**

(i)     Except to the extent that the applicable Creditor agrees to less favorable treatment, each holder of an Allowed Convenience Class Claim shall receive, on or as soon as reasonably practicable after the later of (A) the Initial Distribution Date (for Claims Allowed as of the Effective Date) and (B) the Distribution Date that is at least 20 calendar days after such Convenience Class Claim becomes an Allowed Convenience Class Claim, in full satisfaction, release and discharge of and in exchange for such Claim, its Ratable Share of the Convenience Class Consideration.

(ii)     Except to the extent that the applicable Creditor agrees to less favorable treatment (or as provided in Section 6.2 hereof), on any Interim Distribution Date upon which an Adjustment Distribution of Cash is to be distributed, the Disbursing Agent shall effect a distribution, so that each holder of an Allowed Claim that has received Convenience Class Consideration under the Plan shall have received, after giving effect to all prior distributions

made to such Allowed Claim under the Plan, its Ratable Share of the Convenience Class Consideration allocable to such Claim on or as soon as reasonably practicable after such Interim Distribution Date.

(iii)    If any Cash remains in the Disputed Claims Reserve after all Disputed Convenience Class Claims (and all Disputed General Unsecured Claims that will or are expected to receive (as reasonably determined by the Disbursing Agent) Convenience Class Consideration in accordance with Article III of the Plan, if any) have become either Allowed Claims or Disallowed Claims and all distributions required pursuant to Section 8.4(c) of the Plan have been made, the Disbursing Agent shall effect a final distribution, so that each holder of an Allowed Claim that has received Convenience Class Consideration under the Plan shall have received, after giving effect to all prior distributions made to such Allowed Claims under the Plan, its Ratable Share of the Convenience Class Consideration allocable to such Claim on or as soon as reasonably practicable after the Final Distribution Date.

**(g)    Section 510(b) Claims (Class 1G; 2F-101F)**

The holders of Section 510(b) Claims shall neither receive any distributions nor retain any property on account thereof pursuant to the Plan.  All Section 510(b) Claims shall be cancelled and extinguished.

**(h)    Interests in Patriot Coal (Class 1H)**

The holders of Interests in Patriot Coal shall neither receive any distributions nor retain any property on account thereof pursuant to the Plan.  All Interests in Patriot Coal shall be cancelled and extinguished.

**(i)    Interests in Subsidiary Debtors (Classes 2G through 101G)**

The Interests in the Subsidiary Debtors shall be, in Reorganized Patriot Coal's sole discretion in consultation with the Backstop Parties, Reinstated or canceled on the Effective Date or as soon thereafter as reasonably practicable.

**Section 3.3        Treatment of Intercompany Claims**

In accordance with and giving effect to the provisions of section 1124(1) of the Bankruptcy Code, Intercompany Claims are Unimpaired by the Plan.  However, the Debtors retain the right to, in consultation with the Backstop Parties, eliminate or adjust any Intercompany Claims as of the Effective Date by offset, cancellation, contribution or otherwise. In no event shall Intercompany Claims be allowed as General Unsecured Claims or Convenience Class Claims or entitled to any distribution of Cash, New Common Stock or Rights under the Plan.

## ARTICLE 4
### ACCEPTANCE OR REJECTION OF THE PLAN

### Section 4.1        Voting of Claims

Each holder of a Claim in an Impaired Class as of the Voting Record Date that is entitled to vote on the Plan pursuant to Article 3 of the Plan shall be entitled to vote to accept or reject the Plan as provided in the Approval Order or any other order of the Bankruptcy Court.

### Section 4.2        Presumed Acceptance of Plan

Other Priority Claims (Classes 1A through 101A), Other Secured Claims (Classes 1B through 101B) and Interests in Subsidiary Debtors (Classes 2G through 101G) are Unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in such Classes are conclusively presumed to have accepted the Plan and the votes of such holders will not be solicited.

### Section 4.3        Presumed Rejection of Plan

Section 510(b) Claims (Classes 1G and 2F through 101F) and Interests in Patriot Coal (Class 1F) shall not receive any distribution under the Plan on account of such Claims or Interests.  Pursuant to section 1126(g) of the Bankruptcy Code, the holders of Claims and Interests in such Classes are conclusively presumed to have rejected the Plan and the votes of such holders will not be solicited.

### Section 4.4        Acceptance by Impaired Classes

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan.  Senior Notes Claims (Classes 1C and 2C through 100C), Convertible Notes Claims (Class 1D), General Unsecured Claims (Classes 1E and 2D through 101D) and Convenience Class Claims (Classes 1F and 2E through 101E) are Impaired, and the votes of holders of Claims in such Classes will be solicited.  If holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject the Plan, but no holders of Claims in such Impaired Class of Claims voted to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan.

### Section 4.5        Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan solely for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

39

### Section 4.6        Consensual Confirmation

Notwithstanding the combination of the separate plans of reorganization of all Debtors in this joint plan of reorganization for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate chapter 11 plan for each such Debtor.

### Section 4.7        Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class or Classes of Claims.  Subject to Article 13 of the Plan, the Debtors reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### Section 4.8        Severability; Reservation of Rights

Subject to Article 13 of the Plan, the Debtors reserve the right, after consultation with the Creditors' Committee, to modify or withdraw the Plan, in its entirety or in part, for any reason, including, without limitation, if the Plan as it applies to any particular Debtor is not confirmed. In addition, and also subject to Article 13 of the Plan, should the Plan fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to reclassify Claims or Interests or otherwise amend, modify or withdraw the Plan in its entirety, in part or as to a particular Debtor.  Without limiting the foregoing, if the Debtors withdraw the Plan as to any particular Debtor because the Plan as to such Debtor fails to be accepted by the requisite number and amount of Claims voting or due to the Bankruptcy Court, for any reason, denying Plan confirmation as to such Debtor, then at the option of such Debtor, after consultation with the Creditors' Committee, (a) the Chapter 11 Case for such Debtor may be dismissed or (b) such Debtor's assets may be sold to another Debtor, such sale to be effective at or before the Effective Date of the Plan for such other Debtor, and the sale price shall be paid to the seller in Cash and shall be in an amount equal to the fair value of such assets as proposed by the Debtors and approved by the Bankruptcy Court.

# ARTICLE 5
## IMPLEMENTATION OF THE PLAN

### Section 5.1        Continued Corporate Existence

Except as otherwise provided in the Plan and subject to the Restructuring Transactions, each Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, each with all the powers of a corporation under the laws of its respective jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law.

### Section 5.2      Section 1145 Exemption

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the offering, issuance and distribution of the New Common Stock shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act. The offering, issuance and distribution of the Rights Offering Notes and the Rights Offering Warrants will be made pursuant to the exemption set forth in Section 4(2) of the Securities Act or another exemption thereunder. In addition, all securities contemplated by the Plan and any and all agreements incorporated therein, including the New Common Stock, the Rights Offering Notes and the Rights Offering Warrants (collectively, the "**New Securities**"), shall be subject to (i) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (ii) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the New Certificate of Incorporation and the New Stockholders' Agreement; and (iii) applicable regulatory approval, if any. The New Securities will be offered, distributed and sold pursuant to the Plan.

### Section 5.3      Authorization of New Common Stock

On the Effective Date, the New Certificate of Incorporation shall have provided for sufficient shares of authorized New Common Stock to effectuate the issuances of New Common Stock contemplated by the Plan, and Reorganized Patriot Coal shall issue or reserve for issuance a sufficient number of shares of New Common Stock to effectuate such issuances. The shares of New Common Stock issued in connection with the Plan, including in connection with the consummation of the Rights Offerings, the Backstop Rights Purchase Agreement, or upon exercise of the Rights Offering Warrants, shall be authorized without the need for further corporate action or without any further action by any Person, and once issued, shall be duly authorized, validly issued, fully paid and non-assessable.

Any share of New Common Stock issued to a Creditor of any Subsidiary Debtor shall be treated as (a) a contribution of cash by Reorganized Patriot Coal to the applicable Debtor in the amount equal to the fair market value of such New Common Stock, followed by (b) the issuance of New Common Stock by Reorganized Patriot Coal to the applicable Debtor in return for such cash, followed by (c) the transfer of the New Common Stock by the applicable Debtor to the applicable Creditor.

The New Certificate of Incorporation and the New Stockholders' Agreement will contain restrictions on holders' ability to transfer New Class A Common Stock and other New Securities designed to ensure that the number of holders of such securities does not exceed the threshold at which Reorganized Patriot Coal would be required to become a reporting company under the Exchange Act. Among other things, the New Certificate of Incorporation will require notice to Reorganized Patriot Coal of any proposed transfer of New Class A Common Stock or other New

Securities and will restrict such transfer if Reorganized Patriot Coal determines that the transfer would, if effected, result in Reorganized Patriot Coal potentially having 2,000 or more holders of record of New Common Stock or 500 or more non-accredited holders of record of New Common Stock (in each case as determined under the Exchange Act).

**Section 5.4     Cancellation of Existing Securities and Related Agreements and the Indentures**

On the Effective Date, all rights of any holder of Claims against, or Interests in, the Debtors, including options or warrants to purchase Interests, obligating the Debtors to issue, transfer or sell Interests or any other capital stock of the Debtors shall be cancelled.

Each Indenture shall terminate as of the Effective Date except as necessary to administer the rights, Claims and interests of the applicable Indenture Trustee, and except that such Indenture shall continue in effect to the extent necessary to allow such Indenture Trustee to receive distributions under the Plan and to redistribute them under such Indenture.  Each Indenture Trustee shall be relieved of all further duties and responsibilities related to the applicable Indenture, except with respect to the distributions required to be made to such Indenture Trustee under the Plan or with respect to such other rights of such Indenture Trustee that, pursuant to such Indenture, survive the termination of such Indenture.  Termination of the Indentures shall not impair the rights of each Indenture Trustee to enforce its Charging Lien against property that would otherwise be distributed to holders of the Existing Notes. Subsequent to the performance by each Indenture Trustee of its obligations pursuant to the Plan, such Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the applicable Indenture.

**Section 5.5     Settlements**

**(a)     UMWA Settlement**

The Plan implements and incorporates by reference the UMWA Settlement, including, without limitation, the discharge, exculpation and release provisions contained therein, which provisions are integral to and not severable from the Plan.  Upon the Effective Date, pursuant to the VFA, the Patriot Retirees VEBA shall receive the UMWA Stock Allocation and such other consideration that is contemplated by the VFA to be provided to the Patriot Retirees VEBA on the Effective Date.

**(b)     Non-Union Retiree Settlement**

The Plan implements and incorporates by reference the Non-Union Retiree Settlement Order, including, without limitation, the discharge, exculpation and release provisions contained therein and approved by the UMWA Settlement Order, which provisions are integral to and not severable from the Plan.  Upon the Effective Date, pursuant to the Non-Union Retiree Settlement Order, the Non-Union Retiree VEBA shall receive $3.75 million in Cash.

42

(c)     **Arch Settlement**

The Arch Settlement shall become effective on the Effective Date.  The Plan implements and incorporates by reference the Arch Settlement, including, without limitation, the discharge, exculpation and release provisions contained therein and approved by the Arch Settlement Order, which provisions are integral to and not severable from the Plan.  Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall limit or impair any relief granted to, or rights of, Arch pursuant to the Arch Settlement or the Arch Settlement Order.

(d)     **Peabody Settlement**

The Peabody Settlement shall become effective in accordance with its terms.  The Plan implements and incorporates by reference the Peabody Settlement, including, without limitation, the discharge, exculpation and release provisions contained therein and approved by the Peabody Settlement Order, which provisions are integral to and not severable from the Plan. Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall limit or impair any relief granted to, or rights of, Peabody pursuant to the Peabody Settlement or the Peabody Settlement Order.

### Section 5.6      Financing and Restructuring Transactions

(a)     **Rights Offerings**

The Debtors will implement the Rights Offerings in accordance with the Backstop Rights Purchase Agreement and the Rights Offerings Procedures.  The Rights Offerings shall be open to Certified Eligible Holders as of the Eligibility Certificate Deadline (November 27, 2013 at 5:00 p.m. (prevailing Central Time)).  The Rights Offerings shall consist of a distribution of the Rights in respect of the Rights Offering Notes and the Rights Offering Warrants in accordance with the Rights Offerings Procedures.  The Rights Offerings will be conducted in accordance with the Rights Offerings Procedures.

If, after following the procedures for allocation of Unsubscribed Rights set forth in the Rights Offerings Procedures, there remain any Unsubscribed Rights, the Backstop Parties have agreed to purchase, with respect to Knighthead, on a joint and several basis, and, with respect to the other Backstop Parties, on a several but not joint basis, the number of Rights Offering Notes and Right Offering Warrants equal to its Backstop Commitment Percentage multiplied by the number of remaining Rights Offering Notes and Rights Offering Warrants in accordance with the terms and conditions of the Backstop Rights Purchase Agreement up to an aggregate principal amount of $250,025,000; *provided*, *however*, that the Backstop Parties may direct the Reorganized Debtors to issue a portion of the Rights Offering Notes and the Rights Offering Warrants that are not purchased to one or more third parties who are Eligible Holders (or would be Eligible Holders if such third parties were holders of an Allowed Senior Notes Claim, Allowed Convertible Notes Claim or Allowed General Unsecured Claim) approved by the Backstop Parties.  Any Rights Offering Notes to be issued to a Backstop Party shall be issued to such Backstop Party's respective funds designated by them; *provided*, *further,* that each such

43

fund certifies that it is an Eligible Holder (or would be an Eligible Holder if such fund were a holder of an Allowed Claim). Any Rights Offering Warrants to be issued to a Backstop Party shall be issued to one or more Eligible Affiliates of such Backstop Party.

Notwithstanding anything to the contrary in the Plan, in the event the amount of holders of Claims that subscribe to the Rights is such that, if the Rights Offering Warrants were exercised, Reorganized Patriot Coal would potentially be required to be a reporting company under the Exchange Act or would potentially be required to be registered on any public exchange, the Debtors shall decline to permit the subscription for Rights by holders of Claims subscribing for the lowest amount of Rights to the extent necessary to avoid Reorganized Patriot Coal being potentially required to be a reporting company under the Exchange Act or being potentially required to be registered on any public exchange (assuming, for these purposes, the exercise of the Rights Offering Warrants, and including the Debtors' estimate of shares of New Common Stock to be issued under the Plan and in respect of management incentive packages and other issuances).

As set forth in the Backstop Rights Purchase Agreement, the Backstop Parties shall have consent rights over, among other things, (i) the VFA (ii) the Exit Credit Facilities Documents, including the material financial terms of and definitive documentation for the Exit Credit Facilities; (iii) the Registration Rights Agreement; (iv) the organizational documents of the Reorganized Debtors, including the New Certificate of Incorporation, New Bylaws, and New Stockholders Agreement; (v) the Plan Documents; and (vi) the Rights Offerings Procedures, in each case, as set forth in the Backstop Rights Purchase Agreement.

