**CASE NO. 24-2051 (L)**

**IN THE**
# UNITED STATES COURT OF APPEALS
**FOR THE FOURTH CIRCUIT**

ROCKWELL MINING, LLC and
BLACKHAWK LAND AND RESOURCES, LLC
*Plaintiffs-Appellees*

v.

POCAHONTAS LAND LLC
*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

**SUPPLEMENTAL JOINT APPENDIX**
**VOLUME II OF II**
**Pages: 339 - 657**

J. Thomas Lane
J. Mark Adkins
Gabriele Wohl
Zachary J. Rosencrance
**BOWLES RICE LLP**
600 Quarrier Street (25301)
Post Office Box 1386
Charleston, West Virginia 25325-1386
(304) 341-1100
Fax: (303) 347-1746
tlane@bowlesrice.com
madkins@bowlesrice.com
gwohl@bowlesrice.com
zrosencrance@bowlesrice.com

*Counsel for Defendant-Appellant*
*Pocahontas Land LLC*

Brian A. Glasser
Laura E. Babiak
**BAILEY & GLASSER, LLP**
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555
bglasser@baileyglasser.com
lbabiak@baileyglasser.com

Benjamin A. Schwartzman
**BAILEY & GLASSER, LLP**
950 W. Bannock Street, Suite 940
Boise, Idaho 83702
(208) 342-4411
bschwartzman@baileyglasser.com

*Counsel for Plaintiffs-Appellees*
*Rockwell Mining, LLC and*
*Blackhawk Land and Resources, LLC*

# SUPPLEMENTAL JOINT APPENDIX TABLE OF CONTENTS
# VOLUME II OF II


Exhibit P – Docket No. 1615, the Confirmation Order filed in *In re Patriot Coal Corp., et al.*, No. 15-32450 (Bankr. E.D. Va. 2015)...…………………………………….... SA000339

Exhibit Q – Docket No. 771 filed in *In re Patriot Coal Corp., et al.*, No. 15-32450 (Bankr. E.D. Va. 2015)………………………..…………………………….……… SA000492

Exhibit R – Docket No. 1476 filed in *In re Patriot Coal Corp., et al.*, No. 15-32450 (Bankr. E.D. Va. 2015)……………………………………….……………….…… SA000497

Exhibit S – Sub-Sublease between Blackhawk Land and Resources and Coronado Coal II, dated December 21, 2015...………………………………….……………….……… SA000505

Exhibit T – Acknowledgement of the Sub-Sublease between Blackhawk Land and Resources and Coronado Coal II…....…………………………..………….……… SA000534

Exhibit U – Assignment of the 1937 Lease from Eastern Associated Coal, LLC to Rockwell Mining, LLC, dated October 26, 2015…..……………….....……… SA000538

Exhibit V – Assignment of the 1937 Lease from The Koppers Coal Co. to Eastern Gas and Fuel Associates, dated December 9, 1941….……………………………… SA000549

Exhibit W – Assignment of the 1937 Lease from Eastern Gas and Fuel Associates to Eastern Associated Coal Corporation, dated January 1, 1966,,……………… SA000556

Exhibit X – Credit Line Deed of Trust between Rockwell Mining LLC and Cantor Fitzgerald Securities, dated January 22, 2020…..…………………….……… SA000565

Exhibit Y – Credit Line Deed of Trust between Rockwell Mining, LLC and Midcap Funding IV Trust, dated January 22, 2020...…………………………….……… SA000610

Exhibit Z – Summary of Plaintiffs' royalty payments made to Defendant beginning on June 1, 2020……………………………………………………………….……… SA000656

# EXHIBIT P

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

James H. M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
Justin R. Bernbrock (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PATRIOT COAL CORPORATION, *et al.*, | ) | Case No. 15-32450 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

# FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER (I) CONFIRMING THE DEBTORS' FOURTH AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND (II) APPROVING THE FOURTH AMENDED DISCLOSURE STATEMENT

The above-captioned debtors and debtors in possession (collectively, the "Debtors") having:[1]

[1] Capitalized terms used but not otherwise defined in these findings of fact, conclusions of law, and order (collectively, the "Confirmation Order") have the meanings given to them in the *Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated October 7, 2015 (as amended, supplemented, or modified, the "Plan"), attached hereto as **Exhibit A**, or, where applicable, the *Fourth Amended Disclosure Statement for Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated October 7, 2015 (as amended, supplemented, or modified, the "Disclosure Statement").

a. commenced, on May 12, 2015 (the "Petition Date"), these chapter 11 cases (collectively, the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b. continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c. filed, on July 13, 2015, the *Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498] and the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 499];

d. filed, on August 17, 2015, the *Amended Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 858, Ex. A] and the *Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 859, Ex. A];

e. filed, on August 18, 2015, the *Second Amended Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 880, Ex. A] and the *Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 881, Ex. A];

f. obtained, on August 20, 2015, entry of the *Order Approving Certain Rights Offering Procedures and Forms in Connection Therewith* [Docket No. 902];

g. obtained, on August 21, 2015, entry of an order [Docket No. 916] (the "Disclosure Statement Order") approving the *Third Amended Disclosure Statement for Debtors' Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, *see* [Docket No. 941, Ex. A], solicitation procedures, and related notices, forms, and ballots (the "Solicitation Packages") in connection with soliciting votes on the *Debtors' Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, *see* [Docket No. 942, Ex. A];

h. obtained, on September 17, 2015, entry of an order that, among other things, scheduled the hearing to consider the entry of orders, respectively, approving the Disclosure Statement and confirming the Plan (the "Combined Hearing") and approved the Debtors' proposed solicitation procedures (the "Solicitation Procedures") and related notices, forms, and ballots (collectively, the "Solicitation Packages") [Docket No. 1320] (the "Scheduling and Solicitation Order");

i. filed, on September 18, 2015, the *Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1332, Ex. A] (the "September 18 Plan") and the *Fourth Amended Disclosure Statement for Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to*

*Chapter 11 of the Bankruptcy Code* [Docket No. 1333, Ex. A] (as amended, modified, or supplemented, the "Disclosure Statement"), which included procedures governing the rights offering contemplated by the Plan (the "Rights Offering"), filed as Exhibit D to the Disclosure Statement (the "Rights Offering Procedures"), including the subscription forms for the Rights Offering, filed as Annexes 1–2 to the Rights Offering Procedures (the "Subscription Forms");

j. caused the Rights Offering Procedures and Subscription Forms to be served on Holders eligible to participation in the Rights Offering, beginning on or about September 22, 2015, as evidenced by the *Affidavit of Service* [Docket No. 1514];

k. caused the Solicitation Packages, the Disclosure Statement (with the Plan and other exhibits annexed there), the Disclosure Statement Order, the Scheduling and Solicitation Order, notice of the Combined Hearing (the "Combined Hearing Notice") and the deadline for objecting to confirmation of the Plan ("Confirmation") or adequacy of the Disclosure Statement, and a ballot with instructions to cast a vote to accept or reject the Plan to be available in electronic format on-line or available in paper-copy format upon request, pursuant to the Scheduling and Solicitation Order, beginning on or about September 18, 2015 (the "Solicitation Date"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Scheduling and Solicitation Order, and the Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service of Solicitation Materials* [Docket No. 1530] (the "Solicitation Affidavit");

l. commenced an auction on September 21, 2015, in compliance with the *Order Approving Debtors' Motion for Entry of an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sales of Certain of the Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling Auctions and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief* [Docket No. 406] (the "Bidding Procedures Order") in which the Winning Bidder and the Backup Bidder (each as defined in the Bidding Procedures Order) were identified; with all necessary parties being provided sufficient notice and receiving the *Notice of Designation of Winning and Backup Bids* [Docket No. 1368], as evidenced by the *Affidavit of Service* [Docket No. 1383];

m. caused notice of the Combined Hearing to be published on September 24, 2015, in *The Wall Street Journal (National Edition)*, as evidenced by the *Affidavit of Publication* [Docket No. 1570], the *Charleston Gazette-Mail*, as evidenced by the *Affidavit of Publication* [Docket No. 1569], and the *Richmond Times-Dispatch*, as evidenced by the *Affidavit of Publication* [Docket No. 1571];

n. filed, on October 5, 2015, the *Debtors' Memorandum of Law in Support of Confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1554] (the "Confirmation Brief");

o. filed on October 7, 2015, the *Declaration of Christina Pullo of Prime Clerk LLC Regarding the (I) Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code and (II) Results of the Rights Offering* [Docket No. 1573] (the "Voting Report");

p. filed, on October 7, 2015, the Plan[2] [Docket No. 1579], which, among other things, incorporated certain amendments to the September 18 Plan, including the Committee Settlement incorporated in Article IV.T of the Plan (the "Committee Settlement"), which provided for a resolution pursuant to the Plan of, among other things, the objection of the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee") to confirmation of the Plan [Docket No. 1241] (the "Committee Objection");

q. filed, on October 7, 2015, the *Declaration of Raymond Edward Dombrowski, Jr. in Support of an Order Confirming the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1580] (the "Declaration in Support of Confirmation");

r. filed, on October 8, 2015, an asset purchase agreement among the Debtors and Blackhawk Mining LLC ("Blackhawk") in connection with Blackhawk's designation as the Winning Bidder as Exhibit S to the Plan Supplement [Docket No. 1593] (as amended, supplemented, or modified from time to time, the "Blackhawk APA" and the transaction contemplated by the Blackhawk APA, the "Blackhawk Transaction");

s. filed, on October 8, 2015, that certain settlement term sheet by and between Patriot Coal Corporation and the West Virginia Department of Environmental Protection (the "WVDEP") as Exhibit U to the Plan Supplement [Docket No. 1593] (the "WVDEP Settlement Term Sheet"), providing for a resolution pursuant to the Plan of, among other things, *The West Virginia Department of Environmental Protection's Revised and Restated Objection to Confirmation of the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 1422] (the "WVDEP Objection") and certain environmental obligations to the State of West Virginia; and

t. filed, on October 8, 2015, the proposed *Findings of Fact, Conclusions of Law, and Order (I) Confirming the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code and (II) Approving the Fourth Amended Disclosure Statement* [Docket No. 1591].

---

[2] The rules of interpretation set forth in Article I.B of the Plan apply to this Confirmation Order. To the extent that there may be any conflict between the terms contained in the Plan and this Confirmation Order, the terms of the Confirmation Order will be controlling, to the extent of such conflict.

This Court having:

a. set October 7, 2015, as the date for the commencement of the Combined Hearing in accordance with Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

b. reviewed the Plan, the Disclosure Statement, the Confirmation Brief, the Voting Report, the Declaration in Support of Confirmation, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

c. held the Combined Hearing;

d. heard the statements and arguments made by counsel in respect of Confirmation;

e. considered all oral representations, documents, filings, and other evidence regarding Confirmation;

f. overruled any and all objections to the Plan and to Confirmation and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated; and

g. taken judicial notice of all papers and pleadings filed in the Chapter 11 Cases.

NOW, THEREFORE, the Court having found that notice of the Combined Hearing and the opportunity for any party in interest to object to Confirmation or approval of the Disclosure Statement having been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby; and the record of the Chapter 11 Cases and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Combined Hearing establish just cause for the relief granted in this Confirmation Order; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following findings of fact, conclusions of law, and order:

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

### A. Jurisdiction and Venue[3]

1. On the Petition Date, the Debtors commenced the Chapter 11 Cases. Venue in this Court was proper as of the Petition Date and remains proper under 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2). The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334. The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

### B. Eligibility for Relief

2. The Debtors were and continue to be entities eligible for relief under section 109 of the Bankruptcy Code.

### C. Commencement and Joint Administration of the Chapter 11 Cases

3. On May 13, 2015, the Court entered an order [Docket No. 48] authorizing the joint administration and procedural consolidation of the Chapter 11 Cases in accordance with Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

### D. Consideration on Account of Allowed Prepetition ABL Facility Claims Are Not Proceeds of Any Collateral Other than the ABL Priority Collateral

4. The consideration provided to the Holders of Allowed Prepetition ABL Facility Claims pursuant to Article III.B.4 of the Plan, including any Cash and loans or letters of credit issued under the Combined Company New ABL, results from and is on account of the Allowed

---

[3] Headings to sections and paragraphs in this Confirmation Order are inserted for convenience of reference only and are not intended to affect the interpretation of this Confirmation Order.

Prepetition ABL Facility being oversecured by ABL Priority Collateral (as defined in the First-Lien Intercreditor Agreement). The Combined Company New ABL replaces and refinances the Allowed Prepetition ABL Facility and, as of the Effective Date, the Combined Company New ABL shall have a first-priority lien on current assets, including receivables, inventory and certain cash, contributed by Blackhawk to the Combined Company and which assets were not subject to any liens or claims held by the Debtors' creditors. The Debtors' distributions on account of the Allowed Prepetition ABL Facility Claims are not proceeds of any collateral other than ABL Priority Collateral (as defined in the First-Lien Intercreditor Agreement) and all such consideration is provided to the Holders of such Claims in exchange for, among other things, the release of their liens on the ABL Priority Collateral as contemplated by the Plan (including Articles IV.G and IV.R of the Plan).

**E. Plan Supplement**

5. Commencing September 2, 2015 [Docket No. 1047], and continuing thereafter on September 25, 2015 [Docket Nos. 1405 and 1406] and on October 8, 2015 [Docket Nos. 1593 and 1596], the Debtors caused the Plan Supplement to be filed with the Court. The Plan Supplement complies with the terms of the Plan, and the filing and notice of such documents were good and proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Scheduling and Solicitation Order, and the facts and circumstances of the Chapter 11 Cases. No other or further notice is or will be required with respect to the Plan Supplement.

**F. Modifications to the Plan**

6. Any modifications to the Plan described or set forth in this Confirmation Order (a) were appropriate under the facts and circumstances of the Chapter 11 Cases, (b) do not require, in accordance with Bankruptcy Rule 3019, additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code,

and (c) do not require that holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

**G. Objections Overruled**

7. Any resolution of objections to Confirmation explained on the record at the Combined Hearing is hereby incorporated by reference. All unresolved objections, statements, and reservations of rights are hereby overruled on the merits.

**H. DIP Order**

8. On June 4, 2015, the Court entered the *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay and (G) Granting Related Relief* [Docket No. 230].

**I. Disclosure Statement**

9. The Disclosure Statement (as the same may be updated, supplemented, amended and/or otherwise modified from time to time, including in connection with the Combined Hearing) contains "adequate information" within the meaning of Section 1125 of the Bankruptcy Code and is hereby approved in all respects.

10. The period during which the Debtors solicited acceptances to the Plan is a reasonable and adequate period of time for creditors to have made an informed decision to accept or reject the Plan.

**J. Scheduling and Solicitation Order**

11. On September 17, 2015, the Bankruptcy Court entered the Scheduling and Solicitation Order, which, among other things: (a) fixed September 28, 2015 as the deadline for objecting to confirmation of the Plan and/or adequacy of the Disclosure Statement (the "Plan Objection Deadline"); (b) fixed October 2, 2015, at 4:00 p.m. (prevailing Eastern Time), as the

deadline for voting to accept or reject the Plan (the "Voting Deadline"); and (c) set October 5, 2015, as the date for the commencement of the Combined Hearing, which was subsequently adjourned to October 7, 2015.

**K. Transmittal and Mailing of Materials; Notice**

12. Due, adequate, and sufficient notice of the Rights Offering Procedures, the Disclosure Statement, the Plan, the Plan Supplement, the Combined Hearing, the Voting Deadline, and all deadlines for voting on the Plan or objecting to Confirmation or the adequacy of the Disclosure Statement has been given in substantial compliance with the Scheduling and Solicitation Order, Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), and the Local Bankruptcy Rules for the Eastern District of Virginia (the "Local Rules"), and no other or further notice is or shall be required.

**L. Solicitation**

13. The Debtors solicited votes for acceptance and rejection of the Plan in good faith, and such solicitation (including the extended solicitation period for voting for holders of Class 5 Claims) complied with sections 1125 and 1126, and all other applicable sections, of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Scheduling and Solicitation Order, and all other applicable rules, laws, and regulations.

**M. Voting Report**

14. Prior to the Combined Hearing, the Debtors caused the Voting Report to be filed. The procedures used to tabulate Ballots were fair and conducted in accordance with the Scheduling and Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

15. As set forth in the Plan and the Disclosure Statement, holders of Claims in Classes 4, 5, 6, 7, and 8 (collectively, the "Voting Classes") were eligible to vote on the Plan in

accordance with the Solicitation Procedures. Holders of Claims in Classes 1, 2, and 3 are Unimpaired and conclusively presumed to accept the Plan and, therefore, could not vote on the Plan. Holders of Claims or Interests in Classes 9, 10, and 11 (collectively, the "Deemed Rejecting Classes") are Impaired, entitled to no recovery under the Plan, are therefore deemed to have rejected the Plan, and, therefore, could not vote on the Plan.

16. As evidenced by the Voting Report, holders of Claims in Classes 6 and 8 (together with the Deemed Rejecting Classes, collectively, the "Rejecting Classes") voted to reject the Plan, and holders of Claims in Classes 4, 5, and 7 (collectively, the "Impaired Accepting Classes") voted to accept the Plan.

**N. Bankruptcy Rule 3016**

17. The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the Disclosure Statement with the clerk of the Court satisfied Bankruptcy Rule 3016(b).

**O. Burden of Proof**

18. The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, the applicable evidentiary standard for Confirmation. Further, the Debtors have proven the elements of sections 1129(a) and 1129(b) by clear and convincing evidence.

**P. Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

19. The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

**a. Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code**

20. The Plan complies with all applicable provisions of the Bankruptcy Code, including sections 1122 and 1123, as required by section 1129(a)(1) of the Bankruptcy Code.

**i. Sections 1122 and 1123(a)(1)—Proper Classification**

21. The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code. In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into eleven different Classes, based on differences in the legal nature or priority of such Claims against and Interests in each Debtor (other than Administrative Claims, DIP Claims, Adequate Protection Claims, Professional Fee Claims, and Priority Tax Claims, which are addressed in Article II of the Plan and are required not to be designated as separate Classes by section 1123(a)(1) of the Bankruptcy Code or the DIP Order, as applicable). Valid business, factual, and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not implemented for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among holders of Claims and Interests.

22. In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims or Interests contains only Claims or Interests substantially similar to the other Claims or Interests within that Class. Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

**ii. Sections 1123(a)(2)—Specification of Unimpaired Classes**

23. Article III of the Plan specifies that Claims in Classes 1, 2, and 3[4] are Unimpaired under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

**iii. Sections 1123(a)(3)—Specification of Treatment of Impaired Classes**

24. Article III of the Plan specifies the treatment of each Impaired Class under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

**iv. Sections 1123(a)(4)—No Discrimination**

25. Article III of the Plan provides the same treatment to each Claim or Interest in any particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest. Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

**v. Section 1123(a)(5)—Adequate Means for Plan Implementation**

26. Articles IV and VII of the Plan specifically provide the means for the Plan's execution and implementation, including: (a) the sources of consideration for distributions under the Plan; (b) the Blackhawk Transaction; (c) the distribution of Rights as contemplated by the Rights Offering; (d) the transaction contemplated by the asset purchase agreement among the Debtors and Virginia Conservation Legacy Fund and its affiliate (collectively, "VCLF"), whereby VCLF agreed to acquire certain assets and assume certain liabilities excluded from the Blackhawk Transaction (as amended, supplemented, or modified from time to time, the "VCLF APA" and the transaction contemplated by the VCLF APA, the "VCLF Transaction"); (e) the

[4] For the avoidance of any doubt, Class 3 includes all Allowed Secured Claims pursuant to section 506(b) of the Bankruptcy Code, if any.

WVDEP Settlement; (f) the Committee Settlement; (g) the good-faith compromise and settlement of Claims; (h) the release of mortgages, deeds of trust, Liens, pledges, and other security interests against property of the Estates; (i) the cancellation of securities and any other instrument providing equity in the Debtors; (j) the general authority to take all actions necessary to effectuate the transactions contemplated by the Plan, including with respect to the Blackhawk Transaction, the VCLF Transaction, and the *Liquidating Trust Agreement* attached as Exhibit Q to the Plan Supplement (the "Liquidating Trust Agreement"), each as applicable; (k) the general authority for all corporate actions necessary to effectuate the Plan; (l) the exemption from certain taxes and fees to the extent provided herein; (m) the preservation of Causes of Action to the extent not released, waived, exculpated, or enjoined under the Plan; (n) the Wind Down and dissolution of the Debtors in accordance with the Liquidating Trust Agreement, (o) if applicable, the formation of the Liquidating Trust and the appointment of the Liquidating Trustee, and (p) distribution of the Payout Event Cash if a Payout Event occurs pursuant to the Plan.[5] Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

**vi. Section 1123(a)(6)—Charter**

27. VCLF and the Liquidating Trust, as applicable, will amend, as necessary, their organizational documents to prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1123(a)(6).

**vii. Section 1123(a)(7)—Directors, Officers, and Trustees**

28. Article IV of the Plan satisfies the requirement of section 1123(a)(7) of the Bankruptcy Code by providing for the establishment of the Liquidating Trust and the

[5] Pursuant to Article X.B of the Plan, the Prepetition LC Agent reserves its right to challenge the implementation of the Payout Event, including the proposed distribution to Holders of Claims contemplated therefrom.

appointment of the Liquidating Trustee, which is consistent with the interests of creditors and equity security holders, and the Debtors' officers and directors will be discharged of their duties as of the Effective Date.

**b. Section 1123(b)—Discretionary Contents of the Plan**

29. The Plan contains various provisions that may be construed as discretionary but not necessary for Confirmation under the Bankruptcy Code. Any such discretionary provision complies with section 1123(b) of the Bankruptcy Code and is not inconsistent with the applicable provisions of the Bankruptcy Code. Thus, the Plan satisfies section 1123(b).

**i. Compromise and Settlement**

30. In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, (a) the provisions of the Plan generally constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest, including claims asserted through filed objections to Confirmation, (b) the Committee Settlement constitutes a good-faith compromise of the controversies raised in the Committee Objection, and (c) the written settlement agreement by and among the WVDEP, the Debtors, Blackhawk, and VCLF as contemplated by the WVDEP Settlement Term Sheet (the "WVDEP Settlement") constitutes a good-faith compromise of the controversies raised in the WVDEP Objection.

**ii. Debtor Release**

31. The releases and discharges of Claims and Causes of Action by the Debtors described in Article VIII.C of the Plan in accordance with section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment under Bankruptcy

Rule 9019. The Debtors' or the Liquidating Trust's pursuit of any such claims against the Released Parties is not in the best interest of these Estates' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such Claims. The Debtor Release is furthermore an integral part of the Plan, the Blackhawk Transaction, and the VCLF Transaction, and is in the best interests of the Debtors' Estates.

32. The Debtor Release appropriately offers protection to parties that constructively participated in the Debtors' restructuring efforts. Such protections from liability facilitated the participation of many of the Debtors' stakeholders in the negotiations and compromises that led to the Plan.

33. The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases. In light of the critical nature of the Debtor Release to the Plan, the Debtor Release is approved.

**iii. Third Party Release**

34. The Third Party Release, set forth in Article VIII.D of the Plan, is an essential provision of the Plan. The Third Party Release is: (a) a consensual third-party release; (b) in exchange for the good and valuable consideration provided by the Released Parties; (c) a good-faith settlement and compromise of the Claims and Causes of Action released by the Third Party Release; (d) in the best interests of the Debtors and their Estates; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released by the Third Party Release against any of the Released Parties.

35. The Third Party Release is an integral part of the Plan. Like the Debtor Release, the Third Party Release facilitated participation in both the Debtors' Plan and the

chapter 11 process generally. As such, the Third Party Release appropriately offers protection to parties that constructively participated in the Debtors' restructuring process.

36. The scope of the Third Party Release in the Plan is appropriately tailored under the facts and circumstances of the Chapter 11 Cases, and parties received due and adequate notice of the Third Party Release and the opportunity to opt out of the Third Party Release, as applicable. Such releases by holders of Claims that voted in favor of the Plan, that abstained from voting and did not timely submit the relevant opt-out form, or that otherwise consented to give such release are consensual. In light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Third Party Release to the Plan, the Third Party Release is approved.

**iv. Exculpation**

37. The Exculpation provisions set forth in Article VIII.E of the Plan are essential to the Plan. The record in the Chapter 11 Cases fully supports the Exculpation and the Exculpation provisions set forth in Article VIII.E of the Plan, which are appropriately tailored to protect the Exculpated Parties from inappropriate litigation.

**v. Injunction**

38. The injunction provisions set forth in Article VIII.F of the Plan are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the Debtor Release, the Third Party Release, and the Exculpation provisions in Article VIII.E of the Plan. Such injunction provisions are appropriately tailored to achieve those purposes.

**vi. Preservation of Claims and Causes of Action and Assignment to Liquidating Trust**

39. Article IV.O of the Plan appropriately provides for the preservation by the Debtors of the Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy

Code. Causes of Action not released, waived, or exculpated by the Debtors will be transferred or assigned to the Liquidating Trust as provided by the Plan. The provisions regarding Causes of Action in the Plan are appropriate and in the best interests of the Debtors, their respective Estates, and holders of Claims and Interests. For the avoidance of any doubt, Causes of Action waived or released under the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, and the DIP Orders will not transfer to the Liquidating Trust and will not constitute Liquidating Trust Assets.

**c. Section 1129(a)(2)—Compliance of the Debtors and Others with the Applicable Provisions of the Bankruptcy Code**

40. The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, and 1128, and Bankruptcy Rules 3017, 3018, and 3019.

41. Votes to accept or reject the Plan were solicited by the Debtors and their agents pursuant to section 1125(a) of the Bankruptcy Code and the Scheduling and Solicitation Order, and the Debtors' use of the Disclosure Statement to solicit votes on the Plan was appropriate.

42. The Debtors and their agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e), and in a manner consistent with the applicable provisions of the Scheduling and Solicitation Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation provisions set forth in Article VIII.E of the Plan.

43. The Debtors and their agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

**d. Section 1129(a)(3)—Proposal of Plan in Good Faith**

44. The Debtors have proposed the Plan in good faith and not by any means forbidden by law. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Blackhawk Transaction, the VCLF Transaction, the Plan itself, and the process leading to its formulation. The Debtors', Blackhawk's, and VCLF's good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, the Disclosure Statement Hearing, and the record of the Combined Hearing and other proceedings held in the Chapter 11 Cases.

45. The Plan is the product of arm's-length and good-faith negotiations between and among the Debtors, the Committee, the official committee of non-union retirees appointed in the Chapter 11 Cases (the "Retiree Committee"), Blackhawk, VCLF, the New Money Lender Entities,[6] and certain other of the Debtors' stakeholders. The Plan itself and the process leading

[6] "New Money Lender Entities" means, collectively, the following in any and all capacities, including, without limitation, as Holders of Claims and/or Interests: (a) the Combined Company 1.5 Lien Term Loan Agent; (b) DIP Lenders, (c) the Combined Company 1.5 Lien Term Loan Lenders; and (d) with respect to each of the foregoing Entities in clauses (a) through (c) all such Entities' respective current and former affiliates and all such Entities' and such affiliates' respective current and former attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managers, administrators, trustees, managed funds, special purpose vehicles, accounts, fund managers and representatives, and successors and assigns of each of the foregoing in any and all capacities directors,

to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of holders of Claims and Interests. Consistent with the overriding purpose of chapter 11, the Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to maximize stakeholder value. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

46. Various parties filed objections to the Plan and to Confirmation asserting, *inter alia*, that one or more of the New Money Lender Entities are Plan proponents and have not proceeded in good faith in the Chapter 11 Cases. *See, e.g.*, [Docket Nos. 1422, 1451]. The Court hereby overrules any such lack of good-faith objections and finds that the New Money Lender Entities are not Plan proponents and, in any case, the New Money Lender Entities have proceeded in good faith in these Chapter 11 Cases, including, without limitation, because the New Money Lender Entities were the only parties willing to provide the Debtors with the DIP Facility necessary to prosecute the Chapter 11 Cases (*see* DIP Order at paragraphs (E)(xi), (I), (J), (L), and (M)), and are the only creditors who agreed to provide the additional financing needed to consummate the Restructuring Transactions set forth in the Plan and approved in this Order.

**e. Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable**

47. The procedures set forth in the Plan for the Court's review and ultimate determination of the fees and expenses paid by the Debtors' Estates in connection with the Chapter 11 Cases or in connection with the Plan and incident to the Chapter 11 Cases satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1129(a)(4).

---

employees, partners, subsidiaries, principals, agents, managers, administrators, trustees, managed funds, fund managers and representatives, and successors and assigns of each of the foregoing in any and all capacities.

**f. Section 1129(a)(5)—Disclosure of Directors and Officers and Consistency with the Interests of Creditors and Public Policy**

48. The Debtors have disclosed the identities of all officers and directors for the Combined Company in Exhibit B to the Plan Supplement and all officers and directors for VCLF in Exhibit J to the Plan Supplement. The Debtors have identified the Liquidating Trustee in Exhibit V to the Plan Supplement. Accordingly, the Plan satisfies the requirements of section 1129(a) of the Bankruptcy Code.

**g. Section 1129(a)(6)—Approval of Rate Changes**

49. The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and therefore will not require governmental regulatory approval. Therefore, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

**h. Section 1129(a)(7)—Best Interests of Holders of Claims and Interests**

50. The evidence in support of the Plan that was proffered or adduced at the Combined Hearing, including pursuant to the applicable financial projections and facts and circumstances of the Chapter 11 Cases, establishes that holders of Allowed Claims or Interests in every Class will recover as much or more value under the Plan on account of such Claim or Interest, as of the Effective Date, than the amount such Holder would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

**i. Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class**

51. Because the Plan has not been accepted by the Rejecting Classes, the Debtors seek Confirmation under section 1129(b), rather than section 1129(a)(8), of the Bankruptcy Code. Thus, although section 1129(a)(8) has not been satisfied with respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes and thus satisfies section 1129(b) of the

Bankruptcy Code with respect to such Classes as described further below. As a result, the requirements of section 1129(b) are satisfied.

**j. Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code**

52. The treatment of DIP Claims, Adequate Protection Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**k. Section 1129(a)(10)—Acceptance by at Least One Impaired Class**

53. As set forth in the Voting Report, Holders of Claims in Classes 4, 5, and 7 voted to accept the Plan. As such, there is at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code). Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied.

**l. Section 1129(a)(11)—Feasibility of the Plan**

54. The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. The evidence supporting the Plan proffered or adduced by the Debtors at or before the Combined Hearing, including the applicable financial projections: (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) has not been controverted by other credible evidence; (c) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, except as provided in the Plan; (d) establishes that the Debtors will have sufficient funds available to meet their obligations under the Plan, including sufficient amounts of Cash to reasonably ensure payment of Allowed Administrative Claims, Allowed Priority Tax

Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed Professional Fees Claims, Adequate Protection claims, DIP Claims, Cure Costs, and other expenses in accordance with the terms of the Plan and section 507(a) of the Bankruptcy Code; and (e) establishes that Blackhawk and VCLF will likely be able to satisfy future obligations with respect to property of the estate sold to such parties.

55. Accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**m. Section 1129(a)(12)—Payment of Statutory Fees**

56. Article II.F of the Plan provides that all fees payable pursuant to section 1930(a)(6) of the Judicial Code will be paid by the Debtors (before or on the Effective Date) or the Liquidating Trustee (after the Effective Date). Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**n. Section 1129(a)(13)—Retiree Benefits**

57. Pursuant to the *Agreed Order between the Debtors and the United Mine Workers of America Authorizing, but not Directing, the Debtors to Modify Certain Retirees Benefits*, the Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code). Therefore, section 1129(a)(13) of the Bankruptcy Code does not apply to these Chapter 11 Cases.

**o. Section 1129(b)—Confirmation of Plan over Nonacceptance of Impaired Class**

58. Notwithstanding the fact that the Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes. Accordingly, the Plan is fair and equitable toward all Holders of Claims and Interests in

the Rejecting Classes. As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied. After entry of the Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon the members of the Rejecting Classes.

**p. Section 1129(c)—Only One Plan**

59. Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Cases. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

**q. Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act**

60. No governmental unit has requested that the Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. As evidenced by its terms, the principal purpose of the Plan is not such avoidance. Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

**r. Satisfaction of Confirmation Requirements**

61. Based upon the foregoing, the Plan satisfies the requirements for plan confirmation set forth in section 1129 of the Bankruptcy Code.

**s. Good Faith**

62. The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders. The Plan accomplishes this goal. Accordingly, the Debtors have been, are, and will continue acting in good faith if they proceed to: (a) consummate the Plan, the Blackhawk Transaction,

and the VCLF Transaction, and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed or contemplated by this Confirmation Order. Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**t. Conditions to Effective Date**

63. Entry of the Confirmation Order shall satisfy the conditions to the Effective Date as set forth in Article IX.A.1 of the Plan, *provided that* the Confirmation Order shall not have been stayed, modified, or vacated on appeal. The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article X.A of the Plan may only be waived in accordance with the Plan.

**u. Implementation**

64. All documents and agreements necessary to implement the Plan, including those contained in the Plan Supplement, and all other relevant and necessary documents have been negotiated in good faith and at arm's length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.

**v. Retention of Jurisdiction**

65. The Court properly retains jurisdiction over the matters set forth in Article XII and other applicable provisions of the Plan.

**w. Good Faith of Blackhawk; No Collusion**

66. Blackhawk is not an insider (as that term is defined in section 101(31) of the Bankruptcy Code) of any of the Debtors.

67. Blackhawk is purchasing the Blackhawk Purchased Assets in good faith, and is a good faith purchaser, within the meaning of section 363(m) of the Bankruptcy Code, and is

therefore entitled to, and granted pursuant to paragraph 115 below, the full rights, benefits, privileges, and protections of that provision, and has otherwise proceeded in good faith in all respects in connection with the Blackhawk Transaction in that, inter alia: (i) Blackhawk recognized that the Debtors were free to deal with any other party interested in acquiring the Blackhawk Purchased Assets; (ii) Blackhawk complied with the provisions in the Bidding Procedures Order; (iii) Blackhawk agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) Blackhawk has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (v) no common identity of directors or controlling stockholders exists between Blackhawk, on the one hand, and any of the Debtors, on the other hand; and (vi) the negotiation and execution of the Blackhawk APA and related sale documents were at arms' length and in good faith.

68. None of the Debtors, Blackhawk, or any of their respective affiliates, partners, members, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, have engaged in any conduct that would cause or permit the Blackhawk APA or any of the related Blackhawk Transaction Documents, or the consummation of the Blackhawk Transaction, to be avoidable or avoided, or for costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, or has acted in bad faith or in any improper or collusive manner with any Person in connection therewith.

**x. Business Judgment; Compliance with Bidding Procedures Order; Highest and Best Offer for Blackhawk Purchased Assets**

69. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Blackhawk Transaction and other transactions contemplated by the Blackhawk APA and the related

Blackhawk Transaction Documents, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors and their Estates. Such business reasons include, but are not limited to, the facts that: (i) there is substantial risk of depreciation of the value of the Blackhawk Purchased Assets if the Blackhawk Transaction is not consummated promptly; (ii) the Blackhawk APA constitutes the highest or otherwise best offer for the Blackhawk Purchased Assets; (iii) the Blackhawk APA and the closing of the Blackhawk Transactions will present the best opportunity to realize the value of the Debtors on a going concern basis and avoid decline and devaluation of the Debtors' businesses with respect to the Blackhawk Purchased Assets; and (iv) unless the Blackhawk Transaction is concluded expeditiously as provided for in this Confirmation Order and pursuant to the Blackhawk APA, potential creditor recoveries may be substantially diminished.

70. In accordance with the Bidding Procedures Order, the Blackhawk APA was deemed a Qualified Bid (as defined in the Bidding Procedures Order) and was eligible to participate at the Auction.

71. The Debtors conducted an auction process in accordance with, and have otherwise complied in all material respects with, the Bidding Procedures Order. The auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any Person or entity to make a higher or otherwise better offer to purchase the Blackhawk Purchased Assets. The Auction was duly noticed and conducted in a non-collusive, fair, and good-faith manner and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Blackhawk Purchased Assets.

72. The Blackhawk APA constitutes the highest and best offer for the Blackhawk Purchased Assets and will provide a greater recovery for the Debtors' Estates than would be

provided by any other available alternative. The Debtors' determination that the Blackhawk APA constitutes the highest and best offer for the Blackhawk Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

73. The Blackhawk APA represents a fair and reasonable offer to purchase the Blackhawk Purchased Assets under the circumstances of these Chapter 11 Cases. No other Person or entity or group of entities has offered to purchase the Blackhawk Purchased Assets for greater economic value to the Debtors' Estates than Blackhawk.

74. Approval of the Blackhawk APA, and the prompt consummation of the Blackhawk Transaction contemplated thereby, is in the best interests of the Debtors and their Estates.

**y. No Fraudulent Transfer; Blackhawk Not a Successor**

75. The Blackhawk APA and related Blackhawk Transaction Documents were not entered into, and the Blackhawk Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under applicable law, and none of the parties to the Blackhawk APA or any of the related sale documents are consummating the Blackhawk Transaction with any fraudulent or otherwise improper purpose. The purchase price for the Blackhawk Purchased Assets constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

76. The transactions contemplated by the Blackhawk APA do not cause there to be, and there is not, (i) a consolidation, merger, or de facto merger of Blackhawk, on the one hand, with or into the Debtors or the Debtors' Estates, on the other hand, or vice versa, (ii) a substantial

continuity between Blackhawk, on the one hand, and the Debtors or the Debtors' Estates, on the other hand, (iii) a common identity between Blackhawk, on the one hand, and the Debtors or the Debtors' Estates, on the other hand, or (iv) a mere continuation of the Debtors or their Estates, on the one hand, with Blackhawk, on the other hand. Blackhawk is not and shall not be deemed, as a result of any action taken in connection with the Blackhawk Transaction, to: (1) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the Blackhawk APA); or (2) have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors.

**z. Good Faith of VCLF; No Collusion**

77. VCLF is not an insider (as that term is defined in section 101(31) of the Bankruptcy Code) of any of the Debtors.

78. VCLF is purchasing the VCLF Purchased Assets in good faith, and is a good faith purchaser, within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to, and granted pursuant to paragraph 123 below, the full rights, benefits, privileges, and protections of that provision, and has otherwise proceeded in good faith in all respects in connection with the VCLF Transaction in that, inter alia: (i) VCLF recognized that the Debtors were free to deal with any other party interested in acquiring the VCLF Purchased Assets; (ii) VCLF complied with the provisions in the Bidding Procedures Order; (iii) VCLF agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) VCLF has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (v) no common identity of directors or controlling stockholders exists between VCLF, on the one hand, and any of the Debtors, on the other hand; and (vi) the negotiation and execution of the VCLF APA and related sale documents were at arms' length and in good faith.

79. None of the Debtors, VCLF, or any of their respective affiliates, partners, members, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, have engaged in any conduct that would cause or permit the VCLF APA or any of the related VCLF Transaction Documents, or the consummation of the VCLF Transaction, to be avoidable or avoided, or for costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, or has acted in bad faith or in any improper or collusive manner with any Person in connection therewith.

**aa. Business Judgment; Compliance with Bidding Procedures Order; Highest and Best Offer for VCLF Purchased Assets**

80. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the VCLF Transaction and other transactions contemplated by the VCLF APA and the related VCLF Transaction Documents, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors and their Estates. Such business reasons include, but are not limited to, the facts that: (i) there is substantial risk of depreciation of the value of the VCLF Purchased Assets if the VCLF Transaction is not consummated promptly; (ii) the VCLF APA constitutes the highest or otherwise best offer for the VCLF Purchased Assets; (iii) the VCLF APA and the closing of the VCLF Transactions will present the best opportunity to realize the value of the Debtors on a going concern basis and avoid decline and devaluation of the Debtors' businesses with respect to the VCLF Purchased Assets; and (iv) unless the VCLF Transaction is concluded expeditiously as provided for in this Confirmation Order and pursuant to the VCLF APA, potential creditor recoveries may be substantially diminished.

81. In accordance with the Bidding Procedures Order, the VCLF APA was deemed a Qualified Bid (as defined in the Bidding Procedures Order).

82. The Debtors conducted an auction process in accordance with, and have otherwise complied in all material respects with, the Bidding Procedures Order. The auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any Person or entity to make a higher or otherwise better offer to purchase the VCLF Purchased Assets. The VCLF Transaction was duly noticed and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the VCLF Purchased Assets.

83. The VCLF APA constitutes the highest and best offer for the VCLF Purchased Assets and will provide a greater recovery for the Debtors' Estates than would be provided by any other available alternative. The Debtors' determination that the VCLF APA constitutes the highest and best offer for the VCLF Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

84. The VCLF APA represents a fair and reasonable offer to purchase the VCLF Purchased Assets under the circumstances of these Chapter 11 Cases. No other Person or entity or group of entities has offered to purchase the VCLF Purchased Assets for greater economic value to the Debtors' Estates than VCLF.

85. Approval of the VCLF APA, and the prompt consummation of the VCLF Transaction contemplated thereby, is in the best interests of the Debtors and their Estates.

**bb. No Fraudulent Transfer; VCLF Not a Successor**

86. The VCLF APA and related VCLF Transaction Documents were not entered into, and the VCLF Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under applicable law, and none of the parties to the VCLF APA or any of the related sale documents are consummating the VCLF Transaction with any

fraudulent or otherwise improper purpose. The purchase price for the VCLF Purchased Assets constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

87. The transactions contemplated by the VCLF APA do not cause there to be, and there is not, (i) a consolidation, merger, or de facto merger of VCLF, on the one hand, with or into the Debtors or the Debtors' Estates, on the other hand, or vice versa, (ii) a substantial continuity between VCLF, on the one hand, and the Debtors or the Debtors' Estates, on the other hand, (iii) a common identity between VCLF, on the one hand, and the Debtors or the Debtors' Estates, on the other hand, or (iv) a mere continuation of the Debtors or their Estates, on the one hand, with VCLF, on the other hand. VCLF is not and shall not be deemed, as a result of any action taken in connection with the VCLF Transaction, to: (1) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the VCLF APA); or (2) have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors.

## II. <u>ORDER</u>

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

88. This Confirmation Order approves the Disclosure Statement.

89. This Confirmation Order confirms the Plan.

90. This Confirmation Order approves the Plan Supplement.

91. The Plan and this Confirmation Order will be effective and binding on all parties in interest in the Chapter 11 Cases, including: (a) the Debtors; (b) the Committee; (c) the Retiree Committee; (d) Blackhawk; (e) VCLF; (f) the Liquidating Trust and the Liquidating Trustee; (g) the Government Environmental Entities; (h) all holders of Claims and Interests, whether or not Impaired under the Plan and whether or not such Holders have accepted or rejected the Plan or affirmatively voted to reject the Plan; (i) each Person or Entity receiving, retaining, or otherwise acquiring property under the Plan; and (j) any non-Debtor party to an Executory Contract or Unexpired Lease with the Debtors.

92. The failure to include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document or exhibit does not impair the effectiveness of that article, section, or provision; it being the intent of the Court that the Plan, the Plan Supplement, and any related document or exhibit will be approved in their entirety.

**A. Objections**

93. To the extent that any objections (including any reservations of rights contained therein) to Confirmation have not been withdrawn, waived, or settled prior to entry of this Confirmation Order, are not cured by the relief granted in this Confirmation Order, or have been otherwise resolved as stated by the Debtors on the record of the Combined Hearing, all such objections (including any reservation of rights contained therein) are hereby overruled on the merits.

**B. Findings of Fact and Conclusions of Law**

94. The findings of fact and the conclusions of law set forth in this Confirmation Order constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Combined Hearing in relation to

Confirmation are hereby incorporated into this Confirmation Order to the extent not inconsistent herewith. To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any finding of fact or conclusion of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Court at the Combined Hearing and incorporated herein) constitutes an order of this Court, it is adopted as such.

**C. The Releases, Injunction, Exculpation, and Related Provisions under the Plan**

95. The following releases, injunctions, exculpations, and related provisions set forth in Article IX of the Plan are hereby approved and authorized in their entirety:

**i. The Debtor Release**

96. The Debtor Release set forth in Article VIII.C of the Plan is hereby approved.

**ii. The Third Party Release**

97. The Third Party Release set forth in Article VIII.D of the Plan is hereby approved.[7]

**iii. Exculpation**

98. The Exculpation provisions set forth in Article VIII.E of the Plan are hereby approved.[8]

**iv. Injunction**

99. The injunction provisions set forth in Article VIII.F of the Plan are hereby approved. Article VIII.F of the Plan is necessary to implement the Plan and to preserve and enforce, among other things, the Debtors Release, the Third Party Release, and the Exculpation.

---

7 For the avoidance of doubt, in no circumstance shall Peabody, Arch, or Alcoa be Released Parties under Article VIII.D of the Plan.

8 For the avoidance of doubt, in no circumstance shall Peabody, Arch, or Alcoa be Exculpated Parties under Article VIII.E of the Plan.

**v. WVDEP Settlement**

100. The WVDEP Settlement, as implemented pursuant to the Plan and subject to final documentation as contemplated by the WVDEP Settlement Term Sheet, is hereby approved.

**vi. Committee Settlement**

101. The Committee Settlement, as implemented pursuant to the Plan, is hereby approved.

**vii. UMWA Health & Retirement Funds Settlement**

102. The 1974 Pension Plan shall have an Allowed Administrative Claim in the amount of $23 million, which shall be satisfied *first* by any recovery it receives pursuant to the Excess Cash Distribution Mechanism in Article IV.U of the Plan and *then*, to the extent not satisfied in full by distributions through the Excess Cash Distribution Mechanism, through *pro rata* sharing of the General Unsecured Claims Distribution in Article III.B.8 of the Plan. The 1974 Pension Plan shall also have an Allowed General Unsecured Claim in the amount of $888 million.

103. The United Mine Workers of America 1992 Benefit Plan's and United Mine Workers of America Combined Benefit Fund's claims against Alcoa are expressly preserved.

**D. Post-Confirmation Notices, Professional Compensation, and U.S. Trustee Statutory Fees**

104. In accordance with Bankruptcy Rules 2002 and 3020(c), no later than three Business Days after the Effective Date, the Debtors or the Liquidating Trustee, as applicable, must cause notice of Confirmation (the "Notice of Confirmation") to be served by United States mail, first-class postage prepaid, by hand, or by overnight courier service to all parties served with the Combined Hearing Notice; *provided that* no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Combined Hearing

Notice but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.

105. To supplement the notice procedures described in the preceding sentence, no later than five Business Days after the Effective Date, the Liquidating Trustee shall cause the Notice of Confirmation, modified for publication, to be published on one occasion in *USA Today* (National Edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c). No further notice is necessary.

106. The Notice of Confirmation will have the effect of an order of the Court, will constitute sufficient notice of the entry of the Confirmation Order to such filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

107. From and after the Effective Date, the Debtors or the Liquidating Trustee, as applicable, shall, without the necessity for any approval by the Court, pay all reasonable fees and expenses of the professional Persons incurred by the Debtors, the Committee, and the Retiree Committee as set forth in Article XII.D of the Plan and subject to section 2.06(c) of the Blackhawk APA.

108. In accordance with Article II.B of the Plan and subject to section 2.06(c) of the Blackhawk APA, the amount of Professional Fee Claims owing to the Professionals will be paid in Cash to such Professionals by the Debtors, the Liquidating Trust, or at the Liquidating Trust's direction, without interest or other earnings therefrom, when such Claims are approved by the

Bankruptcy Court; *provided* that, in accordance with Article II.B.1 of the Plan, all final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court and served on the Debtors (or the Liquidating Trustee) no later than the first Business Day that is sixty days after the Effective Date; *provided further* that, notwithstanding the foregoing, on the Effective Date, the Debtors or the Liquidating Trustee, as applicable, shall pay all unpaid fees earned and expenses incurred, including any fee(s) earned in connection with the Blackhawk Transaction and/or the VCLF Transaction, to the Debtors' retained investment banker; *provided further* that the Debtors' retained investment banker shall file a final request for Professional Fee Claims, including with respect to any fee(s) earned in connection with the Blackhawk Transaction, the VCLF Transaction, and/or any financing commitement, in accordance with Article II.B.1 of the Plan.

109. **U.S. Trustee Statutory Fees**. In accordance with Article II.F of the Plan, all fees payable pursuant to section 1930 of title 28 of the United States Code due and payable through the Effective Date, and any interest accruing thereto, shall be paid by the Debtors on or before the Effective Date, and amounts due thereafter shall be paid by the Liquidating Trustee in the ordinary until the entry of a final decree closing the respective Debtor's Chapter 11 Case. Any deadline for filing claims in these Chapter 11 Cases shall not apply to fees payable by the Debtors pursuant to section 1930 of title 28 of the United States Code or any interest accruing thereto.

## E. Notice of Subsequent Pleadings

110. Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in the Chapter 11 Cases after the Effective Date will be limited to the following parties: (a) the United States Trustee; (b) the Debtors or the Liquidating Trust, as

applicable, and counsel; (c) Blackhawk and its counsel; (d) VCLF and its counsel; and (e) any party known to be directly affected by the relief sought by such pleadings.

**F. Retention of Jurisdiction**

111. This Court properly may retain jurisdiction over the matters set forth in Article XI and other applicable provisions of the Plan.

**G. Reports**

112. After the Effective Date, the Debtors will have no obligation to file with the Court or serve on any parties monthly operating reports that the Debtors were obligated to file under the Bankruptcy Code or a Court order (even for those periods for which a monthly operating report was not filed prior to the Effective Date), ordinary course professional reports, and monthly or quarterly reports for Professionals. The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Liquidating Trustee.

**H. Effectiveness of All Actions**

113. Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, prior to, or after the Effective Date pursuant to the Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or stockholders of the Debtors, or the Purchaser and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

**I. Blackhawk Transaction**

114. **Consummation of the Blackhawk APA; Transfer Free and Clear of Liens and Claims**. On the Effective Date, the Debtors shall consummate the transactions contemplated by the Blackhawk APA pursuant to the terms thereof in exchange for the Purchase

Price (as defined in the Blackhawk APA); provided that the conditions precedent set forth in the Blackhawk APA have been satisfied or waived in accordance with the terms of the Blackhawk APA. Upon entry of this Confirmation Order by this Court, all matters provided for under the Blackhawk APA will be deemed authorized and approved without any requirement of further act or action by the Debtors' shareholders or the Debtors' boards of directors. On the Effective Date, in consideration and in exchange for the Purchase Price (as defined in the Blackhawk APA), the Debtors shall tender to Blackhawk duly executed bills of sale and assignment or other appropriate instruments and documents transferring title to and interest in the Blackhawk Purchased Assets, and such transfer shall be free and clear of all Liens, Claims and interests (other than Permitted Encumbrances (as defined in the Blackhawk APA)) pursuant to the terms and conditions of the Blackhawk APA. The provisions of this Confirmation Order authorizing and approving the transfer of the Blackhawk Purchased Assets free and clear of such Liens, Claims and interests shall be self-executing, and neither the Debtors nor Blackhawk shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Confirmation Order. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Blackhawk Transaction.

115. **Good Faith of Blackhawk**. The transactions contemplated by the Blackhawk APA are undertaken by the Debtors and Blackhawk without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the Blackhawk Transaction shall not affect the validity of the Blackhawk Transaction (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease), unless such

authorization and consummation of such Blackhawk Transaction are duly stayed pending such appeal. Blackhawk is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to and hereby granted the full protections of section 363(m) of the Bankruptcy Code.

116. **No Successor Liability for Blackhawk**. Based on the record before this Court, except as otherwise expressly provided in the Plan, this Confirmation Order, or the Blackhawk APA, Blackhawk: (i) does not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations of or assets of the Debtors on or prior to the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity; and (iii) shall not have any successor or transferee liability of any kind or character; provided that Blackhawk shall promptly perform and discharge the obligations specified in the Blackhawk APA, including, without limitation, the Assumed Liabilities.

117. Subject to the terms of the Blackhawk Transaction Documents, the Blackhawk Purchased Assets shall be transferred to and vest in the Combined Company free and clear of all claims (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code). Other than the Blackhawk Assumed Liabilities, such Blackhawk Purchased Assets shall specifically be taken free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever, whether contingent, unliquidated, unmatured or otherwise, in respect of the Debtors or any property of the Debtors, including, without limitation, any employee, workers' compensation, occupational disease or unemployment or temporary

disability related claim, including without limitation, claims that might otherwise arise under or pursuant to:

a. the Employment Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 (1974), as amended;

b. the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*., as amended;

c. Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e §§ *et seq*., as amended;

d. the Federal Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq*., as amended;

e. the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq*, as amended;

f. the Worker Adjustment and Restraining Act of 1988, 28 U.S.C. §§ 2101 *et seq*.;

g. the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 6231 *et seq*., as amended;

h. the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 §§ *et seq*., as amended;

i. the Black Lung Benefits Act and the Kentucky Workers' Compensation Act, §§ 342 *et seq*,;

j. the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§ 1161 *et seq*.;

k. the Longshoreman's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq*., as amended;

l. the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701 *et seq*.;

m. state discrimination laws;

n. state unemployment compensation laws or any other similar state laws; and

o. any other state or federal benefits or claims relating to any employment with any of the Debtors or any of their respective predecessors (including any liabilities for or associated with contributions to the UMWA 1974 Pension Plan, including Patriot's withdrawal liabilities under the plan).

118. Without limiting the generality of the principles of this Section I, neither Blackhawk, the Combined Company, nor any of their affiliates shall assume or be obligated to pay, perform, or otherwise discharge any:

a. workers' compensation debts, obligations, and liabilities of the Debtors arising pursuant to state law or otherwise, including, but without limitation, workers' compensation claims or suits of any type, whether known or unknown, whether incurred or filed, which have occurred or which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of discrimination, any workers' compensation claims filed or to be filed or reopenings of those claims, by or on behalf of any of the Debtors' current or former employees, persons laid-off, inactive or retired status, or their respective dependents, heirs or assigns, as well as any and all premiums, assessments or other obligations of any nature whatsoever of the Debtors relating in any way to workers' compensation liability;

b. debts, obligations, and liabilities of the Debtors arising pursuant to the Debtors' ownership or operation of the Blackhawk Purchased Assets on or prior to the closing date, including without limitation, under any theory of successor liability;

c. liability or benefit obligations related to black lung claims and benefits under the Black Lung Benefits Act of 1972, 30 U.S.C. §§ 901 *et seq.*, the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801 *et seq.*, the Black Lung Benefits Reform Act of 1977, Pub. L. NO. 95-239, 92 Stat. 95 (1978), the Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, Title 11, 95 Stat. 1643, (1981), in each case, as amended, if applicable, and occupational pneumoconiosis, silicosis, or other lung disease disabilities and benefits arising under federal or state law;

d. liability or benefit obligations under the Coal Industry Retiree Health Benefit Act of 1922, 26 U.S.C. §§ 9701 *et seq.*, and all amendments and revisions thereof; or

e. liability for or associated with contributions to the UMWA 1974 Pension Plan, including Patriot's withdrawal liabilities under the plan.

119. Neither Blackhawk, the Combined Company, nor any of their affiliates shall be deemed, as a result of any action taken in connection with the Blackhawk APA or any other Blackhawk Transaction Document, the consummation of the transactions contemplated by the Blackhawk APA or any other Blackhawk Transaction Document, or the transfer or operation of the Blackhawk Purchased Assets (a) to be a legal successor, or otherwise be deemed a successor to the Debtors; (b) to have, de facto or otherwise, merged with or into the Debtors; (c) to be an alter ego or a continuation of the Debtors; or (d) to have any responsibility for any obligations based on any theory of successor or similar theories of liability, including, without limitation, pursuant to the Black Lung Benefits Act or the UMWA 1974 Pension Plan.

120. Without limiting the generality of the foregoing, except as otherwise expressly provided in the Blackhawk APA, other Blackhawk Transaction Documents, or this Confirmation Order, neither Blackhawk, the Combined Company, nor any of their affiliates shall be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Combined Company, Blackhawk, and their affiliates shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor, employment or benefits law, de facto merger or substantial continuity, whether known or unknown as of the closing of the Blackhawk Transaction, then existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Debtors or their affiliates or any obligations of the Debtors or their affiliates arising prior to the closing of the Blackhawk Transaction, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Blackhawk Purchased Assets prior to the closing of the Blackhawk Transaction.

121. **Designated Buyer**. Subject to terms of the Combined Company Debt Facilities, Blackhawk is hereby authorized, in its discretion, in connection with consummation of the Blackhawk Transaction, to allocate the Blackhawk Purchased Assets, Blackhawk Assumed Liabilities, Assumed Contracts (as defined in the Blackhawk APA), and Assumed Leases (as defined in the Blackhawk APA) among its Affiliates, Subsidiaries, designees, assignees, and/or successors (each a "Designated Buyer") in a manner as it, in its discretion, deems appropriate and such Person shall be entitled to all of the rights, benefits, privileges, and protections of Blackhawk as are accorded to Blackhawk under this Order, and the Debtors shall cooperate with and take all actions reasonably requested by Blackhawk to effectuate any of the foregoing. In



KE 37539997

the event that Blackhawk designates any designee to acquire any Blackhawk Purchased Assets, including, without limitation, any Assumed Contracts (as defined in the Blackhawk APA) or Assumed Leases (as defined in the Blackhawk APA), then any reference to "Blackhawk" in this Confirmation Order shall be deemed to be a reference to "Blackhawk and/or such applicable Designated Buyer," unless the context requires otherwise. Upon the transfer of any Blackhawk Purchased Asset, Assumed Contract (as defined in the Blackhawk APA), or Assumed Lease (as defined in the Blackhawk APA) to, or the assumption of any Blackhawk Assumed Liability by, a Designated Buyer, such Designated Buyer shall be solely responsible for such Purchased Asset, Blackhawk Assumed Liability, Assigned Contract (as defined in the Blackhawk APA), or Assumed Lease (as defined in the Blackhawk APA) (including performance thereunder), as applicable, provided, however, that, notwithstanding any such transfer, Blackhawk shall be jointly and severally liable for the obligations and liabilities of such Designated Buyer.

**J. VCLF Transaction**

122. **Consummation of the VCLF APA; Transfer Free and Clear of Liens and Claims**. On the Effective Date, the Debtors shall consummate the transactions contemplated by the VCLF APA pursuant to the terms thereof in exchange for the Purchase Price (as defined in the VCLF APA); provided that the conditions precedent set forth in the VCLF APA have been satisfied or waived in accordance with the terms of the VCLF APA. Upon entry of this Confirmation Order by this Court, all matters provided for under the VCLF APA will be deemed authorized and approved without any requirement of further act or action by the Debtors' shareholders or the Debtors' boards of directors. On the Effective Date, in consideration and in exchange for the Purchase Price (as defined in the VCLF APA), the Debtors shall tender to VCLF duly executed bills of sale and assignment or other appropriate instruments and documents transferring title to and interest in the VCLF Purchased Assets, and such transfer shall



KE 37539997

be free and clear of all Liens, Claims and interests (other than Permitted Encumbrances (as defined in the VCLF APA)) pursuant to the terms and conditions of the VCLF APA. The provisions of this Confirmation Order authorizing and approving the transfer of the VCLF Purchased Assets free and clear of such Liens, Claims and interests shall be self-executing, and neither the Debtors nor VCLF shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Confirmation Order. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the VCLF Transaction.

123. **Good Faith of VCLF**. The transactions contemplated by the VCLF APA are undertaken by the Debtors and VCLF without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the VCLF Transaction shall not affect the validity of the VCLF Transaction (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease), unless such authorization and consummation of such VCLF Transaction are duly stayed pending such appeal. VCLF is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to and hereby granted the full protections of section 363(m) of the Bankruptcy Code.

124. **No Successor Liability for VCLF**. Based on the record before this Court, except as otherwise expressly provided in the Plan, this Confirmation Order, or the VCLF APA, VCLF: (i) does not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations of or assets of the Debtors on or prior to the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity; and

(iii) shall not have any successor or transferee liability of any kind or character; provided that VCLF shall promptly perform and discharge the obligations specified in the VCLF APA, including, without limitation, the Assumed Liabilities.

125. **Designated Buyer**. VCLF is hereby authorized, in its discretion, in connection with consummation of the VCLF Transaction, to allocate the VCLF Purchased Assets, VCLF Assumed Liabilities, Assumed Contracts (as defined in the VCLF APA), and Assumed Leases (as defined in the VCLF APA) among its Affiliates, Subsidiaries, designees, assignees, and/or successors (each a "Designated Buyer") in a manner as it, in its discretion, deems appropriate and such Person shall be entitled to all of the rights, benefits, privileges, and protections of VCLF as are accorded to VCLF under this Order, and the Debtors shall cooperate with and take all actions reasonably requested by VCLF to effectuate any of the foregoing. In the event that VCLF designates any designee to acquire any VCLF Purchased Assets, including, without limitation, any Assumed Contracts (as defined in the VCLF APA) or Assumed Leases (as defined in the VCLF APA), then any reference to "VCLF" in this Confirmation Order shall be deemed to be a reference to "VCLF and/or such applicable Designated Buyer," unless the context requires otherwise. Upon the transfer of any VCLF Purchased Asset, Assumed Contract (as defined in the VCLF APA), or Assumed Lease (as defined in the VCLF APA) to, or the assumption of any VCLF Assumed Liability by, a Designated Buyer, such Designated Buyer shall be solely responsible for such Purchased Asset, VCLF Assumed Liability, Assigned Contract (as defined in the VCLF APA), or Assumed Lease (as defined in the VCLF APA) (including performance thereunder), as applicable, provided, however, that, notwithstanding any such transfer, VCLF shall be jointly and severally liable for the obligations and liabilities of such Designated Buyer.

126. **VCLF Commitment Letter**. The transactions contemplated by the VCLF Commitment Letter are hereby approved in all respects. The indebtedness to be incurred by VCLF, and the Liens to be granted by VCLF, in connection with the transactions contemplated by the VCLF Commitment Letter, are valid, binding and enforceable, and granted as an inducement to the lenders thereunder to extend the credit contemplated thereby, and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance under the Bankruptcy Code or other applicable law. In addition, the equity interests in Healthco (as defined in the VCLF Commitment Letter) to be issued to the lender under the VCLF Commitment Letter are issued as a further inducement to the lender to extend the credit contemplated thereby, shall be deemed to have been issued for fair consideration and reasonably equivalent value, and are deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance under the Bankruptcy Code or other applicable law.

**K. Approval of Consents and Authorization to Take Acts Necessary to Implement Plan**

127. This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any documents, instruments, securities, or agreements, and any amendments or modifications thereto.

128. **Plan Implementation and Corporate Action Authorization**. The Debtors or the Liquidating Trustee, as the case may be, and their respective directors, officers, members, agents, and attorneys, are authorized and empowered from and after the date hereof to negotiate,

execute, issue, deliver, implement, file, or record any contract, instrument, release, or other agreement or document related to the Plan, as the same may be modified, amended, and supplemented (including such modifications to the Liquidating Trust Agreement that are substantially consistent with the terms and provisions of such form and necessary to satisfy the conditions to the effectiveness of the Plan), and to take any action necessary or appropriate to implement, effectuate, consummate, or further evidence the Plan in accordance with its terms, or take any or all corporate actions authorized to be taken pursuant to the Plan, whether or not specifically referred to in the Plan or any exhibit thereto, without further order of the Court. To the extent applicable, any or all such documents shall be accepted upon presentment by each of the respective state filing offices and recorded in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law. The Debtors or the Liquidating Trustee, as applicable, have the authority to reject, assume, and/or assign Executory Contracts and Unexpired Leases after the date hereof as well as after the Effective Date. If such rejection, assumption, and/or assignment of any Executory Contract or Unexpired Lease after the date hereof would, but for the application of this sentence, be unenforceable under applicable law, the Debtors' or the Liquidating Trustee's right to reject, assume, and/or assign Executory Contracts or Unexpired Leases shall nevertheless extend to the Effective Date and the Debtors or the Liquidating Trustee shall nevertheless be authorized to reject, assume, and/or assign any such Executory Contract or Unexpired Lease which is the subject of a motion to reject, assume and/or assign filed before the Effective Date.

129. The Debtors, the Liquidating Trust, and VCLF, as applicable, are authorized but not directed to take any action necessary or appropriate to implement, effectuate, or consummate

any agreement with respect to financing that such parties, to the extent applicable, have determined necessary to fund the Debtors' exit from chapter 11.

130. **The Liquidating Trust**. Pursuant to Article IV.Q of the Plan, a newly formed liquidating trust with no prior assets or liabilities (the "Liquidating Trust") will be established on the Effective Date for the primary purpose of liquidating the Liquidating Trust Assets and winding down the Debtors' Estates and will be maintained thereafter in accordance with the terms of the Plan and the Liquidating Trust Agreement. The Liquidating Trust Agreement, in substantially the form attached as Exhibit Q to the Plan Supplement, and all of the provisions therein are hereby approved by this Confirmation Order. The designation of Eugene I. Davis as the Liquidating Trustee is approved. Pending the occurrence of the Effective Date, the Debtors are authorized to take all actions as may be necessary to facilitate the creation and implementation of the Liquidating Trust. The Liquidating Trust is authorized and empowered, pursuant to the Plan and the Liquidating Trust Agreement, to liquidate or otherwise administer the Liquidating Trust Assets and implement the Wind Down.

131. **Transfer of Assets to Liquidating Trust**. Pursuant to Article IV.Q of the Plan, the Debtors will (a) transfer all Liquidating Trust Assets to the Liquidating Trust, to the extent the VCLF Transaction is not consummated, subject to all rights, defenses, and setoffs of any party in interest including the Liquidating Trustee and (b) make any available distributions, including the funding of the Disputed Claims Reserve, to the Liquidating Trustee pursuant to the Plan and the Liquidating Trust Agreement.

**L. Release of Liens**

132. Except as otherwise provided in this Confirmation Order, the Plan, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, any



KE 37539997

Lien, mortgage, deed of trust, pledge, or other security interest securing any Secured Claim shall be deemed fully released, settled, and compromised and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors held by such Holder and to take such actions, at the expense of the Debtors or the Liquidating Trustee, as the case may be, and as may be requested by the Debtors or the Liquidating Trustee, as the case may be, to evidence the release of such lien, including, without limitation, the execution, delivery, filing, or recording of such releases as may be requested by the Debtors or the Liquidating Trustee at the sole expense of the Debtors or the Liquidating Trustee, as the case may be. The filing of this Confirmation Order with any federal, state, provincial or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims, and other interests described above. Any Entity holding such Liens, Claims, or interests shall, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtors, the Liquidating Trustee, or the Combined Company, as applicable, such instruments of termination, release, satisfaction, and/or assignment (in recordable form) as may be reasonably requested by the Debtors, the Liquidating Trustee, or the Combined Company, as applicable, in each case at sole cost and expense of the Debtors or the Liquidating Trustee, as applicable.

**M. Injunctions and Automatic Stay**

133. Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court entered as of the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect through and including the Effective Date. All injunctions or stays contained in the

Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**N. Dissolution of the Debtors**

134. The Debtors or the Liquidating Trustee, as applicable, is authorized to take any action reasonably necessary to complete the voluntary dissolution of the Debtors pursuant to the Plan and the Liquidating Trust Agreement, as applicable.

**O. Nonseverability of Plan Provisions upon Confirmation**

135. Notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry. Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Court is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified except as provided by the Plan or this Confirmation Order; and (c) nonseverable and mutually dependent.

**P. Waiver or Estoppel**

136. Each holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel (or any other Entity), if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Court before the Confirmation Date.

**Q. Securities Laws Exemptions**

137. The offering, issuance, and distribution of any securities in connection with the VCLF Transaction, including the VCLF Equity Grant, shall be exempt from, among other things,



KE 37539997

the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery prior to the offering, issuance, distribution, or sale of securities to the fullest extent permitted by law pursuant to section 1145 of the Bankruptcy Code or pursuant to another exemption from the registration requirements of the Securities Act, including, without limitation section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. VCLF shall be considered a successor to the Debtors under section 1145 of the Bankruptcy Code. Securities issued pursuant to the section 1145 Bankruptcy Code exemption shall be freely tradable in the United States by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act, (b) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of future transfer of such securities or instruments, (c) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in any corporate organizational document, and (d) applicable regulatory approval, if any.

**R. Authorization to Consummate**

138. The Debtors are authorized to consummate the Plan at any time after the entry of the Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to consummation set forth in Article IX.A of the Plan. The substantial consummation of the Plan, within the meaning of section 1101 of the Bankruptcy Code, is deemed to occur on the first date, on or after the Effective Date, on which distributions are made in accordance with the terms of the Plan to Holders of any Allowed Claims.

**S. Corporate Action Regarding Blackhawk Transaction**

139. Each of the Debtors and the Liquidating Trustee may take any and all actions to execute, deliver, File, or record such contracts, instruments, releases, and other agreements or

documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the consummation of the transactions contemplated by the Blackhawk APA, without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by the security holders, officers, or directors of the Debtors or the Liquidating Trustee or by any other Person (except for those expressly required pursuant to the Plan, this Confirmation Order, or the Blackhawk Transaction Documents).

140. Prior to, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, officers, managers, members, or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, managers, members, or partners of the Debtors or the Liquidating Trustee, or the need for any approvals, authorizations, actions, or consents of any Person.

141. On and after the Effective Date, the appropriate officers of the Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions, and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors, in each case without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person. The secretary and any assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

142. **Authority to Act**. Each Debtor and its respective officers and directors, are authorized and empowered pursuant to Section 303 of the Delaware General Corporation Law and other applicable corporation, limited liability company, and limited partnership laws, to take any and all actions necessary or desirable to implement the transactions contemplated by the Plan and this Confirmation Order, in each case without any requirement of further vote, consent, approval, authorization, or other action by the stockholders, security holders, officers, directors, partners, managers, members, or other applicable owners or notice to, order of, or hearing before this Court. Each federal, state, provincial, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Plan and the transactions contemplated thereby.

143. **Exemption from Transfer Taxes**. Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with the Plan, the Blackhawk APA or the Blackhawk Transaction Documents shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States or by any other Governmental Unit, and each appropriate federal, state, provincial, and local (domestic and foreign) governmental officials and agents shall forgo the collection of any such Stamp or Similar Tax or governmental assessment and shall accept for filing and recordation instruments and other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under the Plan, the Blackhawk APA, or the Blackhawk Transaction Documents, (ii) the issuance and distribution of the Purchase Price (as

defined in the Blackhawk APA), and (iii) the attachment, perfection, maintenance or creation of security interests or any Lien as contemplated by the Plan, the Blackhawk APA, or the Blackhawk Transaction Documents.

**T. Assumed and Assigned Contracts and Leases**

**i. Court Approval; Adequate Notice; Adequate Assurance of Future Performance**

144. The Debtors have exercised reasonable business judgment in determining whether to assume (or assume and assign) each of the Executory Contracts and Unexpired Leases as set forth within the Plan, the Plan Supplement, or this Confirmation Order. Without amending or altering any prior order of this Court approving the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease, all of such assumptions (and assumptions and assignments) as set forth within the Plan, the Plan Supplement, or this Confirmation Order are hereby approved in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, with such assumptions (and assumptions and assignments) effective as of, and subject to the occurrence of, the Effective Date. The Debtors have provided sufficient notice to each non-Debtor counter-party to the Executory Contracts and Unexpired Leases of the assumptions (and assumptions and assignments) described in the Plan and the Plan Supplement. The Debtors and the applicable assignee have, as applicable, provided adequate assurances of future performance, as that term is used in section 365 of the Bankruptcy Code, with respect to the assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease that is to be assumed (or assumed and assigned) pursuant to the Plan. The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.



KE 37539997

**ii. Ipso Facto & Anti-Assignment Clauses.**

145. To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, such assumption or assumption and assignment (as applicable), or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the confirmation or consummation of the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to prohibit, restrict or condition such assumption or assumption and assignment (as applicable), to modify or terminate such Executory Contract or Unexpired Lease, or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan. Each Executory Contract and Unexpired Lease assumed (or assumed and assigned) pursuant to the Plan shall revest in and be fully enforceable by the applicable assignee in accordance with its respective terms and conditions, notwithstanding and without giving any force or effect to any provision in such Executory Contract or Unexpired Lease (including, without limitation, those described in sections 365(b), (c), (e), and (f) of the Bankruptcy Code) or under applicable non-bankruptcy law that purports to (a) terminate, modify, or restrict, or permit the applicable non-Debtor party to terminate, modify or restrict, such contract or lease or the Debtors' rights, benefits, and privileges thereunder; or (b) create or impose, or permit the applicable non-Debtor party to create or impose, any additional duties, obligations, penalties, default rates of interest or

payments (monetary and non-monetary) upon any Debtor, in each case as a result of or in connection with (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the confirmation or consummation of the Plan.

**iii. Cure Disputes**

146. Any counterparty to an Executory Contract or Unexpired Lease that failed to object timely to the proposed assumption (or proposed assumption and assignment), cure amount, or cure obligation (whether as to amount or existence of such obligation) is hereby deemed to have assented to such matters and is deemed to have forever released and waived any objection to the proposed assumption (or proposed assumption and assignment) and cure amount. The amounts, if any, due from the Debtors pursuant to each Executory Contract or Unexpired Lease assumed, or assumed and assigned, hereunder that are required to be paid as cure under section 365 of the Bankruptcy Code shall be satisfied by payment of such amount in Cash on the Effective Date, or as soon thereafter as is practicable, or on such other terms as the parties to the applicable Executory Contract or Unexpired Lease may otherwise agree in writing.

**iv. Full Release and Satisfaction of Claims**

147. Subject to any cure claims Filed with respect thereto, assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of

Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed (or assumed and assigned) by Final Order shall be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of this Court.

**v. Section 365(k) Protection**

148. With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to the Plan, upon and as of the Effective Date, the applicable assignee shall be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors shall be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

**U. Corporate Action Regarding VCLF Transaction**

149. Each of the Debtors and the Liquidating Trustee may take any and all actions to execute, deliver, File, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the consummation of the transactions contemplated by the VCLF APA, without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by the security holders, officers, or directors of the Debtors or the Liquidating Trustee or by any other Person (except for those expressly required pursuant to the Plan, this Confirmation Order, or the VCLF Transaction Documents).

150. Prior to, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, officers, managers, members, or partners of the Debtors (as of prior to the Effective Date) shall

be deemed to have been so approved and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, managers, members, or partners of the Debtors or the Liquidating Trustee, or the need for any approvals, authorizations, actions, or consents of any Person.

151. On and after the Effective Date, the appropriate officers of the Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions, and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors, in each case without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person. The secretary and any assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

152. **Authority to Act**. Each Debtor and its respective officers and directors, are authorized and empowered pursuant to Section 303 of the Delaware General Corporation Law and other applicable corporation, limited liability company, and limited partnership laws, to take any and all actions necessary or desirable to implement the transactions contemplated by the Plan and this Confirmation Order, in each case without any requirement of further vote, consent, approval, authorization, or other action by the stockholders, security holders, officers, directors, partners, managers, members, or other applicable owners or notice to, order of, or hearing before this Court. Each federal, state, provincial, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Plan and the transactions contemplated thereby.

153. **Exemption from Transfer Taxes**. Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with the Plan, the VCLF APA or the VCLF Transaction Documents shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States or by any other Governmental Unit, and each appropriate federal, state, provincial, and local (domestic and foreign) governmental officials and agents shall forgo the collection of any such Stamp or Similar Tax or governmental assessment and shall accept for filing and recordation instruments and other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under the Plan, the VCLF APA, or the VCLF Transaction Documents, (ii) the issuance and distribution of the Purchase Price (as defined in the VCLF APA), and (iii) the attachment, perfection, maintenance or creation of security interests or any Lien as contemplated by the Plan, the VCLF APA, or the VCLF Transaction Documents.

**V. Environmental and Other Laws**

154. Except for the releases expressly granted by the West Virginia Department of Environmental Protection (the "WVDEP") as set forth in the WVDEP Settlement, nothing in the Plan, the Plan Supplement, any document relating to the Plan (including, but not limited to, the Blackhawk Transaction Documents, the VCLF Transaction Documents and the Liquidating Trust Agreement) or this Confirmation Order or any other order relating to the Blackhawk or VCLF Transactions, or to the Liquidating Trust Agreement:

a. (1) with respect to any Entity other than VCLF or Blackhawk: releases, discharges, exculpates, precludes, or enjoins the enforcement of: (i) any liability or obligation to, or any Claim or any cause of action by, a Governmental Unit or



KE 37539997

other Entity under any applicable Environmental Law to which any Entity is subject as and to the extent that they are the owner, lessee, permittee, controller, or operator of real property or a mining operation after the Effective Date (whether or not such liability, obligation, Claim, or cause of action is based in whole or part on acts or omissions prior to the Effective Date); (ii) the obligations in the Specified Orders and Agreements;[9] (iii) any liability under any Environmental Law or other applicable police or regulatory law that is not a Claim; (iv) any Claim under any Environmental Law or other applicable police or regulatory law arising after the Effective Date; (v) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Patriot, or any claim assertable by a Governmental Unit against any Person or Entity other than the Debtors or Reorganized Patriot; (vi) any liability under Environmental Law on the part of any Entity other than the Debtors or Reorganized Patriot; (vii) any liability to a Governmental Unit under the Mine Act, any state mine safety law or the Federal Black Lung Benefit Act (the "BLBA") that is not a Claim; or (viii) any valid right of setoff or recoupment by any Governmental Unit, except in the case of each of (i) through (viii) above, to the extent the Plan, the Plan Supplement, or any document relating to the Plan releases, discharges, or exculpates any of the Debtors from, or precludes or enjoins a Governmental Unit or other Entity from pursuing or enforcing against the Debtors (A) any Claims, obligations, or liabilities for costs expended or paid before the Effective Date, or any penalties or fines owed for days of violations of Environmental Law before the Effective Date (which shall be treated as otherwise provided in the Plan); or (B) any Claims, obligations, or liabilities by or to a party that are resolved in a written agreement to which that party has agreed and only as to that party; and (2) with respect to VCLF or Blackhawk: releases, discharges, exculpates, precludes, or enjoins the enforcement of (i) any liability or obligation to, or any Claim or any cause of action by, a Governmental Unit or other Entity under any applicable Environmental Law to which VCLF or Blackhawk is subject as and to the extent that they are the owner, lessee, permittee, controller, or operator of real property or a mining operation after the Effective Date (whether or not such liability, obligation, Claim, or cause of action is based in whole or part on acts or omissions prior to the Effective Date) or (ii) any obligations under the Specified Orders and Agreements expressly assumed by Blackhawk pursuant to

[9] The "Specified Orders and Agreements" shall mean: (1) the Modified Consent Decree in *Ohio Valley Environmental Coalition, et al. v. Patriot Coal Corp., et al.*, Civil Action No. 3:11-cv-00115 (S.D.W. Va.), entered on January 9, 2013, and as subsequently modified by addenda filed on September 5, 2014; (2) the October 8, 2010 Order Specifying Relief and the December 21, 2012 Order in *Ohio Valley Environmental Coalition, et al. v. Hobet Mining, LLC*, Civil Action No. 3:09-cv-01167 (S.D.W. Va.); (3) The Consent Order and Agreement between Eastern Associated Coal, LLC, Clean Streams Foundation, Inc., and Pennsylvania Department of Environmental Protection, Barnes & Tucker Co. Lancashire No. 15 Mine, entered into on November 18, 2013; (4) the Comprehensive Settlement Agreement between Saline Valley Conservancy District and Peabody Coal Company, dated January 5, 2001, as amended on November 16, 2001 (S.D. Ill.); and (5) ongoing groundwater monitoring obligations memorialized and placed in effect pursuant to the Groundwater Management Zone agreement dated December 6, 2006, resolving the injunctive relief sought in Illinois Environmental Protection Agency v. Heritage Coal, f/k/a Peabody Coal. PCB No. 99-134, (Gallatin Cty, Ill.).

the Blackhawk Transaction Documents or by VCLF pursuant to the VCLF Transaction Documents;

b. shall enjoin or otherwise bar any Governmental Unit or other Entity from asserting or enforcing, outside this Bankruptcy Court, any liability described in the preceding clause (a) hereof; *provided* that (i) the Bankruptcy Court retains jurisdiction to determine whether environmental liabilities asserted by any Governmental Unit or other Entity are discharged or otherwise barred by the Plan, the Plan Supplement, any document relating to the Plan, this Confirmation Order, any other order relating to the Blackhawk or VCLF Transactions or the Liquidating Trust, or the Bankruptcy Code and (ii) nothing in any of the orders or other documents identified in the preceding subclause (i) hereof divests any tribunal of any jurisdiction it may have under applicable Environmental Law or other police or regulatory laws to adjudicate any defense asserted under any of those orders or other documents; provided that all Governmental Units and other Entities hereby reserve whatever rights they may have to argue that any tribunal of any jurisdiction has or does not have jurisdiction with respect to the matters described in the preceding subclauses (i) and (ii); or

c. authorizes the transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy laws and regulations.

155. The WVDEP has withdrawn any and all objections to confirmation of the Plan and shall provide the release of the New Money Lender Entities pursuant to and in accordance with the terms and provisions of the WVDEP Settlement.

156. The WVDEP Settlement shall provide that the release of New Money Lender Entities shall be exclusively enforceable in this Court or another federal court with competent jurisdiction within the Eastern District of Virginia, at the election of the New Money Lender Entities.

157. The New Money Lender Entities shall be third party beneficiaries of the WVDEP Settlement as it relates to the WVDEP release contained in the WVDEP Settlement.

## W. Transaction Support Agreement

158. Notwithstanding anything in the Plan or this Confirmation Order to the contrary, all rights, claims, and causes of actions of all parties to and under that certain Transaction

Support Agreement (as defined below) are reserved and preserved in their entirety. The term "Transaction Support Agreement," as used in this paragraph, means, collectively, (i) that certain Transaction Support Agreement, dated as of June 2, 2015, by and among the signatory parties thereto (as amended by that certain First Amendment to Transaction Support Agreement, dated as of June 18, 2015, by and among the signatory parties thereto (the "TSA First Amendment")); and (ii) the TSA First Amendment.

**X. Old Republic Settlement Agreement**

159. In accordance with the settlement agreement between Old Republic Insurance Company and its affiliates (collectively, "ORINSCO") and the Debtors pursuant to an agreed Court order (the "ORINSCO Settlement"), the rights, interest, claims, and defenses of ORINSCO with respect to ORINSCO's ability to offset applicable prefunded losses, refunded program assessments, incurred loss retrospective premium returns, and tax assessment reimbursements against its Allowed Claim are reserved and preserved in their entirety. In accordance with the ORINSCO Settlement, the Debtors' have the authority to keep the proceeds from the ORINSCO Settlement in their entirety as property of the Estate for, among other things, any costs incident to the Debtors' emergence from chapter 11.

**Y. Resolution of IRS Objection**

160. Notwithstanding any provision to the contrary in the Plan, this Confirmation Order, and any implementing Plan documents, nothing will: (a) affect the ability of the Internal Revenue Service (the "IRS") to pursue any non-debtors to the extent allowed by non-bankruptcy law for any liabilities that may be related to any federal tax liabilities owed by the Debtors or the Debtors' Estates; (b) preclude the IRS from amending any pre-petition or post-petition claim; or (c) require the IRS to file an Administrative Claim in order to receive payment for any liability described in 11 U.S.C. Section 503(b)(1)(B) and (C).

**Z. Resolution of Prepetition Notes Trustee's Objection**

161. As settlement and compromise of various issues raised by the Prepetition Notes Trustee, including without limitation those issues raised in its objection to confirmation and as well as on account of the Prepetition Notes Trustee Charging Lien, the Prepetition Notes Trustee shall receive $450,000 on or promptly after the Effective Date. Notwithstanding the foregoing, the Prepetition Notes Trustee is entitled to assert the Prepetition Notes Trustee Charging Lien to obtain payment of its reasonable expenses, fees and costs and nothing in the Plan shall be deemed to impair, extinguish, or negatively affect the Prepetition Notes Trustee Charging Lien.

**AA. Resolution of Fifth Third Bank Objection**

162. Pursuant to the consensual resolution of the objection to Confirmation of Fifth Third Bank, notwithstanding any provision to the contrary in the Plan or this Confirmation Order, Fifth Third Bank shall be reimbursed for its reasonable legal fees and expenses in the amount of $75,000 which shall be paid as an Allowed Administrative Claim pursuant to Article II A of the Plan.

**BB. AIG**

163. Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, any Plan Supplement, the Blackhawk APA, the VCLF APA, any other transaction document, or this Confirmation Order (the "Plan Documents"), nothing in the Plan Documents shall impair or otherwise affect the legal, equitable or contractual rights and defenses of the insurance affiliates of American International Group, Inc. (collectively, "AIG"), arising out of or in connection with any insurance policies, bonds, sureties, related agreements, endorsements, or documents between AIG and any of the Debtors, their successors and assigns (the "Insurance Agreements"). Notwithstanding anything to the contrary in the Plan Documents, the rights and obligations of the parties shall be determined pursuant to the Insurance Agreements under nonbankruptcy law,

including, without limitation, obligations to pay, provisions regarding arbitration, and all other terms, conditions, limitations and exclusions thereof. For the sake of clarity, nothing in the Plan Documents shall impair or otherwise affect AIG's right to setoff, recoupment, or subrogation in connection with any Insurance Agreement, nor bar AIG from seeking to arbitrate under any Insurance Agreement. Further, AIG may amend any timely filed proofs of claim at any time hereafter without the need for prior Court approval or Liquidating Trust approval. The claim estimation and other claim provisions set forth in Article VII.A.3 and Article VIII.K of the Plan shall not apply to AIG. Any third-party releases in the Plan shall not be binding on AIG. For the avoidance of doubt, if the Debtors assume and assign the Insurance Agreements to VCLF in accordance with the VCLF APA, then the Debtors shall have no continuing obligations to AIG, and VCLF shall have all of the Debtors' obligations under the Insurance Agreements.

**CC. Objecting Non-Debtor Counterparties to Certain Executory Contracts and Unexpired Leases**

164. Notwithstanding anything contained herein or in the Plan, the objections, rights, interests, claims, and defenses of certain non-debtor counterparties to Executory Contracts and Unexpired Leases (collectively, the "Objecting Counterparties" and each, an "Objecting Counterparty")[10] with respect to the assumption, assumption and assignment, or rejection of their agreements with the Debtors are reserved and preserved in their entirety until a further order providing otherwise. For the avoidance of doubt, to the extent any valid liens exist on leased property that the Debtors intend to assume and assign, nothing in this Order shall be deemed to release the Debtors' obligations to satisfy the Cure Costs, if any, associated with those liens prior to assumption, such issue being preserved until the omnibus hearing scheduled for

[10] The Objecting Counterparties, as that term is used in this paragraph 164 of the Confirmation Order, consist of: AIG; Caterpillar Financial Services Corporation; Kinder Morgan Resources, LLC; Siemens Financial Services, Inc. ("Siemens"); Stollings Trucking Company, Inc.; United Leasing, Inc.; and Virginia Electric and Power Company.

October 22, 2015, at 10:00 a.m. (prevailing Eastern Time). Notwithstanding anything contained in this Confirmation Order or in the Plan, all of the Debtors' rights, interests, claims, and defenses with respect to the assumption, assumption and assignment, or rejection of its agreements with any Objecting Counterparty are reserved and preserved in their entirety until a further order providing otherwise. To the extent that the Debtors and Blackhawk or VCLF, as applicable, and any Objecting Counterparty are unable to reach resolution with respect to these matters, the Court will consider the applicable matters at the omnibus hearing scheduled for October 22, 2015, at 10:00 a.m. (prevailing Eastern Time).[11]

165. Notwithstanding anything contained herein or in the Plan, the objections, rights, interests, claims, and defenses of ACIN LLC; Natural Resource Partners L.P.; NRP (Operating) LLC; People's Capital and Leasing Corp.; Shepard Boone Coal Company LLC; and WPP LLC (collectively, the "Counterparties Objecting to Cure Amounts" and each, a "Counterparty Objecting to Cure Amounts") with respect to cure amounts relating to their agreements with the Debtors are reserved and preserved in their entirety until a further order providing otherwise. Notwithstanding anything contained in this Confirmation Order or in the Plan, all of the Debtors' rights, interests, claims, and defenses with respect to the cure amounts relating to its agreements with any Counterparty Objecting to Cure Amounts are reserved and preserved in their entirety until a further order providing otherwise. To the extent that the Debtors and any Counterparty Objecting to Cure Amounts are unable to reach resolution with respect to these matters, the Court will consider the applicable matters at the omnibus hearing scheduled for October 22, 2015, at 10:00 a.m. (prevailing Eastern Time).

[11] Nothing in this paragraph 164 of the Confirmation Order shall pertain to Siemens' lending relationship with the Debtors as a prepetition asset based lender under the prepetition asset based lending facility.

166. **Cassingham Objectors**. Notwithstanding anything contained herein or in the Plan, or in the Court's *Order Extending the Time within which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property* filed September 1, 2015 [Docket No. 1029], all of the rights, interests, claims, and defenses of Cassingham, LLC and its affiliated objecting entities party to Docket No. 1416 (collectively, the "Cassingham Objectors") with respect to cure amounts relating to their agreements with the Debtors are reserved and preserved in their entirety until a further order providing otherwise. Notwithstanding anything contained herein or in the Plan, all of the Debtors' rights, interests, claims, and defenses with respect to cure amounts related to their agreements with the Cassingham Objectors are reserved and preserved in their entirety until a further order providing otherwise. To the extent that the Debtors and Blackhawk or VCLF, as applicable, and the Cassingham Objectors are unable to reach resolution with respect to these matters, the Court will consider these matters at the omnibus hearing scheduled for October 22, 2015 at 10:00 a.m. prevailing Eastern Time.

167. **STB Objecting Parties**. Notwithstanding anything contained herein or in the Plan and pursuant to that *Order Extending the Time within which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property* entered by the Court on September 1, 2015, extending the time as set forth under sections 365(d)(4)(A)(i) and (ii) to assume nonresidential real property leases (the "Extension Order"), all of the rights, interests, claims, including cure claims and defenses of Courtney Company, Daniels Electric, Inc., Penn Virginia Operating Co., LLC, Toney Fork, LLC and Suncrest Resources, LLC (collectively, the "STB Objecting Parties") with respect to the assumption by the Debtors and assignment to Blackhawk or VCLF, as applicable, or rejection of their agreements, are reserved and preserved in their entirety until a further order providing otherwise. Notwithstanding anything contained

herein or in the Plan and pursuant to the Extension Order, all of the Debtors' rights, interests, claims, and defenses with respect to the assumption, assumption and assignment, or rejection of its agreements with the STB Objecting Parties are reserved and preserved in their entirety until a further order providing otherwise. To the extent that the Debtors and Blackhawk or VCLF, as applicable, and the STB Objecting Parties are unable to reach resolution with respect to these matters, the Court will consider these matters at the omnibus hearing scheduled for October 22, 2015 at 10:00 a.m. (prevailing Eastern Time). For the avoidance of doubt, the *Debtors' Motion for Entry of an Order (a) Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases, Effective* Nunc Pro Tunc *to August 13, 2015, and (b) Granting Related Relief* [Docket No. 820] is hereby adjourned and will be considered at the omnibus hearing scheduled for October 22, 2015 at 10:00 a.m. (prevailing Eastern Time).

168. **GE Parties**. Notwithstanding anything contained herein or in the Plan, Disclosure Statement, Plan Supplement, Blackhawk APA, VCLF APA, or any other asset purchase agreement put forward at the Combined Hearing commencing on October [6], 2015 (collectively, the "Plan Sale Documents"), all of General Electric Capital Corporation's and Gelco Corporation d/b/a Element Fleet Management's (together, the "GE Parties") rights, interests, claims, and defenses with respect to the assumption, assumption and assignment, or rejection of its agreements with the Debtors are reserved and preserved in their entirety until a further order providing otherwise. Notwithstanding anything contained herein or in the Plan Sale Documents, all of the Debtors' rights, interests, claims, and defenses with respect to the assumption, assumption and assignment, or rejection of its agreements with the GE Parties are reserved and preserved in their entirety until a further order providing otherwise. Notwithstanding anything contained herein or in the Plan Sale Documents, the GE Parties'

personal property shall not be subject to a sale under section 363 of the Bankruptcy Code as part of the Blackhawk APA, VCLF APA, or any applicable asset purchase agreement at the Combined Hearing commencing on October 7, 2015. The GE Parties' rights, interests, claims, and defenses, with respect to their personal property shall be reserved and preserved in their entirety. To the extent that the Debtors and Blackhawk or VCLF, as applicable, and the GE Parties are unable to reach resolution with respect to these matters, the Court will consider these matters at the omnibus hearing scheduled for October 22, 2015 at 10:00 a.m. (prevailing Eastern Time).

169. **Honey Island**. Notwithstanding anything contained herein or in the Plan, all rights, interests, claims, and defenses of Honey Island Coal Co., LLC ("Honey Island") with respect to any removal or transfer of the equipment identified in the *Limited Objection of Honey Island Coal Co., LLC to Confirmation of Debtors' Fourth Amended Joint Plan of Reorganization* [Docket No. 1415] (collectively, the "Big Mountain Equipment") are reserved and preserved in their entirety until a further order providing otherwise. Notwithstanding anything contained herein or in the Plan, all of the Debtors' rights, interests, claims, and defenses with respect to any removal or transfer of the Big Mountain Equipment are reserved and preserved in their entirety until a further order providing otherwise. To the extent that the Debtors and Blackhawk or VCLF, as applicable, and Honey Island are unable to reach resolution with respect to these matters, the Court will consider these matters at the omnibus hearing scheduled for October 22, 2015 at 10:00 a.m. (prevailing Eastern Time).

170. **Pocahontas**. Notwithstanding anything contained herein or in the Plan, all of the rights, interests, claims, and defenses of Pocahontas Land Corporation ("Pocahontas") with respect to the assumption, assumption and assignment, or rejection of its agreements with the

Debtors, including, without limitation, those issues identified in docket numbers 771 and 1476, are reserved and preserved in their entirety until a further order providing otherwise. Notwithstanding anything contained herein or in the Plan, all of the Debtors' rights, interests, claims, and defenses with respect to the assumption, assumption and assignment, or rejection of its agreements with Pocahontas are reserved and preserved in their entirety until a further order providing otherwise. To the extent that the Debtors and Blackhawk or VCLF, as applicable, and Pocahontas are unable to reach resolution with respect to these matters as well as the issues identified in docket number 820 (which is also further adjourned with respect to Pocahontas), the Court will consider these matters at the omnibus hearing scheduled for October 22, 2015 at 10:00 a.m. (prevailing Eastern Time).

171. **Black King Objectors**. Notwithstanding anything contained herein or in the Plan, all of the rights, interests, claims, objections and defenses of Black King Mine Development Company, Boone East Development Company, Eagle Energy, Inc., Bandy Town Coal Company, and Pioneer Fuel Corporation (collectively, the "Black King Objectors" ) with respect to the assumption, assignment, or rejection of its agreements with the Debtors are reserved and preserved in their entirety until a further hearing and order providing otherwise. Notwithstanding anything contained herein or in the Plan, all of the Debtors' rights, interests, claims, and defenses with respect to the assumptions, assumption and assignment, or rejection of its agreements with the Black King Objectors are reserved and preserved in their entirety until a further hearing and order providing otherwise. To the extent that the Debtors and Blackhawk or VCLF, as applicable, and the Black King Objectors are unable to reach resolution with respect to these matters, the Court will consider these matters at the omnibus hearing scheduled for October 22, 2015 at 10:00 a.m. (prevailing Eastern Time).

172. **Blue Eagle Land Company**. Notwithstanding anything contained herein or in the Plan, all of the rights, interests, claims, objections and defenses of Blue Eagle Land Company with respect to the assumption, assumption and assignment, or rejection of its agreements with the Debtors are reserved and preserved in their entirety until a further hearing and order providing otherwise. Notwithstanding anything contained herein or in the Plan, all of the Debtors' rights, interests, claims, and defenses with respect to the assumptions, assumption and assignment, or rejection of its agreements with Blue Eagle Land Company are reserved and preserved in their entirety until a further hearing and order providing otherwise and the Debtors confirm that they currently seek and shall only seek to assume and assign the December 31, 2005 Coal Mining Lease *cum onere*, in its entirety. To the extent that the Debtors and Blackhawk or VCLF, as applicable, and Blue Eagle Land Company are unable to reach resolution with respect to these matters, the Court will consider these matters at the omnibus hearing scheduled for October 22, 2015 at 10:00 a.m. (prevailing Eastern Time).

173. **Rhino**. Notwithstanding anything contained herein or in the Plan, all of Rhino Eastern LLC's and Rhino Energy WV, LLC's (together "Rhino") rights, interests, claims, and defences—including, but not limited to, the issues raised in the *Objection by Rhino Eastern, LLC and Rhino Energy WV, LLC to Confirmation of Third Amended Plan of Reorganization* [Docket No. 1165]—with respect to the assumption, assumption and assignment, or rejection of its agreements with the Debtors are reserved and preserved in their entirety until a further order providing otherwise. Notwithstanding anything contained herein or in the Plan, all of the Debtors' rights, interests, claims, and defenses with respect to the assumption, assumption and assignment, or rejection of its agreements with Rhino are reserved and preserved in their entirety until a further order providing otherwise. To the extent that the Debtors and Blackhawk or

VCLF, as applicable, and Rhino are unable to reach resolution with respect to these matters, the Court will consider these matters at the omnibus hearing scheduled for October 22, 2015, at 10:00 a.m. (prevailing Eastern Time).

174. **Oracle**. Notwithstanding anything contained herein or in the Plan, all of Oracle America, Inc.'s ("Oracle") rights, interests, claims, and defenses with respect to the assumption, assumption and assignment, or rejection of its agreements with the Debtors are reserved and preserved in their entirety until a further order providing otherwise. Notwithstanding anything contained herein or in the Plan, all of the Debtors' rights, interests, claims, and defenses with respect to the assumption, assumption and assignment, or rejection of its agreements with Oracle are reserved and preserved in their entirety until the earlier of (a) entry of a further order providing otherwise or (b) October 22, 2015, or such later date as Oracle and the Debtors may mutually agree upon in writing. To the extent that the Debtors and Blackhawk or VCLF, as applicable, and Oracle are unable to reach resolution with respect to these matters, the Court will consider these matters at the omnibus hearing scheduled for October 22, 2015 at 10:00 a.m. prevailing Eastern Time. Except to the extent any such obligations are inconsistent with the Debtors' or Oracle's obligations under Title 11 of the United States Code or any order of the Court, the Debtors shall be obligated to timely pay any and all amounts arising or otherwise due under any agreements between the Debtors and Oracle, and the Debtors and Oracle shall timely perform any of their respective obligations under such agreements, from the Petition Date until the date such agreements are either assumed, assumed and assigned, or rejected by the Debtors. The Debtors shall not, without either Oracle's express written consent or a Court order permitting otherwise, (i) provide, enable, or otherwise facilitate Blackhawk's, VCLF's, or any other persons' or entities' use of software licensed by Oracle contrary to any

agreement between Oracle and the Debtors (including, without limitation, any transitional use, whether under a transitional services agreement, or otherwise) or (ii) transfer any IT-Related Equipment (as such term is used in the Blackhawk APA or VCLF APA, as applicable) containing any Oracle licensed software to Blackhawk, VCLF, or any other persons or entities.

175. **Shonk**. Notwithstanding anything contained in this Confirmation Order of in the Plan, all of the rights, interest, claims, objections, and defences of Shonk Land Company LLC ("Shonk") with respect to the assumption, assignment, or rejection of its agreements with the Debtors are reserved and preserved in their entirety until a further hearing and order providing otherwise. Notwithstanding anything contained in this Confirmation Order of the Plan, all of the Debtors' rights, interests, claims, and defenses with respect to the assumptions, assumption and assignment, or rejection of its agreements with Shonk are reserved and preserved in their entirety until a further hearing and order providing otherwise. Shonk agrees that on or before Tuesday, October 13, 2015, at 2:00 p.m. (prevailing Eastern Time), Shonk shall provide in writing to Blackhawk and the Debtors a detailed list of specific issues concerning the assumption and assignment, including adequate assurance, related to the Shonk leases or agreements. To the extent that the Debtors and Blackhawk or VCLF, as applicable, and Shonk are unable to reach resolution with respect to these matters, the Court will consider these matters at the omnibus hearing scheduled for October 22, 2015, at 10:00 a.m. (prevailing Eastern Time).

## DD. LRPB Lease and Lessors

176. **The LRPB Lease**. This section (entitled "LRPB Lease and Lessors") of this Confirmation Order addresses issues specific to that certain Restatement of Leases and Other Documents dated September 28, 1984 among LaFollette, Robson, Prichard & Broun, *et al.* and Cedar Coal Co. and The Charleston Bank, N.A. as Trustee (as amended, assigned and subleased from time to time, but constituting one wholly integrated lease, the "LRPB Lease") to which



KE 37539997

H.A. Robson, LLC (as successor to H.A. Robson Trust), PRC Holdings, LLC, Prichard School, LLC, City National Bank of West Virginia as Trustee under a Trust Agreement dated December 30, 1983 with A.M. Prichard, III, Sarah Ann Prichard and Lewis Prichard and their respective spouses, Robert B. LaFollette Holdings, LLC, Wright Holdings, LLC, Kanawha Boone Holdings LLC, James A. LaFollette Holdings, LLC, LML Properties, LLC, Riverside Park, Inc. and Ohio River Holdings, LLC (as successor to LML-AAW Holdings, L.L.C., RBL – AAW Holdings, LLC, and AAW Holdings, LLC and LaFollette Holdings, Ltd.), and Broun Properties, LLC (collectively, "LRPB") and various Debtors are party, and whereby various Debtors lease approximately 16,000 acres of land located in Boone County and Kanawha County, West Virginia from LRPB, which may be modified pursuant to the Term Sheet dated as of October 4, 2015 executed by and among LRPB, Blackhawk Mining LLC ("Buyer"), and Blackhawk (the "Modification"), which is subject to the occurrence of the Effective Date, the closing of the Blackhawk Transaction (the "Blackhawk Closing"), the payment of Cure Costs (as agreed to by the Debtors and LRPB or otherwise ordered by the Court), and such other conditions as set forth in the Modification.

177. **The Blackhawk/LRPB Lease Permits**. Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or the Blackhawk Transaction Documents, at the Blackhawk Closing: (i) the Debtors shall assume and assign the LRPB Lease, in its entirety, and Buyer shall assume all obligations of the Debtors arising under the LRPB Lease, which, immediately following such assumption and assignment, shall be modified by agreement of LRPB and Buyer pursuant to the Modification; (ii) Blackhawk shall execute and deliver to LRPB the parent guaranty required by the Modification (the "Parent Guaranty"); and (iii) the Debtors, to the extent permitted under applicable non-bankruptcy law, shall assign to Buyer their rights

with respect to the mining permits relating to the LRPB Lease that are listed on Schedule 2.01(g) to the Blackhawk APA (as filed with the Bankruptcy Court on September 5, 2015, at [Docket No. 1078) (the "Blackhawk/LRPB Lease Permits"). Following the Blackhawk Closing, Buyer diligently shall pursue, in accordance with applicable non-bankruptcy law, the transfer of the Blackhawk/LRPB Lease Permits to Buyer. Subject to the occurrence of the Blackhawk Closing, Buyer shall diligently take all measures in accordance with applicable non-bankruptcy law, to effectuate the transfer of the Blackhawk/LRPB Lease Permits to Buyer. Except as expressly provided in the Modification, LRPB has not consented to any sublease, and nothing in this order compels or overrides the need for such consent; *provided*, *however*, that LRPB will not unreasonably withhold, condition, or delay its consent to a sublease to an affiliate of VCLF.

178. **The VCLF Permits**. Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or the VCLF Transaction Documents, at the closing of the VCLF Transaction (the "VCLF Closing"), the Debtors shall assume and assign to VCLF the following mining permits (the "Non-Buyer/LRPB Lease Permits"):

| Item | SMCRA Permit No. | Facility Name | Permittee |
|---|---|---|---|
| 1 | H-354 | Coal Fork Haulroad | Remington, LLC |
| 2 | H-370 | Big White Oak Haulroad | Mountain View Coal Company, LLC |
| 3 | O-21-82 | Two Mile Haulroad | Mountain View Coal Company, LLC |
| 4 | R-753 | 1 Mile White Oak Refuse Fill | Mountain View Coal Company, LLC |
| 5 | S-103-80 | Playground | Mountain View Coal Company, LLC |
| 6 | S-193-77 | Cut 26 | Mountain View Coal Company, LLC |
| 7 | S-218-75 | Cut 22 | Mountain View Coal Company, LLC |
| 8 | S-38-80 | Cut 22 | Mountain View Coal Company, LLC |
| 9 | D-31-82 | Robin 6 | Mountain View Coal Company, LLC |
| 10 | S-6015-86 | Cut 30 | Mountain View Coal Company, LLC |
| 11 | U-80-83 | Stockburg No. 1 Mine | Remington, LLC |
| 12 | S-3010-00 | White Oak Extension | Catenary Coal Company, LLC |
| 13 | S-3006-00 | Wildcat Surface Mine | Wildcat, LLC |

Subject to the occurrence of the VCLF Closing, VCLF shall diligently take all measures, in accordance with applicable non-bankruptcy law, to effectuate the transfer of the Non-Buyer/LRPB Lease Permits to VCLF.

179. **Reservation of LRPB Rights Regarding Permit Transfers**. Notwithstanding anything in the Plan, this Confirmation Order, the Blackhawk Transaction Documents or the VCLF Transaction Documents (including the foregoing provisions of this Section that address transfer of the Blackhawk/LRPB Lease Permits and the Non-Buyer/LRPB Lease Permits, LRPB specifically reserves, and does not hereby waive, any rights of LRPB as lessor under the LRPB lease ancillary to the permit transfer process and all laws and regulations governing the same, with respect to adequacy of bonding and security in connection with reclamation and water treatment, and nothing herein shall be construed to constitute a waiver of LRPB's rights with respect to the transfer process.

180. **Preservation of LRPB Claims under Lease**. Notwithstanding anything to the contrary in the Plan, this Confirmation Order, the Blackhawk Transaction Documents, or the VCLF Transaction Documents: (a) with respect to any claim actually asserted, or as may be asserted in the future, against LRPB or liability or loss incurred by LRPB, the indemnity obligations of Buyer and Blackhawk to LRPB under the LRPB Lease, as amended by the Modification, and Parent Guaranty, associated directly or indirectly with environmental conditions, discharges or the need for reclamation, remediation, restoration or mitigation, or acts or omissions related thereto (as used in this paragraph 180, collectively, the "Environmental Matters"), whether on account of an act or omission of Blackhawk, the Buyer, the Debtors, any of their respective sub-lessees, contractors, agents and/or affiliates, or any bonding company or governmental agency that assumes responsibility for operations in connection with the LRPB

Property or any portion thereof, or any other person operating on the LRPB Property with the permission or consent of Buyer or Blackhawk (including without limitation VCLF, any Back-Up Bidder, or the Liquidating Trust, in connection with the Non-Buyer/LRPB Permits), shall not be discharged, waived, limited or released as a result of the Plan, this Confirmation Order, the occurrence of the Effective Date, the Blackhawk Closing or the VCLF Closing; (b) Buyer and Blackhawk shall have primary responsibility to LRPB under the LRPB Lease and the Parent Guaranty, respectively, for indemnity with respect to such claims, liability or losses; (c) the fact or possibility that Environmental Matters do, or may, exist prior to Effective Date, the Blackhawk Closing or the VCLF Closing shall not alter, affect or vitiate LRPB's right to indemnification from Buyer and Blackhawk as provided in the LRPB Lease, as amended by the Modification, and the Parent Guaranty.

181. **Limitation of Third-Party Releases**. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, nothing in the Plan (including without limitation the third party release and exculpation provisions set forth in the Plan), the Confirmation Order, the Blackhawk Transaction Documents or the VCLF Transaction Documents shall release, discharge or terminate any guaranty or indemnity issued, granted or given by any person (other than the Debtors) in favor of LRPB, or any predecessor, successor, assign or member of LRPB, or of any guaranty or indemnity of, or with respect to, the LRPB Lease, including without limitation, the guaranty executed by Peabody Holding Company, Inc.

182. **Debtors' Release of LRPB**. Effective on the Effective Date, the Debtors hereby waive and release all claims and causes of action that they have, or may have, as of the Effective Date, against LRPB, its agents, attorneys, predecessors, successors, affiliates, and assigns, whether such claims are known or unknown, legal or equitable, disputed or undisputed, fixed or

contingent, including without limiting the generality of the foregoing, claims arising under Chapter 5 of the Bankruptcy Code.

183. **Inconsistencies and Reservation of Rights**. In the event of any inconsistency between the Plan and/or other sections of the Confirmation Order, on the one hand, and paragraphs 176–182 of this Confirmation Order, on the other, the terms set forth in paragraphs 176–182 of the Confirmation Order shall govern. Notwithstanding anything contained in the Plan or other portions of this Confirmation Order, all rights are reserved with respect to Cure Costs until the omnibus hearing scheduled for October 22, 2015, at 10:00 a.m. (prevailing Eastern Time).

**EE. Peabody**

184. Notwithstanding anything in this Confirmation Order or in the Plan to the contrary, Section V.D of the Plan shall not apply to any contracts, agreements, leases, or similar agreements or arrangements to which Peabody Energy Corporation or any of its affiliates (collectively, "Peabody") is or was a party (collectively, "Peabody Agreements"). Peabody, the Debtors, and all parties to the Peabody Agreements reserve all rights with respect to whether any of the Peabody Agreements are executory, and with respect to the assumption or rejection or consequences of assumption or rejection of any Peabody Agreement or the effects of any breach of any Peabody Agreement.

**FF. Subrogating Insurance Carriers**

185. Notwithstanding anything in the Plan, the Disclosure Statement, or this Confirmation Order, there shall be no release, extinguishment, or modification of the rights, entitlements, and Liens of ACE, Allied World Assurance Company, Aspen American Insurance Company, AXIS Insurance, Hannover Insurance Company, Ironshore Insurance Ltd., Lexington Insurance Company, Certain Underwriters at Lloyds, Maiden Reinsurance Company, Markel

Global Insurance (formerly Alterra), RSUI Indemnity, and Starr Technical Risks Agency (collectively, the "Subrogating Carriers") in and to any and all Causes of Action (including the proceeds thereof) arising from or related to the February 6, 2013 catastrophic failure of Patriot Coal Corporation's plate and frame press at the Blue Creek Plant located in Charleston, West Virginia. Each of the Subrogating Carriers' rights, entitlements, and Liens in and to such Causes of Action (including the proceeds thereof) are preserved and shall remain enforceable against the present or future holder or holders of any of such Causes of Action, including but not limited to the Debtors and the Liquidating Trust.

**GG. Assumption of Surety Bond Obligations**

186. Except for surety bonds for permits transferred to Blackhawk or ERP Federal Mining Complex, LLC ("ERP"), which surety bonds shall be replaced, each surety bond issued by Fidelity & Deposit Company of Maryland, Indemnity National Insurance Company, Travelers Casualty and Sureties Company of America, US Specialty Insurance and Sureties Company, Westchester Fire Insurance Company, Federal Insurance Company, Argonaut Insurance Company, and Lexon Insurance Company (together, "Sureties" and the surety bonds issued by such Sureties not excepted in this paragraph collectively, the "Surety Bonds") or affiliates shall be deemed assumed[12] with the Sureties' consent by VCLF as of the Effective Date; *provided* that, at any time after the Effective Date, the Sureties may reimburse any and all premiums and any loss adjustment expenses including attorneys' fees from their collateral or the proceeds therefrom. Additionally, each obligation of a Debtor that is covered by the Surety Bonds and/or any of the Debtors' indemnity agreements in place with the Sureties immediately prior to the Effective Date (collectively, the "Indemnity Agreements"), including, but not limited to obligations under any

[12] In lieu of the assumption of such surety bond, a Surety may elect to issue a rider to any such bond or bonds or to issue new bonds naming VCLF as principal; *provided*, *however*, that in either case the rider or new bond does not contain provisions inconsistent with the terms of this Confirmation Order.

Surety Bond, the common law of Suretyship, is not being released, discharged, precluded or enjoined by the Plan or the Confirmation Order. Additionally, any of the Debtors' rights to a return of any collateral under any applicable settlement agreements or under the Indemnity Agreements, including a right, if any, to a return of any collateral after the satisfaction of all obligations under the Surety Bonds, the Indemnity Agreements, or applicable law, are hereby (and elsewhere in this Confirmation Order) assigned free and clear of all liens, claims, interests and encumbrances to VCLF pursuant to, among other things, Bankruptcy Code Section 363(f). Additionally, to the extent a Surety determines, in its sole and absolute discretion, to release any collateral or the proceeds of any collateral, such Surety is irrevocably directed to deliver such collateral (other than collateral provided by Arch Coal, Inc. and any of its affiliates (collectively, "Arch Coal"), which is addressed as set forth below) or the proceeds thereof to VCLF without recourse to any such Surety by any party, including any letter of credit issuer. In addition, VCLF will execute an indemnity agreement in a form satisfactory to Sureties (the "New Indemnity Agreements"). The New Indemnity Agreements shall provide that VCLF shall not be liable to indemnify the Sureties for a shortfall between the total bond penal sum of any such Surety and the amount of collateral for such Surety as those amounts exist as of the Effective Date or for premiums or for attorneys' fees under the Indemnity Agreements or the New Indemnity Agreements. Notwithstanding any other provision of the Plan or this Confirmation Order, all letters of credit, the proceeds therefrom, or other collateral issued to the Sureties as security for a Debtor's obligations under the Surety Bonds or Indemnity Agreements shall continue to secure against any payment and performance obligation under the applicable Indemnity Agreement. Notwithstanding any other provisions of the Plan or this Confirmation Order, nothing in the injunction and release provisions of the Plan, including, without limitation, Article IV (E), (G)

and (H); Article VIII (A)-(I) shall be deemed to apply to the Sureties or the Sureties' claims, nor shall these provisions or any provision of the Blackhawk Transaction Documents or any agreement relating to the transfer of real property or other assets relating to a Surety Bond, be interpreted to bar, impair, prevent or otherwise limit the Sureties from exercising their respective rights or remedies under any of the Surety Bonds, letters of credit or proceeds therefrom, the Indemnity Agreements, environmental or other laws, or requirements under which the Surety Bonds were issued, the common law of Suretyship, or other applicable law, and in furtherance thereof, the Sureties are authorized to draw, or to have drawn, on any letters of credit in accordance with the applicable letter of credit.

187. Notwithstanding any provision in the preceding paragraph to the contrary, the foregoing section shall not apply to nor shall it be deemed to apply to the workers compensation bond issued by Argonaut Insurance Company in the State of West Virginia, which has previously been canceled.

188. For the avoidance of doubt, no provision of this Confirmation Order (except for the sentence following this sentence), the Plan, the Plan Supplement, any document relating to the Plan (including, but not limited to, the Blackhawk Transaction Documents, the VCLF Transaction Documents and the Liquidating Trust Agreement) or any other order relating to the Blackhawk Transaction or VCLF Transaction, or to the Liquidating Trust Agreement shall impair the rights, if any, of Arch Coal or Peabody, including any rights against any non-debtor party, which are fully reserved, to raise, after the entry of this Confirmation Order any arguments or objections regarding (a) the use or the drawing upon, among other things, any letters of credit and surety bonds posted and guarantees and indemnifications (collectively, the "Credit Support") provided by Arch Coal or Peabody in connection with or related to Surety Bonds securing permits

transferred to VCLF in connection with or upon the consummation of the VCLF Transaction , (b) the application of any proceeds of such Credit Support, (c) the entitlement to any proceeds of such Credit Support not required to satisfy any obligations relating to such Surety Bonds, or (d) VCLF's interest in or use of the proceeds of the Credit Support posted by Arch Coal or Peabody in connection with or related to Surety Bonds securing permits transferred to VCLF in connection with or upon the consummation of the VCLF Transaction, as to which Arch Coal's and Peabody's rights are fully reserved. Notwithstanding the foregoing, the interests or rights of the Debtors and their bankruptcy estates, if any, in the proceeds of the Credit Support posted by Arch Coal or Peabody shall be and hereby are transferred to VCLF free and clear of all liens, claims, encumbrances, rights and interests of all individuals and entities, including, but not limited to Arch Coal or Peabody, to the fullest extent permissible under the provisions of the United States Bankruptcy Code, including but not limited to Section 363 thereof.

**HH. Survival of Surety Bond Obligations**

189. Except for Surety Bonds for permits transferred to Blackhawk or ERP, which Surety Bonds shall be replaced, all obligations of the Debtors to Sureties under Indemnity Agreements, related agreements, each as amended, or applicable law as of the Effective Date shall be reinstated and shall remain unaffected by the Plan or the Confirmation Order and shall not be discharged or impaired by the Plan or Confirmation Order irrespective of whether the obligation is owed in connection with an event occurring before or after the Effective Date.

**II. VCLF Transferred Permits**

190. Upon consummation of the VCLF Transaction, VCLF shall be deemed to have assumed all outstanding obligations and conditions of any and all permits issued pursuant to section 404 of the Clean Water Act associated with any and all of the VCLF Purchased Assets, including but not limited to those permits identified on the Transferred Permits table included in

Schedule 2.01(g) to the VCLF APA ("404 Permits"), and must perform and comply with all such obligations and conditions, including the mitigation required by each such 404 Permit, without regard to whether those mitigation requirements arise from or are related to discharges of dredged or fill material that occurred prior to the consummation of the VCLF transaction. Within 60 days after consummation of the VCLF Transaction, VCLF shall make all applications required to effectuate the transfer of each 404 Permits from the Debtors to VCLF.

191. Upon consummation of the VCLF Transaction and government approval of the transfer of any permit issued pursuant to the Surface Mining Control and Reclamation Act of 1977, as amended, and its approved state counterparts ("Mining Permits") from Debtors to VCLF, including those permits identified on the Transferred Permits table included in Schedule 2.01(g) to the VCLF APA and any additional mining permit transferred to VCLF prior to or after the Effective Date, VCLF shall be deemed to have assumed all outstanding obligations and conditions of those permits, and will be liable for, and must perform and comply with, all outstanding obligations and conditions of the permits, including the mitigation, remediation and reclamation required by each such permit, without regard to whether those requirements arise prior to or after the applicable permit transfer to VCLF.

**JJ. Kentucky Utilities Company**

192. For the avoidance of doubt, notwithstanding anything in this Confirmation Order, the Plan, the Disclosure Statement, the Blackhawk Transaction Documents, including the Blackhawk APA, the VCLF Transaction Documents, including the VCLF APA, or the order authorizing the Debtors to close the Prairie Transactions [Docket No. 953], utility deposits held at any time by Kentucky Utilities Company ("KU") for Debtors Highland Mining Company, LLC and Heritage Coal Company, LLC are not included in the assets to be transferred pursuant to the Blackhawk Transaction or the VCLF Transaction. Those deposits, and the

respective interests of the Debtors and KU in and rights concerning them, remain unaffected by this Confirmation Order, the Blackhawk Transaction Documents, and the VCLF Transaction Documents.

**KK. References to Plan Provisions**

193. The failure specifically to include or reference any particular article, section, or provision of the Plan (and the Plan Supplement) or any related document in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of this Court that the Plan (and the exhibits and schedules thereto) be confirmed and any related documents be approved in their entirety and incorporated herein by reference.

**LL. Right to Be Heard**

194. From and after the Effective Date and continuing through the date of entry of a final decree closing the Chapter 11 Cases, Blackhawk, the Combined Company, and VCLF shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Chapter 11 Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before this Court or other courts, (ii) be entitled to notice and an opportunity for hearing on all such issues, (iii) participate in all matters brought before this Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in this Court.

**MM. Effect of Non-Occurrence of Conditions to the Effective Date**

195. Notwithstanding the entry of this Confirmation Order, if the Effective Date does not occur, the Plan will have no force or effect. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement will be considered an

admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**NN. Non-VCLF Transaction**

196. In the event the Debtors seek the authority to waive condition IX.A.4 of the Plan pursuant to a Final Order of the Bankruptcy Court and implement the Plan through the Liquidating Trust or an alternative transaction other than the VCLF Transaction (a "Non-VCLF Transaction"), nothing in the Plan, the Plan Supplement, any document relating to the Plan (including, but not limited to, the Blackhawk Transaction Documents, the VCLF Transaction Documents and the Liquidating Trust Agreement) or this Confirmation Order or any other order relating to the Blackhawk or VCLF Transactions, or to the Liquidating Trust Agreement shall impair the rights of the Environmental Parties to object to the Debtors' seeking of such Final Order by challenging whether the Plan's implementation through the Liquidating Trust or a Non-VCLF Transaction would violate sections 1129(a)(1), 1129(a)(3), 1129(a)(5), 1129(a)(11), or any other provision of the Bankruptcy Code.

**OO. Final Order; Successors and Assigns**

197. Pursuant to Bankruptcy Rule 3020(e), the fourteen -day stay of this Confirmation Order imposed thereby is waived and the Debtors are hereby authorized to consummate the Plan and the transactions contemplated thereby immediately upon the entry of this Confirmation Order upon the docket and upon the satisfaction or waiver of the conditions set forth in Article IX of the Plan. This Confirmation Order is a Final Order and the period in which an appeal must be Filed will commence upon entry of the Confirmation Order. The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan or this Confirmation Order shall be binding on, and shall inure to the benefit, of any heir, executor, administrator, successor, or assign of each such Person or Entity.

IT IS SO ORDERED.

Dated: Oct 9 2015
Richmond, Virginia

/s/ Keith L. Phillips

UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: Oct 9 2015

WE ASK FOR THIS:

*/s/ Michael A. Condyles*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

- and -

Stephen E. Hessler (*pro hac vice* pending)
Patrick Evans (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Counsel for the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT**
**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Michael A. Condyles*

**Exhibit A**

**Fourth Amended Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PATRIOT COAL CORPORATION, *et al.*, | ) | Case No. 15-32450 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' FOURTH AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
Justin R. Bernbrock (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Counsel for the Debtors and Debtors in Possession*

Dated: October 9, 2015

# TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ..... 1**
A. Defined Terms ..... 1
B. Rules of Interpretation ..... 23
C. Computation of Time ..... 23
D. Governing Law ..... 23
E. Reference to Monetary Figures ..... 24
F. Controlling Document ..... 24

**ARTICLE II. DIP CLAIMS, ADEQUATE PROTECTION CLAIMS, ADMINISTRATIVE CLAIMS, AND PRIORITY TAX CLAIMS ..... 24**
A. Administrative Claims ..... 24
B. Professional Compensation ..... 24
C. DIP Claims ..... 25
D. Adequate Protection Claims ..... 26
E. Priority Tax Claims ..... 26
F. U.S. Trustee Statutory Fees ..... 26

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..... 26**
A. Summary of Classification ..... 26
B. Treatment of Claims and Interests ..... 27
C. Special Provision Governing Unimpaired Claims ..... 33
D. Class Acceptance Requirement ..... 33
E. Elimination of Vacant Classes ..... 33
F. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ..... 33
G. Controversy Concerning Impairment ..... 33

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..... 34**
A. Sources of Consideration for Plan Distributions ..... 34
B. Blackhawk Transaction ..... 34
C. Rights Offering ..... 35
D. VCLF Transaction ..... 36
E. General Settlement of Claims ..... 36
F. Listing of Securities ..... 36
G. Release of Liens ..... 37
H. Cancellation of Securities and Agreements ..... 37
I. Restructuring Transactions ..... 38
J. Corporate Action ..... 38
K. Effectuating Documents; Further Transactions ..... 38
L. Exemption from Certain Taxes and Fees ..... 39
M. D&O Liability Insurance Policies ..... 39
N. Indemnification Provisions ..... 39
O. Preservation of Rights of Action ..... 40
P. Wind Down and Dissolution of the Debtors ..... 40
Q. Liquidating Trust ..... 40
R. Liquidating Trustee ..... 40
S. Distribution of Payout Event Cash ..... 41
T. Committee Settlement ..... 41
U. Excess Cash Distribution Mechanism ..... 42
V. WVDEP Settlement ..... 43
W. Coal Act Settlement ..... 43

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 43**
A. Assumption and Assignment of Executory Contracts and Unexpired Leases ..... 43

B. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ..... 44
C. Claims Based on Rejection of Executory Contracts and Unexpired Leases ..... 45
D. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ..... 45
E. Modifications, Amendments, Supplements, Restatements, or Other Agreements ..... 45
F. Insurance Policies ..... 45
G. Compensation and Benefit Programs ..... 46
H. Reservation of Rights ..... 46
I. Nonoccurrence of Effective Date ..... 46

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..... 46**
A. Timing and Calculation of Amounts to Be Distributed or Paid ..... 46
B. Undrawn LC Facility Claims Reserve ..... 47
C. Distributions and Payments Generally ..... 47
D. Distributions and Payments of the Purchase Price Paid Pursuant to the Blackhawk APA ..... 47
E. Undeliverable Distributions and Unclaimed Property ..... 47

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ..... 48**
A. Resolution of Disputed Claims ..... 48
B. Disallowance of Claims ..... 49
C. Amendments to Claims ..... 50

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..... 50**
A. Discharge of Claims and Termination of Interests ..... 50
**B. Release of Liens** ..... 51
**C. Debtor Release** ..... 51
**D. Third Party Release** ..... 51
**E. Exculpation** ..... 52
**F. Injunction** ..... 52
G. Protections Against Discriminatory Treatment ..... 53
H. Setoffs ..... 53
I. Recoupment ..... 53
J. Document Retention ..... 53
K. Reimbursement or Contribution ..... 54

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ..... 54**
A. Conditions Precedent to the Effective Date ..... 54
B. Waiver of Conditions ..... 55
C. Effective Date ..... 55
D. Effect of Non-Occurrence of Conditions to the Effective Date ..... 55

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ..... 55**
A. Modification and Amendments ..... 55
B. Payout Event ..... 55
C. Revocation or Withdrawal of the Plan ..... 56

**ARTICLE XI. RETENTION OF JURISDICTION ..... 56**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ..... 58**
A. Immediate Binding Effect ..... 58
B. Additional Documents ..... 58
C. Payment of Statutory Fees ..... 58
D. Dissolution of the Committee and the Retiree Committee ..... 59
E. Reservation of Rights ..... 59
F. Successors and Assigns ..... 59

G. Service of Documents ..... 59
H. Term of Injunctions or Stays ..... 60
I. Entire Agreement ..... 60
J. Nonseverability of Plan Provisions ..... 60
K. Request for Court Hearing and Right to Be Heard ..... 60
L. Powers of Combined Company ..... 60

## INTRODUCTION

The Debtors propose this joint plan of reorganization for the resolution of the outstanding claims against, and interests in, the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof or in section 101 of the Bankruptcy Code, as applicable. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, events during the Chapter 11 Cases, and certain financial projections, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

### A. *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1. "*1974 Pension Plan*" means the multi-employer pension fund under the UMWA 1974 Pension Plan and Trust.

2. "*1974 Pension Plan Allowed Administrative Claim*" means an Allowed Administrative Claim in the amount of $23 million; provided, that, the 1974 Pension Plan has agreed that its Allowed Administrative Claim shall be satisfied (a) *first*, by any recovery it receives pursuant to the Excess Cash Distribution Mechanism and (b) *then*, to the extent not satisfied in full by distributions through the Excess Cash Distribution Mechanism, through Pro Rata sharing of the General Unsecured Claims Distribution.

3. "*1974 Pension Plan Allowed General Unsecured Claim*" means an Allowed General Unsecured Claim in the amount of $888 million.

4. "*2012-13 Restructuring*" means the Debtors' prior chapter 11 cases, jointly administered under the caption styled *In re Patriot Coal Corp.*, No. 12-51502-659 (KAS) (Bankr. E.D. Mo.).

5. "*2012-13 Chapter 11 Plan*" means the *Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, confirmed pursuant to the *Amended Order Confirming Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, *In re Patriot Coal Corp.*, No. 12-51502-659 (KAS) (Bankr. E.D. Mo. Dec. 18, 2013) [2012-13 Restructuring Docket No. 5169].

6. "*Adequate Protection Claims*" means any and all adequate protection Claims, if any, arising under or related to the DIP Orders that assert priority on account of diminution in the value of a prepetition secured party's interest in its collateral pursuant to section 507(b) of the Bankruptcy Code, including all: (a) ABL Adequate Protection Obligations; (b) LC Adequate Protection Obligations; (c) Term Adequate Protection Obligations; and (d) Note Adequate Protection Obligations, as each such term is defined in the Final DIP Order.

7. "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Estates pursuant to section 503(b) and 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including but not limited to the U.S. Trustee Fees; and (c) Professional Fee Claims. For the avoidance of doubt, (i) a Claim asserting priority pursuant to section 503(b)(9) of the Bankruptcy Code is included

in the definition of Administrative Claim and (ii) in no instance shall an Intercompany Claim or a DIP Claim be an Administrative Claim.

8. "*Administrative Claims Bar Date*" means the deadline for filing requests for payment of Administrative Claims (other than Professional Fee Claims or any adequate protection claims arising under the DIP Orders) that arose after July 6, 2015, which deadline shall be the first Business Day that is thirty days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

9. "*Administrative Claims Objection Bar Date*" means the deadline for filing objections to any Administrative Claim, which shall be the first Business Day that is thirty days following the Administrative Claims Bar Date.

10. "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

11. "*Alcoa*" means, collectively, Alcoa Inc. (formerly known as Aluminum Company of America) and its subsidiaries as well as their current and former Affiliates, partners, members, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, and only if serving in such capacity

12. "*Allowed*" means with respect to Claims: (a) any Claim other than an Administrative Claim that is evidenced by a Proof of Claim which is or has been timely Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code, a Final Order or the DIP Orders; (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim allowed pursuant to (i) the Plan, (ii) any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, (iii) the DIP Orders, or (iv) a Final Order of the Bankruptcy Court; provided, that, with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed for voting purposes only by a Final Order. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed by the applicable Claims Bar Date, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such entity pays in full the amount that it owes to the applicable Debtor.

13. "*Arch*" means, collectively, Arch Coal, Inc. and its subsidiaries as well as their current and former Affiliates, partners, members, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, and only if serving in such capacity.

14. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or similar remedies that may be brought by or on behalf of the Debtors or the Estates, including causes of action or defenses arising under chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law.

15. "*Ballot*" means the form distributed to holders of Impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan approved by the Bankruptcy Court.

16. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

17. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Eastern District of Virginia.

18. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

19. "*Bidding Procedures Order*" means the *Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sales of Certain of the Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling Auctions and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief* [Docket No. 406] entered on June 25, 2015.

20. "*Blackhawk*" means Blackhawk Mining LLC together with its affiliates and subsidiaries.

21. "*Blackhawk APA*" means that certain Asset Purchase Agreement dated as of June 22, 2015, as amended, modified, or supplemented from time to time, among Blackhawk and certain of the Debtors, including all schedules and exhibits thereto, which shall be Filed with the Plan Supplement.

22. "*Blackhawk APA Break-Up Fee and Expense Reimbursement*" shall have the same meaning as the term "Blackhawk Bid Protections" set forth in paragraph 13 of the Bidding Procedures Order.

23. "*Blackhawk Assumed Liabilities*" shall have the same meaning as the term Assumed Liabilities set forth in Section 2.03 of the Blackhawk APA.

24. "*Blackhawk Excluded Assets*" shall have the same meaning as the term Excluded Assets set forth in Section 2.02 of the Blackhawk APA.

25. "*Blackhawk Excluded Liabilities*" shall have the same meaning as the term Excluded Liabilities set forth in Section 2.04 of the Blackhawk APA.

26. "*Blackhawk LLC Agreement*" means that certain Third Amended and Restated Blackhawk Mining LLC Limited Liability Company Agreement dated as of June 22, 2015, as amended, supplemented, modified or restated from time to time.

27. "*Blackhawk LLC Agreement Joinder*" means the joinder to the Blackhawk LLC Agreement, in substantially the form attached to the Plan Supplement.

28. "*Blackhawk Purchased Assets*" shall have the same meaning as the term Purchased Assets set forth in Section 2.01 of the Blackhawk APA.

29. "*Blackhawk Transaction*" means the purchase and sale transaction contemplated by the Blackhawk APA.

30. "*Blackhawk Transaction Documents*" means the Blackhawk APA and each other document contemplated by the Blackhawk APA or entered into in connection with the Blackhawk Transaction.

31. "*Black Lung Act*" means the Federal Black Lung Benefit Act, 30 U.S.C. §§ 901–944, as may be amended, modified or supplemented.

32. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

33. "*Carve Out Reserve*" shall have the same meaning as the term Carve Out Reserve set forth in the Final DIP Order.

34. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

35. "*Causes of Action*" means any claim, cause of action (including Avoidance Actions or rights arising under section 506(c) of the Bankruptcy Code), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Causes of Action also include: (a) all rights of setoff, counterclaim, cross-claim, or recoupment, and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36. "*Chapter 11 Cases*" means these jointly administered chapter 11 cases commenced by the Debtors and styled *In re Patriot Coal Corporation*, *et al.*, Chapter 11 Case No. 15-32450 (KLP), which are currently pending before the Bankruptcy Court.

37. "*Claim*" means any claim against the Debtors, as defined in section 101(5) of the Bankruptcy Code, including: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

38. "*Claims Bar Date*" means the bar date by which a Proof of Claim must be or must have been Filed, as established by (a) the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, (II) Setting a Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims, (III) Establishing the Amended Schedules Bar Date and the Rejection Damages Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, Including 503(b)(9) Requests, (V) Approving Notice of Bar Dates, and (VI) Granting Related Relief* [Docket No. 246] entered on June 5, 2015; (b) a Final Order of the Bankruptcy Court; or (c) this Plan.

39. "*Claims Objection Bar Date*" means the later of: (a) the first Business Day following one hundred and eighty days after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion Filed before the day that is one hundred and eighty days after the Effective Date, which date may be further extended by the Bankruptcy Court after notice and a hearing upon a motion Filed before the expiration of any such extended period.

40. "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

41. "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

42. "*Coal Act*" means the Coal Industry Retiree Health Benefit Act of 1992.

43. "*Coal Act Stipulation*" means the *Stipulation and Agreed Order Between the Debtors and the United Mine Workers of America 1992 Benefit Plan and the United Mine Workers of America Combined Benefit Fund Regarding Liabilities Under the Coal Act* [Docket No. 1018].

44. "*Combined Company*" shall have the meaning set forth in Section 1.01 of the Blackhawk APA. For the avoidance of doubt, and regardless of any terms used herein to describe Blackhawk, the Combined Company, or the transactions contemplated by the Blackhawk Transaction Documents, such transactions are not, and shall not be deemed to be, a merger between Blackhawk and the Debtors.

45. "*Combined Company Debt Documents*" means, collectively, all documents and agreements (including intercreditor agreements) entered into in connection with, and governing, the Combined Company Debt Facilities.

46. "*Combined Company Debt Facilities*" means, collectively, the Combined Company New ABL, the Combined Company First Lien Term Loan, the Combined Company 1.5 Lien Term Loan, the Combined Company Second Lien Term Loan, and the Combined Company Unsecured Note.

47. "*Combined Company 1.5 Lien Class B Units*" means those certain Class B Units, representing, in the aggregate, 35% of the equity of the Combined Company, issued to the Combined Company 1.5 Lien Term Loan Lenders in connection with providing $80 million in Cash to the Combined Company, all as more fully set forth in Section 2.06(c) of the Blackhawk APA. The Combined Company 1.5 Lien Class B Units shall be issued pursuant to, and in accordance with, the allocations set forth in the Blackhawk Transaction Documents.

48. "*Combined Company 1.5 Lien Term Loan*" shall have the same meaning as the term 1.5 Lien Term Loan set forth in Section 2.06(c) of the Blackhawk APA. Such loan will be provided by the Combined Company 1.5 Lien Term Loan Lenders, and pursuant to such loan, on the Effective Date, (a) the Combined Company shall receive $80 million in Cash, of which the Combined Company shall pay over to the Debtors up to $32.5 million in Cash to be used solely in accordance with Section 2.06(c) of the Blackhawk APA and (b) the Combined Company will have $115 million aggregate face amount of 1.5 lien secured funded debt on the Effective Date.

49. "*Combined Company 1.5 Lien Term Loan Agent*" means the administrative agent with respect to the Combined Company 1.5 Lien Term Loan, or any successor agent appointed in accordance with the applicable Combined Company Debt Documents.

50. "*Combined Company 1.5 Lien Term Loan Lenders*" means, collectively, certain funds and/or accounts managed or advised by Knighthead Capital Management, LLC, Caspian Capital LP on behalf of its advisees, and Davidson Kempner Capital Management LP, on behalf of funds and accounts managed by it (including Midtown Acquisitions L.P.).

51. "*Combined Company First Lien Single Tranche Term Loan*" shall have the same meaning as the term First Lien Single Tranche Term Loan set forth in Section 2.06(b) of the Blackhawk APA.

52. "*Combined Company First Lien Term Loan*" shall have the same meaning as the term First Lien Term Loan set forth in Section 2.06(b) of the Blackhawk APA.

53. "*Combined Company First Lien Tranche B-1 Term Loan*" shall have the same meaning as the term First Lien Tranche B-1 Term Loan set forth in Section 2.06(b) of the Blackhawk APA.

54. "*Combined Company First Lien Tranche B-2 Term Loan*" shall have the same meaning as the term First Lien Tranche B-2 Term Loan set forth in Section 2.06(b) of the Blackhawk APA.

55. "*Combined Company New ABL*" shall have the same meaning as the term New ABL set forth in Section 2.06(a) of the Blackhawk APA.

56. "*Combined Company Second Lien Term Loan*" shall have the same meaning as the term Second Lien Term Loan set forth in Section 2.06(d) of the Blackhawk APA. In the event that the Payout Event does not occur and Class 5 votes to reject the plan, the Combined Company Second Lien Term Loans distributable to the Holders of Allowed Prepetition LC Facility Claims shall be in the aggregate amount equal to $155 million. In the event that the Payout Event does not occur and Class 5 votes to accept the Plan, the Combined Company Second Lien Term Loans distributable to the Holders of Allowed Prepetition LC Facility Claims shall be in the aggregate amount equal to $192,238,375.55.

57. "*Combined Company Unsecured Note*" means the unsecured note in aggregate principal amount of $15 million as contemplated by Section 2.06(e) of the Blackhawk APA and as set forth in Article IV.T.1 hereof.

58. "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on May 21, 2015, as may be constituted from time to time.

59. "*Committee Advisors*" means Morrison & Foerster LLP, as counsel to the Committee, Tavenner & Beran PLC, as local counsel to the Committee, and Jefferies LLC, as financial advisor to the Committee.

60. "*Committee Members*" means: (a) U.S. Bank National Association, as Trustee; (b) United Mine Workers of America; (c) United Mine Workers of America 1974 Pension Plan and Trust; (d) Raleigh Mine & Industrial; (e) Strata Mine Services, LLC; (f) Enviromine, Inc.; and (g) Crown Parts & Machine, Inc.; each solely in their capacity as members of the Committee.

61. "*Committee Settlement*" means the settlement agreement incorporated in Article IV.T hereof.

62. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

63. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

64. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, including any adjournments or continuations thereof.

65. "*Confirmation Objection Deadline*" means the deadline for Filing objections to the Plan, which pursuant to the Scheduling Order, is September 28, 2015, at 4:00 p.m., prevailing Eastern Time.

66. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

67. "*Consultation Parties*" means, collectively, (a) the Committee Advisors, (b) counsel to the Prepetition Agents, (c) counsel to the DIP Lenders, and (d) counsel to Blackhawk.

68. "*Consummation*" means the occurrence of the Effective Date.

69. "*Cortland*" means Cortland Capital Market Services LLC.

70. "*Cure Costs*" means all amounts required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease).

71. "*D&O Liability Insurance Policies*" means all insurance policies for directors', managers', and officers' liability maintained by the Debtors as of the Effective Date.

72. “*Debtor Release*” means the release given by the Debtors to the Debtor Released Parties as set forth in Article VIII.C hereof.

73. “*Debtor Released Parties*” means, collectively, the Debtor Releasees and the Third Party Releasees; provided, however, that, for the avoidance of doubt, in no circumstance shall Peabody, Arch, or Alcoa be Debtor Released Parties.

74. “*Debtor Releasees*” means, collectively, each Debtor and the Debtors’ current and former Affiliates, partners, members, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, and only if serving in such capacity; provided, however, that in no circumstance shall Peabody, Arch, or Alcoa be Debtor Releasees.

75. “*Debtors*” means, collectively: Patriot Coal Corporation; Apogee Coal Company, LLC; Appalachia Mine Services, LLC; Black Stallion Coal Company, LLC; Brody Mining, LLC; Catenary Coal Company, LLC; Central States Coal Reserves of KY, LLC; Colony Bay Coal Company; Corydon Resources LLC; Coyote Coal Company LLC; Dodge Hill Mining Company, LLC; Eastern Associated Coal, LLC; Eastern Royalty, LLC; Emerald Processing, L.L.C.; Gateway Eagle Coal Company, LLC; Grand Eagle Mining, LLC; Heritage Coal Company LLC; Highland Mining Company, LLC; Hillside Mining Company; Hobet Mining, LLC; Jupiter Holdings LLC; Kanawha Eagle Coal, LLC; Kanawha River Ventures III, LLC; Little Creek LLC; Midland Trail Energy LLC; Midwest Coal Resources II, LLC; Mountain View Coal Company, LLC; Panther LLC; Patriot Coal Company, L.P.; Patriot Coal Holdings I LLC; Patriot Coal Holdings II LLC; Patriot Coal Sales LLC; Patriot Coal Services LLC; Patriot Leasing Company LLC; Patriot Midwest Holdings, LLC; Patriot Reserve Holdings, LLC; Patriot Ventures LLC; Pine Ridge Coal Company, LLC; Remington LLC; Rhino Eastern JV Holding Company LLC; Rivers Edge Mining, Inc.; Robin Land Company, LLC; Speed Mining LLC; Thunderhill Coal LLC; Wildcat Energy LLC; Wildcat, LLC; Will Scarlet Properties LLC; and WWMV JV Holding Company LLC.

76. “*DIP Agent*” means Cantor Fitzgerald Securities solely in its capacity as administrative agent under the DIP Loan Agreement, or any successor agent appointed in accordance with such agreement.

77. “*DIP Claims*” means any and all Claims of the DIP Agent and DIP Lenders arising under or related to the DIP Facility and the DIP Orders, including all “DIP Obligations” and the “DIP Superpriority Claims” (as those terms are defined in the DIP Orders).

78. “*DIP Facility*” means that certain debtor-in-possession financing facility entered into pursuant to the DIP Loan Agreement and as approved by the DIP Orders, including any amendments, supplements, and modifications thereto.

79. “*DIP Lenders*” means the lenders from time to time party to the DIP Loan Agreement, each solely in their capacities as such.

80. “*DIP Lender Distribution*” means the distribution to each Holder of an Allowed DIP Claim of such Holder’s Pro Rata share (based upon such Holder’s commitments to the DIP Facility on the date of entry of the Final DIP Order) of up to an aggregate of $114,800,000 of, at Blackhawk’s option, the Combined Company First Lien Tranche B-1 Term Loans or the Combined Company First Lien Single Tranche Term Loans.

81. “*DIP Loan Agreement*” means, collectively, (a) that certain superpriority secured debtor-in-possession credit agreement, dated as of May 13, 2015, by and among Patriot Coal Corporation, as borrower, and the DIP Agent, the DIP Lenders named therein, and the other parties thereto and (b) all other instruments, agreements and other documents executed in connection therewith, as each of the foregoing may have been or may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and the terms of the DIP Orders.

82. “*DIP Orders*” means the Interim DIP Order and the Final DIP Order.

83. "*Disbursing Agent*" means, on the Effective Date, the Debtors or their agent and, after the Effective Date, the Liquidating Trustee or any other Entity or Entities designated the Liquidating Trustee after consultation with the DIP Lenders and acceptance by such Entity or Entities to make or facilitate distributions that are to be made after the Effective Date pursuant to the Plan.

84. "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated July 13, 2015, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

85. "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

86. "*Disputed Claims Reserve*" means a reserve of Cash or such other consideration the Debtors determine appropriate after consultation with the Consultation Parties that may be funded on or after the Effective Date with a portion of the Payout Event Cash, Cash provided in connection with the Combined Company 1.5 Lien Term Loan, such other consideration the Debtors determine appropriate after consultation with the Consultation Parties, or such consideration as ordered by the Bankruptcy Court, as applicable, for distributions to Holders of Allowed Claims and Disputed Claims if and to the extent that such Disputed Claims become Allowed Claims.

87. "*Effective Date*" means the date selected by the Debtors that is a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Article IX.A hereof have been satisfied or waived (in accordance with Article IX.B hereof).

88. "*Eligible Holder*" means a Holder that certifies its status as (a) a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, or an entity in which all of the equity owners are such "qualified institutional buyers," or (b) an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), (5), (6) or (7) under the Securities Act, or an entity in which all of the equity owners are such "accredited investors."

89. "*Encumbrance*" shall have the meaning set forth in the Blackhawk APA.

90. "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

91. "*Environmental Claim*" means any Claim asserted by any Government Environmental Entity and any non-governmental entity against any of the Debtors arising from any Environmental Law.

92. "*Environmental Law*" means all federal, state, local, or tribal statutes, regulations, ordinances and similar provisions having the force or effect of law, all judicial and administrative orders, agreements and determinations and all common law concerning pollution or protection of the environment, or environmental impacts on human health and safety, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act; the Clean Water Act; the Clean Air Act; the Emergency Planning and Community Right-to-Know Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the Resource Conservation and Recovery Act; the Safe Drinking Water Act; the Surface Mining Control and Reclamation Act of 1977; the Toxic Substances Control Act; and any state, local, or tribal analogues or equivalents, including, without limitation, the West Virginia Surface Coal Mining and Reclamation Act.

93. "*Environmental Parties*" means, collectively, the Sierra Club, the Ohio Valley Environmental Coalition, the West Virginia Highlands Conservancy, and the Government Environmental Entities who Filed objections to the Plan prior to the Confirmation Objection Deadline.

94. "*Equity Interest*" means the common stock, limited liability company interests and any other equity, ownership or profits interests of any Debtor and options, warrants, rights or other securities or agreements to acquire the common stock, limited liability company interests or other equity, ownership or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against

the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

95. "*Estate*" means, as to each Debtor, the estate created for the Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

96. "*Excess Cash Distribution Mechanism*" means, if the Payout Event does not occur, the provision governing the distribution of any Cash remaining after facilitating all distributions pursuant to the Plan or any other order of the Bankruptcy Court, as set forth in Article IV.U hereof.

97. "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) Blackhawk; (c) VCLF; (d) the Debtor Releasees; (e) the Third Party Releasees; (f) the DIP Agent; (g) the DIP Lenders; (h) the Combined Company 1.5 Lien Term Loan Agent; (i) the Combined Company 1.5 Lien Term Loan Lenders; (j) the Committee and the Committee Members, each in their capacity as such; (k) the Retiree Committee and the Retiree Committee Members, each in their capacity as such; and (l) all of the current and former Affiliates, attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managed funds and representatives and successors and assigns of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such); provided, however, in no circumstance shall Peabody, Arch, or Alcoa be Exculpated Parties.

98. "*Exculpation*" means the exculpation provision set forth in Article VIII.E hereof.

99. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

100. "*Federal Mine Profit Interest*" means a profit interest/royalty of at least 20% in the Federal mine complex in perpetuity.

101. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice and Claims Agent.

102. "*Final DIP Order*" means the *Final Order (A) Authorizing The Debtors To Obtain Postpetition Financing, (B) Authorizing Use Of Cash Collateral, (C) Granting Liens And Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying The Automatic Stay, (F) Scheduling A Final Hearing, And (G) Granting Related Relief*, entered June 4, 2015 [Docket No. 230], and as may be amended, modified or supplemented by the Bankruptcy Court from time to time. For the avoidance of doubt, the Final DIP Order is a "Final Order."

103. "*Final Order*" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which is and remains in full force and effect, has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, re-argument or rehearing shall then be pending or (b) if an appeal, writ of certiorari new trial, re-argument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, re-argument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be Filed relating to such order, shall not cause an order not to be a Final Order.

104. "*First-Lien Intercreditor Agreement*" means that certain first-lien intercreditor agreement dated as of December 18, 2013 (as amended, modified, supplemented, or restated from time to time), by and among the

Debtors, the Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition Term Agent, and the Prepetition LC/Term Collateral Agent.

105. "*General Unsecured Claim*" means any Unsecured Claim that is not: (a) an Administrative Claim (including, for the avoidance of doubt, any Professional Fee Claim); (b) a DIP Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) an Intercompany Claim; (f) a Prepetition Term Loan Facility Claim; or (g) a Prepetition Notes Claim.

106. "*General Unsecured Claims Distribution*" means the distribution to each Holder of an Allowed General Unsecured Claim of such Holder's Pro Rata share (based upon such Holder's face amount Allowed Claim relative to the total face amount of all Allowed Prepetition Term Loan Facility Claims, Allowed Prepetition Notes Claims, and Allowed General Unsecured Claims) of the GUC Distribution Pool.

107. "*Government Environmental Entity*" means federal, state, local or tribal Governmental Units asserting claims or having regulatory authority or responsibilities with respect to Environmental Law.

108. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

109. "*GUC Distribution Pool*" means (a) if the VCLF Transaction is consummated, the VCLF Equity Grant, as applicable, in accordance with the terms set forth in Section 7.12 of the VCLF APA or (b) if the VCLF Transaction is not consummated, the Liquidating Trust Units, subject to the Liquidating Trust Funding Mechanism.

110. "*GUC Trade Creditor Claim*" means any General Unsecured Claim of a trade vendor and/or service provider arising from or related to the Debtors' business operations.

111. "*GUC Trade Creditor Distribution Pool*" means Cash in an amount equal to $1 million to be distributed to Holders of Allowed GUC Trade Creditor Claims in accordance with the terms of the Committee Settlement and this Plan.

112. "*Holder*" means any Entity holding a Claim or an Interest.

113. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired and, with respect to a Claim or Interest, a Claim or Interest that is not Unimpaired.

114. "*Indemnification Provision*" means each of the Debtors' indemnification obligations currently in place whether in the bylaws, certificates of incorporation, other formation documents, board resolutions, DIP Loan Agreement, or employment contracts for the current and former directors, officers, managers, employees, attorneys, other professionals, DIP Lenders, DIP Agent and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates; provided, however, that in no circumstance (a) shall the Debtors indemnify Peabody, Arch, or Alcoa or (b) shall any indemnification obligation with respect to Peabody, Arch, or Alcoa be an Indemnification Provision.

115. "*Intercompany Claim*" means any Claim held by one Debtor against another Debtor.

116. "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor. For the avoidance of doubt, Intercompany Interests excludes Equity Interests in any Debtor held by non-Debtors.

117. "*Intercreditor Agreements*" means, collectively, the First-Lien Intercreditor Agreement, the Term Loan Subordination Agreement, and the Junior-Lien Intercreditor Agreement.

118. "*Interests*" means, collectively, Equity Interests and Intercompany Interests.

119. "*Interim Compensation Order*" means the *Order (I) Establishing Interim Compensation Procedures and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket

No. 276], entered on June 10, 2015, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

120. "*Interim DIP Order*" means the *Interim Order (A) Authorizing The Debtors To Obtain Postpetition Financing, (B) Authorizing Use Of Cash Collateral, (C) Granting Liens And Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying The Automatic Stay, (F) Scheduling A Final Hearing, And (G) Granting Related Relief*, entered May 13, 2015 [Docket No. 67], and as may be amended, modified, or supplemented by the Bankruptcy Court from time to time.

121. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as may be amended, modified, or supplemented.

122. "*Junior-Lien Intercreditor Agreement*" means that certain junior-lien intercreditor agreement dated as of December 18, 2013 (as amended, modified, supplemented, or restated from time to time), by and among the Debtors, the Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition Term Agent, the Prepetition LC/Term Collateral Agent, and the Prepetition Notes Trustee.

123. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

124. "*Liquidating Trust*" means that certain trust to be created on the Effective Date, as described in Article IV.Q.

125. "*Liquidating Trust Agreement*" means the agreement to be executed as of the Effective Date establishing the Liquidating Trust pursuant to this Plan, substantially in the form Filed with the Plan Supplement.

126. "*Liquidating Trust Assets*" means all of the assets of the Debtors' Estates that have not been sold, abandoned, or otherwise transferred pursuant to a Final Order of the Bankruptcy Court and/or Equity Interests in one or more of the Debtors. For the avoidance of doubt, the Blackhawk Purchased Assets and the VCLF Purchased Assets shall not be Liquidating Trust Assets.

127. "*Liquidating Trust Funding Mechanism*" means Cash, in an amount necessary to fund (a) the working capital needs of the Liquidating Trust and (b) the reasonable, documented fees and expenses of the Liquidating Trust and the Liquidating Trustee Professionals, which cash flow shall be generated by operating the Liquidating Trust Assets.

128. "*Liquidating Trust Units*" means the ownership interests in the Liquidating Trust as more fully set forth in the Liquidating Trust Agreement.

129. "*Liquidating Trustee*" means the Person appointed by the Debtors, after consultation with the Consultation Parties, pursuant to Article IV.R hereof to act as trustee of and administer the Liquidating Trust, which person shall be identified to the extent known prior to the Confirmation Hearing.

130. "*Liquidating Trustee Professionals*" means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals retained by the Liquidating Trustee.

131. "*Mine Act*" means the Federal Mine Safety and Health Act of 1977, as amended by the Miner Act of 2006, and as may be further amended, modified or supplemented.

132. "*Note Incentive Programs*" means, collectively, the Performance-Based Note Incentive Program and Time-Based Note Incentive Program.

133. "*Non-Released Parties*" means those Entities to be identified in the Plan Supplement as Non-Released Parties; provided, that, Non-Released Parties shall not include the following: (a) each Debtor Releasee; (b) the Liquidating Trust; (c) the Liquidating Trustee; (d) Blackhawk; (e) the Combined Company; (f) the Prepetition Agents and Barclays Bank PLC, as predecessor Term Administrative Agent (under and as defined in the

Prepetition LC/Term Loan Agreement) and any of their respective sub-agents; (g) the Prepetition Term Lenders; (h) the Prepetition LC Secured Parties; (i) the Prepetition ABL Secured Parties; (j) the Prepetition Noteholders; (k) the DIP Agent; (l) the DIP Lenders; (m) the Combined Company 1.5 Lien Term Loan Agent; (n) the Combined Company 1.5 Lien Term Loan Lenders; (o) the Committee, including the Committee Members (solely in their official capacity); and (p) the Retiree Committee, including the Retiree Committee Members (solely in their official capacity); provided, further, that, if the Payout Event does not occur and Class 5 votes to reject the Plan, then the Prepetition LC Secured Parties shall be Non-Released Parties.

134. "*Notice and Claims Agent*" means Prime Clerk LLC, in its capacity as notice and claims agent for the Debtors.

135. "*OCP Order*" means the *Order (I) Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief*, entered June 10, 2015 [Docket No. 111].

136. "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; (b) a DIP Claim; or (c) a Priority Tax Claim.

137. "*Other Secured Claim*" means any Secured Claim against any Debtor that is not: (a) a DIP Claim; (b) a Prepetition ABL Facility Claim; (c) a Prepetition LC Facility Claim; (d) a Prepetition Term Loan Facility Claim; (e) a Prepetition Notes Claim; (f) an Administrative Claim; or (g) a Secured Tax Claim. For the avoidance of doubt, a properly perfected mechanic's lien constitutes an Other Secured Claim under this definition.

138. "*Payout Event*" means the implementation of a Winning Bid by the Debtors for some or all of the Blackhawk Purchased Assets by a Winning Bidder other than Blackhawk in accordance with the Bidding Procedures Order.

139. "*Payout Event Cash*" means the Cash resulting from the Payout Event.

140. "*Payout Event Cash Pool*" means the amount of Payout Event Cash available after payment or funding (as applicable) of the Carve Out Reserve and Professional Fee Escrow Account, all Allowed Prepetition ABL Facility Claims, and DIP Claims, subject in all cases to the priorities set forth in Article IV.S.

141. "*Payout Event Class 5 Distribution*" means the distribution to each Holder of an Allowed Prepetition LC Facility Claim of such Holder's Pro Rata share (based upon such Holder's face amount ownership of the Prepetition LC Facility relative to the total face amount of the Prepetition LC Facility as of the Petition Date) of an amount of the Payout Event Cash Pool available, if any, up to the total face amount of Allowed Prepetition LC Facility Claims.

142. "*Payout Event Class 6 Distribution*" means the distribution to each Holder of an Allowed Prepetition Term Loan Facility Claim of such Holder's Pro Rata share (based upon such Holder's loans under the Prepetition Term Loan Facility as of the Petition Date) of an amount of the Payout Event Cash Pool available after payment of the Payout Event Class 5 Distribution, if any, up to the total face amount of the Allowed Prepetition Term Loan Facility Claims.

143. "*Payout Event Class 7 Distribution*" means the distribution to each Holder of an Allowed Prepetition Notes Claim of such Holder's Pro Rata share (based upon the principal amount of Prepetition Notes held by such Holder as of the Petition Date) of an amount of the Payout Event Cash Pool available after payment of the Payout Event Class 5 Distribution and the Payout Event Class 6 Distribution, if any, up to the total face amount of the Allowed Prepetition Notes Claims, subject to the right of the Prepetition Notes Trustee to assert its Prepetition Notes Trustee Charging Lien against such distribution.

144. "*Payout Event Class 8 Distribution*" means the distribution to each Holder of an Allowed General Unsecured Claim of such Holder's Pro Rata share (based upon such Holder's face amount General Unsecured Claim

relative to the total face amount of all General Unsecured Claims) of the Payout Event Cash Pool available after payment of the Payout Event Class 5 Distribution, the Payout Event Class 6 Distribution, and the Payout Event Class 7 Distribution, if any.

145. "*Peabody*" means, collectively, Peabody Energy Corporation, Peabody Holding Company, LLC, and their subsidiaries as well as their current and former Affiliates, partners, members, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, and only if serving in such capacity.

146. "*Performance-Based Note Incentive Program*" means the Debtors' financial performance-based incentive program for certain eligible employees as set forth more fully in the Disclosure Statement.

147. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

148. "*Petition Date*" means May 12, 2015, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

149. "*Plan*" means this *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference and made part of this Plan as if set forth herein.

150. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed on or prior to September 25, 2015, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: the Blackhawk LLC Agreement, VCLF Transaction Documents (excluding the VCLF APA), term sheets identifying the material terms of the Combined Company Debt Documents (excluding the Combined Company Unsecured Note), the Liquidating Trust Agreement, and the Schedule of Assumed Executory Contracts and Unexpired Leases.

151. "*Prepetition ABL Agent*" means Deutsche Bank AG New York Branch, in its capacity as administrative agent for the Prepetition ABL Lenders and its capacity as collateral agent with respect to the Prepetition ABL Facility, and together with any of its successors in such capacities.

152. "*Prepetition ABL Agreement*" means that certain credit agreement dated as of December 18, 2013 (as amended, modified, supplemented, or restated from time to time), by and among Patriot Coal Corporation and other Debtors, the Prepetition ABL Agent, and the Prepetition ABL Secured Parties from time to time party thereto.

153. "*Prepetition ABL Drawn LCs*" means, collectively, and as of any date of determination, the outstanding indebtedness equal to the drawn amounts as of such date of determination of any letters of credit issued under the Prepetition ABL Facility. The aggregate amount of the Prepetition ABL Drawn LCs shall be no greater than $44,263,955 (plus any unpaid accrued interest, letter of credit fees, and unpaid reasonable fees and expenses as of the Effective Date, to the extent not paid pursuant to the Final DIP Order or the DIP Facility).

154. "*Prepetition ABL Facility*" means the revolving loan and letter of credit facility under the Prepetition ABL Agreement, pursuant to which the Prepetition ABL LC Issuers issued letters of credit for the account of Patriot Coal Corporation and other Debtors and the Prepetition ABL Lenders otherwise extended credit to the Debtors, in an aggregate principal amount not to exceed $65,000,000.

155. "*Prepetition ABL Facility Claims*" means any and all Claims arising under or related to the Prepetition ABL Facility, the Prepetition ABL Financing Documents and the DIP Orders, including all "Prepetition Obligations," but excluding all "ABL Adequate Protection Obligations," as each such term is defined in the Final DIP Order and shall include, without limitation, any amount by which letters of credit issued under the Prepetition ABL Agreement increase after the Petition Date by their terms.

156. "*Prepetition ABL Facility Issuers*" means Deutsche Bank AG New York Branch and Barclays Bank PLC, each in its respective capacity as letter of credit issuers under the Prepetition ABL Facility.

157. "*Prepetition ABL Financing Documents*" means the Prepetition ABL Agreement and all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition ABL Agent, any of the Prepetition ABL Lenders and/or any of the Prepetition ABL LC Issuers, including, without limitation, the Intercreditor Agreements, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, as all of the same have been supplemented, modified, extended, renewed, restated, and/or replaced.

158. "*Prepetition ABL LC Issuers*" means Deutsche Bank AG New York Branch and Barclays Bank PLC, each in its respective capacity as a letter of credit issuer under the Prepetition ABL Facility, together with any of their respective successors and permitted assigns in such capacity.

159. "*Prepetition ABL Lenders*" means those banks, financial institutions, and other lender parties to the Prepetition ABL Agreement from time to time, each in their capacity as such.

160. "*Prepetition ABL Obligations*" means all of the Debtors' obligations under the Prepetition ABL Financing Documents, including, without limitation, all reimbursement obligations for Prepetition ABL Drawn LCs and Prepetition ABL Undrawn LCs, and all interest, fees and expenses related thereto. The Prepetition ABL Obligations are Allowed Secured Claims.

161. "*Prepetition ABL Secured Parties*" means, collectively, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition ABL LC Issuers, and all other Secured Parties (as defined in the Prepetition ABL Agreement).

162. "*Prepetition ABL Undrawn LCs*" means, collectively, and as of any date of determination, the undrawn portion as of such date of determination of any outstanding letters of credit issued under the Prepetition ABL Facility (which undrawn portion includes any automatic increases in the stated amount of such letters of credit, whether or not such increase in the stated amount is in effect at such time). The aggregate undrawn stated amount of the Prepetition ABL Undrawn LCs is equal to $44,263,955, less any amounts drawn on or prior to the Effective Date under outstanding letters of credit issued under the Prepetition ABL Facility, and less any amounts of outstanding letters of credit issued under the Prepetition ABL Facility that are released on or prior to the Effective Date.

163. "*Prepetition Agents*" means, collectively, the Prepetition Notes Trustee, the Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition Term Agent and the Prepetition LC/Term Collateral Agent.

164. "*Prepetition Facilities*" means, collectively, the Prepetition Notes, the Prepetition LC Facility, the Prepetition Term Loan Facility, and the Prepetition ABL Facility.

165. "*Prepetition Financing Documents*" means collectively, the Prepetition Notes Documents, the Prepetition LC/Term Loan Financing Documents, and the Prepetition ABL Financing Documents.

166. "*Prepetition Indenture*" means that certain indenture dated as of December 18, 2013, with respect to Patriot Coal Corporation's 15.0% Senior Secured Second Lien PIK Toggle Notes due 2023 (as amended, modified, supplemented, or restated from time to time), by and among Patriot Coal Corporation, certain of the Debtor's subsidiaries from time to time party thereto, as guarantors, and U.S. Bank National Association as the Prepetition Notes Trustee.

167. "*Prepetition LC/Term Collateral Agent*" means Wilmington Trust, National Association in its capacity as collateral agent for itself, the Prepetition LC Lenders, the Prepetition Term Lenders, the Prepetition LC Facility Issuers, the Prepetition LC Agent, the Prepetition Term Agent and the other Prepetition LC Secured Parties and Prepetition Term Secured Parties, together with any of its successors and permitted assigns in such capacity.

168. "*Prepetition LC/Term Loan Agent Expenses Priority*" shall have the same meaning as the term LC/Term Loan Agent Expenses Priority set forth in the Final DIP Order.

169. "*Prepetition LC/Term Loan Agreement*" means that certain credit agreement (L/C Facility and Term Facility) dated as of December 18, 2013 (as amended, modified, supplemented, or restated from time to time), by and among Patriot Coal Corporation, as the borrower, the other Debtors, as guarantors, the Prepetition LC Agent, the Prepetition Term Agent, the Prepetition LC Facility Issuers, the Prepetition LC/Term Collateral Agent, the Prepetition LC Lenders from time to time party thereto and the Prepetition Term Lenders from time to time party thereto.

170. "*Prepetition LC/Term Loan Financing Documents*" means the Prepetition LC/Term Loan Agreement and all other agreements, documents, and instruments executed and/or delivered with, to or in favor of any of the Prepetition LC Secured Parties or Prepetition Term Secured Parties, including, without limitation, the Intercreditor Agreements, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, as all of the same have been or may be supplemented, modified, extended, renewed, restated and/or replaced.

171. "*Prepetition LC Agent*" means Barclays Bank PLC in its capacity as administrative agent for the Prepetition LC Lenders and Prepetition LC Facility Issuers, together with any of its successors and permitted assigns in such capacity.

172. "*Prepetition LC Facility*" means, collectively, the certain letters of credit in the aggregate original undrawn available amount of $200,147,031.55 provided under the Prepetition LC/Term Loan Agreement and other extensions of credit to the Debtors related thereto (including in the form of extensions of such letters of credit and advances in connection with drawings thereunder), together with all Prepetition LC/Term Loan Financing Documents related thereto.

173. "*Prepetition LC Facility Claims*" means any and all Claims arising under or related to the Prepetition LC Facility (whether under or pursuant to any Prepetition LC/Term Loan Financing Document, any DIP Order or otherwise), including all "Prepetition LC Obligations," but excluding all "LC Adequate Protection Obligations," as each such term is defined in the Final DIP Order and shall include, without limitation, any amount by which letters of credit issued under the Prepetition LC Facility increase after the Petition Date by their terms.

174. "*Prepetition LC Facility Distribution*" means the distribution on the Effective Date to each Holder of an Allowed Prepetition LC Facility Claim or the Undrawn LC Facility Claims Reserve Agent, as applicable, of (a) such Holder's Pro Rata share of $192,238,375.55 of the Combined Company Second Lien Term Loans; (b) if VCLF or the Liquidating Trust (as applicable) closes on its respective proposed transaction on financing terms other than as set forth in the VCLF Commitment Letter and such financing terms are acceptable to the Debtors and VCLF or the Liquidating Trust (as applicable), such Holder's Pro Rata share of the Federal Mine Profit Interest; (c) its Prepetition LC Facility Rights; and (d) its Prepetition LC Facility Distribution Release. For the avoidance of doubt, Holders of Prepetition LC Facility Claims on account of either drawn and/or undrawn letters of credit provided under the Prepetition LC Facility shall receive Prepetition LC Facility Rights and be eligible to participate in the Rights Offering.

175. "*Prepetition LC Facility Distribution Alternative*" means the distribution on the Effective Date to each Holder of an Allowed Prepetition LC Facility Claim or the Undrawn LC Facility Claims Reserve Agent, as applicable, of (a) such Holder's Pro Rata share of $155 million of the Combined Company Second Lien Term Loans and (b) its Prepetition LC Facility Rights. For the avoidance of doubt, Holders of Prepetition LC Facility Claims on account of either drawn and/or undrawn letters of credit provided under the Prepetition LC Facility shall receive Prepetition LC Facility Rights and be eligible to participate in the Rights Offering.

176. "*Prepetition LC Facility Distribution Release*" means the release provision set forth in Article VIII.D hereof as applicable to the Prepetition LC Secured Parties if the Payout Event does not occur and Class 5 votes to accept the Plan.

177. "*Prepetition LC Facility Final Distribution Date*" means a day (a) selected by the Undrawn LC Facility Claims Reserve Agent that is twenty calendar days after the date on which all Undrawn LC Facility Claims have become either Allowed Claims or disallowed Claims or (b) otherwise established by the Bankruptcy Court.

178. "*Prepetition LC Facility Issuers*" means Bank of America, N.A., PNC Bank, National Association, and Fifth Third Bank, each in its respective capacity as a letter of credit issuer under the Prepetition LC Facility, together with any of their respective successors and permitted assigns in such capacity.

179. "*Prepetition LC Facility Rights*" means, collectively, the rights of all Holders of Prepetition LC Facility Claims to participate in the Rights Offering that shall be distributed on a Pro Rata basis (based upon such Holder's face amount ownership of the Prepetition LC Facility relative to the total face amount of the Prepetition LC Facility as of the Petition Date).

180. "*Prepetition LC Lenders*" means those banks, financial institutions, and other lender parties to the Prepetition LC/Term Loan Agreement from time to time to the extent owed Prepetition LC Obligations and/or LC Adequate Protection Obligations from time to time, each in their capacity as such, together with any of their respective successors and permitted assigns in such capacity.

181. "*Prepetition LC Obligations*" means all of the Debtors' obligations under the Prepetition LC/Term Loan Financing Documents, in each case to the extent relating to the Prepetition LC Facility, including, without limitation, all reimbursement obligations for drawn and undrawn letters of credit issued under the Prepetition LC Facility, all interest, fees and expenses related thereto and all other "Secured L/C Facility Obligations" as defined in the Prepetition LC/Term Loan Agreement. The Prepetition LC Obligations are Allowed Secured Claims.

182. "*Prepetition LC Secured Parties*" means the Prepetition LC Agent, the Prepetition LC Lenders, the Prepetition LC Facility Issuers, the Prepetition LC/Term Collateral Agent (to the extent of any Prepetition LC Obligations and/or LC Adequate Protection Obligations owing to the Prepetition LC/Term Collateral Agent or granted to or held by the Prepetition LC/Term Collateral Agent for the benefit or on behalf of any other Prepetition LC Secured Party), and all other L/C Secured Parties (as defined in the Prepetition LC/Term Loan Agreement).

183. "*Prepetition Noteholders*" means the holders of the Prepetition Notes.

184. "*Prepetition Notes*" means Patriot Coal Corporation's 15.0% Senior Secured Second Lien PIK Toggle Notes due 2023 in an initial aggregate principal amount of $262,499,992 (together with any additional notes issued or increases to the principal amount of existing notes as of the Petition Date, in each case representing interest "paid in kind").

185. "*Prepetition Notes Claims*" means any and all Claims arising under or related to the Prepetition Notes, Prepetition Notes Documents and DIP Orders, including all "Prepetition Obligations," but excluding all "Note Adequate Protection Obligations," as each such term is defined in the Final DIP Order.

186. "*Prepetition Notes Distribution*" means the distribution to each Holder of an Allowed Prepetition Notes Claim (subject to the Prepetition Notes Trustee Charging Lien in favor of the Prepetition Notes Trustee) of such Holder's Pro Rata share (based upon such Holder's face amount Allowed Claim relative to the total face amount of all Allowed Prepetition Term Loan Facility Claims, Allowed Prepetition Notes Claims, and Allowed General Unsecured Claims) of the GUC Distribution Pool.

187. "*Prepetition Notes Documents*" means the Prepetition Indenture, the Prepetition Notes, and all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition Notes Trustee and/or the Prepetition Noteholders, including, without limitation, the Intercreditor Agreements, all security agreements, collateral trust agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date.

188. "*Prepetition Notes Liens*" means a Lien granted to the Prepetition Notes Trustee for its benefit and the benefit of the Prepetition Noteholders, to secure the Prepetition Notes Obligations.

189. "*Prepetition Notes Obligations*" means any of the Debtors' obligations under the Prepetition Notes Documents.

190. "*Prepetition Notes Secured Parties*" means the Prepetition Notes Trustee, Prepetition Notes Agent and Prepetition Noteholders and "Secured Parties" (as defined in the Prepetition Indenture).

191. "*Prepetition Notes Trustee*" means U.S. Bank National Association in its capacities as trustee and collateral trustee for the Prepetition Noteholders with respect to the Prepetition Notes, and together with any of its successors in such capacities.

192. "*Prepetition Notes Trustee Charging Lien*" means the lien of the Prepetition Notes Trustee arising under the Prepetition Notes Indenture, upon any distributions relating to or on account of the Prepetition Notes, securing the payment of, including without limitation, the fees and expenses of the Prepetition Notes Trustee, including fees and expenses of counsel and other professionals engaged by, on behalf of, or for the benefit of the Prepetition Notes Trustee, whether incurred prepetition, postpetition, or before or after the Effective Date.

193. "*Prepetition Secured Parties*" means, collectively, the Prepetition ABL Secured Parties, the Prepetition LC Secured Parties, the Prepetition Term Secured Parties, and the Prepetition Notes Secured Parties.

194. "*Prepetition Term Agent*" means Cortland in its capacity as successor term administrative agent under the Prepetition LC/Term Loan Agreement, together with any of its successors and permitted assigns in such capacities.

195. "*Prepetition Term Lenders*" means those banks, financial institutions, and other lender parties to the Prepetition LC/Term Loan Agreement to the extent owed Prepetition Term Loan Obligations from time to time, each in their capacity as such, together with any of their respective successors and permitted assigns in such capacity.

196. "*Prepetition Term Loan Facility*" means the term loans in an aggregate initial principal amount of up to $250,000,000 provided under the Prepetition LC/Term Loan Agreement, together with all Prepetition LC/Term Loan Financing Documents related thereto.

197. "*Prepetition Term Loan Facility Claims*" means any and all Claims, insofar as such Claims relate to the Prepetition Term Loan Facility, arising under or related to the Prepetition Term Loan Facility, the Prepetition LC/Term Loan Agreement and the DIP Orders, including all "Prepetition Term Loan Obligations," but excluding all "Term Adequate Protection Obligations," as each such term is defined in the Final DIP Order.

198. "*Prepetition Term Loan Facility Distribution*" means the distribution to each Holder of an Allowed Prepetition Term Loan Facility Claim of (a) such Holder's Pro Rata share (based upon such Holder's face amount Allowed Claim relative to the total face amount of all Allowed Prepetition Term Loan Facility Claims, Allowed Prepetition Notes Claims, and Allowed General Unsecured Claims) of the GUC Distribution Pool and (b) its Prepetition Term Loan Rights.

199. "*Prepetition Term Loan Obligations*" means all of the Debtors' obligations under the Prepetition LC/Term Loan Financing Documents insofar as such obligations relate to the Prepetition Term Loan Facility.

200. "*Prepetition Term Loan Rights*" means, collectively, the rights of all Holders of Prepetition Term Loan Facility Claims to participate in the Rights Offering on a Pro Rata basis (based upon such Holder's loans under the Prepetition Term Loan Facility as of the Petition Date).

201. "*Prepetition Term Secured Parties*" means the Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition LC/Term Collateral Agent (to the extent of any Prepetition Term Loan Obligations and/or

Term Adequate Protection Obligations owing to the Prepetition LC/Term Collateral Agent or granted to or held by the Prepetition LC/Term Collateral Agent for the benefit or on behalf of any other Prepetition Term Secured Party), and all other Term Secured Parties (as defined in the Prepetition LC/Term Loan Agreement)

202. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

203. "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

204. "*Professional*" means any Entity: (a) retained in the Chapter 11 Cases pursuant to and in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; and (c) that is a Liquidating Trustee Professional.

205. "*Professional Fee Claims*" means all Claims for accrued fees and expenses (including success fees) for services rendered and expenses incurred by a Professional from the Petition Date through and including the Effective Date, which Claims are evidenced by applications for compensation Filed with the Bankruptcy Court, to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

206. "*Professional Fee Escrow Account*" means an interest bearing escrow account to be funded on the Effective Date with unused proceeds from the DIP Facility, the Professional Fee Account (as defined in the Final DIP Order), or Cash on hand in an amount equal to all Professional Fee Claims, plus an amount equal to the estimated, unbilled Professional Fees incurred through the Effective Date but not evidenced by applications for compensation Filed with the Bankruptcy Court (calculated in accordance with reasonable estimates from each Professional); provided, that, the Professional Fee Escrow shall be increased to the extent that the aggregate amount of fee applications Filed after the Effective Date exceeds the available balance in the Professional Fee Escrow Account. For the avoidance of doubt, the Professional Fee Escrow Account shall include the funding of the Carve Out Reserve as provided for in the Final DIP Order.

207. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

208. "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

209. "*Released Parties*" means, collectively, the Debtor Releasees and the Third Party Releasees; provided, however, that, for the avoidance of doubt, in no circumstance shall Peabody, Arch, or Alcoa be Released Parties.

210. "*Releasing Parties*" means, collectively: (a) the Prepetition Agents; (b) the Prepetition Term Lenders; (c) the Prepetition LC Lenders and the Prepetition LC Facility Issuers; (d) the Prepetition ABL Lenders and the Prepetition ABL LC Issuers; (e) the Prepetition Noteholders; (f) the DIP Agent; (g) the DIP Lenders; (h) the Combined Company 1.5 Lien Term Loan Agent; (i) the Combined Company 1.5 Lien Term Loan Lenders; (j) the Committee; (k) the Retiree Committee; and (l) all other Holders of Claims or Equity Interests, except Holders of any Claims or Equity Interests (i) who vote to reject the Plan, (ii) who do not vote to accept or reject the Plan but who timely submit a Ballot indicating their decision to not participate in the Third Party Release set forth in Article VIII.D hereof, or (iii) who are in a Class that is deemed to reject the Plan.

211. "*Restructuring Documents*" means this Plan, the Disclosure Statement, the Plan Supplement, the Blackhawk Transaction Documents, VCLF Transaction Documents, and the various agreements and other documentation formalizing the Plan, each of which shall be in form and substance reasonably satisfactory to the

Debtors, the DIP Lenders, and satisfactory to Blackhawk as specified in the Blackhawk APA and to VCLF as specified in the VCLF APA.

212. "*Restructuring Transactions*" means one or more transactions to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, sale, consolidation, equity issuance, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan or the Blackhawk Transaction and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of sale, equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents; and (c) all other actions that the Debtors, after consultation with the Consultation Parties, or Liquidating Trustee, as applicable, determine are necessary or appropriate to implement the Plan, the Blackhawk Transaction Documents, or the VCLF Transaction Documents. For the avoidance of doubt, this definition includes the entry into the Combined Company Debt Facilities (including the Combined Company 1.5 Lien Term Loan).

213. "*Retiree Committee*" means the official committee of non-union retirees appointed in the Chapter 11 Cases pursuant to section 1114(d) of the Bankruptcy Code on July 7, 2015, as may be constituted from time to time, in accordance with the agreed order entered by the Bankruptcy Court on June 25, 2015.

214. "*Retiree Committee Advisors*" means, collectively, Schnader Harrison Segal & Lewis LLP and Stahl Cowen Crowley Addis LLC, as legal advisors to the Retiree Committee, and Zolfo Cooper, LLC, as bankruptcy consultants and financial advisors to the Retiree Committee.

215. "*Retiree Committee Members*" means: (a) James R. Gillenwater; (b) Elizabeth Wills; (c) Harold D. Green; (d) Carl Egnor, UMWA Representative; and (e) David L. McDonald; each solely in their capacity as members of the Retiree Committee.

216. "*Rights*" means the subscription rights to purchase Combined Company First Lien Tranche B-2 Term Loans or Combined Company Single Tranche Term Loans, as applicable, and Combined Company Second Lien Term Loans contemplated by the Rights Offering.

217. "*Rights Offering*" means the rights of Holders of Prepetition LC Facility Claims and Holders of Prepetition Term Loan Facility Claims to purchase, for an aggregate of $13,500,000 in Cash, (a) up to $16,875,000 in aggregate initial principal amount of, at Blackhawk's option, Combined Company First Lien Tranche B-2 Term Loans or Combined Company First Lien Single Tranche Term Loans and (b) up to $9,250,000 in aggregate initial principal amount of Combined Company Second Lien Term Loans, all subject to Sections 2.06(b)(i)(B) and 2.06(d)(ii) of the Blackhawk APA. The Rights shall be issued to Holders of Prepetition LC Facility Claims and to Holders of Prepetition Term Loan Facility Claims. If the Rights are oversubscribed, Rights will be issued (i) first, to the Holders of Prepetition LC Facility Claims and (ii) second, to Holders of Prepetition Term Loan Facility Claims, and any oversubscription within a Class shall be cut back Pro Rata within such Class.

218. "*Rights Offering Participant*" means (a) a Holder of an Allowed Prepetition LC Facility Claim, (b) a Holder of an Allowed Prepetition Term Loan Facility Claim, or (c) an Eligible Holder to whom the Rights of a Holder of an Allowed Prepetition LC Facility Claim or a Holder of an Allowed Prepetition Term Loan Facility Claim were transferred.

219. "*Rights Offering Procedures*" means the procedures governing the Rights Offering, which procedures are attached to the Disclosure Statement as Exhibit D and shall be Filed with the Plan Supplement.

220. "*Rights Offering Record Date*" means September 18, 2015.

221. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to Blackhawk, VCLF or the

Liquidating Trust, as applicable, pursuant to the Plan in the form to be Filed with the Bankruptcy Court as an exhibit to the Plan Supplement, as the same may be amended, modified or supplemented from time to time. Such schedule may include a description of the Unexpired Leases to be assumed by the Debtors and assigned to Blackhawk, VCLF, or the Liquidating Trust, as applicable.

222. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors on June 26, 2015 pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

223. "*Scheduling Order*" means the *Order Approving Debtors' Motion for Entry of An Order (I) Scheduling Combined Hearing on Approval of A Revised Disclosure Statement and Confirmation of A Revised Plan, (II) Approving the Form and Manner of Notice of the Combined Hearing, (III) Shortening the Notice of the Combined Hearing and the Deadline for Filing Objections; (IV) Maintaining the Voting Record Date; (V) Approving the Submission Of Votes to Accept or Reject the Plan through An "E-Ballot" Platform; (VI) Establishing the Voting Deadline; (VII) Establishing the Objection Deadline; and (VIII) Granting Related Relief*, entered on September 17, 2015 [Docket No. 1320].

224. "*Section 510(b) Claims*" means any Claim against any Debtor arising from rescission of a purchase or sale of a security of any Debtor or an Affiliate of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

225. "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) otherwise Allowed pursuant to the Plan as a Secured Claim. For the avoidance of doubt, Secured Claims do not include the DIP Claims.

226. "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

227. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as may be amended, modified, or supplemented, or any similar federal, state, or local law.

228. "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended, and as may be further amended, modified, or supplemented.

229. "*Stamp or Similar Tax*" means any stamp tax, recording tax, conveyance fee, intangible or similar tax, mortgage tax, personal or real property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

230. "*Subscription Accounts*" means one or more trust accounts, escrow accounts, treasury accounts, or similar segregated accounts established by the Subscription Agent to receive and hold payments of the Subscription Purchase Price.

231. "*Subscription Agent*" means Prime Clerk, LLC.

232. "*Subscription Deadline*" means October 2, 2015 at 4:00 p.m. (prevailing Eastern Time) or such later time as determined by the Debtors in their sole discretion.

233. "*Subscription Form*" means the subscription form(s) and applicable instructions sent to each Rights Offering Participant on which such Rights Offering Participant may exercise their Rights, in substantially the forms attached to the Rights Offering Procedures as Annex A and Annex B.

234. "*Subscription Purchase Price*" means the purchase price for the Combined Company First Lien Tranche B-2 Term Loans or Combined Company First Lien Single Tranche Term Loans (as applicable) and Combined Company Second Lien Term Loans acquired by a Rights Offering Participant pursuant to the Rights Offering and as calculated in accordance with such Rights Offering Participant's Subscription Form.

235. "*Term Loan Subordination Agreement*" means, collectively, the certain subordination agreements under the Prepetition LC/Term Loan Financing Documents with respect to the relative rights and priorities of the Prepetition Term Loan Obligations and the Prepetition Term Secured Parties, compared to the Prepetition LC Obligations and the Prepetition LC Secured Parties (including, without limitation, Sections 9.04, 10.15, 10.17, and 12.06(j) of the Prepetition LC/Term Loan Agreement and the related provisions set forth in any Affiliate Assignment Agreement (as defined in the Prepetition LC/Term Loan Agreement)), which provide, among other things, that the Prepetition LC Obligations are "first out" in payment priority versus the Prepetition Term Loan Obligations, subject to the Prepetition LC/Term Loan Agent Expenses Priority.

236. "*Third Party Release*" means the release provision set forth in Article VIII.D hereof.

237. "*Third Party Releasees*" means, collectively, (a) each Debtor Releasee; (b) the Liquidating Trust; (c) the Liquidating Trustee; (d) Blackhawk; (e) VCLF; (f) the Combined Company; (g) the Prepetition Agents and Barclays Bank PLC, as predecessor Term Administrative Agent (under and as defined in the Prepetition LC/Term Loan Agreement) and any of their respective sub-agents; (h) the Prepetition LC Secured Parties; (i) the Prepetition Term Lenders; (j) the Prepetition ABL Secured Parties; (k) the Prepetition Noteholders; (l) the DIP Agent; (m) the DIP Lenders; (n) the Combined Company 1.5 Lien Term Loan Agent; (o) the Combined Company 1.5 Lien Term Loan Lenders; (p) the Committee; (q) the Retiree Committee; and (r) with respect to each of the foregoing Entities in clauses (a) through (q) (other than with respect to a final fee application of a Professional), all such Entities' respective current and former affiliates and all such Entities' and such affiliates' respective current and former attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managers, administrators, trustees, managed funds, special purpose vehicles, accounts, fund managers and representatives, and successors and assigns of each of the foregoing in their respective capacities as such; provided, that, in no circumstance shall Peabody, Arch, or Alcoa be Third Party Releasees; provided, further, that, if the Payout Event does not occur and Class 5 votes to reject the Plan, then the Prepetition LC Secured Parties shall not be Third Party Releasees; provided, further, that, any Holder of a Claim (other than a Committee Member or a Retiree Committee Member) who votes to reject the Plan or who does not vote to accept or reject the Plan but who submits a Ballot opting out of the Third Party Release shall not be a Third Party Releasee.

238. "*Time-Based Note Incentive Program*" means the Debtors' time-based incentive program for certain eligible employees as set forth more fully in the Disclosure Statement.

239. "*U.S. Trustee*" means the United States Trustee for the Eastern District of Virginia.

240. "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

241. "*UMWA*" means the United Mine Workers of America.

242. "*Undrawn LC Facility Claims*" means the Prepetition LC Facility Claims on account of the letters of credit provided under the Prepetition LC Facility that are undrawn as of the Effective Date. The Undrawn LC Facility Claims are contingent and undisputed.

243. "*Undrawn LC Facility Claims Reserve*" has the meaning set forth in Article VI.B hereof.

244. "*Undrawn LC Facility Claims Reserve Agent*" means the Prepetition LC Agent or any other Entity or Entities designated by the Prepetition LC Agent after acceptance by such Entity or Entities to make or facilitate distributions that are to be made in connection with the Undrawn LC Facility Claims Reserve pursuant to the Plan.

245. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

246. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code and, with respect to Claim or Interest, a Claim or Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

247. "*Unsecured*" means not Secured.

248. "*VCLF*" means Virginia Conservation Legacy Fund, Inc. and ERP Compliant Fuels, LLC.

249. "*VCLF APA*" means that certain Asset Purchase Agreement dated as of August 16, 2015, as amended, modified, or supplemented from time to time, among VCLF and certain of the Debtors, including all schedules and exhibits thereto, which is attached to the Disclosure Statement as Exhibit K and shall be Filed with the Plan Supplement.

250. "*VCLF Assumed Liabilities*" shall have the same meaning as the term Assumed Liabilities set forth in Section 2.03 of the VCLF APA.

251. "*VCLF Commitment Letter*" means the commitment letter dated September 21, 2015 between VCLF and Black Diamond Commercial Finance, LLC that was included as Exhibit L to the Plan Supplement [Docket No. 1406].

252. "*VCLF Equity Grant*" means the grant of equity securities set forth in Section 7.12 of the VCLF APA.

253. "*VCLF Excluded Assets*" shall have the same meaning as the term Excluded Assets set forth in Section 2.02 of the VCLF APA.

254. "*VCLF Excluded Liabilities*" shall have the same meaning as the term Excluded Liabilities set forth in Section 2.04 of the VCLF APA.

255. "*VCLF Purchased Assets*" shall have the same meaning as the term Purchased Assets set forth in Section 2.01 of the VCLF APA.

256. "*VCLF Transaction*" means the purchase and sale transaction contemplated by the VCLF APA.

257. "*VCLF Transaction Documents*" means the VCLF APA and each other document contemplated by the VCLF APA or entered into in connection with the VCLF Transaction.

258. "*Voting Deadline*" means October 2, 2015, at 4:00 p.m., prevailing Eastern Time.

259. "*Voting Record Date*" means the close of business on August 18, 2015.

260. "*Wind Down*" means the wind down, dissolution, and liquidation of the Liquidating Trust Assets following the Effective Date as set forth in Article IV.P hereof.

261. "*Winning Bid*" shall have the same meaning as the term Winning Bid as set forth in the Bidding Procedures Order.

262. "*Winning Bidder*" shall have the same meaning as the term Winning Bidder as set forth in the Bidding Procedures Order.

263. "*WVDEP*" means the West Virginia Department of Environmental Protection.

264. "*WVDEP Settlement*" means the written settlement agreement by and among the WVDEP, the Debtors, Blackhawk, VCLF, and the DIP Lenders as contemplated by the WVDEP Settlement Term Sheet.

265. "*WVDEP Settlement Term Sheet*" means the term sheet reflecting the settlement agreement by and among the WVDEP, the Debtors, Blackhawk, and VCLF that is included in the Plan Supplement.

*B. Rules of Interpretation*

For purposes of the Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented upon prior notice to the Committee, Blackhawk, Prepetition Agents, and DIP Agent, without prejudice to any party's rights; (4) any reference to an Entity as a Holder of a Claim includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (7) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended, supplemented or otherwise modified from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; and (14) any immaterial effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. References in the Plan to the Debtors shall mean the Debtors after the 2012-13 Restructuring and prior to and on the Effective Date, and the Liquidating Trust after the Effective Date.

*C. Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

*D. Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws that would dictate the application of another jurisdiction's law, shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements,

documents, instruments or contracts, in which case the governing law set forth in such agreement shall control with respect thereto).

*E. Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

*F. Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan Supplement shall control unless stated otherwise in such Plan Supplement document. Notwithstanding anything to the contrary herein, in the event of an inconsistency between the Plan and the Disclosure Statement, on the one hand, and the Blackhawk APA, on the other hand, the Blackhawk APA shall control.

## ARTICLE II.
## DIP CLAIMS, ADEQUATE PROTECTION CLAIMS, ADMINISTRATIVE CLAIMS, AND PRIORITY TAX CLAIMS

*A. Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim will receive, in full and final satisfaction of its Allowed Administrative Claim, Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim either: (1) if such Administrative Claim is Allowed as of the Effective Date, on the Effective Date; (2) if the Administrative Claim is not Allowed as of the Effective Date, the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors' Estates in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the OCP Order and the DIP Orders) or as provided by Article II.B hereof, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

*B. Professional Compensation*

1. <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court and served on the Debtors (or the Liquidating Trustee) no later than the first Business Day that is sixty days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

2. Professional Fee Escrow Account

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow. Funds held in the Professional Fee Escrow shall not be considered property of the Debtors' Estates or property of the Liquidating Trust, but shall revert to the Liquidating Trust after all Professional Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full. The Professional Fee Escrow shall be held in trust for the Professionals and for no other parties until all Professional Fee Claims Allowed by the Bankruptcy Court have been paid in full. Professional Fees Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way, including with respect to any Liens, claims, or encumbrances securing the DIP Facility. Excess funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fees have been paid shall be transferred to the Liquidating Trust.

3. Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Liquidating Trustee, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Committee and the Retiree Committee as set forth in Article XII.D hereof, or the Liquidating Trust, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention for services rendered after such date shall terminate, and the Debtors may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

*C. DIP Claims*

Pursuant to the DIP Orders, all DIP Claims constitute Allowed Claims. Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, on the Effective Date each Holder of an Allowed DIP Claim shall receive its DIP Lender Distribution.

After the Effective Date, the Liquidating Trust shall continue to reimburse the DIP Agents, DIP Lenders, and Prepetition Agents for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agents, DIP Lenders, and Prepetition Agents in accordance with the DIP Loan Documents and the DIP Orders. On the Effective Date, the Debtor shall fund, in cash, a deposit (the "Deposit") to cover any costs, fees, expenses and the like (collectively, the "Costs and Expenses") anticipated to be incurred by the DIP Agents, DIP Lenders, and Prepetition Agents in connection with the DIP Loan Documents (and the other costs and expenses provided in the last sentence of this section), including in connection with the release of collateral securing the DIP Claims; provided, however, that if the Deposit is insufficient to cover the amount of the Costs and Expenses, the Liquidating Trust shall pay the DIP Agents, DIP Lenders, and Prepetition Agents the amount of such shortfall upon a demand therefor accompanied by evidence of the incurrence of the Costs and Expenses; provided, further, however, that if the Deposit exceeds the ultimate amount of the Costs and Expenses actually incurred by the DIP Agents, DIP Lenders, and Prepetition Agents, the excess shall be promptly remitted to the Liquidating Trust. Any remaining amount of the Deposit shall be remitted to the Liquidating Trust within ninety days of the Effective Date. With respect to any professional fees included as part of the Costs and Expenses, such professional fees may be paid by the DIP Agents, DIP Lenders, and Prepetition Agents, as applicable, without advance notice to any other party; provided, however, that the DIP Agents, DIP Lenders, and Prepetition Agents, as applicable, shall provide evidence of the incurrence of such professional fees to the Liquidating Trustee. To the extent that any provisions of the DIP Loan Documents are of a type that survive repayment of the subject indebtedness (*e.g.*, confidentiality provisions, a duty to release collateral, indemnity provisions), such provisions shall remain in effect notwithstanding repayment of the DIP Claims.

*D. Adequate Protection Claims*

Unless otherwise agreed to by the Holder of an Allowed Adequate Protection Claim and the Debtors to the extent an Allowed Adequate Protection Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Adequate Protection Claim will receive, in full and final satisfaction of its Allowed Adequate Protection Claim, Cash equal to the amount of the unpaid portion of such Allowed Adequate Protection Claim either: (1) if such Adequate Protection Claim is Allowed as of the Effective Date, on the Effective Date or (2) if the Adequate Protection Claim is not Allowed as of the Effective Date, the date on which an order of the Bankruptcy Court Allowing such Adequate Protection Claim becomes a Final Order, or as soon as reasonably practicable thereafter.

*E. Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

*F. U.S. Trustee Statutory Fees*

For the avoidance of doubt, all fees payable pursuant to section 1930 of title 28 of the United States Code due and payable through the Effective Date, and any interest accruing thereto, shall be paid by the Debtors on or before the Effective Date, and amounts due thereafter shall be paid by the Liquidating Trustee in the ordinary course until the entry of a final decree closing the respective Debtor's Chapter 11 Case. Any deadline for filing claims in these Chapter 11 Cases shall not apply to fees payable by the Debtors pursuant to section 1930 of title 28 of the United States Code or any interest accruing thereto.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Adequate Protection Claims, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article III.

*A. Summary of Classification*

All Claims and Interests, other than DIP Claims, Administrative Claims, Adequate Protection Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1. <u>Class Identification</u>

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 (all Debtors) | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 (all Debtors) | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 (all Debtors) | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 (all Debtors) | Prepetition ABL Facility Claims | Impaired | Entitled to Vote |
| Class 5 (all Debtors) | Prepetition LC Facility Claims | Impaired | Entitled to Vote |
| Class 6 (all Debtors) | Prepetition Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 7 (all Debtors) | Prepetition Notes Claims | Impaired | Entitled to Vote |
| Class 8 (all Debtors) | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 9 (all Debtors) | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 (all Debtors) | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 (all Debtors) | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

*B. Treatment of Claims and Interests*

The treatment and voting rights provided to each Class for distribution purposes is specified below:

1. Class 1 - Other Priority Claims

(a) *Classification*: Class 1 consists of all Other Priority Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the sole option of the Debtors or the Liquidating Trustee, as applicable:

(i) be paid in full in Cash in an amount equal to such Allowed Other Priority Claim by the Debtors on the Effective Date or by the Liquidating Trustee after the Effective Date; or

(ii) otherwise be treated in any other manner such that the Allowed Other Priority Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter.

(c) *Voting*: Class 1 is Unimpaired, and Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 - Secured Tax Claims</u>

(a) *Classification*: Class 2 consists of all Secured Tax Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Secured Tax Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Liquidating Trustee, as applicable:

(i) be paid in full in Cash by the Debtors on the Effective Date in an amount equal to such Allowed Secured Tax Claim; or

(ii) be paid by the Debtors or the Liquidating Trustee (as applicable), commencing on the Effective Date and continuing over a period not exceeding 5 years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default contract rate under non-bankruptcy law, subject to the sole option of the Liquidating Trustee to prepay the entire amount of such Allowed Secured Tax Claim during such time period; or

(iii) be paid regular Cash payments by the Debtors (on the Effective Date) or the Liquidating Trustee (after the Effective Date), in a manner not less favorable than the most favored non-priority unsecured Claim provided for by the Plan.

(c) *Voting*: Class 2 is Unimpaired, and Holders of Class 2 Secured Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Secured Tax Claims are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 - Other Secured Claims</u>

(a) *Classification*: Class 3 consists of all Other Secured Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Secured Claim, each Holder of such Claim shall, at the sole option of the Debtors or the Liquidating Trustee, as applicable:

(i) be paid in full in Cash in an amount equal to such Allowed Other Secured Claim by the Debtors on the Effective Date; or

(ii) receive the collateral securing any such Allowed Other Secured Claim and be paid any interest required to be paid under section 506(b) of the Bankruptcy Code; or

(iii) otherwise be treated in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or as soon as reasonably practicable thereafter.

(c) *Voting*: Class 3 is Unimpaired, and Holders of Class 3 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 Other Secured Claims are not entitled to vote to accept or reject the Plan.

4. Class 4 - Prepetition ABL Facility Claims

(a) *Classification*: Class 4 consists of all Prepetition ABL Facility Claims.

(b) *Allowance*: The Prepetition ABL Facility Claims shall be Allowed as Secured Claims in an aggregate amount with respect to drawn amounts under the Prepetition ABL Drawn LCs and undrawn amounts under the Prepetition ABL Undrawn LCs, respectively, not to exceed $44,263,955 (plus any unpaid accrued interest, letter of credit fees, and unpaid reasonable fees and expenses as of the Effective Date, to the extent not paid pursuant to the Final DIP Order).

(c) *Treatment*: Except to the extent that a Holder of a Prepetition ABL Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Prepetition ABL Facility Claim:

(i) **if the Payout Event occurs**, the Allowed Prepetition ABL Facility Claims shall be paid in full and in Cash from the Payout Event Cash, including by cash collateralizing any Prepetition ABL Undrawn LCs on terms and amounts acceptable to the issuers thereof and the Prepetition ABL Agent; or

(ii) **if the Payout Event does not occur**,

(A) with respect to all indebtedness related to the Prepetition ABL Drawn LCs and all other unpaid Prepetition ABL Obligations (other than as contemplated by the following clause (B)), shall be assumed and converted into loans drawn under the Combined Company New ABL on a dollar-for-dollar basis (so long as such Combined Company New ABL is in form and substance reasonably acceptable to the Prepetition ABL Agent); and

(B) with respect to each Prepetition ABL Undrawn LC:

(I) shall be replaced with letter(s) of credit issued (or deemed issued) under the Combined Company New ABL; provided, that, as a condition to such replacement being effective for purposes of this clause (I), each Prepetition ABL Undrawn LC to be considered so replaced shall have been returned to the issuer thereof undrawn or otherwise cancelled in a manner

reasonably acceptable to the issuer of such Prepetition ABL Undrawn LC; and/or

(II) shall be deemed a letter of credit issued under the Combined Company New ABL in an equal stated face amount (so long as such Combined Company New ABL is in form and substance reasonably satisfactory to the Prepetition ABL Agent).

To the extent that any provisions of the Prepetition ABL Financing Documents are of a type that survive repayment of the subject indebtedness (*e.g.*, confidentiality provisions, a duty to release collateral, indemnity provisions), such provisions shall remain in effect notwithstanding repayment of the Prepetition ABL Facility; provided, however, that such surviving provisions shall not be an obligation of, nor shall they be binding upon, Blackhawk or the Combined Company.

The consideration provided to the Holders of Allowed Prepetition ABL Facility Claims pursuant to this Article III.B.4, including any Cash and loans or letters of credit issued under the Combined Company New ABL, shall not be deemed proceeds of any collateral other than the ABL Priority Collateral (as defined in the First-Lien Intercreditor Agreement), and such consideration shall be provided to such Holders in exchange for, among other things, the release of their liens on the ABL Priority Collateral as contemplated by the Plan (including under Article IV.G and Article IV.R hereof).

(d) *Voting*: Class 4 is Impaired under the Plan. Holders of Prepetition ABL Facility Claims are entitled to vote to accept or reject the Plan.

5. Class 5 - Prepetition LC Facility Claims

(a) *Classification*: Class 5 consists of all Prepetition LC Facility Claims.

(b) *Allowance*: The Prepetition LC Facility Claims shall be Allowed as Secured Claims in an aggregate amount of $192,238,375.55.[1]

(c) *Treatment*: Except to the extent that a Holder of a Prepetition LC Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Prepetition LC Facility Claim, each such Holder thereof shall receive:

(i) **if the Payout Event occurs**, its Payout Event Class 5 Distribution; or

(ii) **if the Payout Event does not occur**, and

(A) **if class 5 votes to accept the Plan**, its Prepetition LC Facility Distribution; or

1 This amount includes contingent claims on account of undrawn letters of credit provided under the Prepetition LC Facility, provided, however, that upon the Effective Date, the Undrawn LC Facility Claims shall be deemed undisputed. If the Payout Event does not occur, such Undrawn LC Facility Claims shall be Allowed, without any further action, to the extent that undrawn letters of credit provided under the Prepetition LC Facility are subsequently drawn, and such Allowed Undrawn LC Facility Claims, if any, shall be satisfied from the Undrawn LC Facility Claims Reserve.

(B) **<u>if Class 5 votes to reject the Plan</u>**, its prepetition LC Facility Distribution Alternative.

To the extent that any provisions of the Prepetition LC/Term Loan Financing Documents relating to the Prepetition LC Facility are of a type that survive repayment of the subject indebtedness (*e.g.*, confidentiality provisions, a duty to release collateral, indemnity provisions), such provisions shall remain in effect notwithstanding repayment of the Prepetition LC Facility Claims; <u>provided</u>, <u>however</u>, that such surviving provisions shall not be an obligation of, nor shall they be binding upon, Blackhawk or the Combined Company.

(d) *Voting*: Class 5 is Impaired under the Plan. Holders of Prepetition LC Facility Claims are entitled to vote to accept or reject the Plan.

6. <u>Class 6 - Prepetition Term Loan Facility Claims</u>

(a) *Classification*: Class 6 consists of all Prepetition Term Loan Facility Claims.

(b) *Allowance*: The Prepetition Term Loan Facility Claims shall be Allowed in an aggregate amount not to exceed $250,000,000.

(c) *Treatment*: Except to the extent that a Holder of a Prepetition Term Loan Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Prepetition Term Loan Facility Claim, each such Holder thereof shall receive:

(i) **if the Payout Event occurs**, its Payout Event Class 6 Distribution; or

(ii) **if the Payout Event does not occur**, its Prepetition Term Loan Facility Distribution.

To the extent that any provisions of the Prepetition Term Loan Facility are of a type that survive repayment of the subject indebtedness (*e.g.*, confidentiality provisions, a duty to release collateral, indemnity provisions), such provisions shall remain in effect notwithstanding repayment of the Prepetition Term Loan Facility; <u>provided</u>, <u>however</u>, that such surviving provisions shall not be an obligation of, nor shall they be binding upon, Blackhawk or the Combined Company.

(d) *Voting*: Class 6 is Impaired under the Plan. Holders of Prepetition Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

(e) *Waiver of Adequate Protection Claims*: Each of the funds and/or accounts managed or advised by Knighthead Capital Management, LLC, Caspian Capital LP on behalf of its advisees, Davidson Kempner Capital Management LP, on behalf of funds and accounts managed by it (including Midtown Acquisitions L.P.), and Hudson Bay Absolute Return Credit Opportunities Master Fund Ltd. waives and shall receive no distribution on account of its Claims, if any, arising under or related to the "Term Adequate Protection Obligations" as such term is defined in the Final DIP Order.

7. <u>Class 7 - Prepetition Notes Claims</u>

(a) *Classification*: Class 7 consists of all Prepetition Notes Claims.

(b) *Allowance*: The Prepetition Notes Claims shall be Allowed in an aggregate amount not to exceed $305,504,339.

(c) *Treatment*: Except to the extent that a Holder of a Prepetition Notes Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Prepetition Notes Claim, each such Holder thereof shall receive:

(i) **if the Payout Event occurs**, its Payout Event Class 7 Distribution; or

(ii) **if the Payout Event does not occur**, its Prepetition Notes Distribution.

(d) *Voting*: Class 7 is Impaired under the Plan. Holders of Prepetition Notes Claims are entitled to vote to accept or reject the Plan.

(e) *Waiver of Adequate Protection Claims*: Each of the funds and/or accounts managed or advised by Knighthead Capital Management, LLC, Caspian Capital LP on behalf of its advisees, Davidson Kempner Capital Management LP, on behalf of funds and accounts managed by it (including Midtown Acquisitions L.P.), and Hudson Bay Absolute Return Credit Opportunities Master Fund Ltd. waives and shall receive no distribution on account of its Claims, if any, arising arising under or related to the "Note Adequate Protection Obligations" as such term is defined in the Final DIP Order.

8. <u>Class 8 - General Unsecured Claims</u>

(a) *Classification*: Class 8 consists of all General Unsecured Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder thereof shall receive:

(i) **if the Payout Event occurs**, its Payout Event Class 8 Distribution; or

(ii) **if the Payout Event does not occur**, its General Unsecured Claims Distribution.[2]

(c) *Voting*: Class 8 is Impaired under the Plan. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

9. <u>Class 9 - Intercompany Claims</u>

(a) *Classification*: Class 9 consists of all Intercompany Claims.

(b) *Treatment*: Intercompany Claims shall be cancelled without any distribution on account of such Interests.

(c) *Voting*: Class 9 is Impaired under the Plan. Holders of Intercompany Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

---

[2] For the avoidance of doubt, Holders of Allowed General Unsecured Claims (including the Holders of Allowed Prepetition Notes Claims and Allowed Prepetition Term Loan Facility Claims to the extent such Claims are deemed unsecured and such Claims have not been waived under this Plan) will also receive distributions consistent with the Committee Settlement as set forth in Article IV.T hereof and distributions, if any, in accordance with the Excess Cash Distribution Mechanism as set forth in Article IV.U hereof.

10. Class 10 - Intercompany Interests

(a) *Classification*: Class 10 consists of all Intercompany Interests.

(b) *Treatment*: Intercompany Interests shall be cancelled without any distribution on account of such Interests.

(c) *Voting*: Class 10 is Impaired under the Plan. Holders of Intercompany Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

11. Class 11 - Equity Interests

(a) *Classification*: Class 11 consists of all Equity Interests.

(b) *Treatment*: On the Effective Date, all Equity Interests shall be cancelled without any distribution on account of such Interests.

(c) *Voting*: Class 11 is Impaired under the Plan. Holders of Equity Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

*C. Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

*D. Class Acceptance Requirement*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Claims in such Class and more than one-half (1/2) in number of Holders of such Claims that have voted on the Plan.

*E. Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

*F. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

*G. Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date; provided, that, nothing shall affect or limit the Debtors', Blackhawk's, the Combined

Company's, the DIP Lenders', the Prepetition LC Secured Parties', the Prepetition Term Secured Parties', the Prepetition Notes Trustee's, the Prepetition Noteholders', or the Combined Company 1.5 Lien Term Loan Lenders' applicable rights and defenses (whether legal or equitable) in respect of any such Claims, Interests, or Class of Claims or Interests.

## ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN

*A. Sources of Consideration for Plan Distributions*

The Confirmation Order shall be deemed to authorize, among other things, the Restructuring Transactions. All amounts and securities necessary for the Debtors (on the Effective Date), the Combined Company, VCLF, or Liquidating Trust (after the Effective Date), as applicable, to make payments or distributions pursuant to this Plan shall be obtained from, among other things, the liabilities assumed, consideration paid by Blackhawk, and Cash raised or held by the Debtors.

*B. Blackhawk Transaction*

Subject to the terms of the Blackhawk Transaction Documents, on the Effective Date, the Debtors shall consummate the Blackhawk Transaction and, among other things, the Blackhawk Purchased Assets shall be transferred to and vest in the Combined Company free and clear of all Liens, Claims, charges, or Encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code, the Confirmation Order, the Blackhawk APA and the other Blackhawk Transaction Documents. On the Effective Date, the Debtors shall consummate the transactions contemplated by the Blackhawk Transaction Documents pursuant to the terms thereof; provided, that, the conditions precedent set forth in the Blackhawk Transaction Documents have been satisfied or waived in accordance with the terms thereof. Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Blackhawk APA and the other Blackhawk Transaction Documents will be deemed authorized and approved without any requirement of further act or action by the Debtors' shareholders or the Debtors' boards of directors. The Debtors are authorized to execute and deliver, and to consummate the transactions contemplated by, the Blackhawk Transaction Documents, as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

On and after the Effective Date, the Combined Company may use, acquire, or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Neither Blackhawk, the Combined Company, nor any of their Affiliates shall be deemed, as a result of any action taken in connection with the Blackhawk Transaction Documents, the consummation of the Blackhawk Transaction and any other transaction contemplated by the Blackhawk Transaction Documents, or the transfer or operation of the Blackhawk Purchased Assets (1) to be a legal successor, or otherwise be deemed a successor to all or any of the Debtors; (2) to have, de facto or otherwise, merged with or into all or any of the Debtors; (3) to be an alter ego or a continuation of all or any of the Debtors; or (4) to have any responsibility for any obligations of all or any of the Debtors based on any theory of successor or similar theories of liability, including, without limitation, pursuant to the Black Lung Act, the Coal Act, or the UMWA 1974 Pension Plan.

Without limiting the generality of the foregoing, except as otherwise expressly provided in the Blackhawk Transaction Documents, Blackhawk, the Combined Company and all of their Affiliates shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and neither Blackhawk, the Combined Company nor any of their affiliates shall have successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor, employment or benefits law, de facto merger or substantial continuity, whether known or unknown as of the closing, then existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Debtors or their affiliates or any obligations of the Debtors or their affiliates arising prior to the closing, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Blackhawk Purchased Assets prior to the closing.

The transactions contemplated by the Blackhawk Transaction Documents are undertaken by the Debtors and Blackhawk without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the sale contemplated thereunder shall not affect the validity of such sale (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease), unless such authorization and consummation of such sale are duly stayed pending such appeal. Blackhawk is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code as applicable.

On the Effective Date, (1) the Combined Company, solely in accordance with its operating documents, is authorized to enter into each of the Combined Company Debt Facilities as well as any notes, documents or agreements delivered in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of liens in connection therewith and an intercreditor agreement governing the respective priorities and rights among the Combined Company Debt Facilities; (2) upon the granting of such liens in accordance with the Combined Company Debt Documents and the consummation of the Combined Company Debt Facilities, the lenders under the Combined Company Debt Facilities, including the Prepetition ABL Secured Parties and the Prepetition LC Secured Parties to the extent lenders under the Combined Company Debt Facilities as contemplated by the Plan, shall have valid, binding and enforceable liens on the collateral specified in the documents and agreements governing the Combined Company Debt Facilities; and (3) upon the granting of such guarantees, mortgages, pledges liens and other security interests in accordance with the Combined Company Debt Documents and the consummation of the Combined Company Debt Facilities, the guarantees, mortgages, pledges, liens and other security interests granted to secure the obligations arising under the Combined Company Debt Facilities shall be granted in good faith as an inducement to the respective lenders under the Combined Company Debt Facilities to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the documents and agreements governing the Combined Company Debt Facilities, including any applicable intercreditor agreements.

Notwithstanding anything in the Plan to the contrary, the Blackhawk Transaction Documents are the only documents that govern the Blackhawk Transaction and, for the avoidance of doubt, the VCLF Transaction Documents shall have no effect on the Blackhawk Transaction, Blackhawk, or the Combined Company. A copy of the Blackhawk APA and a summary of the Blackhawk Transaction shall be Filed with the Plan Supplement.

For the avoidance of doubt, the Debtors may implement an Alternative Transaction (as defined in the Bidding Procedures Order) and implement the Payout Event as set forth herein and in accordance with the Bidding Procedures Order.

*C. Rights Offering*

The Rights Offering shall consist of a distribution of the Rights in respect of, at Blackhawk's option, Combined Company First Lien Tranche B-2 Term Loans or Combined Company First Lien Single Tranche Term Loans (as applicable) and Combined Company Second Lien Term Loans. The Rights Offering will be conducted in accordance with the Rights Offering Procedures and shall be open to Persons that are the Rights Offering Participants as of the Rights Offering Record Date.

Any participation in the Rights Offering shall be Pro Rata for each Holder of Prepetition LC Facility Claims or Allowed Prepetition Term Loan Facility Claims, as applicable, based on such Holder's face amount ownership of the Prepetition LC Facility Claims or Prepetition Term Loan Facility, as applicable, relative to the total face amount of the Prepetition LC Facility Claims or Prepetition Term Loan Facility, as applicable. The Rights shall be issued to Holders of Prepetition LC Facility Claims on a Pro Rata basis and to Holders of Prepetition Term Loan Facility Claims. For the avoidance of doubt, if the Rights are oversubscribed, Rights will be issued (1) first, to the Holders of Prepetition LC Facility Claims and (2) second, to Holders of Prepetition Term Loan Facility Claims, and any oversubscription within a Class shall be cut back Pro Rata within such Class.

To exercise Rights, a Rights Offering Participant must timely deliver a duly completed and executed Subscription Form and the other documents referenced therein and the Subscription Purchase Price (as calculated

pursuant to the Subscription Form) by wire transfer or bank or cashier's check, as set forth in the Subscription Form, in accordance with the Rights Offering Procedures.

A Holder of Claims eligible to participate in the Rights Offering shall be deemed to have relinquished and waived all rights to participate in the Rights Offering to the extent the Subscription Agent for any reason does not receive from such Holder, on or before the Subscription Deadline, a duly completed and executed Subscription Form and the other documents referenced therein and the Subscription Purchase Price (as calculated pursuant to the Subscription Form) by wire transfer or bank or cashier's check, as set forth in the Subscription Form, with respect to such Holder's Rights. The funds contained in the Subscription Accounts shall be refunded to the Rights Offering Participants in accordance with the Rights Offering Procedures.

The Combined Company First Lien Tranche B-2 Term Loans or the Combined Company First Lien Single Tranche Term Loans (as applicable) and the Combined Company Second Lien Term Loans to be issued in connection with the Rights Offering are being issued without registration under the Securities Act or any other state or foreign securities law.

*D. VCLF Transaction*

Subject to the terms of the VCLF Transaction Documents, on the Effective Date, the Debtors shall consummate the VCLF Transaction and, among other things, the VCLF Purchased Assets shall be transferred to and vest in VCLF free and clear of all Liens, Claims, charges, or Encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code, the Confirmation Order, the VCLF APA and the other VCLF Transaction Documents. On the Effective Date, the Debtors shall consummate the transactions contemplated by the VCLF Transaction Documents pursuant to the terms thereof; provided, that, the conditions precedent set forth in the VCLF Transaction Documents have been satisfied or waived in accordance with the terms thereof. Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the VCLF APA and the other VCLF Transaction Documents will be deemed authorized and approved without any requirement of further act or action by the Debtors' shareholders or the Debtors' boards of directors. The Debtors are authorized to execute and deliver, and to consummate the transactions contemplated by the VCLF Transaction Documents, as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The transactions contemplated by the VCLF Transaction Documents are undertaken by the Debtors and VCLF without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the sale contemplated thereunder shall not affect the validity of such sale (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease), unless such authorization and consummation of such sale are duly stayed pending such appeal. VCLF is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code as applicable. VCLF may make distributions to stakeholders in accordance with the VCLF Equity Grant.

*E. General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

*F. Listing of Securities*

None of the securities issued in connection with the Blackhawk Transaction (including the Combined Company 1.5 Lien Class B Units) will be listed on a national securities exchange and the Combined Company will not be a reporting company under the Securities Exchange Act upon the Effective Date.

The offering, issuance, and distribution of any securities in connection with the VCLF Transaction shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery prior to the offering, issuance, distribution, or sale of securities to the fullest extent permitted by law pursuant to section 1145 of the Bankruptcy Code. In addition, under section 1145 of the Bankruptcy Code, any securities issued in connection with the VCLF Transaction and any and all agreements associated therewith, shall be subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the VCLF Transaction Documents; and (4) applicable regulatory approval, if any.

*G. Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, the Blackhawk APA, the VCLF APA, as applicable, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised.

Except as otherwise provided in the Blackhawk APA, on the Effective Date all Blackhawk Purchased Assets shall be transferred to the Combined Company free and clear of all Claims, Liens, Encumbrances or Interests pursuant to Sections 363, 365, 1123 and the other applicable sections of the Bankruptcy Code.

Except as otherwise provided in the VCLF APA, on the Effective Date all VCLF Purchased Assets shall be transferred to VCLF free and clear of all Claims, Liens, Encumbrances or Interests pursuant to Sections 363, 365, 1123 and the other applicable sections of the Bankruptcy Code.

*H. Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition Notes Documents, and any other certificate, share, note, bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity or profits interest in the Debtors or any warrants, options or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership or profits interests in the Debtors giving rise to any Claim or Interest, shall be cancelled as to the Debtors, and the Liquidating Trust shall not have any continuing obligations thereunder; (2) the obligations of the Debtors under the DIP Facility, the Prepetition ABL Facility, the Prepetition LC Facility, the Prepetition Notes Documents and the Prepetition Term Loan Facility shall be fully released, settled, and compromised as to the Debtors, and the Liquidating Trust shall not have any continuing obligations thereunder (and the commitments and obligations (if any) of any of the Prepetition ABL Secured Parties, the Prepetition LC Secured Parties, and/or any of Prepetition Term Secured Parties to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the Prepetition ABL Financing Documents or the Prepetition LC/Term Loan Financing Documents, as applicable, shall fully terminate and be of no further force or effect); and (3) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; provided, that, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan as provided herein. None of the terms and conditions hereof, Confirmation or the occurrence of the Effective Date shall (a) constitute a release, waiver, discharge or other modification of any obligations under any of the Intercreditor Agreements owed by any Prepetition Secured Party to any other Prepetition Secured Party pursuant to the terms thereof; (b) prejudice the relative rights, remedies, powers and privileges of any of the Prepetition Secured Parties pursuant to any of the Intercreditor Agreements, including, without limitation, any such rights to enforce the terms and conditions of any Intercreditor Agreement that a

Prepetition Secured Party is party to or bound by against any other Prepetition Secured Party party thereto or bound thereby, subject to the Prepetition LC/Term Loan Agent Expenses Priority; or (c) impair the right of the Prepetition Notes Trustee to enforce the Prepetition Notes Trustee Charging Lien against any distribution to the Prepetition Noteholders pursuant to this Plan.

*I. Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, with the consent of the DIP Lenders, Blackhawk, VCLF, the Combined Company, and the Liquidating Trustee, each as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, and the Liquidating Trust Agreement, each as applicable.

*J. Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, and the Liquidating Trust Agreement, as applicable, shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers or officers of the Debtors, or the Liquidating Trust, or any other Entity or Person, including: (1) execution of, entry into and performance under the Blackhawk Transaction Documents; (2) execution of, entry into and performance under the VCLF Transaction Documents; (3) adoption or assumption, as applicable, and assignment to the Combined Company, VCLF, or the Liquidating Trust, as applicable, of Executory Contracts and Unexpired Leases; (4) selection of the managers and officers for the Combined Company; (5) the issuance and distribution of the Combined Company 1.5 Lien Class B Units as provided herein; and (6) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by, the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, and the Liquidating Trust Agreement, as applicable, and each of the foregoing documents or agreements (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, or the Liquidating Trust Agreement involving the company structure of the Debtors, the Combined Company, or VCLF, as applicable, and any company action required by the Debtors, the Liquidating Trust, Blackhawk, or VCLF in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors, Blackhawk, or VCLF, as applicable.

On or (as applicable) prior to the Effective Date, the appropriate officers, managers or authorized persons of the Debtors or the Liquidating Trust (including, any vice-president, president, chief executive officer, treasurer or chief financial officer thereof), as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, and the Liquidating Trust Agreement, as applicable, (or necessary or desirable to effect the transactions contemplated by the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, and the Liquidating Trust Agreement, as applicable) in the name of and on behalf of the Debtors or the Liquidating Trust, as applicable, including any and all agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

*K. Effectuating Documents; Further Transactions*

On and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, the Liquidating Trust Agreement, as applicable, and the securities issued pursuant to the Plan, the Blackhawk Transaction Documents, and the VCLF Transaction Documents without the need for any approvals, authorization, or consents except for those

expressly required pursuant to the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, and the Liquidating Trust Agreement, as applicable.

*L. Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with this Plan, the Blackhawk Transaction Documents, or the VCLF Transaction Documents shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the Blackhawk Transaction; (2) the VCLF Transaction; (3) the creation of any mortgage, deed of trust, Lien or other security interest; (4) the making or assignment of any lease or sublease; (5) any Restructuring Transaction; (6) the issuance, distribution and/or sale of any of the Combined Company 1.5 Lien Class B Units and any other securities of the Debtors or the Combined Company; or (7) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, the Blackhawk Transaction Documents, or the VCLF Transaction Documents, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan, the Blackhawk Transaction Documents, or the VCLF Transaction Documents.

*M. D&O Liability Insurance Policies*

Notwithstanding anything herein to the contrary, as of the Effective Date, all of the D&O Liability Insurance Policies shall be assumed by the Liquidating Trust pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Liquidating Trust under the Plan as to which no Proof of Claim need be Filed.

*N. Indemnification Provisions*

Notwithstanding anything herein to the contrary or pursuant to the termination, dissolution, or wind down of any or all of the Debtors, the Debtors (if necessary to continue all Indemnification Provisions in full force), as of the Effective Date, shall be deemed to have assumed all Indemnification Provisions and assigned such provisions to the Liquidating Trust as though such Indemnification Provisions were to have full force and effect; provided, that, the assumption by the Debtors of the Indemnification Provisions and the assignment thereof to the Liquidating Trust shall not be deemed to be an assumption or assignment of the contract, agreement, resolution, instrument or document in which such Indemnification Provisions are contained, memorialized, agreed to, embodied or created (or any of the other terms or provisions thereof) unless, and only to the extent that, such contract, agreement, resolution, instrument or document is a Blackhawk Purchased Asset. All Indemnification Provisions in place on and prior to the Effective Date for current and former officers, directors, managers and employees of the Debtors and their subsidiaries and such current and former officers', directors', managers', and employees' respective Affiliates shall survive the Effective Date for all Claims related to or in connection with, without limitation, any actions, omissions or transactions occurring prior to the Effective Date; provided, that, notwithstanding anything herein to the contrary, the Debtors shall not indemnify or assume any Indemnification Provision as to any of the Non-Released Parties for any matter; provided, further, that, for the avoidance of doubt, in no circumstance shall the Debtors indemnify or assume any indemnification obligation with respect to Peabody, Arch, or Alcoa. For the avoidance of doubt, nothing herein shall limit the rights of Blackhawk or the Combined Company against, or the obligations of, any Person or Entity that is a party to any Blackhawk Transaction Documents or any other contract with Blackhawk or the Combined Company, including any contract that is a Blackhawk Purchased Asset.

*O. Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly waived, released, sold or otherwise transferred (including, for the avoidance of doubt, pursuant to Blackhawk Transaction Documents, the VCLF Transaction Documents, the Committee Settlement, and the DIP Orders), the Liquidating Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Liquidating Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Liquidating Trustee may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Liquidating Trust. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Blackhawk Transaction Documents, the VCLF Transaction Documents, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, Blackhawk, VCLF, or the Liquidating Trustee, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors have released, sold or otherwise transferred to, any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release, the Blackhawk Transaction Documents, the VCLF Transaction Documents, or otherwise), the Debtors or the Liquidating Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, sold or otherwise transferred, compromised, or settled in the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, or a Bankruptcy Court order, the Liquidating Trustee expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

*P. Wind Down and Dissolution of the Debtors*

On and after the Effective Date, the Wind Down and dissolution of the Debtors shall occur pursuant to the Liquidating Trust Agreement, any other provision of the Plan, and any applicable orders of the Bankruptcy Court.

*Q. Liquidating Trust*

On the Effective Date, immediately after the consummation of the Blackhawk Transaction and the VCLF Transaction, the Liquidating Trust will be formed to receive the Liquidating Trust Assets and implement the Wind Down. The Liquidating Trust will be established for the primary purpose of liquidating the Liquidating Trust Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets as more fully set forth in the Liquidating Trust Agreement, the Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets. For all federal income tax purposes, the beneficiaries of the Liquidating Trust will be treated as grantors and owners thereof and it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for federal income tax purposes, it is intended that the beneficiaries of the Liquidating Trust be treated as if they had received an interest in the Liquidating Trust's assets and then contributed such interests to the Liquidating Trust. The Liquidating Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trusts Assets, make timely distributions to the beneficiaries of the Liquidating Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration. The Liquidating Trust will not be deemed a successor in interest to the Debtors. Upon the termination of the Liquidating Trust, any excess funds shall be paid to Holders of Allowed Prepetition Term Loan Facility Claims, Allowed Prepetition Notes Claims, and Allowed General Unsecured Claims on a Pro Rata basis (based upon such Holder's face amount Allowed Claim relative to the total face amount of all Allowed Prepetition Term Loan Facility Claims, Allowed Prepetition Notes Claims, and Allowed General Unsecured Claims) as set forth in the Liquidating Trust Agreement.

*R. Liquidating Trustee*

The Liquidating Trustee shall be identified by the Debtors, after consultation with the Consultation Parties, to the extent known prior to the commencement of the Confirmation Hearing. If the VCLF Transaction is not

consummated, the Liquidating Trustee shall purchase the Liquidating Trust Assets and conduct the Wind Down and shall succeed to such powers as would have been applicable to the Debtors' officers, directors, and shareholders, and the Debtors shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Liquidating Trustee, all in accordance with the Liquidating Trust Agreement. All property of the Estates not distributed to the Holders of Claims or Interests on the Effective Date, or transferred pursuant to the Blackhawk Transaction Documents or the VCLF Transaction, shall be transferred to the Liquidating Trust and managed and distributed by the Liquidating Trustee pursuant to the terms of the Liquidating Trust Agreement and shall be held in the name of the Debtors free and clear of all Claims and Interests except for rights to such distributions provided to Holders of Allowed Claims and Allowed Interests as provided in the Plan. As soon as possible after the Effective Date, the Liquidating Trust shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. Any and all reasonable and documented costs and expenses incurred by the Liquidating Trustee in connection with the Wind Down shall be paid from the funds of the Liquidating Trust, subject to the terms and conditions of the Liquidating Trust Agreement. The Liquidating Trustee shall only file tax returns for Debtors in jurisdictions where such Debtor previously filed tax returns, unless the Liquidating Trustee determines that a tax return is required to be filed due to a change in law, fact, or circumstance on or after the Effective Date. Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the Liquidating Trustee, the Liquidating Trust Agreement shall provide for the appointment of the successor Liquidating Trustee and, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Liquidating Trustee.

The Person chosen to be the successor Liquidating Trustee shall have such qualifications and experience to enable the Liquidating Trustee to perform his or her obligations under the Plan and under the Liquidating Trust Agreement. The Liquidating Trustee shall be compensated and reimbursed for reasonable costs and expenses as set forth in, and in accordance with, the Liquidating Trust Agreement.

*S. Distribution of Payout Event Cash*

If the Payout Event occurs, the Payout Event Cash shall be distributed in the following order of priority:

*First*, to fund in full in Cash the Carve Out Reserve and, thereafter, the Professional Fee Escrow Account;

*Second*, after funding of the Carve Out Reserve and Professional Fee Escrow Account as contemplated by the previous paragraph, to pay in full and in Cash, the Allowed Prepetition ABL Facility Claims, including by cash collateralizing the Prepetition ABL Undrawn LCs on terms and amounts acceptable to the issuers thereof and the Prepetition ABL Agent; and

*Third*, after funding of the Carve Out Reserve and the Professional Fee Escrow Account and satisfaction of the Allowed Prepetition ABL Facility Claims as contemplated by the previous paragraphs, to pay in full in Cash the DIP Claims.

*T. Committee Settlement*

The Plan implements the Committee Settlement and incorporates the terms of the Committee Settlement by reference as though fully stated herein. Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and consistent with section 1129 of the Bankruptcy Code, the Plan shall constitute a motion for approval of, and the Confirmation Order shall constitute Bankruptcy Court approval of, the Committee Settlement.

The Committee Settlement shall be effectuated in accordance with the following terms if the Committee Settlement is approved by the Bankruptcy Court:

1. <u>Combined Company Unsecured Notes</u>

On the Effective Date, the Combined Company shall issue the Combined Company Unsecured Note and each Holder of an Allowed General Unsecured Claim other than a GUC Trade Creditor Claim shall receive a distribution of such Holder's Pro Rata share (based upon such Holder's total face amount Claim relative to the total

face amount of the Allowed General Unsecured Claims other than GUC Trade Creditor Claims) of the Combined Company Unsecured Notes.

The Combined Company Unsecured Notes shall accrue interest at 2% payment-in-kind. The maturity date of the Combined Company Unsecured Notes shall be six years after the Effective Date, and the Combined Company Unsecured Notes shall be subject to other customary conditions and covenants. The terms of the Combined Company Unsecured Note shall provide that the Combined Company Unsecured Note shall be prepayable without any premiums or fees.

2. GUC Trade Creditor Distribution Pool

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed GUC Trade Creditor Claim shall receive its Pro Rata share (based upon such Holder's total face amount Claim relative to the total face amount of the Allowed GUC Trade Creditor Claims) of the GUC Trade Creditor Distribution Pool.

3. Preference Waiver

On the Effective Date, the Debtors shall forever waive, relinquish, and release any and all Causes of Action the Debtors and their Estates had, have, or may have had that arise under section 547 of the Bankruptcy Code against any Person with whom the Debtors conducted business prior to the Effective Date.

4. Deficiency Claims Waiver

Solely for the purposes of this Plan, each of the funds and/or accounts managed or advised by Knighthead Capital Management, LLC, Caspian Capital LP on behalf of its advisees, Davidson Kempner Capital Management LP, on behalf of funds and accounts managed by it (including Midtown Acquisitions L.P.), and Hudson Bay Absolute Return Credit Opportunities Master Fund Ltd. agrees to waive and shall receive no distribution on account of its (a) Prepetition Term Loan Facility Claims, if any, other than its Prepetition Term Loan Rights and (b) Prepetition Notes Claims, if any.

*U. Excess Cash Distribution Mechanism*

If the Payout Event does not occur, any Cash remaining after facilitating all distributions pursuant to the Plan or any other order of the Bankruptcy Court (including, for the avoidance of doubt, amounts distributed on account of the Carve Out Reserve, the Professional Fee Escrow Account, any amounts reserved for the Wind Down, payment of Adequate Protection Claims, Administrative Claims, Cure Claims, Other Priority Claims, settlement payments allowed pursuant to any order of the Bankruptcy Court, or any other payments authorized by order of the Bankruptcy Court) shall be distributed in the following order of priority:

*First*, Pro Rata to Holders of Allowed Prepetition LC Facility Claims in an aggregate amount not to exceed $5,000,000 (the "first $5,000,000");

*Second*, after distribution of the first $5,000,000 as contemplated by the previous paragraph, Pro Rata to Holders of Allowed Prepetition Term Loan Facility Claims in an aggregate amount not to exceed $5,000,000 (the "second $5,000,000"); and

*Third*, after distribution of the first $5,000,000 and the second $5,000,000 as contemplated by the previous paragraphs, to the extent any Cash remains to be distributed, to the 1974 Pension Plan and Holders of Allowed General Unsecured Claims of such Entity's Pro Rata share (based upon the total face amount of such Entity's Allowed Claim relative to the total face amount of Allowed General Unsecured Claims plus the 1974 Pension Plan Allowed Administrative Claim to the extent not paid in full).

In consideration for their rights to receive any excess Cash distributions, Holders of Allowed Prepetition LC Facility Claims, Allowed Prepetition Term Loan Facility Claims, Allowed or Disputed General Unsecured Claims, and the 1974 Pension Plan shall be deemed to have stipulated that the Debtors shall have sole discretion to

determine, fund, and/or pay all emergence costs set forth in this Article IV.U so long as the Debtors (or their agents) exercise such determination in a manner consistent with their fiduciary duties; provided, that, the Debtors (or their agents) shall be entitled to rely upon the advice of counsel concerning their (or their agents') duties pursuant to, or in connection with, the determination, funding, and/or payment of the emergence costs set forth in this Article IV.U.

For the avoidance of doubt, the excess Cash described in the first paragraph of this Article IV.U shall not include any of the $32.5 million in Cash provided to the Debtors in connection with the Combined Company 1.5 Lien Term Loan, which $32.5 million will be used solely in accordance with Section 2.06(c) of the Blackhawk APA.

*V. WVDEP Settlement*

The Plan implements the terms of the WVDEP Settlement in accordance with the WVDEP Settlement Term Sheet. Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and consistent with section 1129 of the Bankruptcy Code, the Plan shall constitute a motion for approval of, and the Confirmation Order shall constitute Bankruptcy Court approval of, the WVDEP Settlement. An executed copy of the WVDEP Settlement shall be Filed with the Bankruptcy Court prior to the Effective Date.

*W. Coal Act Settlement*

The Plan gives effect to the Coal Act Stipulation, and consummation of the Blackhawk Transaction and the VCLF Transaction shall qualify as a sale of substantially all of the Debtors' operating assets as contemplated by the Coal Act Stipulation.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A. Assumption and Assignment of Executory Contracts and Unexpired Leases*

On the Effective Date, the Debtors shall assume and assign the Assumed Contracts and Assumed Leases (each as defined in the Blackhawk APA) to the Combined Company. In addition, on the Effective Date, the Debtors shall assume such Executory Contracts to be assumed and assigned to VCLF or the Liquidating Trust, as applicable.

The Plan Supplement shall contain the Schedule of Assumed Executory Contracts and Unexpired Leases. The Debtors may, at any time on or prior to the Effective Date, amend the Schedule of Assumed Executory Contracts and Unexpired Leases in compliance with and in the manner set forth in the Blackhawk Transaction Documents, the VCLF Transaction Documents, or the Liquidating Trust Agreement, as applicable. Notwithstanding anything to the contrary in the Plan, unless otherwise approved in writing in advance by Blackhawk or VCLF, as applicable, the Debtors shall not assume and assign to the Combined Company or VCLF any employment agreement and employee benefit plan except for those employment agreements and employee benefit plans specifically set forth in the Blackhawk Transaction Documents or the VCLF Transaction Documents and, with respect to such employment agreements, only if the employee counterparty thereto executes and delivers to the Debtors and the Combined Company of VCLF, as applicable, an amendment, consent and acknowledgment agreement described in the Blackhawk Transaction Documents in form and substance acceptable to Blackhawk or VCLF, as applicable.

The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions and assignments or rejections described above as of the Effective Date. Unless otherwise indicated, all assumptions and assignments or rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed and assigned pursuant to the Plan or by Bankruptcy Court order, shall vest in and be fully enforceable by the applicable assignee in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

Notwithstanding the foregoing paragraph or anything contrary herein, but subject to the terms of the Blackhawk Transaction Documents or the VCLF Transaction Documents, as applicable, the Debtors, Blackhawk, and VCLF reserve their respective rights to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified in the Plan Supplement prior to the Confirmation Date.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to this Plan (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (1) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (2) any Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease, or (3) the Confirmation or consummation of this Plan, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

For the avoidance of doubt, any Executory Contract or Unexpired Lease not expressly assumed or assumed and assigned pursuant to this Plan (including the Plan Supplement) shall be deemed rejected as of the Effective Date.

*B. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Executory Contracts or Unexpired Leases to be assumed and assigned pursuant to the Plan, the Blackhawk Transaction Documents, and the VCLF Transaction Documents that are, or may be, alleged to be in default, shall be satisfied solely by payment of the Cure Cost or by an agreed-upon waiver of the Cure Cost on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the Combined Company or VCLF, as applicable, and the counterparties to each such Executory Contract or Unexpired Lease may otherwise agree.

The Debtors caused notices of proposed assumptions and assignments to the Combined Company and proposed Cure Costs and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court to be served on applicable counterparties. The Debtors will cause notices of proposed assumptions assignments to VCLF and proposed Cure Costs and for procedures thereto and resolution of disputes by the Bankruptcy Court to be served on applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Cost must be Filed, served and actually received by the Debtors by the Confirmation Objection Deadline. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost will be deemed to have assented to such matters.

In the event of a dispute regarding: (1) the amount of any Cure Cost; (2) the ability of the Combined Company or VCLF to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption and/or assignment, then such Cure Costs shall be paid following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or Unexpired Leases or as may be agreed upon the Debtors, the Combined Company, or VCLF, as applicable, and the counterparty to such Executory Contract or Unexpired Lease; provided, that, the party who is liable for such cure cost shall have the authority to settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Subject to any cure claims Filed with respect thereto, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order

shall be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

*C. Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Notice and Claims Agent no later than thirty days after the effective date of rejection of such Executory Contract or Unexpired Lease.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Combined Company, VCLF, or their property, without the need for any objection by the Debtors or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.F hereof. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B hereof.

Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to, action, order, or approval of the Bankruptcy Court.

*D. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Combined Company and VCLF each expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors, the Combined Company, or VCLF, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

*E. Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, the Blackhawk Transaction Documents, and the VCLF Transaction Documents, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan, the Blackhawk Transaction Documents, or the VCLF Transaction Documents. Nothing in the immediately preceding sentence shall be deemed to limit, supersede or change the provisions set forth in Article V.G.

*F. Insurance Policies*

Except with respect to those insurance policies and any agreements, documents or instruments relating thereto that are listed on the Schedule of Assumed Executory Contracts and Unexpired Leases or acquired by Blackhawk pursuant to the Blackhawk APA or VCLF pursuant to the VCLF APA, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto shall be treated as Executory Contracts of the applicable Debtor under the Plan and the Bankruptcy Code and shall be assumed by the applicable Debtor and assigned to the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement and the Plan. For the avoidance of doubt, any insurance policies, the rights to the proceeds with respect to which are acquired by Blackhawk pursuant to the Blackhawk APA, shall be subject in all respects to section 2.01(l) of the Blackhawk

APA. For the avoidance of doubt, any insurance policies, the rights to the proceeds with respect to which are acquired by VCLF pursuant to the VCLF APA, shall be subject in all respects to section 2.01(l) of the VCLF APA.

*G. Compensation and Benefit Programs*

All employment and severance policies, and all compensation and benefit plans, policies and programs of the Debtors applicable to their respective employees, retirees and directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as Executory Contracts under the Plan and on the Effective Date will be listed on the Schedule of Assumed Executory Contracts and Unexpired Leases and will be rejected unless any of the foregoing is a Blackhawk Purchased Asset or a VCLF Purchased Asset, as applicable, in accordance with the Blackhawk Transaction Documents or the VCLF Transaction Documents, as applicable, in which case the same shall be assumed and assigned to Combined Company or VCLF, as applicable, pursuant to the terms of the Plan and Blackhawk Transaction Documents or VCLF Transaction Documents, as applicable.

*H. Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, the Blackhawk Transaction Documents, or the VCLF Transaction Documents, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Combined Company or VCLF, as applicable, has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Combined Company, or VCLF, as applicable, shall have ninety days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

*I. Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A. Timing and Calculation of Amounts to Be Distributed or Paid*

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions and payments that the Plan provides for Allowed Claims in the applicable Class from the Debtors or Liquidating Trustee, as applicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided herein, and other than with respect to Claims satisfied through the issuance of Combined Company Debt Facilities, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary herein, but subject to the Intercreditor Agreements, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any postpetition interest on such Claim payable in accordance with the Plan. For the avoidance of doubt, nothing herein shall modify the treatment of Claims and Interests set forth in Article III.B of the Plan.

B. *Undrawn LC Facility Claims Reserve*

Amounts to be paid with respect to, or on account of, the Prepetition LC Facility Distribution shall be subject to the Undrawn LC Facility Claims Reserve as set forth herein. A portion of the Prepetition LC Facility Distribution (but excluding the Prepetition LC Facility Rights) shall be held in reserve (the "Undrawn LC Facility Claims Reserve") together with all earnings thereon, if any (net of any expenses relating thereto, such expenses including any taxes imposed thereon or otherwise payable by the reserve), to be distributed on the Prepetition LC Facility Final Distribution Date, as required by this Plan. The Undrawn LC Facility Claims Reserve Agent shall hold in the Undrawn LC Facility Claims Reserve all dividends, payments, and other distributions made on account of, as well as any obligations arising from, the property held in the Undrawn LC Facility Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise.

The Undrawn LC Facility Claims Reserve Agent shall reserve the Pro Rata share (based upon the total amount of Undrawn LC Facility Claims as of the Effective Date relative to the total amount of Prepetition LC Facility Claims) of the Prepetition LC Facility Distribution (but excluding the Prepetition LC Facility Rights) for potential distribution on account of the Undrawn LC Facility Claims. After all Undrawn LC Facility Claims have become either Allowed Claims or disallowed Claims, the Undrawn LC Facility Claims Reserve Agent shall effect a final distribution to all Holders of Allowed Undrawn LC Facility Claims. The Undrawn LC Facility Claims Reserve shall be closed and extinguished by the Undrawn LC Facility Claims Reserve Agent when all distributions required to be made hereunder shall have been made in accordance with the terms of this Plan. Upon closure of the Undrawn LC Facility Claims Reserve, the Undrawn LC Facility Claims Reserve Agent shall distribute to the Holders of Allowed Prepetition LC Facility Claims (including, without limitation, Allowed Undrawn LC Facility Claims) each Holder's Pro Rata share (based upon the face amount of such Holder's Allowed Prepetition LC Facility Claim relative to the total face amount of all Allowed Prepetition LC Facility Claims) of the remaining amount, if any, of the Prepetition LC Facility Distribution held in the Undrawn LC Facility Claims Reserve; provided, that, to the extent a Combined Company Second Lien Term Loan that is part of the Prepetition LC Facility Distribution has not been actually distributed to a Holder of an Allowed Prepetition LC Facility Claim in accordance with the Plan, such Combined Company Second Lien Term Loan shall be deemed to vote under the definitive documentation for the Combined Company Second Lien Term Loan in the same proportion as all other Combined Company Second Lien Term Loans (for the avoidance of doubt, distribution of a Combined Company Second Lien Term Loan to the Undrawn LC Facility Claims Reserve Agent shall not constitute a distribution to a Holder of an Allowed Prepetition LC Facility Claim unless and until the Undrawn LC Facility Claims Reserve Agent actually distributes such Combined Company Second Lien Term Loan to such Holder of an Allowed Prepetition LC Facility Claim). For the avoidance of doubt, this Article VI.B is subject to Article VI.E hereof.

C. *Distributions and Payments Generally*

All distributions and payments under the Plan that are to be made on the Effective Date, if any, shall be made by the Debtors, or to the extent applicable, by the Combined Company or the respective administrative agent in respect of any Combined Company Debt Facilities issued in satisfaction of any Claims. Distributions and payments made after the Effective Date shall be made by the Liquidating Trustee in accordance with the Liquidating Trust Agreement.

D. *Distributions and Payments of the Purchase Price Paid Pursuant to the Blackhawk APA*

Notwithstanding anything to the contrary contained herein, the Purchase Price (as such term is defined in the Blackhawk Transaction Documents) that is delivered to the Debtors shall be used solely to make distributions and payments under the Plan, whether or not such distributions and payments are made on the Effective Date or thereafter; provided, that, for the avoidance of doubt, the Purchase Price (as such term is defined in the Blackhawk Transaction Documents) that is delivered to the Debtors shall be payable on the closing date of the transactions contemplated by the Blackhawk Transaction Documents.

E. *Undeliverable Distributions and Unclaimed Property*

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at

which time such distribution shall be made to such Holder without interest; provided, that, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date. After such date, all unclaimed property or interests in property shall be cancelled or be transferred in accordance with the Liquidating Trust Agreement automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred. For the avoidance of doubt, unclaimed property or interests associated with the Blackhawk Transaction shall be canceled.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A. *Resolution of Disputed Claims*

1. Allowance of Claims

On or after the Effective Date, the Liquidating Trustee, the Combined Company, or VCLF, as applicable, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed as of the Effective Date. Except as expressly provided in the Plan, in the Blackhawk Transaction Documents, the VCLF Transaction Documents, or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order or the DIP Orders, in the Chapter 11 Cases allowing such Claim.

2. Prosecution of Objections to Claims

The Debtors prior to and on the Effective Date or the Liquidating Trustee after the Effective Date shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. From and after the Effective Date, the Liquidating Trustee shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3. Claims Estimation

Prior to and on the Effective Date, the Debtors, and after the Effective Date, the Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate (1) any Disputed Claim pursuant to applicable law and (2) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Liquidating Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtors or the Liquidating Trustee may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a

motion requesting the right to seek such reconsideration on or before twenty-one days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

4. Disputed Claims Reserve

On or prior to the Effective Date, the Disbursing Agent shall be authorized, but not directed, to establish one or more Disputed Claims Reserves, which Disputed Claims Reserve shall be administered by the Disbursing Agent. The Disbursing Agent may, in its sole discretion, hold Cash or such other consideration the Debtors determines appropriate after consultation with the Consultation Parties in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed after the Effective Date. The Disbursing Agent shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Disputed Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Disputed Claims as such amounts would have been distributable had such Disputed Claims been Allowed Claims as of the Effective Date.

When all Disputed Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent Cash or such other consideration the Debtors determines appropriate after consultation with the Consultation Parties remains in the Disputed Claims Reserve after all Holders of Disputed Claims that have become Allowed and have been paid the full amount they are entitled to pursuant to the treatment set forth for the appropriate Class under the Plan, then such excess Cash or such other consideration shall be distributed (a) if the Payout Event occurs, as part of the Payout Event Cash Pool in accordance with Article III hereof or (b) if the Payout Event does not occur, to the Combined Company to the extent such excess Cash was provided in connection with the Combined Company 1.5 Lien Term Loan. For the avoidance of doubt, the Disputed Claims Reserve may be funded with Cash or such other consideration the Debtors determine is appropriate after consultation with the Consultation Parties to address disputes regarding the nature, extent, and value of certain assets the Committee submits to be unencumbered assets.

The preceding two paragraphs shall be subject to Section 2.06(c) of the Blackhawk APA.

5. Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Debtors or the Liquidating Trustee and any Claim that has been amended may be adjusted thereon by the Debtors or the Liquidating Trustee in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

6. Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

*B. Disallowance of Claims*

All Claims of any Entity from which property is sought by the Debtors or the Liquidating Trustee under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Liquidating Trustee allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Liquidating Trustee on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

Notwithstanding anything to the contrary herein, the Debtors or the Liquidating Trustee, as applicable, shall not allow, disallow, estimate, dispute, prosecute an objection or take any other action with respect to a Claim that is

an Assumed Liability, unless expressly provided for in the Blackhawk APA or otherwise consented to by Blackhawk.

**EXCEPT AS OTHERWISE AGREED BY THE DEBTORS ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

*C. Amendments to Claims*

On or after the Effective Date, except as provided in Article II.A hereof, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Liquidating Trustee and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

*A. Discharge of Claims and Termination of Interests*

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan or in any contract, instrument, or other agreement or document created pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trustee may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities (other than such Claims or Causes of Action that are Purchased Assets).

***B. Release of Liens***

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged.**

***C. Debtor Release***

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to this Plan, for good and valuable consideration, on and after the Effective Date, the Debtors and their Estates shall release each Debtor Released Party, and each Debtor Released Party shall be deemed released and discharged by the Debtors and their Estates, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility, the Blackhawk Transaction, the Prepetition Facilities, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Debtor Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Debtor Released Party that constitutes willful misconduct, bad faith, or gross negligence, each solely to the extent determined by a Final Order. For the avoidance of doubt, in no circumstance shall Peabody, Arch, or Alcoa be Debtor Released Parties. Notwithstanding anything to the contrary in the foregoing, the Debtor Release shall not release any obligations of any Debtor Released Party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Debtor Released Parties; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

***D. Third Party Release***

**As of the Effective Date, except as otherwise provided in the Plan, including, without limitation, Article IV.H of the Plan, or in any contract, instrument or other agreement or document created pursuant to this Plan, the Releasing Parties, shall release the Debtors, their Estates, and the Released Parties, and each of the Debtors, their Estates, and the Released Parties shall be deemed released, from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the DIP Facility, the Blackhawk Transaction, the Blackhawk Transaction Documents, the VCLF Transaction, the VCLF Transaction Documents, the Prepetition Facilities, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released**

**Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Debtor Releasee that constitutes willful misconduct, bad faith, or gross negligence. For the avoidance of doubt, in no circumstance shall Peabody, Arch, or Alcoa be Released Parties. Notwithstanding anything to the contrary in the foregoing, the Third Party Release shall not release any obligations of any Released Party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Third Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third Party Release.**

***E. Exculpation***

**Except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to this Plan, no Exculpated Party shall have or incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Blackhawk Transaction Documents, the VCLF Transaction Documents, the Restructuring Transactions, the DIP Facility, the Prepetition Facilities, the issuance, distribution, and/or sale of the Combined Company 1.5 Lien Class B Units or any other security offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided, that,* each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; *provided, further, that,* the foregoing Exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, bad faith, or willful misconduct. For the avoidance of doubt, in no circumstance shall Peabody, Arch, or Alcoa be Exculpated Parties.**

***F. Injunction***

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan (including any obligations under the Prepetition Facilities, the Combined Company 1.5 Lien Class B Units, and documents and instruments related thereto), or Confirmation Order, all Entities who have held, hold, or may hold claims, interests, or Liens that have been discharged pursuant to Article VIII.A, released pursuant to Article VIII.B, Article VIII.C, or Article VIII.D, or are subject to exculpation pursuant to Article VIII.E are, to the fullest extent provided under Section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Liquidating Trust, the Combined Company, the Debtor Released Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any**

**such claims or interests unless such Entity has timely asserted such setoff right prior to the Effective Date in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

*G. Protections Against Discriminatory Treatment*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or the Combined Company, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, the Combined Company, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*H. Setoffs*

Except as otherwise expressly provided for in the Plan or in any court order, each Debtor or the Combined Company (as applicable), pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may (but shall not be required to) set off against any Allowed Claim (other than the DIP Claims, Prepetition ABL Facility Claims, Prepetition LC Facility Claims, Prepetition Term Loan Claims, and Prepetition Notes Claims) and the distributions to be made pursuant to the Plan on account of such Allowed Claim (other than the DIP Claims, Prepetition ABL Facility Claims, Prepetition LC Facility Claims, Prepetition Term Loan Claims, and Prepetition Notes Claims) (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or the Combined Company (as applicable) may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, that, neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or the Combined Company of any such claims, rights, and Causes of Action that such Debtor or the Combined Company may possess against such Holder. In no event shall any Holder of Claims be entitled to setoff any Claim against any claim, right, or Cause of Action of any of the Debtors or the Combined Company unless such Holder has timely Filed a Proof of Claim with the Bankruptcy Court preserving such setoff right, unless such Holder is otherwise not required to File a Proof of Claim pursuant to a Final Order.

*I. Recoupment*

In no event shall any Holder of a Claim be entitled to recoup any Claim against any claim, right, or Cause of Action of any of the Debtors or the Combined Company unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*J. Document Retention*

On and after the Effective Date, the Debtors (or the Liquidating Trustee, as the case may be) shall maintain documents in accordance with the Blackhawk Transaction Documents and the VCLF Transaction Documents and otherwise may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors (or the Liquidating Trust, as the case may be).

*K. Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

*A. Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1. The Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and the DIP Lenders, in consultation with the Consultation Parties, and satisfactory to Blackhawk and VCLF in accordance with the Blackhawk APA and VCLF APA, respectively, and such Confirmation Order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

2. The Plan and Plan Supplement, including any amendments, modifications, or supplements thereto shall be in form and substance acceptable to the Debtors and the DIP Lenders, in consultation with the Consultation Parties, and satisfactory to Blackhawk and VCLF in accordance with the Blackhawk APA and VCLF APA, respectively;

3. The Blackhawk APA shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the Blackhawk APA shall have been waived or satisfied in accordance with the terms thereof and the closing of the Blackhawk Transaction shall have occurred or shall occur concurrently with the Effective Date;

4. The VCLF APA shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of the VCLF APA shall have been waived or satisfied in accordance with the terms thereof and the closing of the VCLF Transaction shall have occurred or shall occur concurrently with the Effective Date; provided, however, that this condition to the Effective Date may be waived only (a) by consent of the Debtors, the DIP Lenders, Blackhawk, VCLF, and the Environmental Parties in consultation with the Consultation Parties or (b) pursuant to a Final Order entered by the Bankruptcy Court;

5. All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

6. All documents and agreements necessary to implement this Plan, the Blackhawk Transaction, including the Combined Company Debt Documents and the Blackhawk LLC Agreement, and the VCLF Transaction shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements or shall occur concurrently with the Effective Date;

7. The WVDEP Settlement, in a final form acceptable to the DIP Lenders in their sole and absolute discretion, shall have been executed, consummated, and become effective in accordance with its terms; provided,

however, that, for the avoidance of doubt, this condition to the Effective Date may not be waived pursuant to Article IX.B hereof; and

8. The DIP Lenders agree to the refinancing or the roll over of the DIP Facility and satisfaction of all DIP Claims pursuant to the terms of the Blackhawk Transaction Documents (in form and substance satisfactory to the DIP Lenders in their sole and absolute discretion).

*B. Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors, the DIP Lenders, Blackhawk (solely as applicable with respect to Article IX.A), and VCLF (solely as applicable with respect to Article IX.A) in consultation with the Consultation Parties; provided, however, that the condition to the Effective Date set forth in Article IX.A.7 may not be waived pursuant to this Article IX.B; provided, further, that, the condition to the Effective Date set forth in Article IX.A.4 may be waived only as set forth therein.

*C. Effective Date*

The Effective Date shall be the first Business Day upon which all of the conditions specified in Article IX.A hereof have been satisfied or waived. "Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

*D. Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, the DIP Lenders, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

*A. Modification and Amendments*

Subject to the limitations contained herein, section 1127 of the Bankruptcy Code, and Bankruptcy Rule 3019, the Debtors reserve the right to modify, with the consent of the DIP Lenders and the Consultation Parties, the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan; provided, that, any material amendment or modifications to the form or substance of the Combined Company New ABL from the version Filed as part of the Plan Supplement, and any amendment or modifications to this proviso, shall require the approval of the Prepetition ABL Agent to the extent the Prepetition New ABL Secured Parties are provided the treatment contemplated in Article III.B.4(c)(i) or Article III.B.4(c)(ii)(B). Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X hereof.

*B. Payout Event*

The Plan contemplates the possibility of the Debtors implementing the Payout Event. If the Payout Event occurs, the Debtors may File a modified Plan evidencing the Payout Event and shall not be required to make

additional disclosures or re-solicit votes for such modified Plan pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 so long as (1) the Payout Event Cash is sufficient to pay all Allowed Prepetition ABL Facility Claims in full in Cash (including by cash collateralizing any Prepetition ABL Undrawn LCs on terms and amounts acceptable to the issuers thereof and the Prepetition ABL Agent) and (2) such modified Plan provides for such payment in full and in Cash of the Allowed Prepetition ABL Facility Claims; (3) such Payout Event Cash is sufficient to pay all DIP Claims in full in Cash; and (4) such modified Plan provides for such payment in full in Cash of the DIP Claims.[3] Pursuant to this Article X.B of the Plan, the Prepetition LC Agent reserves its right to challenge the implementation of the Payout Event, including the proposed distribution to Holders of Claims contemplated therefrom.

*C. Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the DIP Lenders, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including without limitation jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

---

3 For the avoidance of doubt, if the Payout Event occurs, the Blackhawk APA Break-Up Fee and Expense Reimbursement shall be payable in accordance with the terms of the Blackhawk APA and the Bidding Procedures Order.

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to Causes of Action;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code, including the Confirmation Order and approval of, and the findings regarding, the Blackhawk Transaction and the VCLF Transaction;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, the Blackhawk Transaction Documents, the VCLF Transaction Documents, or any actions or courses of dealing related thereto that occurred on or prior to the Effective Date;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, the Blackhawk Transaction Documents, or the VCLF Transaction Documents;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

13. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

14. adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated herein;

15. adjudicate any and all disputes arising from or relating to the Liquidating Trust;

16. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20. hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any

employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21. enforce all orders previously entered by the Bankruptcy Court;

22. to resolve any disputes arising under, or enforce the terms and conditions of, the Blackhawk Transaction Documents, the VCLF Transaction Documents, or Liquidating Trust Agreement, as applicable;

23. hear any other matter not inconsistent with the Bankruptcy Code, including, without limitation, any matters that may arise in connection with, or related to, the Blackhawk Transaction Documents or the VCLF Transaction Documents;

24. enter an order concluding or closing the Chapter 11 Cases; and

25. enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

Notwithstanding anything in this Article XI to the contrary, any disputes arising under or in connection with the Combined Company Debt Documents or the Blackhawk LLC Agreement will be governed by the provisions contained in the applicable Combined Company Debt Documents or the Blackhawk LLC Agreement, as applicable.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A. Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors; the Liquidating Trust; Blackhawk; VCLF; any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan); all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, the Blackhawk Transaction Documents, or the VCLF Transaction Documents; each Entity acquiring property under the Plan or the Confirmation Order; and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

*B. Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, the Blackhawk Transaction Documents, and the VCLF Transaction Documents. The Debtors or the Liquidating Trust, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, the Blackhawk Transaction Documents, and the VCLF Transaction Documents.

*C. Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtors (prior to or on the Effective Date) or the Liquidating Trust (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D. *Dissolution of the Committee and the Retiree Committee*

On the Effective Date, the Committee and the Retiree Committee shall dissolve automatically; provided, however, that, following the Effective Date, the Committee and the Retiree Committee, as applicable, shall continue in existence and have standing and a right to be heard with respect to any of the following: (1) Claims and/or applications for allowance of Professional Fee Claims and requests for allowance of Administrative Claims including, but not limited to, filing Professional Fee Claims in accordance with Article II.B hereof; (2) any appeals of the Confirmation Order that remain pending as of the Effective Date and/or to which the Committee or the Retiree Committee, as applicable, is a party; and (3) any adversary proceedings or contested matters pending as of the Effective Date to which the Committee or the Retiree Committee, as applicable, is a party.

E. *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Liquidating Trust shall be served on:

Patriot Coal Corporation
63 Corporate Centre Drive
Scott Depot, West Virginia 25560
Attn: Joseph W. Bean

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Stephen E. Hessler, Esq. and Patrick Evans, Esq.

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn: Ross M. Kwasteniet, Esq. and Justin R. Bernbrock, Esq.

Kutak Rock LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Attn: Michael A. Condyles, Esq.

*H. Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*I. Entire Agreement*

Except as otherwise provided herein or therein, this Plan (including the Plan Supplement), the Blackhawk Transaction Documents, and the VCLF Transaction Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan (including the Plan Supplement), the Blackhawk Transaction Documents, and the VCLF Transaction Documents.

*J. Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

*K. Request for Court Hearing and Right to Be Heard*

Notwithstanding whether or not a matter requires the consultation of Blackhawk, the DIP Lenders, the Consultation Parties, or the Combined Company under this Plan, the Debtors, the DIP Lenders, the Consultation Parties, and the Combined Company shall have the right to request a hearing, and be heard as a party in interest under section 1109(b) of the Bankruptcy Code, before the Bankruptcy Court on any and all matters arising under or in connection with or related to this Plan, the Blackhawk Transaction Documents, or the VCLF Transaction Documents.

*L. Powers of Combined Company*

From and after the Effective Date and continuing through the date of entry of a final decree closing these Chapter 11 Cases, the Combined Company shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to these Chapter 11 Cases and, in connection therewith, shall (1) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts, (2) be entitled to notice and an opportunity for hearing on all such issues, (3) participate in all matters brought before the Bankruptcy Court, and (4) receive notice of all applications, motions, and other papers and pleadings Filed in the Bankruptcy Court.

Respectfully submitted, as of the date first set forth above,

Patriot Coal Corporation (for itself and all Debtors)

By: *<u>/s/ Ray Dombrowski</u>*
Name: Ray Dombrowski
Title: Chief Restructuring Officer

# EXHIBIT Q

POTTER ANDERSON & CORROON LLP
David J. Baldwin (*pro hac vice pending*)
R. Stephen McNeill (*pro hac vice pending*)
1313 N. Market Street, 7th Floor
Wilmington, DE 19801
Phone: (302) 984-6100
Fax: (302) 658-1192
dbaldwin@potteranderson.com
rmcneill@potteranderson.com

*Counsel for Pocahontas Land Corporation*

SETLIFF & HOLLAND, P.C.
Ryan F. Furgurson (VSB No. 72133)
4940 Dominion Boulevard
Glen Allen, VA 23060
Phone: (804) 377-1275
Fax: (804) 377-1295
rfurgurson@setliffholland.com

*Local Counsel for Pocahontas Land Corporation*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PATRIOT COAL CORPORATION, *et al.* | Case No. 15-32450 (KLP) |
| Debtors. | (Jointly Administered) |

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF POCAHONTAS LAND CORPORATION REGARDING DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE SALE OF ASSETS PURSUANT TO THE BIDDING PROCEDURES, (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND (D) GRANTING RELATED RELIEF**

Pocahontas Land Corporation ("PLC"), by and through its undersigned counsel, hereby objects (the "Limited Objection") to the *Debtors' Motion for Entry of an Order (A) Approving the Sale of Assets Pursuant to the Bidding Procedures, (B) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [D.I. 200] (the "Sale Motion") and, in particular, the cure amounts set forth on the *Notice of Proposed Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* received by PLC's counsel via email on or

about July 28, 2015 (the "Cure Notice"). In support of the Limited Objection, PLC respectfully states as follows:

1. PLC is a counterparty to Debtor, Eastern Royalty, LLC, under the various leases identified in the Cure Notice (the "PLC Leases"). The Cure Notice proposes an aggregate cure amount of $198,770.20 in connection with the PLC Leases (each such listed amount, the "Proposed Cure Amount," and collectively the "Proposed Cure Amounts").

2. Based on information currently available to it, PLC agrees that the Proposed Cure Amounts as of the date of the filing of this Limited Objection are the proper cure amounts for each PLC Lease. Nevertheless, additional cure amounts may continue to accrue under the PLC Leases if such amounts are not paid by the Debtors going forward, and PLC reserves the right to assert these additional cure amounts through the date the PLC Leases are ultimately assumed by the Debtors and assigned to a purchaser of the Debtors' assets.

3. Further, and for the avoidance of doubt, PLC submits that in addition to the payment of the Proposed Cure Amounts, any assumption of the PLC Leases must also include the assumption of all contingent, unmatured and/or unliquidated obligations under the PLC Leases, including, specifically, and without limitation, any indemnification obligations. Whether this objection is properly classified as a cure obligation or an objection to the adequate assurance of future performance requirement required under section 365(b)(1)(C), this issue must be resolved in connection with any assumption of the PLC Leases. Although PLC submits that assumption of the PLC Leases necessarily (and automatically by operation of law) includes the assumption of all these obligations, PLC reserves the right to supplement this Limited Objection in the event that an agreement cannot be reached with the Debtors and/or any purchaser of the Debtors' assets regarding the assumption and/or assignment of the PLC Leases.

WHEREFORE, PLC requests that the Court enter an order (i) conditioning the assumption and/or assignment of the PLC Leases on the payment of the Proposed Cure Amounts plus any other outstanding obligations incurred by the Debtors through the date of assumption, unless otherwise agreed to by PLC; (ii) clarifying that the assumption of the PLC Leases includes the assumption of all contingent, unmatured and/or unliquidated obligations under the PLC Leases; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: August 10, 2015

**SETLIFF & HOLLAND, P.C.**

/s/ Ryan Furgurson
Ryan Furgurson (VA No. 72133)
Setliff & Holland, P.C.
4940 Dominion Boulevard
Glen Allen, VA 23060
Phone: (804) 377-1275
Fax: (804) 377-1295
rfurgurson@setliffholland.com

David J. Baldwin (DE Bar No. 1010)
R. Stephen McNeill (DE Bar No. 5210)
**POTTER ANDERSON & CORROON LLP**
1313 North Market Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 984-6033
Fax: (302) 658-1192

*Attorneys for Pocahontas Land Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2015, I filed the foregoing Limited Objection using the Court's ECF system, and caused a true and correct copy of the same to be served on the "2002 List" pursuant to the Court's Order Establishing Certain Notice, Case Management, and Administrative Procedures (dkt. 79).

_/s/ Ryan Furgurson_______________
Ryan F. Furgurson, VSB No. 72133
rfurgurson@setliffholland.com
SETLIFF & HOLLAND, P.C.
4940 Dominion Boulevard
Glen Allen, Virginia 23060
Telephone: (804) 377-1275
Facsimile: (804) 377-1295

# EXHIBIT R

POTTER ANDERSON & CORROON LLP
David J. Baldwin (*pro hac vice pending*)
R. Stephen McNeill (*pro hac vice pending*)
1313 N. Market Street, 7th Floor
Wilmington, DE 19801
Phone: (302) 984-6100
Fax: (302) 658-1192
dbaldwin@potteranderson.com
rmcneill@potteranderson.com

*Counsel for Pocahontas Land Corporation*

SETLIFF & HOLLAND, P.C.
Ryan Furgurson (VSB No. 72133)
4940 Dominion Boulevard
Glen Allen, VA 23060
Phone: (804) 377-1275
Fax: (804) 377-1295
rfurgurson@setliffholland.com

*Local Counsel for Pocahontas Land Corporation*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PATRIOT COAL CORPORATION, *et al.* | Case No. 15-32450 (KLP) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL CURE OBJECTION AND RESERVATIONS OF RIGHTS OF POCAHONTAS LAND CORPORATION**

Pocahontas Land Corporation ("PLC"), by and through its undersigned counsel, hereby supplements (the "Supplemental Objection") its previously filed *Limited Objection and Reservation of Rights of Pocahontas Land Corporation Regarding Debtors' Motion for Entry of an Order (A) Approving the Sale of Assets Pursuant to the Bidding Procedures, (B) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [D.I. 771] (the "Limited Objection"). In support of the Supplemental Objection, PLC respectfully states as follows:

**A. The Blackhawk Leases**[1]

1. In the Limited Objection, PLC agreed with the cure amounts set forth on the *Notice of Proposed Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* received by PLC's counsel via email on or about July 28, 2015 (the "Cure Notice"), but expressly reserved its rights to assert additional cure amounts for amounts that continued to accrue under its leases with the Debtors.

2. Consistent with its position in its Limited Objection, PLC's counsel contacted Debtors' counsel on September 4, 2015 regarding additional amounts that were now owed under the Blackhawk Leases. Upon receiving notice that Vossloh Track Material, Inc. had filed a notice of mechanic's lien on one of PLC's properties leased by the Debtors, PLC's counsel provided a further update on the cure amounts to Debtors' counsel on September 22, 2015. Finally, after PLC's receipt of a partial payment from the Debtors, PLC's counsel provided Debtors' counsel with updated cure amounts on the morning of Friday, September 25, 2015. The Debtors filed their Plan Supplement later that evening. Despite PLC's diligence in notifying the Debtors of its updated cure amounts, the Plan Supplement listed the same cure amounts that were originally identified in the Cure Notice.

**B. The VCLF Lease**

3. In addition to the Blackhawk Leases, PLC is also responsible for a fourth lease with Debtor, Robin Land Company, LLC, which is identified on page 13 of the list of assumed

[1] The "Blackhawk Leases" are the three leases listed under PLC on page 12 of the assumed contract list that was filed by the Debtors in their plan supplement on September 25, 2015 (the "Plan Supplement"). Although the Plan Supplement continues to identify Debtor, Eastern Associated Coal, LLC ("Eastern") as a contract counterparty to one of the PLC Leases, Eastern assigned its rights and obligations under that particular lease to Eastern Royalty, LLC pursuant to that certain Assumption and Assignment Agreement, effective as of December 18, 2013. Accordingly, Eastern Royalty, LLC is the proper Debtor party under all of the Blackhawk Leases.

contracts in the Plan Supplement under the name "SRIR (Pocahontas Land)" (the "VCLF Lease"). This lease was originally identified for potential rejection in the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases, Effective* Nunc Pro Tunc *to August 13, 2015, and (B) Granting Related Relief* [D.I. 820] (the "Rejection Motion"). Despite being listed for rejection, the VCLF Lease was also listed as a lease to be assumed on Schedule 3.06(A)(I) to the VCLF Asset Purchase Agreement that was filed a mere three days later on August 20, 2015. *See* D.I. 807, at 285.

4. Given the confusion created by the VCLF Lease being simultaneously subject to both assumption and rejection, PLC's counsel immediately reached out to Debtors' counsel for clarity regarding the Debtors' intentions with respect to the VCLF Lease. After several extensions of PLC's objection deadline, the Debtors' listed the VCLF Lease for assumption when it filed the Plan Supplement. As a result of this final decision, Debtors' counsel has informed PLC's counsel that the Rejection Motion will be withdrawn with respect to PLC.[2]

5. Although PLC never received a cure notice in connection with the VCLF Lease and was not made aware of the Debtors' final intentions to assume the VCLF Lease until late Friday evening, PLC's counsel has previously provided cure information for the VCLF Lease at the same times it provided updated cure information for the Blackhawk Leases (as described in paragraph 2 above). Nevertheless, the cure amount listed in the Plan Supplement for the VCLF Lease does not accurately reflect additional obligations that have become due following the Petition Date.

6. While PLC remains hopeful that the cure amounts will be updated once the Debtors have had a chance to reconcile the information that PLC has provided, PLC files this

[2] As of the filing of this Supplemental Objection, this withdrawal has not occurred.

Supplemental Objection to document its longstanding discussions with the Debtors. The list of current cure amounts for the Blackhawk Leases and the VCLF Lease are attached hereto as **Exhibit A**.[3] This is the same information that has been previously shared with Debtors' counsel. To the extent additional amounts become due under the Blackhawk Leases and/or the VCLF Lease prior to the ultimate date of assumption, PLC reserves the right to assert these additional cure amounts.

---

[3] The first two leases listed on **Exhibit A** are the Blackhawk Leases. The third lease is the VCLF Lease. At this point, PLC has been unable to tie the fourth lease listed (Hobet Mining) to any lease that is being assumed by the Debtors.

WHEREFORE, PLC requests that the Court enter an order (i) conditioning the assumption and/or assignment of the Blackhawk Leases and the VCLF Lease on the payment of the cure amounts listed on **Exhibit A** hereto plus any other outstanding obligations incurred by the Debtors through the date of assumption, unless otherwise agreed to by PLC; and (ii) granting such other and further relief as the Court deems just and proper.

Dated: September 29, 2015

**SETLIFF & HOLLAND, P.C.**

/s/ Ryan Furgurson
Ryan Furgurson (VA No. 72133)
4940 Dominion Boulevard
Glen Allen, VA 23060
Phone: (804) 377-1275
Fax: (804) 377-1295
rfurgurson@setliffholland.com

-and-

David J. Baldwin (DE Bar No. 1010)
R. Stephen McNeill (DE Bar No. 5210)
**POTTER ANDERSON & CORROON LLP**
1313 North Market Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 984-6033
Fax: (302) 658-1192

*Attorneys for Pocahontas Land Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2015, I filed the foregoing Supplemental Cure Objection using the Court's ECF system, and caused a true and correct copy of the same to be served on the "2002 List" pursuant to the Court's Order Establishing Certain Notice, Case Management, and Administrative Procedures (dkt. 79).

_/s/ Ryan Furgurson_______________

Ryan F. Furgurson, VSB No. 72133
rfurgurson@setliffholland.com
SETLIFF & HOLLAND, P.C.
4940 Dominion Boulevard
Glen Allen, Virginia 23060
Telephone: (804) 377-1275
Facsimile: (804) 377-1295

# Patriot Coal

Itemization of pre-petition amounts owed to Pocahontas Land Corporation
Revised final amount of pre-petition amounts owed due to Hillside Mining Company, LLC mechanics lien filed August 19, 2015
The lessees involved pro-rated their May 2015 production to reflect pre and post-petition debt
Revised on 9/23/2015 to reflect partial payments received for 1st half 2015 R/E taxes for Eastern Royalty, Robin Land and Rhino (please note - no pymt has been received on Hobet so their amount did not change yet.

**As of 09/23/2015**

## Eastern Royalty LLC

### (Eastern Assoc. Coal Lease)

| AR Bill Number | Bill Type | Amount |
|---|---|---|
| 1504214 | March 2015 Minimum Rental | $1,773.97 |
| 1504216 | March 2015 Production Royalties | $6,559.36 |
| 1505210 | April 2015 Minimum Rental | $3,034.72 |
| 1505211 | April 2015 Production Royalties | $5,298.61 |
| 1506208 | May 2015 Minimum Rental (pro-rated) | $872.89 |
| 1506209 | May 20015 Production Royalties (pro-rated) | $2,084.10 |
| 1508085 | 1st Half 2015 R/E Taxes (after post petition payment) | $73,011.36 |
| | **Outstanding Balance** | **$92,635.01** |

### (Rhino Lease)

| AR Bill Number | Bill Type | Amount |
|---|---|---|
| 1503223 | 2015 Minimum Rental | $20,000.00 |
| 1504217 | March 2015 Production Royalties | $44,719.98 |
| 1504079 | April Interest Bill | $300.00 |
| 1505207 | April 2015 Production Royalties | $32,950.08 |
| 1505210 | May 2015 Production Royalties (pro-rated) | $16,332.62 |
| 1508115 | 1st Half 2015 R/E Taxes (after post petition payment) | $37,268.62 |
| 1508116 | Lease Year 7 Guaranteed Payment | $63,059.77 |
| | August 19, 2015 Mechanics Lien filed by Vossloh Track Material against Hillside Mining Company, LLC | $10,361.00 |
| | **Outstanding Balance** | **$224,992.07** |

## Robin Land (SRIR w/PLC as agent)

| AR Bill Number | Bill Type | Amount |
|---|---|---|
| 1505217 | April 2015 Production Royalties | $30,732.68 |
| 1506218 | May 2015 Production Royalties (pro-rated) | $33,293.83 |
| 1508106 | 1st Half 2015 R/E Taxes (after post petition payment) | $31,735.52 |
| | **Outstanding Balance** | **$95,762.03** |

## Hobet Mining, Inc. (NSRC w/PLC as agent)

| AR Bill Number | Bill Type | Amount |
|---|---|---|
| 1508091 | 1st Half 2015 R/E Taxes | $300.52 |
| | **Outstanding Balance** | **$300.52** |

**GRAND TOTAL OUTSTANDING BALANCE $413,689.63**

# EXHIBIT S

# COAL SUB-SUBLEASE

**THIS COAL SUB-SUBLEASE** (this "Sublease"), entered into effective as of this 21st day of December, 2015 ("Effective Date"), by and between **BLACKHAWK LAND AND RESOURCES, LLC,** a Delaware limited liability company, with principal offices and place of business at 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509 ("Sublessor"), and **CORONADO COAL II LLC,** a Delaware limited liability company, with principal offices and place of business at 57 Danbury Road, Wilton, CT 06897 ("Sublessee").

## RECITALS

**WHEREAS,** by Indenture of Lease dated July 1, 1937, Loup Creek Colliery Company leased to The Koppers Coal Company certain lands in Boone and Wyoming Counties, West Virginia, of record in the Office of the Clerk of the County Commission of Boone County, West Virginia, in Coal Lease Book 5, page 74 and the Office of the Clerk of the County Commission of Wyoming County, West Virginia, in Deed Book 88, page 328 (the "1937 Lease"); and

**WHEREAS**, by Supplemental Lease, dated August 21, 1941, Loup Creek Colliery Company amended the 1937 Lease to lease to The Koppers Coal Company two additional tracts of land situate on Toney Fork of Clear Fork of Guyandotte River, in Wyoming County, West Virginia; and

**WHEREAS**, by Deed of Assignment and Consent, dated December 9, 1941, The Koppers Coal Company assigned the 1937 Lease, as supplemented, to Eastern Gas and Fuel Associates, with the consent of Loup Creek Colliery Company; and

**WHEREAS**, by Supplemental Lease, dated November 2, 1943, Loup Creek Colliery Company amended the 1937 Lease to lease to Eastern Gas and Fuel Associates an additional tract of land situate on Toney Fork of Clear Fork of Guyandotte River, in Wyoming County, West Virginia; and

**WHEREAS**, Loup Creek Colliery Company changed its name to Loup Creek Company by charter amendment dated January 10, 1946; and

Case 2:20-cv-00487 Document 105-20 Filed 11/22/21 Page 3 of 29 PageID #: 1782

**WHEREAS**, by Supplemental Lease, dated May 15, 1947, Loup Creek Company amended the 1937 Lease to lease to Eastern Gas and Fuel Associates an additional tract of land situate on the waters of Clear Fork and Toney Fork, in Wyoming County, West Virginia; and

**WHEREAS**, by Supplemental Lease, dated December 1, 1947, Loup Creek Company amended the 1937 Lease to lease to Eastern Gas and Fuel Associates additional tracts of land situate in Logan, Boone and Wyoming Counties, West Virginia, and amended other provisions of the 1937 Lease, including Articles 4 and 13; and

**WHEREAS**, by Supplemental Lease, dated April 1, 1950, Loup Creek Company amended the 1937 Lease to lease to Eastern Gas and Fuel Associates two additional tracts of land situate in Wyoming and Logan Counties, West Virginia; and

**WHEREAS,** by Indenture dated April 1, 1950, Loup Creek Company, Eastern Gas and Fuel Associates, Pardee Land Company and Lorado Coal Mining Company, agreed to set up a mining barrier pillar between the dividing line of Pardee Land Company's property (leased by Lorado Coal Mining Company) and Loup Creek Company's property (leased by Eastern Gas and Fuel Associates); and

**WHEREAS**, by Supplemental Lease, dated January 15, 1953, Loup Creek Company and Eastern Gas and Fuel Associates amended Article 4 of the 1937 Lease and renewed the term of the 1937 Lease for an additional 20 years; and

**WHEREAS**, by Supplemental Lease, dated September 12, 1956, Loup Creek Company amended the 1937 Lease to lease to Eastern Gas and Fuel Associates additional acreage situate in Wyoming County, West Virginia; and

**WHEREAS,** by Indenture dated June 9, 1959, Loup Creek Company and eastern Gas and Fuel Associates amended Article 1 of the 1937 Lease; and

**WHEREAS,** by Indenture and Release, Eastern Gas and Fuel Associates released certain of its rights under Article 1 of the 1937 Lease, being its right to cut and use walnut and poplar trees; and

**WHEREAS**, Pocahontas Land Corporation ("Pocahontas"), Loup Creek Company and The Wandle Company merged on June 16, 1965, leaving Pocahontas as the surviving entity; and

**WHEREAS**, by Deed of Assignment and Consent, dated January 1, 1966, Eastern Gas and Fuel Associates assigned all of its right in the 1937 Lease, as amended and supplemented, to Eastern Associated Coal Corp. ("Eastern"), with the consent of Pocahontas; and

**WHEREAS**, by Agreement dated January 1, 1970, Pocahontas granted Eastern the right to manufacture commercial lumber from sideboards produced in preparing timber for use in mining operations and to sell commercial lumber to others; and

**WHEREAS**, by Release Agreement dated April 15, 1971, Pocahontas released Eastern Gas and Fuel Associates from its responsibility for the performance and observance of Eastern's duties, responsibilities, obligations and liabilities under the 1937 Lease; and

**WHEREAS**, by Notice of Renewal of Term of Lease, dated November 10, 1976, Eastern renewed the term of the 1937 Lease for an additional 20 years; and

**WHEREAS**, by letter agreement, dated July 28, 1977, Pocahontas granted Eastern the right to transport coal from lands not owned or operated by Eastern for a fee; and

**WHEREAS**, by letter, dated August 24, 1995, Eastern renewed the term of the 1937 Lease for an additional 20 years until June 30, 2017; and

**WHEREAS**, on August 1, 2005 Eastern filed Articles of Conversion with the Office of the Secretary of State of West Virginia converting from a corporation to a limited liability company and changed its name to Eastern Associated Coal, LLC ("EAC"); and

**WHEREAS**, pursuant to (a) Findings of Fact, Conclusions of Law, and Order (I) Confirming the Debtors' Fourth Amended Joint Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code and (II) Approving the Fourth Amended Disclosure Statement, in the Chapter 11 proceedings styled *In Re: Patriot Coal Company, et al* (including EAC), such

proceedings being jointly administered in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, under Case No. 15-32450, and (b) that certain Asset Purchase Agreement by and among Blackhawk Mining LLC, Patriot Coal Corporation and the Subsidiaries of Patriot listed on Schedule A thereto dated June 22, 2015, as amended by First Amendment to Asset Purchase Agreement, dated August 31, 2015, EAC assigned all of its right, title and interest in and to the 1937 Lease to Rockwell Mining LLC, a Delaware limited liability company ("Rockwell") pursuant to the Lease Assignment and Assumption Agreement dated October 26, 2015; and

**WHEREAS,** by Coal Sublease of even date herewith, Rockwell subleased its rights under the Pocahontas Land Lease to Sublessor; and

**WHEREAS,** by Consent and Agreement of even date herewith among Pocahontas, Rockwell and Sublessor (the "2015 Consent"), the 1937 Lease is further amended as to the Subleased Premises (as defined herein); and

**WHEREAS**, the 1937 Lease, as amended, supplemented, renewed and assigned is referred to herein as the "Pocahontas Land Lease"; and

**WHEREAS,** Sublessor desires to sublease to Sublessee and Sublessee desires to sublease from Sublessor the Powellton "A" seam of coal ("Subleased Coal") and certain mining rights appurtenant thereto underlying a portion of the Pocahontas Land Lease as shown on the map attached hereto as Exhibit A ("Subleased Premises");

**WHEREAS**, regardless of being referred to by any other seam name, as used in this Sublease, the Powellton "A" seam of coal shall be that seam of coal that has a bottom of seam elevation, 1,663.46 feet in core hole V-1242.

**WITNESSETH**

For and in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **Sublease - Compliance With Lease.**

Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases from Sublessor, subject to and in accordance with the terms and conditions of the Pocahontas Land Lease and this Sublease, the right to mine by any underground mining method only, the Subleased Coal, together with all appurtenant mining, processing, transportation and access rights now held by Sublessor, whether by deed, lease, sublease or agreement, and whether or not the same of are record or not, for ingress, egress and regress to and from the Subleased Premises. Sublessee hereby acknowledges that surface mining operations will be conducted by or on behalf of Sublessor or its affiliates in the vicinity of the Subleased Premises ("Sublessor's Operations"). As a result, and notwithstanding anything contained in this Sublease to the contrary, with the exception of the possible impact of normal surface subsidence resulting from the ordinary and prudent conduct of deep mining operations in the Subleased Coal, Sublessee will exercise the rights granted in this Sublease in a manner that will not unreasonably interfere with the Sublessor's Operations.

Simultaneously with the execution of this Sublease and as a condition to its effectiveness, simultaneously herewith, Sublessor and Sublessee are entering into a separate Access Agreement, pursuant to which Sublessee will grant Sublessor, its affiliates, and their successors and assigns the right of ingress and egress over that certain real property of Sublessee commonly known as the "Muddy Bridge Branch Property."

**SUBLESSEE HEREBY ACKNOWLEDGES THAT THE SUBLEASED PREMISES ARE SUBLEASED "AS IS," "WHERE IS" AND "WITH ALL FAULTS" AND THAT SUBLESSOR EXPRESSLY DISCLAIMS ALL WARRANTIES OF CONDITION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE FOREGOING, SUBLESSEE ACKNOWLEDGES THAT EXCEPT AS PROVIDED HEREIN, SUBLESSOR AND ITS RESPECTIVE RELATED PARTIES (AS DEFINED IN SECTION 7(A)) HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE SUBLEASED PREMISES MAY BE PUT, (B) ANY PAST OR FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT HAVE RESULTED OR MAY RESULT FROM**

**THE OWNERSHIP, USE OR SALE OF THE SUBLEASED PREMISES, (C) THE SUBLEASED PREMISES PRIOR TO THE DATE SUBLESSOR ACQUIRED THE SUBLEASED PREMISES, (D) THE MINEABILITY AND MERCHANTABILITY OF THE SUBLEASED COAL, OR (E) THE CONDITION, QUALITY AND QUANTITY OF THE SUBLEASED COAL.**

Except as otherwise provided herein, Sublessee hereby assumes all of the obligations and conditions of the Sublessor under the Pocahontas Land Lease, and agrees to perform and observe each and every provision of the Pocahontas Land Lease as if set out at length herein, from and after the Effective Date with respect to all activities of Sublessee on the Subleased Premises in the same manner as if Sublessee were the lessee under the Pocahontas Land Lease with respect to the Subleased Premises. Pertaining to Sublessee's compliance with the Pocahontas Land Lease, Sublessor shall have all of the rights and remedies of Pocahontas, as Sublessor, under the Pocahontas Land Lease.

Sublessor covenants to take all reasonable action to maintain and preserve the validity of the Pocahontas Land Lease.

Sublessee acknowledges receipt of a copy of the Pocahontas Land Lease, has read and examined same, and hereby agrees that the terms and conditions of the Pocahontas Land Lease are deemed incorporated herein and all operations in the exercise of Sublessee's mining rights under this Sublease shall be in compliance with all the terms, conditions and obligations of the Pocahontas Land Lease. To the extent that any of the terms and conditions set forth herein that are required to be performed on the part of Sublessee are inconsistent or in conflict with the terms and conditions of the Pocahontas Land Lease, the terms and conditions set forth in the Pocahontas Land Lease shall control.

Sublessee acknowledges and understands that the Pocahontas Land Lease requires the consent of Pocahontas to this Sublease. Sublessee and Sublessor agree that this Sublease is subject to and conditioned upon the consent of Pocahontas and Sublessor is responsible for obtaining such consent in a form reasonably acceptable to Sublessee.

2. **<u>Term of Sublease.</u>**

The initial term of this Sublease shall be for a period of five (5) years commencing upon the Effective Date (the "Initial Term"). If, at the end of the Initial Term (or

the then current Extended Term as defined below), Sublessee has not mined and removed all of the mineable and merchantable Subleased Coal from the Subleased Premises, Sublessee, at its sole option, may extend this Sublease upon the same terms and conditions set forth herein for successive additional one (1) year period(s) (each an "Extended Term," and collectively the "Extended Terms"). Each such extension shall take effect automatically unless Sublessee gives Sublessor thirty (30) days written notice of termination of this Sublease prior to the end of the then current Initial Term or Extended Term.

3. A. **Payments; Royalty.**

Simultaneously with the execution of this Sublease and as a condition to its effectiveness, Sublessee shall pay to Sublessor, as a non- recoupable prepaid royalty, the sum of three million dollars ($3,000,000.00) by wire transfer pursuant to wiring instructions to be provided by Sublessor.

Further, Sublessee shall pay to Sublessor, without demand, on the 18th day of each calendar month, a royalty of three percent (3.0%) of the average gross selling price, as hereinafter defined, for each ton of 2,000 pounds of Subleased Coal mined and sold from the Subleased Premises (the "Production Royalty"), calculated and reported for the previous calendar month. Sublessor shall be responsible for making the tonnage royalty payments due Pocahontas with regard to the Subleased Coal sold by Sublessee from the Subleased Premises required under the terms and provisions of the Pocahontas Land Lease and shall defend, indemnify and hold Sublessee harmless with respect thereto. Sublessee understands and acknowledges that as of the Effective Date, the base royalty under the Pocahontas Land Lease with respect to the Subleased Premises is one and one half percent (1.5%) of the average gross selling price (the "Pocahontas Land Lease Royalty"), and that Sublessor shall be responsible for remitting such portion of the Production Royalty received from Sublessee hereunder in satisfaction of such base royalty obligation.

For the purpose of calculating the Production Royalty provided for above, the term "average gross selling price" as used herein shall mean the actual gross sales for the month applicable to Sublessee's tonnage of a comparable quality, less any sales tax imposed thereon, divided by the actual tons sold for the month to a bona fide purchaser, calculated on a mine by

mine basis, if practicable. This average gross selling price assumes that the sale occurs f.o.b. the Pardee loadout owned by Sublessee after preparation, if any, at Sublessee's Saunders preparation plant, or, if not first transported to Sublessee's Saunders preparation facility, the actual price paid for the coal, assuming the sale occurs, f.o.b. the outbound loading point on the leasehold, but in any case without deduction for selling commissions, advertising, credit losses, or other expenses, but with deductions for discounts or allowances actually allowed to arms-length wholesalers; provided, however, that if Sublessor gives notice to Sublessee in writing that, in Sublessor's reasonable judgment, a particular purchaser is not a bona fide purchaser, Sublessor may elect to substitute for the gross selling price paid by that purchaser the prevailing market price of such coal as reasonably determined by Sublessor and based upon recent sales by Sublessee and others of coal of comparable quality to bona fide purchasers; provided further, that for any coal consumed on or off the Subleased Premises without sale by Sublessee, the gross selling price for the purpose of computing the Production Royalty shall be the prevailing market price, as determined above, of such coal at the time of shipment from the Subleased Premises or, if used on the Subleased Premises, at the time of use. The term "bona fide purchaser", as used herein shall mean a purchaser who pays valuable consideration in good faith without intending to take unfair advantage of any third parties, including Sublessor, but in no case shall that phrase include persons or parties affiliated with Sublessee, either directly, indirectly or through any joint ownership.

In addition to the Production Royalty, Sublessee shall pay to Sublessor, without demand, on the 18th day of each calendar month, an additional non-recoupable overriding royalty equal to ten cents ($0.10) per clean ton of Subleased Coal sold from the Subleased Premises (the "Additional Overriding Royalty"), regardless of average gross selling price, which obligation shall run with this Sublease and be binding upon each of Sublessee's successors and assigns.

Weights of Subleased Coal sold from the Subleased Premises upon which Royalty is determined shall be based on: (a) if shipped by rail at the Pardee loadout, the railroad's train weights; (b) if shipped by truck to barge, the actual scale weights of the truckloads nearest the point of loading or the barge weights at point of loading, as to be mutually agreed; or (c) if shipped by truck only, on the actual scale weight of the truckloads, nearest the point of loading. Truckload weights shall be measured on scales which shall be inspected and approved as

accurate by a qualified agency. Sublessee shall have the right to commingle Subleased Coal that is mined from the Subleased Premises with coal that is mined from other properties; provided, however, that Sublessee shall develop and follow a plan which shall be subject to review and reasonable approval by Pocahontas and Sublessor so as to accurately account for all Subleased Coal mined from the Subleased Premises.

Any late payment of any royalty payment due hereunder shall be subject to a late charge of one and one-half percent (1.5%) per month of the amount of such overdue royalties, installment, or other monies due from the date that the same were due and payable, until such overdue amount has been paid. Acceptance of such late charge by Sublessor shall, in no event, constitute a waiver of Sublessee's default(s); if any, with respect to such overdue amount(s), nor prevent Sublessor from exercising any of its other rights and/or remedies granted hereunder or available to Sublessor at law or at equity.

B. **Payment Upon Default of Pocahontas Land Lease**

In the event of a default under the Pocahontas Land Lease, the Coal Sublease and/or the 2015 Consent, other than payments disputed in good faith by Sublessor, (i) Sublessor shall provide prompt written notice to Sublessee of such default and (ii) Sublessee shall be permitted, but not required, to pay Pocahontas, in full or in part, any non-disputed outstanding obligations of Sublessor under the Pocahantas Land Lease. Any amounts paid by Sublessee hereunder shall be subject to offset by Sublessee of any amounts owed by Sublessee to Sublessor under the terms of this Sublease, until such amounts are fully offset.

In the event of a default under the Pocahontas Land Lease, the Coal Sublease and/or the 2015 Consent, other than payments disputed in good faith by Sublessor, and during the continuation of any such default, Sublessee may directly pay Pocahontas the Pocahontas Land Lease Royalty. Upon payment by Sublessee of the Pocahontas Land Lease Royalty, the Sublessee shall only be responsible for payment to the Sublessor of the difference between the Production Royalty and the Pocahontas Land Lease Royalty, plus the Additional Overriding Royalty.

4. **Mining Operations and Practices; Inspection.**

Sublessee shall conduct its operations in a skillful, efficient, and workmanlike manner, in accordance with approved methods and practices of modern mining, and in strict compliance in all material respects with the Pocahontas Land Lease and this Sublease. Sublessee shall expeditiously secure all necessary permits and licenses and provide the necessary bond(s) for the production of Subleased Coal hereunder (such permits, licenses and bonds are collectively hereinafter referred to as "Permits and Bonds"), and shall be fully responsible therefor and shall fulfill all obligations in relation thereto as required by the State of West Virginia and the United States of America and any local governmental body. Such Permits and Bonds shall be secured by Sublessee at its sole cost and expense. Sublessee, at its sole expense, hereby agrees to fulfill the obligations and perform all work required with respect to the Subleased Premises under the Pocahontas Land Lease, the Permits and Bonds, and the State of West Virginia or the United States of America or any local authority with respect to land restoration and reclamation of the Subleased Premises. Sublessee has inspected the Subleased Premises, accepts them in their present condition and assumes all risks incident to the mining and removal of coal from and reclamation of the Subleased Premises, including but not limited to, any and all activities on the Subleased Premises of Sublessee or its Related Parties. The parties hereto agree Sublessee shall in no way be considered an agent or employee of Sublessor.

Sublessee covenants that it will use due care and diligence to protect the Subleased Premises and the Subleased Coal included herein from waste, injury or damage and to that end Sublessee shall conduct its operations hereunder in accordance with the terms herein.

Sublessee shall, in accordance with plans of mining and descriptions thereof approved as provided for below, but subject to the requirements of the State of West Virginia and federal law pertaining to the conduct of the mining of coal, mine the coal within the Subleased Premises in a safe, effectual, workmanlike and proper manner, and so that said mining shall not unreasonably interfere with the proper exercise of the rights hereinbefore excepted and reserved to Sublessor; and, Sublessee shall comply in every material respect with the laws of the State of West Virginia and the United States of America now existing or hereafter enacted, and all the rules and regulations promulgated thereunder, relating to the conduct of operations for the mining of coal.

To protect the properties and coal reserves included herein from waste, injury or

damage, Sublessee shall mine the coal within the Subleased Premises in accordance with plans of mining and reclamation and descriptions thereof which shall be submitted by Sublessee to Sublessor. Such mining and reclamation shall not be initiated until such plans and descriptions have been approved in writing by the Sublessor, which approval shall not be unreasonably withheld. Upon Sublessor's request, Sublessee shall furnish Sublessor: (i) a copy of Sublessee's application for the mining permit, including the reclamation plans required by the State of West Virginia, with the maps and drawings attached thereto, and (ii) a statement of the post mining land use which is proposed to be made of the Subleased Premises following reclamation obligations, for approval by Sublessor, prior to its being filed with the governmental agencies responsible for issuance of such mining permits. Sublessor shall use due diligence in reviewing such application and plans of mining and reclamation and descriptions thereof, and Sublessor shall not withhold notice of approval or disapproval for an unreasonable length of time. Notwithstanding the foregoing provisions of this section, Sublessor shall not require a higher post-mining land use and condition than the pre-mining land use and condition, unless otherwise agreed between Sublessor and Sublessee. No material change in any such plans or descriptions so approved by Sublessor shall be made without such change being approved in advance by Sublessor, or except as required by such regulatory agencies.

Sublessee shall conduct operations hereunder on its own behalf and not as agent or employee of Sublessor and there shall be no privity of contract between Sublessor and employees of Sublessee. All employees, agents, contractors, subcontractors, and materialmen of Sublessee, whether on a wage or profit sharing basis, shall be selected, hired, directed, paid, and discharged only by Sublessee.

In all coal mining operations and other activities conducted hereunder Sublessee shall be in material compliance with all the laws of the United States of America and the State of West Virginia now or hereafter enacted, and all rules and regulations promulgated thereunder by any governmental agency, relating to such coal mining operations or other activities. Any disputes as to the meaning and application of any of the provisions of this lease shall be determined under the laws of the State of West Virginia.

Upon termination of this Sublease by expiration of term or for any other reason, Sublessee covenants and agrees that should Sublessor elect, in its sole discretion, and its sole

cost and expense to undertake a transfer or replacement (as the case may be) of any or all Permits and Bonds then existing related to the Subleased Premises, Sublessee will, at no cost to it, cooperate with Sublessor as Sublessor undertakes all actions reasonable, necessary or convenient to effect a timely transfer or replacement (as the case may be) of any or all said Permits and Bonds and other rights to Sublessor or a designee of Sublessor. Notwithstanding the foregoing, Sublessor shall reasonably cooperate with Sublessee (which shall not include payment of money) in seeking a return to Sublessee of any collateral being used to support such transferred or replaced (as the case may be) Permits and Bonds. The provisions of this paragraph shall survive the surrender, cancellation or termination of this Sublease. For the avoidance of doubt, Sublessor shall fully cooperate with Sublessee in obtaining the replacement of any of Sublessee's bonds or other financial assurances pertaining to the Subleased Premises and the return to Sublessee of any collateral associated with such bonds or other financial assurances.

Should Sublessee do or omit to do any act on the Subleased Premises which (a) creates or could reasonably contribute to the creation of any condition constituting a common law nuisance or an environmental hazard in violation of Applicable Environmental Laws, (b) causes the pollution of land, air or water in contravention of any Applicable Environmental Laws or (c) requires continuing expenditures in order to comply with Applicable Environmental Laws (each, an "Environmental Condition," and more than one, collectively, "Environmental Conditions"), Sublessee agrees to take reasonable steps to abate the Environmental Conditions. As used in this Sublease, the term "Applicable Environmental Laws" shall include without limitation the following: the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act of 1976, as amended by the Used Oil Recycling Act of 1980, the Solid Waste Disposal Act Amendments of 1980, and the Hazardous and Solid Waste Amendments of 1984, the Federal Water Pollution Control Act, the Federal Clean Air Act, the Federal Toxic Substances Control Act, the Federal Hazardous Materials Transportation Act, the West Virginia Water Pollution Control, Hazardous Waste and Solid Waste Disposal Acts, the West Virginia Underground Storage Tank Act, the West Virginia Air Pollution Control Act, the West Virginia Surface Coal Mining and Reclamation Act and any

other applicable federal, state or local environmental laws or regulations, whether currently in effect or enacted after the date hereof, as amended.

Sublessee's use of the surface overlying the Subleased Coal shall be limited to incidental activities related directly to the mining, transportation and preparation/processing of the Subleased Coal (such as ventilation shafts, exploration core holes, power boreholes, powerlines, roads, portal facilities, discharge of water or water treatment facilities, etc.). Unless otherwise consented to in writing by Sublessor in its sole discretion, Sublessee shall not have the right to use the surface overlying the Subleased Coal for refuse disposal. Sublessee's use of the surface overlying the Subleased Coal shall be conducted at all times, in material compliance with all Applicable Environmental Laws and all other applicable state and federal laws and regulations.

Sublessor, its agents and persons designated by it, shall have the right, at all reasonable times, to enter the Subleased Premises or mine workings for the purpose of ascertaining that the provisions of this Sublease have been kept and performed. Proper notice shall be given to Sublessee of Sublessor's entrance onto the property, and Sublessor agrees to abide by any safety requirements imposed by any regulatory agency or by the Sublessee.

**5. <u>Records.</u>**

Sublessee shall keep and cause to be kept for a period of ten (10) years accurate records showing the amount of Subleased Coal mined by Sublessee from the Subleased Premises and such other information as may be reasonably requested by Sublessor from time to time to insure compliance with the terms of the Pocahontas Land Lease and this Sublease. Sublessor or its agent, at its risk and expense, shall have access at all reasonable times to such records and to the offices where they are kept for the purpose of inspecting, auditing and making copies thereof. At the time of each payment of any Production Royalty or Additional Overriding Royalty a full and accurate statement duly verified, showing the information required above and such other data as shall be reasonably requested by Sublessor and as shall be required by the Pocahontas Land Lease shall be delivered to Sublessor.

**6. <u>Maps; Mine Plans.</u>**

Sublessee shall employ at all times an experienced and competent mining engineer whose duty it shall be to make and keep accurate and complete maps of the Subleased Premises and mine workings on the Subleased Premises on an appropriate scale, which shall show projections and mine development, and which shall be in conformity in all respects with the Pocahontas Land Lease and this Sublease and with the applicable requirements of the mining laws of the State of West Virginia and of the United States of America. Such maps shall at all times be accessible to Sublessor, its agents or representatives, at their sole risk and expense, for inspection; and correct copies of the same shall be furnished to Sublessor as per the terms and conditions in the Pocahontas Land Lease.

Sublessee shall furnish to Sublessor on January 15, April 15, July 15 and October 15 of each calendar year mine progress maps of seams or splits of seams, on a scale of not more than four hundred feet (400') to the inch showing for each month (utilizing differing colors for each month's production) in the preceding calendar quarter the progress of Sublessee's operation on the Subleased Premises sufficient to compute volumes of coal removed in the preceding quarter. Such map shall be made by a competent registered professional mining engineer as the work progresses and shall conform in all respects with the requirements of applicable mining law. Such progress maps shall clearly show all property lines, lease lines, surface improvements and such natural topography as may require protection. Coal measurements shall be taken and shown on such progress maps at intervals not exceeding 300 feet. Sublessee shall also provide to Sublessor electronic copies of any such maps, plans or drawings.

On an annual basis prior to January 20 of each calendar year or at such time as Sublessee shall make substantial changes in the operations being conducted on the Subleased Premises, Sublessee shall develop and submit to Sublessor a projected mine plan ("Mine Plan") for Sublessee's operation on the Subleased Premises for the then calendar year. Each Mine Plan shall include the recovery of all of the mineable and merchantable coal, in the area of the Subleased Premises to which the Mine Plan is applicable, which is recoverable with good mining practices and techniques in use on the date mining operations are conducted pursuant to this Sublease and the Pocahontas Land Lease and shall comply with all of the provisions of this Sublease and the Pocahontas Land Lease.

In addition to the above, with regard to Sublessee's Mine Plans, Sublessee shall comply with all other requirements of the Pocahontas Land Lease.

7. **Indemnity; Insurance.**

(a) Sublessee agrees to indemnify and save harmless Sublessor and, as required under the Pocahontas Land Lease, Pocahontas, and their respective members, parents, subsidiaries, affiliates, and its and their respective officers, directors, employees, agents, representatives, successors and assigns ("Indemnitees") from any and all claims, demands, suits, losses, penalties, fines, prosecutions, statutory recoveries (whether civil or criminal), governmental actions, expenses (including reasonable attorneys' fees), damages and injuries (including, but not limited to, bodily injury, illness, disease, death or for loss of services, property or wages), to persons and property whatsoever ("Claims") relating to, arising out of or in connection with (i) a breach of this Sublease by Sublessee, (ii) Environmental Conditions or (iii) the operations or activities of Sublessee or its members, parents, subsidiaries, affiliates, sublessees, contractors, subcontractors and invitees, or its or their respective officers, directors, employees, agents, representatives, consultants, invitees, successors and assigns (collectively, "Related Parties") under or in connection with this Sublease. Furthermore, in case any action or proceeding is brought against Sublessor, by reason of any such Claim, Sublessee will at its expense resist and defend, and in its reasonable discretion, settle or otherwise resolve such action or proceeding and satisfy any order or judgment against Sublessor resulting therefrom; provided, however, that any such settlement or resolution will not place any burdens or obligations upon Sublessor and Sublessee shall obtain a full and complete release of Sublessor against any such Claim. Notwithstanding the above, Sublessee will provide the same indemnifications to Pocahontas and Sublessor as Sublessor is required to provide to Pocahontas under the Pocahontas Land Lease with respect to the Subleased Premises. The provisions of this paragraph shall survive the surrender, cancellation or termination of this Sublease.

Sublessee shall subscribe to and operate under the provisions of the West Virginia Workers' Compensation Act, and make all necessary payments thereto, and such coverage shall also include drivers of any trucks which may be hired, rented or leased, and upon request furnish to Sublessor certificate of such compliance, together with paid premium receipts.

If at any time the subscription to said Workers' Compensation Act shall cease to be in force and effect, then Sublessee shall suspend, and Sublessor (and, if permitted under the Pocahontas Land Lease, Pocahontas) may force stoppage of all operations of Sublessee hereunder until such subscription shall be reinstated.

Sublessee hereby guarantees and agrees to indemnify and save harmless Sublessor and, as required under the Pocahontas Land Lease, Pocahontas, and their respective officers, agents and employees, from the payment of or any liability for benefits which may be required under the Black Lung Benefits Act (30 U.S.C. 901, et seq.) and under any laws or regulations of the State of West Virginia, arising from any mining operations hereunder, and Sublessee agrees that during the primary period and renewals, if any, of this lease, it will furnish annually to Pocahontas and Sublessor evidence of financial responsibility for such black lung benefits under applicable federal and state laws, as well as regulations issued thereunder. Such evidence of financial responsibility shall consist of the following:

(a) in the event the Workers' Compensation law of the State of West Virginia has been included in the list published by the Secretary of Labor of the United States of America under the Black Lung Benefits Act (30 U.S.C. 901, et seq.), such evidence shall consist of a certification from the officers administering the Workers' Compensation program for the State certifying as to Sublessee's black lung benefits coverage under those Workers' Compensation laws;

(b) in the event the Workers' Compensation laws of the State of West Virginia ("State") are not included in the list published by the Secretary of Labor of the United States of America under the Black Lung Benefits Act (30 U.S.C. 901, et seq.), Sublessee shall either:

(1) qualify as a self-insurer in accordance with regulations prescribed by said Secretary of Labor, or

(2) insure and keep insured, with any stock company or mutual company or association, or any other person or fund, including any State fund, which is authorized under the laws of the State to insure Workers' compensation, all black lung benefits payable under applicable federal and state statutes and regulations issued thereunder, and furnish a satisfactory certificate to Sublessor evidencing such insurance coverage.

As a condition precedent to the commencement of operations hereunder,

Sublessee shall provide the following insurance coverages:

**Required Insurance Coverage Limits**

| | |
|---|---|
| Worker's Compensation<br>Employer's Liability | Statutory<br>$3,000,000 (per accident) |
| Commercial General Liability (per Occurrence)<br>Bodily Injury & Property Damage | $3,000,000 CSL<br>(Combined Single Limit) |
| Automobile Liability<br>Bodily Injury & Property Damage | $1,000,000 CSL<br>(Combined Single Limit) |
| Excess or Umbrella Liability<br>(Inclusive of above limits) | $10,000,000 CSL<br>(Combined Single Limit) |
| Pollution Legal Liability Coverage | $5,000,000 each incident third party bodily injury and property damage |
| $5,000,000 each incident on and off site clean up | |

Certificates of insurance acceptable to Sublessor evidencing the coverage required herein shall be provided by Sublessee to Sublessor prior to commencement of performance of operations. The above minimum insurance requirements are subject to review, modification, and/or change at the reasonable discretion of Sublessor based on changes in lessee operations, risks or other circumstances. Insurance required herein may be met by a combination of primary, excess, and self-insurance.

**Additional Coverages/LIMITS**

Sublessor (and, if permitted under the Pocahontas Land Lease, Pocahontas) reserve the right to require Sublessee to provide and maintain additional coverages in the event that the particular operations of Sublessee involve unusual risks.

A. **The Following Applies to All Policies**

1. Pocahontas and Sublessor, their parents, subsidiaries and affiliates and their agents, directors, officers and employees, shall be included as additional insured on all policies (except Workers' Compensation coverage).

2. All policies shall contain a Waiver of subrogation in favor of Pocahontas and Sublessor, their parents, subsidiaries and affiliates and their agents, directors, officers and employees, and its Insurers.

3. Pocahontas and Sublessor shall receive thirty (30) days written notice of cancellation or any material change.

4. Coverage under all insurance required to be carried by Sublessee shall be primary insurance exclusive of any other existing valid and collectible insurance.

5. All insurance shall be with insurers acceptable to Pocahontas and Sublessor (Insurer shall be licensed or registered company in the state where lessee operations are conducted and must have ratings of A-/VII or better in the Best's Key Rating Insurance Guide latest edition.)

6. If any of the required insurance contains aggregate limits and such limits are diminished by any incident, occurrence, claim, settlement, or judgment against such insurance, Sublessee shall take immediate steps to restore such aggregate limits or shall provide other insurance protection for such aggregate limits.

B. **Workers' Compensation and Employer's Liability shall include:**

1. Statutory Workers' Compensation for state of operation.
2. Employer's Liability.

C. **Commercial General Liability (Occurrence Form) shall include:**

1. Premises/Operations
2. Independent Contractors
3. Personal Injury
4. Products/Completed Operations
5. Blanket Contractual Liability
6. Explosion, Collapse and Underground Coverages
7. Subsidence Coverage (mining operations)

D. **Comprehensive Automobile Liability shall include:**

1. Owned vehicles
2. Non-Owned vehicles
3. Hired vehicles

E. **Excess Liability (Occurrence Form) shall comply with the Terms and Conditions of the following underlying coverage:**

1. Employer's Liability
2. Commercial General Liability
3. Comprehensive Automobile Liability

F. **Pollution Legal Liability Coverage**

1. Covers all Subleased Premises

8. **Taxes.**

During the term of this Sublease, prorated for partial calendar years, Sublessee shall pay the taxes, levies and assessments on or in respect to: (i) the improvements and personal property placed on the Subleased Premises by Sublessee and (ii) so-called "unmined mineral taxes" and all other taxes, assessments, levies, fees and/or other governmental charges associated with the Subleased Premises and the Subleased Coal. Sublessee, at its sole expense, shall prepare and file any and all reports on unmined mineral taxes, and shall provide Sublessor with copies of all such reports filed with the taxing authorities. Sublessee, at its sole cost and expense, shall be primarily responsible for the protesting, appealing, and defending of any and all assessments upon unmined mineral taxes. In the event(s) any taxes, assessments, levies, fees and/or other governmental charges, in whole or in part, should be paid by Sublessor, then Sublessee shall repay to Sublessor such amount(s), in full, within ten (10) days of Sublessor's sending to Sublessee a reimbursement request for the same.

Sublessee shall remain current on all obligations to appropriate governmental authorities, including timely payment of federal black lung taxes, federal reclamation taxes, federal unemployment compensation taxes, federal withholding and social security taxes, state severance or business and occupation taxes, state black lung compensation taxes, state unemployment compensation taxes, state workers' compensation taxes, state withholding taxes, personal property taxes and all obligations similar to any of the above and also including ongoing compliance with the conditions of any and all applicable bonds, including bonds required by mining authorities and any state wage or employment bonds and of any state license to operate.

9. **Default; Forfeiture; Remedies Cumulative.**

(a) In addition to any of the terms and provisions set forth in the Pocahontas Land Lease with respect to default, forfeiture, termination, or other remedies or similar provisions, which are incorporated herein by reference, in any of the following events:

(i) Sublessee shall abandon the Subleased Premises; or

(ii) Sublessee shall fail to keep and perform any of the other terms, conditions, covenants and agreements of this Sublease including, specifically the provisions of paragraphs 1, 3, 4, 5, 6, 7, 8, and 13 to be kept and performed, and if any such failure shall continue for a period of 15 days after Sublessor or Pocahontas shall have given notice of such default to Sublessee; or

(iii) Sublessee is adjudicated a bankrupt or discharged by a bankruptcy court as an insolvent debtor, or if any receiver or assignee or other person or persons is appointed by any court to take charge of the Subleased Premises or the property of Sublessee, or the mines and equipment upon the same; then in any such event this Sublease and the subleasehold estate hereby created, and all rights of Sublessee hereunder and under any other agreement referred to herein or by which Sublessee may claim an interest in any way to the Subleased Premises shall at the option of Sublessor become forfeited, and Sublessor shall have the right to reenter the Subleased Premises and to exclude Sublessee therefrom, and to hold the Subleased Premises and all improvements thereon free of any claims of Sublessee, anything herein contained to the contrary notwithstanding; or

(b) Upon any declaration of forfeiture, all estate, rights and privileges of Sublessee hereunder shall cease and terminate, and Sublessor may thereupon or at any time thereafter, without further notice, demand or action by any of its agents, reenter and take possession of the Subleased Premises, or any part thereof in the name of Sublessor, to the extent and with like effect as though this Sublease had never been made (other than Sublessee's liabilities arising hereunder), and Sublessor in making said reentry and taking possession of said property shall have the right to do so without legal action, or without notice or process, as may be required by the laws of the State of West Virginia, as amended. In case Sublessor exercises the right herein provided to declare this Sublease forfeited, Sublessee shall, upon demand by Sublessor, cooperate in transferring any or all Permits and Bonds to Sublessor, at no expense to Sublessee. In case Sublessor exercises the right herein provided to declare this Sublease

forfeited, it shall not be liable to Sublessee for any injury or damage by reason thereof, and Sublessee hereby expressly waives and release any and every claim for any such injury or damage including but not limited to any claims for consequential, special damages or lost profits.

(c) All provisions herein concerning the remedy of Sublessor in case of breach by Sublessee of any condition, covenant or agreement herein contained shall be deemed to be cumulative and not exclusive, and shall not deprive Sublessor of any of its other legal or equitable remedies which (i) may now or hereafter be provided under the laws of the State of West Virginia or (ii) are reserved hereunder by Sublessor under the Pocahontas Land Lease.

(d) No delay or omission of Sublessor to exercise any right, remedy or lien accruing upon any default or forfeiture hereunder, or otherwise available to it, shall impair, prejudice or waive any such right, remedy or lien, but every such right, remedy and lien may be exercised by Sublessor on account of any subsequent breach in the same manner and to the same extent as if such delay or omission had not occurred.

10. **Mining Equipment.**

Sublessee shall have the right, upon the expiration or termination of this Sublease, to remove all of Sublessee's mining equipment and Sublessee's mobile facilities within three months from the date of termination or expiration, and any such equipment and mobile facilities not so removed by Sublessee within such time period shall, at the election of Sublessor, become the absolute property of Sublessor; provided, however, notwithstanding the foregoing and in no event shall Sublessee have the right to remove any or all of Sublessee's mining equipment and Sublessee's mobile facilities if Sublessee is in default under the Pocahontas Land Lease or this Sublease in any material respect. Upon request by Sublessor all such equipment and facilities shall be removed by Sublessee within said period.

11. **Notices.**

All notices required and transmittals and payments to Sublessor shall be sufficient if in writing and sent by U.S. registered mail or certified mail or nationally recognized overnight courier delivery to Sublessor addressed to: 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509, Attn: Elizabeth Nicholas, General Counsel.

Case 2:20-cv-00487 Document 105-20 Filed 11/22/21 Page 23 of 29 PageID #: 1802

Any notices required for Sublessee shall be sufficient if in writing and sent U.S. registered mail or certified mail or nationally recognized overnight courier delivery to Sublessee and addressed to: 57 Danbury Road, Wilton CT, 06897.

The giving of any notice shall be in accordance with the foregoing until the parties are notified in writing of a change of address.

12. **Other Instruments.**

Each party agrees to execute and deliver such additional agreements, instruments or documents, in recordable form if requested by the other party, as may from time to time be necessary or advisable to carry out the terms and purposes of this Sublease, including without limitation a short form Sublease or memorandum of Sublease.

13. **Assignments.**

(a) Sublessee shall not assign, sublease, pledge, encumber, hypothecate, convey or otherwise transfer all or any part of its interest in this Sublease either voluntarily or by operation of law without the prior written consent of Sublessor (and, as required under the Pocahontas Land Lease, Pocahontas) which may not be unreasonably withheld. An assignment consented to by Sublessor (and, as required under the Pocahontas Land Lease, Pocahontas) does not constitute the consent of Pocahontas and Sublessor to any further sublease, assignment, pledge, encumbrance, conveyance or other transfer of all or any part of this Sublease. Notwithstanding the foregoing: (i) Sublessee may assign the Sublease to an affiliated entity owned or controlled by Sublessee or under common ownership and control with Sublessee without the consent of Sublessor; provided, however, that Coronado shall remain responsible for the performance of this Sublease by such affiliated entity; and (ii) a transfer of control of Sublessee shall be an event of assignment requiring the consent of Sublessor, and shall be deemed to have occurred whenever 50.1% or more of Sublessee's capital stock or membership interests shall become subject to the direct or indirect control of persons or entities, some or all of whom are different than those persons or entities which directly or indirectly control that portion of the Sublessee's capital stock or membership interests as of the Effective Date. Notwithstanding any of the foregoing, Sublessor hereby acknowledges and agrees that it shall not unreasonably withhold its consent to an assignment of this Sublease where a transfer of control as set forth above occurs

provided the assignee has reasonable coal mining experience and reasonable financial standing..

(b) A contract mining agreement or other contract to perform services on or with respect to the Subleased Premises shall not require Sublessor's consent; provided, however, no such agreement or contract shall relieve Sublessee of its obligations to comply with all the terms and conditions of this Sublease, without regard to its conflict of law provisions.

14. **Governing Law.**

The terms and provisions of this Sublease shall be construed, enforced and performed in accordance with the laws of the State of West Virginia, without regard to its conflict of laws provisions.

15. **Headings.**

Paragraph headings used herein are for convenience of reference only and shall not affect the meaning or construction of any provision hereof.

16. **Construction.**

This Sublease shall not be construed in favor of or against any party on the basis that the party did or did not author this Sublease or any attachment hereto.

17. **Relationship of the Parties.**

Notwithstanding anything in this Sublease to the contrary, this Sublease does not empower Sublessor to make any decisions and Sublessor hereby expressly waives and disclaims any right to exercise any supervision, operation or control with respect to the terms and conditions under which the Subleased Coal is extracted or prepared, such as, but not limited to, the manner of extraction or preparation or the amount of such Subleased Coal to be produced. The parties hereto do acknowledge, however, that Sublessor has reserved certain rights and has imposed certain requirements under the terms of this Sublease solely for the purpose of protecting the Subleased Premises and Subleased Coal and the reserved rights of the Sublessor. Anything in this Sublease to the contrary notwithstanding, it is expressly understood, stipulated, and agreed that the relationship between Sublessor and Sublessee shall be that of sublessor and sublessee and nothing herein shall be construed or interpreted as establishing between Sublessor

and Sublessee a relationship of partners, joint ventures, principal and agent, vendor and purchaser, or any other relationship except that of sublessor and sublessee.

18. **Counterparts.**

This Sublease may be executed in one or more counterparts, including by means of facsimile or electronic signatures, each of which shall be deemed an original and all of which together shall constitute one agreement.

19. **Entire Agreement.**

This Sublease constitutes the entire agreement and understanding of the parties in respect to the transaction contemplated hereby. All prior agreements, arrangements and understandings of the parties relating to the subject matter hereof are hereby superseded, and this Sublease shall not be modified, supplemented or changed in whole or in part other than by an agreement in writing signed by all parties hereto or their respective successors or assigns.

20. **Successors and Assigns.**

This Sublease shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

21. **Severability; Waiver.**

If any terms, covenants, promises and agreements in this Sublease should be held to be unenforceable for any reason, all other terms, covenants, promises and agreements of the parties in this Sublease shall remain in full force and effect. No waiver, at any time, of the terms, provisions or conditions of this Sublease shall be construed as a waiver of any of the other terms, provisions or conditions, nor shall a waiver of any such term, provision or condition be construed to confer a right to a subsequent waiver of the same provision or condition. Any remedies provided in this Sublease are cumulative and not exclusive of any remedies provided by law.

22. **Confidentiality.**

Sublessor and Sublessee, and their respective directors, officers, employees, agents, and advisors shall hold and treat the terms and provisions of this Sublease as confidential

and shall refrain from discussing or disclosing, in whole or in part, to any other person or entity the terms and provisions of this Sublease without the prior written consent of the other party. Provided, however, Sublessor and Sublessee shall have the right to provide copies of this Sublease without such consent (i) to such party's lenders, attorneys, accountants, and consultants, all of which parties shall keep same confidential, and (ii) as required by any litigation, arbitration or any controversy between the parties concerning the terms and conditions of this Sublease.

23. **Memorandum.**

The parties hereto agree to execute one or more Memoranda of Sublease which shall be recorded in the Office of the County Recorder of Wyoming County, West Virginia, and which Memorandum will be recorded in lieu of this Sublease.

***Remainder of Page Intentionally Left Blank; Signature Page Follows***

IN WITNESS WHEREOF, the Sublessor and Sublessee have caused their corporate names to be signed by their proper officers, thereunto duly authorized, all as of the day and year first above written.

BLACKHAWK LAND AND RESOURCES, LLC

By: [signature]

Its: President

Date: 12-21-15

STATE OF Kentucky )
COUNTY OF Fayette ) to-wit:

I, Laurel J. Unseld, a notary public in and for said state, do hereby certify that Chad Salyer, President, of Blackhawk Land and Resources, LLC, a Delaware limited liability company, has this day acknowledged before me the said writing to be the act and duly authorized deed of said company.

Given under my hand and seal this 21 day of December, 2015.

My Commission expires: 6/17/19

Laurel J. Unseld
Notary Public

Laurel J. Unseld
NOTARY PUBLIC
Notary ID 535189
Kentucky, State at Large
My Comm. Exp. June 17, 2019

CORONADO COAL II LLC

By: [signature]

Its: CEO

Date: 12/21/15

STATE OF Connecticut )
COUNTY OF Fairfield ) to-wit: Wilton

I, Michelle McDonald, a notary public in and for said state, do hereby certify that GARold R. Spindler, of Coronado Coal II LLC, a Delaware limited liability company, has this day acknowledged before me the said writing to be the act and duly authorized deed of said company.

Given under my hand and seal this 22 day of December, 2015.

My Commission expires: 8-31-17

[signature]
Notary Public

MICHELLE MC DONALD
Notary Public
Connecticut
My Commission Expires Aug 31, 2017






BLACKHAWK001692

# EXHIBIT T

## ACKNOWLEDGEMENT

Coronado hereby acknowledges it has read this Consent and that the terms of the BLR-Coronado Sub-Sublease are subject to the terms of this Consent.

In the event of a default by Rockwell or BLR under the Pocahontas Land Lease, Pocahontas hereby agrees to provide prompt written notice of such default to Coronado. Likewise, in the event of a default under the Intercompany Lease by BLR, Rockwell hereby agrees to provide prompt written notice of such default to Coronado.

Further, Coronado, Rockwell and Poca Land hereby agree and acknowledge that, as between each of them individually and among them collectively, the Consent, including without limitation the provisions of sections 2 and 4 of the Consent, shall survive any Rockwell or BLR default and/or the termination of the Pocahontas Land Lease, the Intercompany Lease, this Consent, and/or the BLR-Coronado Sub-Sublease (a copy of which is attached hereto as Exhibit A).

In the event of any termination of the Pocahontas Land Lease, the Intercompany Lease, the BLR-Coronado Sub-Sublease, or the Consent, either by the mutual consent of Poca Land and Rockwell or BLR, as applicable, or due to the breach of the terms thereof by Rockwell or BLR, then Poca Land and Coronado shall enter into a lease containing the same terms, conditions, and provisions as set forth in the Pocahontas Land Lease, BLR-Coronado Sub-Sublease, and the Consent as applicable to maintain Coronado's rights thereunder, as they are applicable to the Subleased Reserves. In the event of a termination or non-curable default of the Intercompany Lease (but not the Pocahontas Land Lease), then Rockwell and Coronado shall enter into a sublease containing the same terms, conditions and provisions as set forth in the BLR-Coronado Sub-Sublease and the Consent as they are applicable to the Subleased Reserves.

**POCAHONTAS LAND CORPORATION**

By: ______________________
John W. Payne, Vice President

**ROCKWELL MINING, LLC**

By: ______________________

Its: ______________________

10070033v2

## ACKNOWLEDGEMENT

Coronado hereby acknowledges it has read this Consent and that the terms of the BLR-Coronado Sub-Sublease are subject to the terms of this Consent.

In the event of a default by Rockwell or BLR under the Pocahontas Land Lease, Pocahontas hereby agrees to provide prompt written notice of such default to Coronado. Likewise, in the event of a default under the Intercompany Lease by BLR, Rockwell hereby agrees to provide prompt written notice of such default to Coronado.

Further, Coronado, Rockwell and Poca Land hereby agree and acknowledge that, as between each of them individually and among them collectively, the Consent, including without limitation the provisions of sections 2 and 4 of the Consent, shall survive any Rockwell or BLR default and/or the termination of the Pocahontas Land Lease, the Intercompany Lease, this Consent, and/or the BLR-Coronado Sub-Sublease (a copy of which is attached hereto as Exhibit A).

In the event of any termination of the Pocahontas Land Lease, the Intercompany Lease, the BLR-Coronado Sub-Sublease, or the Consent, either by the mutual consent of Poca Land and Rockwell or BLR, as applicable, or due to the breach of the terms thereof by Rockwell or BLR, then Poca Land and Coronado shall enter into a lease containing the same terms, conditions, and provisions as set forth in the Pocahontas Land Lease, BLR-Coronado Sub-Sublease, and the Consent as applicable to maintain Coronado's rights thereunder, as they are applicable to the Subleased Reserves. In the event of a termination or non-curable default of the Intercompany Lease (but not the Pocahontas Land Lease), then Rockwell and Coronado shall enter into a sublease containing the same terms, conditions and provisions as set forth in the BLR-Coronado Sub-Sublease and the Consent as they are applicable to the Subleased Reserves.

**POCAHONTAS LAND CORPORATION**

By: ______________________
John W. Payne, Vice President

**ROCKWELL MINING, LLC**

By: [signature]

Its: SVP Land + Acquisitions

10070033v2

**CORONADO COAL II, LLC**

By: ______________________

Its: CEO

10070033v2

# EXHIBIT U

Return to: Dinsmore & Shohl LLP
Attn: Chris Playton
611 Third Avenue
Huntington, WV 25701

## LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT

This **LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "**Assignment**") is dated this 22nd day of October, 2015, to be effective as of the 26th day of October, 2015 (the "**Effective Date**"), and is made and entered into by and among **EASTERN ASSOCIATED COAL, LLC**, a West Virginia limited liability company, with an address of 63 Corporate Centre Drive, Suite 411, Scott Depot, West Virginia 25560 ("**Assignor**"), and **ROCKWELL MINING, LLC**, a Delaware limited liability company, with an address of 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509 ("**Assignee**").

**WHEREAS**, Assignor is a party to, or otherwise has been assigned and has assumed, the Assumed Leases (including the Assumed Leases listed on Exhibit A attached hereto and made a part hereof) (including all prepaid royalties and un-recouped minimum royalties thereunder) (collectively, the "**Leases**");

**WHEREAS**, Assignor is a party to that certain Asset Purchase Agreement, dated as of June 22, 2015 (as amended from time to time) (the "**Agreement**"), by and among Blackhawk Mining LLC (the parent company of Assignee) ("**Buyer**"), Patriot Coal Corporation (the parent company of Assignor), the Subsidiaries of Patriot Coal Corporation listed on Schedule A thereto and Patriot Coal Corporation, as Sellers' Representative;

**WHEREAS**, pursuant to that certain Assignment and Assumption Agreement, dated as of October 26, 2015, by and between Buyer and Assignee, Buyer assigned certain rights and obligations of Buyer under the Asset Purchase Agreement with respect to certain Purchased Assets (including the Leases) and certain Assumed Liabilities to Assignee; and

**WHEREAS**, pursuant to the terms of the Agreement, Assignor is assigning the Leases to Assignee upon the terms and conditions set forth therein and herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Definitions. All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Agreement.

2. Assignment and Assumption. Pursuant to the Agreement, Assignor hereby grants, conveys, transfers, assigns, sells and delivers to Assignee as of the date hereof, in accordance with and subject to the terms of the Agreement, all of Assignor's right, title and interest in, to and under the Leases, and Assignee hereby accepts such assignment, and assumes and agrees to pay, perform and discharge, as and when due, all of the duties and obligations of Assignor under the Leases, except to the extent such duties and obligations constitute Excluded Liabilities.

3. Conflict. This Assignment is subject to all the terms and provisions of the Agreement, including without limitation all representations and warranties and indemnities. No provision of this Assignment shall be deemed to enlarge, alter or amend the terms or provisions

Boone County
Rocklick; Wells

9899762v1



Doc ID: 001897020010 Type: MIS
Recorded: 11/19/2015 at 09:44:31 AM
Fee Amt: $17.00 Page 1 of 10
Boone County Clerk
Gary W. Williams County Clerk
BK 4 PG 281-290

of the Agreement. Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and provisions of this Assignment and the terms and provisions of the Agreement, the terms and provisions of the Agreement shall control.

4. Binding Effect. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5. Counterparts. This Assignment may be executed in one or more counterparts (including by means of facsimile or e-mail signature pages) and all such counterparts taken together shall constitute one and the same agreement.

6. Governing Law. This Assignment, and all claims or causes of action based upon, arising out of, or related to this Assignment or the transactions contemplated hereby, shall be governed by and construed in accordance with the law of the State of Delaware, without regard to the conflicts of law rules of such state to the extent such principles or rules would require or permit the application of laws of another jurisdiction.

7. Entire Agreement. All prior negotiations and agreements by and among the parties hereto with respect to the subject matter hereof are superseded by this Assignment and the Agreement, and there are no representations, warranties, understandings or agreements with respect to the subject matter hereof other than those expressly set forth in this Assignment or the Agreement.

8. Headings. Section headings are not to be considered part of this Assignment, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Assignment or any provision in it.

9. Further Assurances. Each party hereto agrees, upon the reasonable request of the other party hereto (and at such other party's expense), to make, execute and deliver any and all documents or instruments of any kind or character, and to perform all such other actions, that may be reasonably necessary or proper to effectuate, confirm, perform or carry out the terms or provisions of this Assignment.

***Remainder of Page Intentionally Left Blank; Signature Page Follows***

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment to be duly executed as of the day and year first above written.

**EASTERN ASSOCIATED COAL, LLC,**
a West Virginia limited liability company

By: [signature]
Name: Kenneth R. Bolyard
Title: Treasurer

STATE OF WV
COUNTY OF Putnam, to-wit:

The foregoing instrument was acknowledged before me this 23 day of October, 2015, by Kenneth R. Bolyard, as Treasurer of Eastern Associated Coal, LLC, a West Virginia limited liability company, Assignor herein, on behalf of said company, in the aforesaid County and State.

My commission expires: 4/7/2020.

Sandra Martin
Notary Public

[SEAL]

OFFICIAL SEAL
Notary Public, State Of West Virginia
SANDRA MARTIN
117 Overlook Drive
Hurricane, WV 25526
My Commission Expires April 07, 2020

**ROCKWELL MINING, LLC,**
a Delaware limited liability company

By: [signature]
Name: Elizabeth Nicholas
Title: Corporate Secretary

STATE OF Kentucky
COUNTY OF Fayette, to-wit:

The foregoing instrument was acknowledged before me this 22 day of October, 2015, by Elizabeth Nicholas, as Corporate Secretary of Rockwell Mining, LLC, a Delaware limited liability company, Assignee herein, on behalf of said company, in the aforesaid County and State.

My commission expires: 6/17/19.

Laurel J. Unseld
Notary Public

[SEAL]

Laurel J. Unseld
NOTARY PUBLIC
Notary ID 535189
Kentucky, State at Large
My Comm. Exp. June 17, 2019

This instrument was prepared by:

DINSMORE & SHOHL LLP
Brady W. Dunnigan
900 Lee Street, Huntington Square, Suite 600
P.O. Box 11887
Charleston, WV 25301
(304) 357-0900

Boone County
Rocklick; Wells

Bk 4 Pg 281

## EXHIBIT A

**The Leases**

| Contract Number | Mine Complex | Instrument | County |
|---|---|---|---|
| 0865-001-00 | Rocklick | Deed of Lease dated January 1, 1968 between WPP, LLC (successor-in-interest to Washington and Old Dominion Railroad) and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.), of record in Coal Lease Book 12, Page 167 in the Office of the Clerk of the County Commission of Boone County, West Virginia, and in Book 34, Page 211 in the Office of the Clerk of the County Commission of Raleigh County, West Virginia, as modified, amended and supplemented by (i) Supplemental Agreement of Lease dated July 7, 1969; (ii) Agreement of Lease and Release dated April 15, 1974; (iii) Agreement dated April 1, 1975; (iv) Partial Release of Deed of Lease dated October 15, 1994; (v) Amendment to Lease dated December 24, 1997; (vi) Letter Agreement dated November 14, 2001; (vii) Letter Agreement dated March 5, 2002; (viii) Settlement Agreement and Release dated June 7, 2002; (ix) Letter Agreement dated August 18, 2008; and (x) Partial Surrender of Lease dated December 30, 2010. | Boone |
| 0865-002-00 | Rocklick | Indenture of Lease (including subsequent supplements adding acreage to original leased premises) dated July 1, 1937 between Pocahontas Land Corporation (successor-in-interest to Loup Creek Colliery Company) and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp. (successor-in-interest to Eastern Gas and Fuel Associates (successor-in-interest to The Koppers Company)), of record in Lease Book 5, Page 74 in the Office of the Clerk of the County Commission of Boone County, West Virginia and in Lease Book 88, Page 328 in the Office of the Clerk of the County Commission of Wyoming County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. Assigned to Eastern Associated Coal Corp. (n/k/a Eastern Associated Coal, LLC) by Eastern Gas and Fuel Associates by Deed of Assignment and Consent dated January 1, 1966, of record in Book 224, Page 123 in the Office of the Clerk of the County Commission of [Boone][Logan] County, West Virginia and Book ___, Page 182 in the Office of the Clerk of the County Commission of [Boone][Logan] County, West Virginia. | Boone |

| Contract Number | Mine Complex | Instrument | County |
|---|---|---|---|
| 0865-003-00 | Rocklick | Deed of Lease dated March 1, 1968 between Pardee Minerals LLC (successor-by-merger to Pardee Resources Group, Inc. (f/k/a Pardee Exploration Company) d/b/a Pardee Land Company and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.), of record in Lease Book 12, Page 193 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. | Boone |
| 0865-004-00 | Rocklick | Agreement of Lease dated February 1, 1974 between Pardee Minerals LLC (successor-by-merger to Pardee Resources Group, Inc. (f/k/a Pardee Exploration Company) d/b/a Pardee Land Company) and Lorado, LLC (successor-in-interest to The Southern Land Company and Dickinson Properties, Inc.) and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.), of record in Lease Book 14, Page 54 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. | Boone |
| 0865-005-00 | Rocklick | Deed of Lease dated July 1, 1942 between Rowland Land Company and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) (successor-in-interest to Eastern Gas and Fuel Associates), of record in Lease Book 13, Page 1 in the Office of the Clerk of the County Commission of Raleigh County, West Virginia, of record in Lease Book 5, Page 74 in the Office of the Clerk of the County Commission of Boone County, West Virginia and in Lease Book 88, Page 328 in the Office of the Clerk of the County Commission of Wyoming County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. Assigned to Eastern Associated Coal Corp. (n/k/a Eastern Associated Coal, LLC) by Eastern Gas and Fuel Associates by Deed of Assignment and Consent dated January 1, 1966, of record in Book 32, Page 137 in the Office of the Clerk of the County Commission of Boone County, West Virginia. | Boone |

| Contract Number | Mine Complex | Instrument | County |
|---|---|---|---|
| 0866-001-00 | Wells | Agreement of Lease dated October 1, 1947 between Lorado, LLC (successor-in-interest to Dickinson Properties, Inc. (successor-in-interest to Charles C. Dickinson and Nellie C. Dickinson)) and Southern Land Company and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) (successor-in-interest to Eastern Gas and Fuel Associates) of record in Coal Lease Book 6, Page 392 in the Office of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. Assigned to Eastern Associated Coal Corp. (n/k/a Eastern Associated Coal, LLC) by Eastern Gas and Fuel Associates by Deed of Assignment and Consent dated January 1, 1966, of record in Book 112, Page 108 in the Office of the Clerk of the County Commission of Boone County, West Virginia. | Boone |
| 0866-002-00 | Wells | Lease dated July 1, 1967 between Cole & Crane Real Estate Trust and Lorado, LLC (successor-in-interest to Dickinson Properties, Inc. and Southern Land Company) and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.), of record in Book 12, Page 108 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. | Boone |
| 0866-003-00 | Wells | Agreement of Lease dated January 29, 1946 between Shepard Boone Coal Company, LLC (successor-in-interest to Donald D. Shepard and Emily H. Shepard) and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) (successor-in-interest to Eastern Gas and Fuel Associates), of record in Coal Lease Book 6, Page 1 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. Assigned to Eastern Associated Coal Corp. (n/k/a Eastern Associated Coal, LLC) by Eastern Gas and Fuel Associates by Deed of Assignment and Consent dated January 1, 1966, of record in Book 112, Page 103 in the aforementioned Clerk's office. | Boone |

| Contract Number | Mine Complex | Instrument | County |
|---|---|---|---|
| 0793-012-01 | Wells | Real Estate Office Lease between Rivers Edge Mining LLC (f/k/a Rivers Edge Mining, Inc.) and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) dated July 31, 2004, as restated by that certain Restated Real Estate Office Lease between Rivers Edge Mining LLC (f/k/a Rivers Edge Mining, Inc.) and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) dated January 1, 2005 (unrecorded). | Boone |
| 0866-003-02 | Wells | Bill of Sale (Buildings on Sublease) between Eastern Associated Coal, LLC and Rivers Edge Mining, LLC dated July 31, 2004 (unrecorded). | Boone |
| N/A | Wells | Amended and Restated Road Use Agreement (Shepard Boone Lease) between Eastern Associated Coal, LLC and Elkland Holdings dated January 1, 2011 (unrecorded). | Boone |
| N/A | Wells | Amended and Restated Road Use Agreement (Berwind Lease) between Eastern Associated Coal, LLC and Elkland Holdings dated January 1, 2011 (unrecorded). | Boone |
| 0866-033 | Wells | Right of Way Agreement between Western Pocahontas Properties Limited Partnership and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) dated May 1, 1995 (unrecorded). | Boone |
| 0866-038 | Wells | License Agreement between Western Pocahontas Properties Limited Partnership and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) dated October 30, 1995 (unrecorded). | Boone |
| 0866-043 | Wells | Lease of Land between Penn Virginia Operating Co. (successor-by-merger to Penn Virginia Coal Company) and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) dated December 1, 2000, as modified by that certain Novation and Restatement of Lease of Land dated January 1, 2001 (unrecorded). | Boone |
| 0866-056 | Wells | License Agreement between Western Pocahontas Properties Limited Partnership, Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) and WPP LLC dated December 1, 2004 (unrecorded). | Boone |
| 0865-002-02 | Wells | Sublease between Eastern Associated Coal, LLC and Appalachia Mine Services, LLC dated June 1, 2005 (unrecorded). | Boone |
| W-LF-13 | Wells | Surface Lease between CSX Transportation and Eastern Associated Coal, LLC dated July 1, 1977. | Boone |

| Contract Nos. | Assignor | Counterparty | Instrument | Date | Location |
|---|---|---|---|---|---|
| CO L06434 | Eastern Associated Coal, LLC | CSX Transportation | Water Pipeline Crossing | 6/12/1929 | MP CLI 19.03 - Wharton, WV |
| CSX010589 | Eastern Associated | CSX Transportation | Private Crossing & | 8/21/1989 | MP CLI 20.34 - Barrett, WV |

| Contract Nos. | Assignor | Counterparty | Instrument | Date | Location |
|---|---|---|---|---|---|
| | Coal, LLC | | Replacement Cost | | |
| CO L20841 | Eastern Associated Coal, LLC | CSX Transportation | Gas Pipeline Longitudinal | 6/5/1948 | MP CLI 20.87 to CLI 21.12 - Wharton, WV |
| CO L21126 | Eastern Associated Coal, LLC | CSX Transportation | Powerline Crossing | 10/30/1948 | MP CLI 18.37 - Bim, WV |
| CO L21176 | Eastern Associated Coal, LLC | CSX Transportation | Powerline Crossing | 8/30/1948 | MP CLI 19.60 - Wharton, WV |
| CO L21313 | Eastern Associated Coal, LLC | CSX Transportation | Powerline Crossing | 1/25/1949 | MP CLI 19.96 - Wharton, WV |
| CO L23199 | Eastern Associated Coal, LLC | CSX Transportation | Powerline Crossing | 6/13/1951 | MP CLI 19.60 - Wharton, WV |
| 866-039 CSX023107 | Eastern Associated Coal, LLC | CSX Transportation | Private Crossing & Replacement Cost | 7/1/1996 | MP CLI 18.00 - Wharton, WV |
| 866-034 CSX023303 | Eastern Associated Coal, LLC | CSX Transportation | Private Crossing & Replacement Cost | 8/8/1995 | MP CLI 25.00 - Lick, WV |
| CO L35934 | Eastern Associated Coal, LLC | CSX Transportation | Private Crossing & Replacement Cost | 1/15/1973 | MP CLI 19.61 - Barrett, WV |
| 866-014 CSX003691 | Eastern Associated Coal, LLC | CSX Transportation | Private Crossing & Replacement Cost | 7/15/1987 | MP CLI 17.91 to 18.00 - Wharton, WV |
| CO L37011 | Eastern Associated Coal, LLC | CSX Transportation | Private Crossing & Replacement Cost | 11/3/1975 | MP CLI 27.19 - Bald Knob, WV |
| CO L37227 | Eastern Associated Coal, LLC | CSX Transportation | Powerline Crossing | 9/29/1976 | MP CLI 18.24 - Wharton, WV |
| CO L37292 | Eastern Associated Coal, LLC | CSX Transportation | Water Pipeline Crossing | 1/6/1977 | MP CLI 18.35 - Wharton, WV |
| CO L37293 | Eastern Associated Coal, LLC | CSX Transportation | Powerline Crossing | 1/24/1977 | MP CLI 18.00 - Wharton, WV |
| CO L40590 | Eastern Associated | CSX Transportation | Powerline Crossing | 6/4/1985 | MP CLI 25.05 - Bald Knob, |

| Contract Nos. | Assignor | Counterparty | Instrument | Date | Location |
|---|---|---|---|---|---|
| | Coal, LLC | | | | WV |
| 866-017 CO L40627 | Eastern Associated Coal, LLC | CSX Transportation | Private Crossing & Replacement Cost | 9/3/1985 | MP CLI 19.69 - Wharton, WV |
| 0866-044 CSX040826 | Eastern Associated Coal, LLC | CSX Transportation | Conveyor Belt Crossing | 1/30/2001 | MP CLI 18.7 - Wharton, WV |
| W-LF-14 to 20 CSX051235 | Eastern Associated Coal, LLC | CSX Transportation | Sidetrack - Wells | 12/18/2013 | MP CLI 17.89 - Wharton, WV |
| 0866-005 | Eastern Associated Coal, LLC | CSX Transportation | Sidetrack - Rocklick | 5/16/1986 | MP CLI 25.00 - Lick, WV |

STATE OF WEST VIRGINIA, Boone County Commission Clerk's Office 11/19/2015. The foregoing together with the certificate of its acknowledgment, was this day presented in said office and admitted to record.

Teste: [signature] Clerk

# EXHIBIT V

USCA4 Appeal: 24-2051 Doc: 34-2 Filed: 02/10/2025 Pg: 214 of 321

308

Warren L. Schultz
A Notary Public

WARREN L. SCHULTZ
My Commission expires Jan. 27, 1942

State of West Virginia,

Boone County Court Clerk's Office.

The foregoing writing, together with the annexed certificates, was this 5th day of Feb., 1942, admitted to record in my said office.

Teste: O. H. Carson, Clerk.

A Copy, Teste: O. H. Carson, Clerk.

(RECORDER'S NOTE: A copy of the map mentioned in the foregoing instrument has been furnished this office and is to be filed in Map Record No. 4 in this office.)

Orig. Mailed: H. G. Shaffer City 4-21-42

This Deed of Assignment and Consent this 9th day of December, 1941, by and between THE KOPPERS COAL COMPANY, a Delaware corporation, authorized to hold property and transact business in West Virginia, (hereinafter called "Koppers"), party of the first part, EASTERN GAS AND FUEL ASSOCIATES, (hereinafter called "Eastern"), by which name are designated the Trustees for the time being, in their collective capacity but not personally, under an Agreement and Declaration of Trust dated July 18, 1929, a copy of wh which as amended has been filed in the Office of the Commissioner of Corporations and Taxation of the Commonwealth of Massachusetts and copies of which as amended will be recorded in the Office of the Clerk of the County Court of Wyoming County, West Virginia, as a part of a deed dated October 15, 1941, from Koppers to Eastern, and in the Office of the Clerk of the County Court of Boone County as a part of a Deed of Assignment and Consent by and between Koppers, Eastern and Donald D. Shepard, dated October 15, 1941, said Deed and said Deed of Assignment and Consent to be filed for record in said Clerks' Offices contemporaneously with this Deed of Assignment and Consent, party of the second part, and LOUP CREEK COLLIERY COMPANY, a West Virginia corporation, (hereinafter called "Loup Creek"), party of the third part.

WHEREAS,

(1) By Indenture of Lease dated July 1, 1937, (hereinafter called "Original Leas Lease"), recorded in said Clerk's Office of Wyoming County in Deed Book No. 88, Page 325, and in said Clerk's Office of Boone County, in Coal Lease Book No. 5, Page 74, Loup Creek leased to Koppers for a period of 20 years, with the privilege of renewal until all the merchantable coal shall have been mined, the sole and exclusive right of mining and removing coal, and the other privileges therein set forth, in lands therein described aggregating 10,000 acres, more or less, situate partly in Wyoming and partly in Boone Counties, West Virginia; subject to the exceptions, reservations and limitations, and to terms, conditions, covenants and stipulations in Original Lease set forth at large.

(2) By Indenture dated June 1, 1938, (hereinafter called "First Easement Grant"), recorded in said Clerk's Office of Wyoming County in Deed Book No. 91, Page 489, and in

309



said Clerk's Office of Boone County in Book No. 13, Page 443, Loup Creek (Koppers joining to release its rights under Original Lease) sold, assigned and conveyed to Appalachian Electric Power Company a right-of-way for the construction of a power line over a part of the lands included in Original Lease.

(3) By Deed dated November 17, 1939, (hereinafter called "First Deed"), recorded in said Clerk's office of Wyoming County in Deed Book No. 94, Page 449, Loup Creek (Koppers joining to release its rights under Original Lease) sold and conveyed to the Board of Education of the County of Wyoming for school purposes only a tract situate on the waters of Toney Fork, Oceana District, Wyoming County, containing 0.48 of an acre, more or less; being a tract included in Original Lease.

(4) By Indenture dated May 6, 1940, (hereinafter called "Second Easement Grant"), recorded in said Clerk's Office of Wyoming County in Deed Book No. 96, Page 365, Loup Creek (koppers joining to release its rights under Original Lease) sold and conveyed to Appalachian Electric Power Company a right-of-way for the construction and maintenance of a power line therein described across lands included in Original Lease.

(5) By Supplemental Lease dated August 21, 1941, (hereinafter called "Supplemental Lease"), recorded in said Clerk's Office of Wyoming County in Deed Book No. 99, Page 488, Loup Creek leased and let, for the term and subject to the provisions of Original Lease, two tracts or parcels of land situate on Toney Fork of Clear Fork of Guyandot River therein described, containing respectively 9.7 acres and 5.3 acres, more or less, subject to an exception therein contained.

(Original Lease, as supplemented, modified and amended by First Deed, First and Second Easement Grants and Supplemental Lease are hereinafter referred to collectively as "Kopperston Lease" and the rights and privileges and leasehold estates thereby created and lands included therein are hereinafter referred to collectively as "Kopperston Leasehold"); and

WHEREAS, ARTICLE SIXTEEN of Original Lease provides that Lessee therein will not assign, convey, lease, underlet, sublet, or set over any of its estate, interest or term, in whole or in part, in the premises or their appurtenances, leased by said Original Lease without the license or consent of Loup Creek in writing under seal for that purpose being first had and obtained, but Koppers derires to assign all its interest in Kopperston Lease and Kopperston Leasehold to Eastern, and Loup Creek is willing to consent thereto under the terms and conditions hereinafter contained.

NOW, THEREFORE, THIS DEED OF ASSIGNMENT AND CONSENT WITNESSETH:

That, in consideration of the sum of Ten Dollars ($10.00) cash in hand paid, and other good and valuable considerations, receipt of all of which is hereby acknowledged, Koppers, with the consent of Loup Creek, doth sell, assign, transfer and set over unto Eastern:

I. All the estate, interest or term of Koppers in Kopperston Lease and Kopperston Leasehold.

II. All the buildings, improvements, fixtures, machinery, equipment, apparatus and appliances, including without limiting the generality of the foregoing, all tenement houses, electric locomotives, side tracks, mine rails, tipple and tipple equipment, power house machinery and equipment, mine cars, mining machines, wires, mine pumps and pipe lines, shop machinery and equipment, electric lines, substations, poles and equipment, fans, motors, office equipment and furniture, and all other tangible personal property of every kind and character owned by Koppers and belonging to or in any way appertaining to the coal mining

310



operations now conducted by Koppers on Kopperston Leasehold.

Loup Creek consents and agrees in writing under seal to the assignment of all of the estate, interest or terms of Koppers in said Kopperston Lease and Kopperston Leasehold, and in consideration of the consent of Loup Creek to this assignment Eastern expressly accepts the assignment of the leasehold estate and mining equipment herein contained and agrees to assume all the duties, responsibilities, liabilities, and obligations of Koppers under Kopperston Lease as fully and with the same effect as if it had been the original lessee in Kopperston Lease and covenants with Loup Creek that it will faithfully keep and perform each and every the covenants and conditions therein required to be kept and performed, including, without limiting the generality of the foregoing, the covenant against assignment contained in Article SIXTEEN of Original Lease.

Koppers covenants with Eastern that it shall have quiet possession of the leases and leasehold estates hereby assigned.

It is expressly understood and agreed that the name "Eastern" refers to the Trustees under the Agreement and Declaration of Trust establishing Eastern Gas and Fuel Associates dated July 18, 1929, filed and recorded as above recited, as Trustees, and not personally, and no Trustee, shareholder, officer or agent of Eastern shall be held to any personal liability hereunder or in connection with the affairs of Eastern, but only the trust estate under said Agreement and Declaration of Trust is or shall be liable for any default in the obligations assumed by Eastern or for any liability in any way arising hereunder.

The date of this Deed of Assignment and Consent first appearing is intended as a date of reference only, and the assignment herein contained from Koppers to Eastern and the consent of Loup Creek shall not become effective until acceptance hereof by Eastern, which acceptance will be on the date of the acknowledgment hereof by Eastern.

IN WITNESS WHEREOF, Koppers and Loup Creek have caused their corporate names to be signed and their corporate seals to be affixed hereto by their proper officers thereunto duly authorized and Eastern has caused its name to be signed and its common seal to be affixed hereto by its proper officers thereunto duly authorized.

(CORPORATE SEAL)

Attest:

Thomas J. Mintin
Asst Secretary

APPROVED AS TO
LEGAL FORM
BY T. J. M.

THE KOPPERS COAL COMPANY,

By J. P. Williams Jr.
President

EASTERN GAS AND FUEL ASSOCIATES,

By H. Doolittle
Vice President

(CORPORATE SEAL)

Attest:

T. H. Hamilton
Asst. Secretary

LOUP CREEK COLLIERY COMPANY

By C. Bucholtz
President.

Attest:

J. B. Fuggle
Asst. Secretary

COMMONWEALTH OF PENNSYLVANIA }
COUNTY OF ALLEGHENY } SS:

I, W. V. Blackstone, a Notary Public of the County and Commonwealth aforesaid do certify that J. P. WILLIAMS, JR., President, who has signed the writing above bearing date the 9th day of December, 1941, for The Koppers Coal Company, has this day in my

USCA4 Appeal: 24-2051 Doc: 34-2 Filed: 02/10/2025 Pg: 217 of 321

said County, before me, acknowledged the said writing to be the act and deed of said corporation.

Given undeб my hand and notarial seal this 22nd day of December, 1941.

(NOTARIAL SEAL)

W. V. Blackstone
Notary Public.

My Commission Expires:

W. V. BLACKSTONE, Notary Public
MY COMMISSION EXPIRES
APRIL 1, 1943

COMMONWEALTH OF PENNSYLVANIA }
COUNTY OF ALLEGHENY } SS:

I, W. V. Blackstone, a Notary Public of the County and Commonwealth aforesaid do certify that H. DOOLITTLE, Vice President, who signed the writing above bearing date the 9th day of December, 1941, for Eastern Gas and Fuel Associates, has this day, in my said County, before me, acknowledged the said writing to be the act and deed of said Association.

Given under my hand and notarial seal this 31st day of December, 1941.

(NOTARIAL SEAL)

W. V. Blackstone
Notary Public

My Commission expires:

W. V. BLACKSTONE, Notary Public
MY COMMISSION EXPIRES
APRIL 1, 1943

STATE OF VIRGINIA }
CITY OF NORFOLK } SS:

I, C. F. Fitzsimmons, a Notary Public of the City and State aforesaid do certify that C. BUCHOLTZ, who has signed the writing above bearing date the9th day of December, 1941, for Loup Creek Colliery Company, has this day in my said City, before me, acknowledged the said writing to be the act and deed of said corporation.

Given under my hand andsnotarial seal this 26 day of December, 1941.

C. F. Fitzsimmons
Notary Public

My Commission Expires: April 27, 1944.

(NOTARIAL SEAL)

OFFICE OF THE CLERK OF THE COUNTY COURT }
Wyoming County, W. Va. January 2, 1942 } ss.

The foregoing writing, together with the certificate of acknowledgment thereof thereto annexed, was this day admitted to record in said office.

Teste: E. P. Cook Clerk

State of West Virginia,
Boone County Court Clerk's Office.

The foregoing writing, together with the annexed certificates, was this 9th day of April, 1942, admitted to record in my said office.

Teste: O. H. Carson, Clerk.

A Copy, Teste: O. H. Carson, Clerk.

USCA4 Appeal: 24-2051 Doc: 34-2 Filed: 02/10/2025 Pg: 218 of 321

Warren L. Schultz
A Notary Public

WARREN L. SCHULTZ
My Commission expires Jan. 27, 1942

State of West Virginia,

Boone County Court Clerk's Office.

The foregoing writing, together with the annexed certificates, was this 5th day of Feb., 1942, admitted to record in my said office.

Teste: O. H. Carson, Clerk.

A Copy, Teste: O. H. Carson, Clerk.

(RECORDER'S NOTE: A copy of the map mentioned in the foregoing instrument has been furnished this office and is to be filed in Map Record No. 4 in this office.)

This Deed of Assignment and Consent this 9th day of December, 1941, by and between THE KOPPERS COAL COMPANY, a Delaware corporation, authorized to hold property and transact business in West Virginia, (hereinafter called "Koppers"), party of the first part, EASTERN GAS AND FUEL ASSOCIATES, (hereinafter called "Eastern"), by which name are designated the Trustees for the time being, in their collective capacity but not personally, under an Agreement and Declaration of Trust dated July 18, 1929, a copy of wh which as amended has been filed in the Office of the Commissioner of Corporations and Taxation of the Commonwealth of Massachusetts and copies of which as amended will be recorded in the Office of the Clerk of the County Court of Wyoming County, West Virginia, as a part of a deed dated October 15, 1941, from Koppers to Eastern, and in the Office of the Clerk of the County Court of Boone County as a part of a Deed of Assignment and Consent by and between Koppers, Eastern and Donald D. Shepard, dated October 15, 1941, said Deed and said Deed of Assignment and Consent to be filed for record in said Clerks' Offices contemporaneously with this Deed of Assignment and Consent, party of the second part, and LOUP CREEK COLLIERY COMPANY, a West Virginia corporation, (hereinafter called "Loup Creek"), party of the third part.

WHEREAS,

(1) By Indenture of Lease dated July 1, 1937, (hereinafter called "Original Leas Lease"), recorded in said Clerk's Office of Wyoming County in Deed Book No. 88, Page 325, and in said Clerk's Office of Boone County, in Coal Lease Book No. 5, Page 74, Loup Creek leased to Koppers for a period of 20 years, with the privilege of renewal until all the merchantable coal shall have been mined, the sole and exclusive right of mining and removing coal, and the other privileges therein set forth, in lands therein described aggregating 10,000 acres, more or less, situate partly in Wyoming and partly in Boone Counties, West Virginia; subject to the exceptions, reservations and limitations, and to terms, conditions, covenants and stipulations in Original Lease set forth at large.

(2) By Indenture dated June 1, 1938, (hereinafter called "First Easement Grant"),

Orig. Mailed: H. G. Shaffer City 4.21.42

operations now conducted by Koppers on Kopperston Leasehold.

Loup Creek consents and agrees in writing under seal to the assignment of all of the estate, interest or terms of Koppers in said Kopperston Lease and Kopperston Leasehold, and in consideration of the consent of Loup Creek to this assignment Eastern expressly accepts the assignment of the leasehold estate and mining equipment herein contained and agrees to assume all the duties, responsibilities, liabilities, and obligations of Koppers under Kopperston Lease as fully and with the same effect as if it had been the original lessee in Kopperston Lease and covenants with Loup Creek that it will faithfully keep and perform each and every the covenants and conditions therein required to be kept and performed, including, without limiting the generality of the foregoing, the covenant against assignment contained in Article SIXTEEN of Original Lease.

Koppers covenants with Eastern that it shall have quiet possession of the leases and leasehold estates hereby assigned.

It is expressly understood and agreed that the name "Eastern" refers to the Trustees under the Agreement and Declaration of Trust establishing Eastern Gas and Fuel Associates dated July 18, 1929, filed and recorded as above recited, as Trustees, and not personally, and no Trustee, shareholder, officer or agent of Eastern shall be held to any personal liability hereunder or in connection with the affairs of Eastern, but only the trust estate under said Agreement and Declaration of Trust is or shall be liable for any default in the obligations assumed by Eastern or for any liability in any way arising hereunder.

The date of this Deed of Assignment and Consent first appearing is intended as a date of reference only, and the assignment herein contained from Koppers to Eastern and the consent of Loup Creek shall not become effective until acceptance hereof by Eastern, which acceptance will be on the date of the acknowledgment hereof by Eastern.

IN WITNESS WHEREOF, Koppers and Loup Creek have caused their corporate names to be signed and their corporate seals to be affixed hereto by their proper officers thereunto duly authorized and Eastern has caused its name to be signed and its common seal to be affixed hereto by its proper officers thereunto duly authorized.

(CORPORATE SEAL)

Attest:

Thomas J. Mintin
Asst Secretary

THE KOPPERS COAL COMPANY,

By J. P. Williams Jr.
President

APPROVED AS TO LEGAL FORM
BY T. J. M.

EASTERN GAS AND FUEL ASSOCIATES,

By H. Doolittle
Vice President

(CORPORATE SEAL)

Attest:

T. H. Hamilton
Asst. Secretary

LOUP CREEK COLLIERY COMPANY

By C. Bucholtz
President.

Attest:

J. B. Fuggle
Asst. Secretary

COMMONWEALTH OF PENNSYLVANIA }
COUNTY OF ALLEGHENY } SS:

I, W. V. Blackstone, a Notary Public of the County and Commonwealth aforesaid do certify that J. P. WILLIAMS, JR., President, whose name is signed the writing above bearing

# EXHIBIT W

(PARTIAL) SEE RELEASE BOOK No. V7 PAGE 127

7-20-65 GIP:gpb

182

BOOK 224 PAGE 123

THIS DEED OF ASSIGNMENT AND CONSENT, made this first day of January, 1966, by and between Pocahontas Land Corporation, a corporation of Virginia (hereinafter called "Land Corporation"), Eastern Gas and Fuel Associates, a Massachusetts voluntary association (hereinafter called "Eastern") and Eastern Associated Coal Corp., a West Virginia corporation (hereinafter called "Coal Corp."):

W I T N E S S E T H:

WHEREAS:

(1) By lease dated July 1, 1937 (hereinafter called "Original Lease") recorded in Wyoming County, West Virginia in Deed Book No. 88, page 325 and in Boone County, West Virginia in Coal Lease Book No. 5, page 74, Loup Creek Colliery Company (hereinafter called "Colliery Company"), remote predecessor of Land Corporation, leased to The Koppers Coal Company (hereinafter called "Koppers") for a period of twenty years from July 1, 1937, subject to renewal, the right of mining coal from all seams of coal in approximately 10,000 acres located partly in said Wyoming County and partly in said Boone County;

(2) By deed dated November 17, 1939, recorded in said Wyoming County in Deed Book No. 94, page 449, Colliery Company conveyed and Koppers released to The Board of Education of the County of Wyoming, solely for public school purposes the surface only of 0.48 of an acre of lands included in Eastern's leasehold;

(3) By supplemental lease dated August 21, 1941, recorded in said Wyoming County in Deed Book No. 99, page 488, Colliery Company and Koppers added approximately 15 acres in Wyoming County to the property covered by the said Original Lease;

(4) By deed of assignment and consent dated December 9, 1941, recorded in said Wyoming County in Deed Book No. 102, page 1 and in said Boone County in Deed Book No. 5, page 308, Koppers, with the consent of Colliery Company, assigned to Eastern all of its rights, duties, responsibilities, obligations and liabilities under said Original Lease as theretofore supplemented and modified to the date of such assignment and Eastern accepted said assignment;

(5) By supplemental lease dated November 2, 1943, recorded in said Wyoming County in Deed Book No. 106, page 91, Colliery Company and Eastern added approximately 410 acres located in said Wyoming County to the said Original Lease;

(6) By certificate dated January 10, 1946, Colliery Company changed its name to Loup Creek Company (hereinafter called "Loup Creek");

Orig: C. S. Terrell

USCA4 Appeal: 24-2051 Doc: 34-2 Filed: 02/10/2025 Pg: 222 of 321



BOOK 224 PAGE 174

(7) By indenture of lease dated August 15, 1946, recorded in said Wyoming County in Deed Book No. 118, page 359, Loup Creek, with consent of Eastern, leased to Hope Natural Gas Company the surface only of 6.47 acres of lands included in Eastern's leasehold;

(8) By supplemental lease dated May 15, 1947, recorded in said Wyoming County in Deed Book No. 123, page 360, Loup Creek and Eastern added approximately 1,454 acres located in said Wyoming County to the said Original Lease;

(9) By letter dated September 25, 1947, unrecorded, Eastern was given permission to mine and remove the outcrop coal by the strip mining method within the area covered by the said Original Lease;

(10) By supplemental lease dated December 1, 1947, recorded in said Wyoming County in Deed Book No. 131, page 39, in said Boone County in Coal Lease Book No. 7, page 459 and in Logan County, West Virginia, in Lease Book No. 13, page 219, Loup Creek and Eastern added approximately 17,200 acres located in said three aforementioned counties to the said Original Lease and adjusted the minimum royalties thereunder;

(11) By indenture dated March 15, 1948, unrecorded, Loup Creek and Eastern conveyed to the Virginian Railway, an easement for additional tipple tracks at Kopperston, 5.63 acres in two parcels;

(12) By deed dated April 1, 1950, recorded in said Wyoming County in Deed Book No. 144, page 320, and in said Logan County in Deed Book No. 207, page 258, Loup Creek conveyed and Eastern and Hope Natural Gas Company released from their respective leaseholds, 40.64 acres to Pardee Land Company;

(a) In exchange for the above, by deed dated April 1, 1950, recorded in said Wyoming County in Deed Book No. 144, page 317, and in said Logan County in Deed Book No. 207, page 255, Pardee conveyed and The Lorado Coal Mining Company and United Producing Company, Inc. released from their respective leaseholds, 40.64 acres to Loup Creek;

(b) By supplemental lease dated April 1, 1950, recorded in said Wyoming County in Deed Book No. 144, page 323, and in said Logan County in Deed Book No. 207, page 261, Loup Creek added the above said 40.64 acres to Original Lease; and

(c) By indenture dated April 1, 1950, recorded in said Wyoming County in Deed Book No. 144, page 329 and in said Logan County in Deed Book No. 207, page 267, Loup Creek, Eastern, Pardee Land Company and The Lorado Coal Mining Company agreed to the establishment of a mining barrier pillar on the dividing line between the lands of Loup Creek and Pardee Land Company;

(13) By deed dated August 30, 1951, recorded in said Wyoming County in Deed Book No. 151, page 95, Loup Creek conveyed and Eastern released to Jesse Redyard 15.7 acres of surface



 

184

included in Eastern's leasehold;

(14) By deed dated September 25, 1951, unrecorded, Loup Creek conveyed and Eastern released to The Board of Education of the County of Wyoming, solely for public school purposes the surface only of 0.85 of an acre of lands included in Eastern's leasehold;

BOOK 224 PAGE 185

(15) By indenture dated January 15, 1953, recorded in said Wyoming County in Deed Book No. 159, page 185, in said Boone County in Coal Lease Book No. 8, page 486, and in said Logan County in Deed Book No. 228, page 230, Loup Creek and Eastern extended the term of the said Original Lease for an additional period of twenty years from and after July 1, 1957, and Loup Creek agreed to a reduction in the minimum rental payable thereunder;

(16) By deed dated June 29, 1953, recorded in said Wyoming County in Deed Book No. 158, page 248, Loup Creek conveyed and Eastern released to Murvan Walker and W. C. Bailey, Jr. 1.24 acres of surface included in Eastern's leasehold;

(17) By deed dated September 10, 1954, recorded in said Wyoming County in Deed Book No. 163, page 381, Loup Creek conveyed to Eastern the surface only of 53.52 acres, in four parcels, at Kopperston;

(18) By deed dated April 14, 1955, recorded in said Wyoming County in Deed Book No. 166, page 176, Loup Creek conveyed to Eastern the surface only of 10.29 acres for a tipple site at Kopperston;

(19) By deed dated May 22, 1956, unrecorded, Loup Creek conveyed and Eastern released to Joda Brown, Trustee, 1.52 acres for use as a cemetery on Big Huff Creek in said Wyoming County;

(20) By supplemental lease dated September 12, 1956, recorded in said Wyoming County in Deed Book No. 174, page 375, Loup Creek and Eastern added approximately 3,042 acres to the said Original Lease, as extended;

(21) By indenture dated June 9, 1959, recorded in said Wyoming County in Deed Book No. 191, page 386, in said Boone County in Coal Lease Book No. 10, page 193, and in said Logan County in Deed Book No. 269, page 210, Loup Creek and Eastern amended the said Original Lease to permit Eastern to cut all timber on the said leased premises except line trees;

(22) By agreement dated March 1, 1963, unrecorded, as supplemented and extended, Loup Creek and Eastern granted J. P. Hamer Lumber Company, Inc., the right to cut certain specified timber on 2,400 acres on Pond Fork in said Boone County;

(23) By sublease and consent agreement dated April 15, 1963, unrecorded, Eastern, with the consent of Loup Creek, subleased to Ranger Fuel Corporation until exhaustion or April 14, 1968, whichever first occurs, the right to mine by strip or auger all coal contained in certain outcrop areas of the Campbell Creek

and Eagle Seams in approximately 13,400 acres;

(24) By agreement dated May 15, 1963, unrecorded, as supplemented, Loup Creek and Eastern granted to said J. P. Hamer Lumber Company, Inc., the right to cut certain specified timber on 7,500 acres on the headwaters of Huff Creek in said Wyoming and Logan Counties;

(25) By lease dated June 1, 1963, recorded in said Wyoming County in Deed Book No. 211, page 216, Loup Creek, with Eastern's consent, leased to Hope Natural Gas Company 0.92 of an acre within Eastern's leasehold;

(26) By agreement dated June 10, 1963, unrecorded, Hope Natural Gas Company, with consent of Loup Creek and Eastern, granted to Peake Petroleum Company the right to maintain, operate and remove a radio tower and small building located on the above 0.92 of an acre;

(27) By indenture and release dated December 5, 1963, recorded in said Wyoming County in Deed Book No. 211, page 285, and in said Boone County in Deed Book No. 107, page 92, Eastern surrendered to Loup Creek its right to use walnut and poplar trees upon Eastern's leasehold, said right having been granted to Eastern by the hereinbefore recited indenture dated June 9, 1959 (recital No. 21);

(28) By indenture of conveyance of production payment dated December 28, 1964, recorded in said Wyoming County in Deed Book No. 216, page 448, in said Boone County in Contract Book No. 32, page 340, and in Raleigh County, West Virginia in Deed Book No. 436, page 287, Eastern, with the consent of Loup Creek, sold to Woodfin Corporation 22% of all of the coal which may be mined from the area described in Exhibit A attached thereto;

(29) By indenture of conveyance of production payment dated December 28, 1964, recorded in said Wyoming County in Deed Book No. 216, page 404, in said Boone County in Contract Book No. 32, page 388, and in said Raleigh County in Deed Book No. 436, page 321, Eastern, with the consent of Loup Creek, sold to Woodfin Corporation 15% of all of the coal which may be mined from the area described in Exhibit A attached thereto;

(30) By agreement dated March 4, 1965, unrecorded, Loup Creek and Eastern granted to said J. P. Hamer Lumber Company, Inc., the right to cut certain additional specified timber on about 980 acres on Pond Fork in said Boone County;

(31) By various instruments of record in said Wyoming, Boone and Logan Counties but too numerous to be practicable to recite herein, Loup Creek and Eastern have granted easements of rights of way for public roads, electric power transmission lines, gas pipelines, water pipelines, telephone lines and private roadways to

(a) State Road Commission of West Virginia for public roads;

166

(b) Appalachian Power Company for electric power transmission lines and appurtenances;

(c) Hope Natural Gas Company, Cabot Corporation, United Producing Company, Oceana Gas Company and Jesse Redyard for gas pipelines and appurtenances;

(d) Chesapeake and Potomac Telephone Company of West Virginia for telephone lines and appurtenances;

(e) Town of Oceana and Kopperston Water Company for water pipelines; and

(f) Hope Natural Gas Company and Cabot Corporation for private roadways; and

(32) By agreement of merger dated June 16, 1965, effective June 30, 1965, recorded in Fayette County, West Virginia in Book No. 7, page 233, and in Mercer County, West Virginia in Deed Book No. 415, page 641, Loup Creek was merged into Land Corporation.

WHEREAS, Eastern desires to assign to Coal Corp. all of its rights, duties, responsibilities, obligations and liabilities as specified in all of the aforementioned documents (said documents hereinabove mentioned being hereinafter collectively referred to as the "Kopperston Papers") and Coal Corp. is willing to receive and accept said assignment and to assume said duties, responsibilities, obligations and liabilities; and

WHEREAS, Land Corporation, whose consent to such assignment is necessary, is willing to consent to said assignment upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) paid by each of the parties hereto to the other, the receipt and sufficiency of which is hereby acknowledged, in consideration of the above premises and in further consideration of the mutual promises and undertakings hereinafter set forth, Land Corporation, Eastern and Coal Corp. do hereby agree as follows:

FIRST. Eastern herewith assigns all of its rights, duties, responsibilities, obligations and liabilities under the said Kopperston Papers to Coal Corp.

USCA4 Appeal: 24-2051 Doc: 34-2 Filed: 02/10/2025 Pg: 226 of 321



SECOND. Coal Corp. herewith accepts said assignment and herewith expressly assumes all of the duties, responsibilities, obligations and liabilities of Eastern under said Kopperston Papers and further covenants that it will perform and observe all the terms and provisions thereof as fully and to the same effect as if it had been the original party thereto.

THIRD. Land Corporation hereby consents to the aforesaid assignment by Eastern to Coal Corp., provided, however, that (a) this consent shall not be construed as consenting to any subsequent assignment of any or all of the Kopperston Papers or of any rights thereunder or as a waiver of any of the restrictions therein contained or of any other terms and provisions thereof and (b) Eastern shall be responsible to Land Corporation for the performance and observance by Coal Corp. of all of Eastern's present duties, responsibilities, obligations and liabilities under said Kopperston Papers.

FOURTH. Reference is hereby made to the declaration of trust establishing Eastern Gas and Fuel Associates, dated July 18, 1929, as amended, a copy of which is on file in the office of the Secretary of the Commonwealth of Massachusetts. The name "Eastern Gas and Fuel Associates" refers to the trustees under said declaration as trustees and not personally; and no trustee, shareholder, officer, agent or employee of Eastern Gas and Fuel Associates shall be held to any personal liability in connection with the affairs of said Eastern Gas and Fuel Associates, but the trust estate only is liable.

IN WITNESS WHEREOF, Land Corporation, Eastern and Coal Corp. have hereunto, by their officers duly authorized, executed this deed of assignment and consent thereto and have affixed their seals hereto on the day and year first above written.

188

Executed in three counterparts.

POCAHONTAS LAND CORPORATION
By

W. L. Bailes Jr.
Vice President

Attest: M. T. Harrington
Assistant Secretary
M. T. HARRINGTON

BOOK 224 PAGE 161

EASTERN GAS AND FUEL ASSOCIATES
By

Senior Vice President

Attest: Guido A. Rothrauff Jr.
Assistant Secretary

EASTERN ASSOCIATED COAL CORP.
By

A. P. Boxley
Executive Vice President

Attest:
Assistant Secretary

- - - - - - - - - - - - - - -

STATE OF VIRGINIA )
( to-wit:
CITY OF ROANOKE )

I, HARRY W. SCRUGGS, a Notary Public of said City, do certify that W. L. BAILES JR., Vice President, who signed the writing hereto annexed, bearing date the first day of January, 1966, for said Pocahontas Land Corporation, has this day in my said City, before me, acknowledged the said writing to be the act and deed of said corporation.

Given under my hand and official seal this 30th day of DECEMBER, ~~1966~~ 1965.

Harry W. Scruggs
Notary Public

My commission expires July 1, 1968

COMMONWEALTH OF MASSACHUSETTS )
(to-wit:
COUNTY OF SUFFOLK )

I, Jean Wook, a Notary Public of said County, do certify that J. D. Philips, Senior Vice President, who signed the writing hereto annexed, bearing date the first day of January, 1966, for Eastern Gas and Fuel Associates, has this day in my said County, before me, acknowledged the said writing to be the act and deed of said association.

Given under my hand and official seal this 31st day of December, ~~1966~~ 1965.

Notary Public

My commission expires My commission expires March 15, 1971

COMMONWEALTH OF PENNSYLVANIA )
(to-wit:
COUNTY OF ALLEGHENY )

I, Mary Sipula, a Notary Public of said County, do certify that A. P. Bosley, Executive Vice President, who signed the writing hereto annexed, bearing date the first day of January, 1966, for Eastern Associated Coal Corp., has this day in my said County, before me, acknowledged the said writing to be the act and deed of said corporation.

Given under my hand and official seal this 27th day of December, ~~1966~~ 1965.

Mary Sipula
Notary Public

My commission expires MARY SIPULA, Notary Public Pittsburgh, Allegheny Co., Pa. My Commission Expires March 4, 1968



This instrument prepared by Paige Wooldridge, Attorney at Law, Bluefield, West Virginia

OFFICE OF THE CLERK OF THE COUNTY COURT
WYOMING COUNTY, W. VA. Jan 3, 1966 - A.M. 11:37 SS.
The foregoing writing, together with the certificate of acknowledgment thereof thereto annexed, was this day admitted to record.

Clerk

By Dacia M Brook Deputy

State of West Virginia, Boone County Court Clerk's Office.
The foregoing writing, together with the annexed certificate, was this 7th day of January, 1966, at 2:15 o'clock P. M., admitted to record in my said office.
Teste: [signature] Clerk. By E Kay Hall Deputy
8318 Fee $ 7.25

 

# EXHIBIT X

THIS LEASEHOLD CREDIT LINE DEED OF TRUST IS, AMONG OTHER THINGS, A FINANCING STATEMENT UNDER THE UNIFORM COMMERCIAL CODE COVERING MINERALS, TIMBER, AS-EXTRACTED COLLATERAL AND THE LIKE, ACCOUNTS RESULTING FROM THE SALE OF MINERALS, TIMBER, AS-EXTRACTED COLLATERAL AND THE LIKE, AND GOODS WHICH ARE, OR ARE TO BECOME, FIXTURES ON THE REAL/IMMOVABLE PROPERTY HEREIN DESCRIBED IN SCHEDULES THROUGH A, B AND C ATTACHED HERETO. THIS DEED OF TRUST IS TO BE RECORDED IN THE REAL ESTATE OR COMPARABLE RECORDS OF THE COUNTY OF EACH COUNTY IN EACH STATE IN WHICH IS SITUATED ANY OF THE REAL PROPERTY COLLATERAL COVERED HEREBY.

# LEASEHOLD CREDIT LINE DEED OF TRUST

**(This instrument secures an obligation that may increase and decrease from time to time.)**

LEASEHOLD CREDIT LINE DEED OF TRUST,
ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT,
FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING

BY
**ROCKWELL MINING, LLC,**

as Grantor,

TO
**BRYON D. COLLIER, ESQ.,**
as Trustee for the benefit of,

CANTOR FITZGERALD SECURITIES,
as Collateral Agent,

Beneficiary

Dated as of January 22, 2020
Effective as of January 22, 2020
Relating to Premises in:
Boone County, West Virginia

This instrument was prepared in consultation with counsel in the state in which the Trust Property is located by the attorney named below and after recording, please return to:

Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016
Attn: Michael A. Smith, Esq.

Return to: **Dinsmore & Shohl LLP**
**Attn:** Bryon Collier
**611 Third Avenue**
**Huntington, WV 25701**

Roger Toney
BOONE County 11:28:30 AM
Instrument No 202000710
Date Recorded 02/19/2020
Document Type DEED OF TRUST
Pages Recorded 44
Book-Page 383-70-113
Recording Fee $50.00
Additional $19.00

# LEASEHOLD CREDIT LINE DEED OF TRUST

**(This instrument secures an obligation that may increase and decrease from time to time.)**

LEASEHOLD CREDIT LINE DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT, FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING

LEASEHOLD CREDIT LINE DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT, FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING (the "Deed of Trust"), dated as of January 22 2020, and effective as of January 22, 2020, made by **ROCKWELL MINING, LLC**, a Delaware limited liability company, having an office at 3228 Summit Square Place, Suite 180, Lexington, KY 40509, as grantor, assignor and debtor (in such capacities and together with any successors in such capacities, the "Grantor"), in favor of **BRYON D. COLLIER, ESQ.**, having a residence address of 611 Third Avenue, Huntington, WV, 25701, as trustee under this Deed of Trust (together with any successors in such capacities, the "Trustee") for the benefit of CANTOR FITZGERALD SECURITIES LLC, a New York general partnership, having the address of its principal place of business at 900 West Trade Street, Suite 725, Charlotte, North Carolina 28202, in its capacity as senior secured collateral agent pursuant to the Senior Secured Term Loan Credit Agreement (each as hereinafter defined), as beneficiary, assignee and secured party (in such capacities and together with any successors in such capacities, the "Collateral Agent" or "Beneficiary").

## R E C I T A L S:

A. BLACKHAWK DRE, LLC, a Delaware limited liability company (the "Borrower"), BLACKHAWK MINING, LLC, a Delaware limited liability company ("Holdings"), the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent, have entered into that certain Senior Secured Term Loan Credit Agreement, dated as of October 31, 2019 (as further amended, restated, supplemented or otherwise modified from time to time, the "Senior Secured Term Loan Credit Agreement").

B. The Borrower owns, directly or through its Subsidiaries, all of the issued and outstanding shares of the Grantor.

C. The Grantor has, pursuant to the Guaranty, unconditionally guaranteed the Secured Obligations.

D. The Grantor will receive substantial benefits from the execution, delivery and performance of the obligations under the Senior Secured Term Loan Credit Agreement and the other Credit Documents and is, therefore, willing to enter into this Deed of Trust.

E. This Deed of Trust is given by Grantor in favor of Beneficiary for the benefit of the Secured Creditors to secure the payment and performance of all of the Secured Obligations.

F. It is a condition to the obligations of the Lenders to make the Term Loans under the Senior Secured Term Loan Credit Agreement that the Grantor execute and deliver the applicable Credit Documents, including this Deed of Trust.

G. Grantor is the owner and holder of (i) the Trust Property (as hereinafter defined), including all of the Land described in Schedule A annexed hereto, (ii) the tenant's/subtenant's or lessee's/sublessee's interest created by those certain leases and subleases (as amended to date and as amended, amended and restated, supplemented, renewed or otherwise modified from time to time in accordance with the provisions of this Deed of Trust, the "Mortgaged Leases") set forth in Schedule B annexed hereto, which Schedule B describes the properties demised under such Mortgaged Leases and as evidenced by the recorded original or a short form lease or memorandum of lease or similar instrument relating to the Mortgaged Leases recorded at the times and in the real property records set forth in Schedule B annexed hereto and (iii) the rights of way, easements and contracts set forth in Schedule C annexed hereto (as amended, amended and restated, supplemented, renewed or otherwise modified from time to time in accordance with the provisions of this Deed of Trust, the "Other Rights").

A G R E E M E N T:

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor and the Beneficiary hereby agrees as follows:

ARTICLE I.

DEFINITIONS AND INTERPRETATION

SECTION 1.1. Definitions. (a) Capitalized terms used but not otherwise defined herein that are defined in the Senior Secured Term Loan Credit Agreement shall have the meanings given to them in the Senior Secured Term Loan Credit Agreement, including the following:

"ABL Intercreditor Agreement"; "Affiliate"; "Asset Sale"; "Commitments"; "Credit Documents"; "Credit Party"; "Environmental Law"; "Event of Default"; "Governmental Authority"; "Guaranty"; "Lender"; "Lien"; "Material Adverse Effect"; "Mining Laws"; "Mining Lease"; "Mining Permits"; "Net Cash Proceeds"; "Recover Event"; "Requirements of Law"; "Secured Creditors"; and "Security Agreement".

The following terms in this Deed of Trust shall have the following meanings:

"Bankruptcy Code" shall have the meaning assigned to such term in Section 5.1(ii) hereof.

"Beneficiary" shall have the meaning assigned to such term in the Preamble hereof.

"Charges" shall mean any and all real estate, ad valorem, real property, personal property, severance, production, and other taxes, assessments and special assessments, levies,

fees, all water and sewer rents and charges and all other governmental charges imposed upon or assessed against, and all claims (including, without limitation, claims for landlords', carriers', mechanics', workmens', repairmens', laborers', materialmens', suppliers' and warehousemens' Liens and other claims arising by operation of law) judgments or demands against, all or any portion of the Trust Property or other amounts of any nature which, if unpaid, may be reasonably be expected to result in or permit the creation of, a lien on the Trust Property or which might result in foreclosure of all or any portion of the Trust Property.

"Contracts" shall mean, collectively, any and all right, title and interest of the Grantor in and to any and all contracts and other general intangibles relating to the Trust Property and all reserves, deferred payments, deposits, refunds and claims of every kind, nature or character relating thereto.

"Deed of Trust" shall have the meaning assigned to such term in the Preamble hereof.

"Senior Secured Term Loan Credit Agreement" shall have the meaning assigned to such term in Recital A hereof.

"Grantor" shall have the meaning assigned to such term in the Preamble hereof.

"Grantor's Interest" shall have the meaning assigned to such term in Section 2.2 hereof.

"Improvements" shall have the meaning assigned to such term in Section 2.1(iii).

"Insurance Policies" means the insurance policies and coverages required to be maintained by the Grantor with respect to the Trust Property pursuant to the Senior Secured Term Loan Credit Agreement and includes, without limitation, any and all contracts, insurance policies, bonds, and the like, and all financial assurance instruments, agreements and insurance policies, obtained by or given on behalf of Grantor in connection with mining, mineral processing, reclamation and other activities on the Trust Property, and includes all such policies under which Beneficiary, or either Grantor is listed as an additional loss payee or beneficiary.

"Land" shall mean the real property more particularly described in Schedules A and C annexed hereto.

"Landlord" shall mean any landlord, lessor, sublandlord, sublessor, franchisor, licensor or grantor, as applicable.

"Leases" shall have the meaning assigned to such term in Section 2.1(vi).

"Leased Premises" shall have the meaning assigned to such term in Section 2.1(ii).

"Mortgaged Leases" shall have the meaning assigned to such term in Recital G as set forth in Schedule B hereto.

"Other Rights" shall have the meaning assigned to such term in Recital G.

"Owned Premises" shall have the meaning assigned to such term in Section 2.1(i).

"Permit" shall mean any and all permits, certificates, approvals, authorizations, consents, licenses, variances, franchises or other instruments, however characterized, of any Governmental Authority (or any person acting on behalf of a Governmental Authority) now or hereafter acquired or held, together with all amendments, modifications, extensions, renewals and replacements of any thereof issued or in any way furnished in connection with the Trust Property including, without limitation, building permits, certificates of occupancy, environmental certificates, industrial permits or licenses and certificates of operation.

"Permitted Collateral Liens" shall mean "Permitted Encumbrances" as defined in the Senior Secured Term Loan Credit Agreement.

"Personal Property" shall have the meaning assigned to such term in Section 2.1(iv).

"Premises" shall have the meaning assigned to such term in Section 2.1(iii).

"Proceeds" shall mean, collectively, any and all cash proceeds and noncash proceeds and shall include all (i) proceeds of the conversion, voluntary or involuntary, of any of the Trust Property or any portion thereof into cash or liquidated claims, (ii) proceeds of any Insurance Policy, indemnity, warranty, guaranty or claim payable to the Beneficiary or to the Grantor from time to time with respect to any of the Trust Property, (iii) payments (in any form whatsoever) made or due and payable to the Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any portion of the Trust Property by any Governmental Authority (or any person acting on behalf of a Governmental Authority), (iv) products of the Trust Property and (v) other amounts from time to time paid or payable under or in connection with any of the Trust Property including, without limitation, refunds of real estate taxes and assessments, including interest thereon.

"Records" shall mean, collectively, any and all right, title and interest of the Grantor in and to any and all drawings, plans, specifications, file materials, operating and maintenance records, catalogues, tenant lists, correspondence, advertising materials, operating manuals, warranties, guarantees, appraisals, studies and data relating to the Trust Property or the construction of any alteration relating to the Premises or the maintenance of any Permit.

"Rents" shall mean have the meaning assigned to such term in Section 2.1(vi).

"Secured Obligations" shall have the meaning assigned to such term in the Security Agreement.

"Tenant" shall mean any tenant, lessee, sublessee, franchisee, licensee, grantee or obligee, as applicable.

"Trust Property" shall have the meaning assigned to such term in Section 2.1 hereof.

"UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the state in which the Premises are located; provided, however, that if the creation, perfection or enforcement of any security interest herein granted is governed by the laws of any other state as

to the matter in question, "UCC" shall mean the Uniform Commercial Code in effect in such state.

"UCC Collateral" shall have the meaning assigned to such term in Section 3.2(ii).

SECTION 1.2. Interpretation. The rules of construction set forth in Section 1.02 of the Senior Secured Term Loan Credit Agreement shall be applicable to this Deed of Trust mutatis mutandis.

ARTICLE II.

GRANTS AND OBLIGATIONS

SECTION 2.1. Grant of Trust Property. NOW, THEREFORE, IN CONSIDERATION OF the foregoing and as collateral security for the payment and performance in full of all the Secured Obligations for the benefit of the Secured Creditors, Grantor hereby grants, conveys, mortgages, bargains, sells, transfers, assigns and pledges to the Trustee, its successors and assigns, in trust, with power of sale, for the use and benefit of the Beneficiary, a deed of trust lien on and a security interest in and upon, all of Grantor's estate, right, title and interest in, to and under, all the following described property (the "Trust Property") whether now owned or held or hereafter acquired from time to time:

(i) the Land more particularly described on Schedules A and C, hereto and the real property and other rights described in Schedule C hereto, together with all rights appurtenant thereto, including the easements over certain other adjoining land granted by any easement agreements, covenant or restrictive agreements and all air rights, water courses, water rights, minerals, mineral rights and interests, resources, reserves, land positions, stockpiled ore, overburden piles, byproducts, oil and gas rights, geothermal rights and resources, timber and development rights, if any, relating thereto, and also together with all of the other easements, rights, privileges, interests, hereditaments and appurtenances thereunto belonging or in any way appertaining and all of the estate, right, title, interest, claim or demand whatsoever of Grantor therein, either in law or in equity, in possession or expectancy, now or hereafter acquired and including, without limitation, the Land and the Other Rights (collectively, the "Owned Premises") and all of Grantor's rights and interest in and to streets, roads, ways, railways and public places, opened or postponed, and all rights of way, public or private, now or hereafter used in connection with, or belonging or appertaining to or being adjacent to the Owned Premises;

(ii) the Tenant's interest and estate in the Mortgaged Leases and all recorded or unrecorded extensions, amendments, supplements restatements, renewals and assignments thereof, together with all rights, titles, and interests of the Tenant under the Mortgaged Leases in and to any and all easement agreements, covenant or restrictive agreements and all air rights, mineral rights, resources, reserves, land positions, water rights, gas rights and development rights, if any, relating thereto, and also together with all of the other easements, rights, privileges, interests, hereditaments and appurtenances thereunto belonging or in any way appertaining and in any way demised or granted under the Mortgaged Leases or belonging, relating or appertaining to the land demised or

granted under the Mortgaged Leases and more particularity described in Schedule B, or which hereafter shall be in any way demised or granted under the Mortgaged Leases or belong, relate or be appurtenant to such land (collectively, the "Leased Premises");

(iii) all concentrators, mills, plants, processing, refinery, warehouse, or storage facilities, dries, pump stations, water lines, administrative buildings, infirmaries, laboratories, garages, shops, access roads, haul roads, railroad tracks, bridges, culverts, ponds, impoundments, foundations, structures, improvements, paving, parking areas, walkways and landscaping, now or hereafter erected on, in or under the Owned Premises and the Leased Premises, and all machinery, appliances, apparatus, equipment, fittings, fixtures, improvements and articles of personal property of every kind, description and nature whatsoever now or hereinafter attached or affixed to the Owned Premises and the Leased Premises or attached to or forming part of any structures, buildings or improvements and replacements thereof now or hereafter erected or located on, in or under the Owned Premises and the Leased Premises and all materials now or hereafter intended for construction, reconstruction or repair thereof, in each case now or hereafter located or erected on, in or under the Owned Premises and the Leased Premises, but specifically excluding buildings or other structures situated on the Owned Premises or the Leased Premises which (x) are rented to third parties for residential use, or (y) do not contain at least three walls and a roof, or (z) are otherwise not used in connection with business operations conducted by Grantor or any of its Affiliates on such premises (the "Improvements"; together with the Owned Premises and the Leased Premises, the "Premises");

(iv) all Permits;

(v) all Contracts;

(vi) all now or hereafter existing leases (including, without limitation, Mining Leases), or licenses (under which Grantor is Landlord) and subleases (under which Grantor is subLandlord), concession, management, mineral or other agreements of a similar kind that permit the use or occupancy of all or any portion of the Premises for any purpose in return for any payment, or the extraction or taking of any gas, water, geothermal resources, or minerals, or other minerals from the Premises in return for payment of any fee, rent or royalty, including Grantor's right, title and interest as lessor, Landlord, in the same (collectively, "Leases"), and all agreements or contracts for the sale or other disposition of all or any part of the Premises, now or hereafter entered into by Grantor, together with all charges, fees, income, issues, profits, receipts, rents, revenues or royalties payable thereunder ("Rents");

(vii) all Proceeds of any or all of the Trust Property;

(viii) all "fixtures", "timber to be cut" and "as-extracted collateral" under and as defined in the UCC in effect in the state in which the Premises are located; and

(ix) all Records.

TO HAVE AND TO HOLD the Trust Property, IN TRUST FOREVER, with power of sale, together with all estate, right, title and interest of the Grantor and anyone claiming by, through or under the Grantor in and to the Trust Property and all rights and appurtenances relating thereto, unto the Beneficiary, its successors and assigns, for the benefit of the Secured Creditors for the purpose of securing the payment and performance in full of all the Secured Obligations.

SECTION 2.2. Assignment of Leases and Rents. As additional security for the payment and performance in full of the Secured Obligations and subject to the provisions of Article V hereof, the Grantor absolutely, presently, unconditionally and irrevocably assigns, transfers and sets over to the Beneficiary, and grants to the Beneficiary, all of the Grantor's estate, right, title, interest, claim and demand, as Landlord, under any and all of the Leases including, without limitation, the following (such assigned rights, the "Grantor's Interest"):

(i) the immediate and continuing right to receive and collect Rents payable by the Tenants pursuant to the Leases;

(ii) all claims, rights, powers, privileges and remedies of the Grantor, whether provided for in the Leases or arising by statute or at law or in equity or otherwise, consequent on any failure on the part of the Tenants to perform or comply with any term of the Leases;

(iii) all rights to take all actions upon the happening of a default under the Leases as shall be permitted by the Leases or by law including, without limitation, the commencement, conduct and consummation of proceedings at law or in equity; and

(iv) the full power and authority, in the name of the Grantor or otherwise, to enforce, collect, receive and receipt for any and all of the foregoing and to take all other actions whatsoever which the Grantor, as Landlord, is or may be entitled to take under the Leases.

(v) It being understood, however, this Section 2.2 shall be subject to the provision of Section 5.1.

SECTION 2.3. Secured Obligations. This Deed of Trust secures, and the Trust Property is collateral security for, the payment and performance in full when due of the Secured Obligations.

SECTION 2.4. Future Advances; Revolving Credit. THIS IS A LEASEHOLD CREDIT LINE DEED OF TRUST FOR THE PURPOSES OF W. VA. CODE §38-1-14 AND SUBJECT TO THE LIMITATION SET FORTH IN SECTION 2.5 BELOW WITH RESPECT TO THE MAXIMUM AMOUNT OF INDEBTEDNESS, THIS DEED OF TRUST SHALL SECURE ALL SECURED OBLIGATIONS INCLUDING, WITHOUT LIMITATION, FUTURE ADVANCES TO THE EXTENT OF NOT MORE THAN $85,000,000 whenever hereafter made with respect to or under the Senior Secured Term Loan Credit Agreement or the other Credit Documents and shall secure not only Secured Obligations with respect to presently existing indebtedness under the Senior Secured Term Loan Credit Agreement or the other Credit Documents, but also any and all other indebtedness which may

hereafter be owing by the Grantor to the Secured Creditors under the Senior Secured Term Loan Credit Agreement or the other Credit Documents, however incurred, whether interest, discount or otherwise, and whether the same shall be deferred, accrued or capitalized, including future advances and re-advances, pursuant to the Senior Secured Term Loan Credit Agreement or the other Credit Documents, and any extensions, refinancings, modifications or renewals of all such Secured Obligations whether or not Grantor executes any extension agreement or renewal instrument and, in each case, to the same extent as if such future advances were made on the date of the execution of this Deed of Trust. Future advances or re-advances made pursuant to the Senior Secured Term Loan Credit Agreement or the other Credit Documents are intended to be obligatory. All other Future Advances are intended to be non-obligatory pursuant to West Virginia Code Section 38-1-14. Notice of intervening liens which may be sent pursuant to the provisions of West Virginia Code §38-1-14, may be sent to Beneficiary at the address stated on the first page of this Deed of Trust and will be effective upon receipt by Beneficiary.

SECTION 2.5. Maximum Amount of Indebtedness. The maximum aggregate principal amount of all indebtedness that is, or under any contingency may be secured at the date hereof or at any time hereafter by this Deed of Trust is $85,000,000 (the "Secured Amount"), plus, interest paid in kind, to the extent permitted by applicable law, collection costs, sums advanced for the payment of taxes, assessments, maintenance and repair charges, insurance premiums and any other costs incurred to protect the security encumbered hereby or the lien hereof, expenses incurred by the Beneficiary by reason of any default by the Grantor under the terms hereof, together with interest thereon, all of which amount shall be secured hereby.

SECTION 2.6. Last Dollar Secured. So long as the aggregate amount of the Secured Obligations exceeds the Secured Amount, any payments and repayments of the Secured Obligations shall not be deemed to be applied against or to reduce the Secured Amount.

SECTION 2.7. No Release. Nothing set forth in this Deed of Trust shall relieve the Grantor from the performance of any term, covenant, condition or agreement on the Grantor's part to be performed or observed under or in respect of any of the Trust Property or from any liability to any person under or in respect of any of the Trust Property or shall impose any obligation on the Trustee, Beneficiary or any other Secured Creditor to perform or observe any such term, covenant, condition or agreement on the Grantor's part to be so performed or observed or shall impose any liability on the Trustee, Beneficiary or any other Secured Creditor for any act or omission on the part of the Grantor relating thereto or for any breach of any representation or warranty on the part of the Grantor contained in this Deed of Trust or any other Credit Document, or under or in respect of the Trust Property or made in connection herewith or therewith.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF GRANTOR

SECTION 3.1. Incorporation of Senior Secured Term Loan Credit Agreement. The Grantor represents, warrants, covenants and agrees that each of the representations, warranties, covenants and other agreements of the Grantor (as a Credit Party)

under and as contained in the Senior Secured Term Loan Credit Agreement are hereby incorporated herein in their entirety by this reference.

SECTION 3.2. Warranty of Title. The Grantor represents and warrants that:

(i) Grantor has good and valid record fee simple title to the Owned Premises; good and valid leasehold/subleasehold interests in the Leased Premises; good title or valid right and interest in and to the balance of the Trust Property, in each case subject to no Liens, except for Permitted Collateral Liens; and

(ii) subject in each case to the Permitted Collateral Liens upon recordation in the official real estate records in the county (or other applicable jurisdiction) in which the Premises are located, this Deed of Trust will be in a form sufficient to create and constitute a valid and enforceable first priority Lien on the Trust Property that is real property; and, upon recording of this Deed of Trust in the county records, and this Deed of Trust being, indexed as a fixture, timber, and as-extracted collateral filing in such records, of the county in which the Premises are located, this Deed of Trust will be in a form sufficient to create and constitute a valid and enforceable first priority Lien on and UCC security interest in the Trust Property that is fixture and timber, and a valid and enforceable Lien on as-extracted collateral; and upon the due execution and delivery of this Deed of Trust and with value given therefor, this Deed of Trust will be in a form sufficient to create a valid security interest in and to the Trust Property that is personal property and in which security interests can be created under Article 9 of the UCC (the "UCC Collateral"); and upon the taking of the other actions required with respect to Trust Property that is personal property under and pursuant to the Security Agreement, the interests granted in favor of the Secured Creditors herein and therein will be perfected as valid and enforceable first priority security interests and liens therein, to the extent perfection may be accomplished by taking such actions, all of which first priority Liens and first priority security interests are subject only to Permitted Collateral Liens.

SECTION 3.3. Flood. The Grantor represents and warrants that no portion of the Premises is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Acts promulgated by the Federal Emergency Management Agency or any successor thereto or, if any portion of the Premises is located within such area as evidenced by the Federal Emergency Management Agency Standard Flood Hazard Determination provided to the Beneficiary by the Grantor pursuant to Section 5.17 of the Senior Secured Term Loan Credit Agreement, the Grantor has obtained the flood insurance prescribed in Section 7.03(b) of the Senior Secured Term Loan Credit Agreement hereof;

SECTION 3.4. Charges. The Grantor represents and warrants that, to the extent required by the Senior Secured Term Loan Credit Agreement, all Charges imposed upon or assessed against the Trust Property have been paid and discharged except to the extent such Charges constitute a Permitted Collateral Lien.

ARTICLE IV.

CERTAIN COVENANTS OF GRANTOR

SECTION 4.1. Payment and Performance. The Grantor shall pay and perform the Secured Obligations in full as and when the same shall become due under the Credit Documents and when they are required to be performed thereunder.

SECTION 4.2. Title. The Grantor shall

(i) (A) to the extent required by the Senior Secured Term Loan Credit Agreement, keep in effect all rights and appurtenances to or that constitute a part of the Trust Property except where the failure to keep in effect the same could not result in a Material Adverse Effect and (B) protect, preserve and defend its rights, title and interest in the Trust Property and title thereto; and

(ii) (A) comply with each of the terms, conditions and provisions of all Requirements of Law and Permits, including but not limited to Environmental Laws, environmental permits, Mining Laws and Mining Permits, and with all other obligations of the Grantor which are secured by the Trust Property, and with all other obligations the noncompliance with which may reasonably be expected to result in the imposition of a Lien on the Trust Property subject to Permitted Collateral Liens, (B) forever warrant and defend to the Trustee and Beneficiary the Lien and security interests created and evidenced hereby and the validity and first priority position hereof in any action or proceeding against the claims of any and all persons whomsoever affecting or purporting to affect the Trust Property or any of the rights of the Trustee and Beneficiary hereunder and (C) maintain this Deed of Trust as a valid and enforceable first priority mortgage Lien on the Trust Property subject only to Permitted Collateral Liens.

SECTION 4.3. Limitation on Liens; Transfer Restrictions.

(i) Except for the Permitted Collateral Liens and the Lien of this Deed of Trust, the Grantor may not, without the prior written consent of the Beneficiary, permit to exist or grant any Lien on all or any part of the Trust Property or suffer or allow any of the foregoing to occur by operation of law or otherwise.

(ii) Except to the extent permitted by the Senior Secured Term Loan Credit Agreement, the Grantor may not, without the prior written consent of the Beneficiary, sell, convey, assign, lease or otherwise transfer all or any part of the Trust Property.

SECTION 4.4. Insurance. The Grantor shall obtain and keep in full force and effect the Insurance Policies required by the Senior Secured Term Loan Credit Agreement pursuant to the terms thereof.

ARTICLE V.

CONCERNING ASSIGNMENT OF LEASES AND RENTS

SECTION 5.1. Present Assignment; License to the Grantor.

(i) Section 2.2 of this Deed of Trust constitutes a present, absolute, effective, irrevocable and complete collateral assignment by Grantor to Beneficiary of the Leases and Rents and the right, subject to applicable law, to collect all sums payable to Grantor thereunder and apply the same as Beneficiary may reasonably determine to be appropriate to protect the security afforded by this Deed of Trust (including the payment of reasonable costs and expenses in connection with the maintenance, operation, improvement, insurance, taxes and upkeep of the Trust Property), which is not conditioned upon Beneficiary being in possession of the Premises. This assignment is an absolute assignment and not an assignment for additional security only. The Beneficiary hereby grants to the Grantor, however, a license to collect and apply the Rents and to enforce the obligations of Tenants under the Leases. Immediately upon the occurrence of and during the continuance of any Event of Default, whether or not legal proceedings have commenced and without regard to waste, adequacy of security for the Secured Obligations or solvency of Grantor, the license granted in the immediately preceding sentence shall automatically cease and terminate without any notice by Beneficiary (such notice being hereby expressly waived by Grantor to the extent permitted by applicable law), or any action or proceeding or the intervention of a receiver appointed by a court.

(ii) Grantor acknowledges that Beneficiary has taken all reasonable actions necessary to obtain, and that upon recordation of this Deed of Trust Beneficiary shall have, to the extent permitted under applicable law, a valid and fully perfected, first priority, present assignment of the Rents arising out of the Leases and all security for such Leases subject to the Permitted Collateral Liens and in the case of security deposits, rights of depositors and requirements of law. Grantor acknowledges and agrees that upon recordation of this Deed of Trust, Beneficiary's interest in the Rents shall (to the maximum extent permitted by law) be deemed to be fully perfected, "choate" and enforced as to Grantor and all third parties, including, without limitation, any subsequently appointed trustee in any case under Title II of the United States Code (the "Bankruptcy Code"), without the necessity of commencing a foreclosure action with respect to this Deed of Trust, making formal demand for the Rents, obtaining the appointment of a receiver or taking any other affirmative action.

(iii) Without limitation of the absolute nature of the assignment of the Rents hereunder, Grantor and Beneficiary agree that (a) this Deed of Trust shall constitute a "security agreement" for purposes of Section 552(b) of the Bankruptcy Code, (b) the security interest created by this Deed of Trust extends to property of Grantor acquired before the commencement of a case in bankruptcy and to all amounts paid as Rents, and (c) such security interest shall extend to all rents acquired by the estate after the commencement of any case in bankruptcy.

SECTION 5.2. Collection of Rents by the Beneficiary.

(i) Any Rents receivable by the Beneficiary hereunder, after payment of all proper costs and expenses as Beneficiary may, in its sole discretion, determine to be appropriate

(including the payment of reasonable costs and expenses in connection with the maintenance, operation, improvement, insurance, taxes and upkeep of the Trust Property), shall be applied in accordance with the provisions of Section 8.2(ii) of this Deed of Trust. The Beneficiary shall be accountable to the Grantor only for Rents actually received by the Beneficiary. The collection of such Rents and the application thereof shall not cure or waive any Event of Default or waive, modify or affect notice of Event of Default or invalidate any act done pursuant to such notice.

(ii) Following the occurrence of and during the continuance of an Event of Default, the Grantor hereby irrevocably authorizes and directs Tenant under each Lease to rely upon and comply with any and all notices or demands from the Beneficiary for payment of Rents to the Beneficiary and the Grantor shall have no claim against Tenant for Rents paid by Tenant to the Beneficiary pursuant to such notice or demand.

SECTION 5.3. Irrevocable Interest. All rights, powers and privileges of the Beneficiary herein set forth are coupled with an interest and are irrevocable, subject to the terms and conditions hereof, and the Grantor shall not take any action under the Leases or otherwise which is inconsistent with this Deed of Trust or any of the terms hereof and any such action inconsistent herewith or therewith shall be void.

## ARTICLE VI.

## TAXES AND CERTAIN STATUTORY LIENS

SECTION 6.1. Payment of Charges. Unless and to the extent permitted under the provisions of the Senior Secured Term Loan Credit Agreement or contested by the Grantor in accordance with the provisions of the Senior Secured Term Loan Credit Agreement, the Grantor shall pay and discharge, or cause to be paid and discharged, from time to time prior to same becoming delinquent, all Charges. The Grantor shall, upon the Beneficiary's request, deliver to the Beneficiary receipts evidencing the payment of all such Charges.

SECTION 6.2. Stamp and Other Taxes. The Grantor shall pay any United States documentary stamp taxes, with interest and fines and penalties, and any mortgage recording taxes, with interest and fines and penalties, that may hereafter be levied, imposed or assessed under or upon or by reason hereof or the Secured Obligations or any instrument or transaction affecting or relating to either thereof and in default thereof the Beneficiary may advance the same and the amount so advanced shall be payable by the Grantor to the Beneficiary in accordance with the provisions of Section 11.01 of the Senior Secured Term Loan Credit Agreement.

SECTION 6.3. Certain Tax Law Changes. In the event of the passage after the date hereof of any law deducting from the value of real property, for the purpose of taxation, amounts in respect of any Lien thereon or changing in any way the laws for the taxation of mortgages or debts secured by mortgages for state or local purposes or the manner of the collection of any taxes, and imposing any taxes, either directly or indirectly, on this Deed of Trust or any other Credit Document, the Grantor shall promptly pay to the Beneficiary such amount or amounts as may be necessary from time to time to pay any such taxes, assessments or other charges resulting therefrom; provided, that if any such payment or reimbursement shall be

unlawful or taxable to Beneficiary, or would constitute usury or render the indebtedness wholly or partially usurious under applicable law, the Grantor shall pay or reimburse Beneficiary for payment of the lawful and non-usurious portion thereof.

SECTION 6.4. Proceeds of Tax Claim. In the event that the proceeds of any tax claim are paid after the Beneficiary has exercised its right to foreclose the Lien hereof, such proceeds shall be paid to the Beneficiary to satisfy any deficiency remaining after such foreclosure. The Beneficiary shall retain its interest in the proceeds of any tax claim during any redemption period. The amount of any such proceeds in excess of any deficiency claim of the Beneficiary shall in a reasonably prompt manner be released to the Grantor.

ARTICLE VII.

RECOVERY EVENTS AND RESTORATION

SECTION 7.1. Recovery Event. If there shall occur any Recovery Event (or, in the case of any condemnation, taking or other proceeding in the nature thereof, upon the occurrence thereof or notice of the commencement of any proceedings therefor), the Grantor shall promptly send to the Beneficiary a written notice setting forth the nature and extent thereof. The proceeds payable in respect of any such Recovery Event are hereby assigned and shall be paid to the Beneficiary. The Net Cash Proceeds of each Recovery Event shall be applied, allocated and distributed in accordance with the provisions of Section 4.02 of the Senior Secured Term Loan Credit Agreement.

SECTION 7.2. Condemnation. In the case of any taking, condemnation or other proceeding in the nature thereof, the Beneficiary may, at its option, participate in any proceedings or negotiations which might result in any taking or condemnation and the Grantor shall deliver or cause to be delivered to the Beneficiary all instruments reasonably requested by it to permit such participation. The Beneficiary may be represented by counsel satisfactory to it at the reasonable expense of the Grantor in connection with any such participation. The Grantor shall pay all reasonable fees, costs and expenses incurred by the Beneficiary in connection therewith and in seeking and obtaining any award or payment on account thereof. The Grantor shall take all steps necessary to notify the condemning authority of such participation.

ARTICLE VIII.

EVENTS OF DEFAULT AND REMEDIES

SECTION 8.1. Remedies in Case of an Event of Default. If any Event of Default shall have occurred and be continuing, subject to the terms of any ABL Intercreditor Agreement then in effect, the Beneficiary may at its option in addition to any other action permitted under this Deed of Trust or the Senior Secured Term Loan Credit Agreement or any other Credit Document or by law, statute or in equity, take one or more of the following actions to the greatest extent permitted by local law:

(i) personally, or by its agents or attorneys, and where applicable law so requires, with the Trustee, (A) enter into and upon and take possession of all or any part

of the Premises together with the books, records and accounts of the Grantor relating thereto and, exclude the Grantor, its agents and servants wholly therefrom, (B) use, operate, manage and control the Premises and conduct the business thereof, (C) maintain and restore the Premises, (D) make all necessary or proper repairs, renewals and replacements and such useful alterations thereto and thereon as the Beneficiary may deem advisable, (E) manage, lease and operate the Premises and carry on the business thereof and exercise all rights and powers of the Grantor with respect thereto either in the name of the Grantor or otherwise or (F) collect and receive all Rents. The Beneficiary shall be under no liability for or by reason of any such taking of possession, entry, removal or holding, operation or management except that any amounts so received by the Beneficiary shall be applied in accordance with the provisions of Section 9.1 of the Security Agreement.

(ii) with or without entry, personally or by its agents or attorneys, or by the Trustee (as so required by applicable law) (A) sell the Trust Property and all of Grantor's estate, right, title and interest, claim and demand therein at one or more sales in one or more parcels, in accordance with the provisions of Section 8.2 or (B) institute and prosecute proceedings for the complete or partial foreclosure of the Lien and security interests created and evidenced hereby; or

(iii) take such steps to protect and enforce its rights whether by action, suit or proceeding at law or in equity for the specific performance of any covenant, condition or agreement in the Senior Secured Term Loan Credit Agreement and the other Credit Documents, or in aid of the execution of any power granted in this Deed of Trust, or for any foreclosure hereunder, or for the enforcement of any other appropriate legal or equitable remedy or otherwise as the Beneficiary shall elect.

SECTION 8.2. Sale of Trust Property if Event of Default Occurs; Proceeds of Sale.

(i) If any Event of Default shall have occurred and be continuing, the Beneficiary and/or Trustee (as so required by applicable law) may institute an action to foreclose this Deed of Trust or take such other action as may be permitted and available to the Beneficiary and/or Trustee at law or in equity or pursuant to this Deed of Trust for the enforcement of the Senior Secured Term Loan Credit Agreement and realization on the Trust Property and proceeds thereon through power of sale (if then available under applicable law) or to final judgment and execution thereof for the Secured Obligations, and in furtherance thereof the Beneficiary and/or Trustee (as so required by applicable law) may sell the Trust Property at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law or statute or in equity. Further, at any time after the exercise by Beneficiary of the option to declare the Secured Obligations to be immediately due and payable, Trustee, upon the written request of Beneficiary, shall foreclose upon and sell the Trust Property (or any part or parts thereof) to satisfy the Secured Obligations at public auction at the front door of the courthouse of the county (or any county if more than one) in the State of West Virginia in which the Trust Property is located, for cash in hand on the day of sale and subject to such other terms and conditions of sale as determined by Beneficiary, after first giving

notice of such sale by publishing such notice in a qualified newspaper of general circulation published in said county, or if there be no such newspaper in a qualified newspaper of general circulation in said county, once a week for two successive weeks preceding the day of sale and after giving such other notice as may be required by applicable law. Any notice of subordinate liens pursuant to West Virginia Code § 38-1-4 shall be mailed to the mailing address of the Beneficiary provided above on the first page of this Deed of Trust. The Beneficiary and/or Trustee (as so required by applicable law) may execute and deliver to the purchaser at such sale a conveyance of the Trust Property in fee simple or otherwise, as appropriate, and an assignment or conveyance of all the Grantor's Interest in the Leases and the Trust Property, each of which conveyances and assignments shall contain recitals as to the Event of Default upon which the execution of the power of sale herein granted depends, and the Grantor hereby constitutes and appoints the Beneficiary and/or Trustee (as so required by applicable law) the true and lawful attorney in fact of the Grantor to make any such recitals, sale, assignment and conveyance, and all of the acts of the Beneficiary as such attorney in fact are hereby ratified and confirmed. The Grantor agrees that such recitals shall be binding and conclusive upon the Grantor and that any assignment or conveyance to be made by the Beneficiary or Trustee shall divest the Grantor of all right, title, interest, equity and right of redemption, including any statutory redemption, in and to the Trust Property. The power and agency hereby granted are coupled with an interest and are irrevocable by death or dissolution, or otherwise, and are in addition to any and all other remedies which the Beneficiary and Trustee may have hereunder, at law or in equity. So long as the Secured Obligations, or any part thereof, remain unpaid, the Grantor agrees that possession of the Trust Property by the Grantor, or any person claiming under the Grantor, shall be as tenant, and, in case of a sale under power or upon foreclosure as provided in this Deed of Trust, the Grantor and any person in possession under the Grantor, as to whose interest such sale was not made subject, shall, at the option of the purchaser at such sale, then become and be tenants holding over, and shall forthwith deliver possession to such purchaser, or be summarily dispossessed in accordance with the laws applicable to tenants holding over. In case of any sale under this Deed of Trust by virtue of the exercise of the powers herein granted, or pursuant to any order in any judicial proceeding or otherwise, the Trust Property may be sold as an entirety or in separate parcels in such manner or order as the Beneficiary and Trustee in their sole discretion may elect. One or more exercises of powers herein granted shall not extinguish or exhaust such powers, until the entire Trust Property is sold or all amounts secured hereby are paid in full.

(ii) The proceeds of any sale made under or by virtue of this Article VIII, together with any other sums which then may be held by the Beneficiary under this Deed of Trust, whether under the provisions of this Article VIII or otherwise, shall be applied in accordance with the provisions of Section 9.1 of the Security Agreement.

(iii) The Beneficiary (on behalf of any Secured Creditor or on its own behalf) or any Lender or any of their respective Affiliates may bid for and acquire the Trust Property or any part thereof at any sale made under or by virtue of this Article VIII and, in lieu of paying cash therefor, may make settlement for the purchase price by crediting against the purchase price the unpaid amounts (whether or not then due) owing to the Beneficiary, or such Lender in respect of the Secured Obligations, after deducting from the sales price the expense of the sale

and the reasonable costs of the action or proceedings and any other sums that the Beneficiary, Trustee or such Lender is authorized to deduct under this Deed of Trust.

(iv) The Beneficiary and/or Trustee (as so required by applicable law) may adjourn from time to time any sale by it to be made under or by virtue hereof by announcement at the time and place appointed for such sale or for such adjourned sale or sales, and, the Beneficiary and/or Trustee (as so required by applicable law), without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(v) If the Premises are comprised of more than one parcel of land, the Beneficiary and/or Trustee (as so required by applicable law) may take any of the actions authorized by this Section 8.2 in respect of any or a number of individual parcels.

SECTION 8.3. Additional Remedies in Case of an Event of Default.

(i) If an Event of Default shall have occurred and be continuing, the Beneficiary shall be entitled to recover judgment as aforesaid either before, after or during the pendency of any proceedings for the enforcement of the provisions hereof and, to the extent permitted by applicable law, the right of the Beneficiary to recover such judgment shall not be affected by any entry or sale hereunder, or by the exercise of any other right, power or remedy for the enforcement of the provisions hereof, or the foreclosure of, or absolute conveyance pursuant to, this Deed of Trust. In case of proceedings against the Grantor in insolvency or bankruptcy or any proceedings for its reorganization or involving the liquidation of its assets, the Beneficiary shall be entitled to prove the whole amount of principal and interest and other payments, charges and costs due in respect of the Secured Obligations to the full amount thereof without deducting therefrom any proceeds obtained from the sale of the whole or any part of the Trust Property; provided, however, that in no case shall the Beneficiary receive a greater amount than the aggregate of such principal, interest and such other payments, charges and costs from the proceeds of the sale of the Trust Property and the distribution from the estate of the Grantor.

(ii) Any recovery of any judgment by the Beneficiary and any levy of any execution under any judgment upon the Trust Property shall not affect in any manner or to any extent the Lien and security interests created and evidenced hereby upon the Trust Property or any part thereof, or any conveyances, powers, rights and remedies of the Beneficiary hereunder, but such conveyances, powers, rights and remedies shall continue unimpaired as before.

(iii) Any monies collected by the Beneficiary under this Section 8.3 shall be applied in accordance with the provisions of Section 8.2(ii).

SECTION 8.4. Legal Proceedings After an Event of Default.

(i) After the occurrence and during the continuance of any Event of Default and immediately upon the commencement of any action, suit or legal proceedings to obtain judgment for the Secured Obligations or any part thereof, or of any proceedings to foreclose the Lien and security interest created and evidenced hereby or otherwise enforce the provisions hereof or of any other proceedings in aid of the enforcement hereof, the Grantor shall enter its voluntary appearance in such action, suit or proceeding.

(ii) Upon the occurrence and during the continuance of an Event of Default, the Beneficiary and/or Trustee shall be entitled forthwith as a matter of right, concurrently or independently of any other right or remedy hereunder either before or after declaring the Secured Obligations or any part thereof to be due and payable, to the appointment of a receiver without giving notice to any party and without regard to the adequacy or inadequacy of any security for the Secured Obligations or the solvency or insolvency of any person or entity then legally or equitably liable for the Secured Obligations or any portion thereof. The Grantor hereby consents to the appointment of such receiver. Notwithstanding the appointment of any receiver, the Beneficiary shall be entitled as pledgee to the possession and control of any cash, deposits or instruments at the time held by or payable or deliverable under the terms of the Senior Secured Term Loan Credit Agreement to the Beneficiary.

(iii) Upon the occurrence and during the continuance of an Event of Default, the Grantor shall not (A) at any time insist upon, or plead, or in any manner whatsoever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from execution or sale of the Trust Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance hereof, (B) claim, take or insist on any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Trust Property, or any part thereof, prior to any sale or sales of the Trust Property which may be made pursuant to this Deed of Trust, or pursuant to any decree, judgment or order of any court of competent jurisdiction or (C) after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof. To the extent permitted by applicable law, the Grantor hereby expressly (A) waives all benefit or advantage of any such law or laws, including, without limitation, any statute of limitations applicable to this Deed of Trust, (B) waives any and all rights to trial by jury in any action or proceeding related to the enforcement hereof, (C) waives any objection which it may now or hereafter have to the laying of venue of any action, suit or proceeding brought in connection with this Deed of Trust and further waives and agrees not to plead that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum and (D) covenants not to hinder, delay or impede the execution of any power granted or delegated to the Beneficiary and Trustee by this Deed of Trust but to suffer and permit the execution of every such power as though no such law or laws had been made or enacted. The Beneficiary shall not be liable for any incorrect or improper payment made pursuant to this Article VIII in the absence of gross negligence or willful misconduct.

SECTION 8.5. Remedies Not Exclusive. No remedy conferred upon or reserved to the Beneficiary and/or Trustee by this Deed of Trust is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Deed of Trust or now or hereafter existing at law or in equity. Any delay or omission of the Beneficiary to exercise any right or power accruing on any Event of Default shall not impair any such right or power and shall not be construed to be a waiver of or acquiescence in any such Event of Default. Every power and remedy given by this Deed of Trust may be exercised from time to time concurrently or independently, when and as often as may be deemed expedient by the Beneficiary in such order and manner as the Beneficiary, in its sole discretion, may elect. If the Beneficiary accepts any monies required to be paid by the Grantor under this Deed of Trust after the same become due,

such acceptance shall not constitute a waiver of the right either to require prompt payment, when due, of all other sums secured by this Deed of Trust or to declare an Event of Default with regard to subsequent defaults. If the Beneficiary accepts any monies required to be paid by the Grantor under this Deed of Trust in an amount less than the sum then due, such acceptance shall be deemed an acceptance on account only and on the condition that it shall not constitute a waiver of the obligation of the Grantor to pay the entire sum then due, and the Grantor's failure to pay the entire sum then due shall be and continue to be a default hereunder notwithstanding acceptance of such amount on account.

ARTICLE IX.

SECURITY AGREEMENT, FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING

SECTION 9.1. Security Agreement. To the extent that the Trust Property consists of UCC Collateral or items of personal property which are or are to become fixtures or as-extracted collateral or timber to be cut under applicable law, this Deed of Trust shall also be construed as a security agreement under the UCC and Grantor in order to secure the due and punctual payment and payments of the Secured Obligations hereby grants to Beneficiary for its benefit and for the benefit of the Secured Creditors, a security interest in and to such UCC Collateral, fixtures, as-extracted collateral and timber. Upon and during the continuance of an Event of Default, the Beneficiary shall be entitled with respect to the UCC Collateral, fixtures, as-extracted collateral and timber to exercise all remedies hereunder, or under any other Credit Document, or all remedies available under the UCC with respect thereto and all other remedies available under applicable law. Without limiting the foregoing, the UCC Collateral, fixtures, as-extracted collateral and timber may, at the Beneficiary's option, (i) be sold hereunder together with any sale of any portion of the Trust Property or otherwise, (ii) be sold separately pursuant to the UCC, or (iii) be dealt with by the Beneficiary in any other manner permitted under applicable law. The Beneficiary may require the Grantor to assemble the UCC Collateral, fixtures, as-extracted collateral and timber or any part thereof and make it available to the Beneficiary at a place to be designated by the Beneficiary. The Grantor acknowledges and agrees that a disposition of such collateral in accordance with the Beneficiary's rights and remedies in respect to the Trust Property as heretofore provided is a commercially reasonable disposition thereof; provided, however, that the Beneficiary shall give the Grantor not less than ten (10) days' prior notice of the time and place of any intended disposition.

SECTION 9.2. Fixture Filing. To the extent that the Trust Property includes items of personal property which are or are to become fixtures, timber to be cut, or as-extracted collateral under applicable law, and to the extent permitted under applicable law, the recording hereof in the real estate records of the county in which such Trust Property is located shall also operate from the date of such recording as a fixtures, timber and as-extracted collateral filing with respect to such Trust Property, and the following information is applicable for the purpose of such filing, to wit:

| **Name and Address of the debtor:** | **Name and Address of the Secured Party:** |
|---|---|
| The Grantor having the address described in the Preamble hereof.<br><br>The Grantor is a limited liability company organized under the laws of the State of Delaware whose Organization Number is 5763697, and whose Taxpayer Identification Number is 47-4843874. | The Beneficiary having the address described in the Preamble hereof, from which address information concerning the security interest may be obtained. |
| **This Financing Statement covers the following types or items of property:**<br><br>The Trust Property.<br><br>This instrument covers goods or items of personal property which are or are to become fixtures upon the property, or is timber to be cut, or is as-extracted collateral.<br><br>With respect to the Owned Premises, the name of the record owner of the Trust Property on which such collateral is or is to be located is the Grantor listed on page 1 of this Deed of Trust and with respect to the Leased Premises, the name of the record owner of the Trust Property on which such collateral is or is to be located is the Landlord pursuant to each of the Mortgaged Leases. | |

In addition, Grantor authorizes the Beneficiary to file appropriate financing and continuation statements under the UCC in effect in the jurisdiction in which the Trust Property is located where Grantor is organized, or any other applicable jurisdiction as may be required by law in order to create, establish, perfect, maintain perfection, preserve and protect the liens and security interests intended to be granted to the Beneficiary pursuant to this Deed of Trust in the Trust Property. Beneficiary is also authorized to file a copy of this Deed of Trust or such other notice, document, instrument or certificate as may be required, allowed or available under applicable law to provide notice to third persons and Governmental Authorities of the Liens and security interests intended to be granted by this Deed of Trust in the Trust Property.

ARTICLE X.

FURTHER ASSURANCES

SECTION 10.1. Recording Documentation To Assure Security. The Grantor shall, forthwith after the execution and delivery hereof and thereafter, from time to time, cause this Deed of Trust and any financing statement, continuation statement, or similar instrument relating to any of the Trust Property or to any property intended to be subject to the Lien hereof or the security interests created hereby to be filed, registered and recorded in such manner and in such places as may be required by any present or future law and shall take such actions as Beneficiary shall reasonably deem necessary in order to publish notice of and fully to protect the validity and priority of the Liens, assignment, and security interests purported to be created upon the Trust Property and the interest and rights of the Beneficiary therein. The Grantor shall pay or

cause to be paid all taxes and fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment thereof, and of any instrument of further assurance, and all Federal or state stamp taxes or other taxes, duties and charges arising out of or in connection with the execution and delivery of such instruments.

SECTION 10.2. Further Acts. The Grantor shall, at the sole cost and expense of the Grantor, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers, financing statements, continuation statements, instruments and assurances as the Beneficiary or Trustee shall from time to time reasonably request, which may be necessary in the reasonable judgment of the Beneficiary from time to time to assure, perfect, convey, assign, mortgage, transfer and confirm unto the Beneficiary and Trustee, the property and rights hereby conveyed or assigned or which the Grantor may be or may hereafter become bound to convey or assign to the Beneficiary and Trustee or for carrying out the intention or facilitating the performance of the terms hereof or the filing, registering or recording hereof. Without limiting the generality of the foregoing, in the event that the Beneficiary or Trustee desires to exercise any remedies, consensual rights or attorney-in-fact powers set forth in this Deed of Trust and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other person therefor, then, upon the reasonable request of the Beneficiary or Trustee, the Grantor agrees to use its commercially reasonable efforts to assist and aid the Beneficiary and/or Trustee to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers. Upon the occurrence and during the continuance of an Event of Default, the Beneficiary and/or Trustee may execute any instrument or take any action required to be executed or taken by the Grantor under this Section 10.2 as the attorney-in-fact for the Grantor, such power of attorney being coupled with an interest and is irrevocable.

SECTION 10.3. Additions to Trust Property. All right, title and interest of Grantor in and to all extensions, amendments, relocations, retakings, improvements, betterments, renewals, substitutes and replacements of, and all additions and appurtenances to, the Trust Property hereafter acquired by or released to Grantor or constructed, assembled or placed by Grantor upon the Premises, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case without any further mortgage, conveyance, assignment or other act by Grantor, shall become subject to the lien and security interest of this Deed of Trust as fully and completely and with the same effect as though now owned by Grantor and specifically described in the grant of the Trust Property above, but at any and all times Grantor will execute and deliver to Beneficiary any and all such further assurances, mortgages, conveyances or assignments thereof as Beneficiary may reasonably require for the purpose of expressly and specifically subjecting the same to the lien and security interest of this Deed of Trust.

SECTION 10.4. Additional Security. Without notice to or consent of the Grantor and without impairment of the Lien and rights created by this Deed of Trust, the Beneficiary and/or Trustee may accept (but the Grantor shall not be obligated to furnish) from the Grantor or from any other person, additional security for the Secured Obligations. Neither the giving hereof nor the acceptance of any such additional security shall prevent the Beneficiary or Trustee from resorting, first, to such additional security, and, second, to the security created by

this Deed of Trust without affecting the Beneficiary's and Trustee's Lien and rights under this Deed of Trust.

ARTICLE XI.

MISCELLANEOUS

SECTION 11.1. Covenants To Run with the Land. All of the grants, covenants, terms, provisions and conditions in this Deed of Trust shall run with the Land and Grantor's interests therein and in the Leased Premises and shall apply to, and bind the successors and assigns of, the Grantor. If there shall be more than one grantor with respect to the Trust Property, the covenants and warranties hereof shall be joint and several.

SECTION 11.2. No Merger. The rights and estate created by this Deed of Trust shall not, under any circumstances, be held to have merged into any other estate or interest now owned or hereafter acquired by the Beneficiary unless the Beneficiary shall have consented to such merger in writing.

SECTION 11.3. Concerning Beneficiary.

(i) The Beneficiary has been appointed as Collateral Agent pursuant to the Senior Secured Term Loan Credit Agreement. The actions of the Beneficiary hereunder are subject to the provisions of the Senior Secured Term Loan Credit Agreement. The Beneficiary shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including, without limitation, the release or substitution of the Trust Property), in accordance with this Deed of Trust and the Credit Documents. The Beneficiary may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith. The Beneficiary may resign and a successor Beneficiary may be appointed in the manner provided in the Senior Secured Term Loan Credit Agreement. Upon the acceptance of any appointment as the Beneficiary by a successor Beneficiary, that successor Beneficiary shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Beneficiary under this Deed of Trust, and the retiring Beneficiary shall thereupon be discharged from its duties and obligations under this Deed of Trust. After any retiring Beneficiary's resignation, the provisions hereof shall inure to its benefit as to any actions taken or omitted to be taken by it under this Deed of Trust while it was the Beneficiary.

(ii) The Beneficiary shall be deemed to have exercised reasonable care in the custody and preservation of the Trust Property in its possession if such Trust Property is accorded treatment substantially equivalent to that which the Beneficiary, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that neither the Beneficiary nor any of the Secured Creditors shall have responsibility for taking any necessary steps to preserve rights against any person with respect to any Trust Property.

(iii) The Beneficiary shall be entitled to rely upon any written notice, statement, certificate, order or other document or any telephone message believed by it to be

genuine and correct and to have been signed, sent or made by the proper person, and, with respect to all matters pertaining to this Deed of Trust and its duties hereunder, upon advice of counsel selected by it.

(iv) If any portion of the Trust Property also constitutes collateral granted by any Credit Party to the Beneficiary to secure the Secured Obligations under any other deed of trust, mortgage, security agreement, pledge or instrument of any type, in the event of any conflict between the provisions hereof and the provisions of such other deed of trust, mortgage, security agreement, pledge or instrument of any type in respect of such collateral, the Beneficiary, in its sole discretion, shall select which provision or provisions shall control.

SECTION 11.4. Beneficiary May Perform; Beneficiary Appointed Attorney-in-Fact. If the Grantor shall fail to perform any covenants contained in this Deed of Trust (including, without limitation, the Grantor's covenants to (i) pay the premiums in respect of all required Insurance Policies hereunder or under the Senior Secured Term Loan Credit Agreement, (ii) pay Charges, (iii) make repairs, (iv) discharge Liens or (v) pay or perform any obligations of the Grantor under any Trust Property) or if any warranty on the part of the Grantor contained herein shall be breached, and such failure shall constitute an Event of Default, the Beneficiary may (but shall not be obligated to), do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose; provided, however, that the Beneficiary shall in no event be bound to inquire into the validity of any tax, Lien, imposition or other obligation which the Grantor fails to pay or perform as and when required hereby and which the Grantor does not contest in accordance with the provisions of the Senior Secured Term Loan Credit Agreement and the applicable provisions of each other Credit Document. Any and all amounts so expended by the Beneficiary shall be paid by the Grantor in accordance with the provisions of Section 11.01 of the Senior Secured Term Loan Credit Agreement and the applicable provisions of each other Credit Document and repayment shall be secured by this Deed of Trust. Neither the provisions of this Section 11.4 nor any action taken by the Beneficiary pursuant to the provisions of this Section 11.4 shall prevent any such failure to observe any covenant contained in this Deed of Trust nor any breach of representation or warranty from constituting an Event of Default. The Grantor hereby appoints the Beneficiary and Trustee its attorney-in-fact, with full power and authority in the place and stead of the Grantor and in the name of the Grantor, or otherwise, in the Beneficiary's and Trustee's discretion to take any action and to execute any instrument consistent with the terms of the Senior Secured Term Loan Credit Agreement, this Deed of Trust and the other Credit Documents which the Beneficiary and Trustee may deem necessary or advisable to accomplish the purposes hereof (but the Beneficiary shall not be obligated to and shall have no liability to Grantor or any third party for failure to so do or take action). The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof. The Grantor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

SECTION 11.5. Continuing Security Interest; Assignment. This Deed of Trust shall create a continuing Lien on and security interest in the Trust Property and shall (i) be binding upon the Grantor, its successors and assigns, (ii) inure, together with the rights and remedies of the Beneficiary and Trustee hereunder, to the benefit of the Beneficiary for the benefit of the Secured Creditors and each of their respective successors, transferees and assigns

and (iii) in the event there is more than one grantor party hereto, all undertakings hereunder shall be deemed joint and several. No other persons (including, without limitation, any other creditor of any Credit Party) shall have any interest herein or any right or benefit with respect hereto. Without limiting the generality of the foregoing clause (ii), any Secured Creditor may assign or otherwise transfer any indebtedness held by it secured by this Deed of Trust to any other person, and such other person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Creditor, herein or otherwise, subject, however, to the provisions of the Senior Secured Term Loan Credit Agreement. Grantor agrees that its obligations hereunder and the Lien and security interest created hereunder shall continue to be effective or be reinstated, as applicable, if at any time payment, or any part thereof, of all or any part of the Secured Obligations is rescinded or must otherwise be restored by the Secured Creditor upon the bankruptcy or reorganization of Grantor or otherwise.

SECTION 11.6. Termination; Release. When all the Secured Obligations have been paid in full in cash (other than contingent obligations not yet accrued and payable) and all Commitments have terminated or expired, this Deed of Trust shall terminate. Upon termination of this Deed of Trust, the Trust Property shall be released from the Lien and security interest of this Deed of Trust. In addition, a Grantor shall automatically be released from its obligations hereunder and the security interests created hereunder in the Trust Property of such Grantor shall be automatically released upon the consummation of any transaction permitted by the Senior Secured Term Loan Credit Agreement or otherwise in accordance with the Credit Documents as a result of which such Grantor ceases to be a Credit Party. Upon any Asset Sale or any other sale by any Grantor of any Trust Property that is permitted under the Senior Secured Term Loan Credit Agreement to any person that is not a Credit Party, the Beneficiary's Lien on such Trust Property shall be automatically released. Upon such release, termination hereof or any release of the Trust Property or any portion thereof in accordance with the provisions of the Senior Secured Term Loan Credit Agreement (it being understood that, other than in connection with the repayment in full of the Secured Obligations (other than contingent obligations not yet accrued and payable), the Beneficiary shall be entitled to request, and be fully protected in relying upon, an Officer's Certificate from the Borrower certifying that any such release of the Trust Property is permitted under the terms of the Senior Secured Term Loan Credit Agreement), the Beneficiary shall, upon the request and at the sole cost and expense of the Grantor, forthwith assign, transfer and deliver to the Grantor, without recourse to or warranty by the Beneficiary except as to the fact that the Beneficiary has not encumbered the released assets, such of the Trust Property or any part thereof to be released (in the case of a release) as may be in possession of the Beneficiary and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Trust Property, proper documents and instruments (including UCC-3 termination statements or releases) acknowledging the termination hereof or the release of such Trust Property, as the case may be.

SECTION 11.7. Modification in Writing. No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by the Grantor therefrom, shall be effective unless the same shall be done in accordance with the terms of the Senior Secured Term Loan Credit Agreement and unless in writing and signed by the Beneficiary, and, if required by applicable law, the Trustee. Any amendment, modification or supplement of or to any provision hereof in each case, any waiver of any provision hereof and

any consent to any departure by the Grantor from the terms of any provision hereof shall be effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Deed of Trust or any other document evidencing the Secured Obligations, no notice to or demand on the Grantor in any case shall entitle the Grantor to any other or further notice or demand in similar or other circumstances.

SECTION 11.8. Notices. Unless otherwise provided herein or in the Senior Secured n Term Loan Credit Agreement, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Senior Secured Term Loan Credit Agreement, as to the Grantor, addressed to it at the address of the Borrower set forth in the Senior Secured Term Loan Credit Agreement and as to the Beneficiary, addressed to it at the address set forth in the Senior Secured Term Loan Credit Agreement, or in each case at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 11.8.

SECTION 11.9. GOVERNING LAW; SERVICE OF PROCESS; WAIVER OF JURY TRIAL. THIS DEED OF TRUST SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS, EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTEREST HEREUNDER, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR ITEM OR TYPE OF DEED OF TRUSTD PROPERTY ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE. GRANTOR AGREES THAT SERVICE OF PROCESS IN ANY PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO BORROWER AT ITS ADDRESS SET FORTH IN THE SENIOR SECURED TERM LOAN CREDIT AGREEMENT OR AT SUCH OTHER ADDRESS OF WHICH THE DEED OF TRUSTE SHALL HAVE BEEN NOTIFIED PURSUANT THERETO. IF ANY AGENT APPOINTED BY GRANTOR REFUSES TO ACCEPT SERVICE, GRANTOR HEREBY AGREES THAT SERVICE UPON IT BY MAIL SHALL CONSTITUTE SUFFICIENT NOTICE. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF DEED OF TRUSTE TO BRING PROCEEDINGS AGAINST GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION. THE GRANTOR HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS DEED OF TRUST OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 11.10. Severability of Provisions. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 11.11. Relationship. The relationship of the Beneficiary to the Grantor hereunder is strictly and solely that of lender and borrower and grantor and beneficiary

and nothing contained in the Senior Secured Term Loan Credit Agreement, this Deed of Trust or any other document or instrument now existing and delivered in connection therewith or otherwise in connection with the Secured Obligations is intended to create, or shall in any event or under any circumstance be construed as creating a partnership (including a mining partnership or otherwise), joint venture, tenancy-in-common, joint tenancy or other relationship of any nature whatsoever between the Beneficiary and the Grantor other than as lender and borrower and grantor and beneficiary.

SECTION 11.12. No Credit for Payment of Taxes or Impositions. The Grantor shall not be entitled to any credit against the principal, premium, if any, or interest payable under the Senior Secured Term Loan Credit Agreement, and the Grantor shall not be entitled to any credit against any other sums which may become payable under the terms thereof or hereof, by reason of the payment of any Charge on the Trust Property or any part thereof.

SECTION 11.13. No Claims Against the Beneficiary. Nothing contained in this Deed of Trust shall constitute any consent or request by the Beneficiary, express or implied, for the performance of any labor or services or the furnishing of any materials or other property in respect of the Premises or any part thereof, nor as giving the Grantor any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against the Beneficiary in respect thereof or any claim that any Lien based on the performance of such labor or services or the furnishing of any such materials or other property is prior to the Lien hereof.

SECTION 11.14. Intercreditor Agreements. Notwithstanding any provision to the contrary contained herein, the terms of this Deed of Trust, the Lien and security interest created hereby and the rights and remedies of the Beneficiary hereunder shall be subject to the terms of the ABL Intercreditor Agreement, if any is in effect at such time. In the event of any conflict or inconsistency between the terms of this Deed of Trust and the ABL Intercreditor Agreement, the terms of the ABL Intercreditor Agreement shall govern and control.

ARTICLE XII.

LEASES

SECTION 12.1. Grantor's Affirmative Covenants with Respect to Leases. With respect to each Lease, the Grantor shall:

(i) observe and perform in all material respects all the obligations imposed upon the Landlord under such Lease;

(ii) promptly send copies to the Beneficiary of all notices of default which the Grantor shall send or receive thereunder; and

(iii) enforce all of the material terms, covenants and conditions contained in such Lease upon the part of the Tenant thereunder to be observed or performed.

SECTION 12.2. Grantor's Negative Covenants with Respect to Leases. With respect to each Lease, the Grantor shall not, without the prior written consent of the Beneficiary:

(i) receive or collect, or permit the receipt or collection of, any Rent under such Lease more than three (3) months in advance of the respective period in respect of which such Rent is to accrue, except:

(A) in connection with the execution and delivery of such Lease (or of any amendment to such Lease), Rent thereunder may be collected and received in advance in an amount not in excess of three (3) months Rent;

(B) the amount held by Landlord as a reasonable security deposit thereunder; and

(C) any amount received and collected for escalation and other charges in accordance with the terms of such Lease;

(ii) assign, transfer or hypothecate (other than to the Beneficiary hereunder) any Rent under such Lease whether then due or to accrue in the future or the interest of the Grantor as Landlord under such Lease;

(iii) enter into any amendment or modification of any Lease if the same would not be a Permitted Collateral Lien or could reasonably be expected to result in a Material Adverse Effect;

(iv) terminate (whether by exercising any contractual right of the Grantor to recapture leased space or otherwise) or permit the termination of such Lease or accept surrender of all or any portion of the space demised under such Lease prior to the end of the term thereof or accept assignment of such Lease to the Grantor unless the same would not cause a Material Adverse Effect or;

(v) waive, excuse, condone or in any manner discharge or release any Tenants of or from the obligations of such Tenants under their respective Leases or guarantors of Tenants from obligations under any guarantees of the Leases unless the same would not cause a Material Adverse Effect.

## ARTICLE XIII.

## REGARDING TRUSTEE

SECTION 13.1. Trustee's Powers and Liabilities.

(i) Trustee, by acceptance hereof, covenants faithfully to perform and fulfill the trusts herein created, being liable, however, only for gross negligence, bad faith or willful misconduct, and hereby waives any statutory fee and agrees to accept reasonable

Case 2:20-cv-00487 Document 105-25 Filed 11/22/21 Page 29 of 45 PageID #: 1868

compensation, in lieu thereof, for any services rendered by it in accordance with the terms thereof. All authorities, powers and discretions given in this Deed of Trust to Trustee and/or Beneficiary may be exercised by either, without the other, with the same effect as if exercised jointly;

(ii) Trustee may resign at any time upon giving thirty (30) days' notice in writing to Grantor and to Beneficiary;

(iii) Beneficiary may remove Trustee at any time or from time to time and select a successor trustee. In the event of the death, removal, resignation, refusal to act, inability to act or absence of Trustee from the state in which the Premises are located, or in its sole discretion for any reason whatsoever. Beneficiary may, upon notice to the Grantor and without specifying the reason therefore and without applying to any court, select and appoint a successor trustee, and all powers, rights, duties and authority of the former trustee, as aforesaid, shall thereupon become vested in such successor. Such substitute trustee shall not be required to give bond for the faithful performance of his duties unless required by Beneficiary. Such substitute trustee shall be appointed by written instrument duly recorded in the county where the Land is located. Grantor hereby ratifies and confirms any and all acts that the herein named Trustee, or his successor or successors in this trust, shall do lawfully by virtue hereof. Grantor hereby agrees, on behalf of itself and its heirs, executors, administrators and assigns, that the recitals contained in any deed or deeds executed in due form by any Trustee or substitute trustee, acting under the provisions of this instrument, shall be prima facie evidence of the facts recited, and that it shall not be necessary to prove in any court, otherwise than by such recitals, the existence of the facts essential to authorize the execution and delivery of such deed or deeds and the passing of title thereby;

(iv) Trustee shall not be required to see that this Deed of Trust is recorded nor liable for its validity or its priority as a first deed of trust, or otherwise, nor shall Trustee be answerable or responsible for performance or observance of the covenants and agreements imposed upon Grantor or Beneficiary by this Deed of Trust or any other agreement. Trustee, as well as Beneficiary, shall have authority in their respective discretion to employ agents and attorneys in the execution of this trust and to protect the interest of the Beneficiary hereunder, and to the fullest extent permitted by law they shall be compensated and all expenses relating to the employment of such agents and/or attorneys, including expenses of litigation, shall be paid out of the proceeds of the sale of the Trust Property conveyed hereby should a sale be had, but if no such sale be had, all sums so paid out shall be recoverable to the fullest extent permitted by law by all remedies at law or in equity; and

(v) At any time, or from time to time, without liability therefore and with ten (10) day's prior written notice to Grantor, upon written request of Beneficiary and without affecting the effect of this Deed of Trust upon the remainder of the Trust Property, Trustee may (A) reconvey any part of the Trust Property, (B) consent in writing to the making of any map or plat thereof, so long as Grantor has consented thereto, (C)

join in granting any easement thereon, so long as Grantor has consented thereto, or (D) join in any extension agreement or any agreement subordinating the lien or charge hereof.

ARTICLE XIV.

LOCAL LAW PROVISIONS

SECTION 14.1. Maturity Date. The last scheduled installment of the debt secured by this Mortgage shall become due and payable on the Maturity Date (as defined in the Senior Secured Term Loan Credit Agreement).

ARTICLE XV.

SECTION 15.1. Representations; Warranties; Covenants.

Grantor hereby represents, warrants and covenants that:

(1) Except as set forth in Schedule B hereof, the Mortgaged Leases are unmodified and in full force and effect except any Mortgaged Leases in respect of which the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect, and (2) Grantor enjoys peaceful and undisturbed possession under the Mortgaged Leases other than Mortgaged Leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

Grantor shall pay, when due and payable, the rent and other charges payable pursuant to the Mortgaged Leases, taking into account any applicable grace or cure periods, except for such amounts as may be contested in good faith, and will perform and observe, in all material respects, all of the other terms, covenants and conditions required to be performed and observed by Grantor as lessee under the Mortgaged Leases;

Grantor shall, promptly upon receipt thereof, deliver a copy of each notice of default given to Grantor by the lessor pursuant to the Mortgaged Leases and promptly notify Beneficiary in writing of any material default by the lessor in the performance or observance of any of the material terms, covenants or conditions on the part of the lessor to be performed or observed thereunder;

Unless permitted by the terms of the Senior Secured Term Loan Credit Agreement, Grantor shall not terminate, modify in any material respect or surrender the Mortgaged Leases without the prior written consent of Beneficiary (which shall not be unreasonably withheld, conditioned or delayed), and any such attempted termination, modification or surrender without Beneficiary's written consent shall be void;

If the Mortgaged Leases shall be rejected or disaffirmed by the lessor thereunder (or by any receiver, trustee, custodian or other party who succeeds to the rights of such lessor) pursuant to the Bankruptcy Code or similar or successor law or right, Grantor covenants that it will not elect to treat the Mortgaged Leases as terminated under 11 U.S.C. § 365(h) or any

similar or successor law or right without Beneficiary's prior written consent. Upon the occurrence and during the continuance of an Event of Default, Beneficiary shall have the sole and exclusive right to make or refrain from making any such election, and Grantor agrees that any such election, if made by Grantor other than in accordance with this subsection, shall be void and of no force or effect; and

Except to the extent provided in the Mortgaged Leases, Grantor shall not at any time subordinate its interest in the Mortgaged Property or any portion thereof to the Lien or interests of any mortgagee of the lessor's fee interest in the Premises without Beneficiary's prior written consent (which shall not be unreasonably withheld, conditioned or delayed).

SECTION 15.2. <u>No Merger</u>.So long as any of the Commitments or the Secured Obligations remain unpaid or unperformed, the fee title to and the leasehold estate in the Premises subject to each Mortgaged Lease shall not merge but shall always be kept separate and distinct notwithstanding the union of such estates in the lessor or Grantor, or in a third party, by purchase or otherwise. If Grantor acquires the fee title or any other estate, title or interest in the Premises, or any part thereof, the lien of this Mortgage shall attach to, cover and be a lien upon such acquired estate, title or interest and the same shall thereupon be and become a part of the Mortgaged Property with the same force and effect as if specifically encumbered herein. Grantor agrees to execute all instruments and documents that Beneficiary may reasonably require to ratify, confirm and further evidence the lien of this Mortgage on the acquired estate, title or interest.

SECTION 15.3. <u>Beneficiary as Lessee.</u>If the Mortgaged Leases shall be terminated prior to the natural expiration of its term due to default by Grantor or any tenant thereunder, and if, pursuant to the provisions of such Mortgaged Leases, Beneficiary or its designee shall acquire from the lessor a new lease of the Premises, Grantor shall have no right, title or interest in or to such new lease or the leasehold estate created thereby, or renewal privileges therein contained.

SECTION 15.4. <u>No Assignment or Encumbrance.</u>Notwithstanding anything to the contrary contained herein, this Mortgage shall not constitute an assignment or encumbrance on or of any Mortgaged Leases within the meaning of any provision thereof prohibiting its assignment or encumbrance and Beneficiary shall have no liability or obligation thereunder by reason of its acceptance of this Mortgage. Beneficiary shall be liable for the obligations of the tenant arising out of any Subject Lease for only that period of time for which Beneficiary is in possession of the premises demised thereunder or has acquired, by foreclosure or otherwise, and is holding all of Grantor's right, title and interest therein.

<u>[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]</u>

IN WITNESS WHEREOF, the Grantor has caused this Deed of Trust to be duly executed and delivered under seal the day and year first above written.

**ROCKWELL MINING, LLC**, a Delaware limited liability company

By: ______________________
Name: Elizabeth Nicholas
Title: General Counsel

ACKNOWLEDGMENT

STATE OF KENTUCKY

COUNTY OF FAYETTE, to-wit:

The foregoing instrument was acknowledged before me this 22 day of JANUARY, 2020, by Elizabeth Nicholas, as General Counsel of Rockwell Mining, LLC, a Delaware limited liability company, Grantor herein, on behalf of said company, in the aforesaid County and State.

My commission expires: 08-02-2021.

______________________
Notary Public
Notary ID #584283

[SEAL]

Schedule A — Legal Description

Owned Premises

None

Case 2:20-cv-00487 Document 105-25 Filed 11/22/21 Page 34 of 45 PageID #: 1873

Mortgaged Leases

Schedule B

| Contract Number | Mine Complex | Assignor | Assignee | Instrument | County |
|---|---|---|---|---|---|
| 5102001F | Rocklick | Eastern Associated Coal, LLC | Rockwell Mining, LLC | Indenture of Lease (including subsequent supplements adding acreage to original leased premises) dated July 1, 1937 between Pocahontas Land Corporation (successor-in-interest to Loup Creek Colliery Company) and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp. (successor-in-interest to Eastern Gas and Fuel Associates (successor-in-interest to The Koppers Company)), of record in Lease Book 5, Page 74 in the Office of the Clerk of the County Commission of Boone County, West Virginia and in Lease Book 88, Page 328 in the Office of the Clerk of the County Commission of Wyoming County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. Assigned to Eastern Associated Coal Corp. (n/k/a Eastern Associated Coal, LLC) by Eastern Gas and Fuel Associates by Deed of Assignment and Consent dated January 1, 1966, of record in Book 224, Page 123 in the Office of the Clerk of the County Commission of [Boone][Logan] County, West Virginia and Book ___, Page 182 in the Office of the Clerk of the County Commission of [Boone][Logan] County, West Virginia. | Boone<br>Logan<br>Wyoming |

| | | | | | |
|---|---|---|---|---|---|
| 0865-003-00 | Rocklick | Eastern Associated Coal, LLC | Rockwell Mining, LLC | Deed of Lease dated March 1, 1968 between Pardee Minerals LLC (successor-by-merger to Pardee Resources Group, Inc. (f/k/a Pardee Exploration Company) d/b/a Pardee Land Company and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.), of record in Lease Book 12, Page 193 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. | Boone |
| 0865-005-00 | Rocklick | Eastern Associated Coal, LLC | Rockwell Mining, LLC | Deed of Lease dated July 1, 1942 between Rowland Land Company and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) (successor-in-interest to Eastern Gas and Fuel Associates), of record in Lease Book 13, Page 1 in the Office of the Clerk of the County Commission of Raleigh County, West Virginia, of record in Lease Book 5, Page 74 in the Office of the Clerk of the County Commission of Boone County, West Virginia and in Lease Book 88, Page 328 in the Office of the Clerk of the County Commission of Wyoming County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. Assigned to Eastern Associated Coal Corp. (n/k/a Eastern Associated Coal, LLC) by Eastern Gas and Fuel Associates by Deed of Assignment and Consent dated January 1, 1966, of record in Book 32, Page 137 in the Office of the Clerk of the County Commission of Boone County, West Virginia. | Boone<br>Raleigh<br>Wyoming |

| | | | | | |
|---|---|---|---|---|---|
| 0860-003-00 | Wells | Pine Ridge Coal Company, LLC | Rockwell Mining, LLC | Supplemental Agreement of Lease effective January 1, 1977 (dated March 10, 1978) between Berwind Land Company and Pine Ridge Coal Company, LLC (successor-in-interest to Peabody Coal Company (n/k/a Heritage Coal Company, LLC) (successor-in-interest to Armco Steel Corporation)) (unrecorded), as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. The Lease Assignment and Assumption Agreement dated February 13, 1984 between Armco Steel Corporation and Peabody Coal Company is of record in the Office of the Clerk of the County Commission of Boone County, West Virginia at Book 20, Page 672, and in the Office of the Clerk of the County Commission of Raleigh County at Book 52, Page 275. Assigned to Pine Ridge Coal Company by Peabody Coal Company (n/k/a Heritage Coal Company, LLC) by Berwind Lease Assignment and Assumption Agreement dated October 16, 1994 (unrecorded).<br><br>Tracts of land situated in Boone and Raleigh Counties, situate on the Marsh Fork of Big Coal River, and on the West Fork of the Pond Fork of Little Coal River. | Boone<br><br>Raleigh |
| 0793-001 | Wells | Rivers Edge Mining LLC | Rockwell Mining, LLC | Lease between Gary A. Dempsey and Freda Dempsey and Rivers Edge Mining LLC (f/k/a Rivers Edge Mining, Inc.) dated March 26, 2001. | Boone |
| 0793-001-01 | Wells | Rivers Edge Mining LLC | Rockwell Mining, LLC | Easement Agreement between Gary A. Dempsey and Freda Dempsey and Rivers Edge Mining (f/k/a Rivers Edge Mining, Inc.) dated January 25, 2002. | Boone |
| 0793-002 | Wells | Rivers Edge Mining LLC | Rockwell Mining, LLC | Lease between Paul Ray Horsman and Cynthia Horsman and Rivers Edge Mining LLC (f/k/a Rivers Edge Mining, Inc.) dated April 10, 2001. | Boone |
| 0793-002-01 | Wells | Rivers Edge Mining LLC | Rockwell Mining, LLC | Easement Agreement between Paul Ray Horsman and Cynthia Horseman and Rivers Edge Mining LLC (f/k/a Rivers Edge Mining, Inc.) dated February 12, 2002. | Boone |
| 0793-003 | Wells | Rivers Edge Mining LLC | Rockwell Mining, LLC | Lease between Melvin L. Jarrell and Norma Jean Jarrell and Rivers Edge Mining LLC (f/k/a Rivers Edge Mining, Inc.) dated March 30, 2001. | Boone |

| | | | | | |
|---|---|---|---|---|---|
| 0866-033 | Wells | Eastern Associated Coal, LLC | Rockwell Mining, LLC | Right of Way Agreement between Western Pocahontas Properties Limited Partnership and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) dated May 1, 1995. | Boone |
| 0794-006 | Black Stallion | Black Stallion Coal Company, LLC | Rockwell Mining, LLC | Lease Agreement between Jeffrey Sampson and Black Stallion Coal Company, LLC dated January 1, 2012 (unrecorded). | Boone |
| 0794-004 | Black Stallion | Black Stallion Coal Company, LLC | Rockwell Mining, LLC | Lease Agreement between Larry Woodie and Nada Woodie and Black Stallion Coal Company, LLC dated July 1, 2005 (unrecorded). | Boone |
| W-LF-13 | | Eastern Associated Coal, LLC | Rockwell Mining, LLC | Surface Lease between CSX Transportation and Eastern Associated Coal, LLC dated July 1, 1977. | Boone |
| 0883-011-00 | Wells | Eastern Royalty, LLC | Rockwell Mining, LLC | Supplemental Agreement of Lease effective January 1, 1977 (dated March 10, 1978) between Berwind Land Company and Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to Performance Coal Company (successor-in-interest to Peabody Coal Company (n/k/a Heritage Coal Company, LLC) (successor-in-interest to Armco Steel Corporation))) (unrecorded), as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments.<br><br>Tracts of land situated in Boone and Raleigh Counties, situate on the Marsh Fork of Big Coal River, and on the West Fork of the Pond Fork of Little Coal River. | Boone Raleigh |

| | | | | | |
|---|---|---|---|---|---|
| 0883-012-00 | Wells | Eastern Royalty, LLC | Rockwell Mining, LLC | Agreement of Lease dated August 15, 1995 between Berwind Land Company and Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to New River Energy Corporation (f/k/a Federal Development Corporation)) (unrecorded), as amended by Amendment to Lease dated August 31, 2005. Assigned to Eastern Royalty Corp. (n/k/a Eastern Royalty, LLC) by New River Energy Corporation by Partial Assignment and Assumption Agreement (Berwind No. 2 Gas Reserves) dated August 31, 2005 (unrecorded).<br><br>Tracts of land situate on the West Fork and Pond Fork of the Little Coal River, Crook District, Boone County. | Boone |
| 0883-005 | Wells | Eastern Royalty, LLC | Rockwell Mining, LLC | Amended and Restated Lease dated June 16, 2003 between Penn Virginia Operating Co., LLC (successor-by-merger to Penn Virginia Coal Company) and Rockwell Mining, LLC (successor-in-interest to Easter Royalty, LLC (f/k/a Eastern Royalty Corp.))) (unrecorded), as amended by First Amendment to Lease effective December 1, 2003. | Boone |
| 0883-011-00 | Wells | Eastern Royalty, LLC | Rockwell Mining, LLC | Supplemental Agreement of Lease effective January 1, 1977 (dated March 10, 1978) between Berwind Land Company and Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to Performance Coal Company (successor-in-interest to Peabody Coal Company (n/k/a Heritage Coal Company, LLC ) (successor-in-interest to Armco Steel Corporation))) (unrecorded), as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments.<br><br>Tracts of land situated in Boone and Raleigh Counties, situate on the Marsh Fork of Big Coal River, and on the West Fork of the Pond Fork of Little Coal River. | Boone<br><br>Raleigh |

| | | | | | |
|---|---|---|---|---|---|
| 0883-012-00 | Wells | Eastern Royalty, LLC | Rockwell Mining, LLC | Agreement of Lease dated August 15, 1995 between Berwind Land Company and Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to New River Energy Corporation (f/k/a Federal Development Corporation)) (unrecorded), as amended by Amendment to Lease dated August 31, 2005. Assigned to Eastern Royalty Corp. (n/k/a Eastern Royalty, LLC) by New River Energy Corporation by Partial Assignment and Assumption Agreement (Berwind No. 2 Gas Reserves) dated August 31, 2005 (unrecorded)<br><br>Tracts of land situate on the West Fork and Pond Fork of the Little Coal River, Crook District, Boone County. | Boone |

| Contract Number | Mine Complex | Instrument | County |
|---|---|---|---|
| 0894-002 | Rocklick | Agreement of Lease dated January 29, 1946 between Shepard Boone Coal Company, LLC (successor-in-interest to Donald D. Shepard and Emily H. Shepard) and Rockwell Mining, LLC (successor-in-interest to Hillside Mining Company, LLC (f/k/a Hillside Mining Company) (successor-in-interest to Eastern Associated Coal Corp. (successor-in-interest to Eastern Gas and Fuel Associates))), of record in Coal Lease Book 6, Page 1 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. The Deed of Assignment and Consent between Eastern Gas and Fuel Associates and Eastern Associated Coal Corp. dated January 1, 1966 is of record in Book 112, Page 103 in the aforementioned Clerk's office. | Boone |

| | | | |
|---|---|---|---|
| 0793-006 | Wells | Agreement of Lease dated January 29, 1946 between Shepard Boone Coal Company, LLC (successor-in-interest to Donald D. Shepard and Emily H. Shepard) and Rockwell Mining, LLC (successor-in-interest to Rivers Edge Mining, LLC (successor-in-interest to Eastern Associated Coal Corp. (successor-in-interest to Eastern Gas and Fuel Associates))), of record in Coal Lease Book 6, Page 1 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments and as modified by Partial Lease Assignment and Assumption Agreement (Bank One Lease) effective February 1, 2004 between Rivers Edge Mining, Inc. (n/k/a Rivers Edge Mining, LLC), Eastern Royalty Corp. and Eastern Associated Coal Corp. The Deed of Assignment and Consent between Eastern Gas and Fuel Associates and Eastern Associated Coal Corp. dated January 1, 1966 is of record in Book 112, Page 103 in the aforementioned Clerk's office. | Boone |
| 0883-008 | Wells | Agreement of Lease dated January 29, 1946 between Shepard Boone Coal Company, LLC (successor-in-interest to Donald D. Shepard and Emily H. Shepard) and Rockwell Mining, LLC (successor-in-interest to Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to Rivers Edge Mining, LLC (successor-in-interest to Eastern Associated Coal Corp. (successor-in-interest to Eastern Gas and Fuel Associates)))), of record in Coal Lease Book 6, Page 1 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. The Deed of Assignment and Consent between Eastern Gas and Fuel Associates and Eastern Associated Coal Corp. dated January 1, 1966 is of record in Book 112, Page 103 in the aforementioned Clerk's office. | Boone |
| 0865-001 | Rocklick | Deed of Lease dated January 1, 1968 between WPP, LLC (successor-in-interest to Washington and Old Dominion Railroad) and Rockwell Mining, LLC (successor-in-interest to Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.)), of record in Coal Lease Book 12, Page 167 in the Office of the Clerk of the County Commission of Boone County, West Virginia, and in Book 34, Page 211 in the Office of the Clerk of the County Commission of Raleigh County, West Virginia, as modified, amended and supplemented by (i) Supplemental Agreement of Lease dated July 7, 1969; (ii) Agreement of Lease and Release dated April 15, 1974; (iii) Agreement dated April 1, 1975; (iv) Partial Release of Deed of Lease dated October 15, 1994; (v) Amendment to Lease dated December 24, 1997; (vi) Letter Agreement dated November 14, 2001; (vii) Letter Agreement dated March 5, 2002; (viii) Settlement Agreement and Release dated June 7, 2002; (ix) Letter Agreement dated August 18, 2008; and (x) Partial Surrender of Lease dated December 30, 2010. | Boone<br>Raleigh |

| | | | |
|---|---|---|---|
| 0883-013 | Wells | Coal Mining Lease dated October 15, 1994 between WPP, LLC (successor-in-interest to Western Pocahontas Properties Limited Partnership) and Rockwell Mining, LLC (successor-in-interest to Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to Performance Coal Company)) (unrecorded). Assigned to Eastern Royalty Corp. (n/k/a Eastern Royalty, LLC) by Performance Coal Company by Partial Assignment and Assumption Agreement (WPP Reserves) dated August 31, 2005 (unrecorded). | Boone |
| 0883-014 | Wells | Deed of Lease dated January 1, 1956 between WPP, LLC (successor-in-interest to Western Pocahontas Properties Limited Partnership) and Rockwell Mining, LLC (successor-in-interest to Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to Boone East Development Co. (successor-in-interest to Bethlehem Steel Corporation (successor-in-interest to Oglebay Norton Company (successor-in-interest to Truax-Traer Coal Company))))), of record in Lease Book 9, Page 219, in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time y recorded or unrecorded instruments. | Boone |

| **Blackhawk Contract No.** | **Patriot Assignor** | **Blackhawk Assignee** | **Counter Party** | **Agreement Date** | **Company Use** | **Location** | **CSX Contract No.** | **County** |
|---|---|---|---|---|---|---|---|---|
| 0884-005 5101039X | Black Stallion Coal Company, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 6/17/2005 | Private Crossing & Replace-ment Cost | MP CLH 7.69 - Stark, WV | DOT 926217X | Boone |
| 5102005X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 6/12/1929 | Water Pipeline Crossing | MP CLI 19.03 - Wharton, WV | COL 06434 | Boone |
| 5102006X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 8/21/1989 | Private Crossing & Replace-ment Cost | MP CLI 20.34 - Barrett, WV | CSX 010589 | Boone |
| 5102007X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 6/5/1948 | Gas Pipeline Longitu-dinal | MP CLI 20.87 to CLI 21.12 - Wharton, WV | COL 20841 | Boone |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 5102008X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 10/30/1948 | Powerline Crossing | MP CLI 18.37 - Bim, WV | COL 21126 | Boone |
| 5102009X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 8/30/1948 | Powerline Crossing | MP CLI 19.60 - Wharton, WV | COL 21176 | Boone |
| 5102010X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 1/25/1949 | Powerline Crossing | MP CLI 19.96 - Wharton, WV | COL 21313 | Boone |
| 5102011X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 6/13/1951 | Powerline Crossing | MP CLI 19.60 - Wharton, WV | COL 23199 | Boone |
| 866-039<br>5101027X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 7/1/1996 | Private Crossing & Replace-ment Cost | MP CLI 18.00 - Wharton, WV | CSX 023107 | Boone |
| 866-034<br>5101026X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 8/8/1995 | Private Crossing & Replace-ment Cost | MP CLI 25.00 - Lick, WV | CSX 023303 | Boone |
| 5102012X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 1/15/1973 | Private Crossing & Replace-ment Cost | MP CLI 19.61 - Barrett, WV | COL 35934 | Boone |
| 866-014<br>5102013X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 7/15/1987 | Private Crossing & Replace-ment Cost | MP CLI 17.91 to 18.00 - Wharton, WV | CSX 003691 | Boone |
| 5102014X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 11/3/1975 | Private Crossing & Replace-ment Cost | MP CLI 27.19 - Bald Knob, WV | COL 37011 | Boone |
| 5102015X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 9/29/1976 | Powerline Crossing | MP CLI 18.24 - Wharton, WV | COL 37227 | Boone |
| 5102016X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 1/6/1977 | Water Pipeline Crossing | MP CLI 18.35 - Wharton, WV | COL 37292 | Boone |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 5102017X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 1/24/1977 | Powerline Crossing | MP CLI 18.00 - Wharton, WV | COL 37293 | Boone |
| 5101037X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 6/4/1985 | Powerline Crossing | MP CLI 25.05 - Bald Knob, WV | COL 40590 | Boone |
| 866-017<br>5101038X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 9/3/1985 | Private Crossing & Replace-ment Cost | MP CLI 19.69 - Wharton, WV | COL 40627 | Boone |
| 0866-044<br>5101028X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 1/30/2001 | Conveyor Belt Crossing | MP CLI 18.7 - Wharton, WV | CSX 040826 | Boone |
| 0793-007<br>5101034X | Rivers Edge Mining LLC | Rockwell Mining, LLC | CSX Transpor-tation | 9/9/2002 | Private Crossing & Replace-ment Cost | MP CLI 16.60 - Wharton, WV | CSX 041349 | Boone |
| 0793-009<br>5101035X | Rivers Edge Mining LLC | Rockwell Mining, LLC | CSX Transpor-tation | 4/9/2003 | Powerline Crossing | MPL CLI 16.59 - Bim, WV | CSX 045225 | Boone |
| 0794-005<br>5101036X | Black Stallion Coal Company, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 6/17/2005 | Conveyor Belt Crossing | MP CLI 17.98 - Wharton, WV | CSX 048693 | Boone |
| W-LF-14 to 20<br>5102018X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 12/18/2013 | Sidetrack - Wells | MP CLI 17.89 - Wharton, WV | CSX 051235 | Boone |
| 0866-005 | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 5/16/1986 | Sidetrack - Rocklick | MP CLI 25.00 - Lick, WV | | Boone |

Being the same instruments assigned to Rockwell Mining, LLC, a Delaware limited liability company, pursuant to the following instruments:

1. Lease Assignment and Assumption Agreement from Eastern Associated Coal, LLC, a West Virginia limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 281 in the Office of the Clerk of the County Commission of Boone County, West Virginia.

2. Lease Assignment and Assumption Agreement from Eastern Royalty, LLC, a Delaware limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 291 in the Office of the Clerk of the County Commission of Boone County, West Virginia.

3. Lease Assignment and Assumption Agreement from Hillside Mining, LLC a West Virginia limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 305, in the Office of the Clerk of the County Commission of Boone County, West Virginia.

4. Lease Assignment and Assumption Agreement from Pine Ridge Coal Company, LLC, a Delaware limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 322, in the Office of the Clerk of the County Commission of Boone County, West Virginia.

5. Lease Assignment and Assumption Agreement from Rivers Edge Mining LLC, a Delaware limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 316, in the Office of the Clerk of the County Commission of Boone County, West Virginia.

6. Lease Assignment and Assumption Agreement from Black Stallion Coal Company, LLC, a West Virginia limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 355, in the Office of the Clerk of the County Commission of Boone County, West Virginia.

Case 2:20-cv-00487 Document 105-25 Filed 11/22/21 Page 45 of 45 PageID #: 1884

Schedule C

Other Rights

None

Case 2:20-cv-00487 Document 105-26 Filed 11/22/21 Page 1 of 46 PageID #: 1885

# EXHIBIT Y

THIS LEASEHOLD CREDIT LINE DEED OF TRUST IS, AMONG OTHER THINGS, A FINANCING STATEMENT UNDER THE UNIFORM COMMERCIAL CODE COVERING MINERALS, TIMBER, AS-EXTRACTED COLLATERAL AND THE LIKE, ACCOUNTS RESULTING FROM THE SALE OF MINERALS, TIMBER, AS-EXTRACTED COLLATERAL AND THE LIKE, AND GOODS WHICH ARE, OR ARE TO BECOME, FIXTURES ON THE REAL/IMMOVABLE PROPERTY HEREIN DESCRIBED IN SCHEDULES THROUGH A, B AND C ATTACHED HERETO. THIS DEED OF TRUST IS TO BE RECORDED IN THE REAL ESTATE OR COMPARABLE RECORDS OF THE COUNTY OF EACH COUNTY IN EACH STATE IN WHICH IS SITUATED ANY OF THE REAL PROPERTY COLLATERAL COVERED HEREBY.

---

# LEASEHOLD CREDIT LINE DEED OF TRUST

**(This instrument secures an obligation that may increase and decrease from time to time.)**

LEASEHOLD CREDIT LINE DEED OF TRUST,
ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT,
FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING

BY
**ROCKWELL MINING, LLC,**

as Grantor,

TO
**BRYON D. COLLIER, ESQ.**,
as Trustee for the benefit of,

MIDCAP FUNDING IV TRUST,
as Agent,

Beneficiary

Dated as of January 22, 2020,
Effective as of January 22, 2020,
Relating to Premises in:
Boone County, West Virginia

Return to: Dinsmore & Shohl LLP
Attn: Bryon Collier
611 Third Avenue
Huntington, WV 25701

This instrument was prepared in consultation with counsel in the state in which the Trust Property is located by the attorney named below and after recording, please return to:

Hogan Lovells US LLP
555 Thirteenth Street
NW, Washington, DC 20004
Attn: Lee E. Berner, Esq.

Roger Toney
BOONE County 11:42:41 AM
Instrument No 2020000714
Date Recorded 02/19/2020
Document Type DEED OF TRUST
Pages Recorded 45
Book-Page 383-235-27
Recording Fee $51.00
Additional $19.00

# LEASEHOLD CREDIT LINE DEED OF TRUST

**(This instrument secures an obligation that may increase and decrease from time to time.)**

LEASEHOLD CREDIT LINE DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT, FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING

LEASEHOLD CREDIT LINE DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT, FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING (the "Deed of Trust"), dated as of January 22, 2020, and effective as of January 22, 2020, made by **ROCKWELL MINING, LLC**, a Delaware limited liability company, having an office at 3228 Summit Square Place, Suite 180, Lexington KY 40509, as grantor, assignor and debtor (in such capacities and together with any successors in such capacities, the "Grantor"), in favor of **BRYON D. COLLIER, ESQ.**, having a residence address of 611 Third Avenue, Huntington, WV, 25701, as trustee under this Deed of Trust (together with any successors in such capacities, the "Trustee") for the benefit of MIDCAP FUNDING IV TRUST, a Delaware statutory trust, having the address of its principal place of business at c/o MidCap Financial Services, LLC, as servicer, 7255 Woodmont Avenue, Suite 200, Bethesda Maryland 20814, in its capacity as agent pursuant to the Senior Secured ABL Credit Agreement (each as hereinafter defined), as beneficiary, assignee and secured party (in such capacities and together with any successors in such capacities, the "Agent" or "Beneficiary").

## R E C I T A L S:

A. BLACKHAWK DRE, LLC, a Delaware limited liability company (the "Blackhawk Parent"), certain subsidiaries of the Blackhawk Parent (including Grantor) as borrowers (collectively with the Blackhawk Parent, the "Borrowers"") BLACKHAWK MINING, LLC, a Delaware limited liability company ("Holdings"), MidCap Financial Trust, a Delaware statutory trust, the lenders party thereto from time to time and Midcap Funding IV Trust, as agent, have entered into that certain Senior Secured ABL Credit Agreement, dated as of October 31, 2019 (as further amended, restated, supplemented or otherwise modified from time to time, the "Senior Secured ABL Credit Agreement").

B. The Blackhawk Parent owns, directly or through its Subsidiaries, all of the issued and outstanding shares of the Grantor.

C. The Grantor will receive substantial benefits from the execution, delivery and performance of the obligations under the Senior Secured ABL Credit Agreement and the other Financing Documents and is, therefore, willing to enter into this Deed of Trust.

D. This Deed of Trust is given by Grantor in favor of Beneficiary for the benefit of the Secured Creditors to secure the payment and performance of all of the Secured Obligations.

E. It is a condition to the obligations of the Lenders to make the Term Loans under the Senior Secured ABL Credit Agreement that the Grantor execute and deliver the applicable Financing Documents, including this Deed of Trust.

F. Grantor is the owner and holder of (i) the Trust Property (as hereinafter defined), including all of the Land described in Schedule A annexed hereto, (ii) the tenant's/subtenant's or lessee's/sublessee's interest created by those certain leases and subleases (as amended to date and as amended, amended and restated, supplemented, renewed or otherwise modified from time to time in accordance with the provisions of this Deed of Trust, the "Mortgaged Leases") set forth in Schedule B annexed hereto, which Schedule B describes the properties demised under such Mortgaged Leases and as evidenced by the recorded original or a short form lease or memorandum of lease or similar instrument relating to the Mortgaged Leases recorded at the times and in the real property records set forth in Schedule B annexed hereto and (iii) the rights of way, easements and contracts set forth in Schedule C annexed hereto (as amended, amended and restated, supplemented, renewed or otherwise modified from time to time in accordance with the provisions of this Deed of Trust, the "Other Rights").

A G R E E M E N T:

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor and the Beneficiary hereby agrees as follows:

ARTICLE I.

DEFINITIONS AND INTERPRETATION

SECTION 1.1. Definitions. (a) Capitalized terms used but not otherwise defined herein that are defined in the Senior Secured ABL Credit Agreement shall have the meanings given to them in the Senior Secured ABL Credit Agreement, including the following:

"ABL Intercreditor Agreement"; "Affiliate"; "Asset Sale"; "Revolving Loan Commitment"; "Credit Party"; "Environmental Law"; "Event of Default"; "Financing Documents" "Governmental Authority"; "Lender"; "Lien"; "Material Adverse Effect"; "Mining Laws"; "Mining Lease"; "Mining Permits"; "Obligations"; "Recover Event"; "Requirements of Law"; "Secured Creditors"; and "Security Agreement".

The following terms in this Deed of Trust shall have the following meanings:

"Bankruptcy Code" shall have the meaning assigned to such term in Section 5.1(ii) hereof.

"Beneficiary" shall have the meaning assigned to such term in the Preamble hereof.

"Blackhawk Parent" shall have the meaning assigned to such term in Recital A.

Case 2:20-cv-00487 Document 105-26 Filed 11/22/21 Page 5 of 46 PageID #: 1889

"Charges" shall mean any and all real estate, ad valorem, real property, personal property, severance, production, and other taxes, assessments and special assessments, levies, fees, all water and sewer rents and charges and all other governmental charges imposed upon or assessed against, and all claims (including, without limitation, claims for landlords', carriers', mechanics', workmens', repairmens', laborers', materialmens', suppliers' and warehousemens' Liens and other claims arising by operation of law) judgments or demands against, all or any portion of the Trust Property or other amounts of any nature which, if unpaid, may be reasonably be expected to result in or permit the creation of, a lien on the Trust Property or which might result in foreclosure of all or any portion of the Trust Property.

"Contracts" shall mean, collectively, any and all right, title and interest of the Grantor in and to any and all contracts and other general intangibles relating to the Trust Property and all reserves, deferred payments, deposits, refunds and claims of every kind, nature or character relating thereto.

"Deed of Trust" shall have the meaning assigned to such term in the Preamble hereof.

"Default Rate" shall mean the rate of interest payable during a default pursuant to the provisions of Section 10.5 of the Senior Secured ABL Credit Agreement.

"Grantor" shall have the meaning assigned to such term in the Preamble hereof.

"Grantor's Interest" shall have the meaning assigned to such term in Section 2.2 hereof.

"Improvements" shall have the meaning assigned to such term in Section 2.1(iii).

"Insurance Policies" means the insurance policies and coverages required to be maintained by the Grantor with respect to the Trust Property pursuant to the Senior Secured ABL Credit Agreement and includes, without limitation, any and all contracts, insurance policies, bonds, and the like, and all financial assurance instruments, agreements and insurance policies, obtained by or given on behalf of Grantor in connection with mining, mineral processing, reclamation and other activities on the Trust Property, and includes all such policies under which Beneficiary, or either Grantor is listed as an additional loss payee or beneficiary.

"Land" shall mean the real property more particularly described in Schedules A and C annexed hereto.

"Landlord" shall mean any landlord, lessor, sublandlord, sublessor, franchisor, licensor or grantor, as applicable.

"Leases" shall have the meaning assigned to such term in Section 2.1(vi).

"Leased Premises" shall have the meaning assigned to such term in Section 2.1(ii).

"Mortgaged Leases" shall have the meaning assigned to such term in Recital G as set forth in Schedule B hereto.

"Other Rights" shall have the meaning assigned to such term in Recital G.

"Owned Premises" shall have the meaning assigned to such term in Section 2.1(i).

"Permit" shall mean any and all permits, certificates, approvals, authorizations, consents, licenses, variances, franchises or other instruments, however characterized, of any Governmental Authority (or any person acting on behalf of a Governmental Authority) now or hereafter acquired or held, together with all amendments, modifications, extensions, renewals and replacements of any thereof issued or in any way furnished in connection with the Trust Property including, without limitation, building permits, certificates of occupancy, environmental certificates, industrial permits or licenses and certificates of operation.

"Permitted Collateral Liens" shall mean "Permitted Encumbrances" as defined in the Senior Secured ABL Credit Agreement.

"Premises" shall have the meaning assigned to such term in Section 2.1(iii).

"Proceeds" shall mean, collectively, any and all cash proceeds and noncash proceeds and shall include all (i) proceeds of the conversion, voluntary or involuntary, of any of the Trust Property or any portion thereof into cash or liquidated claims, (ii) proceeds of any Insurance Policy, indemnity, warranty, guaranty or claim payable to the Beneficiary or to the Grantor from time to time with respect to any of the Trust Property, (iii) payments (in any form whatsoever) made or due and payable to the Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any portion of the Trust Property by any Governmental Authority (or any person acting on behalf of a Governmental Authority), (iv) products of the Trust Property and (v) other amounts from time to time paid or payable under or in connection with any of the Trust Property including, without limitation, refunds of real estate taxes and assessments, including interest thereon.

"Records" shall mean, collectively, any and all right, title and interest of the Grantor in and to any and all drawings, plans, specifications, file materials, operating and maintenance records, catalogues, tenant lists, correspondence, advertising materials, operating manuals, warranties, guarantees, appraisals, studies and data relating to the Trust Property or the construction of any alteration relating to the Premises or the maintenance of any Permit.

"Rents" shall mean have the meaning assigned to such term in Section 2.1(vi).

"Secured Obligations" shall mean the Obligations

"Senior Secured ABL Credit Agreement" shall have the meaning assigned to such term in Recital A hereof.

"Tenant" shall mean any tenant, lessee, sublessee, franchisee, licensee, grantee or obligee, as applicable.

"Trust Property" shall have the meaning assigned to such term in Section 2.1 hereof.

"UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the state in which the Premises are located; provided, however, that if the creation, perfection or

enforcement of any security interest herein granted is governed by the laws of any other state as to the matter in question, "UCC" shall mean the Uniform Commercial Code in effect in such state.

"UCC Collateral" shall have the meaning assigned to such term in Section 3.2(ii).

SECTION 1.2. Interpretation. The rules of construction set forth in Section 1.3 of the Senior Secured ABL Credit Agreement shall be applicable to this Deed of Trust mutatis mutandis.

ARTICLE II.

GRANTS AND OBLIGATIONS

SECTION 2.1. Grant of Trust Property. NOW, THEREFORE, IN CONSIDERATION OF the foregoing and as collateral security for the payment and performance in full of all the Secured Obligations for the benefit of the Secured Creditors, Grantor hereby grants, conveys, mortgages, bargains, sells, transfers, assigns and pledges to the Trustee, its successors and assigns, in trust, with power of sale, for the use and benefit of the Beneficiary, a deed of trust lien on and a security interest in and upon, all of Grantor's estate, right, title and interest in, to and under, all the following described property (the "Trust Property") whether now owned or held or hereafter acquired from time to time:

(i) the Land more particularly described on Schedules A and C, hereto and the real property and other rights described in Schedule C hereto, together with all rights appurtenant thereto, including the easements over certain other adjoining land granted by any easement agreements, covenant or restrictive agreements and all air rights, water courses, water rights, minerals, mineral rights and interests, resources, reserves, land positions, stockpiled ore, overburden piles, byproducts, oil and gas rights, geothermal rights and resources, timber and development rights, if any, relating thereto, and also together with all of the other easements, rights, privileges, interests, hereditaments and appurtenances thereunto belonging or in any way appertaining and all of the estate, right, title, interest, claim or demand whatsoever of Grantor therein, either in law or in equity, in possession or expectancy, now or hereafter acquired and including, without limitation, the Land and the Other Rights (collectively, the "Owned Premises") and all of Grantor's rights and interest in and to streets, roads, ways, railways and public places, opened or postponed, and all rights of way, public or private, now or hereafter used in connection with, or belonging or appertaining to or being adjacent to the Owned Premises;

(ii) the Tenant's interest and estate in the Mortgaged Leases and all recorded or unrecorded extensions, amendments, supplements restatements, renewals and assignments thereof, together with all rights, titles, and interests of the Tenant under the Mortgaged Leases in and to any and all easement agreements, covenant or restrictive agreements and all air rights, mineral rights, resources, reserves, land positions, water rights, gas rights and development rights, if any, relating thereto, and also together with all of the other easements, rights, privileges, interests, hereditaments and appurtenances thereunto belonging or in any way appertaining and in any way demised or granted under the Mortgaged Leases or belonging, relating or

appertaining to the land demised or granted under the Mortgaged Leases and more particularity described in Schedule B, or which hereafter shall be in any way demised or granted under the Mortgaged Leases or belong, relate or be appurtenant to such land (collectively, the "Leased Premises");

(iii) all concentrators, mills, plants, processing, refinery, warehouse, or storage facilities, dries, pump stations, water lines, administrative buildings, infirmaries, laboratories, garages, shops, access roads, haul roads, railroad tracks, bridges, culverts, ponds, impoundments, foundations, structures, improvements, paving, parking areas, walkways and landscaping, now or hereafter erected on, in or under the Owned Premises and the Leased Premises, and all machinery, appliances, apparatus, equipment, fittings, fixtures, improvements and articles of personal property of every kind, description and nature whatsoever now or hereinafter attached or affixed to the Owned Premises and the Leased Premises or attached to or forming part of any structures, buildings or improvements and replacements thereof now or hereafter erected or located on, in or under the Owned Premises and the Leased Premises and all materials now or hereafter intended for construction, reconstruction or repair thereof, in each case now or hereafter located or erected on, in or under the Owned Premises and the Leased Premises, but specifically excluding buildings or other structures situated on the Owned Premises or the Leased Premises which (x) are rented to third parties for residential use, or (y) do not contain at least three walls and a roof, or (z) are otherwise not used in connection with business operations conducted by Grantor or any of its Affiliates on such premises (the "Improvements"; together with the Owned Premises and the Leased Premises, the "Premises");

(iv) all Permits;

(v) all Contracts;

(vi) all now or hereafter existing leases (including, without limitation, Mining Leases), or licenses (under which Grantor is Landlord) and subleases (under which Grantor is subLandlord), concession, management, mineral or other agreements of a similar kind that permit the use or occupancy of all or any portion of the Premises for any purpose in return for any payment, or the extraction or taking of any gas, water, geothermal resources, or minerals, or other minerals from the Premises in return for payment of any fee, rent or royalty, including Grantor's right, title and interest as lessor, Landlord, in the same (collectively, "Leases"), and all agreements or contracts for the sale or other disposition of all or any part of the Premises, now or hereafter entered into by Grantor, together with all charges, fees, income, issues, profits, receipts, rents, revenues or royalties payable thereunder ("Rents");

(vii) all Proceeds of any or all of the Trust Property;

(viii) all "fixtures", "timber to be cut" and "as-extracted collateral" under and as defined in the UCC in effect in the state in which the Premises are located; and

(ix) all Records.

TO HAVE AND TO HOLD the Trust Property, IN TRUST FOREVER, with power of sale, together with all estate, right, title and interest of the Grantor and anyone claiming by, through or

under the Grantor in and to the Trust Property and all rights and appurtenances relating thereto, unto the Beneficiary, its successors and assigns, for the benefit of the Secured Creditors for the purpose of securing the payment and performance in full of all the Secured Obligations.

SECTION 2.2. Assignment of Leases and Rents. As additional security for the payment and performance in full of the Secured Obligations and subject to the provisions of Article V hereof, the Grantor absolutely, presently, unconditionally and irrevocably assigns, transfers and sets over to the Beneficiary, and grants to the Beneficiary, all of the Grantor's estate, right, title, interest, claim and demand, as Landlord, under any and all of the Leases including, without limitation, the following (such assigned rights, the "Grantor's Interest"):

(i) the immediate and continuing right to receive and collect Rents payable by the Tenants pursuant to the Leases;

(ii) all claims, rights, powers, privileges and remedies of the Grantor, whether provided for in the Leases or arising by statute or at law or in equity or otherwise, consequent on any failure on the part of the Tenants to perform or comply with any term of the Leases;

(iii) all rights to take all actions upon the happening of a default under the Leases as shall be permitted by the Leases or by law including, without limitation, the commencement, conduct and consummation of proceedings at law or in equity; and

(iv) the full power and authority, in the name of the Grantor or otherwise, to enforce, collect, receive and receipt for any and all of the foregoing and to take all other actions whatsoever which the Grantor, as Landlord, is or may be entitled to take under the Leases.

(v) It being understood, however, this Section 2.2 shall be subject to the provision of Section 5.1.

SECTION 2.3. Secured Obligations. This Deed of Trust secures, and the Trust Property is collateral security for, the payment and performance in full when due of the Secured Obligations.

SECTION 2.4. Future Advances; Revolving Credit. THIS IS A LEASEHOLD CREDIT LINE DEED OF TRUST FOR THE PURPOSES OF W. VA. CODE §38-1-14 AND SUBJECT TO THE LIMITATION SET FORTH IN SECTION 2.5 BELOW WITH RESPECT TO THE MAXIMUM AMOUNT OF INDEBTEDNESS, THIS DEED OF TRUST SHALL SECURE ALL SECURED OBLIGATIONS INCLUDING, WITHOUT LIMITATION, FUTURE ADVANCES TO THE EXTENT OF NOT MORE THAN $90,000,000 whenever hereafter made with respect to or under the Senior Secured ABL Credit Agreement or the other Financing Documents and shall secure not only Secured Obligations with respect to presently existing indebtedness under the Senior Secured ABL Credit Agreement or the other Financing Documents, but also any and all other indebtedness which may hereafter be owing by the Grantor to the Secured Creditors under the Senior Secured ABL Credit Agreement or the other Financing Documents, however incurred, whether interest, discount or otherwise, and whether the same shall be deferred, accrued or capitalized, including future advances and re-advances, pursuant to the Senior Secured ABL Credit Agreement or the other Financing

Documents, and any extensions, refinancings, modifications or renewals of all such Secured Obligations whether or not Grantor executes any extension agreement or renewal instrument and, in each case, to the same extent as if such future advances were made on the date of the execution of this Deed of Trust. Future advances or re-advances made pursuant to the Senior Secured ABL Credit Agreement or the other Financing Documents are intended to be obligatory. All other Future Advances are intended to be non-obligatory pursuant to West Virginia Code Section 38-1-14. Notice of intervening liens which may be sent pursuant to the provisions of West Virginia Code §38-1-14, may be sent to Beneficiary at the address stated on the first page of this Deed of Trust and will be effective upon receipt by Beneficiary.

SECTION 2.5. Maximum Amount of Indebtedness. The maximum aggregate principal amount of all indebtedness that is, or under any contingency may be secured at the date hereof or at any time hereafter by this Deed of Trust is $90,000,000 (the "Secured Amount"), plus, accrued and unpaid interest thereon, to the extent permitted by applicable law, collection costs, sums advanced for the payment of taxes, assessments, maintenance and repair charges, insurance premiums and any other costs incurred to protect the security encumbered hereby or the lien hereof, expenses incurred by the Beneficiary by reason of any default by the Grantor under the terms hereof, together with interest thereon, all of which amount shall be secured hereby.

SECTION 2.6. Last Dollar Secured. So long as the aggregate amount of the Secured Obligations exceeds the Secured Amount, any payments and repayments of the Secured Obligations shall not be deemed to be applied against or to reduce the Secured Amount.

SECTION 2.7. No Release. Nothing set forth in this Deed of Trust shall relieve the Grantor from the performance of any term, covenant, condition or agreement on the Grantor's part to be performed or observed under or in respect of any of the Trust Property or from any liability to any person under or in respect of any of the Trust Property or shall impose any obligation on the Trustee, Beneficiary or any other Secured Creditor to perform or observe any such term, covenant, condition or agreement on the Grantor's part to be so performed or observed or shall impose any liability on the Trustee, Beneficiary or any other Secured Creditor for any act or omission on the part of the Grantor relating thereto or for any breach of any representation or warranty on the part of the Grantor contained in this Deed of Trust or any other Financing Document, or under or in respect of the Trust Property or made in connection herewith or therewith.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF GRANTOR

SECTION 3.1. Incorporation of Senior Secured ABL Credit Agreement. The Grantor represents, warrants, covenants and agrees that each of the representations, warranties, covenants and other agreements of the Grantor (as a Credit Party) under and as contained in the Senior Secured ABL Credit Agreement are hereby incorporated herein in their entirety by this reference.

SECTION 3.2. Warranty of Title. The Grantor represents and warrants that:

(i) Grantor has good and valid record fee simple title to the Owned Premises; good and valid leasehold/subleasehold interests in the Leased Premises; good title or valid right and interest in and to the balance of the Trust Property, in each case subject to no Liens, except for Permitted Collateral Liens; and

(ii) subject in each case to the Permitted Collateral Liens upon recordation in the official real estate records in the county (or other applicable jurisdiction) in which the Premises are located, this Deed of Trust will be in a form sufficient to create and constitute a valid and enforceable Lien on the Trust Property that is real property; and, upon recording of this Deed of Trust in the county records, and this Deed of Trust being, indexed as a fixture, timber, and as-extracted collateral filing in such records, of the county in which the Premises are located, this Deed of Trust will be in a form sufficient to create and constitute a valid and enforceable Lien on and UCC security interest in the Trust Property that is fixture and timber, and a valid and enforceable Lien on as-extracted collateral; and upon the due execution and delivery of this Deed of Trust and with value given therefor, this Deed of Trust will be in a form sufficient to create a valid security interest in and to the Trust Property that is personal property and in which security interests can be created under Article 9 of the UCC (the "UCC Collateral"); and upon the taking of the other actions required with respect to Trust Property that is personal property under and pursuant to the Security Agreement, the interests granted in favor of the Secured Creditors herein and therein will be perfected as valid and enforceable security interests and liens therein, to the extent perfection may be accomplished by taking such actions, all of which Liens and f security interests are subject only to Permitted Collateral Liens and shall have such priority as is provided for in the Financing Documents and the ABL Intercreditor Agreement.

SECTION 3.3. Flood. The Grantor represents and warrants that no portion of the Premises is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Acts promulgated by the Federal Emergency Management Agency or any successor thereto or, if any portion of the Premises is located within such area as evidenced by the Federal Emergency Management Agency Standard Flood Hazard Determination provided to the Beneficiary by the Grantor pursuant to Section 4.12(c)(v) of the Senior Secured ABL Credit Agreement, the Grantor has obtained the flood insurance prescribed in Section 4.3(b) of the Senior Secured ABL Credit Agreement hereof;

SECTION 3.4. Charges. The Grantor represents and warrants that, to the extent required by the Senior Secured ABL Credit Agreement, all Charges imposed upon or assessed against the Trust Property have been paid and discharged except to the extent such Charges constitute a Permitted Collateral Lien.

## ARTICLE IV.

## CERTAIN COVENANTS OF GRANTOR

SECTION 4.1. Payment and Performance. The Grantor shall pay and perform the Secured Obligations in full as and when the same shall become due under the Financing Documents and when they are required to be performed thereunder.

SECTION 4.2. Title. The Grantor shall

(i) (A) to the extent required by the Senior Secured ABL Credit Agreement, keep in effect all rights and appurtenances to or that constitute a part of the Trust Property except where the failure to keep in effect the same could not result in a Material Adverse Effect and (B) protect, preserve and defend its rights, title and interest in the Trust Property and title thereto; and

(ii) (A) comply with each of the terms, conditions and provisions of all Requirements of Law and Permits, including but not limited to Environmental Laws, environmental permits, Mining Laws and Mining Permits, and with all other obligations of the Grantor which are secured by the Trust Property, and with all other obligations the noncompliance with which may reasonably be expected to result in the imposition of a Lien on the Trust Property subject to Permitted Collateral Liens, (B) forever warrant and defend to the Trustee and Beneficiary the Lien and security interests created and evidenced hereby and the validity and priority position hereof in any action or proceeding against the claims of any and all persons whomsoever affecting or purporting to affect the Trust Property or any of the rights of the Trustee and Beneficiary hereunder and (C) maintain this Deed of Trust as a valid and enforceable Lien on the Trust Property subject only to Permitted Collateral Liens and with such priority as is in effect upon the execution, delivery and recording hereof as provided for in the Financing Documents and the ABL Intercreditor Agreement.

SECTION 4.3. Limitation on Liens; Transfer Restrictions.

(i) Except for the Permitted Collateral Liens and the Lien of this Deed of Trust, the Grantor may not, without the prior written consent of the Beneficiary, permit to exist or grant any Lien on all or any part of the Trust Property or suffer or allow any of the foregoing to occur by operation of law or otherwise.

(ii) Except to the extent permitted by the Senior Secured ABL Credit Agreement, the Grantor may not, without the prior written consent of the Beneficiary, sell, convey, assign, lease or otherwise transfer all or any part of the Trust Property.

SECTION 4.4. Insurance. The Grantor shall obtain and keep in full force and effect the Insurance Policies required by the Senior Secured ABLCredit Agreement pursuant to the terms thereof.

## ARTICLE V.

## CONCERNING ASSIGNMENT OF LEASES AND RENTS

SECTION 5.1. Present Assignment; License to the Grantor.

(i) Section 2.2 of this Deed of Trust constitutes a present, absolute, effective, irrevocable and complete collateral assignment by Grantor to Beneficiary of the Leases and Rents and the right, subject to applicable law, to collect all sums payable to Grantor thereunder and apply the same as Beneficiary may reasonably determine to be appropriate to protect the

security afforded by this Deed of Trust (including the payment of reasonable costs and expenses in connection with the maintenance, operation, improvement, insurance, taxes and upkeep of the Trust Property), which is not conditioned upon Beneficiary being in possession of the Premises. This assignment is an absolute assignment and not an assignment for additional security only. The Beneficiary hereby grants to the Grantor, however, a license to collect and apply the Rents and to enforce the obligations of Tenants under the Leases. Immediately upon the occurrence of and during the continuance of any Event of Default, whether or not legal proceedings have commenced and without regard to waste, adequacy of security for the Secured Obligations or solvency of Grantor, the license granted in the immediately preceding sentence shall automatically cease and terminate without any notice by Beneficiary (such notice being hereby expressly waived by Grantor to the extent permitted by applicable law), or any action or proceeding or the intervention of a receiver appointed by a court.

(ii) Grantor acknowledges that Beneficiary has taken all reasonable actions necessary to obtain, and that upon recordation of this Deed of Trust Beneficiary shall have, to the extent permitted under applicable law, a valid and fully perfected, present assignment of the Rents arising out of the Leases and all security for such Leases with the priority required pursuant to the Financing Documents and the ABL Intercreditor Agreement (subject to the Permitted Collateral Liens) and in the case of security deposits, rights of depositors and requirements of law. Grantor acknowledges and agrees that upon recordation of this Deed of Trust, Beneficiary's interest in the Rents shall (to the maximum extent permitted by law) be deemed to be fully perfected, "choate" and enforced as to Grantor and all third parties, including, without limitation, any subsequently appointed trustee in any case under Title II of the United States Code (the "Bankruptcy Code"), without the necessity of commencing a foreclosure action with respect to this Deed of Trust, making formal demand for the Rents, obtaining the appointment of a receiver or taking any other affirmative action.

(iii) Without limitation of the absolute nature of the assignment of the Rents hereunder, Grantor and Beneficiary agree that (a) this Deed of Trust shall constitute a "security agreement" for purposes of Section 552(b) of the Bankruptcy Code, (b) the security interest created by this Deed of Trust extends to property of Grantor acquired before the commencement of a case in bankruptcy and to all amounts paid as Rents, and (c) such security interest shall extend to all rents acquired by the estate after the commencement of any case in bankruptcy.

SECTION 5.2. Collection of Rents by the Beneficiary.

(i) Any Rents receivable by the Beneficiary hereunder, after payment of all proper costs and expenses as Beneficiary may, in its sole discretion, determine to be appropriate (including the payment of reasonable costs and expenses in connection with the maintenance, operation, improvement, insurance, taxes and upkeep of the Trust Property), shall be applied in accordance with the provisions of Section 8.2(ii) of this Deed of Trust. The Beneficiary shall be accountable to the Grantor only for Rents actually received by the Beneficiary. The collection of such Rents and the application thereof shall not cure or waive any Event of Default or waive, modify or affect notice of Event of Default or invalidate any act done pursuant to such notice.

(ii) Following the occurrence of and during the continuance of an Event of Default, the Grantor hereby irrevocably authorizes and directs Tenant under each Lease to rely

Case 2:20-cv-00487 Document 105-26 Filed 11/22/21 Page 14 of 46 PageID #: 1898

upon and comply with any and all notices or demands from the Beneficiary for payment of Rents to the Beneficiary and the Grantor shall have no claim against Tenant for Rents paid by Tenant to the Beneficiary pursuant to such notice or demand.

SECTION 5.3. Irrevocable Interest. All rights, powers and privileges of the Beneficiary herein set forth are coupled with an interest and are irrevocable, subject to the terms and conditions hereof, and the Grantor shall not take any action under the Leases or otherwise which is inconsistent with this Deed of Trust or any of the terms hereof and any such action inconsistent herewith or therewith shall be void.

## ARTICLE VI.

## TAXES AND CERTAIN STATUTORY LIENS

SECTION 6.1. Payment of Charges. Unless and to the extent permitted under the provisions of the Senior Secured ABL Credit Agreement or contested by the Grantor in accordance with the provisions of the Senior Secured ABL Credit Agreement, the Grantor shall pay and discharge, or cause to be paid and discharged, from time to time prior to same becoming delinquent, all Charges. The Grantor shall, upon the Beneficiary's request, deliver to the Beneficiary receipts evidencing the payment of all such Charges.

SECTION 6.2. Stamp and Other Taxes. The Grantor shall pay any United States documentary stamp taxes, with interest and fines and penalties, and any mortgage recording taxes, with interest and fines and penalties, that may hereafter be levied, imposed or assessed under or upon or by reason hereof or the Secured Obligations or any instrument or transaction affecting or relating to either thereof and in default thereof the Beneficiary may advance the same and the amount so advanced shall be payable by the Grantor to the Beneficiary in accordance with the provisions of Section 2.8 of the Senior Secured ABL Credit Agreement.

SECTION 6.3. Certain Tax Law Changes. In the event of the passage after the date hereof of any law deducting from the value of real property, for the purpose of taxation, amounts in respect of any Lien thereon or changing in any way the laws for the taxation of mortgages or debts secured by mortgages for state or local purposes or the manner of the collection of any taxes, and imposing any taxes, either directly or indirectly, on this Deed of Trust or any other Financing Document, the Grantor shall promptly pay to the Beneficiary such amount or amounts as may be necessary from time to time to pay any such taxes, assessments or other charges resulting therefrom; provided, that if any such payment or reimbursement shall be unlawful or taxable to Beneficiary, or would constitute usury or render the indebtedness wholly or partially usurious under applicable law, the Grantor shall pay or reimburse Beneficiary for payment of the lawful and non-usurious portion thereof.

SECTION 6.4. Proceeds of Tax Claim. In the event that the proceeds of any tax claim are paid after the Beneficiary has exercised its right to foreclose the Lien hereof, such proceeds shall be paid to the Beneficiary to satisfy any deficiency remaining after such foreclosure. The Beneficiary shall retain its interest in the proceeds of any tax claim during any redemption period. The amount of any such proceeds in excess of any deficiency claim of the Beneficiary shall in a reasonably prompt manner be released to the Grantor.

Case 2:20-cv-00487 Document 105-26 Filed 11/22/21 Page 15 of 46 PageID #: 1899

ARTICLE VII.

RECOVERY EVENTS AND RESTORATION

SECTION 7.1. Recovery Event. If there shall occur any Recovery Event (or, in the case of any condemnation, taking or other proceeding in the nature thereof, upon the occurrence thereof or notice of the commencement of any proceedings therefor), the Grantor shall promptly send to the Beneficiary a written notice setting forth the nature and extent thereof. The proceeds payable in respect of any such Recovery Event are hereby assigned and shall be paid to the Beneficiary.

SECTION 7.2. Condemnation. In the case of any taking, condemnation or other proceeding in the nature thereof, the Beneficiary may, at its option, participate in any proceedings or negotiations which might result in any taking or condemnation and the Grantor shall deliver or cause to be delivered to the Beneficiary all instruments reasonably requested by it to permit such participation. The Beneficiary may be represented by counsel satisfactory to it at the reasonable expense of the Grantor in connection with any such participation. The Grantor shall pay all reasonable fees, costs and expenses incurred by the Beneficiary in connection therewith and in seeking and obtaining any award or payment on account thereof. The Grantor shall take all steps necessary to notify the condemning authority of such participation.

ARTICLE VIII.

EVENTS OF DEFAULT AND REMEDIES

SECTION 8.1. Remedies in Case of an Event of Default. If any Event of Default shall have occurred and be continuing, subject to the terms of the ABL Intercreditor Agreement then in effect, the Beneficiary may at its option in addition to any other action permitted under this Deed of Trust or the Senior Secured ABL Credit Agreement or any other Financing Document or by law, statute or in equity, take one or more of the following actions to the greatest extent permitted by local law:

(i) personally, or by its agents or attorneys, and where applicable law so requires, with the Trustee, (A) enter into and upon and take possession of all or any part of the Premises together with the books, records and accounts of the Grantor relating thereto and, exclude the Grantor, its agents and servants wholly therefrom, (B) use, operate, manage and control the Premises and conduct the business thereof, (C) maintain and restore the Premises, (D) make all necessary or proper repairs, renewals and replacements and such useful alterations thereto and thereon as the Beneficiary may deem advisable, (E) manage, lease and operate the Premises and carry on the business thereof and exercise all rights and powers of the Grantor with respect thereto either in the name of the Grantor or otherwise or (F) collect and receive all Rents. The Beneficiary shall be under no liability for or by reason of any such taking of possession, entry, removal or holding, operation or management except that any amounts so received by the Beneficiary shall be applied in accordance with the provisions of Section 9.1 of the Security Agreement.

(ii) with or without entry, personally or by its agents or attorneys, or by the Trustee (as so required by applicable law) (A) sell the Trust Property and all of Grantor's estate, right, title and interest, claim and demand therein at one or more sales in one or more parcels, in accordance with the provisions of Section 8.2 or (B) institute and prosecute proceedings for the complete or partial foreclosure of the Lien and security interests created and evidenced hereby; or

(iii) take such steps to protect and enforce its rights whether by action, suit or proceeding at law or in equity for the specific performance of any covenant, condition or agreement in the Senior Secured ABL Credit Agreement and the other Financing Documents, or in aid of the execution of any power granted in this Deed of Trust, or for any foreclosure hereunder, or for the enforcement of any other appropriate legal or equitable remedy or otherwise as the Beneficiary shall elect.

SECTION 8.2. Sale of Trust Property if Event of Default Occurs; Proceeds of Sale.

(i) If any Event of Default shall have occurred and be continuing, the Beneficiary and/or Trustee (as so required by applicable law) may institute an action to foreclose this Deed of Trust or take such other action as may be permitted and available to the Beneficiary and/or Trustee at law or in equity or pursuant to this Deed of Trust for the enforcement of the Senior Secured ABL Credit Agreement and realization on the Trust Property and proceeds thereon through power of sale (if then available under applicable law) or to final judgment and execution thereof for the Secured Obligations, and in furtherance thereof the Beneficiary and/or Trustee (as so required by applicable law) may sell the Trust Property at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law or statute or in equity. Further, at any time after the exercise by Beneficiary of the option to declare the Secured Obligations to be immediately due and payable, Trustee, upon the written request of Beneficiary, shall foreclose upon and sell the Trust Property (or any part or parts thereof) to satisfy the Secured Obligations at public auction at the front door of the courthouse of the county (or any county if more than one) in the State of West Virginia in which the Trust Property is located, for cash in hand on the day of sale and subject to such other terms and conditions of sale as determined by Beneficiary, after first giving notice of such sale by publishing such notice in a qualified newspaper of general circulation published in said county, or if there be no such newspaper in a qualified newspaper of general circulation in said county, once a week for two successive weeks preceding the day of sale and after giving such other notice as may be required by applicable law. Any notice of subordinate liens pursuant to West Virginia Code § 38-1-4 shall be mailed to the mailing address of the Beneficiary provided above on the first page of this Deed of Trust. The Beneficiary and/or Trustee (as so required by applicable law) may execute and deliver to the purchaser at such sale a conveyance of the Trust Property in fee simple or otherwise, as appropriate, and an assignment or conveyance of all the Grantor's Interest in the Leases and the Trust Property, each of which conveyances and assignments shall contain recitals as to the Event of Default upon which the execution of the power of sale herein granted depends, and the Grantor hereby constitutes and appoints the Beneficiary and/or Trustee (as so required by applicable law) the true and lawful attorney in fact of the Grantor to make any such recitals, sale, assignment and conveyance, and

all of the acts of the Beneficiary as such attorney in fact are hereby ratified and confirmed. The Grantor agrees that such recitals shall be binding and conclusive upon the Grantor and that any assignment or conveyance to be made by the Beneficiary or Trustee shall divest the Grantor of all right, title, interest, equity and right of redemption, including any statutory redemption, in and to the Trust Property. The power and agency hereby granted are coupled with an interest and are irrevocable by death or dissolution, or otherwise, and are in addition to any and all other remedies which the Beneficiary and Trustee may have hereunder, at law or in equity. So long as the Secured Obligations, or any part thereof, remain unpaid, the Grantor agrees that possession of the Trust Property by the Grantor, or any person claiming under the Grantor, shall be as tenant, and, in case of a sale under power or upon foreclosure as provided in this Deed of Trust, the Grantor and any person in possession under the Grantor, as to whose interest such sale was not made subject, shall, at the option of the purchaser at such sale, then become and be tenants holding over, and shall forthwith deliver possession to such purchaser, or be summarily dispossessed in accordance with the laws applicable to tenants holding over. In case of any sale under this Deed of Trust by virtue of the exercise of the powers herein granted, or pursuant to any order in any judicial proceeding or otherwise, the Trust Property may be sold as an entirety or in separate parcels in such manner or order as the Beneficiary and Trustee in their sole discretion may elect. One or more exercises of powers herein granted shall not extinguish or exhaust such powers, until the entire Trust Property is sold or all amounts secured hereby are paid in full.

(ii) The proceeds of any sale made under or by virtue of this Article VIII, together with any other sums which then may be held by the Beneficiary under this Deed of Trust, whether under the provisions of this Article VIII or otherwise, shall be applied in accordance with the provisions of Section 9.1 of the Security Agreement.

(iii) The Beneficiary (on behalf of any Secured Creditor or on its own behalf) or any Lender or any of their respective Affiliates may bid for and acquire the Trust Property or any part thereof at any sale made under or by virtue of this Article VIII and, in lieu of paying cash therefor, may make settlement for the purchase price by crediting against the purchase price the unpaid amounts (whether or not then due) owing to the Beneficiary, or such Lender in respect of the Secured Obligations, after deducting from the sales price the expense of the sale and the reasonable costs of the action or proceedings and any other sums that the Beneficiary, Trustee or such Lender is authorized to deduct under this Deed of Trust.

(iv) The Beneficiary and/or Trustee (as so required by applicable law) may adjourn from time to time any sale by it to be made under or by virtue hereof by announcement at the time and place appointed for such sale or for such adjourned sale or sales, and, the Beneficiary and/or Trustee (as so required by applicable law), without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(v) If the Premises are comprised of more than one parcel of land, the Beneficiary and/or Trustee (as so required by applicable law) may take any of the actions authorized by this Section 8.2 in respect of any or a number of individual parcels.

SECTION 8.3. Additional Remedies in Case of an Event of Default.

(i) If an Event of Default shall have occurred and be continuing, the Beneficiary shall be entitled to recover judgment as aforesaid either before, after or during the pendency of any proceedings for the enforcement of the provisions hereof and, to the extent permitted by applicable law, the right of the Beneficiary to recover such judgment shall not be affected by any entry or sale hereunder, or by the exercise of any other right, power or remedy for the enforcement of the provisions hereof, or the foreclosure of, or absolute conveyance pursuant to, this Deed of Trust. In case of proceedings against the Grantor in insolvency or bankruptcy or any proceedings for its reorganization or involving the liquidation of its assets, the Beneficiary shall be entitled to prove the whole amount of principal and interest and other payments, charges and costs due in respect of the Secured Obligations to the full amount thereof without deducting therefrom any proceeds obtained from the sale of the whole or any part of the Trust Property; provided, however, that in no case shall the Beneficiary receive a greater amount than the aggregate of such principal, interest and such other payments, charges and costs (with interest at the Default Rate) from the proceeds of the sale of the Trust Property and the distribution from the estate of the Grantor.

(ii) Any recovery of any judgment by the Beneficiary and any levy of any execution under any judgment upon the Trust Property shall not affect in any manner or to any extent the Lien and security interests created and evidenced hereby upon the Trust Property or any part thereof, or any conveyances, powers, rights and remedies of the Beneficiary hereunder, but such conveyances, powers, rights and remedies shall continue unimpaired as before.

(iii) Any monies collected by the Beneficiary under this Section 8.3 shall be applied in accordance with the provisions of Section 8.2(ii).

SECTION 8.4. Legal Proceedings After an Event of Default.

(i) After the occurrence and during the continuance of any Event of Default and immediately upon the commencement of any action, suit or legal proceedings to obtain judgment for the Secured Obligations or any part thereof, or of any proceedings to foreclose the Lien and security interest created and evidenced hereby or otherwise enforce the provisions hereof or of any other proceedings in aid of the enforcement hereof, the Grantor shall enter its voluntary appearance in such action, suit or proceeding.

(ii) Upon the occurrence and during the continuance of an Event of Default, the Beneficiary and/or Trustee shall be entitled forthwith as a matter of right, concurrently or independently of any other right or remedy hereunder either before or after declaring the Secured Obligations or any part thereof to be due and payable, to the appointment of a receiver without giving notice to any party and without regard to the adequacy or inadequacy of any security for the Secured Obligations or the solvency or insolvency of any person or entity then legally or equitably liable for the Secured Obligations or any portion thereof. The Grantor hereby consents to the appointment of such receiver. Notwithstanding the appointment of any receiver, the Beneficiary shall be entitled as pledgee to the possession and control of any cash, deposits or instruments at the time held by or payable or deliverable under the terms of the Senior Secured ABL Credit Agreement to the Beneficiary.

(iii) Upon the occurrence and during the continuance of an Event of Default, the Grantor shall not (A) at any time insist upon, or plead, or in any manner whatsoever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from execution or sale of the Trust Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance hereof, (B) claim, take or insist on any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Trust Property, or any part thereof, prior to any sale or sales of the Trust Property which may be made pursuant to this Deed of Trust, or pursuant to any decree, judgment or order of any court of competent jurisdiction or (C) after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof. To the extent permitted by applicable law, the Grantor hereby expressly (A) waives all benefit or advantage of any such law or laws, including, without limitation, any statute of limitations applicable to this Deed of Trust, (B) waives any and all rights to trial by jury in any action or proceeding related to the enforcement hereof, (C) waives any objection which it may now or hereafter have to the laying of venue of any action, suit or proceeding brought in connection with this Deed of Trust and further waives and agrees not to plead that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum and (D) covenants not to hinder, delay or impede the execution of any power granted or delegated to the Beneficiary and Trustee by this Deed of Trust but to suffer and permit the execution of every such power as though no such law or laws had been made or enacted. The Beneficiary shall not be liable for any incorrect or improper payment made pursuant to this Article VIII in the absence of gross negligence or willful misconduct.

SECTION 8.5. Remedies Not Exclusive. No remedy conferred upon or reserved to the Beneficiary and/or Trustee by this Deed of Trust is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Deed of Trust or now or hereafter existing at law or in equity. Any delay or omission of the Beneficiary to exercise any right or power accruing on any Event of Default shall not impair any such right or power and shall not be construed to be a waiver of or acquiescence in any such Event of Default. Every power and remedy given by this Deed of Trust may be exercised from time to time concurrently or independently, when and as often as may be deemed expedient by the Beneficiary in such order and manner as the Beneficiary, in its sole discretion, may elect. If the Beneficiary accepts any monies required to be paid by the Grantor under this Deed of Trust after the same become due, such acceptance shall not constitute a waiver of the right either to require prompt payment, when due, of all other sums secured by this Deed of Trust or to declare an Event of Default with regard to subsequent defaults. If the Beneficiary accepts any monies required to be paid by the Grantor under this Deed of Trust in an amount less than the sum then due, such acceptance shall be deemed an acceptance on account only and on the condition that it shall not constitute a waiver of the obligation of the Grantor to pay the entire sum then due, and the Grantor's failure to pay the entire sum then due shall be and continue to be a default hereunder notwithstanding acceptance of such amount on account.

ARTICLE IX.

SECURITY AGREEMENT, FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING

SECTION 9.1. Security Agreement. To the extent that the Trust Property consists of UCC Collateral or items of personal property which are or are to become fixtures or as-extracted collateral or timber to be cut under applicable law, this Deed of Trust shall also be construed as a security agreement under the UCC and Grantor in order to secure the due and punctual payment and payments of the Secured Obligations hereby grants to Beneficiary for its benefit and for the benefit of the Secured Creditors, a security interest in and to such UCC Collateral, fixtures, as-extracted collateral and timber. Upon and during the continuance of an Event of Default, the Beneficiary shall be entitled with respect to the UCC Collateral, fixtures, as-extracted collateral and timber to exercise all remedies hereunder, or under any other Financing Document, or all remedies available under the UCC with respect thereto and all other remedies available under applicable law. Without limiting the foregoing, the UCC Collateral, fixtures, as-extracted collateral and timber may, at the Beneficiary's option, (i) be sold hereunder together with any sale of any portion of the Trust Property or otherwise, (ii) be sold separately pursuant to the UCC, or (iii) be dealt with by the Beneficiary in any other manner permitted under applicable law. The Beneficiary may require the Grantor to assemble the UCC Collateral, fixtures, as-extracted collateral and timber or any part thereof and make it available to the Beneficiary at a place to be designated by the Beneficiary. The Grantor acknowledges and agrees that a disposition of such collateral in accordance with the Beneficiary's rights and remedies in respect to the Trust Property as heretofore provided is a commercially reasonable disposition thereof; provided, however, that the Beneficiary shall give the Grantor not less than ten (10) days' prior notice of the time and place of any intended disposition.

SECTION 9.2. Fixture Filing. To the extent that the Trust Property includes items of personal property which are or are to become fixtures, timber to be cut, or as-extracted collateral under applicable law, and to the extent permitted under applicable law, the recording hereof in the real estate records of the county in which such Trust Property is located shall also operate from the date of such recording as a fixtures, timber and as-extracted collateral filing with respect to such Trust Property, and the following information is applicable for the purpose of such filing, to wit:

<table>
<tr><td>Name and Address of the debtor:<br>The Grantor having the address described in the Preamble hereof.<br>The Grantor is a limited liability company organized under the laws of the State of Delaware whose Organization Number is 5763728, and whose Taxpayer Identification Number is 47-4710586.</td><td>Name and Address of the Secured Party:<br>The Beneficiary having the address described in the Preamble hereof, from which address information concerning the security interest may be obtained.</td></tr>
<tr><td colspan="2">This Financing Statement covers the following types or items of property:</td></tr>
</table>

| |
|---|
| The Trust Property.<br><br>This instrument covers goods or items of personal property which are or are to become fixtures upon the property, or is timber to be cut, or is as-extracted collateral.<br><br>With respect to the Owned Premises, the name of the record owner of the Trust Property on which such collateral is or is to be located is the Grantor listed on page 1 of this Deed of Trust, and with respect to the Leased Premises, the name of the record owner of the Trust Property on which such collateral is or is to be located is the Landlord pursuant to each of the Mortgaged Leases. |

In addition, Grantor authorizes the Beneficiary to file appropriate financing and continuation statements under the UCC in effect in the jurisdiction in which the Trust Property is located where Grantor is organized, or any other applicable jurisdiction as may be required by law in order to create, establish, perfect, maintain perfection, preserve and protect the liens and security interests intended to be granted to the Beneficiary pursuant to this Deed of Trust in the Trust Property. Beneficiary is also authorized to file a copy of this Deed of Trust or such other notice, document, instrument or certificate as may be required, allowed or available under applicable law to provide notice to third persons and Governmental Authorities of the Liens and security interests intended to be granted by this Deed of Trust in the Trust Property.

ARTICLE X.

FURTHER ASSURANCES

SECTION 10.1. Recording Documentation To Assure Security. The Grantor shall, forthwith after the execution and delivery hereof and thereafter, from time to time, cause this Deed of Trust and any financing statement, continuation statement, or similar instrument relating to any of the Trust Property or to any property intended to be subject to the Lien hereof or the security interests created hereby to be filed, registered and recorded in such manner and in such places as may be required by any present or future law and shall take such actions as Beneficiary shall reasonably deem necessary in order to publish notice of and fully to protect the validity and priority of the Liens, assignment, and security interests purported to be created upon the Trust Property and the interest and rights of the Beneficiary therein. The Grantor shall pay or cause to be paid all taxes and fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment thereof, and of any instrument of further assurance, and all Federal or state stamp taxes or other taxes, duties and charges arising out of or in connection with the execution and delivery of such instruments.

SECTION 10.2. Further Acts. The Grantor shall, at the sole cost and expense of the Grantor, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers, financing statements, continuation statements, instruments and assurances as the Beneficiary or Trustee shall from time to time reasonably request, which may be necessary in the reasonable judgment of the Beneficiary from time to time to assure, perfect, convey, assign, mortgage, transfer and confirm unto the Beneficiary and Trustee, the property and rights hereby conveyed or assigned or which

the Grantor may be or may hereafter become bound to convey or assign to the Beneficiary and Trustee or for carrying out the intention or facilitating the performance of the terms hereof or the filing, registering or recording hereof. Without limiting the generality of the foregoing, in the event that the Beneficiary or Trustee desires to exercise any remedies, consensual rights or attorney-in-fact powers set forth in this Deed of Trust and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other person therefor, then, upon the reasonable request of the Beneficiary or Trustee, the Grantor agrees to use its commercially reasonable efforts to assist and aid the Beneficiary and/or Trustee to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers. Upon the occurrence and during the continuance of an Event of Default, the Beneficiary and/or Trustee may execute any instrument or take any action required to be executed or taken by the Grantor under this Section 10.2 as the attorney-in-fact for the Grantor, such power of attorney being coupled with an interest and is irrevocable.

SECTION 10.3. Additions to Trust Property. All right, title and interest of Grantor in and to all extensions, amendments, relocations, retakings, improvements, betterments, renewals, substitutes and replacements of, and all additions and appurtenances to, the Trust Property hereafter acquired by or released to Grantor or constructed, assembled or placed by Grantor upon the Premises, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case without any further mortgage, conveyance, assignment or other act by Grantor, shall become subject to the lien and security interest of this Deed of Trust as fully and completely and with the same effect as though now owned by Grantor and specifically described in the grant of the Trust Property above, but at any and all times Grantor will execute and deliver to Beneficiary any and all such further assurances, mortgages, conveyances or assignments thereof as Beneficiary may reasonably require for the purpose of expressly and specifically subjecting the same to the lien and security interest of this Deed of Trust.

SECTION 10.4. Additional Security. Without notice to or consent of the Grantor and without impairment of the Lien and rights created by this Deed of Trust, the Beneficiary and/or Trustee may accept (but the Grantor shall not be obligated to furnish) from the Grantor or from any other person, additional security for the Secured Obligations. Neither the giving hereof nor the acceptance of any such additional security shall prevent the Beneficiary or Trustee from resorting, first, to such additional security, and, second, to the security created by this Deed of Trust without affecting the Beneficiary's and Trustee's Lien and rights under this Deed of Trust.

## ARTICLE XI.

## MISCELLANEOUS

SECTION 11.1. Covenants To Run with the Land. All of the grants, covenants, terms, provisions and conditions in this Deed of Trust shall run with the Land and Grantor's interests therein and in the Leased Premises and shall apply to, and bind the successors

and assigns of, the Grantor. If there shall be more than one grantor with respect to the Trust Property, the covenants and warranties hereof shall be joint and several.

SECTION 11.2. No Merger. The rights and estate created by this Deed of Trust shall not, under any circumstances, be held to have merged into any other estate or interest now owned or hereafter acquired by the Beneficiary unless the Beneficiary shall have consented to such merger in writing.

SECTION 11.3. Concerning Beneficiary.

(i) The Beneficiary has been appointed as Agent pursuant to the Senior Secured ABL Credit Agreement. The actions of the Beneficiary hereunder are subject to the provisions of the Senior Secured ABL Credit Agreement. The Beneficiary shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including, without limitation, the release or substitution of the Trust Property), in accordance with this Deed of Trust and the Financing Documents. The Beneficiary may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith. The Beneficiary may resign and a successor Beneficiary may be appointed in the manner provided in the Senior Secured ABL Credit Agreement. Upon the acceptance of any appointment as the Beneficiary by a successor Beneficiary, that successor Beneficiary shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Beneficiary under this Deed of Trust, and the retiring Beneficiary shall thereupon be discharged from its duties and obligations under this Deed of Trust. After any retiring Beneficiary's resignation, the provisions hereof shall inure to its benefit as to any actions taken or omitted to be taken by it under this Deed of Trust while it was the Beneficiary.

(ii) The Beneficiary shall be deemed to have exercised reasonable care in the custody and preservation of the Trust Property in its possession if such Trust Property is accorded treatment substantially equivalent to that which the Beneficiary, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that neither the Beneficiary nor any of the Secured Creditors shall have responsibility for taking any necessary steps to preserve rights against any person with respect to any Trust Property.

(iii) The Beneficiary shall be entitled to rely upon any written notice, statement, certificate, order or other document or any telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person, and, with respect to all matters pertaining to this Deed of Trust and its duties hereunder, upon advice of counsel selected by it.

(iv) If any portion of the Trust Property also constitutes collateral granted by any Credit Party to the Beneficiary to secure the Secured Obligations under any other deed of trust, mortgage, security agreement, pledge or instrument of any type, in the event of any conflict between the provisions hereof and the provisions of such other deed of trust, mortgage, security agreement, pledge or instrument of any type in respect of such collateral, the Beneficiary, in its sole discretion, shall select which provision or provisions shall control.

SECTION 11.4. Beneficiary May Perform; Beneficiary Appointed Attorney-in-Fact. If the Grantor shall fail to perform any covenants contained in this Deed of Trust (including, without limitation, the Grantor's covenants to (i) pay the premiums in respect of all required Insurance Policies hereunder or under the Senior Secured ABL Credit Agreement, (ii) pay Charges, (iii) make repairs, (iv) discharge Liens or (v) pay or perform any obligations of the Grantor under any Trust Property) or if any warranty on the part of the Grantor contained herein shall be breached, and such failure shall constitute an Event of Default, the Beneficiary may (but shall not be obligated to), do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose; provided, however, that the Beneficiary shall in no event be bound to inquire into the validity of any tax, Lien, imposition or other obligation which the Grantor fails to pay or perform as and when required hereby and which the Grantor does not contest in accordance with the provisions of the Senior Secured ABL Credit Agreement and the applicable provisions of each other Financing Document. Any and all amounts so expended by the Beneficiary shall be paid by the Grantor in accordance with the provisions of Section 11.14 of the Senior Secured ABL Credit Agreement and the applicable provisions of each other Financing Document and repayment shall be secured by this Deed of Trust. Neither the provisions of this Section 11.4 nor any action taken by the Beneficiary pursuant to the provisions of this Section 11.4 shall prevent any such failure to observe any covenant contained in this Deed of Trust nor any breach of representation or warranty from constituting an Event of Default. The Grantor hereby appoints the Beneficiary and Trustee its attorney-in-fact, with full power and authority in the place and stead of the Grantor and in the name of the Grantor, or otherwise, in the Beneficiary's and Trustee's discretion to take any action and to execute any instrument consistent with the terms of the Senior Secured ABL Credit Agreement, this Deed of Trust and the other Financing Documents which the Beneficiary and Trustee may deem necessary or advisable to accomplish the purposes hereof (but the Beneficiary shall not be obligated to and shall have no liability to Grantor or any third party for failure to so do or take action). The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof. The Grantor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

SECTION 11.5. Continuing Security Interest; Assignment. This Deed of Trust shall create a continuing Lien on and security interest in the Trust Property and shall (i) be binding upon the Grantor, its successors and assigns, (ii) inure, together with the rights and remedies of the Beneficiary and Trustee hereunder, to the benefit of the Beneficiary for the benefit of the Secured Creditors and each of their respective successors, transferees and assigns and (iii) in the event there is more than one grantor party hereto, all undertakings hereunder shall be deemed joint and several. No other persons (including, without limitation, any other creditor of any Credit Party) shall have any interest herein or any right or benefit with respect hereto. Without limiting the generality of the foregoing clause (ii), any Secured Creditor may assign or otherwise transfer any indebtedness held by it secured by this Deed of Trust to any other person, and such other person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Creditor, herein or otherwise, subject, however, to the provisions of the Senior Secured ABL Credit Agreement. Grantor agrees that its obligations hereunder and the Lien and security interest created hereunder shall continue to be effective or be reinstated, as applicable, if at any time payment, or any part thereof, of all or any part of the Secured

Obligations is rescinded or must otherwise be restored by the Secured Creditor upon the bankruptcy or reorganization of Grantor or otherwise.

SECTION 11.6. Termination; Release. When all the Secured Obligations have been paid in full in cash (other than contingent obligations not yet accrued and payable) and the Revolving Loan Commitment has terminated or expired, this Deed of Trust shall terminate. Upon termination of this Deed of Trust, the Trust Property shall be released from the Lien and security interest of this Deed of Trust. In addition, a Grantor shall automatically be released from its obligations hereunder and the security interests created hereunder in the Trust Property of such Grantor shall be automatically released upon the consummation of any transaction permitted by the Senior Secured ABL Credit Agreement or otherwise in accordance with the Financing Documents as a result of which such Grantor ceases to be a Credit Party. Upon any Asset Sale or any other sale by any Grantor of any Trust Property that is permitted under the Senior Secured ABL Credit Agreement to any person that is not a Credit Party, the Beneficiary's Lien on such Trust Property shall be automatically released. Upon such release, termination hereof or any release of the Trust Property or any portion thereof in accordance with the provisions of the Senior Secured ABL Credit Agreement (it being understood that, other than in connection with the repayment in full of the Secured Obligations (other than contingent obligations not yet accrued and payable), the Beneficiary shall be entitled to request, and be fully protected in relying upon, an Officer's Certificate from the Blackhawk Parent certifying that any such release of the Trust Property is permitted under the terms of the Senior Secured ABL Credit Agreement), the Beneficiary shall, upon the request and at the sole cost and expense of the Grantor, forthwith assign, transfer and deliver to the Grantor, without recourse to or warranty by the Beneficiary except as to the fact that the Beneficiary has not encumbered the released assets, such of the Trust Property or any part thereof to be released (in the case of a release) as may be in possession of the Beneficiary and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Trust Property, proper documents and instruments (including UCC-3 termination statements or releases) acknowledging the termination hereof or the release of such Trust Property, as the case may be.

SECTION 11.7. Modification in Writing. No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by the Grantor therefrom, shall be effective unless the same shall be done in accordance with the terms of the Senior Secured ABL Credit Agreement and unless in writing and signed by the Beneficiary, and, if required by applicable law, the Trustee. Any amendment, modification or supplement of or to any provision hereof in each case, any waiver of any provision hereof and any consent to any departure by the Grantor from the terms of any provision hereof shall be effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Deed of Trust or any other document evidencing the Secured Obligations, no notice to or demand on the Grantor in any case shall entitle the Grantor to any other or further notice or demand in similar or other circumstances.

SECTION 11.8. Notices. Unless otherwise provided herein or in the Senior Secured ABL Credit Agreement, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Senior Secured ABL Credit Agreement, as to the Grantor, addressed to it at the address of the Blackhawk Parent

set forth in the Senior Secured ABL Credit Agreement and as to the Beneficiary, addressed to it at the address set forth in the Senior Secured ABL Credit Agreement, or in each case at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 11.8.

SECTION 11.9. GOVERNING LAW; SERVICE OF PROCESS; WAIVER OF JURY TRIAL. THIS DEED OF TRUST SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS, EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTEREST HEREUNDER, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR ITEM OR TYPE OF DEED OF TRUSTD PROPERTY ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE. GRANTOR AGREES THAT SERVICE OF PROCESS IN ANY PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO BLACKHAWK PARENT AT ITS ADDRESS SET FORTH IN THE SENIOR SECURED ABL CREDIT AGREEMENT OR AT SUCH OTHER ADDRESS OF WHICH THE DEED OF TRUSTE SHALL HAVE BEEN NOTIFIED PURSUANT THERETO. IF ANY AGENT APPOINTED BY GRANTOR REFUSES TO ACCEPT SERVICE, GRANTOR HEREBY AGREES THAT SERVICE UPON IT BY MAIL SHALL CONSTITUTE SUFFICIENT NOTICE. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF DEED OF TRUSTE TO BRING PROCEEDINGS AGAINST GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION. THE GRANTOR HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS DEED OF TRUST OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 11.10. Severability of Provisions. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 11.11. Relationship. The relationship of the Beneficiary to the Grantor hereunder is strictly and solely that of lender and borrower and grantor and beneficiary and nothing contained in the Senior Secured ABL Credit Agreement, this Deed of Trust or any other document or instrument now existing and delivered in connection therewith or otherwise in connection with the Secured Obligations is intended to create, or shall in any event or under any circumstance be construed as creating a partnership (including a mining partnership or otherwise), joint venture, tenancy-in-common, joint tenancy or other relationship of any nature whatsoever between the Beneficiary and the Grantor other than as lender and borrower and grantor and beneficiary.

SECTION 11.12. No Credit for Payment of Taxes or Impositions. The Grantor shall not be entitled to any credit against the principal, premium, if any, or interest payable under

the Senior Secured ABL Credit Agreement, and the Grantor shall not be entitled to any credit against any other sums which may become payable under the terms thereof or hereof, by reason of the payment of any Charge on the Trust Property or any part thereof.

SECTION 11.13. No Claims Against the Beneficiary. Nothing contained in this Deed of Trust shall constitute any consent or request by the Beneficiary, express or implied, for the performance of any labor or services or the furnishing of any materials or other property in respect of the Premises or any part thereof, nor as giving the Grantor any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against the Beneficiary in respect thereof or any claim that any Lien based on the performance of such labor or services or the furnishing of any such materials or other property is prior to the Lien hereof.

SECTION 11.14. Intercreditor Agreements. Notwithstanding any provision to the contrary contained herein, the terms of this Deed of Trust, the Lien and security interest created hereby and the rights and remedies of the Beneficiary hereunder shall be subject to the terms of the ABL Intercreditor Agreement, if any is in effect at such time. In the event of any conflict or inconsistency between the terms of this Deed of Trust and the ABL Intercreditor Agreement, the terms of the ABL Intercreditor Agreement shall govern and control.

ARTICLE XII.

LEASES

SECTION 12.1. Grantor's Affirmative Covenants with Respect to Leases. With respect to each Lease, the Grantor shall:

(i) observe and perform in all material respects all the obligations imposed upon the Landlord under such Lease;

(ii) promptly send copies to the Beneficiary of all notices of default which the Grantor shall send or receive thereunder; and

(iii) enforce all of the material terms, covenants and conditions contained in such Lease upon the part of the Tenant thereunder to be observed or performed.

SECTION 12.2. Grantor's Negative Covenants with Respect to Leases. With respect to each Lease, the Grantor shall not, without the prior written consent of the Beneficiary:

(i) receive or collect, or permit the receipt or collection of, any Rent under such Lease more than three (3) months in advance of the respective period in respect of which such Rent is to accrue, except:

(A) in connection with the execution and delivery of such Lease (or of any amendment to such Lease), Rent thereunder may be collected and received in advance in an amount not in excess of three (3) months Rent;

(B) the amount held by Landlord as a reasonable security deposit thereunder; and

(C) any amount received and collected for escalation and other charges in accordance with the terms of such Lease;

(ii) assign, transfer or hypothecate (other than to the Beneficiary hereunder) any Rent under such Lease whether then due or to accrue in the future or the interest of the Grantor as Landlord under such Lease;

(iii) enter into any amendment or modification of any Lease if the same would not be a Permitted Collateral Lien or could reasonably be expected to result in a Material Adverse Effect;

(iv) terminate (whether by exercising any contractual right of the Grantor to recapture leased space or otherwise) or permit the termination of such Lease or accept surrender of all or any portion of the space demised under such Lease prior to the end of the term thereof or accept assignment of such Lease to the Grantor unless the same would not cause a Material Adverse Effect or;

(v) waive, excuse, condone or in any manner discharge or release any Tenants of or from the obligations of such Tenants under their respective Leases or guarantors of Tenants from obligations under any guarantees of the Leases unless the same would not cause a Material Adverse Effect.

## ARTICLE XIII.

## REGARDING TRUSTEE

SECTION 13.1. Trustee's Powers and Liabilities.

(i) Trustee, by acceptance hereof, covenants faithfully to perform and fulfill the trusts herein created, being liable, however, only for gross negligence, bad faith or willful misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by it in accordance with the terms thereof. All authorities, powers and discretions given in this Deed of Trust to Trustee and/or Beneficiary may be exercised by either, without the other, with the same effect as if exercised jointly;

(ii) Trustee may resign at any time upon giving thirty (30) days' notice in writing to Grantor and to Beneficiary;

(iii) Beneficiary may remove Trustee at any time or from time to time and select a successor trustee. In the event of the death, removal, resignation, refusal to act, inability to act or absence of Trustee from the state in which the Premises are located, or in its sole discretion for any reason whatsoever. Beneficiary may, upon notice to the Grantor and without specifying the reason therefore and without applying to any court, select and appoint a successor trustee, and all powers, rights, duties and authority of the former trustee, as aforesaid, shall

thereupon become vested in such successor. Such substitute trustee shall not be required to give bond for the faithful performance of his duties unless required by Beneficiary. Such substitute trustee shall be appointed by written instrument duly recorded in the county where the Land is located. Grantor hereby ratifies and confirms any and all acts that the herein named Trustee, or his successor or successors in this trust, shall do lawfully by virtue hereof. Grantor hereby agrees, on behalf of itself and its heirs, executors, administrators and assigns, that the recitals contained in any deed or deeds executed in due form by any Trustee or substitute trustee, acting under the provisions of this instrument, shall be prima facie evidence of the facts recited, and that it shall not be necessary to prove in any court, otherwise than by such recitals, the existence of the facts essential to authorize the execution and delivery of such deed or deeds and the passing of title thereby;

(iv) Trustee shall not be required to see that this Deed of Trust is recorded nor liable for its validity or its priority as a first deed of trust, or otherwise, nor shall Trustee be answerable or responsible for performance or observance of the covenants and agreements imposed upon Grantor or Beneficiary by this Deed of Trust or any other agreement. Trustee, as well as Beneficiary, shall have authority in their respective discretion to employ agents and attorneys in the execution of this trust and to protect the interest of the Beneficiary hereunder, and to the fullest extent permitted by law they shall be compensated and all expenses relating to the employment of such agents and/or attorneys, including expenses of litigation, shall be paid out of the proceeds of the sale of the Trust Property conveyed hereby should a sale be had, but if no such sale be had, all sums so paid out shall be recoverable to the fullest extent permitted by law by all remedies at law or in equity; and

(v) At any time, or from time to time, without liability therefore and with ten (10) day's prior written notice to Grantor, upon written request of Beneficiary and without affecting the effect of this Deed of Trust upon the remainder of the Trust Property, Trustee may (A) reconvey any part of the Trust Property, (B) consent in writing to the making of any map or plat thereof, so long as Grantor has consented thereto, (C) join in granting any easement thereon, so long as Grantor has consented thereto, or (D) join in any extension agreement or any agreement subordinating the lien or charge hereof.

ARTICLE XIV.

LOCAL LAW PROVISIONS

SECTION 14.1. Maturity Date. The last scheduled installment of the debt secured by this Mortgage shall become due and payable on the Maturity Date (as defined in the Senior Secured ABL Credit Agreement).

ARTICLE XV.

SECTION 15.1. Representations; Warranties; Covenants.

Grantor hereby represents, warrants and covenants that:

(1) Except as set forth in Schedule B hereof, the Mortgaged Leases are unmodified and in full force and effect except any Mortgaged Leases in respect of which the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect, and (2) Grantor enjoys peaceful and undisturbed possession under the Mortgaged Leases other than Mortgaged Leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

Grantor shall pay, when due and payable, the rent and other charges payable pursuant to the Mortgaged Leases, taking into account any applicable grace or cure periods, except for such amounts as may be contested in good faith, and will perform and observe, in all material respects, all of the other terms, covenants and conditions required to be performed and observed by Grantor as lessee under the Mortgaged Leases;

Grantor shall, promptly upon receipt thereof, deliver a copy of each notice of default given to Grantor by the lessor pursuant to the Mortgaged Leases and promptly notify Beneficiary in writing of any material default by the lessor in the performance or observance of any of the material terms, covenants or conditions on the part of the lessor to be performed or observed thereunder;

Unless permitted by the terms of the Senior Secured ABL Credit Agreement, Grantor shall not terminate, modify in any material respect or surrender the Mortgaged Leases without the prior written consent of Beneficiary (which shall not be unreasonably withheld, conditioned or delayed), and any such attempted termination, modification or surrender without Beneficiary's written consent shall be void;

If the Mortgaged Leases shall be rejected or disaffirmed by the lessor thereunder (or by any receiver, trustee, custodian or other party who succeeds to the rights of such lessor) pursuant to the Bankruptcy Code or similar or successor law or right, Grantor covenants that it will not elect to treat the Mortgaged Leases as terminated under 11 U.S.C. § 365(h) or any similar or successor law or right without Beneficiary's prior written consent. Upon the occurrence and during the continuance of an Event of Default, Beneficiary shall have the sole and exclusive right to make or refrain from making any such election, and Grantor agrees that any such election, if made by Grantor other than in accordance with this subsection, shall be void and of no force or effect; and

Except to the extent provided in the Mortgaged Leases, Grantor shall not at any time subordinate its interest in the Mortgaged Property or any portion thereof to the Lien or interests of any mortgagee of the lessor's fee interest in the Premises without Beneficiary's prior written consent (which shall not be unreasonably withheld, conditioned or delayed).

SECTION 15.2. No Merger.So long as the Revolving Loan Commitment or the Secured Obligations remain unpaid or unperformed, the fee title to and the leasehold estate in the Premises subject to each Mortgaged Lease shall not merge but shall always be kept separate and distinct notwithstanding the union of such estates in the lessor or Grantor, or in a third party, by purchase or otherwise. If Grantor acquires the fee title or any other estate, title or interest in the Premises, or any part thereof, the lien of this Mortgage shall attach to, cover and be a lien upon

such acquired estate, title or interest and the same shall thereupon be and become a part of the Mortgaged Property with the same force and effect as if specifically encumbered herein. Grantor agrees to execute all instruments and documents that Beneficiary may reasonably require to ratify, confirm and further evidence the lien of this Mortgage on the acquired estate, title or interest.

SECTION 15.3. Beneficiary as Lessee.If the Mortgaged Leases shall be terminated prior to the natural expiration of its term due to default by Grantor or any tenant thereunder, and if, pursuant to the provisions of such Mortgaged Leases, Beneficiary or its designee shall acquire from the lessor a new lease of the Premises, Grantor shall have no right, title or interest in or to such new lease or the leasehold estate created thereby, or renewal privileges therein contained.

SECTION 15.4. No Assignment or Encumbrance.Notwithstanding anything to the contrary contained herein, this Mortgage shall not constitute an assignment or encumbrance on or of any Mortgaged Leases within the meaning of any provision thereof prohibiting its assignment or encumbrance and Beneficiary shall have no liability or obligation thereunder by reason of its acceptance of this Mortgage. Beneficiary shall be liable for the obligations of the tenant arising out of any Subject Lease for only that period of time for which Beneficiary is in possession of the premises demised thereunder or has acquired, by foreclosure or otherwise, and is holding all of Grantor's right, title and interest therein.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Grantor has caused this Deed of Trust to be duly executed and delivered under seal the day and year first above written.

**ROCKWELL MINING, LLC**, a Delaware limited liability company

By: [signature]
Name: Elizabeth Nicholas
Title: General Counsel

ACKNOWLEDGMENT

STATE OF KENTUCKY

COUNTY OF FAYETTE, to-wit:

The foregoing instrument was acknowledged before me this 22 day of JANUARY 2020, by Elizabeth Nicholas, as General Counsel of Rockwell Mining, LLC, a Delaware limited liability company, Grantor herein, on behalf of said company, in the aforesaid County and State.

My commission expires: 08-02-2021.

[signature]
Notary Public
NOTARY ID #584283

[SEAL]

Case 2:20-cv-00487 Document 105-26 Filed 11/22/21 Page 33 of 46 PageID #: 1917

# Schedule A — Legal Description

Owned Premises

None

Mortgaged Leases

Schedule B

| Contract Number | Mine Complex | Assignor | Assignee | Instrument | County |
|---|---|---|---|---|---|
| 5102001F | Rocklick | Eastern Associated Coal, LLC | Rockwell Mining, LLC | Indenture of Lease (including subsequent supplements adding acreage to original leased premises) dated July 1, 1937 between Pocahontas Land Corporation (successor-in-interest to Loup Creek Colliery Company) and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp. (successor-in-interest to Eastern Gas and Fuel Associates (successor-in-interest to The Koppers Company)), of record in Lease Book 5, Page 74 in the Office of the Clerk of the County Commission of Boone County, West Virginia and in Lease Book 88, Page 328 in the Office of the Clerk of the County Commission of Wyoming County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. Assigned to Eastern Associated Coal Corp. (n/k/a Eastern Associated Coal, LLC) by Eastern Gas and Fuel Associates by Deed of Assignment and Consent dated January 1, 1966, of record in Book 224, Page 123 in the Office of the Clerk of the County Commission of [Boone][Logan] County, West Virginia and Book ___, Page 182 in the Office of the Clerk of the County Commission of [Boone][Logan] County, West Virginia. | Boone<br>Logan<br>Wyoming |

| | | | | | |
|---|---|---|---|---|---|
| 0865-003-00 | Rocklick | Eastern Associated Coal, LLC | Rockwell Mining, LLC | Deed of Lease dated March 1, 1968 between Pardee Minerals LLC (successor-by-merger to Pardee Resources Group, Inc. (f/k/a Pardee Exploration Company) d/b/a Pardee Land Company and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.), of record in Lease Book 12, Page 193 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. | Boone |
| 0865-005-00 | Rocklick | Eastern Associated Coal, LLC | Rockwell Mining, LLC | Deed of Lease dated July 1, 1942 between Rowland Land Company and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) (successor-in-interest to Eastern Gas and Fuel Associates), of record in Lease Book 13, Page 1 in the Office of the Clerk of the County Commission of Raleigh County, West Virginia, of record in Lease Book 5, Page 74 in the Office of the Clerk of the County Commission of Boone County, West Virginia and in Lease Book 88, Page 328 in the Office of the Clerk of the County Commission of Wyoming County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. Assigned to Eastern Associated Coal Corp. (n/k/a Eastern Associated Coal, LLC) by Eastern Gas and Fuel Associates by Deed of Assignment and Consent dated January 1, 1966, of record in Book 32, Page 137 in the Office of the Clerk of the County Commission of Boone County, West Virginia. | Boone<br>Raleigh<br>Wyoming |

| | | | | | |
|---|---|---|---|---|---|
| 0860-003-00 | Wells | Pine Ridge Coal Company, LLC | Rockwell Mining, LLC | Supplemental Agreement of Lease effective January 1, 1977 (dated March 10, 1978) between Berwind Land Company and Pine Ridge Coal Company, LLC (successor-in-interest to Peabody Coal Company (n/k/a Heritage Coal Company, LLC) (successor-in-interest to Armco Steel Corporation)) (unrecorded), as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. The Lease Assignment and Assumption Agreement dated February 13, 1984 between Armco Steel Corporation and Peabody Coal Company is of record in the Office of the Clerk of the County Commission of Boone County, West Virginia at Book 20, Page 672, and in the Office of the Clerk of the County Commission of Raleigh County at Book 52, Page 275. Assigned to Pine Ridge Coal Company by Peabody Coal Company (n/k/a Heritage Coal Company, LLC) by Berwind Lease Assignment and Assumption Agreement dated October 16, 1994 (unrecorded).<br><br>Tracts of land situated in Boone and Raleigh Counties, situate on the Marsh Fork of Big Coal River, and on the West Fork of the Pond Fork of Little Coal River. | Boone<br><br>Raleigh |
| 0793-001 | Wells | Rivers Edge Mining LLC | Rockwell Mining, LLC | Lease between Gary A. Dempsey and Freda Dempsey and Rivers Edge Mining LLC (f/k/a Rivers Edge Mining, Inc.) dated March 26, 2001. | Boone |
| 0793-001-01 | Wells | Rivers Edge Mining LLC | Rockwell Mining, LLC | Easement Agreement between Gary A. Dempsey and Freda Dempsey and Rivers Edge Mining (f/k/a Rivers Edge Mining, Inc.) dated January 25, 2002. | Boone |
| 0793-002 | Wells | Rivers Edge Mining LLC | Rockwell Mining, LLC | Lease between Paul Ray Horsman and Cynthia Horsman and Rivers Edge Mining LLC (f/k/a Rivers Edge Mining, Inc.) dated April 10, 2001. | Boone |
| 0793-002-01 | Wells | Rivers Edge Mining LLC | Rockwell Mining, LLC | Easement Agreement between Paul Ray Horsman and Cynthia Horseman and Rivers Edge Mining LLC (f/k/a Rivers Edge Mining, Inc.) dated February 12, 2002. | Boone |
| 0793-003 | Wells | Rivers Edge Mining LLC | Rockwell Mining, LLC | Lease between Melvin L. Jarrell and Norma Jean Jarrell and Rivers Edge Mining LLC (f/k/a Rivers Edge Mining, Inc.) dated March 30, 2001. | Boone |

| | | | | | |
|---|---|---|---|---|---|
| 0866-033 | Wells | Eastern Associated Coal, LLC | Rockwell Mining, LLC | Right of Way Agreement between Western Pocahontas Properties Limited Partnership and Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.) dated May 1, 1995. | Boone |
| 0794-006 | Black Stallion | Black Stallion Coal Company, LLC | Rockwell Mining, LLC | Lease Agreement between Jeffrey Sampson and Black Stallion Coal Company, LLC dated January 1, 2012 (unrecorded). | Boone |
| 0794-004 | Black Stallion | Black Stallion Coal Company, LLC | Rockwell Mining, LLC | Lease Agreement between Larry Woodie and Nada Woodie and Black Stallion Coal Company, LLC dated July 1, 2005 (unrecorded). | Boone |
| W-LF-13 | | Eastern Associated Coal, LLC | Rockwell Mining, LLC | Surface Lease between CSX Transportation and Eastern Associated Coal, LLC dated July 1, 1977. | Boone |

| | | | | | |
|---|---|---|---|---|---|
| 0883-011-00 | Wells | Eastern Royalty, LLC | Rockwell Mining, LLC | Supplemental Agreement of Lease effective January 1, 1977 (dated March 10, 1978) between Berwind Land Company and Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to Performance Coal Company (successor-in-interest to Peabody Coal Company (n/k/a Heritage Coal Company, LLC) (successor-in-interest to Armco Steel Corporation))) (unrecorded), as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments.<br><br>Tracts of land situated in Boone and Raleigh Counties, situate on the Marsh Fork of Big Coal River, and on the West Fork of the Pond Fork of Little Coal River. | Boone Raleigh |
| 0883-012-00 | Wells | Eastern Royalty, LLC | Rockwell Mining, LLC | Agreement of Lease dated August 15, 1995 between Berwind Land Company and Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to New River Energy Corporation (f/k/a Federal Development Corporation)) (unrecorded), as amended by Amendment to Lease dated August 31, 2005. Assigned to Eastern Royalty Corp. (n/k/a Eastern Royalty, LLC) by New River Energy Corporation by Partial Assignment and Assumption Agreement (Berwind No. 2 Gas Reserves) dated August 31, 2005 (unrecorded).<br><br>Tracts of land situate on the West Fork and Pond Fork of the Little Coal River, Crook District, Boone County. | Boone |
| 0883-005 | Wells | Eastern Royalty, LLC | Rockwell Mining, LLC | Amended and Restated Lease dated June 16, 2003 between Penn Virginia Operating Co., LLC (successor-by-merger to Penn Virginia Coal Company) and Rockwell Mining, LLC (successor-in-interest to Easter Royalty, LLC (f/k/a Eastern Royalty Corp.))) (unrecorded), as amended by First Amendment to Lease effective December 1, 2003. | Boone |

Case 2:20-cv-00487 Document 105-26 Filed 11/22/21 Page 39 of 46 PageID #: 1923

| | | | | | |
|---|---|---|---|---|---|
| 0883-011-00 | Wells | Eastern Royalty, LLC | Rockwell Mining, LLC | Supplemental Agreement of Lease effective January 1, 1977 (dated March 10, 1978) between Berwind Land Company and Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to Performance Coal Company (successor-in-interest to Peabody Coal Company (n/k/a Heritage Coal Company, LLC ) (successor-in-interest to Armco Steel Corporation))) (unrecorded), as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments.<br><br>Tracts of land situated in Boone and Raleigh Counties, situate on the Marsh Fork of Big Coal River, and on the West Fork of the Pond Fork of Little Coal River. | Boone<br><br>Raleigh |
| 0883-012-00 | Wells | Eastern Royalty, LLC | Rockwell Mining, LLC | Agreement of Lease dated August 15, 1995 between Berwind Land Company and Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to New River Energy Corporation (f/k/a Federal Development Corporation)) (unrecorded), as amended by Amendment to Lease dated August 31, 2005. Assigned to Eastern Royalty Corp. (n/k/a Eastern Royalty, LLC) by New River Energy Corporation by Partial Assignment and Assumption Agreement (Berwind No. 2 Gas Reserves) dated August 31, 2005 (unrecorded)<br><br>Tracts of land situate on the West Fork and Pond Fork of the Little Coal River, Crook District, Boone County. | Boone |

| Contract Number | Mine Complex | Instrument | County |
|---|---|---|---|
| 0894-002 | Rocklick | Agreement of Lease dated January 29, 1946 between Shepard Boone Coal Company, LLC (successor-in-interest to Donald D. Shepard and Emily H. Shepard) and Rockwell Mining, LLC (successor-in-interest to Hillside Mining Company, LLC (f/k/a Hillside Mining Company) (successor-in-interest to Eastern Associated Coal Corp. (successor-in-interest to Eastern Gas and Fuel Associates))), of record in Coal Lease Book 6, Page 1 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. The Deed of Assignment and Consent between Eastern Gas and Fuel Associates and Eastern Associated Coal Corp. dated January 1, 1966 is of record in Book 112, Page 103 in the aforementioned Clerk's office. | Boone |
| 0793-006 | Wells | Agreement of Lease dated January 29, 1946 between Shepard Boone Coal Company, LLC (successor-in-interest to Donald D. Shepard and Emily H. Shepard) and Rockwell Mining, LLC (successor-in-interest to Rivers Edge Mining, LLC (successor-in-interest to Eastern Associated Coal Corp. (successor-in-interest to Eastern Gas and Fuel Associates))), of record in Coal Lease Book 6, Page 1 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments and as modified by Partial Lease Assignment and Assumption Agreement (Bank One Lease) effective February 1, 2004 between Rivers Edge Mining, Inc. (n/k/a Rivers Edge Mining, LLC), Eastern Royalty Corp. and Eastern Associated Coal Corp. The Deed of Assignment and Consent between Eastern Gas and Fuel Associates and Eastern Associated Coal Corp. dated January 1, 1966 is of record in Book 112, Page 103 in the aforementioned Clerk's office. | Boone |
| 0883-008 | Wells | Agreement of Lease dated January 29, 1946 between Shepard Boone Coal Company, LLC (successor-in-interest to Donald D. Shepard and Emily H. Shepard) and Rockwell Mining, LLC (successor-in-interest to Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to Rivers Edge Mining, LLC (successor-in-interest to Eastern Associated Coal Corp. (successor-in-interest to Eastern Gas and Fuel Associates)))), of record in Coal Lease Book 6, Page 1 in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time by recorded or unrecorded instruments. The Deed of Assignment and Consent between Eastern Gas and Fuel Associates and Eastern Associated Coal Corp. dated January 1, 1966 is of record in Book 112, Page 103 in the aforementioned Clerk's office. | Boone |

| | | | |
|---|---|---|---|
| 0865-001 | Rocklick | Deed of Lease dated January 1, 1968 between WPP, LLC (successor-in-interest to Washington and Old Dominion Railroad) and Rockwell Mining, LLC (successor-in-interest to Eastern Associated Coal, LLC (f/k/a Eastern Associated Coal Corp.)), of record in Coal Lease Book 12, Page 167 in the Office of the Clerk of the County Commission of Boone County, West Virginia, and in Book 34, Page 211 in the Office of the Clerk of the County Commission of Raleigh County, West Virginia, as modified, amended and supplemented by (i) Supplemental Agreement of Lease dated July 7, 1969; (ii) Agreement of Lease and Release dated April 15, 1974; (iii) Agreement dated April 1, 1975; (iv) Partial Release of Deed of Lease dated October 15, 1994; (v) Amendment to Lease dated December 24, 1997; (vi) Letter Agreement dated November 14, 2001; (vii) Letter Agreement dated March 5, 2002; (viii) Settlement Agreement and Release dated June 7, 2002; (ix) Letter Agreement dated August 18, 2008; and (x) Partial Surrender of Lease dated December 30, 2010. | Boone<br>Raleigh |
| 0883-013 | Wells | Coal Mining Lease dated October 15, 1994 between WPP, LLC (successor-in-interest to Western Pocahontas Properties Limited Partnership) and Rockwell Mining, LLC (successor-in-interest to Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to Performance Coal Company)) (unrecorded). Assigned to Eastern Royalty Corp. (n/k/a Eastern Royalty, LLC) by Performance Coal Company by Partial Assignment and Assumption Agreement (WPP Reserves) dated August 31, 2005 (unrecorded). | Boone |
| 0883-014 | Wells | Deed of Lease dated January 1, 1956 between WPP, LLC (successor-in-interest to Western Pocahontas Properties Limited Partnership) and Rockwell Mining, LLC (successor-in-interest to Eastern Royalty, LLC (f/k/a Eastern Royalty Corp.) (successor-in-interest to Boone East Development Co. (successor-in-interest to Bethlehem Steel Corporation (successor-in-interest to Oglebay Norton Company (successor-in-interest to Truax-Traer Coal Company))))), of record in Lease Book 9, Page 219, in the Office of the Clerk of the County Commission of Boone County, West Virginia, as the same may have been amended, supplemented, extended, restated, assigned, partially assigned, subleased, partially released or otherwise modified from time to time y recorded or unrecorded instruments. | Boone |

| Blackhawk Contract No. | Patriot Assignor | Blackhawk Assignee | Counter Party | Agreement Date | Company Use | Location | CSX Contract No. | County |
|---|---|---|---|---|---|---|---|---|
| 0884-005 5101039X | Black Stallion Coal Company, LLC | Rockwell Mining, LLC | CSX Transportation | 6/17/2005 | Private Crossing & Replacement Cost | MP CLH 7.69 - Stark, WV | DOT 926217X | Boone |
| 5102005X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transportation | 6/12/1929 | Water Pipeline Crossing | MP CLI 19.03 - Wharton, WV | COL 06434 | Boone |
| 5102006X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transportation | 8/21/1989 | Private Crossing & Replacement Cost | MP CLI 20.34 - Barrett, WV | CSX 010589 | Boone |
| 5102007X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transportation | 6/5/1948 | Gas Pipeline Longitudinal | MP CLI 20.87 to CLI 21.12 - Wharton, WV | COL 20841 | Boone |
| 5102008X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transportation | 10/30/1948 | Powerline Crossing | MP CLI 18.37 - Bim, WV | COL 21126 | Boone |
| 5102009X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transportation | 8/30/1948 | Powerline Crossing | MP CLI 19.60 - Wharton, WV | COL 21176 | Boone |
| 5102010X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transportation | 1/25/1949 | Powerline Crossing | MP CLI 19.96 - Wharton, WV | COL 21313 | Boone |
| 5102011X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transportation | 6/13/1951 | Powerline Crossing | MP CLI 19.60 - Wharton, WV | COL 23199 | Boone |
| 866-039 5101027X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transportation | 7/1/1996 | Private Crossing & Replacement Cost | MP CLI 18.00 - Wharton, WV | CSX 023107 | Boone |
| 866-034 5101026X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transportation | 8/8/1995 | Private Crossing & Replacement Cost | MP CLI 25.00 - Lick, WV | CSX 023303 | Boone |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 5102012X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 1/15/1973 | Private Crossing & Replace-ment Cost | MP CLI 19.61 - Barrett, WV | COL 35934 | Boone |
| 866-014<br>5102013X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 7/15/1987 | Private Crossing & Replace-ment Cost | MP CLI 17.91 to 18.00 - Wharton, WV | CSX 003691 | Boone |
| 5102014X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 11/3/1975 | Private Crossing & Replace-ment Cost | MP CLI 27.19 - Bald Knob, WV | COL 37011 | Boone |
| 5102015X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 9/29/1976 | Powerline Crossing | MP CLI 18.24 - Wharton, WV | COL 37227 | Boone |
| 5102016X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 1/6/1977 | Water Pipeline Crossing | MP CLI 18.35 - Wharton, WV | COL 37292 | Boone |
| 5102017X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 1/24/1977 | Powerline Crossing | MP CLI 18.00 - Wharton, WV | COL 37293 | Boone |
| 5101037X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 6/4/1985 | Powerline Crossing | MP CLI 25.05 - Bald Knob, WV | COL 40590 | Boone |
| 866-017<br>5101038X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 9/3/1985 | Private Crossing & Replace-ment Cost | MP CLI 19.69 - Wharton, WV | COL 40627 | Boone |
| 0866-044<br>5101028X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 1/30/2001 | Conveyor Belt Crossing | MP CLI 18.7 - Wharton, WV | CSX 040826 | Boone |
| 0793-007<br>5101034X | Rivers Edge Mining LLC | Rockwell Mining, LLC | CSX Transpor-tation | 9/9/2002 | Private Crossing & Replace-ment Cost | MP CLI 16.60 - Wharton, WV | CSX 041349 | Boone |
| 0793-009<br>5101035X | Rivers Edge Mining LLC | Rockwell Mining, LLC | CSX Transpor-tation | 4/9/2003 | Powerline Crossing | MPL CLI 16.59 - Bim, WV | CSX 045225 | Boone |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 0794-005<br>5101036X | Black Stallion Coal Company, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 6/17/2005 | Conveyor Belt Crossing | MP CLI 17.98 - Wharton, WV | CSX 048693 | Boone |
| W-LF-14 to 20<br>5102018X | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 12/18/2013 | Sidetrack - Wells | MP CLI 17.89 - Wharton, WV | CSX 051235 | Boone |
| 0866-005 | Eastern Associated Coal, LLC | Rockwell Mining, LLC | CSX Transpor-tation | 5/16/1986 | Sidetrack - Rocklick | MP CLI 25.00 - Lick, WV | | Boone |

Being the same instruments assigned to Rockwell Mining, LLC, a Delaware limited liability company, pursuant to the following instruments:

1. Lease Assignment and Assumption Agreement from Eastern Associated Coal, LLC, a West Virginia limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 281 in the Office of the Clerk of the County Commission of Boone County, West Virginia.

2. Lease Assignment and Assumption Agreement from Eastern Royalty, LLC, a Delaware limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 291 in the Office of the Clerk of the County Commission of Boone County, West Virginia.

3. Lease Assignment and Assumption Agreement from Hillside Mining, LLC a West Virginia limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 305, in the Office of the Clerk of the County Commission of Boone County, West Virginia.

4. Lease Assignment and Assumption Agreement from Pine Ridge Coal Company, LLC, a Delaware limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 322, in the Office of the Clerk of the County Commission of Boone County, West Virginia.

5. Lease Assignment and Assumption Agreement from Rivers Edge Mining LLC, a Delaware limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 316, in the Office of the Clerk of the County Commission of Boone County, West Virginia.

6. Lease Assignment and Assumption Agreement from Black Stallion Coal Company, LLC, a West Virginia limited liability company, dated October 22, 2015, effective as of October 26, 2015, of record in Book 4, Page 355, in the Office of the Clerk of the County Commission of Boone County, West Virginia.

Case 2:20-cv-00487 Document 105-26 Filed 11/22/21 Page 45 of 46 PageID #: 1929

Schedule C

Other Rights

None

# EXHIBIT Z

| Checkbook ID | Check Date | Check No. | Vendor Name | Check Amount | Voided | Document Type | Vendor ID | 1937 Portion | Month | Month | Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 197,241.82 | | | |
| BRL AGENCY ACCT | 6/10/2020 | EFT000000003896 | POCAHONTAS LAND LLC | 90,178.68000 | No | Payment | 7162 | 8,876.31 | 6-2020 | | |
| BRL AGENCY ACCT | 6/23/2020 | EFT000000003922 | POCAHONTAS LAND LLC | 52,568.94000 | No | Payment | 7162 | 7,540.01 | 6-2020 | | |
| BRL AGENCY ACCT | 6/25/2020 | EFT000000003926 | POCAHONTAS LAND LLC | 18,254.71000 | No | Payment | 7162 | - | 6-2020 | | |
| BRL AGENCY ACCT | 7/23/2020 | EFT000000004034 | POCAHONTAS LAND LLC | 62,794.96000 | No | Payment | 7162 | 4,746.04 | 7-2020 | | |
| BRL AGENCY ACCT | 8/24/2020 | EFT000000004208 | POCAHONTAS LAND LLC | 45,017.30000 | No | Payment | 7162 | 9,755.02 | 8-2020 | | |
| BRL AGENCY ACCT | 8/25/2020 | EFT000000004214 | POCAHONTAS LAND LLC | 51,471.05000 | No | Payment | 7162 | - | 8-2020 | | |
| BRL AGENCY ACCT | 9/24/2020 | EFT000000004237 | POCAHONTAS LAND LLC | 145,939.65000 | No | Payment | 7162 | 16,231.35 | 9-2020 | | |
| BRL AGENCY ACCT | 10/23/2020 | EFT000000004336 | POCAHONTAS LAND LLC | 231,287.68000 | No | Payment | 7162 | 11,516.78 | 10-2020 | | |
| BRL AGENCY ACCT | 11/24/2020 | EFT000000004428 | POCAHONTAS LAND LLC | 81,664.05000 | No | Payment | 7162 | 12,477.89 | 11-2020 | | |
| BHMCORP-1STTRUS | 11/24/2020 | WIRE 112420 7162 | POCAHONTAS LAND LLC | 343,749.74000 | No | Payment | 7162 | - | 11-2020 | | |
| BHMCORP-1STTRUS | 11/25/2020 | EFT000000024774 | POCAHONTAS LAND LLC | 57,420.33000 | No | Payment | 7162 | - | 11-2020 | 6-2020 | 16,416.32 |
| BHMCORP-1STTRUS | 12/4/2020 | EFT000000024867 | POCAHONTAS LAND LLC | 76,132.46000 | No | Payment | 7162 | - | 12-2020 | 7-2020 | 4,746.04 |
| BRL AGENCY ACCT | 12/22/2020 | EFT000000004525 | POCAHONTAS LAND LLC | 176,070.75000 | No | Payment | 7162 | 15,317.94 | 12-2020 | 8-2020 | 9,755.02 |
| BHMCORP-1STTRUS | 1/7/2021 | WIRE 010721 7162 | POCAHONTAS LAND LLC | 40,000.00000 | No | Payment | 7162 | - | 1-2021 | 9-2020 | 16,231.35 |
| BRL AGENCY ACCT | 1/25/2021 | EFT000000004616 | POCAHONTAS LAND LLC | 310,877.30000 | No | Payment | 7162 | 11,535.20 | 1-2021 | 10-2020 | 11,516.78 |
| BRL AGENCY ACCT | 2/25/2021 | EFT000000004715 | POCAHONTAS LAND LLC | 251,641.01000 | No | Payment | 7162 | 13,295.11 | 2-2021 | 11-2020 | 12,477.89 |
| BRL AGENCY ACCT | 3/25/2021 | EFT000000004816 | POCAHONTAS LAND LLC | 105,195.49000 | No | Payment | 7162 | 7,472.82 | 3-2021 | 12-2020 | 15,317.94 |
| BRL AGENCY ACCT | 3/25/2021 | EFT000000004822 | POCAHONTAS LAND LLC | 343,749.54000 | No | Payment | 7162 | - | 3-2021 | 1-2021 | 11,535.20 |
| BRL AGENCY ACCT | 4/26/2021 | EFT000000004839 | POCAHONTAS LAND LLC | 181,119.91000 | No | Payment | 7162 | 11,162.11 | 4-2021 | 2-2021 | 13,295.11 |
| BRL AGENCY ACCT | 5/25/2021 | EFT000000004885 | POCAHONTAS LAND LLC | 208,133.84000 | No | Payment | 7162 | 11,088.04 | 5-2021 | 3-2021 | 7,472.82 |
| BHMCORP-1STTRUS | 6/10/2021 | EFT000000028025 | POCAHONTAS LAND LLC | 15,000.00000 | No | Payment | 7162 | - | 6-2021 | 4-2021 | 11,162.11 |
| BRL AGENCY ACCT | 6/24/2021 | EFT000000004915 | POCAHONTAS LAND LLC | 171,684.27000 | No | Payment | 7162 | 13,167.43 | 6-2021 | 5-2021 | 11,088.04 |
| BHMCORP-1STTRUS | 7/26/2021 | EFT000000028679 | POCAHONTAS LAND LLC | 236,999.43000 | No | Payment | 7162 | 11,807.65 | 7-2021 | 6-2021 | 13,167.43 |
| BRL AGENCY ACCT | 8/24/2021 | EFT000000005012 | POCAHONTAS LAND LLC | 139,545.27000 | No | Payment | 7162 | 6,350.52 | 8-2021 | 7-2021 | 11,807.65 |
| BHMCORP-1STTRUS | 9/23/2021 | EFT000000029723 | POCAHONTAS LAND LLC | 193,075.35000 | No | Payment | 7162 | 14,010.61 | 9-2021 | 8-2021 | 6,350.52 |
| BHMCORP-1STTRUS | 9/28/2021 | WIRE 092821 POCA | POCAHONTAS LAND LLC | 74,078.47000 | No | Payment | 7162 | - | 9-2021 | 9-2021 | 14,010.61 |
| BRL AGENCY ACCT | 10/25/2021 | EFT000000005165 | POCAHONTAS LAND LLC | 98,100.06000 | No | Payment | 7162 | 10,890.99 | 10-2021 | Oct-21 | 10,890.99 |