The Rights, the Rights Offering Notes and the Rights Offering Warrants, in each case, whether issued pursuant to the Rights Offerings, in connection with the payment of the Backstop Commitment Fee and/or pursuant to the Backstop Rights Purchase Agreement, shall all be issued without registration in reliance upon the exemption set forth in section 4(2) of the Securities Act and will be "restricted securities."

**(b)    Exit Credit Facilities**

On or before the Effective Date, Reorganized Patriot Coal shall enter into the Exit Credit Facilities, and, subject to the repayment of the DIP Facility Claims in accordance with Section 2.1 hereof, grant all liens and security interests provided for thereunder. The applicable Reorganized Debtors that are the guarantors under the Exit Credit Facilities shall issue the guarantees, Liens and security interests as provided thereunder. The Exit Credit Facilities shall be on terms and conditions substantially as set forth in the Plan Supplement.

**(c)    Restructuring Transactions**

On or after the Effective Date, including after the cancellation and discharge of all Claims pursuant to the Plan and before the issuance of the New Common Stock, the Reorganized Debtors may engage in or take such actions as may be necessary or appropriate to effect corporate restructurings of their respective businesses, including actions necessary to simplify,

reorganize and rationalize the overall reorganized organizational structure of the Reorganized Debtors (together, the "**Restructuring Transactions**").  The Restructuring Transactions may include (a) dissolving companies or creating new companies (including limited liability companies), (b) merging, dissolving, transferring assets or otherwise consolidating any of the Debtors in furtherance of the Plan, or engaging in any other transaction in furtherance of the Plan, (c) executing and delivering appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, liquidation, domestication, continuation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (d) executing and delivering appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, debt or obligation on terms consistent with the terms of the Plan; (e) filing appropriate certificates or articles of merger, consolidation or dissolution or other filings or recordings pursuant to applicable state law; and (f) taking any other action reasonably necessary or appropriate in connection with such organizational restructurings.  In each case in which the surviving, resulting or acquiring Entity in any of these transactions is a successor to a Reorganized Debtor, such surviving, resulting or acquiring Entity will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan, including with respect to the DIP Agents and the DIP Lenders, and paying or otherwise satisfying the Allowed Claims to be paid by such Reorganized Debtor.  Implementation of any Restructuring Transactions shall not affect any performance obligations, distributions, discharges, exculpations, releases or injunctions set forth in the Plan.

Nothing in the Plan or the Confirmation Order authorizes the transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval without compliance with all applicable legal requirements under non-bankruptcy laws and regulations governing such transfers or assignments.

### Section 5.7    Voting Trust(s)

On or before the Effective Date, the Voting Trust Agreement(s) shall be executed, and all other necessary steps shall be taken to establish the Voting Trust(s).

On the Effective Date, (a) the shares of New Class B Common Stock designated to be transferred to a Voting Trust(s) shall be issued and transferred by the Debtors directly to the Voting Trust(s) without the need for any person or Entity to take any further action or obtain any approval.  Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  Upon the foregoing transfers to the Voting Trust, except as specifically set forth in the Voting Trust Agreement, the Debtors and the Reorganized Debtors shall have no further liability or obligation relating to the Voting Trust.  Except as specifically set forth in the Voting Trust Agreement, in no event shall the Debtors or the Reorganized Debtors have or be deemed to have any fiduciary or other duty to the Voting Trust, nor any responsibilities for administering the Voting Trust.

The Voting Trustee(s) shall govern the Voting Trust(s) in accordance with the Voting Trust Agreement(s).  The duty of the Voting Trustee(s) shall be to vote the shares of the New

45

Class B Common Stock held in trust so as to maximize the enterprise value of Reorganized Patriot Coal that accretes to the holders of the debt and equity of Reorganized Patriot Coal.

The Voting Trust Beneficiaries shall be one or more parties to be determined; *provided* that Knighthead may not be a direct or indirect beneficiary of a Voting Trust; *provided*, *further*, that the Patriot Retirees VEBA will be the beneficiary of the economic value of any shares of New Class B Common Stock issued to the Voting Trust on the Effective Date in respect of any Senior Notes Stock Allocation otherwise issuable to Knighthead. Additionally, the holders of Allowed Senior Notes Claims and the Backstop Parties may elect to cause the shares of New Common Stock issued to such parties pursuant to the Plan to be issued to a Voting Trust, which New Common Stock shall be New Class B Common Stock in lieu of New Class A Common Stock otherwise issuable in respect of Allowed Senior Notes Claims.

## ARTICLE 6
### PROVISIONS GOVERNING DISTRIBUTIONS

### Section 6.1        Disbursing Agent

The Debtors shall retain a Disbursing Agent to assist with the distributions to be made under the Plan as directed by the Debtors. The Disbursing Agent shall make and/or provide assistance with making all distributions required under the Plan; *provided* that the applicable DIP Agent will be considered a Servicer for the purpose of distributions pursuant to the DIP Facility Claims, as applicable.

Notwithstanding anything to the contrary herein, all distributions of New Common Stock, Rights Offering Warrants and Rights Offering Notes related to or on account of the Existing Notes shall be accomplished in accordance with the customary practices of the transfer agent for the New Common Stock and Rights Offering Warrants and the indenture trustee for the Rights Offering Notes, as applicable, and in accordance with any applicable procedures of DTC. Each Indenture Trustee shall cooperate in the administration of distributions in accordance with the Plan and the applicable Indenture. Neither Indenture Trustee shall be required to give any bond, surety, or other security for the performance of its duties with respect to the administration and implementation of distributions. Any and all distributions on account of the Existing Notes shall be subject to the terms and conditions of the applicable Indenture, including any Charging Lien.

The Reorganized Debtors shall be authorized, without further Bankruptcy Court approval, but not directed to, reimburse any Servicer for its reasonable, documented, actual and customary out-of-pocket expenses incurred in providing postpetition services directly related to distributions pursuant to the Plan. These reimbursements must be made, with respect to First Out DIP Facility Claims, in accordance with Section 12.04 of the First Out DIP Facility, with respect to Second Out DIP Facility Claims, in accordance with Section 10.04 of the Second Out DIP Facility, and otherwise on terms agreed to between the Reorganized Debtors and the applicable Servicer.

SA000284

### Section 6.2        Timing and Delivery of Distributions

**(a)    Timing**

Subject to any reserves or holdbacks established pursuant to the Plan, and taking into account the matters discussed in Section 6.3 of the Plan, on the appropriate Distribution Date or as soon as practicable thereafter, holders of Allowed Claims against the Debtors shall receive the distributions provided for Allowed Claims in the applicable Classes as of such date.

If and to the extent there are Disputed Claims as of the Effective Date, distributions on account of such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in the Plan on or as soon as reasonably practicable after the next Distribution Date that is at least 20 calendar days after each such Claim is Allowed; *provided, however*, that distributions on account of the Claims set forth in Article 3 of the Plan shall be made as set forth therein and Professional Fee Claims shall be made as soon as reasonably practicable after such Claims are Allowed or as provided in any other applicable Order.  Because of the size and complexities of the Chapter 11 Cases, the Debtors at the present time cannot accurately predict the timing of the Final Distribution Date.

**(b)    *De Minimis* Distributions**

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer nor the Disbursing Agent shall have any obligation to make any distributions under the Plan with a value of less than $100, unless a written request therefor is received by the Disbursing Agent from the relevant recipient at the addresses set forth in Section 15.13 hereof within 120 days after the later of the (a) Effective Date and (b) the date such Claim becomes an Allowed Claim.  *De minimis* distributions for which no such request is timely received shall revert to Reorganized Patriot Coal.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer nor any Disbursing Agent shall have any obligation to make a particular distribution to a specific holder of an Allowed Claim if such holder is also the holder of a Disputed Claim.

Notwithstanding any other provision of the Plan, none of the Reorganized Debtors, any Servicer nor any Disbursing Agent shall have any obligation to make any distributions on any Interim Distribution Date unless the sum of all distributions authorized to be made to all holders of Allowed Claims on such Interim Distribution Date exceeds $100,000 in value.

**(c)    Fractional Shares**

Notwithstanding any other provision of the Plan, no fractional shares of New Common Stock shall be distributed; *provided*, *however*, that any fractional shares of New Common Stock

47

shall be rounded down to the next whole number or zero, as applicable, and no consideration shall be provided in lieu of fractional shares that are rounded down.

### (d)    Delivery of Distributions – Allowed Claims

As to all holders of Allowed Claims, distributions shall only be made to the record holders of such Allowed Claims as of the Distribution Record Date; *provided*, that any Eligible Holder who is otherwise entitled to receive Rights in accordance with the terms of the Plan may designate an Eligible Affiliate to receive such Rights and such Eligible Affiliate may exercise such Notes Rights or Warrant Rights in accordance with the Rights Offerings Procedures.  On the Distribution Record Date, at the close of business for the relevant register, all registers maintained by the Debtors, Reorganized Debtors, Servicers, the Disbursing Agent, the Indenture Trustees and each of the foregoing's respective agents, successors and assigns shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Plan.  The Debtors, Reorganized Debtors, Servicers, Disbursing Agent, Indenture Trustees and all of their respective agents, successors and assigns shall have no obligation to recognize, for purposes of distributions pursuant to or in any way arising from the Plan (or for any other purpose), any Claims that are transferred after the Distribution Record Date.  Instead, they shall be entitled to recognize only those record holders set forth in the registers as of the Distribution Record Date, irrespective of the number of distributions made under the Plan or the date of such distributions.  Furthermore, if a Claim is transferred 20 or fewer calendar days before the Distribution Record Date, the Disbursing Agent or Indenture Trustee, as applicable, shall make distributions to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

If any dispute arises as to the identity of a holder of an Allowed Claim that is entitled to receive a distribution pursuant to the Plan, the applicable Disbursing Agent, Servicer or Indenture Trustee may, in lieu of making such distribution to such person, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

Subject to Bankruptcy Rule 9010, a distribution to a holder of an Allowed Claim may be made by the applicable Disbursing Agent or Indenture Trustee, in each case, in its sole discretion: (i) to the address set forth on the first page of the Proof of Claim filed by such holder (or at the last known address of such holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address), (ii) to the address set forth in any written notice of an address change delivered to the Disbursing Agent after the date of any related Proof of Claim, (iii) to the address set forth on the Schedules filed with the Bankruptcy Court, if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of an address change, (iv) in the case of a holder whose Claim is governed by an agreement and administered by a Servicer, to the address contained in the official records of such Servicer or (v) to the address of any counsel that has appeared in the Chapter 11 Cases on such holder's behalf.

(e)    **Delivery of Distributions – Allowed Claims Relating to Existing Notes; Surrender of Cancelled Instruments or Securities**

Subject to the provisions of Section 5.4 of the Plan, as to holders of Allowed Claims relating to the Existing Notes and as a condition to receive any distribution:

As to any holder of an Allowed Claim relating to an Existing Note that is held in the name of, or by a nominee of, DTC, the Debtors and the Reorganized Debtors shall seek the cooperation of DTC to provide appropriate instructions to the applicable Indenture Trustee and such distribution shall be made through a mandatory and/or voluntary exchange on or as soon as practicable after the Effective Date.

Any holder of an Allowed Claim relating to an Existing Note who fails to surrender such Existing Note in accordance with this Section 6.2(e) within one year after the Effective Date shall be deemed to have forfeited all rights and Claims in respect of such Existing Note and shall not participate in any distribution hereunder, and all property relating to such forfeited distribution, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary.

### Section 6.3    Manner of Payment under Plan

(a)    All Cash distributions to be made hereunder to the DIP Agents on account of the DIP Facility Claims shall be made by wire transfer.  With respect to any other Cash payment to be made hereunder, at the Disbursing Agent's option, any such payment may be made by check, wire transfer or any other customary payment method.

(b)    The Debtors shall distribute New Common Stock, Rights or Cash as required under the Plan.  Where the applicable Reorganized Debtor is a Reorganized Subsidiary Debtor, Reorganized Patriot Coal shall be deemed to have made a direct capital contribution to the applicable Reorganized Subsidiary Debtor of an amount of Cash to be distributed to the Creditors of such Reorganized Debtor, but only at such time as, and to the extent that, such amounts are actually distributed to holders of Allowed Claims.  Any distributions of New Common Stock, Rights or Cash that revert to Reorganized Patriot Coal or are otherwise cancelled (such as to the extent any distributions have not been claimed within one year) shall revest solely in Reorganized Patriot Coal and no other Reorganized Debtor shall have (nor shall it be considered to ever have had) any ownership interest in the amounts distributed.

(c)    **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any unsecured Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**(d)    Compliance Matters**

In connection with the Plan, each Debtor, each Reorganized Debtor and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, each Debtor, each Reorganized Debtor and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtors or the Reorganized Debtors, as applicable, believe are reasonable and appropriate.  For tax purposes, distributions received with respect to Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

The Debtors, the Reorganized Debtors and the Disbursing Agent, as applicable, reserve the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

**(e)    Foreign Currency Exchange Rate**

As of the Effective Date, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m., mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal*, National Edition, on the day after the Petition Date.

**Section 6.4       Undeliverable or Non-Negotiated Distributions**

If any distribution is returned as undeliverable, no further distributions to such Creditor shall be made unless and until the Disbursing Agent or appropriate Servicer is notified in writing of such holder's then-current address, at which time any undelivered distribution shall be made to such holder without interest or dividends.  Undeliverable distributions shall be returned to Reorganized Patriot Coal until such distributions are claimed.  All undeliverable distributions under the Plan that remain unclaimed for one year after attempted distribution shall indefeasibly revert to Reorganized Patriot Coal.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 120 calendar days from and after the date of issuance thereof.  Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the holder of the relevant Allowed Claim within the 120-calendar-day period.  After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check) shall be automatically

discharged and forever barred, and such funds shall revert to Reorganized Patriot Coal, notwithstanding any federal or state escheat laws to the contrary.

**Section 6.5        Claims Paid or Payable by Third Parties**

**(a)        Claims Paid by Third Parties**

To the extent a Creditor receives a distribution on account of a Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Creditor shall, within 30 calendar days of receipt thereof, repay and/or return the distribution to the applicable Reorganized Debtor, to the extent the Creditor's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of the Claim as of the date of any such distribution under the Plan.

A Claim may be adjusted or expunged on the official claims register, without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Creditor receives payment in full or in part on account of such Claim; *provided*, *however*, that to the extent the non-Debtor party making the payment is subrogated to the Creditor's Claim, the non-Debtor party shall have a 30-calendar-day grace period following payment in full to notify the Claims Agent of such subrogation rights.

**(b)        Claims Payable by Third Parties**

To the extent that one or more of the Debtors' insurers agrees (or if and to the extent any such insurer is required by a court or other tribunal of competent jurisdiction) to satisfy any Claim, then immediately upon such court or other tribunal determination or insurers' agreement, such Claim may be expunged (to the extent of any agreed-upon or determined satisfaction) on the official claims register without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE 7**
**FILING OF ADMINISTRATIVE CLAIMS**

**Section 7.1        Professional Fee Claims**

**(a)        Final Fee Applications**

All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court by the date that is 60 calendar days after the Confirmation Date.  Such requests shall be filed with the Bankruptcy Court and served as required by the Case Management Order; *provided* that if any Professional is unable to file its own request with the Bankruptcy Court, such Professional may deliver an original, executed copy and an electronic copy to the Debtors' attorneys and the Reorganized Debtors at least three Business Days before the deadline, and the Debtors' attorneys shall file such request with the Bankruptcy Court.  The objection deadline relating to the final requests shall be 4:00 p.m. (prevailing Central Time) on the date that is 15 calendar days after the filing deadline.  If no objections are timely filed and

51

properly served in accordance with the Case Management Order as to a given request, or all timely objections are subsequently resolved, such Professional shall submit to the Bankruptcy Court for consideration a proposed order approving the Professional Fee Claim as an Allowed Administrative Claim in the amount requested (or otherwise agreed), and the order may be entered without a hearing or further notice to any party.  The Allowed amounts of any Professional Fee Claims subject to unresolved timely objections shall be determined by the Bankruptcy Court at a hearing to be held no later than 30 calendar days after the objection deadline.  Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed or in accordance with any other applicable Order.

    **(b)**    **Payment of Interim Amounts**

Professionals shall be paid pursuant to the "Monthly Statement" process set forth in the Interim Compensation Order with respect to all calendar months ending before the Confirmation Date and, for the month in which the Confirmation Date occurred, the Confirmation Date and the days prior to the Confirmation Date.

    **(c)**    **Post-Confirmation Date Fees**

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Reorganized Debtors may employ and pay all Professionals and may pay the reasonable and documented fees and expenses of each of the DIP Agents' professionals in accordance with the DIP Documents and the DIP Order in the ordinary course of business (including for the month in which the Confirmation Date occurred) without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

    **Section 7.2**    **Other Administrative Claims**

    **(a)**    A notice setting forth the Other Administrative Claim Bar Date will be (i) filed on the Bankruptcy Court's docket and (ii) posted on the Debtors' Case Information Website.  No other notice of the Other Administrative Claim Bar Date will be provided.

    **(b)**    All requests for payment of Other Administrative Claims that accrued on or before the Effective Date (other than Professional Fee Claims, which are subject to the provisions of Section 7.1 of the Plan) must be filed with the Claims Agent and served on counsel for the Debtors and Reorganized Debtors by the Other Administrative Claim Bar Date.  Any requests for payment of Other Administrative Claims pursuant to this Section 7.2 that are not properly filed and served by the Other Administrative Claim Bar Date shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.

**(c)**     The Reorganized Debtors, in their sole discretion, shall have exclusive authority to settle Other Administrative Claims without further Bankruptcy Court approval.

**(d)**     Unless the Debtors or the Reorganized Debtors object to a timely filed and properly served Other Administrative Claim by the Claims Objection Deadline, such Other Administrative Claim shall be deemed allowed in the amount requested.  If the Debtors or the Reorganized Debtors object to an Other Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Other Administrative Claim should be allowed and, if so, in what amount.

**(e)**     Notwithstanding the foregoing, requests for payment of Other Administrative Claims need not be filed for Other Administrative Claims that (i) are for goods or services provided to the Debtors in the ordinary course of business, (ii) previously have been Allowed by Final Order of the Bankruptcy Court, (iii) are for Cure amounts, (iv) are on account of postpetition taxes (including any related penalties or interest) owed by the Debtors or the Reorganized Debtors to any Governmental  Unit or (v) the Debtors or Reorganized Debtors have otherwise agreed in writing do not require such a filing.

## ARTICLE 8
### DISPUTED CLAIMS

### Section 8.1     Objections to Claims

**(a)**     After the Effective Date, the Reorganized Debtors shall have the sole authority to object to all Claims; *provided*, *however*, that the Reorganized Debtors shall not be entitled to object to any Claim that has been expressly allowed by Final Order or under the Plan.  Any objections to Claims filed by the Reorganized Debtors shall be filed on the Bankruptcy Court's docket on or before the Claims Objection Deadline.

**(b)**     Claims objections filed before, on or after the Effective Date shall be filed, served and administered in accordance with the Claims Objection Procedures Order, which shall remain in full force and effect; *provided*, *however*, that, on and after the Effective Date, filings and notices related to the Claims Objection Procedures Order need only be served on the relevant claimants and otherwise as required by the Case Management Order.

### Section 8.2     Resolution of Disputed Claims

On and after the Effective Date, the Reorganized Debtors shall have the sole authority to litigate, compromise, settle, otherwise resolve or withdraw any objections to all Claims and to compromise and settle any Claims without notice to or approval by the Bankruptcy Court or any other party.

### Section 8.3     Estimation of Claims and Interests

The Debtors or Reorganized Debtors may, in their sole discretion, after consultation with the Creditors' Committee (if prior to the Effective Date) determine, resolve and otherwise

adjudicate all Contingent Claims, Unliquidated Claims and Disputed Claims in the Bankruptcy Court or such other court of the Debtors' or Reorganized Debtors' choice having jurisdiction over the validity, nature or amount thereof. The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether any of the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, that estimated amount shall constitute the maximum limitation on such Claim and the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the ultimate allowance of such Claim; *provided*, *however*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Claim unless the holder of such Claim has filed a motion requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

### Section 8.4        Payments and Distributions for Disputed Claims

### (a)        No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, no payments or distributions shall be made for a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

### (b)        Disputed Claims Reserve

(i)        On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall hold in reserve (the "**Disputed Claims Reserve**") the amount of Cash that the Reorganized Debtors determine, in consultation with the Creditors' Committee, would likely have been distributed to the Holders of all Disputed Claims as if such Disputed Claims had been Allowed on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court as set forth in the non-duplicative Proof of Claim, or (if no proof of such Claim was filed) listed by the Debtors in the Schedules, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order

54

of the Bankruptcy Court, or (c) the amount otherwise agreed to by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Backstop Parties, and the Holder of such Disputed Claim for distribution purposes. With respect to all Disputed Claims that are General Unsecured Claims or Convenience Class Claims and are unliquidated or contingent and for which no dollar amount is asserted on a Proof of Claim, the Debtors will reserve Cash adjusted from time to time equal to the amount reasonably determined by the Reorganized Debtors.

(ii)     The Disbursing Agent may, at the direction of the Debtors or the Reorganized Debtors, adjust the Disputed Claims Reserve to reflect all earnings thereon (net of any expenses relating thereto, such expenses including any taxes imposed thereon or otherwise payable by the reserve), to be distributed on the Distribution Dates, as required by the Plan. The Disbursing Agent shall hold in the Disputed Claims Reserve all dividends, payments and other distributions made on account of, as well as any obligations arising from, the property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise. The taxes imposed on the Disputed Claims Reserve (if any) shall be paid by the Disbursing Agent from the property held in the Disputed Claims Reserve, and the Reorganized Debtors shall have no liability for such taxes.

(iii)    After any reasonable determination by the Reorganized Debtors that the Disputed Claims Reserve should be adjusted downward in accordance with Section 8.4(b)(i) of the Plan, the Disbursing Agent shall, at the direction of the Debtors or the Reorganized Debtors, effect a distribution in the amount of such adjustment as required by the Plan (an "**Adjustment Distribution**"), and any date of such distribution shall be an Interim Distribution Date.

(iv)    After all Disputed Claims have become either Allowed Claims or Disallowed Claims and all distributions required pursuant to Section 8.4(c) of the Plan have been made, the Disbursing Agent shall, at the direction of the Reorganized Debtors, effect a final distribution of the Cash remaining in the Disputed Claims Reserve.

(v)     It is expected that the Disbursing Agent will (A) make an election pursuant to United States Treasury Regulations section 1.468B-9 to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of that section and (B) allocate taxable income or loss to the Disputed Claims Reserve with respect to any taxable year that would have been allocated to the holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims). The affected holders of the Disputed Claims shall be bound by such election, if made by the Disbursing Agent. For federal income tax purposes, absent definitive guidance from the IRS or a contrary determination by a court of competent jurisdiction, the Disbursing Agent shall, to the extent permitted by applicable law, report consistently with the foregoing characterization for state and local income tax purposes. All affected holders of Disputed Claims shall report, for income tax purposes, consistently with the foregoing.

55

**(c)** **Distributions after Allowance**

(i)    To the extent that a Disputed Claim, other than a Convenience Class Claim, becomes an Allowed Claim after the Effective Date, the Disbursing Agent will, out of the Disputed Claims Reserve, distribute to the holder thereof the distribution, if any, to which such holder is entitled under the Plan in accordance with Section 6.2(a) of the Plan. Subject to Section 8.6 of the Plan, all distributions made under this Section 8.4(c)(i) on account of Allowed Claims will be made together with any dividends, payments or other distributions made on account of, as well as any obligations arising from, the distributed property, then held in the Disputed Claims Reserve as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claim holders included in the applicable class under the Plan.

(ii)    To the extent that a Convenience Class Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent will distribute to the holder thereof the distribution, if any, to which such holder is entitled under the Plan in accordance with Section 6.2(a) and Section 8.6 of the Plan.

**Section 8.5    No Amendments to Claims**

A Claim may be amended before the Confirmation Date only as agreed upon by the Debtors and the holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable non-bankruptcy law. On or after the Confirmation Date, the holder of a Claim (other than an Other Administrative Claim or a Professional Fee Claim) must obtain prior authorization from the Bankruptcy Court or Reorganized Debtors to file or amend a Claim. Any new or amended Claim (other than Rejection Claims) filed after the Confirmation Date without such prior authorization will not appear on the official claims register and will be deemed disallowed in full and expunged without any action required of the Debtors or the Reorganized Debtors and without the need for any court order.

**Section 8.6    No Interest**

Other than as provided by section 506(b) of the Bankruptcy Code or as specifically provided for in the Plan, the Confirmation Order or with respect to the DIP Facilities, postpetition interest shall not accrue or be paid on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Claim or Disputed Claim for the period from and after the Effective Date; *provided*, *however*, that nothing in this Section 8.6 shall limit any rights of any Governmental Unit to interest under sections 503, 506(b), 1129(a)(9)(A) or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

SA000294

<div align="center">

**ARTICLE 9**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

</div>

**Section 9.1        Rejection of Executory Contracts and Unexpired Leases**

Pursuant to sections 365 and 1123 of the Bankruptcy Code, each executory contract and unexpired lease to which any Debtor is a party shall be deemed automatically rejected by the Debtors effective as of the Effective Date, except for any executory contract or unexpired lease that (i) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered before the Effective Date, (ii) is the subject of a motion to assume or reject pending on the Effective Date, including the *Debtors' Motion for Authorization to (i) Assume or (ii) Reject Unexpired Leases of Nonresidential Real Property* filed on January 15, 2013 [ECF No. 1995], (iii) is assumed, rejected or otherwise treated pursuant to Section 9.3 or Section 9.4 of the Plan, (iv) is listed on Schedule 9.2(a) or 9.2(b) of the Plan or (v) as to which a Treatment Objection has been filed and properly served by the Treatment Objection Deadline.  If an executory contract or unexpired lease either (x) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered before the Effective Date or (y) is the subject of a motion to assume or reject pending on the Confirmation Date, then the listing of any such executory contract or unexpired lease on the aforementioned schedules shall be of no effect.

**Section 9.2        Schedules of Executory Contracts and Unexpired Leases**

**(a)**        Schedules 9.2(a) and 9.2(b) of the Plan shall be filed by the Debtors as specified in Section 15.6 of the Plan and shall represent the Debtors' then-current good faith belief regarding the intended treatment of all executory contracts and unexpired leases listed thereon.  The Debtors reserve the right, on or before 3:00 p.m. (prevailing Central Time) on the Business Day immediately before the Confirmation Hearing to (i) amend Schedules 9.2(a) and 9.2(b) to add, delete or reclassify any executory contract or unexpired lease or amend a proposed assignment and (ii) amend the Proposed Cure, in each case as to any executory contract or unexpired lease previously listed as to be assumed; *provided*, *however*, that if the Confirmation Hearing is adjourned, such amendment right shall be extended to 3:00 p.m. on the Business Day immediately before the rescheduled or continued Confirmation Hearing, and this proviso shall apply in the case of any and all subsequent adjournments of the Confirmation Hearing; *provided, further* that (a) for Intercompany Contracts and agreements proposed to be rejected as of the above deadline, the Debtors reserve the right to make amendments at any time before Confirmation and (b) the Debtors may amend Schedules 9.2(a) and 9.2(b) to add, delete or reclassify any executory contracts or unexpired leases or amend proposed assignments after such date to the extent agreed with the relevant counterparties.  Pursuant to sections 365 and 1123 of the Bankruptcy Code, and except for executory contracts and unexpired leases as to which a Treatment Objection is properly filed and served by the Treatment Objection Deadline, (x) each of the executory contracts and unexpired leases listed on Schedule 9.2(a) shall be deemed assumed (and, if applicable, assigned) effective as of the Assumption Effective Date specified thereon and the Proposed Cure specified in the notice mailed to each Assumption Party shall be the Cure and shall be deemed to satisfy fully any obligations the Debtors might have regarding such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code and

<div align="center">57</div>

(y) each of the executory contracts and unexpired leases listed on Schedule 9.2(b) shall be deemed rejected effective as of the Rejection Effective Date specified thereon.

(b)    The Debtors shall file initial versions of Schedules 9.2(a) and 9.2(b) and any amendments thereto with the Bankruptcy Court and shall serve all notices thereof only on the DIP Agents, the Creditors' Committee and the relevant Assumption Parties and Rejection Parties.  For any executory contract or unexpired lease first listed on Schedule 9.2(b) later than the date that is 10 calendar days before the Voting Deadline, the Debtors shall use their best efforts to notify the DIP Agents, the Creditors' Committee and the applicable Rejection Party promptly of such proposed treatment via facsimile, email or telephone at any notice address or number included in the relevant executory contract or unexpired lease or as otherwise timely provided in writing to the Debtors by any such counterparty or its counsel.

(c)    For any executory contracts or unexpired leases first listed on Schedule 9.2(b) later than the date that is 10 calendar days before the Voting Deadline, affected Rejection Parties shall have five calendar days from the date of such amendment to Schedule 9.2(b) to object to Confirmation of the Plan.  For any executory contracts or unexpired leases first listed on Schedule 9.2(b) later than the date that is five calendar days before the Confirmation Hearing, affected Rejection Parties shall have until the Confirmation Hearing to object to Confirmation of the Plan.

(d)    The listing of any contract or lease on Schedule 9.2(a) or 9.2(b) is not an admission that such contract or lease is an executory contract or unexpired lease or that any Debtor has any liability thereunder.  The Debtors reserve the right to assert that any of the agreements listed on Schedule 9.2(a) or 9.2(b) are not executory contracts or unexpired leases.

### Section 9.3    Categories of Executory Contracts and Unexpired Leases to Be Assumed

Pursuant to sections 365 and 1123 of the Bankruptcy Code, each of the executory contracts and unexpired leases within the following categories shall be deemed assumed as of the Effective Date (and the Proposed Cure for each shall be zero dollars), except for any executory contract or unexpired lease (i) that has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (ii) that is the subject of a motion to assume or reject pending on the Confirmation Date, (iii) that is listed on Schedule 9.2(a) or 9.2(b), (iv) that is otherwise expressly assumed or rejected pursuant to the terms of the Plan or (v) as to which a Treatment Objection has been filed and properly served by the Treatment Objection Deadline.

(a)    **Customer Programs, Foreign Agreements, Insurance Plans, Intercompany Contracts and Workers' Compensation Plans**

Subject to the terms of the first paragraph of this Section 9.3, each Customer Program, Foreign Agreement, Insurance Plan, Intercompany Contract and Workers' Compensation Plan shall be deemed assumed effective as of the Effective Date.  Nothing contained in this Section 9.3(a) shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold

against any entity, including, without limitation, the insurer under any of the Insurance Plans. Except as provided in the previous sentence, all Proofs of Claim on account of or in respect of any agreement covered by this Section 9.3(a) shall be deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court.

**(b)    Surety Bonds**

Subject to the terms of the first paragraph of this Section 9.3, each Surety Bond shall be deemed assumed effective as of the Effective Date and each Reorganized Debtor party thereto shall pay any and all premium and other obligations due or that may become due on or after the Effective Date. Additionally, as specified in Section 11.4(d), each obligation of a Debtor that is covered by the Surety Bonds, including, but not limited to, obligations of the Debtors to various Governmental Units for reclamation of mines, are not being released, discharged, precluded or enjoined by the Plan or the Confirmation Order and shall remain obligations of the applicable Reorganized Debtor as of the Effective Date. Nothing contained in this Section 9.3(b) shall constitute or be deemed a waiver of any Cause of Action that any Debtor may hold against any entity. All Proofs of Claim on account of or in respect of any agreement covered by this Section 9.3(b) shall be deemed withdrawn automatically and without further notice to or action by the Bankruptcy Court. Each Reorganized Debtor shall be deemed to have assumed as of the Effective Date, and shall continue to perform under, any of its indemnity agreements in place with each such Surety immediately prior to the Petition Date (the "**Indemnity Agreements**"). Failure to expressly identify any Indemnity Agreement in any schedule pursuant to Section 9.2 shall not imply the rejection or failure to assume that agreement. To the extent that Restructuring Transactions create new corporate entities or change the relative corporate position of Patriot Coal as parent, then each new corporate entity and/or the new corporate parent will execute an Indemnity Agreement. Notwithstanding any other provision of the Plan, all letters of credit issued to the Sureties as security for a Debtor's obligations under the Surety Bonds or Indemnity Agreements shall remain in place to secure against any "loss" (as defined in the applicable Indemnity Agreement) incurred by the respective Surety. Notwithstanding any other provisions of the Plan, nothing in the injunction and release provisions of the Plan, including Sections 11.4, 11.8, and 11.9 shall be deemed to apply to the Sureties or the Sureties' claims, nor shall these provisions be interpreted to bar, impair, prevent or otherwise limit the Sureties from exercising their rights under any of the Surety Bonds, letters of credit, Indemnity Agreements, Surface Mining Control and Reclamation Act, or the common law of suretyship.

**(c)    Directors and Officers Insurance Policies and Agreements**

To the extent that the D&O Liability Insurance Policies issued to, or entered into by, the Debtors prior to the Petition Date constitute executory contracts, notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary

contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any advancement, indemnity or other obligations of the D&O Liability Insurance Policies.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled from the insurers to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

### (d)    Certain Indemnification Obligations

Each Indemnification Obligation to a director, officer, manager or employee who was employed by any of the Debtors in such capacity on the Effective Date or immediately prior thereto shall be deemed assumed effective as of the Effective Date; *provided* that any Indemnification Obligation contained in an Employee Agreement that is rejected pursuant to Section 9.4 shall also be deemed rejected.  Each Indemnification Obligation that is deemed assumed pursuant to the Plan shall (i) remain in full force and effect, (ii) not be modified, reduced, discharged, impaired or otherwise affected in any way, (iii) be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not Proofs of Claim have been filed with respect to such obligations and (iv) survive Unimpaired and unaffected irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

Notwithstanding anything contained in the Plan, the Reorganized Debtors, in their sole discretion, may (but have no obligation to) honor each Indemnification Obligation to a director, officer, manager or employee that was no longer employed by any of the Debtors in such capacity on or immediately prior to the Effective Date, unless such obligation (i) shall have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) is the subject of a motion to reject pending on or before the Confirmation Date, (iii) is listed on Schedule 9.2(b) or (iv) is otherwise expressly rejected pursuant to the terms of the Plan or any Notice of Intent to Assume or Reject; *provided* that, for each such director, officer, manager or employee, the Reorganized Debtors shall be permitted to honor Indemnification Obligations only to the extent of available coverage under the applicable D&O Liability Insurance Policy (and payable from the proceeds of such D&O Liability Insurance Policies).

### (e)    Peabody Contracts

Subject to the terms of the first paragraph of this Section 9.3, each contract and agreement entered into by and between the Debtors and Peabody prior to the Petition Date that the Debtors are obligated to assume pursuant to the Peabody Settlement, all of which contracts and agreements are deemed executory pursuant to the terms of the Peabody Settlement, shall be deemed assumed effective as of the Effective Date with a Cure of zero dollars.

60

### Section 9.4        Other Categories of Agreements and Policies

#### (a)        Employee Agreements

Pursuant to sections 365 and 1123 of the Bankruptcy Code, each Employee Agreement entered into before the Petition Date shall be deemed rejected effective as of the Effective Date, except for any Employee Agreement (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) that is the subject of a motion to assume or reject pending on the Confirmation Date, (iii) that is listed on Schedule 9.2(a) or 9.2(b) of the Plan, (iv) that is otherwise expressly assumed or rejected pursuant to the terms of the Plan or (v) as to which a Treatment Objection has been filed and properly served by the Treatment Objection Deadline.  The assumption by the Debtors or the Reorganized Debtors or the agreement of the Debtors or the Reorganized Debtors to assume any Employee Agreement will not entitle any Person to any contractual right to any benefit or alleged entitlement under any of the Debtors' policies, programs or plans, except as to such individual and as expressly set forth in such Employee Agreement.

#### (b)        Employee Benefits

As of the Effective Date, except for Employee Agreements, and unless specifically listed on Schedule 9.2(a) or 9.2(b) or rejected or otherwise addressed by an order of the Bankruptcy Court (including, without limitation, by virtue of the Debtors having been granted the authority to terminate any such plan, policy, program or agreement or the Bankruptcy Court determining that the Debtors cannot successfully reorganize absent such termination), the Debtors and the Reorganized Debtors, in their sole discretion, may (but have no obligation to) honor, in the ordinary course of business, the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits (including retiree travel benefits), vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time.  To the extent that the above-listed contracts, agreements, policies, programs and plans are executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless a Treatment Objection is timely filed and properly served, each of them will be deemed assumed (as modified or terminated) as of the Effective Date with a Cure of zero dollars.  However, notwithstanding anything else herein, the assumed plans shall be subject to modification in accordance with the terms thereof at the discretion of the Reorganized Debtors.

61

**Section 9.5      Assumption and Rejection Procedures and Resolution of Treatment Objections**

**(a)      Proposed Assumptions**

(i)      As to any executory contract or unexpired lease to be assumed pursuant to any provision of the Plan or any Notice of Intent to Assume or Reject, unless an Assumption Party files and properly serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed assumed and, if applicable, assigned as of the Assumption Effective Date proposed by the Debtors or Reorganized Debtors, without any further notice to or action by the Bankruptcy Court, and any obligation the Debtors or Reorganized Debtors may have to such Assumption Party with respect to such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code shall be deemed fully satisfied by the Proposed Cure, if any, which shall be the Cure.

(ii)      Any objection to the assumption or assignment of an executory contract or unexpired lease that is not timely filed and properly served shall be denied automatically and with prejudice (without the need for any objection by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval by the Bankruptcy Court), and any Claim relating to such assumption or assignment shall be forever barred from assertion and shall not be enforceable against any Debtor or Reorganized Debtor or their respective Estates or properties without the need for any objection by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval by the Bankruptcy Court, and any obligation the Debtors or the Reorganized Debtors may have under section 365(b) of the Bankruptcy Code (over and above any Proposed Cure) shall be deemed fully satisfied, released and discharged, notwithstanding any amount or information included in the Schedules or any Proof of Claim.

**(b)      Proposed Rejections**

(i)      As to any executory contract or unexpired lease to be rejected pursuant to any provision of the Plan or any Notice of Intent to Assume or Reject, unless a Rejection Party files and properly serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed rejected as of the Rejection Effective Date proposed by the Debtors or Reorganized Debtors without any further notice to or action by the Bankruptcy Court.

(ii)      Any objection to the rejection of an executory contract or unexpired lease that is not timely filed and properly served shall be deemed denied automatically and with prejudice (without the need for any objection by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval by the Bankruptcy Court).

(c)     **Resolution of Treatment Objections**

(i)     On and after the Effective Date, the Reorganized Debtors may, in their sole discretion, settle Treatment Objections without any further notice to or action by the Bankruptcy Court or any other party (including by paying any agreed Cure amounts).

(ii)    For each executory contract or unexpired lease as to which a Treatment Objection is timely filed and properly served and that is not otherwise resolved by the parties after a reasonable period of time, the Debtors, in consultation with the Bankruptcy Court, shall schedule a hearing on such Treatment Objection and provide at least 21 calendar days' notice of such hearing to the relevant Assumption Party or Rejection Party.  Unless the Bankruptcy Court expressly orders or the parties agree otherwise, any assumption or rejection approved by the Bankruptcy Court notwithstanding a Treatment Objection shall be effective as of the Assumption Effective Date or Rejection Effective Date originally proposed by the Debtors or specified in the Plan.

(iii)   Any Cure shall be paid as soon as reasonably practicable following the entry of a Final Order resolving an assumption dispute and/or approving an assumption (and, if applicable, assignment), unless the Debtors or Reorganized Debtors file a Notice of Intent to Assume or Reject under Section 9.5(d).

(iv)    No Cure shall be allowed for a penalty rate or default rate of interest, each to the extent not proper under the Bankruptcy Code or applicable law.

(d)     **Reservation of Rights**

If a Treatment Objection is filed regarding any executory contract or unexpired lease sought to be assumed or rejected by any of the Reorganized Debtors, the Reorganized Debtors reserve the right (i) to seek to assume or reject such agreement at any time before the assumption, rejection or assignment of, or Cure for, such agreement is determined by Final Order and (ii) to the extent a Final Order is entered resolving a dispute as to Cure or the permissibility of assignment (but not approving the assumption of the executory contract or unexpired lease sought to be assumed), to seek to reject such agreement within 14 calendar days after the date of such Final Order, in each case by filing with the Bankruptcy Court and serving upon the applicable Assumption Party or Rejection Party, as the case may be, a Notice of Intent to Assume or Reject.

### Section 9.6     Rejection Claims

Any Rejection Claim must be filed with the Claims Agent by the Rejection Bar Date. Any Rejection Claim for which a Proof of Claim is not properly filed and served by the Rejection Bar Date shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors or their respective Estates or properties.  The Debtors or the Reorganized Debtors may contest any Rejection Claim in accordance with Section 8.1 of the Plan.

**Section 9.7**        **Assignment**

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned pursuant to the Plan shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment constitutes an unenforceable anti-assignment provision and is void and of no force or effect.  Any assignment by the Reorganized Debtors of an executory contract or unexpired lease after the Effective Date shall be governed by the terms of the executory contract or unexpired lease and applicable non-bankruptcy law.

**Section 9.8**        **Approval of Assumption, Rejection, Retention or Assignment of Executory Contracts and Unexpired Leases**

**(a)**        Entry of the Confirmation Order by the Bankruptcy Court shall, subject to the occurrence of the Effective Date, constitute approval of the rejections, retentions, assumptions and/or assignments contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease that is assumed (and/or assigned) pursuant to the Plan, shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms as of the applicable Assumption Effective Date, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing or providing for its assumption (and/or assignment), or applicable federal law.

**(b)**        The provisions (if any) of each executory contract or unexpired lease assumed and/or assigned pursuant to the Plan that are or may be in default shall be deemed satisfied in full by the Cure, or by an agreed-upon waiver of the Cure.  Upon payment in full of the Cure, any and all Proofs of Claim based upon an executory contract or unexpired lease that has been assumed in the Chapter 11 Cases or under the terms of the Plan shall be deemed disallowed and expunged with no further action required of any party or order of the Bankruptcy Court.

**(c)**        Confirmation of the Plan and consummation of the Restructuring Transactions shall not constitute a change of control under any executory contract or unexpired lease assumed by the Debtors on or prior to the Effective Date.

### Section 9.9 Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided by the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, whether or not such executory contract or unexpired lease relates to the use, acquisition or occupancy of real property, shall include (i) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in remedy related to such premises, unless any of the foregoing agreements has been or is rejected pursuant to an order of the Bankruptcy Court or is otherwise rejected as part of the Plan.

Modifications, amendments, supplements and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (i) do not alter in any way the prepetition nature of the executory contracts and unexpired leases, or the validity, priority or amount of any Claims against the Debtors that may arise under the same, (ii) are not and do not create postpetition contracts or leases, (iii) do not elevate to administrative expense priority any Claims of the counterparties to the executory contracts and unexpired leases against any of the Debtors and (iv) do not entitle any entity to a Claim under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition executory contracts or unexpired leases and subsequent modifications, amendments, supplements or restatements.

### ARTICLE 10
### PROVISIONS REGARDING CORPORATE GOVERNANCE OF THE REORGANIZED DEBTORS

### Section 10.1 Corporate Action

(a) On and after the Effective Date, the adoption, filing, approval and ratification, as necessary, of all corporate or related actions contemplated hereby for each of the Reorganized Debtors, including the Restructuring Transactions, shall be deemed authorized and approved in all respects. Without limiting the foregoing, such actions may include: (i) the adoption and filing of the New Certificate of Incorporation, (ii) the adoption and filing of the Reorganized Subsidiary Debtors' Certificates of Incorporation, (iii) the approval of the New Bylaws, (iv) the approval of the Reorganized Subsidiary Debtors' Bylaws, (v) the election or appointment, as the case may be, of directors and officers for the Reorganized Debtors, (vi) the issuance of the Rights Offering Notes, the Rights Offering Warrants and the New Common Stock, (vii) the Restructuring Transactions to be effectuated pursuant to the Plan and (viii) the qualification of any of the Reorganized Debtors as foreign corporations if and wherever the conduct of business by such entities requires such qualification.

65

(b)    All matters provided for herein involving the corporate structure of any Debtor or any Reorganized Debtor, or any corporate action required by any Debtor or any Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders or directors of such Debtor or Reorganized Debtor or by any other stakeholder.

(c)    On or after the Effective Date, the appropriate officers of each Reorganized Debtor and members of the board of directors, board of managers or equivalent body of each Reorganized Debtor are authorized and directed to issue, execute, deliver, file and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases and instruments contemplated by the Plan in the name of and on behalf of such Reorganized Debtor and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### Section 10.2    Certificates of Incorporation and Bylaws

(a)    The New Certificate of Incorporation and the New Bylaws shall be amended or deemed amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code.  The New Certificate of Incorporation will be amended or deemed amended to, among other purposes, (i) authorize the New Common Stock, (ii) pursuant to section 1123(a)(6) of the Bankruptcy Code, add a provision prohibiting the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code and (iii) add restrictions on holders' ability to transfer New Common Stock and other New Securities designed to ensure that the number of holders of such securities does not exceed the threshold at which Reorganized Patriot Coal would be required to become a reporting company under the Exchange Act; *provided* that such restrictions shall no longer be applicable in the event that the Reorganized Patriot Coal makes a public offering of its securities within the meaning of the Securities Act or the Backstop Parties exercise their demand registration rights under the Registration Rights Agreement.  After the Effective Date, the Reorganized Debtors may amend and restate their Certificates of Incorporation, organizational documents or other analogous documents as permitted by applicable law.

(b)    Subject to the Restructuring Transactions, the Reorganized Subsidiary Debtors' Bylaws in effect before the Effective Date shall remain in effect after the Effective Date.  After the Effective Date, any of the Reorganized Debtors may file amended and restated certificates of incorporation (or other formation documents, if applicable) with the Secretary of State in any appropriate jurisdiction.

### Section 10.3    Directors and Officers of the Reorganized Debtors

(a)    Subject to the Restructuring Transactions, on the Effective Date, the management, control and operation of each Reorganized Debtor shall become the general responsibility of the board of directors of such Reorganized Debtor or other governing body as provided in the applicable governing documents.

**(b)**    On the Effective Date, the term of the members of the Board shall expire and such members shall be replaced by the New Board.  The classification and composition of the New Board shall be consistent with the New Certificate of Incorporation and the New Bylaws.  In the Plan Supplement, to the extent known, the Debtors will disclose pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of the Persons proposed to serve on the New Board.  The New Board members shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the New Certificate of Incorporation and the New Bylaws.

**(c)**    Subject to the Restructuring Transactions, and except as specified in the Plan Supplement, the members of the boards of directors of the Subsidiary Debtors before the Effective Date shall continue to serve in their current capacities after the Effective Date.  The classification and composition of the boards of directors of the Reorganized Subsidiary Debtors shall be consistent with the Reorganized Subsidiary Debtors' Certificates of Incorporation and Reorganized Subsidiary Debtors' Bylaws.  Each such director shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the relevant Reorganized Debtor's constituent documents.

**(d)**    Subject to the Restructuring Transactions and any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as otherwise specified in the Plan Supplement, the principal officers of each Debtor immediately before the Effective Date will be the officers of such Reorganized Debtor as of the Effective Date.  Each such officer shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of such Reorganized Debtor's constituent documents.

## ARTICLE 11
### EFFECT OF CONFIRMATION

**Section 11.1    Vesting of Assets**

Except as otherwise provided herein or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights and privileges related thereto) of each of the Debtors shall vest in each of the respective Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests.  All Liens, Claims, encumbrances, charges and other interests shall be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and settle and compromise Claims and Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code.

67

### Section 11.2      Release of Liens

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released, settled, discharged and compromised and all rights, titles and interests of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns.  The Reorganized Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges or other security interests.

### Section 11.3      Releases and Discharges

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by holders of Claims, constitute good faith compromises and settlements of the matters covered thereby and are consensual.  Such compromises and settlements are made in exchange for consideration and are in the best interest of holders of Claims, are fair, equitable, reasonable and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.  Each of the discharge, release, indemnification and exculpation provisions set forth in the Plan, including, without limitation, those set forth in the UMWA Settlement, the UMWA Settlement Order, the Non-Union Retiree Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement and the Peabody Settlement Order, each of which are incorporated herein by reference, (a) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b) and 1334(e) of title 28 of the United States Code, (b) is an essential means of implementing the Plan, (c) is an integral and non-severable element of the transactions incorporated into the Plan, (d) confers a material benefit on, and is in the best interests of, the Debtors, their Estates and their Creditors, (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors, (f) is fair, equitable and reasonable and in exchange for good and valuable consideration and (g) is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.  Nothing in the Plan shall be deemed to impair, extinguish or negatively impact any Charging Lien.

### Section 11.4      Discharge and Injunction

**(a)      Except as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all existing debts and Claims, and shall terminate all Interests of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except**

68

as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, upon the Effective Date, all existing Claims against the Debtors and Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Interests (and all representatives, trustees or agents on behalf of each holder) shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees, or any of their assets or properties, any other or further Claim or Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against, liabilities of and Interests in the Debtors, subject to the occurrence of the Effective Date.

(b)     Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, each holder (as well as any representatives, trustees or agents on behalf of each holder) of a Claim or Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, the Debtors.

(c)     Except as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, all persons or entities who have held, hold or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, representatives and Affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including, without limitation, a Section 510(b) Claim) or Interest against the Debtors, the Reorganized Debtors or property of any Debtors or Reorganized Debtors, other than to enforce any right to a distribution pursuant to the Plan, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Reorganized Debtors or property of any Debtors or Reorganized Debtors, other than to enforce any right to a distribution pursuant to the Plan, (iii) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors other than to enforce any right to a distribution pursuant to the Plan or (iv) asserting any right of set-off, subrogation or recoupment of any kind against any obligation due from the Debtors or Reorganized Debtors or against the property or

69

interests in property of the Debtors or Reorganized Debtors, with respect to any such Claim or Interest. Such injunction shall extend to any successors or assignees of the Debtors and Reorganized Debtors and their respective properties and interest in properties.

(d)     Nothing in the Plan or the Confirmation Order releases, discharges, precludes, exculpates, or enjoins the enforcement of: (i) any liability or obligation to, or any Claim or cause of action by, a Governmental Unit under any applicable Environmental Law to which any Entity is subject as and to the extent that they are the owner, lessee, controller, or operator of real property or a mining operation after the Effective Date (whether or not such liability, obligation, Claim or cause of action is based in whole or part on acts or omission prior to the Confirmation Date); (ii) any liability to a Governmental Unit under any applicable Police or Regulatory Law that is not a Claim; (iii) the Debtors' and Reorganized Debtors' obligations under (1) the Consent Decree in *United States v. Patriot Coal et al.,* 2:09cv0099 (S.D. W.Va.), (2) the settlement and consent order (including subsequent modifications) entered in *Mandirola v. Hobet Mining, LLC and Catenary Coal Co., LLC,* Case Nos. 07-C-03 & 10-C-96 (W. Va. Cir. Ct. Boone County), (3) the settlement and consent order (including subsequent modifications) entered in *Mandirola v. Apogee Coal Co., LLC,* Case No. 10-C-144 (W. Va. Cir. Ct. Logan County), (4) the consent decree and court orders in *Ohio Valley Environmental Coalition, Inc. v. Hobet Mining, LLC, et al.,* Case Nos. 3:07-cv-00413, 3:08-cv-00088, and 3:09-cv-01167 (S.D. W.Va.), and (5) the consent decree in *Ohio Valley Environmental Coalition, Inc. v. Patriot Coal Corp., et al.,* Case No. 3:11-cv-00115 (S.D. W. Va.); (iv) any Claim of a Governmental Unit under any applicable Police or Regulatory Law arising on or after the Confirmation Date; (v) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors; (vi) any liability to a Governmental Unit under the Mine Act, any state mine safety law or the BLBA; or (vii) any valid right of setoff or recoupment by any Governmental Unit. Nothing in this Plan or any Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

(e)     For the avoidance of doubt, nothing in the Plan or the Confirmation Order, or any documents incorporated by reference herein, including, without limitation, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, is to be construed as (i) (a) releasing, discharging, precluding, waiving or enjoining the liability of the Reorganized Debtors or any third party to the UMWA 1974 Pension Plan, the UMWA 1992 Benefit Plan or the UMWA Combined Benefit Fund (collectively, the "UMWA Plans"), if any, on account of any claim by or on behalf of the UMWA Plans, if any, (b) releasing, discharging, precluding, waiving or enjoining the liability of any third party to the UMWA 2012 Retiree Bonus Account Trust or the UMWA 1993 Benefit Plan (collectively, the "Other UMWA Plans"), if any, on account of any claim by or on behalf of the Other UMWA Plans, or (c) releasing, discharging, precluding, waiving or enjoining the liability of the Reorganized Debtors to the Other UMWA Plans, if any, on account of any claim by or on behalf of the Other UMWA Plans, solely, in the case of this subclause (c), to the extent arising on or after

70

the Effective Date; or (ii) affecting the rights and defenses of any party with respect to any such Claim. It being understood that this provision shall not apply with respect to any Causes of Action of the Debtors or the Reorganized Debtors against Arch or Peabody that are released under the Arch Settlement Order or the Peabody Settlement Order, as applicable, or the Arch Settlement or the Peabody Settlement, as applicable.

(f) Nothing in this Plan (including, without limitation, this Section 11.4) or the Confirmation Order, shall (i) release, waive, or discharge the Potential LRPB Claims or (ii) preclude the LRPB Lessors from prosecuting the Potential LRPB Claims against the Reorganized Debtors and/or any other person or entity to the fullest extent permitted by applicable law from and after the Effective Date. Nothing in this Plan or the Confirmation Order or any other order or decree entered into after November 1, 2013 shall be deemed to impair, bar or estop the LRPB Lessors from exercising their rights (i) available pursuant to applicable law or (ii) set forth in the LRPB Lease, in each case from and after the Effective Date.

(g) Nothing in the Plan or Confirmation Order, or any documents incorporated by reference herein, including, without limitation, the Peabody Settlement and the Peabody Settlement Order, limits or in any way affects (i) the liability of the Debtors, the Reorganized Debtors, or any third party to successful claimants or the DOL under the BLBA, (ii) the DOL's power to administer the Mine Act or the BLBA, including, without limitation, the authority to determine whether and under what conditions the Debtors, the Reorganized Debtors, or any third party shall be authorized to self-insure their BLBA liabilities and the form and amount of security necessary to secure those liabilities, or (iii) the liability of, or right of action against, any non-Debtor for any Claim under ERISA by a Governmental Unit.

Section 11.5    Term of Injunction or Stays

Unless otherwise provided herein, any injunction or stay arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

Section 11.6    Exculpation

Pursuant to the Plan, and except as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, none of the Exculpated Parties shall have or incur any liability to any holder of a Claim, Cause of Action or Interest for any act or omission in connection with, related to or arising out of, the Chapter 11 Cases, the negotiation of any settlement or, agreement, contract, instrument, release or document created or entered into in connection with the Plan or in the Chapter 11 Cases (including the Plan Supplement, the Rights Offerings, the

71

Backstop Rights Purchase Agreement, the Rights Offerings Procedures, the DIP Facilities, the UMWA Settlement, the Non-Union Retiree Settlement Order (including the termination of life insurance benefits in accordance with paragraph 10 thereof), the Arch Settlement, the Peabody Settlement and, in each case, any documents related thereto), the pursuit of confirmation of the Plan, the consummation of the Plan, the preparation and distribution of the Disclosure Statement, the offer, issuance and distribution of any securities issued or to be issued under or in connection with the Plan, including pursuant to the Rights Offerings and the Backstop Rights Purchase Agreement, the Backstop Fees, the Backstop Expense Reimbursement, any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or the administration of the Plan or the property to be distributed under the Plan, except for any act or omission that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence. Each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.

### Section 11.7    Release by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (including Section 11.12 of the Plan), the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to these Chapter 11 Cases, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors and their Estates from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, their Estates and/or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Reorganized Debtors, their estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity or that any holder of a Claim or Interest or other entity would have been legally entitled to assert for or on behalf of the Debtors, their estates or the Reorganized Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party excluding any assumed executory contract or lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the DIP Facilities, the Loan Documents (as defined in the

72

Prepetition Credit Agreement), the Exit Credit Facilities Documents, the Rights Offerings, the Backstop Rights Purchase Agreement, the Rights Offerings Procedures, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement, the Peabody Settlement Order or, in each case, related agreements, instruments or other documents, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided, however*, that if any Released Party directly or indirectly brings or asserts any Claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against the Debtors or the Reorganized Debtors, or any of their respective Affiliates, officers, directors, members, employees, advisors, actuaries, attorneys, financial advisors, investment bankers, professionals or agents, in each case, solely in their capacity as such, then the release set forth in this Section 11.7 shall automatically and retroactively be null and void *ab initio* with respect to such Released Party bringing or asserting such Claim or Cause of Action; *provided further* that the immediately preceding proviso shall not apply to (i) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority or secured status of any prepetition or ordinary course administrative Claim against the Debtors, (ii) any release or indemnification provided for in any settlement or granted under any other court order, including, without limitation, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, (iii) any action by a Released Party to enforce such Released Party's rights against the Debtors and/or the Reorganized Debtors under the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, or (iv) any action by the DIP Agents or DIP Lenders to enforce their rights under the DIP Facilities relating to Contingent DIP Obligations or any Approved Second Out DIP L/C Arrangement, in which case of (i) through (iv), however, the Debtors shall retain all defenses related to any such action.

### Section 11.8    Voluntary Releases by the Holders of Claims and Interests

Except as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, on and after the Effective Date, for good and valuable consideration, holders of Claims that (i) are deemed to have accepted the Plan or (ii) (a) vote to accept or reject the Plan and (b) do not elect (as permitted on the Ballots) to opt out of the releases contained in this paragraph shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Released Parties from any and all claims, equity interests, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, the Debtors'

73

Estates and/or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the restructuring, the Chapter 11 Cases, the DIP Facilities, the Loan Documents (as defined in the Prepetition Credit Agreement), the UMWA Settlement, the UMWA Settlement Order, the Non-Union Retiree Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement, the Peabody Settlement Order, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party excluding any assumed executory contract or lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offerings, the Exit Credit Facilities Documents, the Backstop Rights Purchase Agreement, the Rights Offerings Procedures, or, in each case, related agreements, instruments or other documents, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided* that any holder of a Claim that elects to opt out of the releases contained in this paragraph shall not receive the benefit of the releases set forth in this paragraph (even if for any reason otherwise entitled); *provided*, *further*, that no Governmental Unit shall be deemed to have given the foregoing release.

Section 11.9    Injunction

Except as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, all Entities who have held, hold or may hold claims, interests, Causes of Action or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to Section 11.7 hereof; (3) have been released pursuant to Section 11.8 hereof; (4) have been released or are contemplated to be released pursuant to the UMWA Settlement, the UMWA Settlement Order, the Non-Union Retiree Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, (5) are subject to exculpation pursuant to Section 11.6 hereof, including exculpated claims (but only to the extent of the exculpation provided in Section 11.6 hereof); or (6) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind,

74

whether directly, derivatively or otherwise, including on account of any claims, interests, Causes of Action or liabilities that have been compromised or settled against the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised, or exculpated claims, interests, Causes of Action or liabilities; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property of the Debtors or the Estates, the Reorganized Debtors, or any Entity so released or exculpated) on account of or in connection with or with respect to any such released, settled, compromised, or exculpated claims, interests, Causes of Action, or liabilities; (c) creating, perfecting or enforcing any lien, claim, or encumbrance of any kind against the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property of the Debtors or the Estates, the Reorganized Debtors, or any Entity so released or exculpated) on account of or in connection with or with respect to any such released, settled, compromised, or exculpated claims, interests, Causes of Action, or liabilities; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property of the Debtors or the Estates, the Reorganized Debtors, or any Entity so released or exculpated) on account of or in connection with or with respect to any such released, settled, compromised, or exculpated claims, interests, Causes of Action or liabilities unless such holder has filed a timely proof of claim with the Bankruptcy Court preserving such right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property of the Debtors or the Estates, the Reorganized Debtors, or any Entity so released or exculpated) on account of or in connection with or with respect to any such released, settled, compromised, or exculpated claims, interests, Causes of Action, or liabilities released, settled or compromised pursuant to the Plan; *provided* that nothing contained herein shall preclude an Entity from obtaining benefits directly and expressly provided to such Entity pursuant to the terms of the Plan; *provided*, further, that nothing contained herein shall be construed to prevent any Entity from defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.

Section 11.10    Set-off and Recoupment

The Debtors and the Reorganized Debtors may, but shall not be required to, set off or recoup against any Claim and any distribution to be made on account of such Claim, any and all claims, rights and Causes of Action of any nature that the Debtors may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, *however*, that neither the failure to effect such a set-off or recoupment nor the allowance of any Claim hereunder shall constitute a waiver, abandonment or release by the Debtors or the Reorganized Debtors of any such claims,

75

rights and Causes of Action that the Debtors or the Reorganized Debtors may have against the holder of such Claim.

### Section 11.11   Avoidance Actions

On the Effective Date, the Reorganized Debtors shall be deemed to waive and release all Avoidance Actions; *provided* that, except as expressly provided in this Article 11, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, the Reorganized Debtors shall retain the right to assert any Avoidance Actions as defenses or counterclaims in any Cause of Action brought by any Creditor.

### Section 11.12   Preservation of Causes of Action

(a)     Except as expressly provided in this Article 11, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors, the Reorganized Debtors or the Estates may have or that the Reorganized Debtors may choose to assert on behalf of their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim and/or claim for set-off that seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors or representatives or (ii) the turnover of any property of the Estates.

(b)     Except as set forth in this Article 11, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan.  The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such rights and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

(c)     Except as set forth in this Article 11, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### Section 11.13   Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Causes of Action and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have relating to any Allowed Claim, or any distribution to be made on account of such an Allowed Claim.  Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the benefits provided under the Plan and as a mechanism to effect a fair distribution of value to the Debtors' constituencies, except as set forth in the Plan, the provisions of the Plan shall also constitute a good faith compromise of all Claims, Causes of Action and controversies by any Debtor against any other Debtor.  In each case, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and the holders of such Claims and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order or approval of the Bankruptcy Court, the Debtors may compromise and settle Claims against them and Causes of Action against other Entities, in their sole discretion, and after the Effective Date, such right shall pass to the Reorganized Debtors.

## ARTICLE 12
### CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### Section 12.1   Conditions to Confirmation

Confirmation of the Plan will not occur unless each of the following conditions has been satisfied or waived in accordance with Section 12.3 of the Plan:

(a)   The Confirmation Order shall be entered;

(b)   The Debtors shall have received a binding commitment for the Exit Credit Facilities; and

(c)   The Backstop Rights Purchase Agreement shall have been executed and the Backstop Approval Order shall have been entered.

### Section 12.2   Conditions to Effectiveness

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date, or waived in accordance with Section 12.3 of the Plan:

(a)   The Confirmation Order shall have been entered, and there shall not be a stay or injunction in effect with respect thereto;

77

SA000315

**(b)**     The Backstop Rights Purchase Agreement shall be in full force and effect and the transactions contemplated thereunder shall have been consummated and there shall not be a stay or injunction in effect with respect thereto;

**(c)**     The Exit Credit Facilities Documents shall have been duly executed and delivered by the Reorganized Debtors parties thereto, and all conditions precedent to the consummation of the Exit Credit Facilities shall have been waived or satisfied in accordance with the terms thereof and the closing of the Exit Credit Facilities shall have occurred;

**(d)**     The Voting Trust(s) shall have been formed;

**(e)**     Each of the New CBAs, the MOU and the VFA shall be effective in accordance with the terms thereof;

**(f)**     The Arch Settlement Order shall have been entered by the Bankruptcy Court;

**(g)**     The Peabody Settlement Order shall have been entered by the Bankruptcy Court;

**(h)**     All actions, documents and agreements necessary to implement the Plan shall have been effected or executed;

**(i)**     The Debtors shall have received any authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and that are required by law, regulation or order;

**(j)**     Each of the New Certificate of Incorporation, the New Bylaws, the Reorganized Subsidiary Debtors' Certificates of Incorporation and the Reorganized Subsidiary Debtors' Bylaws, each in form and substance reasonably acceptable to the Backstop Parties, will be in full force and effect as of the Effective Date; and

**(k)**     The Plan Documents shall have been executed and delivered by all of the parties thereto.

### Section 12.3     Satisfaction and Waiver of Conditions to Effectiveness

The Debtors may waive, at any time, (i) any of the conditions set forth in Section 12.2(a) through (c) hereof in consultation with the Creditors' Committee and with the consent of the DIP Agents and the Backstop Parties, (ii) the condition set forth in Section 12.2(d) hereof with the consent of the Backstop Parties and in consultation with the Creditors' Committee, (iii) any of the conditions set forth in Section 12.2(e) through (g) hereof with the consent of the Backstop Parties and in consultation with the DIP Agents and the Creditors' Committee and (iv) any of the conditions set forth in Section 12.2(h) through (k) in consultation with the DIP Agents, the Creditors' Committee and the Backstop Parties, in each case, without any notice to other parties-in-interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan.   The failure to satisfy any condition before the Confirmation Date or the Effective Date may be asserted by the Debtors as a reason not to seek

78

Confirmation or declare an Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors, in their sole discretion). The failure of the Debtors, in their sole discretion, to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE 13
### MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### Section 13.1    Plan Modifications

(a)    Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors may alter, amend or modify the Plan, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date; *provided*, *however*, that the Debtors shall consult with (i) the DIP Agents, the Creditors' Committee and the Backstop Parties with respect to any proposed alteration, amendment or modification of the Plan, (ii) Peabody, with respect to any proposed alteration, amendment or modification that relates to the Peabody Settlement or the Peabody Settlement Order, which may require Peabody's consent in accordance with the terms thereof and (iii) Arch, with respect to any proposed alteration, amendment or modification that relates to the Arch Settlement or the Arch Settlement Order, which may require Arch's consent in accordance with the terms thereof. After the Confirmation Date and before substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure Statement or the Confirmation Order relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    Before the Effective Date, the Debtors may make appropriate adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court; *provided* that such adjustments and modifications do not materially and adversely affect the treatment of holders of Claims or Interests.

### Section 13.2    Revocation or Withdrawal of the Plan and Effects of Non-Occurrence of Confirmation or Effective Date

The Debtors reserve the right to, after consulting with the Creditors' Committee, revoke, withdraw or delay consideration of the Plan before the Confirmation Date, either entirely or as to any one or more of the Debtors, and to file subsequent amended plans of reorganization. If the Plan is revoked, withdrawn or delayed as to fewer than all of the Debtors, such revocation, withdrawal or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn or delayed. If the Debtors revoke or withdraw the Plan in its entirety or if the Confirmation Date or the Effective Date does not occur, then, absent further order of the Bankruptcy Court, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court

79

embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases effected by the Plan and any document or agreement executed pursuant hereto, shall be deemed null and void and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (2) prejudice in any manner the rights of such Debtors or any other Person or (3) constitute an admission of any sort by the Debtors or any other Person.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction over any request to extend the deadline for assuming or rejecting executory contracts or unexpired leases.

For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall alter the rights and remedies of the DIP Agents or the DIP Lenders under the DIP Documents and the DIP Order, inclusive of, without limitation, the DIP Agents' rights to exercise remedies should an event of default occur at any time (including between Confirmation and the Effective Date).

## ARTICLE 14
### RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     To hear and determine all matters relating to the assumption or rejection of executory contracts or unexpired leases and the allowance of Cure amounts and Claims resulting therefrom;

(b)     To hear and determine any motion, adversary proceeding, application, contested matter or other litigated matter pending on or commenced after the Confirmation Date;

(c)     To hear and determine all matters relating to the allowance, disallowance, liquidation, classification, priority or estimation of any Claim;

(d)     To hear and determine matters relating to the DIP Facilities and the DIP Order;

(e)     To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(f)     To hear and determine all applications for compensation and reimbursement of Professional Fee Claims;

(g)     To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement or any order of the Bankruptcy Court,

including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing;

(i)    To issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(j)    To issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan;

(k)    To enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(l)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(m)    To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code;

(n)    To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Approval Order, the Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to the Plan, the Disclosure Statement or the Plan Supplement;

(o)    To recover all assets of the Debtors and property of the Debtors' Estates, which shall be for the benefit of the Reorganized Debtors, wherever located;

(p)    To hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(q)    To hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(r)    To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases with respect to any Person;

81

    **(s)**    To hear and resolve any disputes relating to the Rights Offerings (and the conduct thereof) and the issuances of Rights;

    **(t)**    To hear and resolve any disputes relating to the Backstop Rights Purchase Agreement;

    **(u)**    To hear and resolve any disputes relating to the UMWA Settlement, the UMWA Settlement Order, the Non-Union Retiree Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order; *provided*, *however*, that nothing in the Plan or the Confirmation Order shall alter the alternative dispute resolution provisions of the New CBAs or the MOU;

    **(v)**    To hear any other matter not inconsistent with the Bankruptcy Code; and

    **(w)**    To enter a final decree closing the Chapter 11 Cases.

    Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims.

    Notwithstanding the foregoing, nothing in the Plan or the Confirmation Order divests any tribunal of any jurisdiction it may have under applicable Environmental Law to adjudicate any defense asserted under the Plan or the Confirmation Order or grants the Bankruptcy Court any jurisdiction over the Non-Union Retiree VEBA or the Patriot Retirees VEBA.

## ARTICLE 15
### MISCELLANEOUS

### Section 15.1    Exemption from Transfer Taxes and Recording Fees

    Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, Transfer or exchange of notes or equity securities under the Plan, the creation, the filing or recording of any mortgage, deed of trust or other security interest, the making, assignment, filing or recording of any lease or sublease, the transfer of title to or ownership of any of the Debtors' interests in any property, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the Plan Documents, the New Common Stock, and any agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment in the United States. The Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

SA000320

### Section 15.2        Expedited Tax Determination

The Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of such Debtors or Reorganized Debtors for all taxable periods ending on or before the Effective Date.

### Section 15.3        Payment of Fees and Expenses of the Indenture Trustees

On the Effective Date or as soon as reasonably practicable thereafter (or, if post-Effective Date, promptly upon receipt of invoice), the Reorganized Debtors shall pay in full in Cash all reasonable and documented fees and expenses of (i) the Convertible Notes Trustee and its counsel through the Effective Date and for services rendered post-Effective Date to implement the Plan; *provided, however*, that, in no event shall such fees and expenses for post-Effective Date services for counsel exceed $25,000, and *provided, further* that, in no event shall the fees and expenses covered by this subclause (i) exceed $1.35 million in the aggregate; and (ii) the Senior Notes Trustee and its counsel through the Effective Date and for services rendered post-Effective Date to implement the Plan; *provided, however*, that, in no event shall such fees and expenses for post-Effective Date services for counsel exceed $25,000, and *provided, further* that, in no event shall the fees and expenses covered by this subclause (ii) exceed $1.65 million in the aggregate.

### Section 15.4        Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of title 28 of the United States Code and/or section 3717 of title 31 of the United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

### Section 15.5        Dissolution of the Creditors' Committee and the Non-Union Retiree Committee

After the entry of the Effective Date, the Creditors' Committee's and the Non-Union Retiree Committee's functions shall be restricted to and shall not be heard on any issue except applications filed pursuant to sections 330 and 331 of the Bankruptcy Code.  Upon the resolution of all applications filed by the Creditors' Committee and the Non-Union Retiree Committee pursuant to sections 330 and 331 of the Bankruptcy Code, the Creditors' Committee or Retiree Committee, as applicable, shall dissolve, and the members thereof, in their capacities as such, shall be released and discharged from all rights, duties, responsibilities and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that the Creditors' Committee shall have the right to be heard solely in connection with all Professional Fee Claims and shall be deemed to remain in existence solely with respect thereto.

### Section 15.6    Plan Supplement

Draft forms of certain Plan Documents and certain other documents, agreements, instruments, schedules and exhibits specified in the Plan shall, where expressly so provided for in the Plan, be contained in the Plan Supplement filed from time to time. Unless otherwise expressly provided in the Plan, the Debtors may file any Plan Supplement until five (5) days prior to the Voting Deadline and may alter, modify or amend any Plan Supplement in accordance with Section 13.1 of the Plan. Holders of Claims or Interests may obtain a copy of the Plan Supplement on the Debtors' Case Information Website or the Bankruptcy Court's Website.

### Section 15.7    Claims Against Other Debtors

Nothing in the Plan or the Disclosure Statement or any document or pleading filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim against any other Debtor.

### Section 15.8    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### Section 15.9    Section 1125 of the Bankruptcy Code

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan and, therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### Section 15.10    Severability

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected,

impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. Notwithstanding the foregoing, each of the Peabody Settlement and the Arch Settlement, each of which is incorporated herein by reference, including, without limitation, the respective release and injunction provisions contained therein, are integral to and not severable from the Plan and may not be altered or interpreted without the consent of the respective parties thereto.

### Section 15.11    Governing Law

Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent the Plan, an exhibit or a schedule hereto, a Plan Document or any settlement incorporated herein provide otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Missouri, without giving effect to the principles of conflict of laws thereof.

### Section 15.12    Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former holders of Claims or Interests and their respective heirs, executors, administrators, successors and assigns.

### Section 15.13    Notices

To be effective, any notice, request or demand to or upon, as applicable, the Debtors, the Creditors' Committee or the United States Trustee must be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually received and confirmed by the relevant party as follows:

If to the Debtors:

> Patriot Coal Corporation
> 12312 Olive Boulevard
> St. Louis, Missouri 63141
> Attn:   Joseph W. Bean
>             Jacquelyn A. Jones
> Facsimile: (314) 275-3660

with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn:   Marshall S. Huebner
        Brian M. Resnick
Telephone: (212) 450-4000
Facsimile:  (212) 607-7983

If to the Creditors' Committee:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn:   Thomas Moers Mayer
        Adam C. Rogoff
        P. Bradley O'Neill
        Gregory G. Plotko
Telephone: (212) 715-9100
Facsimile:  (212) 715-8000

If to the Backstop Parties:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Stephen E. Hessler
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900

If to the United States Trustee:

Office of the United States Trustee
111 S. 10th St., Suite 6.353
St. Louis, Missouri 63102-1125
Attn:   Leonora S. Long
Telephone: (314) 539-2976

If to the Reorganized Debtors:

> Patriot Coal Corporation
> 12312 Olive Boulevard
> St. Louis, Missouri 63141
> Attn:   Joseph W. Bean
>             Jacquelyn A. Jones
> Facsimile: (314) 275-3660

> with a copy to:

> Davis Polk & Wardwell LLP
> 450 Lexington Avenue
> New York, New York 10017
> Attn:   Marshall S. Huebner
>             Brian M. Resnick
> Telephone: (212) 450-4000
> Facsimile:  (212) 607-7983

### Section 15.14    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Before the Effective Date, none of the filing of the Plan, any statement or provision contained herein or the taking of any action by the Debtors related to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors of any kind, including as to the holders of Claims or Interests or as to any treatment or classification of any contract or lease.

### Section 15.15    Further Assurances

The Debtors, the Reorganized Debtors and all holders of Claims receiving distributions hereunder and all other parties in interest may and shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### Section 15.16    Case Management Order

Except as otherwise provided herein, the Case Management Order shall remain in full force and effect, and all Court Papers (as defined in the Case Management Order) shall be filed and served in accordance with the procedures set forth in the Case Management Order; *provided* that on and after the Effective Date, Court Papers (as defined in the Case Management Order) need only be served on (i) the chambers of the Honorable Kathy Surratt-States, United States

Bankruptcy Court for the Eastern District of Missouri, Thomas F. Eagleton US Courthouse, 110 S. 10th Street, 4th Floor, St. Louis, Missouri 63102 (by a hard copy, with all exhibits, unless the Bankruptcy Court otherwise directs), (ii) the attorneys for the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner and Brian M. Resnick and (iii) Kramer, Levin, Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10035, Attn: Thomas Moers Mayer, Adam C. Rogoff and Gregory G. Plotko, counsel to the Creditors' Committee; *provided further* that final requests for payment of Professional Fee Claims filed pursuant to Section 7.1(a) of the Plan (and all Court Papers related thereto) shall also be served on the Office of the United States Trustee for the Eastern District of Missouri, 111 S. 10th Street, Suite 6.353, St. Louis, Missouri 63102-1125, Attn: Leonora S. Long.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

SA000326

USCA4 Appeal: 24-2051    Doc: 34-1        Filed: 02/10/2025    Pg: 329 of 340

Case 2:20-cv-00487   Document 105-16   Filed 11/22/21   Page 181 of 172 PageID #: 1602
Case 12-51502   Doc 5169-1   Filed 12/18/13   Entered 12/18/13 15:01:51   Appendix A
Pg 96 of 103

Dated: St. Louis, Missouri
       December 15, 2013

             Respectfully submitted,

             PATRIOT COAL CORPORATION (for itself and
             on behalf of all Debtors)

By:   */s/ Bennett K. Hatfield*
        Name:  Bennett K. Hatfield
        Title:   President and Chief Executive Officer

89

**Schedule A**
Debtor Entities

| Debtor No. | Identifier | Debtor | Case No. | EIN |
|---|---|---|---|---|
| 1 |  | Patriot Coal Corporation | 12-51502 | 20-5622045 |
| 2 | AMC | Affinity Mining Company | 12-52020 | 25-1207512 |
| 3 | ACC | Apogee Coal Company, LLC | 12-52026 | 35-0672865 |
| 4 | AMS | Appalachia Mine Services, LLC | 12-52021 | 20-1680233 |
| 5 | BDC | Beaver Dam Coal Company, LLC | 12-52022 | 61-0129825 |
| 6 | BEL | Big Eagle, LLC | 12-52027 | 54-1985006 |
| 7 | BER | Big Eagle Rail, LLC | 12-52028 | 54-1988672 |
| 8 | BSC | Black Stallion Coal Company, LLC | 12-52030 | 20-0657792 |
| 9 | BWC | Black Walnut Coal Company | 12-52029 | 68-0541705 |
| 10 | BMS | Bluegrass Mine Services, LLC | 12-52031 | 43-1540253 |
| 11 | BRO | Brody Mining, LLC | 13-48727 | 27-0140610 |
| 12 | BTC | Brook Trout Coal, LLC | 12-52034 | 26-0004876 |
| 13 | CAT | Catenary Coal Company, LLC | 12-52036 | 43-1515836 |
| 14 | CSC | Central States Coal Reserves of Kentucky, LLC | 12-52038 | 20-3960681 |
| 15 | CHA | Charles Coal Company, LLC | 12-52037 | 04-2698757 |
| 16 | CLE | Cleaton Coal Company | 12-52039 | 43-1887526 |
| 17 | CCL | Coal Clean LLC | 12-52040 | 31-1488063 |
| 18 | CPL | Coal Properties, LLC | 12-52041 | 04-2702708 |
| 19 | CR2 | Coal Reserve Holding Limited Liability Company No. 2 | 12-52042 | 43-1922735 |
| 20 | COL | Colony Bay Coal Company | 12-52043 | 55-0604613 |
| 21 | CMC | Cook Mountain Coal Company, LLC | 12-52044 | 55-0732291 |
| 22 | CRL | Corydon Resources LLC | 12-52045 | 45-2463790 |
| 23 | CMS | Coventry Mining Services, LLC | 12-52046 | 45-0573119 |
| 24 | COY | Coyote Coal Company LLC | 12-52047 | 20-8226141 |
| 25 | CUB | Cub Branch Coal Company LLC | 12-52048 | 45-2977278 |

USCA4 Appeal: 24-2051   Doc: 34-1   Filed: 02/10/2025   Pg: 331 of 340

Case 1:20-cv-00487   Document 105-16   Filed 11/22/21   Page 183 of 172 PageID #: 1604
Case 12-51502   Doc 5169-1   Filed 12/18/13   Entered 12/18/13 15:01:51   Appendix A
Pg 98 of 103

| Debtor No. | Identifier | Debtor | Case No. | EIN |
|---|---|---|---|---|
| 26 | DAK | Dakota LLC | 12-52050 | 55-0763723 |
| 27 | DAL | Day LLC | 12-52049 | 20-0041392 |
| 28 | DMC | Dixon Mining Company, LLC | 12-52051 | 62-1872287 |
| 29 | DHH | Dodge Hill Holding JV, LLC | 12-52053 | 05-0575436 |
| 30 | DHM | Dodge Hill Mining Company, LLC | 12-52055 | 61-1378899 |
| 31 | DHK | Dodge Hill of Kentucky, LLC | 12-52054 | 02-0697247 |
| 32 | ECI | EACC Camps, Inc. | 12-52056 | 25-0600150 |
| 33 | EAC | Eastern Associated Coal, LLC | 12-52057 | 25-1125516 |
| 34 | ECC | Eastern Coal Company, LLC | 12-52059 | 20-4099004 |
| 35 | ERL | Eastern Royalty, LLC | 12-52060 | 04-2698759 |
| 36 | EPL | Emerald Processing, L.L.C. | 12-52061 | 54-1766524 |
| 37 | GEC | Gateway Eagle Coal Company, LLC | 12-52062 | 27-4256908 |
| 38 | GEM | Grand Eagle Mining, LLC | 12-52064 | 61-1250622 |
| 39 | HCC | Heritage Coal Company LLC | 12-52063 | 13-2606920 |
| 40 | HIG | Highland Mining Company, LLC | 12-52065 | 43-1869675 |
| 41 | HIL | Hillside Mining Company | 12-52066 | 55-0695451 |
| 42 | HML | Hobet Mining, LLC | 12-52068 | 31-4446083 |
| 43 | IHC | Indian Hill Company LLC | 12-52069 | 20-0066123 |
| 44 | ICS | Infinity Coal Sales, LLC | 12-52070 | 26-0004884 |
| 45 | IHL | Interior Holdings, LLC | 12-52072 | 43-1700075 |
| 46 | IOC | IO Coal LLC | 12-52073 | 55-0769812 |
| 47 | JBC | Jarrell's Branch Coal Company | 12-52075 | 73-1625894 |
| 48 | JHL | Jupiter Holdings LLC | 12-52076 | 31-1688670 |
| 49 | KEC | Kanawha Eagle Coal, LLC | 12-52077 | 54-1969926 |
| 50 | KR1 | Kanawha River Ventures I, LLC | 12-52078 | 20-0089445 |
| 51 | KR2 | Kanawha River Ventures II, LLC | 12-52079 | 20-0506578 |

| Debtor No. | Identifier | Debtor | Case No. | EIN |
|---|---|---|---|---|
| 52 | KR3 | Kanawha River Ventures III, LLC | 12-52080 | 20-0506617 |
| 53 | KEV | KE Ventures, LLC | 12-52081 | 54-1985007 |
| 54 | LCL | Little Creek LLC | 12-52082 | 20-0041764 |
| 55 | LFC | Logan Fork Coal Company | 12-52083 | 73-1625895 |
| 56 | MAG | Magnum Coal Company LLC | 12-52084 | 20-3678373 |
| 57 | MCS | Magnum Coal Sales LLC | 12-52085 | 20-4623056 |
| 58 | MAR | Martinka Coal Company, LLC | 12-52086 | 55-0716084 |
| 59 | MTE | Midland Trail Energy LLC | 12-52087 | 26-1629024 |
| 60 | MCR | Midwest Coal Resources II, LLC | 12-52088 | 20-8080003 |
| 61 | MVC | Mountain View Coal Company, LLC | 12-52089 | 25-1474206 |
| 62 | NTC | New Trout Coal Holdings II, LLC | 12-52090 | 20-5032361 |
| 63 | NEI | Newtown Energy, Inc. | 12-52091 | 55-0685209 |
| 64 | NPC | North Page Coal Corp. | 12-52092 | 31-1210133 |
| 65 | OCC | Ohio County Coal Company, LLC | 12-52094 | 20-8080158 |
| 66 | PAN | Panther LLC | 12-52095 | 55-0763722 |
| 67 | PBD | Patriot Beaver Dam Holdings, LLC | 12-52017 | 90-0858476 |
| 68 | PCC | Patriot Coal Company, L.P. | 12-52096 | 61-1258748 |
| 69 | PCS | Patriot Coal Sales LLC | 12-52097 | 26-0232530 |
| 70 | PCR | Patriot Coal Services LLC | 12-52102 | 27-3459485 |
| 71 | PLC | Patriot Leasing Company LLC | 12-52103 | 20-8819264 |
| 72 | PMH | Patriot Midwest Holdings, LLC | 12-52104 | 20-4370400 |
| 73 | PRH | Patriot Reserve Holdings, LLC | 12-52105 | 20-3405596 |
| 74 | PTL | Patriot Trading LLC | 12-52106 | 26-3247515 |
| 75 | PVL | Patriot Ventures LLC | 13-48728 | 80-0175661 |
| 76 | PCX | PCX Enterprises, Inc. | 12-52019 | 45-5405016 |
| 77 | PRC | Pine Ridge Coal Company, LLC | 12-52107 | 55-0737187 |

3

| Debtor No. | Identifier | Debtor | Case No. | EIN |
|---|---|---|---|---|
| 78 | PCL | Pond Creek Land Resources, LLC | 12-52108 | 75-3058253 |
| 79 | PFP | Pond Fork Processing LLC | 12-52110 | 55-0782677 |
| 80 | RHL | Remington Holdings LLC | 12-52117 | 20-0063793 |
| 81 | RE2 | Remington II LLC | 12-52118 | 20-0046320 |
| 82 | REM | Remington LLC | 12-52119 | 55-0763721 |
| 83 | RIV | Rivers Edge Mining, Inc. | 12-52120 | 43-1898371 |
| 84 | RLC | Robin Land Company, LLC | 12-52121 | 20-4090125 |
| 85 | SEN | Sentry Mining, LLC | 12-52123 | 43-1540251 |
| 86 | SLC | Snowberry Land Company | 12-52124 | 43-1721980 |
| 87 | SPE | Speed Mining LLC | 12-52125 | 55-0742194 |
| 88 | SSC | Sterling Smokeless Coal Company, LLC | 12-52127 | 55-0463558 |
| 89 | TCS | TC Sales Company, LLC | 12-52128 | 20-4090162 |
| 90 | TPE | The Presidents Energy Company LLC | 12-52130 | 80-0256382 |
| 91 | TCL | Thunderhill Coal LLC | 12-52131 | 55-0769813 |
| 92 | TCH | Trout Coal Holdings, LLC | 12-52132 | 26-0004872 |
| 93 | UCC | Union County Coal Co., LLC | 12-52133 | 74-3096591 |
| 94 | VIP | Viper LLC | 12-52134 | 20-0041882 |
| 95 | WPL | Weatherby Processing LLC | 12-52135 | 55-0757147 |
| 96 | WEL | Wildcat Energy LLC | 12-52136 | 55-0779955 |
| 97 | WIL | Wildcat, LLC | 12-52137 | 55-0783526 |
| 98 | WSP | Will Scarlet Properties LLC | 12-52138 | 45-2233074 |
| 99 | WIN | Winchester LLC | 12-52139 | 20-0052628 |
| 100 | WDL | Winifrede Dock Limited Liability Company | 12-52140 | 55-0746752 |
| 101 | YDL | Yankeetown Dock, LLC | 12-52141 | 35-0923438 |

SA000331

# Schedule B:  Debtor Groups

## Group 1 Debtors

| | | | |
|---|---|---|---|
| 1. | Affinity Mining Company | 48. | Kanawha River Ventures II, LLC |
| 2. | Apogee Coal Company, LLC | 49. | Kanawha River Ventures III, LLC |
| 3. | Appalachia Mine Services, LLC | 50. | KE Ventures LLC |
| 4. | Beaver Dam Coal Company, LLC | 51. | Logan Fork Coal Company |
| 5. | Big Eagle, LLC | 52. | Magnum Coal Company LLC |
| 6. | Big Eagle Rail, LLC | 53. | Magnum Coal Sales LLC |
| 7. | Black Stallion Coal Company, LLC | 54. | Martinka Coal Company, LLC |
| 8. | Black Walnut Coal Company | 55. | Midland Trail Energy LLC |
| 9. | Bluegrass Mine Services, LLC | 56. | Midwest Coal Resources II, LLC |
| 10. | Brody Mining, LLC | 57. | Mountain View Coal Company, LLC |
| 11. | Brook Trout Coal, LLC | 58. | New Trout Coal Holdings II, LLC |
| 12. | Catenary Coal Company, LLC | 59. | North Page Coal Corp. |
| 13. | Central States Coal Reserves of Kentucky, LLC | 60. | Ohio County Coal Company, LLC |
| 14. | Charles Coal Company, LLC | 61. | Patriot Beaver Dam Holdings, LLC |
| 15. | Cleaton Coal Company | 62. | Patriot Coal Company, L.P. |
| 16. | Coal Clean LLC | 63. | Patriot Coal Corporation |
| 17. | Coal Properties, LLC | 64. | Patriot Coal Sales LLC |
| 18. | Coal Reserve Holding Limited Liability Company No. 2 | 65. | Patriot Coal Services LLC |
| 19. | Colony Bay Coal Company | 66. | Patriot Leasing Company LLC |
| 20. | Cook Mountain Coal Company, LLC | 67. | Patriot Midwest Holdings, LLC |
| 21. | Corydon Resources LLC | 68. | Patriot Trading LLC |
| 22. | Coventry Mining Services, LLC | 69. | Patriot Ventures LLC |
| 23. | Cub Branch Coal Company LLC | 70. | PCX Enterprises, Inc. |
| 24. | Dakota LLC | 71. | Pine Ridge Coal Company, LLC |
| 25. | Day LLC | 72. | Pond Creek Land Resources, LLC |
| 26. | Dixon Mining Company, LLC | 73. | Pond Fork Processing LLC |
| 27. | Dodge Hill Holding JV, LLC | 74. | Remington Holdings LLC |
| 28. | Dodge Hill Mining Company, LLC | 75. | Remington II LLC |
| 29. | Dodge Hill of Kentucky, LLC | 76. | Remington LLC |
| 30. | EACC Camps, Inc. | 77. | Rivers Edge Mining, Inc. |
| 31. | Eastern Associated Coal, LLC | 78. | Sentry Mining, LLC |
| 32. | Eastern Coal Company, LLC | 79. | Snowberry Land Company |
| 33. | Eastern Royalty, LLC | 80. | Speed Mining LLC |
| 34. | Gateway Eagle Coal Company, LLC | 81. | Sterling Smokeless Coal Company, LLC |
| 35. | Grand Eagle Mining, LLC | 82. | TC Sales Company, LLC |
| 36. | Heritage Coal Company LLC | 83. | The Presidents Energy Company LLC |
| 37. | Highland Mining Company, LLC | 84. | Thunderhill Coal LLC |
| 38. | Hillside Mining Company | 85. | Trout Coal Holdings, LLC |
| 39. | Hobet Mining, LLC | 86. | Union County Coal Co., LLC |
| 40. | Indian Hill Company LLC | 87. | Viper LLC |
| 41. | Infinity Coal Sales, LLC | 88. | Weatherby Processing LLC |
| 42. | Interior Holdings, LLC | 89. | Wildcat, LLC |
| 43. | IO Coal LLC | 90. | Will Scarlet Properties LLC |
| 44. | Jarrell's Branch Coal Company | 91. | Winchester LLC |
| 45. | Jupiter Holdings LLC | 92. | Winifrede Dock Limited Liability Company |
| 46. | Kanawha Eagle Coal, LLC | 93. | Yankeetown Dock, LLC |
| 47. | Kanawha River Ventures I, LLC | | |

## Group 2 Debtors

| | | | |
|---|---|---|---|
| 1. | Coyote Coal Company LLC | 4. | Panther LLC |
| 2. | Emerald Processing, L.L.C. | 5. | Wildcat Energy LLC |
| 3. | Newtown Energy, Inc. | | |

## Group 3 Debtors

| | | | |
|---|---|---|---|
| 1. | Little Creek LLC | 3. | Robin Land Company, LLC |
| 2. | Patriot Reserve Holdings, LLC | | |

**Schedule 9.2(a)**

Executory Contracts and Unexpired Leases to Be Assumed

*See* Notice of Filing of Amended Plan Schedules, filed December 13, 2013 [ECF No. 5138]

USCA4 Appeal: 24-2051   Doc: 34-1      Filed: 02/10/2025    Pg: 336 of 340

Case 2:20-cv-00487   Document 105-16   Filed 11/22/21   Page 188 of 172 PageID #: 1609
Case 12-51502   Doc 5169-1   Filed 12/18/13   Entered 12/18/13 15:01:51   Appendix A
Pg 103 of 103

## Schedule 9.2(b)

Executory Contracts and Unexpired Leases to Be Rejected

*See* Notice of Filing of Amended Plan Schedules, filed December 13, 2013 [ECF No. 5138]

USCA4 Appeal: 24-2051    Doc: 34-1    Filed: 02/10/2025    Pg: 337 of 340

Case 2:20-cv-00487    Document 105-16    Filed 11/22/21    Page 169 of 172 PageID #: 1610
Case 12-51502    Doc 5169-2    Filed 12/18/13    Entered 12/18/13 15:01:51    Appendix B
Pg 1 of 4

# APPENDIX B

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

In re:

**PATRIOT COAL CORPORATION,** *et al.,*

Debtors.[1]

**Chapter 11**
**Case No. 12-51502-659**
**(Jointly Administered)**

**NOTICE OF (I) ENTRY OF ORDER CONFIRMING DEBTORS' FOURTH AMENDED JOINT PLAN**
**OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE; (II) OCCURRENCE**
**OF EFFECTIVE DATE AND (III) BAR DATES FOR FILING CERTAIN CLAIMS**

1.     **Confirmation of the Plan.**  On December 17, 2013, the United States Bankruptcy Court for the Eastern District of Missouri entered an order (the "**Confirmation Order**") in the Chapter 11 Cases of the above-captioned Debtors and Debtors In Possession (collectively, the "**Debtors**") confirming the Debtors' Fourth Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (as confirmed, the "**Plan**"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan or the Confirmation Order, as applicable.  The Plan and the Confirmation Order are available on the Debtors' case information website (located at http://www.patriotcaseinfo.com/) or by written request to the Debtors' Claims Agent, GCG, Inc., P.O Box 9898, Dublin, OH 43017, Attn: Patriot Team.

2.     **Effective Date.**  On [   •   ], 2013, the Effective Date of the Plan occurred.

3.     **Discharge and Injunction.**  Except as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, the rights afforded in the Plan and the payments and distributions to be made under the Plan shall discharge all existing debts and Claims, and shall terminate all Interests of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by Section 1141 of the Bankruptcy Code.  Except as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, upon the Effective Date, all existing Claims against the Debtors and Interests in the Debtors were, and were deemed to be, discharged and terminated, and all holders of Claims and Interests (and all representatives, trustees or agents on behalf of each holder) are precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees, or any of their assets or properties, any other or further Claim or Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.  As set forth therein, the Confirmation Order shall be a judicial determination of the discharge of all Claims against, liabilities of and Interests in the Debtors, subject to the occurrence of the

---

[1] The Debtors are the entities listed on Schedule 1 attached hereto.  The employer tax identification numbers and addresses for each of the Debtors are set forth in the Debtors' Chapter 11 Petitions.

1

Effective Date.  The Confirmation Order is a judicial determination of the discharge of all Claims or Causes of Action against, liabilities of and Interests in the Debtors.

On the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, each holder (as well as any representatives, trustees or agents on behalf of each holder) of a Claim or Interest and any Affiliate of such holder was deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by Section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such persons were forever precluded and enjoined, pursuant to Section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, the Debtors.

**4.      Exculpation.**  Pursuant to the Plan and Confirmation Order, and except as otherwise specifically provided in the Plan, the Confirmation Order, the UMWA Settlement, the UMWA Settlement Order, the Arch Settlement, the Arch Settlement Order, the Peabody Settlement or the Peabody Settlement Order, to the maximum extent permitted by applicable law, none of the Exculpated Parties shall have or incur any liability to any holder of a Claim, Cause of Action or Interest for any act or omission in connection with, related to or arising out of, the Chapter 11 Cases, the negotiation of any settlement or, agreement, contract, instrument, release or document created or entered into in connection with the Plan or in the Chapter 11 Cases (including the Plan Supplements, the Rights Offerings, the Backstop Rights Purchase Agreement, the Rights Offerings Procedures, the DIP Facilities, the UMWA Settlement, the Non-Union Retiree Settlement Order (including the termination of life insurance benefits in accordance with paragraph 10 thereof), the Arch Settlement, the Peabody Settlement and, in each case, any documents related thereto), the Exit Credit Facilities (and, in each case, any documents related thereto), the pursuit of confirmation of the Plan, the consummation of the Plan, the preparation and distribution of the Disclosure Statement, the offer, issuance and distribution of any securities issued or to be issued under or in connection with the Plan, including pursuant to the Rights Offerings and the Backstop Rights Purchase Agreement, the Backstop Fees, the Backstop Expense Reimbursement, any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or the administration of the Plan or the property to be distributed under the Plan, except for any act or omission that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence. Each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.

**5.      Bar Dates.**

a.      <u>Other Administrative Claim Bar Date</u>.  Pursuant to Section 7.2 of the Plan, all requests for payment of Other Administrative Claims that accrued on or before the Effective Date (other than Professional Fee Claims, which are subject to the provisions of Section 7.1 of the Plan) must be filed with the Claims Agent and served on counsel for the Debtors and the Reorganized Debtors by the Other Administrative Claim Bar Date.  The Other Administrative Claim Bar Date is the date that is 30 calendar days after the Effective Date.  Accordingly, any requests for payment of Other Administrative Claims pursuant to Section 7.2 of the Plan must be filed with the Claims Agent, GCG, Inc., P.O Box 9898, Dublin, OH 43017, Attn: Patriot Coal Corporation, and served on counsel for the Debtors, **so as to actually be received on or before 4:00 p.m. (prevailing Central Time) on [  •  ], 2014**.  Any requests for payment of Other Administrative Claims pursuant to Section 7.2 of the Plan that are not properly filed and served by the Other Administrative Claim Bar Date shall not appear on the register of Claims maintained by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.  Any requests for payment of Other Administrative Claims pursuant to Section 7.2 of the Plan should include, at a minimum, (i) the name of the Debtor(s) that are purported to be liable for the Other Administrative Claim, (ii) the name of the holder of the Other Administrative Claim, (iii) the amount of the Other Administrative Claim, (iv) the basis of the Other Administrative Claim and (v) supporting documentation for the Other Administrative Claim.

Notwithstanding the foregoing, requests for payment of Other Administrative Claims need **NOT** be filed with respect to the following types of Other Administrative Claims:

- Those that are for goods or services provided to a Debtor in the ordinary course of such Debtor's business
- Those that have previously been Allowed by Final Order of the Bankruptcy Court
- Those that are for Cure amounts
- Those that are on account of post-petition taxes (including any related penalties or interest) owed by the Debtors or the Reorganized Debtors to any governmental unit (as defined in Section 101(27) of the Bankruptcy Code)
- Those that are held by Peabody and preserved under the terms of the Peabody Settlement
- Those that the (a) Debtors or (b) Reorganized Debtors have otherwise agreed in writing do not require such a filing

b.    <u>Deadline for Submitting Final Fee Applications</u>.  Pursuant to Section 7.1 of the Plan, all final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served in accordance with the Case Management Order by the date that is 60 calendar days after entry of the Confirmation Order.  Accordingly, all Professional Fee Claims must be filed and served **so as to actually be received on or before February 17, 2014**.

c.    <u>Rejection Bar Date</u>.  Pursuant to the Confirmation Order, any Rejection Claims must be filed by the date that is 30 days after the entry of the Confirmation Order (the "**Confirmation Bar Date**").  Accordingly, if you are a counterparty to an executory contract or unexpired lease that has been rejected pursuant to Article 9 of the Plan (whether pursuant to Section 9.2, by being listed on Schedule 9.2(b) or pursuant to Section 9.4 of the Plan), any Rejection Claims on account of such executory contracts or unexpired leases must be filed with the Claims Agent, GCG, Inc., P.O Box 9898, Dublin, OH 43017, Attn: Patriot Team, **so as to actually be received on or before January 16, 2014**.  Any Rejection Claim on account of an executory contract or unexpired lease listed on Schedule 9.2(b) or pursuant to Section 9.4 of the Plan for which a Proof of Claim is not properly filed by the Confirmation Bar Date shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors or their respective Estates or properties.  The Debtors or the Reorganized Debtors may contest any Rejection Claim in accordance with Section 8.1 of the Plan.

Dated:    **[   ●   ]**, 2013
      New York, New York

                                        DAVIS POLK & WARDWELL LLP
                                        Counsel to the Debtors
                                        and Debtors In Possession
                                        450 Lexington Avenue
                                        New York, New York 10017

                                        -and-

                                        BRYAN CAVE LLP
                                        Local Counsel to the Debtors
                                        and Debtors In Possession
                                        One Metropolitan Square
                                        211 N. Broadway, Suite 3600
                                        St. Louis, Missouri 63102

SA000338